IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| GERMAN C. SINISTERRA, | ) | |
| BOP # 11582-045 | ) | |
| Terre Haute Federal Penitentiary, USP | ) | |
| | ) | |
| Petitioner, | ) | No. 04-CV-8003-GAF |
| | ) | |
| v. | ) | Hon. Gary A. Fenner |
| | ) | |
| UNITED STATES OF AMERICA, | ) | **DEATH SENTENCE IMPOSED** |
| | ) | |
| Respondent. | ) | |

**FIRST AMENDED MOTION OF GERMAN C. SINISTERRA TO VACATE, SET ASIDE OR CORRECT CONVICTIONS AND SENTENCES PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

Comes now German C. Sinisterra, an inmate at the United States Penitentiary at Terre Haute, Indiana under sentence of death, by and through court-appointed counsel, John Jenab and William E. Shull, and pursuant to 28 U.S.C. § 2255, moves the Court to vacate, set aside and correct his convictions and sentences of death because he was convicted and sentenced to death in violation of the United States Constitution. In support of this motion, Sinisterra states as follows:

**PROCEDURAL HISTORY**

1. Sinisterra is attacking his convictions and sentences entered against him in the District Court, Western District of Missouri, Western Divison, located in Kansas City, Missouri in Case Number 98-00311-02-CR-W-4.

2. The judgment of convictions and sentences was entered on December 18, 2000.

3. Sinisterra's sentences are:

a. 324 months on Count 1, consecutive to the sentences of death on Counts 2 and 3;

b. Death on Counts 2 and 3.

4. Sinisterra was charged in a Second Superseding Indictment with three counts as follows:

a. Count 1, conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) & 21 U.S.C. § 846;

b. Count 2, aiding and abetting the use of a firearm in relation to a drug trafficking crime and the commission of murder in the perpetration of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1), (j)(1) & 18 U.S.C. § 2;

c. Count 3, interstate travel with intent to commit murder for hire, in violation of 18 U.S.C. § 1958 & 18 U.S.C. § 2.

5. Sinisterra entered pleas of not guilty.

6. The case went to jury trial commencing April 11, 2000. On April 27, 2000, the jury returned verdicts of guilty as charged on all counts. On May 3, 2000, after penalty phase evidence and arguments were presented, the jury recommended sentences of death on counts 2 and 3.

7. Sinisterra testified during the guilt phase of trial.

8. Sinisterra timely appealed the judgment of conviction.

9. Appeal was taken to the United States Court of Appeals for the Eighth Circuit, which affirmed the convictions and sentences in a published opinion filed

November 5, 2002.  <u>United States v. Ortiz</u>, 315 F.3d 873 (8th Cir. 2002).  The United States Supreme Court denied Sinisterra's petition for writ of certiorari on December 8, 2003.  <u>Sinisterra v. United States</u>, 124 S. Ct. 920 (2003).

10. On December 7, 2004, through court-appointed post-conviction counsel, Sinisterra timely filed an initial motion pursuant to 28 U.S.C. 2255.  Sinisterra was subsequently granted leave to file an amended motion on or before February 28, 2006.

11. Other than his direct appeal and motions filed in the instant 2255 case, Sinisterra has not previously filed any petitions, applications or motions with respect to this judgment in any federal court.

**GROUNDS FOR RELIEF AND SUPPORTING FACTS**

12. Sinisterra's convictions and sentences were obtained in violation of the Constitution and the laws and treaties of the United States as follows:

**A.** **Sinisterra's Fifth and Sixth Amendment Rights Were Violated by the Government's Failure to Charge Statutory Aggravating Circumstances in the Indictment**

The second superseding indictment charged Sinisterra and three co-defendants in Count 2 with aiding and abetting the use of a firearm in relation to a drug trafficking crime and the commission of murder in the perpetration of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1), (j)(1) & 18 U.S.C. § 2, and in Count 3 with interstate travel with intent to commit murder for hire, in violation of 18 U.S.C. § 1958 & 18 U.S.C. § 2.  Each of these counts failed to allege at least one statutory aggravating factor from 18 U.S.C. § 3592(c), an element essential required under the Fifth and Sixth Amendments where imposition of a sentence of death is

3

sought.[1]  As a result, the indictment failed to charge a federal capital offense, and Sinisterra's

sentence exceeded the maximum sentence authorized for the crimes with which he was charged.

Sinisterra's trial and appellate counsel were ineffective in failing to preserve this issue at trial and

raise it on direct appeal.  The constitutional violation in this case represents a structural defect

which cannot be deemed harmless beyond a reasonable doubt and which requires that Sinisterra's

sentences of death be vacated and set aside.[2]

> **B.     The FDPA Unconstitutionally Relaxes Penalty Phase Evidentiary Standards**

Sinisterra's sentences of death must be vacated because the Federal Death Penalty Act, 18

U.S.C. § 3593 (FDPA) violates the Fifth, Sixth, Eighth and Fourteenth Amendments in that it

allows for relaxed evidentiary rules during the penalty phase of a capital trial.  The fact that death

eligibility factors operate as the functional equivalent of an element of a greater offense mandates

also a "recognition that the fundamental rights of confrontation and cross-examination and an

evidentiary standard consistent with the adversarial nature of the proceeding must be afforded in

the death-eligibility determination."[3]

An abundance of inflammatory hearsay evidence, which had nothing to do with German

Sinisterra and which could not be confronted or cross-examined, was introduced by the

government during the penalty phase through the testimony of Dennis Conway, a Special Agent

---

[1] See  Ring v. Arizona, 122 S. Ct. 2428 (2002); United States v. Allen, 357 F.3d 745 (8th Cir. 2004), *vacated*, 2004 U.S. App. LEXIS 9190 (8th Cir. May 11, 2004).

[2] See Stirone v. United States, 316 U.S. 212, 215-17 (1960); see also United States v. Johnson, 934 F.2d 936, 941 (8th Cir. 1994).

[3] United States v. Fell, No. 2:01-CR-12-01, slip op. P. 39 (D. Vt. Sept. 24, 2002), *rev'd,* 360 F.3d 135, 143-46 (2d Cir. 2004); cf. United States v. Lee, 374 F.3d 637 (8th Cir. 2004).

with the FBI. This testimony included, for example: (a) unsubstantiated hearsay about "serious" inmate assaults at BOP-Leavenworth "at least once a week" (Tr. 2798); (b) double and triple hearsay relating to a fight between two "Hispanic groups" the previous week in which the "head of the G.27 Spanish group ... felt he was being disrespected by a member of the Latin Kings," shanks were pulled, "everybody got into it ... and nine individuals were stabbed, three hospitalized" (Tr. 2799); (c) gratuitous hearsay references to one of the nation's most notorious killers, Leonard Peltier (Tr. 2801-02); (d) rank hearsay to the effect that inmates use prison telephones for "illegal" purposes "all the time" to "run drug operations," and that "90 percent of the drugs" come in through family visits, (Tr. 2802-04); incredibly prejudicial and utterly unsubstantiated hearsay to the effect that "lifers" are the biggest problem in prisons because they have nothing to lose, "lifers" commit the violent crimes in prison, that "people who go into Leavenworth violent, remain violent," that "the majority" of problem inmates are "enforcers" for the "various gangs" who collect "drug debts that may have been incurred either inside or outside the joint" (Tr. 2804-05, 2811).

All of this hearsay testimony was extremely powerful and prejudicial, in particular because by its nature it could not be challenged or confronted effectively. The admission of this evidence prejudiced Sinisterra by focusing the jury away from consideration of "full and complete information about the defendant," and away from "an individualized inquiry into the appropriate sentence for the offense,"[4] instead arousing its passion and prejudice with anecdotal horror stories about prison gangs, prison drug traffickers, and prison violence, none of which had anything to do with the defendant. The admission of this evidence violated Sinisterra's Fifth,

---

[4]See Lee, supra (citing United States v. Fell, 360 F.3d at 143).

Sixth and Eighth Amendment rights and therefore his sentences of death must be vacated. Sinisterra's trial and appellate counsel were ineffective in failing to preserve this issue at trial and raise it on direct appeal. The constitutional violation in this case represents a structural defect which cannot be deemed harmless beyond a reasonable doubt and which requires that Sinisterra's sentences of death be vacated and set aside.

### C.    Violation of the Vienna Convention

Article 36 of the Vienna Convention on Consular Relations requires that nationals of one country who are arrested in another country must be advised "without delay" of their right to communicate with a consular officer of their government. Upon the request of an arrested national, the arresting authorities must without delay notify consular officers of the foreign national's home country and permit them full access to the prisoner. Sinisterra's convictions and sentences were obtained in violation of the Vienna Convention on Consular Relations and its Optional Protocol.[5]  By signing this treaty, the United States made solemn commitments to its treaty partners, including Colombia, and to the rule of law. Specifically, the United States committed that detained Colombian nationals would be promptly notified of their right to seek consular assistance, would be provided an opportunity to exercise that right, and that Columbia would be afforded the opportunity to provide consular assistance and protection to its nationals. And by signing and ratifying the Optional Protocol to the Vienna Convention, the United States committed to a dispute resolution mechanism that conferred jurisdiction on the International Court of Justice to resolve conflicts over the interpretation and application of the treaty's

---

[5]*Opened for signature* Apr. 24, 1963, 21 U.S.T. 77.

6

provisions.[6]

On March 31, 2004, the International Court of Justice (ICJ) rendered its judgment in Avena and Other Mexican Nationals.[7] The ICJ held that the United States had violated the rights of Mexico and of its detained nationals under Article 36 of the Vienna Convention. As a remedy for those violations, the ICJ held that the United States must provide review and reconsideration of the convictions and sentences of the individuals whose rights had been violated that gives full effect to the purposes of Article 36.

This Court, as well as the Eighth Circuit Court of Appeals, has held that the United States violated Article 36 of the Vienna Convention in Sinisterra's case.[8] Nonetheless, no remedy for the violation has ever been provided. The Eighth Circuit held that Sinisterra was not entitled to any remedy for the violation because he could not show prejudice resulting from the violation. This conclusion is clearly erroneous and should be reconsidered and corrected for several reasons.

First, the Avena decision held that violations of Article 36 of the Vienna Convention create enforceable rights under international law and that United States courts must review and reconsider any criminal conviction of Mexican nationals where the Vienna Convention has been

[6]Optional Protocol Concerning the Compulsory Settlement of Disputes, art. 1, *opened for signature* Apr. 24, 1963, 21 U.S.T. 325.

[7](Mexico v. United States), 2004 ICJ 128.

[8]See United States v. Ortiz, 315 F.3d 873, 884-85, 887 (8th Cir. 2002) ("As to the Vienna Convention, the District Court found that it had been violated. Ortiz and Sinisterra were told of their Rights under the Convention, but they were also told ... that the police would help them exercise these rights, or would give them an opportunity to exercise them. No such opportunity was ever afforded."; "That the Convention was violated in these cases is not something to be proud of.").

violated. This decision is binding on the United States, which by ratifying the Convention in 1969 made it binding on the federal government under the Supremacy Clause of the United States Constitution. Thus, Sinisterra is entitled to meaningful *de novo* review and reconsideration of the Vienna Convention violation in his case and the appropriate remedy therefor.[9] The Supreme Court had before it this precise issue when it granted certiorari in the case of Medellin v. Dretke,[10] in which the movant was one of the Mexican nationals on death row in the State of Texas and a litigant in Avena. The case had been briefed and argued and awaiting decision when President Bush issued a memorandum to Attorney General Gonzalez stating that: "The United States will discharge its international obligations under the decision in [Avena] by having state courts give effect to the decision in accordance with general principles of comity."[11] Accordingly, the U.S. Supreme Court dismissed the writ of certiorari in Medellin in order to allow the movant to pursue his Vienna Convention issues before the state courts of Texas.[12]

No basis in law or policy supports limitation of the Bush memorandum to state as opposed to federal courts. To the contrary, it is clear that the rationale of the memorandum, and of the Avena decision itself, requires all courts in the United States to give binding effect to the Avena decision. Accordingly, the decision of the Eighth Circuit in Sinisterra's case must be

---

[9]Avena Judgment, para. 153(9); see also Torres v. Oklahoma, No. PCD-04-442 (Okla. Crim. App. May 13, 2004).

[10]125 S. Ct. 686 (2004).

[11]George W. Bush, Memorandum for the Attorney General (Feb. 28, 2005).

[12]125 S. Ct. 2088 (2005).

reevaluated and an appropriate remedy provided.

This conclusion does not depart from traditional legal principles. Throughout our Nation's history, United States courts have recognized their power and duty to enforce rights conferred by self-executing treaties directly through litigation.[13] United States courts also have routinely given effect to treaties conferring rights on foreign nationals, often by limiting the authority of the state and federal governments to prosecute crimes.[14] United States courts also have applied the consular-immunity provisions of the Vienna Convention to decide consular officials' and employees' claims of immunity from federal prosecution.[15] The rights of foreign nationals under consular treaties also are enforceable under federal habeas corpus statutes which allow individuals to challenge "custody in violation of the ... treaties of the United States."[16]

In Wildenhus' Case,[17] the Supreme Court enforced a bilateral consular relations convention between Belgium and the United States. The convention allocated criminal jurisdiction between the Beligian consul and local courts over Belgian sailors trading in American ports. New Jersey sought to prosecute a Belgian crew member for a murder committed in the Port of Jersey City. Asserting its right under the convention to try the crew member, Belgium sought a writ of habeas corpus. The Court sided with Belgium, finding that the consular convention was part of the "supreme law of the land" and that it granted exclusive

---

[13]United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 110 (1801).

[14]United States v. Rauscher, 119 U.S. 407 (1886).

[15]United States v. Cole, 717 F. Supp. 309, 321-25 (E.D. Pa. 1989).

[16]28 U.S.C. § 2241(c)(3).

[17]120 U.S. 1 (1887).

jurisdiction over the offense to Belgium.

This Court should reconsider the Vienna Convention issues in this case as part of this 2255 proceeding. The treaty violation here created legally enforceable rights, and violation of those rights should not be without a remedy. Sinisterra presented ample evidence during pre-trial suppression hearings that the violation of his right of consular notification should have resulted in suppression of his statements and reversal of his underlying convictions. The violation also should have resulted in the preclusion of the death penalty from being sought in this case. The Court should now provide appropriate relief by: (1) reversing the convictions and granting a new trial in which the statements by Sinisterra illegally obtained by the police are suppressed; and (2) prohibiting the government from seeking the death penalty in this case.

**D.** **The Federal Death Penalty Is Disproportionately and Unconstitutionally Applied By Race**

Sinisterra is both black and Hispanic. Sinisterra's death sentences violate the Fifth and Eighth Amendments because the authorization process by which the Department of Justice selects those defendants who will face the death penalty, and subsequent government decisionmaking with respect to plea bargaining, are impermissibly influenced by the defendant's race. See Affidavit of Kevin McNally (attached as Exhibit 1 hereto). The figures compiled by Mr. McNally and the Federal Death Penalty Resource Counsel clearly demonstrate that black people are overrepresented on federal death row to an extent that is so far in excess of their representation in the general population that a violation of equal protection and the Eighth Amendment is abundantly clear. Thus, during 1995-2000, 45% of defendants approved for capital prosecution by DOJ were black, while only 20% were white; under Attorney General

10

Ashcroft, the majority of defendants approved for capital prosecution were black.  Of the 35 defendants currently on death row, 60% are black.

These numbers create a compelling inference that government decisions regarding who will face the death penalty are impermissibly influenced by race, violating equal protection and the Eighth Amendment.

### E.    Ineffective Assistance of Counsel

Sinisterra was denied his constitutional right to the effective assistance of counsel both at trial and on appeal in violation of his Fifth, Sixth and Eighth Amendment rights.  Each of the areas of deficiency identified below represents an example of incompetent performance of counsel that prejudiced Sinisterra's defense.  As to each allegation of ineffective assistance discussed below, and as to all of the allegations cumulatively, had counsel performed competently, there is a reasonable likelihood that the outcome of the trial would have been different.  Strickland v. Washington, 466 U.S. 668, 694 (1984).

1.    Introduction of Testimony That Sinisterra Was A Violent Person Who Killed People for A Living

a.    Factual Background

This case involves charges of a murder-for-hire allegedly performed in retribution for stolen drug money.  The principal defendant, Edwin Hinestroza, was a fugitive at the time of trial.  According to the government's hearsay evidence, Hinestroza's girlfriend claimed to have been beaten and robbed in their apartment in November 1998.  The robbery involved approximately $250,000 in drug proceeds.  Hinestroza was concerned that his Colombian suppliers, who were known as "the Office," would conclude that he and his girlfriend had faked the incident and that Hinestroza had stolen the money himself.  Hinestroza therefore concocted a

plan to blame the theft on two of his own distributors, Julian Colon and Heberth Andres Borja-Molina, and murder them.  In a deadly bait-and-switch, however, he told Borja-Molina and Colon that the robbery and theft had been committed by one of their distribution customers, Percy White aka "YC."  Hinestroza thus recruited Borja-Molina and Colon to assist him in capturing, beating and probably killing YC.  The set-up was revealed, however, as the two would-be-killers entered YC's house and were themselves taped and beaten, allegedly by Hinestroza, Sinisterra, Ortiz and Tello.  Ultimately, Colon was shot in the back of the head and killed.  Borja-Molina also had a shot fired near him that, somewhat miraculously,  missed.  Both men allegedly were thought to be dead, however, and were loaded into the trunk of Borja-Molina's car, which was then ditched near a park in Kansas City, Missouri.[18]

b.      <u>Inadmissible, Prejudicial Testimony</u>

At trial, Borja-Molina testified that he became concerned about a possible double-cross when he saw Sinisterra's truck at YC's house:

Q:      Why were you scared when you saw Waja's [Sinisterra's] truck?

A:      I knew he had come along and I knew what he do.

Q:      What does he do?

A:      <u>He kills people for a living</u>.

Q:      How do you know that?

A:      I remember the first time I went to his house, <u>the guy I used to work with in Houston, he told me he's bad</u>. [Objection] ... From my personal experience, one time I got beaten up by this guy who jumped me. ... Some week later, I saw Waja

---

[18]<u>See</u> <u>generally</u> Tr. 1196-1232 (testimony of Heberth Andres Borja-Molina).

and I told him what happened. He said, man, give me a picture of that guy and wait a little bit and I will take care of it. <u>I go, are you going to beat his butt and he said, no, not beat his butt, pop him up, which means kill him. And he told me he charged cheap, charged two thousand dollars.</u>

Tr. 1218-20 (emphasis added). The objection by defense counsel noted above was only as "to what Botija said as hearsay. No indication this was made as part of the conspiracy ... ." Tr. 1219. This objection was overruled. <u>Id</u>. No objection was made on any other ground.

On cross-examination, Sinisterra's own counsel actually elicited more bad acts evidence. <u>See</u> Tr. at 1321 (Q: And did you and he ever have any other conversations about popping anybody's ass? ... A: Another time he told me how he got this one guy in the park and shot him in some park in Houston, told me how he popped him in the leg.").

Further, during cross-examination by co-defendant Tello, Molina's videotaped statement to the police on the day after the murder was played for the jury. The tape included Molina's statement that Hinestroza had told him that the Office always sent "the same bad people" to commit murders, and "for this type of stuff they always send the same guys to kill." (Tr. 1442-47) No objection to this statement was made by Sinisterra's counsel.

Government witness Edward Ortiz (Borja-Molina's brother) also testified on <u>cross-examination</u> by Sinisterra's counsel as follows:

Q: And did you know Waja as somebody who would sometimes pick up cars as part of his work in the drug conspiracy?

A: Well, before when I was around Edwin I used to call him GiGi, and me and my brother, <u>Edwin said if you needed to go smoke somebody, kill, just call Waja, just</u>

13

> give him the money.

Q:      My question did you know Waja to be somebody that transported cars?

A:      Oh, no.

Tr. 1774 (emphasis added).  No objection was made to the nonresponsive answer.

All of the prior bad acts and reputation evidence introduced against Sinsiterra at trial was extremely, almost incalculably, prejudicial to the defense case.  The government used and misused it repeatedly in guilt phase closing to portray Sinisterra as a vicious, cold-blooded, professional killer.  See, e.g., Tr. at 2458 (inaccurately – and without objection – recounting Edward Ortiz's testimony as being "I met him through Hinestroza who told [me] that Waja was a killer, a person who grabbed them up.  Remember they said he just grabbed them up and he killed them and he kills them for money."); Tr. at 2460 (Hinestroza "told them the office always sends the same bad people to do any killing that is necessary.  Again this is consistent with what people knew about Waja before he arrived"); Tr. at 2462 ("They become frightened because they see the truck of German Sinisterra and they know, they know he kills people and they know that something very bad is going to happen. ...  They know what Sinisterra does for a living.  Remember Sinisterra had previously offered to kill somebody for Heberth Andres Borja-Molina for 25 hundred dollars."); Tr. at 2464 ("Imagine, ladies and gentlemen, the person who is wrapping duct tape around your head is a person you know takes care of killing for the drug organization you work.  Think about it as the tape is going around and he knows it's Waja, the hired killer.").   This evidence was even more prejudicial at the penalty phase, where the government used it with devastating effect to eviscerated the penalty phase testimony of Sinisterra's family and friends – people who had known him his whole life – and to support its

allegation of future dangerousness, urging the jury to impose the death penalty on the "stone cold killer." (Tr. 2887, 2912)[19]

None of this incredibly prejudicial evidence should have been admitted at trial. All of it amounted to reputation and/or 404(b) evidence, for which no evidentiary foundation was laid. All of it was hearsay attributable to Hinestroza, for which no evidentiary exception existed, except for the testimony that was incompetently elicited from Borja-Molina by Sinisterra's own attorney. All of it was extremely prejudicial, and none was probative of any fact in issue. Alternatively, any marginal relevance was vastly outweighed by the extreme prejudice to Sinisterra. None of the evidence was intrinsic to the crime charged or necessary to an understanding of the relevant facts. Indeed, the only fact in evidence to which any of this testimony related even remotely was Borja-Molina's claim that his uncle Julian Colon, the homicide victim in the case, wrote down Sinisterra's license plate number because he knew Sinisterra was a killer and so Colon was afraid that he himself might die that night. (Tr. at 1218)

Upon analysis, this claim makes no sense. Borja-Molina's statement to the police the day after Colon's murder, which was played for the jury (Tr. 1442-47), gave another and far more reasonable explanation for Colon's actions:

Molina:     We wrote down the plate number and then my uncle gave it to his wife.

Kilkenny:     How did he do that? How did he give it to her?

---

[19]See Tr. 2910 ("And the most telling thing, the most telling thing about whether or not he had done this before, recall this, here we have two armed individuals, Julian Colon and Heberth Andres Borja-Molina, they see his truck. They are in mortal fear – because they know, they know exactly what that man is. They know German Sinisterra better than any one of his character witnesses. They know what he's capable of. They were so scared they call Savannah Colon, if you don't see us again it's because of this man, not Edwin Hinestroza, this man was responsible for our murder.")

Molina:        He called, he called her phone and told her.

...

Kilkenny:      Why did you do that?

Molina:        Because he was scared, 'cause he was telling me he had a bad feeling about that.

Kilkenny:      [inaudible]

Molina:        He was telling me <u>he had a bad feeling about Eddie being so nice and you know about those people because Eddie told him that he didn't want to go by hisself and we need other people</u>.

(Emphasis added.)  This explanation – that Colon was scared because Eddie was being suspiciously nice and was claiming without explanation that other people were needed – makes far more sense than the one offered by Molina at trial.  After all, the "work" that Molina and Colon were going to perform for Hinestroza was, or so they thought, very likely going to involve murder – specifically, the murder of YC, one of Hinestroza's regular drug customers.  Molina and Colon were armed to the teeth and ready to kill YC. (Tr. 1346).  It defies logic, then, that the reason they would be scared when they saw Sinisterra's truck was his supposed reputation as a killer.  Indeed, if help <u>was</u> needed for a killing, the help of a supposedly known killer would be a source of comfort, not fear.  Rather, as Molina said to the police, he and Colon were afraid because <u>Hinestroza's</u> behavior was suspicious, and they did not see why more people were <u>needed</u> for the job.  In short, the incredibly prejudicial testimony about Sinisterra's alleged reputation as a hired killer and alleged other bad acts added nothing of probative value to the case.

Moreover, the government's discovery, provided to defense counsel months in advance of

trial, clearly shows that counsel should have anticipated this inflammatory testimony and sought its exclusion at trial.[20] Counsel's failure to do so, or to make any objection that the subject testimony bore no indicia of reliability, did not come within any hearsay exception, was inadmissible reputation evidence and/or inadmissible 404(b) evidence, and was in any event more prejudicial than probative under Fed. R. Evid. 401 and 403, was incompetent and objectively unreasonable and resulted in prejudice to Sinisterra. Had counsel performed competently, there is more than a reasonable likelihood that the outcome of the guilt phase and penalty phase proceedings would have been different. Counsel's bizarre decision to elicit additional harmful, inadmissible evidence only magnifies the Sixth Amendment violation.[21]

2. Failure to Present Evidence That Sinisterra Did Not Attend the "Murraco" Meeting, to Challenge the Lone Eyewitness Identification Placing Him There, Or to Object to False and Misleading Closing Argument On This Issue

a. Factual Background

Another key part of the government's case against Sinisterra was its claim that he attended a meeting at the home of Amparo Molina, mother of Borja-Molina and Edward Ortiz, in Houston, Texas on Thanksgiving Day, 1998. This meeting occurred two days before the murder of Colon, and allegedly was attended by Houston drug dealer Jaime Hurtado, Hinestroza, Hinestroza's girlfriend Monica Osma, and co-defendants Plutarco Tello and Arboleda Ortiz.

At this meeting, according to government witnesses Amparo Molina and Edward Ortiz who claimed to have been present in the house but not participating, co-defendants Tello and

---

[20]See, e.g., Bates #'s 3071, 3080, 3145 (police interviews of Molina and Edward Ortiz).

[21]See, e.g., Whitfield v. Bowersox, 324 F.3d 1009 (8th Cir. 2003).

17

Ortiz represented "the Office," and were highly skeptical of Hinestroza's claim that his girlfriend had been beaten and robbed of the $250,000.  Their final pronouncement was that someone must die, that there must be a body ("murraco") or the Office would not be satisfied.  Both Tello and Ortiz were identified in court by Amparo Molina and Edward Ortiz.

b.      <u>Incompetent Performance</u>

Sinisterra was not at the "murraco" meeting.  His alleged presence was one of the most damning pieces of evidence connecting him to the conspiracy and to the premeditation of the murder-for-hire, and formed the basis for one of the government's most powerful aggravating circumstances supporting imposition of the death penalty.  The only evidence tying Sinisterra to this meeting, however, the testimony of a 12-year-old child who claimed to have seen Sinisterra – a complete stranger – for only a few moments.  Sinisterra's attorneys failed to call nine different witnesses who would have totally refuted the child's testimony.

Sinisterra was identified only by Amparo Molina's then-12-year-old son Edward Ortiz, who claimed that he saw Sinisterra outside the house after the meeting was over.  (Tr. 1760-61)  The juvenile's alleged identification, however, was based on a split-second glance, as Ortiz was inside the house peaking out through the corner of one lifted window mini-blind.  (Tr. 1772-74)  Ortiz volunteered on cross examination that he had never seen Sinisterra before that moment.  (Tr. 1772)  And, according to Ortiz, Sinisterra was standing behind a car when he saw him.  (Tr. 1774)  Yet, one and a half years later, this child claimed to be "sure" that the person he saw was Sinisterra.  (Tr. 1773)

Amazingly, defense counsel never challenged the reliability of this critical identification testimony in any way.  Indeed, cross examination actually served to strengthen the identification:

18

Q: And you saw who you believe was Waja standing outside.

A: Yes, it was. I recognize his face.

Q: Today you are sure it's him.

A: Yes.

(Tr. 1773) Ultimately, defense counsel conceded Sinisterra's presence at the meeting by failing to request the standard Eighth Circuit model jury instruction on eyewitness testimony (which would have focused the jury's attention on all of the factors tending to show the unreliability of Ortiz's testimony); by failing to take issue with Edward Ortiz's identification of Sinisterra, or even to mention the Murraco meeting at all in closing arguments (Tr. 2474-87); by failing to question Sinisterra himself during his testimony as to his whereabouts that day; and by failing to present other available evidence that Sinisterra was not in fact present at Amparo Molina's residence that day.

Sinisterra was prepared and wanted to testify in his own defense that he did not attend the "murraco" meeting, but his counsel inexplicably and inexcusably failed to inquire about the subject at all. Even more egregiously, eight other witnesses, including Michelle Sinisterra, her mother Delores Rankin, and six others were ready and willing to testify that Sinisterra was at Ms. Rankin's home on Thanksgiving 1998 at the time of the alleged "murraco" meeting. See Affidavit of Michelle Sinisterra (attached as Exhibit 2 hereto). Defense counsel was aware of this evidence and inexplicably withheld it from the jury, over Sinisterra's vehement objection and against his repeated instructions. See Affidavit of Counsel Jennifer Herndon (hereafter "Herndon Aff.") ¶¶ 17-18 (attached as Exhibit 3 hereto); Michelle Sinisterra Affidavit. Indeed, when Sinisterra himself testified, his own attorney did not even ask him where he was that day.

(Tr. 2295-2306)

Sinisterra was not at the "murraco" meeting. Trial counsel's failure to challenge the government's flimsy evidence purporting to place him there, and failure to present available defense evidence as to Sinisterra's actual whereabouts at the time, was objectively unreasonable and prejudiced Sinisterra's defense. As a result of counsel's failures, the government had a field day in guilt phase closing argument on this issue:

Mr. Miller:    ... Somebody had to die in order for the office to be satisfied, ladies and gentlemen, the words out of Plutarco Tello's mouth. He is letting everybody know in no uncertain terms that somebody is going to be killed. He's telling you in no uncertain terms this has to be done. At that very moment, ladies and gentlemen, he said murraco in the presence of Mr. Ortiz, Bombita, they both form the necessary intent and premeditated murder in the first degree because they knew right then and there, ladies and gentlemen, they were going to kill somebody.

Who is outside the apartment in the parking lot during the meeting. Waja, Mr. Sinisterra, Edward Ortiz, the younger brother of Heberth Andres Borja-Molina, tells you he saw him. How does he know Waja. He knows him two ways. First, he told you about the time went there and a load was picked up at Waja's house. Secondly, I met him through Hinestroza who told him that Waja was a killer, a person who grabbed them up.

(Tr. 2458) Due to counsel's failures, the government was able to rely on a 12-year-old's completely unchallenged identification to tie Sinisterra solidly to the "Office," the conspiracy, and the substantial premeditation and planning of the murder. Counsel's failures, as egregious as they were to this point, did not stop. To the contrary, trial counsel incompetently and disastrously allowed the government to bolster the weak evidence provided by Ortiz by grossly misstating the record, without objection from the defense. In particular:

_____First_, by claiming that Edward Ortiz testified that he knew Sinisterra because of a drug transaction at Sinisterra's house – this was an absolute fabrication, as Ortiz never said any such

thing and in fact testified that he had never seen Sinisterra prior to the Murraco meeting (Tr. 1772);

Second, by claiming that Edward Ortiz knew Sinisterra through Hinestroza, which is false for the same reason; and

Third, by claiming that "[i]t's interesting, too, the mother of Sinisterra's children, the young lady who testified yesterday, told you that the last time she saw Sinisterra was on her birthday [in Houston]. And what was her birthday, November the 26[th], 1998, which also happened to be Thanksgiving Day [i.e., the day of the meeting]." (Tr. 2457) This was a preposterous misstatement of the evidence: the woman in question, Reina Alvarenga, was the mother of Hinestroza's children and claimed to have last seen Hinestroza on her birthday a few years ago. (Tr. 2241) In her entire testimony, Ms. Alvarenga never mentioned Sinisterra once.

Moreover, counsel was aware that the government was seeking the death penalty in this case in part on the basis of the statutory aggravating factor of "substantial planning and premeditation." By conceding Sinisterra's presence at the "murraco" meeting, his attorneys conceded this crucial aggravator as well. Accordingly, and predictably, the government used the unrebutted and unchallenged identification of Sinisterra by Edward Ortiz to great effect in penalty phase closing argument. (Tr. 2885)

Defense counsel's performance on the issue of Sinisterra's presence vel non at the Murraco meeting was objectively unreasonable and significantly prejudiced Sinisterra during the guilt phase and penalty phase proceedings. An effective presentation, one that challenged the flimsy eyewitness identification, that put before the jury the eyewitness instruction, that presented available evidence from Sinisterra and others showing that he was not present, and that made

appropriate objections to the government's improper closing argument, would have had a more than reasonable likelihood of changing the outcome of the trial and, in particular, of avoiding the death penalty.

### 3. Incompetent Preparation and Presentation of Sinisterra's Testimony

As noted above, Sinisterra testified during the defense case-in-chief. During direct examination, Sinisterra stated that he did not shoot Colon – Hinestroza did – and that he had falsely confessed to being the shooter out of fear of Hinestroza and Jaime Hurtado. He testified that he carried Colon and Borja-Molina's bodies to Borja-Molina's car at Hinestroza's instruction. He further testified that he believed Hurtado was now dead, and that he was no longer afraid of Hinestroza.

Due to his counsel's ineffectiveness, Sinisterra's testimony was totally unprepared, radically incomplete and, totally unconvincing. The only time that Sinisterra discussed the substance of his anticipated testimony with counsel was in a single meeting with Mr. Duchardt, and the conversation took place entirely in English. See Herndon Aff. ¶¶ 15-16[22] Sinisterra did not understand most of the conversation and was unable to be a productive participant in it. Sinisterra was not able to understand questions, elaborate on answers, or suggest additional topics of questioning. Moreover, because no preparation of direct and possible cross-examination was conducted with an interpreter present, Sinisterra was totally unprepared for the manner in which his in-court testimony was actually conducted.

Largely as a result, the exchange between Sinisterra and his own counsel was forced, choppy and incomplete. For example, Sinisterra's attorney never even asked him why he was no

_____

[22]See also Part 4, below.

longer afraid of Hinestroza by the time of trial.  Given that Sinisterra testified that he had falsely confessed to being the shooter out of fear of Hinestroza, it was absolutely critical for the jury to know why, if Sinisterra was so afraid when he spoke to the police, and if Hinestroza was still at large and still knew where Sinisterra's family lived, he was willing to tell the truth now.  Similarly, counsel never asked Sinisterra whether he in fact was present at the infamous "murraco" meeting, or even whether, on the night of the murder, Sinisterra knew that Borja-Molina was alive when he carried him to the car.

If Sinisterra had been asked these obvious questions, he would have informed the jury that he no longer feared Hinestroza because he knew by the time of trial that Hinestroza was a federal fugitive whose capture was a top priority of the U.S. authorities, and that under such circumstances Sinisterra believed Hinestroza would not risk attempting retribution on Sinisterra or on Sinisterra's family.  Sinisterra also would have explained that he did not attend the so-called "murraco" meeting but was at the home of his mother-in-law with his immediate and extended family all day on Thanksgiving 1998, testimony which could have been corroborated through other available witnesses.  Finally, Sinisterra would have explained that he knew Borja-Molina was alive when he carried him to the car, and thus that Sinisterra in fact assisted in saving Borja-Molina's life that night.

This was critical testimony, and counsel knew or should have known that it had to get before the jury if Sinisterra was to take the stand.  It was objectively unreasonable for counsel to fail to elicit this information.  If the jury had heard this evidence, it would have assessed the entirety of Sinisterra's testimony in a different and more positive light, and there is a reasonable likelihood that it would have reached a different verdict, and in particular would not have

reached a verdict of death.

Instead, as a result of inadequate preparation and incompetent questioning, Sinisterra came across to the jury as stiff, cold, evasive, unremorseful, and utterly lacking in credibility. Accordingly, the government easily shredded his unprepared and truncated testimony in guilt phase closing arguments (Tr. 2449-50), and actually used Sinisterra's testimony to support its "lack of remorse" argument in favor of the death sentence in its penalty phase closing arguments. (Tr. 2888)

Counsel's handling of Sinisterra's testimony was objectively unreasonable. But for counsel's ineffective preparation and presentation of Sinisterra's testimony, there would have been a reasonable probability that the outcome of the trial would have been different, and particularly that sentences of death would not have been imposed.

4.      Failure to Communicate with Sinisterra Through An Interpreter

At trial and throughout the pretrial proceedings, defense counsel argued repeatedly that Sinisterra had a very poor understanding of the English language, and was incapable of understanding anything but the simplest ideas in English. For example, counsel argued and presented extensive evidence in a pretrial motion to suppress that Sinisterra completely illiterate and incapable of understanding the oral Miranda warning in English. A similar presentation was made at jury trial. (See Tr. 2251-86)

Nonetheless, virtually every time that any member of the defense team met with Sinisterra, the entire meeting was conducted in English, without an interpreter present. See Herndon Aff. ¶¶ 14 (trial counsel acknowledges ability to carry on only "basic conversation" with Sinisterra, and confirming that "I have never had a conversation with Mr. Sinisterra in

24

which I used an interpreter:"); 15 (confirming that co-counsel never used an interpreter in meeting with Sinisterra except on one occasion, in the Marshal's Office holding cell, right before Sinisterra's testimony, which conversation "was simply to make sure Mr. Sinisterra understood his rights"). As a result, Sinisterra never understood the majority of the issues discussed in any of these conversations and was denied his right to participate in his own defense. As discussed above, even counsel's meeting with Sinisterra regarding the substance of Sinisterra's own testimony was conducted in English and hence without Sinisterra's meaningful participation, a fact which explains in part the deficiencies in counsel's performance with respect to that testimony.

Counsel's failure to communicate with Sinisterra in Spanish amounted to failure to communicate with him at all. The failure of trial counsel to have meaningful communication with their client was objectively unreasonable, and the resulting prejudice permeated every major aspect of the case: for example, it prevented Sinisterra from having meaningful participation in fact investigation and strategic planning relating to the guilt phase of the trial; it prevented Sinisterra from having meaningful participation in the all-important decision of whether to testify at trial; it prevented meaningful preparation of Sinisterra's direct testimony and anticipated cross-examination; it ensured that no thorough mitigation investigation could be performed; and it contributed directly to counsel's unreasonable failure to realize that Sinisterra might be mentally retarded or suffer from other organic brain disorder and to obtain the assistance of a qualified mental health/mental retardation expert.

This fundamental breakdown in the attorney-client relationship violated Sinisterra's right to the assistance of counsel, to participate in his own defense, to due process, and to a fair trial.

Absent counsel's unreasonable failure to communicate with Sinisterra through an interpreter, there is a reasonable likelihood that the result of the proceeding would have been different.

### 5. Failure to Retain and Utilize a Mitigation Specialist

Sinisterra's trial attorneys retained Mr. Dan Grothaus as an "investigator/mitigation specialist" in December 1998. Undersigned counsel has reviewed Mr. Grothaus' memoranda and billing records in the case and determined that he did not function as a mitigation specialist, but rather as a fact investigator. As such, Mr. Grothaus was an essential element of the defense team and performed much valuable work. Effective representation of Sinisterra, however, required the utilization of a separate, trained mitigation specialist.[23]

A mitigation specialist is an "indispensable member of the defense team throughout all capital proceedings." *Guidelines* § 4.1 Commentary. The Commentary further explains:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant my have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.

> Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert

---

[23]See ABA, *Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases* (Rev. Ed. 2003) (hereafter "*Guidelines*").

assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

Id. The 2003 Guidelines further confirm that they do not set new standards but rather incorporate the "existing 'standard of care' in capital cases," a standard of care dating back to well before the trial of this case. Id. at n. 107, n. 91.

None of the afore-mentioned critical work was performed in Sinisterra's case. No probing personal interviews of Sinisterra were conducted by Mr. Grothaus or any other member of the defense team. To the contrary, interviews of Sinisterra were largely confined to guilt/innocence issues and were uniformly conducted in English, with the result that Sinisterra did not even understand most of the conversations. No member of the defense team possessed the clinical skills contemplated by the Guidelines. No member of the defense team assured that the penalty phase presentation would be integrated into the overall presentation of the case. No psycho-social history was ever prepared on Sinisterra, comprehensive or otherwise, much less presented at trial or used as the foundation of an effective penalty phase presentation.

The result was a penalty phase defense that was disjointed, unfocused, and incomplete, one that objectively appears to have been "hurriedly thrown together by defense counsel still in shock at the guilty verdict." As a result, no coherent presentation was made. Available evidence regarding Sinisterra's low IQ was not presented. Available evidence that Sinisterra suffers from organic brain damage and lacks the mental capacity to engage in "substantial planning and premeditation" of murder as alleged by the government was neither obtained nor presented. See Exhibit 4 (report of Antolin Llorente, Ph.D.) No witness supplied a comprehensive presentation regarding Sinisterra's intellectual, social, economic and psychological history, as a trained

mitigation specialist could have done. By a last-minute decision, numerous witnesses "testified" through videotapes of exceedingly poor quality, in interviews conducted by <u>counsel</u> rather than by a mitigation specialist who could have been a competent witness at trial. As a result, the already taxing videos were made almost unendurable due to numerous redactions necessitated by the fact that counsel conducted the interviews.[24]

The validity and significance of this claim is candidly acknowledged by one of Sinisterra's trial attorneys, Ms. Jennifer Herndon, in paragraphs 4-13 of her attached Affidavit as follows (emphasis added):

> 4. **At no time prior to or during the trial did we employ a mitigation specialist to work on Mr. Sinisterra's behalf**. In my 10 years of death penalty practice, this is the only case where I have not worked with a mitigation specialist. From the beginning of the case, it was my plan and desire to employ a mitigation specialist. I searched for a Spanish speaking mitigation specialist because Mr. Sinisterra is Spanish speaking and many of his family members speak Spanish exclusively and understand no English.
>
> 5. At some point during my search for a qualified mitigation specialist, Mr. Duchardt indicated that he was seeking to have the fact investigator, Dan Grothaus, appointed as a fact and mitigation specialist. Mr. Duchardt indicated that the court would pay a higher hourly rate if Mr. Grothaus was considered a mitigation specialist. I have worked with Dan Grothaus on several occasions and believe that he is the best fact investigator one could ever find. However, due to the amount of work required in a capital trial no one, not even Mr. Grothaus, could adequately serve double duty as fact and mitigation investigator. Furthermore, Mr. Grothaus has no experience or training in the art of mitigation investigation, and is therefore not qualified to handle the complexities of preparing a mitigation case for a capital trial.
>
> 6. Mitigation investigation is very different from fact investigation, and

---

[24]<u>See</u>, <u>e.g.</u>, Tr. 2743-58 (redactions); Tr. 2791, 2792-94 (Court characterizes videotapes as "extremely taxing," as "incomprehensible" (three times), as being such that "nobody can understand" them, and as "difficult and fruitless").

requires a specialist who is trained in developing relationships with reluctant family members, convincing family and friends of the defendant to reveal closely held secrets, and identifying other experts (such as mental health professionals) that need to be brought in to work on the case. Mitigation specialists have both clinical training and experience and have usually obtained an advanced degree. Such training teaches the specialist specifically how to evaluate family systems and how to conduct interviews in a way that will reveal sensitive information. A detailed description of the duties of the mitigation specialist is contained in the attached affidavit of Caryn Tatelli, LCSW, a mitigation specialist that I have worked with in several cases.

7. Because time constraints and lack of qualification would preclude Mr. Grothaus from performing the functions of a mitigation specialist, I continued to search for a qualified mitigation specialist to work on Mr. Sinisterra's case. However, Mr. Duchardt insisted that Mr. Grothaus would be represented to the court as the mitigation specialist. During this portion of the pretrial preparation in Mr. Sinisterra's case, I was also preparing for trial the capital case of *United States v. David Martin*, pending in the Eastern District of Missouri. Because of my obligations in Mr. Martin's case, there were times that I could not give my full attention to Mr. Sinisterra. I approached Mr. Duchardt with this problem and stated that we needed a continuance of Mr. Sinisterra's trial so that I could adequately prepare for trial. Mr. Duchardt stated we did not need a continuance and that he could do the "heavy lifting" in the trial if I could merely just show up and sit at counsel table. Fortunately, Mr. Martin's case was eventually resolved without a trial and I was able to be an active participant in Mr. Sinisterra's trial. However, in retrospect, I believe my failure to more strenuously object to not having a mitigation specialist in Mr. Sinisterra's case was due simply to a lack of time to adequately deal with the situation.

8. I am aware that "part of the existing 'standard of care' in a federal death penalty case" includes the employment of a mitigation specialist. *See* Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation, p. 51 (May 1998) (This report is commonly referred to as the "Spencer Report"); American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guidelines 4.1(A)(1) and 10.4(C)(2)(a), (Feb 2003). I am also aware that the work of a mitigation specialist is not to be entrusted to a regular investigator. As the Spencer Report recognized, "[t]he work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." Spencer Report, pp. 24-25. "Mitigation specialists typically have graduate degrees

. . . and have extensive training and experience in the defense of capital cases." *Ibid*. at 24. I sought to locate and employ someone that met these standards in Mr. Sinisterra's case.

9. **Mr. Grothaus did not attempt to perform the functions of a mitigation specialist in Mr. Sinisterra's case**. I traveled to Mr. Sinisterra's home town of Buenaventura, Colombia alone to conduct family interviews. I also conducted mitigation interviews of family witnesses alone. I prepared a videotape of Mr. Sinisterra's young daughter, which was shown to the jury. All of these tasks are usually completed with the aid of a mitigation specialist, who has better expertise in conducting interviews, drawing conclusions, identifying necessary experts and developing mitigation themes. The times that I traveled to Houston, Texas to do investigation with Mr. Grothaus were spent conducting fact investigation.

10. Some specific examples of why a mitigation specialist was vital to this case are as follows. First, the bulk of the mitigation evidence on Mr. Sinisterra's behalf was presented by way of videotapes that I made of witness interviews in Buenaventura, Colombia. Many of the tapes were edited because the government objected to my narrative on the tape. As the trial court recognized, the videotapes were of poor quality due to the fact that there was no quite place to conduct interviews and the interviews were all translated from Spanish to English. While it would be impossible to capture the poverty and hopelessness in Mr. Sinisterra's hometown without bringing the jury there, one important function the mitigation specialist could have served was to testify to the jury about the demographics of Buenaventura, the lack of employment opportunities, and the difficulties of daily life Mr. Sinisterra's family endures. It is a common function for the mitigation specialist to testify when witnesses aren't available or are too impaired for whatever reason to testify. As Mr. Sinisterra's attorney, I was not available to testify. The testimony of a mitigation specialist who accompanied me to Colombia would have greatly bolstered the powerful evidence I found there. Instead, the presentation of this evidence in the form of videotapes prevented the evidence from having much persuasive value. The defense theory was that Mr. Sinisterra became involved in the charged drug conspiracy to obtain money to support his family in Colombia. The evidence available in Colombia would have shown the jury why Mr. Sinisterra resorted to such desperate measures to attempt to support his family.

11. Another important function that required a mitigation specialist in this case is gathering of social history records and compiling a chronology. Record gathering is very important because it provides unbiased factual support for what can be seen as self-serving statements by the defendant

and his family.  In Mr. Sinisterra's case, I gathered little if any records.  Record gathering can be surprisingly time consuming.  Often the mitigation specialist is told that records do not exist and is subsequently able to locate those records with a little persistence.  The mitigation specialist is often forced to jump through many hoops to obtain records, including submitting specific release forms, talking to several different clerks on the phone, writing letters, obtaining subpoenas, and in general being persistent about seeing that the records are copied and mailed.  I am not aware of what additional records exist on Mr. Sinisterra, but at the very least, a mitigation specialist could have attempted to secure supporting records.

12.  A mitigation specialist could have also identified and located an expert to talk about the differences in American and Colombian culture.  Mr. Sinisterra testified at trial that he lied to the police when he told them that he killed the victim.  He stated that he lied to protect his family in Colombia from Hinestroza, an indicted coconspirator who had not been arrested at the time.  He feared that Hinestroza would have his family killed if he told the police that it was Hinestroza, and not Mr. Sinisterra, that killed the victim.  In investigating Mr. Sinisterra's case, I learned that fear of retribution against his family was a valid and realistic fear on Mr. Sinisterra's behalf and a much more common occurrence in Colombian culture than we see happen in America.  Having an expert on Colombian culture to add credibility to Mr. Sinisterra's testimony was crucial.  At the least, the jury may have believed that Mr. Sinisterra was not telling the whole truth to the police in an attempt to protect his family from Mr. Hinestroza.

13.  I did the vast majority of the mitigation investigation and preparation of the mitigation case for trial.  The only exception to this fact is that Mr. Duchardt worked with and called to testify Joe Brandenburg, an expert on bureau of prisons issues.  I never talked with Mr. Brandenburg and was not aware of the specifics of his testimony prior to hearing him give such testimony in court.  No one else participated in the preparation of the case or development of themes for the penalty phase.  Typically, a mitigation specialist would develop themes based on the evidence she uncovered in her investigation.  The defense team (including the mitigation specialist) would then turn those themes into specific mitigators we wanted to submit to the jury.  The team would then discuss specifically what evidence and which witnesses should be presented to support each theme.  The fact that this entire process was solely my responsibility resulted in a disorganized and less effective presentation of the evidence than would have been possible with the assistance of a mitigation specialist.

That Sinisterra was grievously prejudiced by the lack of a trained mitigation specialist on his defense team is apparent from the disorganized and haphazard penalty phase defense put on by his attorneys. Among other things, a trained mitigation specialist would have prepared a detailed biopsychosocial evaluation of Sinisterra that would have served as a foundation for the development of a consistent, coherent penalty phase defense:

> The role of the mitigation specialist in a capital murder case is to conduct a detailed biopsychosocial evaluation of the defendant's life history. The purpose of the evaluation is multifaceted. It is crucial to understand which issues or factors in a client's life impacted the client, and how the issues or factors affected that client. It is also crucial to determine which issues or factors in the client's life require additional expert examination. The mitigation specialist is responsible for gathering whatever records or other materials may be needed by such an expert to conduct a thorough examination. The mitigation specialist is responsible for communicating with the attorneys so that they are aware of the result of the investigation, and so that a consistent theory of defense can be developed for the case. The mitigation specialist is also responsible for working with the client and his or her family. Lastly, the mitigation specialist aids in the development of a theory of presentation of the developmental life history information. The mitigation specialist may or may not be a mitigation witness during the sentencing phase.

Affidavit of Caryn Platt Tatelli, AM, LCSW ("Tatelli Aff.") (Exhibit 4 hereto).

In the absence of a mitigation specialist, the critical work described above was not performed. No biopsychosocial history was obtained; no experts were located; no analysis of issues and factors that affected Sinisterra's life was performed; no coherent mitigation defense was presented. This prejudice was real and substantial, and without it there is a reasonable likelihood that the result of the penalty phase proceeding would have been different. Assessment of the exact nature and extent of this prejudice is impossible, however, without the assistance of a mitigation specialist in these post-conviction proceedings.

A qualified mitigation specialist is needed to perform a thorough mitigation investigation

on behalf of Sinisterra. Such an investigation will demonstrate what additional or different evidence could have been presented at trial, and how and to what extent such additional or different evidence would have avoided the death penalty. Post-conviction counsel has previously filed two motions for authorization to hire a mitigation specialist, which were denied by this Court. To assist the ongoing investigation of this matter, Sinisterra is renewing his request for authorization to hire a mitigation specialist and for an opportunity for said specialist to conduct a thorough mitigation investigation.

One of the very first things a qualified mitigation specialist would do in this case would be to conduct a series of searching, detailed interviews of Sinisterra. As Ms. Tatelli, a qualified mitigation specialist, states:

> The client is integral in the process of developing mitigation, and must be interviewed extensively. The client is one of the original sources for ... records and sources, and must be interviewed about his entire developmental life experience. This interview usually begins with a study of what the client knows about his family before his birth (i.e. prior generational material) and moves forward through the client's life up to and including his or her arrest. The client will be asked to provide both factual and emotional content materials, such as information about his or her birth and the birth of his or her siblings, and his or her feelings about those events. The types of information solicited includes, but is not limited to: the composition of the client's family; a complete medical history; psychiatric data pertaining to the client and any and all family members; a complete educational assessment including a review of any and all records and an evaluation of the client's and his or her family's level of education; the client's employment history and employment patterns with the client's family; discipline patterns both within the client's family and a study of patterns established in earlier generations; friendships and participations in peer groups of any kind; hobbies and extracurricular activities; criminal histories and correctional records of all family members, including the juvenile record of the client; substance use and abuse and treatment both for the client and for any and all family members with identified issues; and coping and communication methods and patterns within the family.

Tatelli Aff. ¶ 11.

In the absence of a qualified mitigation specialist, post-conviction counsel have attempted to elicit some of this information from Sinisterra themselves. It should be noted that counsel has absolutely no training in this field. Nonetheless, counsel believes that the following thumbnail sketch of key parts of Sinisterra's life delineates some of the areas that a competent mitigation investigation would have explored and demonstrates some of the massive prejudice Sinisterra suffered at trial due to lack of a mitigation specialist on his defense team. It should be emphasized that apart from the poverty of his upbringing and his illiteracy and lack of schooling, none of the following information was presented at Sinisterra's trial:

\* \* \* \* \* \* \* \* \* \* \*

<u>Brief Background Information on German Sinisterra</u>

German Sinisterra was born on November 9, 1964 in the violence-ravaged Colombian port city of Buenaventura, in an environment of civil war, social unrest and frequent murder. He was born into abject poverty, and both of his parents were illiterate. Sinisterra's father may have been mentally retarded, and lacked basic living skills. He virtually never bathed, changed his clothes, or groomed himself. Either from inability or laziness, he never worked or helped support his family in any way. Almost no one could understand his speech. When Sinisterra was 5 or 6 years old, his father apparently had a psychotic episode, and chased Sinisterra's mother around the house with a machete. Although his mother escaped, his father's rage continued and he hacked down a banana

tree with the machete.  Sinisterra was forced to watch the entire violent outburst.

After the machete incident, Sinisterra's father left the family hovel and Sinisterra never lived with him again.  Meanwhile, and continuing throughout the portion of his childhood in which he lived with his family, Sinisterra suffered brutal beatings at the hands of his mother, who would whip him with a leather horsewhip, often causing extensive bleeding.

When he was about 7 years old, Sinisterra dropped out of school, where he had always had serious behavioral problems and had gotten into fights continually, and where he been completely unable to learn to read.  In fact, he seemed incapable of learning anything.  The highest level of education Sinisterra achieved was completion of the first grade.

At about this same time, Sinisterra suffered a brutal sexual assault. One evening, shortly after dark, he and a young friend were walking in Buenaventura when they were accosted by four much older youths, probably in their late teens.  Sinisterra and his friend were forced into an abandoned house where they were both

brutally gang-raped.  This experience caused feelings of isolation and fear that haunt Sinisterra to this day.  It also caused him to become withdrawn and antisocial.

Within a few months after the sexual assault, Sinisterra ran away from home and went to Cali, where he lived on the street. Sinisterra fell in with a gang of 5 or 6 other homeless youths, who survived by committing petty thefts.  The youths protected each other from the occasional attempted sexual assaults perpetrated by unknown adults in the streets of Cali.  Sinisterra lived as a homeless child in Cali for approximately 6 years, with two interruptions when he was taken into custody and placed in juvenile correctional facilities.  The first time, Sinisterra was in juvenile correctional facilities for about a year, and then escaped. The second time, he was in custody for about four months before escaping.  While in custody, Sinisterra attended school, and was again completely unable to advance in almost any subject, and in particular in learning to read or write.

When he was 12 or 13, Sinisterra left Cali and went back to Buenaventura to live with his family.  At this time, his oldest brother Paolo, about 5 years older than Sinisterra, had recently

been released from prison for brutally assaulting a woman and was abusing narcotics heavily.  When Paolo was high on narcotics, he would attempt, and often succeed in, sexually fondling both German and German's younger brothers Luis Eduardo and Ricouter.

Sinisterra lived with his family until he was about 20 years old, never holding a steady job or supporting himself.  The family was supported almost exclusively by his mother, who sold fish and wood on the streets.  In 1984, Sinisterra made it to the United States as a stowaway on a commercial boat, despite the fact that it was common knowledge that stowaways were often thrown into the ocean if they were caught.  Sinisterra arrived in Newark, New Jersey and made his way to Manhattan, where he again lived in the streets with no means of support, until after a month or so he was discovered and taken in by a charitable organization.  This organization sent him to Boston, where he lived in a shelter sponsored by an evangelical church for about two months, until he was kicked out for violating their rules.  He was then sent back to Manhattan and deported back to Colombia.

In 1989, Sinisterra again risked illegal passage on a boat to come

back to the United States.  This time he arrived in Miami with two fellow travelers.  They took him to Tampa, where a friend of Sinisterra's sent him the money to travel to Houston.  Sinisterra lived in Houston with his friend for about 4 months, during which time he impregnated Tawana Lynn, who eventually bore their daughter Kaniesha.  Some months after the pregnancy, Sinisterra stayed with another American woman, named Evelyn, for a few months until going back to Colombia in about November 1990.  In Colombia, Sinisterra again lived with his mother.  A third illegal boat passage brought him back to the United States in April 1992, again to Miami.  Sinisterra and a friend were homeless until a Cuban man let them stay with him.  During this time, Sinisterra worked in the fields, picking cucumbers for $3/hr cash.  After about two months, Sinisterra again went to Houston, where he lived with Tawana and her sister for about a year.  Sinisterra made no money except for small amounts of cash from dealing drugs.  While living with Tawana, Sinisterra impregnated his future wife Michelle.  Eventually they married, Sinisterra moved in with Michelle, and their two children were born.

Sinisterra has never rented an apartment.  He has never had a checking account.  He has never held a regular job.  He has never,

at any age, lived without depending on someone else.  He did not even pass his driver's license test himself.  After he himself failed the test, a friend of his impersonated Sinisterra and passed the written driver's test for him.

Sinisterra had three brothers.  The oldest, Paolo, sexually abused him when he was a child.  His older brother by two years, Luis Eduardo, was murdered in 1986.  Sinisterra's family found Luis Eduardo with two bullet holes in his head near some train tracks in Buenaventura.  Sinisterra's younger brother by five years, Ricouter, was murdered in 1994, apparently by the Colombian police.  All of the brothers except Paolo were illiterate.  Sinisterra's three full sisters and one half-sister are all able to read and write, and one finished at least high school and possibly college.  Growing up, the girls had luxuries that the boys did not have (such as learning to ride a bicycle and even having a bicycle) while only the boys were beaten.

Sinisterra has suffered at least three instances of serious head trauma.  When he was about 7 or 8, and living in the streets of Cali, he got into a fight and struck his head against a lamppost so hard that he was knocked unconscious.  A Cali housewife found

him and took him to her home, where he awoke after being unconscious for two full days.  On another occasion, when he was 17 or 18 years old, he and his brother got into a fight with some other boys, and Sinisterra received a debilitating blow to the side of his head from a metal stick.  As a very young child, Sinisterra suffered a near-drowning accident, caused apparently when he hit his head diving into a pool, which resulted in an extended period of unconsciousness.  None of these injuries ever received any medical attention, and Sinisterra suffers to this day from excruciating headaches and a feeling of intense pressure in his skull.

In his early 20's, Sinisterra heavily abused marijuana and "primo," a pasty cocaine precursor that was ingested by mixing it with tobacco and wrapping it into a cigar.  During these periods of drug use, Sinisterra would sometimes experience "crazy episodes" where the pounding in his head became unbearable.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Again, virtually **<u>none</u>** of the above information was presented at trial, or even known to Sinisterra's attorneys prior to trial.  Had counsel bothered to gather this information and present it to the jury, there is a reasonable likelihood that the outcome of the penalty phase proceedings would have been different.

Sinisterra wishes particularly to emphasize that his requests for a mitigation specialist in these post-conviction proceedings is **not** made in order to redo or second-guess another mitigation specialist's work prior to trial. This case has never had a mitigation specialist. <u>See</u> Herndon Aff. ¶ 4 ("At no time prior to or during trial did we employ a mitigation specialist to work on Mr. Sinisterra's behalf."); ¶ 9 ("Mr. Grothaus did not attempt to perform the functions of a mitigation specialist in Mr. Sinisterra's case.") If called as a witness, Dan Grothaus will confirm that he understands the role of a mitigation specialist in a death penalty case and did not act as a mitigation specialist nor was he asked to perform any of the traditional roles of a mitigation specialist in this case. In a prior Order in these post-conviction proceedings, the Court declined to authorize the hiring of a mitigation specialist because an examination of the CJA records indicated to the Court that Grothaus had spent substantial time on mitigation. It is respectfully submitted that the allocation of substantial time to mitigation investigation on which the Court relied was not made by Grothaus or by either of Sinisterra's attorneys, and was grossly in error, as Grothaus' own testimony will show.

The Court has authorized funding for a thorough mitigation investigation on behalf of co-defendant Ortiz in his post-conviction proceedings. Sinisterra respectfully prays for the opportunity to have this essential work performed on his behalf as well.

6.      Failure to Conduct A Thorough Mitigation Investigation

Trial counsel failed to conduct a mitigation investigation in this case. As noted in Part 5, above, one of the first steps in any competent mitigation investigation are searching, probing, sensitive interviews of the client. <u>See</u> Tatelli Aff. ¶ 11. Prior to trial, no one on the defense team even <u>attempted</u> such probing interviews of Sinisterra. Indeed, no one on the defense team even

41

spoke to Sinisterra in his native language or with the aid of a Spanish language interpreter, and Sinisterra's English does not permit anything but rudimentary, basic conversation. See Herndon Aff. ¶ 14. The facts set forth in Part 5 above, under the heading Brief Background Information on German Sinisterra, were never known to defense counsel, because they never asked. Accordingly, any prospect of a "mitigation investigation" essentially was destroyed from the outset. As a result, no biopsychosocial history was prepared, mitigation themes were not identified, qualified experts (such as a mental health/mental retardation expert and a cultural expert) were not located and retained, witnesses from Colombia were incompetently interviewed, and an effective mitigation case was not presented. See Herndon Aff. ¶ 13.

Had counsel met even the most minimal level of competency, Sinisterra's jury would have been presented with a wealth of mitigation factors. This evidence included that Sinisterra was brutally abused, victimized, and neglected as a child; that he grew up without significant parental controls or any type of stable support system; that he lacked any role model or any source of inculcation of moral and social values; that he spent most of his formative years living in the street with only other homeless children for companionship; and that to the extent he had any family life at all it was characterized by sexual abuse from his own brother, brutal beatings from his mother, rampant violence from his father, and complete and utter dysfunctionality of the family unit as a source of nurturing, growth or development.

This is strikingly powerful evidence of the type that can explain to a jury the background of brutalization and neglect that can lead an individual to such a point that he would participate in a vicious murder. Instead, trial counsel offered a penalty phase case that can only be characterized as farcical and absurd. Counsel insulted the jury's intelligence and invited disaster

for Sinisterra by trying to portray him as simply a "nice guy" who served as a pallbearer at funerals and cooked and cleaned house for his wife. Had the jury been presented with the far more persuasive full and complete picture of Sinisterra's life, instead of the superficial charade put on by trial counsel, there is a reasonable likelihood that the outcome of the penalty phase would have been different and Sinisterra's life would have been spared.

Post-conviction counsel is aware that all 12 jurors in the trial of co-defendant Hinestroza found as a non-statutory mitigator that the defendant's lack of guidance and support as an adolescent made him an easy target of the violent drug culture. So compelling is this type of evidence that Hinestroza's jury found this mitigator sua sponte after being presented with mitigation evidence strikingly similar to what could have been offered on behalf of Sinisterra. It was ineffective for trial counsel in Sinisterra's case not to present the easily available evidence of his tragic upbringing and to request non-statutory mitigators relating thereto, such as lack of guidance, lack of any positive role model, homelessness, and exposure to horrific violence, abuse and violation. Had counsel performed competently in this regard, there is a substantial likelihood that the jury would have spared Sinisterra's life.

In assessing the issues of counsel's performance and Strickland prejudice, the Court should apply the standards of the ABA Guidelines (note 23 above) as confirmed by Wiggins v. Smith, 539 U.S. 510, 524 (2003). Those Guidelines make clear that counsel needs to explore medical history (including hospitalizations and illness or injury, alcohol and drug use, malnutrition, developmental delays, and neurological damage); family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse or domestic violence; poverty, family instability, neighborhood

43

environment and peer influence; exposure to criminal violence, social or ethnic bias); educational history (including special needs, cognitive limitations, learning disabilities, and limited opportunities). ABA Guidelines, supra n. 23 at 10.7. It is clear from the brief history of Sinisterra's life presented above that virtually every one of the medical, family, social and educational factors listed in the ABA Guidelines are present in Sinisterra's background.

It is equally that this litany of crucially important mitigating factors were ignored by Sinisterra's counsel. Had these mitigators been presented to the jury, they would have formed the basis of a powerful mitigation case that undoubtedly would have convinced the jury to spare Sinisterra's life, just as they did for co-defendants Tello and Hinestroza.

Counsel's failure to conduct a thorough mitigation investigation was objectively unreasonable. Had a thorough mitigation investigation been conducted and the evidence therein uncovered been placed before the jury, there is a reasonable likelihood that the outcome of the penalty phase would have been different.

7. <u>Failure to Investigate and Present Mental Health Evidence in Mitigation During the Penalty Phase</u>

More than six months prior to trial, defense counsel was in possession of a written report of testing prepared by Warren Wheelock, Ph.D., Professor of Education, University of Missouri-Kansas City. Dr. Wheelock tested Sinisterra's intellectual capacity and his language and literacy levels, and concluded that Sinisterra is totally illiterate in both English and Spanish, has a 30% comprehension rate of spoken English at the first grade level, and has an IQ of 75. (Tr. Supp. H. 706-42 & Ex. DS-2). Sinisterra's low IQ places him at least in a borderline deficient intellectual capacity category, and falls within the IQ range for mental retardation pursuant to the diagnostic standards of DSM-IV and the American Association on Mental Retardation Manual.

Dr. Wheelock testified regarding Sinisterra's low IQ, illiteracy, and poor comprehension of English in a pretrial hearing on defendant's motion to suppress evidence evidence. (Tr. Supp. H. 706-42) Nevertheless, although Dr. Wheelock testified during the guilt phase at trial regarding Sinisterra's inability to understand the Miranda waiver in English (Tr. 2251-86), defense counsel failed to call him to testify at the penalty phase regarding Sinisterra's low IQ. Further, despite knowing that Sinisterra has a low IQ, counsel failed to retain a qualified mental health expert to determine whether Sinisterra is mentally retarded or suffers from other significant mental or psychological impairment or dysfunction. As confirmed by Ms. Herndon, Herndon Aff. ¶ 19:

> I was aware through the testimony of Dr. Warren Wheelock that Mr. Sinisterra has a low IQ. I do not know if Mr. Sinisterra is mentally retarded. This is an issue usually brought to my attention by the mitigation specialist in the case. I am aware that a person must meet three criteria to be classified as mentally retarded, and that mental retardation can only be diagnosed by an expert in that field. We never had any testing done to determine whether Mr. Sinisterra is mentally retarded or substantially impaired in his mental abilities in any way. I have no reason to believe that if we had done such testing it would not have been favorable to us. It is my experience that many people are able to develop enough "street smarts" to get by in life despite substantial mental impairments. The only way to determine or rule out retardation is to have expert testing done.

Sinisterra was denied his rights to due process, a fair trial, and effective assistance of counsel due to trial counsel's failure to have him evaluated by a competent mental health professional for diagnosis of mental retardation or other significant mental impairment or disorder in advance of trial. Trial counsel's failure prejudiced Sinisterra in both the guilt and penalty phases of his trial. Had counsel performed competently, they would have obtained and presented evidence that Sinisterra suffers from organic brain damage (static encephalopathy) and dampened intellectual functioning. Sinisterra's mental impairment is such that he lacks the

ability to plan and premeditate a murder.  Report of Antolin Llorente, Ph.D. (Exhibit 5).  Had this evidence been presented to the jury, there is a reasonable likelihood that its verdict at the guilt phase of the trial would have been different, because Sinisterra did not possess the requisite intent to commit the charged offenses.[25]  This evidence also would have provided powerful support at the penalty phase for the statutory mitigating factors of impaired capacity, duress, and severe mental disturbance, *see* 18 U.S.C. § 3592(a)(1)(2) and (6), and to defeat the government's claim as to the aggravating factor of "substantial planning and preparation."

It was objectively unreasonable for trial counsel to fail to have a pre-trial comprehensive mental evaluation conducted for Sinisterra even after learning of his low IQ, particularly in a capital case, where mental health issues are so prevalent.  It was objectively unreasonable for counsel to fail to elicit basic information from their own client that would have highlighted the need for this mental health testing.  Had counsel performed competently, there is a reasonable likelihood that the outcome of the trial would have been different.

Evidence of diminished mental capacity is perhaps the single most powerful type of mitigating evidence to be found in capital cases.  There is no conceivable reasonable strategic purpose to ignore this evidence in this type of case.  The Supreme Court has held that "impaired intellectual functioning is inherently mitigating,"[26] and that issues surrounding a capital defendant's mental health and intellectual functioning are always relevant to a jury's determination of the appropriate punishment.[27]  The Court has further emphasized that it "cannot

---

[25]United States v. Frisbee, 623 F. Supp. 1217 (D.C. Cal. 1985).

[26]Tennard v. Dretke, 124 S. Ct. 2562 (2004).

[27]Burger v. Kemp, 483 U.S. 776, 779 (1987).

countenance the suggestion that low IQ evidence is not relevant mitigating evidence," regardless of whether such evidence has the slightest nexus to the crime of conviction.[28] As the ABA Guidelines state: "Mental health experts are essential to defending capital cases," and the defendant's "emotional and mental health are often of vital importance to the jury's decision at the punishment phase." Supra n. 23 at § 4.1.

It was objectively unreasonable for counsel to fail to present evidence of Sinisterra's low IQ, dampened intellectual functioning, organic brain damage, and inability to premeditate violent crime in mitigation, and to request submission to the jury of nonstatutory mitigating factors relating to his low intellectual functioning. It was objectively unreasonable for counsel to fail to investigate Sinisterra's biopsychosocial background and the state of Sinisterra's mental health through qualified, competent experts in the field. Had counsel presented the available mental health evidence to the jury, and conducted a proper investigation to obtain and present additional mental health evidence in mitigation – particularly in conjunction with the available evidence regarding Sinisterra's life and upbringing summarized in subparts 5 and 6 above – it would have significantly altered the balance between the aggravating and mitigating factors which "might well have influenced the jury's appraisal" of Sinisterra's moral culpability and changed the result of the penalty phase proceeding.[29]

    8.    <u>Failure to Object to Prosecutorial Misconduct in Closing Argument</u>

During the penalty phase, in rebuttal closing argument, with Sinisterra's life in the balance, the government made the following remarks:

---

[28]Tennard, supra (emphasis added).

[29]Williams v. Taylor, 529 U.S. 362, 398 (2000).

Ladies and gentlemen, decent people, decent citizens, fear for their lives becaues of drug traffickers like German Sinisterra. We cannot forget that he was a member of a very efficient but unforgiving cocaine distribution organization and American society is a much different place than it was 50 years ago because of the German Sinisterras of the world.

It is time to turn the tables on drug traffickers like this defendant. Finish the message that you began with your verdict of guilt in this case. Tell this defendant and those like him that murder will not be tolerated especially murder committed to further drug trafficking schemes. There is no worse crime. As you sit there you are not just twelve people. You are ... the conscience of the community and you have a unique opportunity to make a difference. You have a unique opportunity to send a message. Don't squander that opportunity. Have the courage to do the right thing.

          ...
German Sinisterra believes by his actions that murdering couriers over a drug debt is just part of doing business. Tell him he's wrong and tell the other drug traffickers of the world if they come to Kansas City they are going to be dealt with in the most severe way, they are going to receive a sentence of death.
...

The death penalty was enacted for these kinds of killings. It was enacted for these kinds of killers. You will never ever see a more calculated or cold excuse.

(Tr. 2911)

This argument constituted an emotional appeal calculated to persuade the jury to decide the question of life or death on other than the facts before it. By equating a sentence of death to the delivery of a blow against the drug problem, and falsely magnifying the significance of this crime as opposed to all other capital crimes, the government substituted emotion for evidence, passion for deliberation, and placed on Sinisterra's shoulders the heavy burden of the amelioration of general societal woes.

Defense counsel knew, or should have known, that much less inflammatory remarks in other cases had previously been found by the Eighth Circuit to be so prejudicial as to warrant, by

48

themselves, reversal of federal drug trafficking convictions.[30]  At the penalty phase of a capital

case, in which the Constitution mandates a significantly heightened standard of reliability in

sentencing, the prejudicial impact of such inflammatory remarks is dramatically greater.[31]  It is

reasonably likely that this unchallenged misconduct caused the jury to return verdicts of death

against Sinisterra.  Defense counsel's failure to object to the improper remarks was objectively

unreasonable and constituted ineffective assistance of counsel in violation of Sinisterra's Sixth

Amendment rights.  As a result, the sentences of death must be vacated.

Additional prosecutorial misconduct in penalty phase closing further tainted the

proceedings and compounded the violation of Sinisterra's Fifth, Sixth and Eighth Amendment

rights.  For example, the prosecutor improperly and prejudicially made reference to Adolph

Hitler, Charles Manson, and Jeffrey Dahmer.  Trial counsel unreasonably and prejudicially failed

to object to these improper references as well.  Appellate counsel raised only this instance of

misconduct on appeal, unreasonably and prejudicially ignoring the additional misconduct quoted

above.

The Eighth Circuit concluded that the "single reference to these famous criminals" did

not, by itself, deprive Sinisterra of his right to a fair sentencing hearing.  The Court expressly

based its holding on a plain error standard of review and the fact that Sinisterra "failed to object

at that time."  That failure was objectively unreasonable.  Counsel also unreasonably failed to

---

[30]See, e.g., United States v. Johnson, 968 F2d 768 (8th Cir. 1992) (prosecutor's statement
in closing that the jurors "stand as a bulwark against what Mr. Johnson is doing on the street,
putting this poison on the streets" required reversal of convictions); United States v. Lee, 743
F.2d 1240 (8th Cir. 1984) (argument that "[a]ll the drug smugglers around should be told by your
actions that bringing in marijuana is wrong" was reversible error).

[31]See, e.g., Copeland v. Washington, 232 F.3d 969 (8th Cir. 2000).

object to or raise on appeal the government's gross mischaracterization of the record relating to Sinisterra's alleged presence at the so-called "murraco" meeting. See Part E.2, above. The cumulative impact of all of the foregoing the prosecutorial misconduct in penalty phase closing, defense counsel's unprofessional errors in failing to make contemporaneous objection to the misconduct, the lack of any curative actions by the Court, and the failure of appellate counsel to properly raise these issues individually and collectively violated Sinisterra's right to effective assistance of counsel and deprived him of a fair sentencing hearing. Had trial and/or appellate counsel performed competently in this regard, there is a reasonable likelihood that the outcome of the penalty phase would have been different.

### 9. Failure to Challenge the Indictment

Sinisterra's trial and appellate counsel unreasonably and prejudicially failed to challenge the second superseding indictment on the ground that it was insufficient to charge a capital offense, and failed to argue that Sinisterra's death sentences violated the Fifth Amendment Indictment Clause. Prior to trial, Sinisterra's attorneys knew that this argument was being made by defense counsel in federal capital proceedings, and were aware or should have been aware of the cases supporting it, but unreasonably failed to challenge the indictment here, either in the District Court or on direct appeal, either before or after Ring was decided.[32]

The failure of Sinisterra's attorneys to challenge the indictment, and Sinisterra's resulting sentences of death, as being in violation of the Fifth Amendment Indictment Clause was

---

[32]See, e.g., United States v. Allen, 247 F.3d 741 (8th Cir. 2001), vacated, 536 U.S. 953 (2002). Allen raised this issue throughout the district court proceedings, which concluded prior to trial of this case, and on direct appeal. One of Sinisterra's attorneys, Jennifer Herndon f/k/a Brewer, also was counsel for Allen's co-defendant, Norris Holder, and was aware of Allen's filings.

objectively unreasonable. Sinisterra was prejudiced by counsel's deficient performance because, had counsel properly raised this claim either at trial or on direct appeal, there is a reasonable likelihood that Sinisterra's sentences of death would have been vacated and reduced to sentences of life imprisonment.

10.    Failure to Object to Inflammatory Hearsay in Penalty Phase

Sinisterra's trial and appellate counsel unreasonably failed to argue that the relaxed evidentiary standard applied in the penalty phase pursuant to 18 U.S.C. § 3593(c) violates the Fifth, Sixth and Eighth Amendments. Prior to trial, Sinisterra's attorneys knew that this argument was being made by defense counsel in federal capital proceedings, and were aware or should have been aware of the cases supporting it. Nonetheless, counsel failed to argue this issue either in the district court or on direct appeal. Had counsel properly raised this issue, there is a reasonable likelihood that the result of the penalty phase proceeding would have been different. Counsel was further ineffective in failing to object to the inflammatory, prejudicial hearsay elicited by the government from FBI Special Agent Dennis Conway during the penalty phase proceedings, even under the relaxed standards of 18 U.S.C. § 3593(c). This hearsay, summarized in Part B, above, had nothing to do with Sinisterra and should have been excluded because it was irrelevant and inflammatory, and because its introduction would violate due process and prevent the jury from exercising its sentencing discretion with the heightened reliability and responsibility required under the Eighth Amendment in a capital case. Had counsel objected to this testimony, there is a reasonable likelihood that the result of the penalty phase proceeding would have been different.

11.    Failure to Object to Unconstitutional Application of FDPA

Prior to trial, defense counsel knew or should have known that the Federal Death Penalty Act is administered in such a manner as to violate equal protection and the Eighth Amendment. See Part D, above. The figures demonstrating the hugely disparate impact of the federal death penalty on black people were compiled by the Federal Death Penalty Resource Counsel and available to all court-appointed counsel representing clients facing the federal death penalty. Counsel's failure to challenge the unconstitutional administration of the FDPA prejudiced Sinisterra. Had counsel raised this issue, either at trial or on direct appeal, there is a reasonable likelihood that Sinisterra would not have been sentenced to death.

F.        **Prosecutorial Misconducft Violated Sinisterra's Fifth and Eighth Amendment Rights**

The prosecutorial misconduct in closing arguments summarized in Part E.8., above, also constituted a violation of Sinisterra's right to due process under the Fifth Amendment and his right to individualized sentencing determinations and to the heightened requirement of responsible and reliable exercise of sentencing discretion in capital cases imposed by the Eighth Amendment.[33] For these reasons as well, the sentences of death must be vacated.

G.        **Sinisterra's Death Sentences Constitute Cruel and Unusual Punishment**

The imposition of death penalty on the Defendant is so disproportionate as to be cruel and unusual and a violation of the Defendant's Eighth Amendment rights in that other defendants who were equally or more culpable and who planned and organized the alleged homicide were not given the death penalty. The United States Supreme Court has, in fact, observed that proportionality review is a useful safeguard against the arbitrary imposition of the death

---

[33]See, e.g., Caldwell v. Mississippi, 472 U.S. 320, 329 (1985) (Eighth Amendment); Darden v. Wainwright, 477 U.S. 168, 181 (1986) (due process).

penalty.[34]

The patchwork of verdicts in this case in which some defendants received death sentences and others received only life sentences clearly reveals how arbitrary and capricious the results were in this case. It clearly suggests an irrational application of death sentences that did not reflect the fair and impartial application of punishments.

Furthermore, the Defendant's jury was not given the opportunity to consider that other defendants equally culpable in the crime would not be punished by death. This is specifically required as a mitigating factor pursuant to 18 U.S.C. Section 392 (a)(4). In United States v. Bin Laden 156 F. Supp. 2d 359, 369 (S.D.N.Y. 2001), Judge Leonard Sand found that the use of the mitigating factor concerning equally culpable defendants was an expressed Congressional mandate that provided jurors with a means of improving the likelihood that the death penalty would not be administered in an arbitrary or random manner.

Sinisterra was denied due process of law herein in that there is a clear statutory mandate that the jury be allowed to consider how other Defendants are sentenced. United States v. Beckford, 962 F. Supp. 804 (E.D.VA. 1997). In United States v. Karake, Memorandum Opinion, Criminal Action No. 02-0256 (D.C. 2003) the Court specifically found that the circumstance "that others who are equally culpable will not be subject to the death penalty is a comparative factor which reflects a determination by Congress that it is appropriate for jurors to consider questions of proportionality and equity when they are evaluating whether a death sentence is

---

[34]Gregg v. Georgia, 428 U.S. 153, 198 (1976); Zant v. Stephens 462 U.S. 862, 890 (1983).

appropriate."

In the present case, two co-defendants received a life sentence after Sinisterra's conviction so the jury did not have this information that the statute deems to be so important.

Proportionality is generally regarded as a very important factor in sentencing. It was the foundation of the United States sentencing guidelines in that the guidelines used nationwide statistics to promote proportional sentences throughout the United States. It would be anomalous if the choice between a life sentence and a death sentence were the only sentencing decision in the federal system in which proportionality was not a proper consideration.

In the trial of the defendant, the jury was not given the benefit of the decision by another jury to not impose the death penalty on a co-defendant – Hinestroza – whose involvement in the crime was much more extensive than Defendant Sinisterra's in that he clearly was the organizer, planner and moving party behind the homicide in question if the Government's case is to be believed.

The results in this case, when viewed from the government's own theory of the case, are completely absurd: The leaders and organizers of the murder-for-hire conspiracy – namely Hinestroza, who recruited Sinisterra and Ortiz and directed all the activities culminating in the murder, and Tello, the representative of the Office who was present to ensure that the Office's wishes expressed at the "murraco" meeting were carried out and that "a body" would be produced – these two who were by far the most culpable defendants received sentences of life in prison, while the two mules – Sinisterra and Ortiz – the low-level operatives who simply followed orders, received death.  These results are grossly disproportionate, arbitrary, capricious,

and indefensible, and constitute cruel and unusual punishment in violation of the Eighth Amendment.

### H. The Cumulative Effect of the Errors Significantly Undermines Confidence in the Outcome of the Trial, Particularly in the Penalty Phase

Sinisterra, relying on the Fifth, Sixth, Eighth and Fourteenth Amendments, incorporates by reference Claims A-G above, including all subparts, and realleges these errors cumulatively. The cumulative effect of all of the errors noted under Claims A through G was extremely prejudicial to Sinisterra and denied him his constitutional right to a fair trial. In assessing prejudice arising from constitutional errors, it is appropriate both legally and logically to apply a cumulative effect analysis in assessing prejudice.[35] Each of the above-stated grounds for relief, standing alone, requires reversal of Sinisterra's convictions and/or sentences. Yet even if this court concludes that each individual circumstance is insufficient to warrant relief, in conjunction with one another, these circumstances rise to the level of prejudicial cumulative error.

Further, the claims and facts set forth in this petition are those of which Sinisterra, through counsel, is currently aware and knows or has reason to believe are true and which after additional investigation, discovery, adequate funding, and access to this court's subpoena power, can be proven. All facts set forth in this petition are incorporated fully, as are the transcripts of all pretrial proceedings and of trial, and all exhibits introduced at pretrial hearings and at trial. Sinisterra has been prejudiced by each and every one of the actions and failures to act alleged in this petition, both individually and collectively. Without the errors set forth in this motion, there is a reasonable likelihood that Sinisterra would not have been convicted, and particularly that he

---

[35]See Kyles v. Whitley, 514 U.S. 419 (1995).

would not have been sentenced to death.

12. The grounds for relief listed above have not previously been presented for the following reasons: (A) All of the foregoing grounds for relief, with the exception of the Vienna Convention Claim, were not raised previously due to ineffective assistance of counsel at trial and on appeal; (B) The Vienna Convention claim was previously raised, but the treaty violation must now be reviewed and reconsidered in light of the decision in the <u>Avena</u> case; (C) all claims of ineffective assistance of counsel herein are appropriately presented for the first time in a Section 2255 motion.

13. Sinisterra does not have any petition or appeal now pending in any other court regarding the judgment under attack in this proceeding.

14. Sinisterra has been represented by the following attorneys:

    a. At trial and on direct appeal by Fred Duchardt of Kearney, Missouri.

    b. At trial and on direct appeal by Jennifer Herndon f/k/a Brewer of St. Louis, Missouri.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, Sinisterra respectfully requests (1) that he be permitted to file an amended motion for post-conviction relief after a full and fair investigation of all the facts supporting relief has been completed; (2) that respondent be required to appear and answer the allegations in this motion; (3) that Sinisterra be afforded reasonable discovery and an evidentiary hearing on the allegations contained in this motion; (4) that after a full and fair hearing, Sinisterra be discharged from his unlawful convictions and sentences; and

(5) that Sinisterra be granted such other and further relief as he is entitled to receive under law.

Respectfully submitted,

/s/John Jenab

John Jenab   MO # 47452
110 S. Cherry, Suite 200
Olathe, KS 66061
913-390-5023
Fax 913-764-5539


/s/William E. Shull

William E. Shull MO #
104 W. Kansas
Liberty, MO 64068
816-792-4242
Fax 816-792-0888

ATTORNEYS FOR MOVANT GERMAN
C. SINISTERRA

## VERIFICATION

As counsel for German C. Sinisterra, I declare that the allegations in this motion are true and correct to the best of my knowledge and belief.  I further state that it is practically impossible for movant German C. Sinisterra to personally verify and attest to the validity of the allegations in this motion for the reason that he is illiterate in any language.  However, I have discussed the substance of the allegations in this motion with Mr. Sinisterra, with the aid of an interpreter, and he has confirmed that they are true and correct to the best of his knowledge and belief.

/s/John Jenab

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of February, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/John Jenab