<u>AFFIDAVIT OF COUNSEL JENNIFER HERNDON</u>

I, Jennifer Herndon, being duly sworn and of lawful age, state as follows:

1. I am a licensed attorney in the State of Missouri and a member of the Western District of Missouri bar. I was appointed by the court to represent German Sinisterra at trial in the capital murder case pending against him in the Western District of Missouri.

2. I represented Mr. Sinisterra during pretrial proceedings, trial, and on direct appeal to the Eighth Circuit Court of Appeals. Fred Duchardt also represented Mr. Sinisterra pursuant to the court's appointment. Mr. Duchardt served as lead counsel for Mr. Sinisterra.

3. I have been asked by Mr. Sinisterra's current counsel, representing him in his proceedings under §2255, to provide information as to certain events that occurred pretrial and during trial in Mr. Sinisterra's case.

**<u>Mitigation Specialist</u>**

4. At no time prior to or during the trial did we employ a mitigation specialist to work on Mr. Sinisterra's behalf. In my 10 years of death penalty practice, this is the only case where I have not worked with a mitigation specialist. From the beginning of the case, it was my plan and desire to employ a mitigation specialist. I searched for a Spanish speaking mitigation specialist because Mr. Sinisterra is Spanish speaking and many of his family members speak Spanish exclusively and understand no English.

5. At some point during my search for a qualified mitigation specialist, Mr. Duchardt indicated that he was seeking to have the fact investigator, Dan Grothaus, appointed as a fact and mitigation specialist. Mr. Duchardt indicated that the court would pay a higher hourly rate if Mr. Grothaus was considered a mitigation specialist. I have

Case 4:04-cv-08003-GAF     Document 41-3     Filed 03/01/06     Page 1 of 10

worked with Dan Grothaus on several occasions and believe that he is the best fact investigator one could ever find. However, due to the amount of work required in a capital trial no one, not even Mr. Grothaus, could adequately serve double duty as fact and mitigation investigator. Furthermore, Mr. Grothaus has no experience or training in the art of mitigation investigation, and is therefore not qualified to handle the complexities of preparing a mitigation case for a capital trial.

6. Mitigation investigation is very different from fact investigation, and requires a specialist who is trained in developing relationships with reluctant family members, convincing family and friends of the defendant to reveal closely held secrets, and identifying other experts (such as mental health professionals) that need to be brought in to work on the case. Mitigation specialists have both clinical training and experience and have usually obtained an advanced degree. Such training teaches the specialist specifically how to evaluate family systems and how to conduct interviews in a way that will reveal sensitive information. A detailed description of the duties of the mitigation specialist is contained in the attached affidavit of Caryn Tatelli, LCSW, a mitigation specialist that I have worked with in several cases.

7. Because time constraints and lack of qualification would preclude Mr. Grothaus from performing the functions of a mitigation specialist, I continued to search for a qualified mitigation specialist to work on Mr. Sinisterra's case. However, Mr. Duchardt insisted that Mr. Grothaus would be represented to the court as the mitigation specialist. During this portion of the pretrial preparation in Mr. Sinisterra's case, I was also preparing for trial the capital case of *United States v. David Martin*, pending in the Eastern District of Missouri. Because of my obligations in Mr. Martin's case, there were

2

times that I could not give my full attention to Mr. Sinisterra. I approached Mr. Duchardt with this problem and stated that we needed a continuance of Mr. Sinisterra's trial so that I could adequately prepare for trial. Mr. Duchardt stated we did not need a continuance and that he could do the "heavy lifting" in the trial if I could merely just show up and sit at counsel table. Fortunately, Mr. Martin's case was eventually resolved without a trial and I was able to be an active participant in Mr. Sinisterra's trial. However, in retrospect, I believe my failure to more strenuously object to not having a mitigation specialist in Mr. Sinisterra's case was due simply to a lack of time to adequately deal with the situation.

8. I am aware that "part of the existing 'standard of care' in a federal death penalty case" includes the employment of a mitigation specialist. *See* Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation, p. 51 (May 1998) (This report is commonly referred to as the "Spencer Report"); American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guidelines 4.1(A)(1) and 10.4(C)(2)(a), (Feb 2003). I am also aware that the work of a mitigation specialist is not to be entrusted to a regular investigator. As the Spencer Report recognized, "[t]he work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." Spencer Report, pp. 24-25. "Mitigation specialists typically have graduate degrees . . . and have extensive training and experience in the defense of capital cases." *Ibid.* at 24. I sought to locate and employ someone that met these standards in Mr. Sinisterra's case.

3

9. Mr. Grothaus did not attempt to perform the functions of a mitigation specialist in Mr. Sinisterra's case. I traveled to Mr. Sinisterra's home town of Buenaventura, Colombia alone to conduct family interviews. I also conducted mitigation interviews of family witnesses alone. I prepared a videotape of Mr. Sinisterra's young daughter, which was shown to the jury. All of these tasks are usually completed with the aid of a mitigation specialist, who has better expertise in conducting interviews, drawing conclusions, identifying necessary experts and developing mitigation themes. The times that I traveled to Houston, Texas to do investigation with Mr. Grothaus were spent conducting fact investigation.

10. Some specific examples of why a mitigation specialist was vital to this case are as follows. First, the bulk of the mitigation evidence on Mr. Sinisterra's behalf was presented by way of videotapes that I made of witness interviews in Buenaventura, Colombia. Many of the tapes were edited because the government objected to my narrative on the tape. As the trial court recognized, the videotapes were of poor quality due to the fact that there was no quite place to conduct interviews and the interviews were all translated from Spanish to English. While it would be impossible to capture the poverty and hopelessness in Mr. Sinisterra's hometown without bringing the jury there, one important function the mitigation specialist could have served was to testify to the jury about the demographics of Buenaventura, the lack of employment opportunities, and the difficulties of daily life Mr. Sinisterra's family endures. It is a common function for the mitigation specialist to testify when witnesses aren't available or are too impaired for whatever reason to testify. As Mr. Sinisterra's attorney, I was not available to testify. The testimony of a mitigation specialist who accompanied me to Colombia would have

4

greatly bolstered the powerful evidence I found there. Instead, the presentation of this evidence in the form of videotapes prevented the evidence from having much persuasive value. The defense theory was that Mr. Sinisterra became involved in the charged drug conspiracy to obtain money to support his family in Colombia. The evidence available in Colombia would have shown the jury why Mr. Sinisterra resorted to such desperate measures to attempt to support his family.

11. Another important function that required a mitigation specialist in this case is gathering of social history records and compiling a chronology. Record gathering is very important because it provides unbiased factual support for what can be seen as self-serving statements by the defendant and his family. In Mr. Sinisterra's case, I gathered little if any records. Record gathering can be surprisingly time consuming. Often the mitigation specialist is told that records do not exist and is subsequently able to locate those records with a little persistence. The mitigation specialist is often forced to jump through many hoops to obtain records, including submitting specific release forms, talking to several different clerks on the phone, writing letters, obtaining subpoenas, and in general being persistent about seeing that the records are copied and mailed. I am not aware of what additional records exist on Mr. Sinisterra, but at the very least, a mitigation specialist could have attempted to secure supporting records.

12. A mitigation specialist could have also identified and located an expert to talk about the differences in American and Colombian culture. Mr. Sinisterra testified at trial that he lied to the police when he told them that he killed the victim. He stated that he lied to protect his family in Colombia from Hinestroza, an indicted coconspirator who had not been arrested at the time. He feared that Hinestroza would have his family killed

Case 4:04-cv-08003-GAF     Document 41-3     Filed 03/01/06     Page 5 of 10

if he told the police that it was Hinestroza, and not Mr. Sinisterra, that killed the victim. In investigating Mr. Sinisterra's case, I learned that fear of retribution against his family was a valid and realistic fear on Mr. Sinisterra's behalf and a much more common occurrence in Colombian culture than we see happen in America. Having an expert on Colombian culture to add credibility to Mr. Sinisterra's testimony was crucial. At the least, the jury may have believed that Mr. Sinisterra was not telling the whole truth to the police in an attempt to protect his family from Mr. Hinestroza.

13. I did the vast majority of the mitigation investigation and preparation of the mitigation case for trial. The only exception to this fact is that Mr. Duchardt worked with and called to testify Joe Brandenburg, an expert on bureau of prisons issues. I never talked with Mr. Brandenburg and was not aware of the specifics of his testimony prior to hearing him give such testimony in court. No one else participated in the preparation of the case or development of themes for the penalty phase. Typically, a mitigation specialist would develop themes based on the evidence she uncovered in her investigation. The defense team (including the mitigation specialist) would then turn those themes into specific mitigators we wanted to submit to the jury. The team would then discuss specifically what evidence and which witnesses should be presented to support each theme. The fact that this entire process was solely my responsibility resulted in a disorganized and less effective presentation of the evidence than would have been possible with the assistance of a mitigation specialist.

6

**Language Barrier**

14. Mr. Sinisterra's native language is Spanish. Mr. Sinisterra cannot read or write either English or Spanish. To the best of my recollection, he had been in the United States for 7-8 years when I began representing him. When I first met Mr. Sinisterra, he understood basic English but could not understand any legal terminology. I have a basic understanding of Spanish. While Mr. Sinisterra and I could carry on basic conversation, I was often unable to understand what he was saying because of his heavy accent. Many times, we would both have to repeat things several times or rephrase things to reach an understanding. I continue to communicate with Mr. Sinisterra by phone today. While we can carry on a conversation much easier today than when we first met, there are still times that we have misunderstandings or are unable to communicate. This is especially true when we go past basic conversation. I have never had a conversation with Mr. Sinisterra in which I used an interpreter.

15. I believe that the language barrier became a problem when it became time to discuss whether Mr. Sinisterra should testify at trial. Mr. Duchardt believed that he should testify, and I advised that I did not think he should testify. The only time this issue was discussed with the aid of an interpreter was in the Marshal's Office holding cell through the mess screen shortly before Mr. Sinisterra testified. By this time, Mr. Sinisterra had already decided to testify. The conversation through the interpreter, in Mr. Duchardt's words, was simply to make sure Mr. Sinisterra understood his rights. To my knowledge, this is the only time Mr. Duchardt used an interpreter to assist in a conversation with Mr. Sinisterra.

16. When a client chooses to testify, several hours of preparation are necessary to ensure that he knows what questions will be asked and knows what to expect on cross examination. I don't know how much time Mr. Duchardt spent preparing Mr. Sinisterra for his testimony. I do know that all of this preparation was done without the aid of an interpreter. I did not spend any time preparing Mr. Sinisterra for his testimony, as I continued to believe that it was a bad idea for him to testify.

**Thanksgiving Meeting**

17. Part of the government's case consisted of evidence of a meeting at an apartment on Thanksgiving between many of the co-conspirators. At this meeting, a murder was allegedly discussed. There was some evidence that Mr. Sinisterra was present outside of the apartment around the time of this meeting. Mr. Sinisterra was adamant to me that he was not present at the apartment on this day. This evidence was a constant source of dismay for Mr. Sinisterra and he talked on several occasions about wanting to refute the evidence.

18. Mr. Sinisterra stated that his wife, Michelle, could testify that he was at home all day on Thanksgiving and could not have been at the apartment. Based on my conversation with Michelle Sinisterra, I believe that she would have testified to this fact. However, Mr. Duchardt and I chose not to call her as a witness during the guilt phase of the trial. I also recall that Mr. Sinisterra thought that his mother-in-law, and perhaps additional in-laws, could have supported his wife's testimony on this issue. We did not call any of these potential witnesses to testify on the issue.

8

## Expert Testimony

19. I was aware through the testimony of Dr. Warren Wheelock that Mr. Sinisterra has a low IQ. I do not know if Mr. Sinisterra is mentally retarded. This is an issue usually brought to my attention by the mitigation specialist in the case. I am aware that a person must meet three criteria to be classified as mentally retarded, and that mental retardation can only be diagnosed by an expert in that field. We never had any testing done to determine whether Mr. Sinisterra is mentally retarded or substantially impaired in his mental abilities in any way. I have no reason to believe that if we had done such testing it would not have been favorable to us. It is my experience that many people are able to develop enough "street smarts" to get by in life despite substantial mental impairments. The only way to determine or rule out retardation is to have expert testing done.

## *Ring* Issue

20. After trial, the Supreme Court decided the case of ***Ring v. Arizona***, which held that aggravating circumstances are essential elements of the offense of capital murder and must therefore be pled in the indictment and proven to the jury beyond a reasonable doubt. The indictment in Mr. Sinisterra's case did not comply with the requirements of ***Ring***. The aggravating circumstances were not pled in the indictment.

21. Furthermore, the presentation of the government's aggravating evidence was held to the admissibility standard found in 18 U.S.C. §3593(c), which provides that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials . . ." I believe that the Court's decision in ***Ring***, and its more recent decision in ***Blakely v. Washington***, make this portion of §3593(c)

9

unconstitutional. Therefore, Mr. Sinisterra's constitutional rights were violated by the use of this relaxed standard for the admission of evidence at the penalty phase and by the faulty indictment.

22. Mr. Duchardt and I represented Mr. Sinisterra on his direct appeal to the Eighth Circuit Court of Appeals. The issues presented by the Supreme Court's decision in *Ring* were not raised on direct appeal, but should have been raised at that stage to preserve Mr. Sinisterra's rights.

Addie M Carter
Notary Public   Notary Seal
State of Missouri
County of St. Louis
Expires August 20, 2008

Jennifer Herndon

Dated this 2nd day of December, 2004

I hereby certify that a person known to me as Jennifer Herndon appeared before me on this 2nd day of December, 2004, and personally executed the above affidavit.

Notary Public

My Commission Expires  8/20/2008

10

Case 4:04-cv-08003-GAF    Document 41-3    Filed 03/01/06    Page 10 of 10