**Antolin M. Llorente, Ph.D.**
**1708 West Rogers Avenue, Suite 1141**
**Baltimore, MD 21209**
**(410) 578-5080**

**REPORT OF NEUROPSYCHOLOGICAL EVALUATION**
(CLIENT CONFIDENTIAL)

Patient's Name:               SINISTERRA, German
Date of Birth:                11-09-1964
Date of Evaluation:           11-08-2005
Chronological Age:            40 years, 11 months
Date of Report:               02-06-2006

**Identifying Information and Reason for Referral:**

German Sinisterra is a 40-year-old, right-handed, Hispanic (Colombian National) male. He reportedly attended school until the first grade in Colombia. He was employed as an unskilled laborer (e.g., construction aid) a portion of his life prior to his incarceration.

Mr. Sinisterra was referred by defense counsel (Mr. John Jenab, Esq.) for neuropsychological evaluation in an attempt to assess his present level of cognitive functioning and determine whether he suffers from mental retardation and/or encephalopathy. Mr. Sinisterra has been charged and found guilty of murder in the first degree, and the U.S. Government is seeking the death penalty. He is presently imprisoned in a Federal Penitentiary in Terra Haute, Indiana. He is not receiving prescribed psychotropic medication at this time (verified through personnel at his prison).

**Relevant Background Information, Present Situation, and Review of Records:**

Mr. Sinisterra was reportedly charged with first degree murder as a result of a homicide, allegedly committed as part of his involvement with a drug cartel. He reportedly confessed and was subsequently tried and found guilty. During the clinical interview, he admitted that he had been involved with the drug cartel but he vehemently denied that he had committed the crime he is being charged with, noting that he had confessed under duress after he was told that confessing to the crime would help his outcome at sentencing.

He denied a history of previous involvement with the law, particularly in Colombia as he was growing up, information verified by his family but not by other sources. When asked, he indicated behaving appropriately while incarcerated at the present center, information corroborated by prison personnel).

Mr. Sinisterra was able to correctly recall portions of his history, but portions of such information had to be obtained from records and an interview with his mother and sister. He did not note developmental delays in early motor functions or speech (despite the fact that he has a lisp). With regard to past family medical history, he indicated that several members of his family suffered from "alcoholism" and other psychiatric disorders. The interview with him also revealed the presence of an impoverished background which probably included physical abuse, malnutrition, and probable child neglect. In this regard, Mr. Sinisterra was reportedly physically abused by his father (despite the fact that neither his family or him consider it abuse) and he admitted that he had worked from a

very tender age to assist his family (an age that would be considered statutory child abuse, even in Colombia). Other reported past family history included depression.

With regard to medical history, the clinical interview revealed that Mr. Sinisterra may have experienced multiple head injuries both of which may have involved loss of consciousness. He sustained a head injury as a child in which he lost consciousness during an episode in which he hit a street signage steel pole as he ran away from children who wanted to "beat" him. Subsequent to hitting the pole with his head, he reportedly remained unconscious for an unknown period of time. He reportedly also may have experienced a near-drowning episode when he was a child but he does not recall that episode. He speculated that it occurred subsequent to a head injury he sustained as he was diving into a pool. Unfortunately, there are no records to substantiate these episodes. He has not had a need for psychiatric care during this incarceration, but it is possible that he may have experienced untreated bouts of depression throughout his life. His history also includes a probable, positive history of controlled substance use and possible dependence (e.g., cocaine).

The interview with Mr. Sinisterra failed to reveal a history of military service, information later confirmed by his mother and sister. The interview with Mr. Sinisterra revealed a history of employment in unskilled positions. He reportedly was employed in his family's business selling wood in Colombia. Aside from his involvement with the drug cartel, he also reportedly worked in the past as a car washer, carpenter in the construction industry, and as a construction aid building "houses." When asked how he had immigrated to the U.S. on multiple occasions, he indicated that he came in a "banana" cargo ship from Colombia to the U.S. on multiple occasions.

With regard to interpersonal relationships, Mr. Sinisterra indicated that he was married. When asked, he indicated that he had six children ranging in ages from 7 to 20 years. He reportedly has not had contact with his wife recently. No other relationships were reported.

In response to questions surrounding his present condition, he exhibited significant remorse but he denied having killed anyone. When asked about the contradictory information provided as hearsay by others about his involvement in the event leading to his incarceration, he noted that he was being framed by the drug cartel he worked for, and that there was no factual information supporting the hearsay of others who worked with him in the drug cartel that he had murdered anyone. When asked about the blood found on his clothes consistent with victim's specimen, he indicated that he had been told to move the victim's body from one location to another responsible for the stains in his clothes but that he did not "killed" anyone.

A clinical interview was conducted with his mother and a sister. During this interview via telephone (Colombia), his biological mother noted the absence of developmental delays. He reportedly walked by 8 months, used single words by 6-9 months, and was toilet trained around 24 months of age. When asked about other developmental milestones (e.g., riding a bike without training wheels), she denied any problems with these developmental milestones. When asked about adaptive skills, the mother did not mention problems in this area, and she indicated he was able to dispatch his responsibilities well as he was growing up. He reportedly helped her around the house at an early age as he performed minor jobs or helped his family with their wood sales business in Colombia

(although unintentional, the mother failed to recognize that he was asked to do work that may have been too harsh for such a young child constituting abuse). When she was challenged with the question why he only went to school for such a short period of time, she indicated that "he wanted to help around his household" but she denied the presence of learning difficulties forcing him to leave school. When asked specific questions about school difficulties, she denied that he had difficulties in this area. The only problem noted by his mother was poor memory and "forgetfulness." She also mentioned that Mr. Sinisterra had experienced a near-drowning episode in which he lost consciousness for an unknown period of time when he was a young child but she did not remember specific details about the event. When asked about her perception related to the events that led to his present situation, she indicated that it was impossible for her to look after him after he had departed, being so far away (U.S.) from her. She noted that he may have been associating with the wrong people. She also noted that her son never had problems with the law in Colombia. One of his siblings and his mother reported that he had been exposed to a significant amount of violence as he grew up in his home as a result of extensive and severe marital conflicts between his parents. When asked, she candidly admitted that her husband "hit" her, and the children were exposed to this violence, leading her to divorce their biological father. She also corroborated the story told by Mr. Sinisterra about his father "going after his mother with a machete" on one occasion, nearly hurting her severely. When asked about her other children, his mother noted that his siblings are doing well and one of his brothers reportedly is very bright (inteligente) and he recently received an undergraduate degree. However, although she indicated that he had no developmental delays, she did not have an answer nor appears to note that his lisp represents a speech problem.

Academic records were not available for review despite the fact that attempts were made to obtain such archives. However, Mr. Sinisterra only attended the first grade which he started at the appropriate age of 6-7 years. He did not remember if he received special education or tutoring after school but his mother denied such a need. He reportedly did not exhibit behavioral problems in school. When asked, he noted he left school not because of academic difficulties (although he noted he found schoolwork hard) but because he had to go to work to assist his family economically.

Review of records indicated that Mr. Sinisterra had undergone a previous "psychological" evaluation. His intellectual functioning (assessed in English) was grossly estimated to be in the borderline range. In addition, aside from the concerns indicated in the report noting that he was illiterate, no mention was made about the possibility that he may suffer from an organic condition, not to mention that he also may have been suffering from a profound depressive episode, or other problem(s), or more important, the impact of his illiteracy on his test performance.

It should also be noted that the aforementioned evaluation, despite its forensic nature, never addressed the issue of response bias in this client. In addition, more perplexing is the fact that raw data are not available for review. Most egregious, he was assessed and an intellectual measure administered and interpreted by someone who is an educational specialist, not a licensed mental health professional, and an interpreter must have been employed and/or the client may have been assessed in English without the use of standardized assessment to evaluate an individual who is predominantly fluent in Spanish, and this information was used as the basis for the forensic opinions expressed in his case in the past, a posture not consistent with best practices or ethical guidelines.

SINISTERRA, G.
DOE: 01-05
Report of Neuropsychological Evaluation
Page 4


**Behavioral Observations**:

Mr. Sinisterra was evaluated within the confines of an attorney-client contact room within the U.S. Federal Penitentiary in Terra Haute, Indiana. He was evaluated without upper extremity restraint so as not to impact his performance. The entire examination was conducted in Spanish, as he is most fluent in this language, a fact objectively assessed. Although his attorney had explained the purpose of this examination, similar to the introduction provided prior to the start of his evaluation, he initially presented as an apprehensive man. During the evaluation, his speech was normal in pace and intonation. The content of his speech was coherent but a lisp was noted. He was well oriented to person, time, and place. His overall motor output was within normal limits.

Although he initially appeared to be somewhat apprehensive as noted above, he slowly acclimated to the assessment situation and appeared to put forth appropriate effort on all tasks. When asked, he conversed about his present condition (incarcerated where he is reportedly treated well).

A discussion of his childhood elicited blunt affect. Overall, affect appeared to be flat. Mood appeared to be somber. The assessment environment was quiet throughout most of the examination reducing threats to the validity of this evaluation.

Mr. Sinisterra's demeanor was observed outside of the one-on-one testing situation as he took a small break during the course of the evaluation to use the restroom or to have lunch (he had lunch in the test room). During these observational periods, he was at all times appropriate from a behavioral standpoint consistent with reports from prison personnel indicative of unremarkable behavior. Although Mr. Sinisterra did not wear upper extremity cuffs, at no time did this examiner feel unsafe in the exam room while assessing this individual.

**Procedures and Tests Administered**:

Batería Woodcock-Muñoz-Pruebas de Aprovechamiento-Revisada (Letter-Word Identification, Reading Comprehension and Calculation) (WMPA-R)
Batería Woodcock-Muñoz-Pruebas de Habilidad Cognitiva-Revisada (WMPHC-R)
Beck Depression Inventory (Spanish Version)
Clinical Interview with the Patient (Spanish)
Color Trails Test 1 & 2 (CTT) (Spanish Instructions and American Norms)
Draw-A-Person Test (Spanish Instructions)
Grooved Pegboard Test (Spanish Instructions and American Norms)
Judgment of Line Orientation, Form V (Spanish Instructions and North American Norms)
Modified Boston Naming Test (Spanish Instructions and Hispanic Norms) (MBNT)
Reitan-Kløve Sensory Perceptual Examination - Except Tactile Form Recognition –Spanish
        Instructions and North American Norms
Rey 15-Item Memory Test (Spanish Instructions)
Rey-Osterrieth Complex Figure Test (Copy and 30' Delayed Recall) (Spanish Instructions and
        Hispanic Norms)

Stroop Interference Test (Spanish Version, American Norms)
Symptom Validity Test – (Color Pens) (Spanish Instructions)
WHO-UCLA Auditory Verbal Learning Test (WHO-UCLA-AVLT-SV) (Spanish
       Version) (Hispanic Norms)

**Assessment Results**

Assessment Validity:

Due to the legal nature of this case, coupled with the fact that Mr. Sinisterra may have been
motivated to present himself in a good light (or ill) as a result of his impending legal proceedings,
several procedures believed to be sensitive to the presence of feigned symptom exaggeration and/or
response bias were administered. The results of these procedures revealed that Mr. Sinisterra was
being straightforward and honest in his responses to test items. He performed within the range of
expectation on the Rey 15-Item Memory Test (Score=12/15). Similarly, his scores on the Dot
Counting Test fell within normal limits (25th-50th percentile). On a more complex probabilistic
procedure, involving forced-choice responding (The Symptom Validity Technique [SVT]; Color
Pens), his performance fell within expectation on three sets of trials involving 5-, 15-, and 30-second
delays (Score=60/60). The level of rapport established with this individual also was appropriate.

Academic Functioning (Reading and Math Computational Levels):

Because of his academic record, Mr. Sinisterra was administered subtests from the WMPA-R (Letter-
Word Identification [Identificación de Letras y Palabras] and Calculation [Cálculo]) in an attempt to
assess his reading and math skills. On these measures, his performance fell at a 1.1 grade-equivalent
level in reading and a 2.5 grade-equivalent level in math calculation.

Intellectual Functioning (Estimate):

Mr. Sinisterra was administered the WMPHC-R, an aptitude test. On this intellectual instrument, he
obtained an overall score of 68 (61-75) placing his overall performance (Broad Cognitive Ability)
within the 2nd percentile and within the very low range of intellectual abilities when compared to his
same age peers. However, when controlling for his low educational level (1.9 grade), his overall
score fell in the average range (106; 65th %ile). He obtained the following Standard Scores (SS)
(mean=100; standard deviation = 15):

| Subtest | Process Assessed | SS | %ile |
|---------|-----------------|----|----|
| Memory for Names | aud.-visual association | 77 | 6th |
| Memory for Sentences | attention/memory | 89 | 24th |
| Visual Matching | processing speed | 83 | 13th |
| Incomplete Words | auditory processing | 58 | 0.3rd |
| Visual Closure | visual processing | 86 | 18th |

| | | | |
|---|---|---|---|
| Picture Vocabulary | crystallized intellect | 74 | 4th |
| Analysis-Synthesis | fluid intellect/reasoning | 80 | 9th |

His performance on WMPHC-R subtests merits further attention because it captures the essence of this individual's cognitive profile, particularly his variability in scores frequently found in individuals with brain organic conditions. For example, his score on a subtest requiring significant auditory processing (Incomplete Words) and auditory-visual associative processes (Memory for Names) as well as crystallized reasoning (Picture Vocabulary) fell within the impaired to borderline range.

Similarly, his scores on all other measures fell in the low average range and none of his subtests scores fell in the average range. Although lack of formal education has been known to impact performance on this measures, and when corrected for education his scores would definitely be higher, his overall profile is consistent with that sometimes seen in individuals with organic conditions as well.

It should be noted that his WMPHC-R Index is consistent with his score from an examination he underwent two years ago using the WAIS-III. However, it should be noted that that assessment only made use of the Performance scale (restricted to visual reasoning), and as such, whatever deficits existed in this client in verbal reasoning were not investigated. In addition, the use of an individualized, unpublished, and unstandardized translation of the WAIS-III render that evaluation invalid, not to mention that taking such course of action was unethical.

Attention and Concentration:

Mr. Sinisterra was administered several measures to investigate attention and concentration skills. His performance on a measure assessing his ability to visually concentrate (Color Trails Test 1) fell within the impaired range when compared to 30-44 year-olds with less or equal to 8 years of education (93 secs; <1st %ile). His score on a procedure requiring visual concentration and sequencing (Color Trails Test 2) using the same demographics fell in the average range (96 sec; 38th %ile). His interference score on this measure fell within normal limits (0.35; >16th %ile). His poor score on the first part is attributed to a lack of testing experience.

His performance fell within the low average range (16th %ile) on a measure of auditory attention (WMPHC-R, Inversión de Números) as he repeated digits backwards when compared to his same age peers. On this measure, he was able to consistently repeat 3 digits backwards, and inconsistently repeat four digits backwards.

Language/Auditory Processing (Screening):

Although Mr. Sinisterra spoke fluently in Spanish, his language of origin, his speech was marked by a lisp. On the other hand, his speech was normal in prosody and the content of his speech was coherent. His score (20/30) on a task requiring confrontational naming (BNT) fell in the average range (34th %ile, average) when compared to norms for individuals with ≤ 8 years of education. Functional and phonemic cues did not aid his performance on this test. However, his most impaired

performance in this area occurred on a test (Incomplete Words, $0.3^{rd}$ %ile) requiring the completion of words after having heard partial phonemes of the words. Even when corrected for his low level of education, his score on this measure fell in the impaired range (1st-2nd %ile).

<u>Visual Spatial Skills and Perceptual Organization</u>:

On a complex visuo-motor procedure requiring perceptual organization and visual processing (Copy, Rey-Osterrieth Complex Figure), Mr. Sinisterra obtained a score of 21/36 placing his performance within the low average range (21st %ile) when compared to individuals with similar educational (0-6 years) and cultural (Hispanics) backgrounds. On this task, he exhibited significant organizational difficulties and he missed or distorted several components of the drawing as he copied it. Mr. Sinisterra also was administered a motor-free visuo-perceptual measure assessing his ability to determine angular distances between lines (JLO). On this measure, his score (50/30) fell within the average range (56th %ile) when compared to his same age peers.

<u>Learning and Memory Functions</u>:

*Verbal Memory*: Mr. Sinisterra's verbal memory was assessed using a rote verbal memory as he performed a list learning task (WHO-UCLA AVLT-SV). On this measure his score fell within the borderline range (4th %ile) on the fifth recall of the original list (Trial V). His score fell in the average range (38th %ile and 66th %ile) on indices assessing immediate and delayed recall, respectively. All these indices were corrected for individuals with his same low educational level (0-6 years) and cultural background (to use the most appropriate approach). While learning the word list, he predominantly used a primacy and recency approach as expected providing further support for the validity of this assessment. He exhibited little to no retroactive or proactive interference.

*Visual Memory:* Mr. Sinisterra's performance on a visual learning and memory task (Rey-Osterrieth Complex Figure, 30-minute Delayed Recall) fell within the low average range (12th %ile) when compared to peers with similar educational (0-6 years) and cultural (Hispanics) backgrounds.

<u>Motor/Sensory Skills</u>:

Informal lateral preference assessment (use of hand to write, throw a ball [pantomimed], etc.) suggests that Mr. Sinisterra is right-hand dominant. Using this information, his motor/sensory functioning was assessed. On the Grooved Pegboard Test, a test requiring fine motor coordination and dexterity, his scores fell within the average range with his right (dominant) and left (non-dominant) hands (preferred hand=75 sec., 66th %ile; non-dominant hand=85 sec., 50th %ile) when compared to 40-59 year-old males with less than a high school education. There was a non-significant raw score lateralizing discrepancy of 12% favoring his preferred hand. On another procedure examining manual dexterity (FTT), he respectively scored within the above average and average range with his right (dominant) and left (non-dominant) hands (preferred hand=49 mean taps, 90th %ile; non-dominant hand=41 mean taps, 66th %ile) when compared to 40-59 year-old males with less than a high school education. A non-significant raw score lateralizing discrepancy of 16% emerged favoring his preferred hand. His performance on the Sensory Perceptual Exam revealed no

errors.

<u>Executive (Frontal Systems) Skills Functioning</u>:

On Color Trails Test 2, a test requiring inhibition and shifting of set, his score (using appropriate demographics: compared to 30-44 year-olds with less than or equal to 8 years of education) fell in the average range (126 sec; $\leq 38^{th}$ %ile). His interference score on this measure fell within normal limits (0.35, >16th %ile). In contrast, he exhibited significant difficulty in organization and planning while performing the copy portion of the Rey-Osterrieth Complex Figure. He scored in the impaired range (1st %ile) when compared to same age peers on the three components (color naming, word reading, and color-word reading) of another procedure assessing the ability to inhibit a common response for a more complex response (Stroop Interference Test). However, his poor performance on this test may be due to his poor reading ability. On the WCST, the test was discontinued because he was not able to perform the task earning impaired scores (1st %ile) on all indices after the first 64 trials (he was confused by this test, and he had difficulties staying on set).

<u>Behavioral/Emotional/Personality Functioning</u>:

He completed the BDI. On this measure, he obtained a score of 9. Although not diagnostic, this score suggests that he is not experiencing depressive symptoms. During this assessment, Mr. Sinisterra was asked to complete the Draw-A-Person Test. His drawing of a person was unremarkable from a developmental standpoint. Using the Goodehough-Harris system, his performance is similar to that produced by adults.

**Summary and Clinical Impressions**:

German Sinisterra is a 40-year-old, right-handed, Latino (Colombian National) male. He reportedly attended school until the first grade in Colombia. He was employed as an unskilled laborer (construction, etc.) a portion of his life prior to his incarceration. He was referred by defense counsel for neuropsychological evaluation in an attempt to assess his present level of cognitive functioning and determine whether he suffers from mental retardation and/or encephalopathy. Mr. Sinisterra has been charged and found guilty of murder in the first degree. He is presently imprisoned in a federal penitentiary. He is not receiving prescribed psychotropic medication at this time.

The present results revealed an overall intellect within very low range of intellectual abilities when compared to a cohort with his same age, and estimated in the average range when his low educational level is taken into consideration. It should be noted that these kinds of comparison are not as accurate than specific norms for illiterate persons or individuals with extremely low levels of education, but they are required to meet minimum standards of practice, and despite the fact that they represent estimates of abilities, they provide important information related to the effects of low educational levels on test performance. Within this overall level of functioning, his profile exhibited significant variability. A number of subtests scores fell in the impaired to borderline range whereas others fell in the low average to average range. It is important to note that his low educational level impacted his performance on this measure as well as his score from a previous examination noting

borderline cognition. However, regardless of his low educational attainment, it is my impression that this individual does not possess average intellect at this time, and it appears that his overall intellect resides somewhere between his impaired and average scores estimated through the intellectual measure administered to him. Just as important, his profile revealed a great deal of scatter, and such profiles are sometimes seen in individuals with organic conditions.

The patient's neuropsychological performance fell within the range of expectation on selected domains when compared to individuals with similar chronological age, and whenever possible, where compared to individuals with similar levels of low educational attainment (these types of comparisons are important to rule-out artificial dampening effects on performance as a result of his low educational level). The present results revealed performance within the range of expectation on selected measures of auditory attention, expressive language including naming, visual perceptual skills, selected aspects of verbal and visual memory and fine-gross motor skills. In contrast, the results of this examination revealed relative weaknesses or deficits on measures of working memory, selected aspects of speech-language including auditory processing and a lisp, verbal learning, and selected executive skills (e.g., inhibition). The pattern of neuropsychological performance observed during the course of this evaluation suggests that Mr. Sinisterra suffers from organic brain damage (static encephalopathy). Such a hypothesis is also supported by some scores falling in the impaired range despite the fact that they were controlled for his low educational level, his lisp, and his background history. With regard to specific aspects of his history, as it relates to a hypothesis suggesting the presence of encephalopathy, the use of controlled substances by this individual strongly buttresses such a postulate. Therefore, when all these factors are taken into consideration, it is impossible to rule-out the presence of static encephalopathy (brain damage) in this individual.

A measure of emotional functioning and behavioral observations assessing depressive symptomatology fell within normal limits. Behavioral and emotional indicators obtained during this examination revealed that Mr. Sinisterra is probably not experiencing elevated levels of psychological distress at this time.

Because there are no valid measures to retrospectively assess adaptation, and adaptive skills are difficult to assess retrospectively using verbal report (verbal report may be inaccurate and there are no valid, formal measures to do so for this individual), coupled with the inability to assess these abilities while an individual is incarcerated where adaptation and organization are provided by the Federal Criminal Justice System, a question remains whether a hypothesis of adaptive deficits is supported by history. With this in mind, many unbiased and independent sources of information coincide to support a postulate suggesting the presence of moderate to severe adaptive delays in select areas. Although self-report and reports from family members could be considered biased, review of records indicated the presence of a chronic history of delays in adaptation in several areas. His records revealed a poor history related to issues of safety. Similarly, his academic and vocational histories are marked by low educational attainment and unemployment or employment in unskilled jobs, and such findings also supports a postulate indicative of adaptive delays. On the other hand, at different points through his lifetime, he came to the U.S. through its border without assistance. He also reportedly was able to make friendships (yet, some of which may have led to his present situation). Similarly, despite difficulties early in life, he was self-sustained, and he indicated that he

was able to obtain a license and purchase transportation in the U.S. Although the latter factors alone do not decrease his difficulties in other areas, they point to an individual who was able to partially dispatch his responsibilities in several areas of adaptation.

With regard to mental retardation (MR), this is a difficult issue to address in this individual. Some aspects of his adaptive history would argue in favor of MR as specified by the AAMR, including his inability to safely care for himself. Portions of his academic and vocational histories also argue in favor of MR. On the other hand, although his valid, impaired performance on a test of overall cognition fell in the impaired range when compared to his same age peers, his score is not impaired when corrected for his low educational level and his profile is then inconsistent with mental deficiency. Altogether, it is my clinical impression based on his history, my behavioral observations, and the present findings that this individual suffers from dampened intellectual functioning, yet not consistent with mental retardation. Although individuals with mental retardation are quite capable of having isolated cognitive strengths, Mr. Sinisterra's overall wealth of information, history, in conjunction with his overall profile, in my opinion, is not consistent with mental retardation. On the other hand, as noted above, such a finding does not negate the fact that in my opinion he suffers from encephalopathy (brain damage).

Although he is said to have participated in an event that allegedly led to the death of an individual, in my opinion, he does not posses the mental capacity to have planned such incidents. His lower-than-average intellectual index and executive functioning scores merit additional attention because they have direct bearing on the present situation. Aside from supporting a hypothesis suggesting the presence of dampened cognition, his deficits in executive skills are also partially responsible for the present condition, and individuals with these profiles have been known to be at greater risk to use poor judgment and impulsivity, particularly when under the effects of powerful undue influences.

Finally, Mr. Sinisterra's psychosocial background should be taken into consideration when interpreting these results and reaching judicial decisions. For this reason, these critical factors should not be ignored but given due weight because they partially account for his present situation, not to mention that they serve as plausible etiologies for his organicity (brain damage). He definitely lacked significant parental controls that would have protected him as a youth. Information obtained during the course of this evaluation additionally revealed that Mr. Sinisterra might have been the victim of exposure to abuse, violence, and neglect, including malnutrition, at a tender age, and each of these three factors in and of themselves is capable of accounting for a portion of his present neuropsychological profile, not to mention when these factors are considered in combination as a result of their synergistic effect on developing neural substrates. These factors, in conjunction with his limited formal education, created an unstable environment for an individual like Mr. Sinisterra who lacked any type of stable support system, particularly after he left Colombia and arrived as immigrant in the U.S. Such impoverished backgrounds, coupled with limited psychological and/or societal resources, place these individuals at risk to undue influences, regardless of intellectual level, and even greater danger when their intellect is subaverage.

Thank you for referring this individual for evaluation. If I can be of further assistance, I remain available for further consultation.

SINISTERRA, G.
DOE: 01-05
Report of Neuropsychological Evaluation
Page 11


Antolin M. Llorente, Ph.D.
Licensed Psychologist (MD: 3839)
Clinical Neuropsychologist


cc: File