IN THE UNITED STATES DISTRICT COURT,
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA )
    Plaintiff )
        )
v. )    Case # 98-311-02-CR-W-GAF
        )
        )
GERMAN SINISTERRA )
    Defendant )

### *STATEMENT OF FREDERICK A. DUCHARDT, JR.*

Now on this 26th day of November, 2006 comes Frederick A. Duchardt, Jr., and

in light of the specific and particularized direction of the Court and counsel for the

parties on October 6, 2006 and October 16, 2006, does make the following, limited

responses to those allegations made in the amended petition for relief under 28 U.S.C

2255 filed by counsel for Mr. Sinisterra before this Court.

1. I was appointed by the Court as lead counsel for Mr. Sinisterra at trial and

upon appeal in the above captioned cause. I have been licensed to practice law in

Missouri and in the Western District of Missouri since 1980. At the time that I tried

Mr. Sinisterra's case, I had previously handled, as lead counsel, and to completion,

one other Federal capital case and four other Missouri state capital cases.

2. As lead counsel in this case, I was responsible for seeking and obtaining

members of the defense team to work on the case with me.

1

3. I asked Jennifer Herndon to join me as cocounsel for Mr. Sinisterra. I chose Ms. Herndon because of her capital case experience, which I knew at the time to be that, while she was with the Missouri Public Defender System, she had tried capital cases, and that while in private practice, she had been cocounsel in the Federal capital case of *United States v. Norris Holder*, tried in the Eastern District of Missouri, and had handled Federal capital habeas actions on behalf of petitioners, including the case of *Kenley v. Bowersox*, a matter on which I worked together with Ms. Herndon. When Ms. Herndon agreed to participate in this case, I sought and obtained her appointment as cocounsel.

4. I also asked Dan Grothaus to act as an investigator related to both phases of the case, and to help with duties often assigned to a person referred to as a "mitigation specialist". I chose Mr. Grothaus for this dual role because of his unique educational and experience background. Previous to his working as a private investigator for a number of years in Kansas City and in Houston, Texas, Mr. Grothaus had been an investigative journalist for a number of years with the Houston Chronicle. Mr. Grothaus' college course pursuits had also educationally trained him in various aspects of human relations. Mr. Grothaus' extensive connections with, and knowledge about, the Houston, Texas area was also a bonus, since many aspects of the case were connected with that area. I knew that Mr. Grothaus had not previously

acted specifically in the capacity as a "mitigation specialist". However, I believed that Mr. Grothaus' educational and experience background made him qualified, even more than those who often act as "mitigation specialists" to take on the multifaceted tasks that confronted us as concerned investigation of both phases of the trial of this case. I discussed this dual role with Mr. Grothaus, and he agreed to take on the duties at the rate of forty-five dollars ($45.00) per hour.

5. I discussed my choice of Mr. Grothaus with Ms. Herndon. I explained to her that, at the time, there was a policy in the Western District of Missouri, initiated by Chief Judge D. Brook Bartlett, and enforced by Ann Busterud, CJA Clerk for the Western District of Missouri, that fact investigators for cases could not be paid any more than thirty-five dollars ($35.00) per hour. This limit owed to the notion that since, at the time, attorneys were paid only forty dollars ($40.00) per hour for their time, investigators should not be paid more. I explained to Ms. Herndon that, rather than battle against these notions, we would ask for more per hour for Mr. Grothaus because of his unique qualifications and unique role, also touting that using one expert for two investigative purposes would actually save money in the long run.

6. As the case developed, there was so much first phase case investigation work for Mr. Grothaus to do that I actually assigned him only a very few duties related to the penalty phase of the case, related to matters in the Houston, Texas area. Despite

3

this fact, I did not enlist another "mitigation specialist" to help with development of mitigation themes and evidence because that work was being done by me and by Ms. Herndon. We, of course, drew upon our previous experience in development of mitigation themes and evidence.

7. Several months before trial began (my best recollection is that this was in December of 1999 or January of 2000), Ms. Herndon called me on the telephone and indicated to me that, because she had another capital case which she was handling, which was also scheduled to begin trial near the time that this case was set (April of 2000), she did not feel that she could assist any further, at that time, in preparation for the trial, and suggested that I seek a continuance of the case, to permit her to remain on as cocounsel in this case, and handle her other case as well. I told Ms. Herndon that, in light of the nearly year and a half continuance which had been granted in the first place, in the setting the case for trial in April of 2000, and because there were still several months remaining prior to trial, and because there were other codefendants involved in the case, I believed that there was a good chance that a continuance would not be granted. I was also disinclined to continue the case because I believed our preparation for trial was in full swing. The government had refused open file discovery in the case. The government had even gone so far as to dismiss the severed case of codefendant Percy Smith so as to avoid going to trial on that case prior to our

trial date, thereby avoiding providing us, through that trial, disclosure of certain of its witnesses and evidence which it wished kept secret as long as possible. The Court was prepared to order full discovery disclosure in the near future, because of the impending trial date. A continuance would have meant that that disclosure would have been delayed. We were ready to have that protected information to carry forward with case investigation. In my estimation, a delay would have meant we would have had to gear up for the further investigation at a later time, and would have had to redo work which had recently been done. I also believed that, with the help of another counsel to do certain, distinct tasks, the matter could be fully prepared for trial by the trial date by me, even without Ms. Herndon's assistance. Even a new counsel, unfamiliar with all of the facts of the case, who nevertheless was a very good book lawyer, could have taken over fairly quickly some of the legal issues which I was handling related to challenges over the Vienna Convention and suppression. That would have freed up my time to handle the duties which Ms. Herndon was handling. I also told Ms. Herndon that, though we had originally planned that I would take the lead (meaning giving opening statement and closing argument, and taking the larger share of the witnesses) in the first phase of the case, and she would take the lead in the second phase of the case, if she wanted to remain with the case, I believed that I could do the "heavy lifting" in terms of being lead counsel as to both phases, especially

since that is the way that I had handled four of my five previous capital case trials. I also believed that I could take the lead in evidence preparation for both phases of the trial, and thereby do the "heavy lifting" as to that aspect of the case as well. Nevertheless, I suggested that Ms. Herndon bring her work conflict to the attention of the Court, and she did so. Shortly after Ms. Herndon contacted the Court, I spoke with Magistrate Judge Sarah Hays about the matter. Judge Hays indicated that, if Ms. Herndon actually sought leave of court to withdraw on the bases of her duties in her other case and her not being able to further participate in this case, the Court would likely grant that request to withdraw, and then provide me with another appointed counsel and any other assistance which I required in order to have the case prepared for trial as scheduled. Judge Hays indicated that I could instead file a motion for continuance if I wished, and of course the Court would entertain and fully consider any arguments which I made about the matter. However, Judge Hays also indicated that, in light of the considerable time left before trial, and the willingness of the Court to provide me services of other attorneys and experts, that would seem to address any problems which might be created by Ms. Herndon's departure, and obviate the need for a continuance. This all became a moot point when Ms. Herndon secured a continuance in her other case, and continued, without interruption, as cocounsel in this case.

8. Even though Ms. Herndon continued on the case, and was going to be lead counsel with respect to the penalty phase, I not only took the lead with respect to jury selection and the first phase legal and factual issues. I also took the lead on developing mitigation evidence from the Houston, Texas area, particularly with the Sinisterra extended family there, and I also developed and presented legal arguments with respect to the penalty phase aspects of the Vienna Convention. Ms. Herndon took on responsibility for developing and presenting other penalty phase related motions. And, Ms. Herndon took the lead on developing mitigation evidence from Colombia.

9. Pretrial, I reviewed the penalty phase-related motions which Ms. Herndon developed and filed, and I did not participate directly in the work on those motions, since I believed that those motions were capably drafted and handled.

10. At the time of trial, I was not familiar with the arguments being made in other cases, based on *Apprendi*, regarding the Constitutional error in the failure of the government to include in its indictment allegations related to aggravating factors. I learned after trial that Ms. Herndon was familiar with this motion practice because her client, Norris Holder, was the codefendant of Billie Allen, whose counsel was one of the first to raise the *Apprendi* issue in a Federal capital case. For reasons which I do not know or understand, Ms. Herndon did not join

7

Allen's motion in this regard on behalf of her client Holder, and therefore Holder did not enjoy the vacation and reconsideration of his case which occurred for Allen in *Allen v. United States*, 536 U.S. 963 (2002), as wrought by the holding of the Supreme Court in *Ring v. Arizona*, 536 U.S. 584, 589 (2002). Ms. Herndon also did not raise the issue on behalf of Mr. Sinisterra in this case, and therefore this issue was also lost to us on direct appeal. I had never before delegated to another attorney the handling of any part of motion practice in a capital case of mine, and have not done so since. Since learning about the *Ring* issue, I have raised it and modified it in connection with every capital case which I have handled. I believe that the failure to raise the issue in this case was erroneous, and I take responsibility for that failure, since I was general lead counsel for the case. In calling this failure erroneous, I realize that the Eighth Circuit has ultimately decided against granting relief for this failure in *United States v. Allen*, 406 F.3d 940 (8th Cir. 2005). However, Mr. Allen's petition for certiorari with regard to the Eighth Circuit holding is still pending under Supreme Court Case # 05-6764, and I personally believe it likely that Mr. Allen should and will ultimately gain relief. Should such a determination of the *Allen* case occur, that would mean that our error in this case would be prejudicial.

11. At time of trial, I was aware that Ms. Herndon had chosen not to make a

challenge to the FDPA on the basis of racial bias in the practices of the Federal government in seeking of the death penalty. I was aware that others were making such challenges. It is my recollection that, at the time of trial, there had not yet been publication and dissemination of the report of the Department of Justice, as cited in Mr. Sinisterra's 2255 amended petition, regarding the much larger numbers of black Federal capital case defendants being prosecuted under the FDPA. Nevertheless, the information which was ultimately contained in the DOJ report was anecdotally well known among Federal capital case practitioners, including me, at the time that Mr. Sinisterra's case was working its way toward trial. However, I knew that challenges about racial bias in charging practices were not gaining success because courts were refusing to infer racial discrimination based upon the numbers for a host of reasons, among which was the strong justification for death penalty prosecution in all of the Federal capital cases pursued, based upon the aggravating facts in the cases which were being capitally prosecuted. In light of these considerations, I did not believe that such a motion had any real chance for success, and thus I did not urge Ms. Herndon to prepare such a motion, and I did not prepare such a motion myself. The Supreme Court's subsequent decision in **United States v. Bass**, 536 U.S. 862 (2002) has caused me to believe that this issue is not one which can achieve success based upon the facts

currently available.

12. In reviewing the 2255 amended petition, I do not note any objections to the way in which the Houston-based penalty phase evidence, handled by me, was prepared and presented, other than the comment that the penalty phase presentation, as a whole, was "disjointed".  I made trips to Houston, Texas to prepare this evidence, and I worked with the witnesses I presented while I was in Houston, and while they were in Kansas City.  While I certainly did not perceive the penalty phase evidence presented by me to be disjointed at the time, I leave it to others, particularly the Court, to determine the quality of that portion of the presentation.

13. In reviewing the 2255 amended petition, I do note strong objections to the penalty phase presentation with regard to information from Colombia about Mr. Sinisterra's background and upbringing.  I have reviewed the details in the amended petition concerning Mr. Sinisterra's background, and I acknowledge that I was aware of all of this information prior to the start of trial.  I also acknowledge that this information was only partially addressed in our penalty phase presentation.  It had been our intention to present most of Mr. Sinisterra's youthful background information through the live testimony of his family members, most importantly through his mother.  We intended to handle things in this way because

10

there were no records about Mr. Sinisterra's childhood which were available from Colombian authorities. The only information came from Mr. Sinisterra's family members, mostly from his mother.  At this time, pre-9/11/2001, we believed that we would be able to prevail upon the Court, the Department of Justice and the Department of State to permit these witnesses to enter this country for the purpose of testifying.  We took all appropriate steps to assist the witnesses in timely applying for entry visas.   We believed that, if the entry visas were rejected, we would have a strong issue for appeal regarding denial of the right to present mitigation evidence.  We frankly believed that this issue was so strong that it would persuade government officials to grant the visas.  Unfortunately, despite these efforts, we learned, at the last minute, that these persons would not be granted entry visas.  Even more unfortunately, this Court, and then the Court of Appeals, did not find sufficient prejudice to warrant relief from the death sentence arising out of the failure to grant witness visas.  It should also be noted that, because of her severe heart condition which became more pronounced as trial approached, Mr. Sinisterra's mother was unable to travel, even if visas had been granted.  While she was in Colombia conducting penalty phase investigation, Ms. Herndon had taken the step of videotaping interviews with all of the witnesses. When it became clear that the witness visas would not be issued, Ms. Herndon

11

suggested that we use the videotapes in lieu of the testimony of the witnesses. Ms. Herndon indicated to me that she was having the tapes prepared for presentation, and thus the tapes were not available for me to review prior to trial. Because of this, I left it to Ms. Herndon to review and prepare the tapes for presentation. I had urged Ms. Herndon to disclose copies of the tapes to the government as soon as we knew that the tapes would have to be used in lieu of testimony, in other words just before trial. I believed that the Court's reciprocal discovery order might well require such disclosure. Ms. Herndon resisted the idea of such disclosure, believing that, under statutory and case law, the government did not have any right to discovery of mitigation evidence until time of the sentencing phase. I acquiesced to Ms. Herndon on this question because her legal viewpoint was, and still is, the predominant one held by the vast majority of Federal capital case defense counsel nationally, and my viewpoint was, and still is, in the very small minority. Unfortunately, at trial, the Court found that earlier disclosure of the tapes should have been made, and remedied the disclosure failure by allowing an instruction telling the jury that the tapes had been withheld from the government until just before their presentation. Even more unfortunately, the Eighth Circuit upheld this Court's position on appeal. To compound the difficulties wrought by the adverse jury instruction, during the playing of these videotapes during trial, it

12

became clear that the quality of many of these tapings were very poor. For all of the aforementioned reasons, I believe that the criticism that this portion of the presentation was "incomplete" and "disjointed" is more than fair. Again, because I was lead counsel for the case, I take responsibility for this deficiency. I had not before, and have not since, delegated to another attorney such a critical part of a penalty phase presentation.

14. In retrospect, I believe that we should have sought authorization for the taking of the Colombian witnesses' testimony by depositions pursuant to F.R.Cr.P. 15(a)(1). That would have permitted the presentation of all of the evidence, and would have eliminated the problems encountered with getting the witnesses live.

15. In the 2255 amended petition, and in Ms. Herndon's affidavit, an issue is raised, with respect to the presentation of the Colombian witness information, particularly over whether the employment of a "mitigation specialist" different from Mr. Grothaus could have also addressed the problem which arose. I believe what is actually being argued is that we should have engaged the services of a forensic social worker to present the Colombian witness information, either in addition to, or in lieu of, the testimony of those witnesses. In my experience, often in capital cases, such a forensic social worker synthesizes all of the background information about the client, and then testifies, in hearsay fashion, about the

information gathered by him/her and others from other persons and sources. Many times, the "mitigation specialist" who is hired is also a forensic social worker, and thus is qualified to play this role. Such a presentation is regularly allowed because of the relaxed rules of admissibility which attend in the penalty phase of a capital case trial. In some of my cases, I have used such a forensic social worker to make such a presentation. However, I have generally found such presentations about the client's background are more effectively made if family members can be enlisted to make the presentations directly, themselves, instead of second hand, through a forensic social worker. Before trial, I believed that the Houston and Colombian presentations could be most effectively made by Mr. Sinisterra's wife and mother, respectively, with supplementation from other family members. Nevertheless, both Ms. Herndon and I, prior to trial, attempted to also identify a forensic social worker who had a background in the Spanish culture, and particularly a familiarity with Colombia and its culture. We both felt that such an expert could add something more to our presentation. However, we were unable to find such a person. Without finding such an expert, we decided to proceed with presentation of the facts through family members, as described above. Ms. Herndon never suggested that we enlist any other sort of forensic social worker prior to her trip to Colombia. Instead, she identified a Colombian interpreter/guide whom she requested that we

employ, and I obtained Court authorization for employment and payment of that person. I have no doubt that, had Ms. Herndon or I requested the services of a forensic social worker, I could have obtained Court approval for the expenditure of funds for such an expert. In retrospect, I believe we should hav employed such a forensic social worker because, had we had such a person on our defense team, that person could have stepped into the void left when the witness visas were disallowed, and could have presented the Colombia witness information in that fashion.

16. Since Ms. Herndon made our penalty phase closing argument, she was responsible for making, and was actually required by Court rule to make, objections to perceived improper arguments made by the prosecution. In the amended 2255 petition, certain arguments are cited as being improper, and requiring objection, for which none was forthcoming. With one of those contentions, as concerns the "Hitler" argument, I agree, and I argued the matter on appeal. Had I been the person to make objections, I would have objected to the argument, and in retrospect, I believe I should have made the objection in Ms. Herndon's stead. I did not make the objection at the time because I believed that Ms. Herndon might have had some tactical reason for not doing so. Actually, when we later discussed the matter, Ms. Herndon told me that she believed the objection should have been made, and had no excuse for not making the

objection, As concerns the other arguments urged as improper, I would not have objected to any of those, as I did not believe them to be improper.

17. In the amended 2255 petition, it is contended that objection should have been made to penalty phase testimony offered by Dennis Conway. I believe that, had Mr. Conway's testimony been offered by the government in its penalty phase case in chief, the points made in the 2255 petition would be well taken. However, it is not accounted in the 2255 petition that Mr. Conway's testimony was offered in rebuttal to the testimony offered by defense witness, former Federal Parole Officer Joe Brandenburg. We offered the testimony of Mr. Brandenburg to counter the government's non-statutory aggravating factor of future dangerousness. Mr. Brandenburg was familiar with, and testified about, the general capabilities of the BOP to eliminate dangerousness from the prison population. I had used Mr. Brandenburg as an expert in a previous Federal capital case, and hoped that his presentation would be an effective one. Mr. Conway, as an FBI agent assigned to USP Leavenworth, offered the counterpoint to Mr. Brandenburg's testimony, positing that, at least in that penitentiary setting, crime and dangerousness was still at least a possibility. I did not object to the Conway testimony because I believed that objection to the Conway testimony would not have been well taken, since we had opened the issue with the Brandenburg testimony. It may well be argued that Mr. Conway's

16

testimony was more persuasive than Mr. Brandenburg's, and that consequently I should not have opened the door to the Conway testimony by use of Brandenburg.

18. In the amended petition, criticism is made about the presentation made before the jury with respect to the findings of Dr. Warren Wheelock. I have reviewed the testimony offered from Dr. Wheelock during the trial, and I believe that the testimony accurately set forth Dr. Wheelock's conclusions.

19. In the amended petition, there seems to be criticism over my not enlisting the services of a mental health expert to call into question Mr. Sinisterra's mental capacity generally, and his capacity to substantially plan particularly. I did have Mr. Sinisterra evaluated before trial by Dr. Enrique dos Santos, M.D. Dr. dos Santos is a Spanish-speaking psychiatrist, and was at the time the Clinical Director of the Fulton State Hospital. Dr. dos Santos in his oral report to me, indicated finding no mental problems. In light of this finding, I did not pursue the matter further. I have reviewed the report of Dr. Llorente, appended to the amended pleading. Had I received such a report prior to trial in this case, I am not sure whether I would have used such testimony because of its lack of strength. Had we relied on such an expert, it would have permitted evaluation of Mr. Sinisterra by a mental health expert of the government's choosing. Being familiar with the sorts of experts regularly relied upon by the government, I believe that the evidence from such an expert would likely be

quite damaging, so as to counterbalance whatever benefit would be gained by Dr. Llorente's opinions.

20. In the amended petition, dissatisfaction is expressed over my failure to elicit testimony from Mr. Sinisterra, his wife, his mother-in-law and others about Mr. Sinisterra's presence at Thanksgiving dinner in 1998, and his consequent inability to have been present in the parking lot outside the home of Amparo Molina during the so-called "murraco meeting".  Mr. Sinisterra told me, at trial, that he was not present at this meeting, and he was at home with his family, and I fully believed him.  I discussed this with Mr. Sinisterra's wife, Michelle Sinisterra, and his mother-in-law, Delores Rankin, and both remembered Thanksgiving, and Mr. Sinisterra's general presence at Ms. Rankin's home.  However, when I probed, in a way I felt likely would occur in cross-examination, as to their ability to account for all of the time of the day, and precisely when dinner had occurred, neither woman could say that she could account for Mr. Sinisterra's presence so as to preclude the possibility that he left for a time (for example, to go across town, to be present outside during the "murraco meeting").  Thus, I believed that the testimony of these witnesses would have been easily undercut by what I believed to be a likely line of cross-examination.  For several reasons, I was particularly reluctant to put forth Michelle Sinisterra as a witness in the first phase of trial unless that was absolutely necessary.  While I did not

believe that Michelle was in any way involved in drug trafficking, I believed that the government suspected that she was, at least indirectly. I was concerned that the greater the role I gave Michelle in the first phase of trial, the greater the danger that Michelle would be charged. Michelle was the sole caregiver and support for Mr. Sinisterra's children, Kayla and Kristopher. Her prosecution would have thrown the situation for the children into chaos. I believed that Mr. Sinisterra wanted to avoid such a calamity for his wife and children. Moreover, I believed that, if Michelle testified in the first phase of the trial, the government would at the very least cross-examine her about her knowledge about her husband's involvement with drug dealings, most certainly her knowing that Mr. Sinisterra would contribute sums of money to the family, with no means for obtaining those funds other than through drug dealings. I believed that such cross-examination would undercut Michelle's ability to later play her far more important role as advocate for life during the penalty phase. Finally, I questioned the significance of any alibi for the "murraco meeting" in light of the other evidence in the case. The evidence, even if believed, was that Mr. Sinisterra was not participating in the "murraco meeting" but instead was outside, not privy to what was going on inside. But even if Mr. Sinisterra could have been excluded from this aspect of substantial planning, other evidence implied he was part of the planning, including his travel from Houston to Kansas City, as well as whatever planning which

was carried out in the Kansas City area prior to the killing.  And, of course, there was testimony, including the confession from Mr. Sinisterra himself, about his roughing up and actually shooting Julian Colon.  In this context, his presence or lack thereof outside the "murraco meeting" seemed to me, rightly or wrongly, to not be significant. For the combination of these reasons, Ms. Herndon and I decided that it was best to not debate the testimony about Mr. Sinisterra's presence in the parking lot outside the "murraco meeting", save for the gingerly made attempts at cross-examination noted in the amended petition.  Once those efforts did not work, we dropped the matter.  I spoke to Mr. Sinisterra, in English, about all of these reasons for the tack which we took in this regard.  Despite this effort, and post-trial attempts at communication on the subject, I am virtually certain that Mr. Sinisterra, to this day, still DOES NOT understand the reasons and reasoning noted above, and wanted all possible arguments against his presence at the "murraco meeting" to have been made.

21. There is raised the question about my choice of means of communication with Mr. Sinisterra.  It is noted that I had presented evidence and argument against Mr. Sinisterra being able to understand English, particularly the *Miranda* warnings given him.  Lest there be any confusion, I not only argued these points, I firmly and personally believe that Mr. Sinisterra was and is incapable of understanding the English language *Miranda* warnings.  From that premise, it is consequently argued in

20

the amended petition that I should have known better than to try to communicate with Mr. Sinisterra in English in any fashion at any time.  Actually, over the years that I represented Mr. Sinisterra, I tried a variety of approaches toward communication. Early in the case, I tried speaking with Mr. Sinisterra in English, and I also used interpreters, primarily one employed by us named Juanita Chavez.  I learned early on in the case that interpreters often were counterproductive against communication. Most interpreters paraphrase in English and in Spanish, thereby putting their own interpretation, even spin, on what each party is saying.  I noticed this phenomenon when I detected that interpreters would wait until I finished several sentences before they would give a Spanish translation to Mr. Sinisterra.  What I learned is that what they were doing was wholly recreating what I was saying.  I noticed the same thing in their translations to me of what Mr. Sinisterra was saying.  With this going on, I could never trust that Mr. Sinisterra was actually hearing what I was saying, or visa versa. We ultimately found so called "simultaneous interpreters" such as the interpreters whom we used at trial.  While they were a vast improvement over the others, there was still a gap in communication which I believed occurred, even with their help.  The approach toward communications with Mr. Sinisterra on which I finally settled was the one which Michelle Sinisterra described to me, and to the jury in her testimony. Michelle did not know any Spanish, but carried on a marriage and acted as Mr.

Sinisterra's interpreter with other English speakers. Michelle's approach involves talking slowly, being willing to repeat ideas and have those ideas explained back to assure accurate communication of an idea, and taking all the time necessary to get communication to happen. It also involves understanding that Mr. Sinisterra's way of speaking English would oftentimes involve his "speaking backward", as Michelle put it, using English in a form similar to that used in Spanish. In order to facilitate my communication in English with Mr. Sinisterra, I spent long periods of time in each session, and spent more sessions. That, of course, was a far different approach to speaking with Mr. Sinisterra, in English, than was used by those who interrogated him, and gave him *Miranda* warnings. Even with these efforts, I am sure that there were miscommunications, for instance my inability to explain, for clear understanding, the decision to not counter the "murraco meeting" claims, as described above..

22. In a similar vein, it is claimed that I did not adequately prepare Mr. Sinisterra for his testimony at trial, and as a consequence that the presentation was incomplete and left a bad impression of Mr. Sinisterra. It is implied, I believe, that the only preparations for Mr. Sinisterra's testimony occurred on or near the day of his testimony. That is incorrect. Actually, work on Mr. Sinisterra's testimony was done in my discussions with him over the months prior to trial. Particularly, because Mr.

Sinisterra had testified during pretrial hearings, I had had the chance to observe certain things which he did, and was able to coach him about those things afterward. An example was Mr. Sinisterra's use of the Spanish word "*claro*" in answering in the affirmative. The interpreters would translate "*claro*" to mean "of course", rather than simply "yes". In the hearings, this answer, in my opinion, came off as smug, whereas Mr. Sinisterra was only trying to make an affirmative response using a word which he knew. To avoid this, I asked Mr. Sinisterra to, instead, use the Spanish word "*si*", which would be translated simply as "yes", and for the most part, Mr. Sinisterra did this at trial. As for the completeness of the content of Mr. Sinisterra's testimony, the only complaint in this regard which I have noted in the amended petition concerns my not eliciting from him testimony about his alibi for the "murraco meeting". Again, for the reasons mentioned above, that was a deliberate omission, not an oversight due to inadequate preparation. As for Mr. Sinisterra not coming off as well as possible in the testimony, I agree to some extent. Because Mr. Sinisterra was testifying through an interpreter, the interpreter, to some degree, became Mr. Sinisterra's persona. The interpreter was obviously well-educated, and well-spoken, and put Mr. Sinisterra's answers very correctly, but in an impersonal, detached way, without the nuances of emotion which a witness himself would put with his own words. Thus, the need to use an interpreter made Mr. Sinisterra come off as very intelligent, calculating,

detached, and cold, none of which would be correct impressions of Mr. Sinisterra.  As odd as it may sound, if I had Mr. Sinisterra's trial testimony to do over again, I would not change the content of the questions or answers.  I would change only the use of the interpreter.  I would, instead, have Mr. Sinisterra do his best to answer the questions in English.  Then, the jury would hear Mr. Sinisterra's true words, voice and incapabilities, and that, I believe, would change the entire tone of the testimony

23. In the amended petition, there are also questions raised over the failure by me and Ms. Herndon, respectively, to object to testimony by Andres Borja Molina and Edward Ortiz regarding their alleged knowledge about what might be termed, generally, as Mr. Sinisterra's reputation for violence.  I researched the matter prior to trial, and I concluded from that research that objections to such testimony would have been fruitless.

/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.

Subscribed and sworn to before me this 24th day of November, 2006.

/S/
NOTARY PUBLIC

My commission expires _____

24