IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

GERMAN C. SINISTERRA,               )
                                    )
            Movant,                 )
                                    )  Civil No. 04-08003-CV-W-GAF-P
      v.                            )  Crim. No. 98-00311-02-CR-W-GAF
                                    )
UNITED STATES OF AMERICA,           )
                                    )
            Respondent.             )

## GOVERNMENT'S RESPONSE IN OPPOSITION
## TO MOVANT'S 28 U.S.C. § 2255 MOTION

The respondent, the United States of America, appears by Bradley J. Schlozman,

United States Attorney, and Jeffrey Valenti and Lajuana M. Counts, Assistant United States

Attorneys, both for the Western District of Missouri, and provides the following response to

movant German Sinisterra's motion under 28 U.S.C. § 2255. This response is filed in

compliance with this Court's directive that the Government file its response within 14 days

of trial counsel Frederick A. Duchardt, Jr., filing his affidavit, which was filed on

November 26, 2006.

## I. SUMMARY

Sinisterra alleges a total of 18 grounds for relief - seven individual substantive claims

and eleven ineffective assistance of counsel claims. He alleges that: (1) his Fifth and Sixth

Amendment rights were violated by the Government's failure to charge statutory aggravating

circumstances in the indictment; (2) the Federal Death Penalty Act (FDPA)

unconstitutionally relaxes evidentiary standards at the penalty phase, which, Sinisterra

alleges, resulted in his death sentence being unconstitutionally imposed; (3) the Government's failure to comply with the Vienna Convention on Consular Relations violated Sinisterra's right to consular consultation under the treaty; (4) the FDPA is disproportionately and unconstitutionally applied by race; (5) prosecutorial misconduct violated Sinisterra's Fifth and Eighth Amendment rights; (6) Sinisterra's death sentences constitute cruel and unusual punishment; and (7) the cumulative effect of all the previously stated grounds amounts to an unfair trial.

Sinisterra's eleven ineffective assistance of counsel allegations are that his trial counsel failed to: (1) object to the introduction of testimony that Sinisterra was a violent person who killed people for a living; (2) present evidence, challenge or object to evidence regarding Sinisterra's presence at the "murraco" meeting; (3) prepare for and present Sinisterra for his testimony; (4) communicate with Sinisterra through a Spanish-speaking interpreter; (5) retain and utilize a mitigation specialist; (6) conduct a thorough mitigation investigation; (7) investigate and present mental health evidence during the death penalty phase; (8) object to alleged prosecutorial misconduct in closing argument; (9) challenge the indictment; (10) object to alleged inflammatory hearsay in the penalty phase; and (11) object to application of the FDPA.

None of Sinisterra's contentions have merit. The Eighth Circuit Court of Appeals has already ruled that there was "no evidence that violations of the Vienna Convention in the

case of these defendants prejudiced them in any way," and therefore, the Vienna Convention issue has already been resolved. *United States v. Ortiz*, 315 F.3d 873, 887 (8th Cir. 2002).

Additionally, counsel were not ineffective in not foreseeing a change in the law in *Ring v. Arizona*, 526 U.S. 584 (2002), and thus they did not provide ineffective assistance. Further, the issue of the evidentiary standards in the penalty phase is an issue for direct appellate review and not in collateral proceedings. The current law supports the evidentiary standard utilized by the district court, and thus, counsel were not ineffective in not raising or appealing the evidentiary standards set forth in the FDPA.

As to Sinisterra's ineffective assistance of counsel claims, the Government has attached the affidavit of attorney Frederick Duchardt (Duchardt's Affidavit, Attachment A, Docket Entry No. 50), which clearly refutes each and every one of Sinisterra's allegations. Consequently, Sinisterra's claims are without merit and should be summarily denied without an evidentiary hearing.

## II. DISCUSSION

### A.    Procedural History

On November 30, 1998, a complaint was filed against defendants Plutarco Tello, German Sinisterra, Arboleda Ortiz, and Edwin Hinestroza, which charged them with intentionally killing and causing the death of Julian Colon in connection with a conspiracy to distribute cocaine in an amount of five kilograms or more.

On December 16, 1998, an indictment was returned likewise charging the defendants with killing Julian Colon in connection with a cocaine conspiracy. Subsequently, a

superseding indictment was returned on August 9, 1999, charging the defendants with: (1) conspiracy to distribute cocaine, a Schedule II controlled substance, in an amount of five kilograms or more, contrary to the provisions of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A), all in violation of 21 U.S.C. § 846; (2) aiding and abetting the use of a firearm in relation to a drug trafficking crime and committing a murder in the perpetration of a drug trafficking crime, contrary to the provisions of 18 U.S.C. §§ 924(c)(1), 924(j)(1) and (2); and (3) knowingly traveling in interstate commerce with the intent that a murder for hire be committed, contrary to the provisions of 18 U.S.C. §§ 1958 and 2. Additionally, defendant Sinisterra was charged with one count of criminal forfeiture, contrary to the provisions of 21 U.S.C. § 853.

The matter against Sinisterra, Ortiz, and Tello proceeded to trial by jury before the Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri, on April 11, 2000. Hinestroza was a fugitive from justice during the trial and was not apprehended until February 2004. On April 27, 2000, the jury returned guilty verdicts against Sinisterra, Ortiz, and Tello on all the above charges.

The penalty phase against Sinisterra began on April 28, 2000, during which the Government requested imposition of the death penalty. On May 3, 2000, the jury returned the verdict that Sinisterra should receive sentences of death under Counts Two and Three of the second superseding indictment. Sinisterra was sentenced by this Court on December 18, 2000, to death on Counts Two and Three, and to 324 months in prison on Count One.

On May 4, 2000, Ortiz's penalty phase began, with the Government again requesting imposition of the death penalty. The court read the initial jury instructions, explaining and describing the aggravating and mitigating factors the jury were to consider. Later that same day, the jury returned the verdict that Ortiz should also receive a sentence of death.

On May 8, 2000, Tello's penalty phase began, with the Government again asking for imposition of the death penalty. On May 10, 2000, the jury was unable to reach a unanimous sentencing decision and acknowledged that the court should impose a sentence of life imprisonment without possibility of release. This Court sentenced Tello to life imprisonment on December 20, 2000, on Counts Two and Three, and to 235 months in prison on Count One.

On December 19, 2000, the court conducted a sentencing hearing for Ortiz. After argument, this Court ordered sentences of death on Counts Two and Three and a sentence of 235 months in prison on Count One.

Hinestroza's trial did not occur until October 31, 2005, with that jury returning guilty verdicts on Counts One, Two, and Three of the fourth superseding indictment[1] on November 14, 2005. The jury deadlocked during the death penalty phase, thereby making Hinestroza ineligible for a death sentence. Hinestroza's sentencing hearing occurred on April 17, 2006. He was sentenced to life imprisonment on Counts Two and Three, and to 400 months in prison on Count One.

---

[1]The charges in the fourth superseding indictment were the same as in the prior indictment with the exception of additional defendants.

**B.** **Trial Evidence**[2]

In 1997, Heberth Andres Borja-Molina (hereinafter referred to as Borja) became actively involved in the cocaine trafficking activities of Edwin Hinestroza in Houston, Texas. At that time, Borja was sixteen years of age. (T. Vol. VI at 1177.) Hinestroza's activities grew to include cocaine distribution in the Kansas City metropolitan area, where Borja distributed cocaine on his behalf for about one year to approximately five different individuals in the Kansas City area. (T. Vol. VI at 1192-94.) Borja collected proceeds from the sale of cocaine from the Kansas City area customers and provided these proceeds to Hinestroza. (T. Vol. VI at 1192-93.) Borja was assisted in these activities by his uncle, Julian Colon.[3] (T. Vol. VI at 1194.) Borja stated that Hinestroza received shipments of approximately 5 to 50 kilograms of cocaine on a monthly basis. (T. Vol. VI at 1194.) According to Borja, cocaine shipments came from La Oficina, or the Office, located in Colombia, South America. The Office shipped the cocaine to Jaime Hurtado, via Mexico. (T. Vol. VI at 1181.) Hurtado was Hinestroza's partner in Houston, Texas. (T. Vol. VI at 1180.) Once Hurtado received the cocaine in Houston, he gave it to Hinestroza to distribute. (T. Vol. VI at 1183.) Initially, Hinestroza distributed cocaine in the Houston Metropolitan Area. (T. Vol. VI at 1188.) However, Hinestroza became a target of various investigations in that area, so he decided to branch out his activities, to include the Kansas City

---

[2]"T. Vol." refers to the transcript on appeal for Tello and Sinisterra, specifically the volume number and page number of relevance.

[3]Julian Colon was born Giovanni Molina. (T. Vol. VI at 1172.)

Metropolitan Area.  (T. Vol. VI at 1179.)  Hinestroza began, therefore, transporting cocaine from Houston to Kansas City.  (T. Vol. VI at 1188.)  This was done by utilizing several people, including: Airton Mosquera (a/k/a Botija); Shelly Anderson; Borja; Colon; and German Sinisterra.  (T. Vol. VI at 1189-90.)  These individuals used several vehicles to "mule" the cocaine to Kansas City.  (T. Vol. VI at 1203.)  Each of these vehicles contained false compartments.  (T. Vol. VI at 1182.)  Some of the compartments were located in door panels or behind stereo speakers, but most were false compartments located within the vehicle's gas tank.  (T. Vol. VI at 1182.)  Once the cocaine was hidden in a vehicle, the vehicle was driven to Kansas City, usually by Shelly Anderson.  (T. Vol. VI at 1188-89.)  In Kansas City, the cocaine was distributed to one of Hinestroza's five major customers on a "front," or, in other words, the cocaine was provided on consignment.  (T. Vol. VI at 1185-86.)  The recipient of the cocaine was allowed several days to repay the fronted drug debt. (T. Vol. VI at 1185-86.)  Borja indicated that fronted cocaine cost customers between $17,000 and $21,000 per kilogram.  (T. Vol. VI at 1183.)  When the fronted debt was repaid, all the money was collected and sent to Houston in one of the vehicles with false compartments.  (T. Vol. VI at 1187-88.)  Hinestroza maintained two stash houses in Kansas City, one was for money, the other for cocaine.  (T. Vol. VI at 1199.)

As previously stated, this drug organization had five major cocaine customers. (T. Vol. VI at 1331.)  The largest customer was Brian Thompson.  (T. Vol. VI at 1184.) Thompson bought as many kilograms of cocaine as Hinestroza's organization could deliver. (T. Vol. VI at 1185.)  Thompson usually paid $17,000 per kilogram because he was a good

customer who repaid his debt quickly. (T. Vol. VI at 1184.) In December 1997, Thompson was arrested by the Federal Bureau of Investigation (FBI). ( T. Vol. VI at 1195.) After serving numerous search warrants, Thompson was found in possession of 15 kilograms of cocaine, approximately $710,000, and numerous vehicles. (T. Vol. VIII at 1811, 1818.) The cocaine in Thompson's possession was all supplied by Hinestroza's organization.[4] (T. Vol. VIII at 1810.)

After Thompson was arrested, Hinestroza continued to supply cocaine to different customers within the Kansas City area. (T. Vol. VI at 1329.) The two major customers then became Percy Smith (a/k/a "Y.C.") and Fabio Montano (a/k/a Fernando or Fercho). (T. Vol. VI at 1329-31.) At this time, Hinestroza received for distribution approximately 10 to 50 kilograms of cocaine in a month. (T. Vol. VI at 1191.)

Edwin Hinestroza lived in Kansas City with Monica Osma, who is the sister of Julian Colon and the maternal aunt of Borja. (T. Vol. VI at 1200.) On November 19, 1998, the apartment Hinestroza and Osma shared was robbed. (T. Vol. VI at 1200.) Reportedly, the apartment was robbed by two unknown males who tied and beat Monica Osma and demanded to know where she kept the money. (T. Vol. VIII at 1758.) After being beaten, Osma told the intruders that the third stair on the staircase contained a false compartment in which money could be found. (T. Vol. VIII at 1758.) The apartment was ransacked, with approximately $240,000 being stolen. (T. Vol. VI at 1201.) Osma was found bound within

---

[4]On June 12, 1998, Thompson was convicted by a jury of conspiracy to distribute cocaine and subsequently sentenced to life imprisonment.

the apartment.  (T. Vol. VI at 1196.)  She was sent to Houston to recover from her injuries, which required hospital attention.  (T. Vol. VI at 1202.)

Amparo Molina, Monica's sister, picked Osma up from the airport in Houston. (T. Vol. VIII at 1689.)  On Thanksgiving Day, November 26, 1998, Osma was visited at her sister's apartment by Edwin Hinestroza, Jaime Hurtado, and two Colombian males.  (T. Vol. VIII at 1693, 1754.)  One of the Colombian males was identified as Arboleda Ortiz by Amparo Molina (T. Vol. VIII at 1700-01), while the other was identified as Plutarco Tello by Edward Ortiz.[5]  (T. Vol. VIII at 1694.)  During this meeting, the Colombians, who purported to represent "La Oficina," or the drug cartel, began questioning Osma regarding how the money in the apartment robbery had been taken.  The man identified as defendant Tello asked numerous questions.  Questioning continued and the Colombians asked to see photographs and hospital reports detailing Osma's injuries.  (T. Vol. VIII at 1693-94.) Apparently not satisfied with Osma's story or injuries, the Colombians stated "Muracco." (T. Vol. VIII at 1695.)  Roughly translated, this is a death threat which means that if a dead body does not appear, the people at the office are not going to be satisfied.  (T. Vol. VIII at 1695.)  The Colombians continued by claiming that they were going to be required to come to Kansas City to tie someone up and find the money.  (T. Vol. VIII at 1759.)  As everyone left Amparo Molina's apartment, Edward Ortiz saw German Sinisterra on the street outside

---

[5]Edward Ortiz is Amparo Molina's youngest son and Heberth Andres Borja-Molina's brother.

the apartment.  (T. Vol. VIII at 1761.)  Sinisterra was known by Edward Ortiz as someone who would "smoke somebody."  (T. Vol. VIII at 1774.)

Back in Kansas City on November 28, 1998, Edwin Hinestroza asked Borja and Colon to accompany him to the Drury Inn, at I-435 and Metcalf Avenue, Overland Park, Kansas, where they were to meet with three Colombian males.  (T. Vol. VI at 1217.)  Borja identified these individuals as German Sinisterra, Arboleda Ortiz, and Plutarco Tello, when he was shown photo spreads by Kansas City, Missouri Police Department detectives.  (T. Vol. VI at 1299-1302.)  Borja related that he previously met Sinisterra and Ortiz in Houston and knew them as associates of Hinestroza. (T. Vol. VI at 1216-17.)  In particular, Sinisterra was known by Borja as a killer, because Sinisterra had told Borja in the past that he would kill someone cheaply.  (T. Vol. VI at 1218-20.)  Borja testified that Sinisterra served as Jaime Hurtado's right hand man and Ortiz served in the same capacity for Fabio Montano.  (T. Vol. VI at 1190, 1216.)  Hinestroza told Borja that the three Colombians would accompany them to meet with one of Hinestroza's local distributors, a male known as Percy Smith or "Y.C." for the purpose of selling him over one kilogram of fake cocaine.  (T. Vol. VI at 1222-23.)  This deal was a sham that was devised because Hinestroza told Borja that he believed "Y.C." was responsible for the theft of approximately $240,000 in drug proceeds from his apartment.  (T. Vol. VI at 1211-13.)  Hinestroza told Borja that the Colombians they were meeting had been hired to help collect the debt.  (T. Vol. VI at 1212.)  When speaking about the three Colombian males, Hinestroza said "they always send people that hurt people for a living."

(T. Vol. VI at 1212.)  Borja, Colon, Hinestroza, and the Colombians met at and departed from the Drury Inn.  (T. Vol. VI at 1221-22.)

After meeting with "Y.C." at an unknown location in Kansas City, Missouri, the makeshift group followed "Y.C." to a second house, also in Kansas City, Missouri, which was approximately five minutes away.  (T. Vol. VI at 1222-24.)  At this house, "Y.C." immediately departed while Hinestroza and the three Colombian males went into the residence.  (T. Vol. VI at 1224-25.)  Once inside, Hinestroza and the Colombian males put handguns to both Borja's and Colon's heads.  (T. Vol. VIII at 1225.)  Borja and Colon were then bound with duct tape and physically assaulted by all four individuals.  (T. Vol. VI at 1226-28.)  As the suspects continued beating Borja and Colon, they demanded to know where the money was, referencing the lost drug proceeds of approximately $240,000. (T. Vol. VI at 1226-27.)  The suspect identified as Tello demanded, "Where's my $300,000, where?"  (T. Vol. VI at 1226-27.)  As the beatings continued, so did the demands, taunts, and threats of death.  (T. Vol. VI at 1227.)  Borja was dragged to the basement of the residence by one of the Colombian males and could hear his uncle, Julian Colon, screaming upstairs from his location in the bathroom.  (T. Vol. VI at 1228.)  Borja overheard Hinestroza order the Colombian males to "shoot him in the head," and then heard, "shoot the other one, too."[6] Shortly thereafter, Borja heard a single gunshot and Colon stopped screaming.  (T. Vol. VI at 1229.)

---

[6]This conversation occurred in Spanish.

As Borja laid in the basement, he heard footsteps come down the stairs, followed by the sound of a gunshot and loud ringing in his ears. (T. Vol. VI at 1229.) Initially, Borja believed he was dead, but realized that in fact he was not; whereupon he pretended to be dead in order to survive. (T. Vol. VI at 1230-31.) Hinestroza and the other suspects then carried Borja to the trunk of a vehicle[7] where they deposited his body alongside Colon's. (T. Vol. VI at 1231.) The vehicle was driven to Swope Park, where it and the bodies were abandoned. (T. Vol. VI at 1230-32.)

By kicking the inside of the trunk and fidgeting with the lock, Borja managed to escape the vehicle and observed Colon still in the trunk of the car surrounded by a large amount of blood. (T. Vol. VI at 1231, 1233.) Borja retrieved a shotgun and ran to the street in an attempt to get to a phone. (T. Vol. VI at 1234.) After abandoning the shotgun, Borja was picked up by a van driven by Bernie Hiller. (T. Vol. VI at 1234.) Borja was taken to the Metro Plaza Shopping Mall where he called Savannah Colon, wife of Julian Colon. (T. Vol. VI at 1235.) Savannah Colon responded to Borja's location and helped transport Julian Colon to Menorah Medical Center where she and Borja were contacted by police. (T. Vol. VI at 1237-38.) Police noted that the victim was lying in the back seat; that there was a lot of blood around him; and that his hands, feet, mouth, and eyes were bound with duct tape. (T. Vol. VII at 1502.) The victim was pronounced dead at the hospital. (T. Vol. VII at 1501-02.)

---

[7]The vehicle Borja and Colon were thrown into was Borja's Acura. (T. Vol. VI at 1231.)

Borja told police what had occurred and further related that earlier that evening he and Colon had met their attackers at the Drury Inn, located at I-435 and Metcalf Avenue. (T. Vol. VI at 1217.) Borja also stated that their attackers were driving a black Mazda pickup truck. (T. Vol. VI at 1218.) Savannah Colon informed police that her now deceased husband had called her earlier in the evening and asked her to take down a Texas license plate number. (T. Vol. VII at 1620-22.) Savannah testified that Colon had called with the license plate and told her if anything happens to me you know what happened. This license plate number was identified as belonging to suspect German Sinisterra. (T. Vol. VII at 1607-08.) Police went to the Drury Inn and found a vehicle that matched Borja's description. (T. Vol. VII at 1478-79.) As police maintained surveillance on the Mazda pickup, a Lexus pulled in behind it. (T. Vol. VII at 1479.) Three black males got out of the Lexus, with two of these individuals getting into the Mazda pickup, and the other going into the hotel. (T. Vol. VII at 1480.) The Lexus drove out of the Drury Inn parking lot, followed by the black males who had entered the Mazda pickup. A short time later, the Mazda pickup returned and parked in the exact same spot. Officers approached and took two suspects into custody, each without incident. (T. Vol. VII at 1480.) The two suspects were identified as German Sinisterra and Arboleda Ortiz. (T. Vol. VII at 1482-83.) The third suspect, Plutarco Tello, was taken into custody without incident a few hours later inside the hotel. (T. Vol. VII at 1485-86.) A subsequent search of Tello's room, Room #433, revealed a Stallard 9mm handgun and rubber gloves. (T. Vol. VII at 1583-86.)

On November 29, 1998, Special Agent (SA) Amy Hess (FBI) accompanied Borja to his apartment in Overland Park, Kansas, where he provided SA Hess with several notebooks and pieces of paper containing names and telephone numbers of individuals Borja identified as drug customers. (T. Vol. IX at 2041-44.) Additionally, Borja identified three sheets of paper as drug ledgers which depicted the quantity of drugs delivered to, and money received from, several local customers. (T. Vol. VIII at 1282-84.) Later that day, SA Hess accompanied Borja to the Hawthorne On The Lake Apartments, located in Overland Park, Kansas. (T. Vol. IX at 2032.) At this apartment complex, Borja pointed out one apartment as Fabio Montano, a/k/a Fernando's, primary residence. (T. Vol. IX at 2033.) This apartment was identified as 5219 West 119th Terrace, Apartment 114, Overland Park, Kansas. (T. Vol. IX at 2036.) Parked in front of the apartment was a newer model, dark-colored Lexus bearing Kansas license plate MVH-811, which Borja identified as Fabio Montano's car. (T. Vol. IX at 2033.)

On November 29, 1998, Sinisterra, Ortiz, and Tello were located and arrested. (T. Vol. VII at 1505-09.) Sinisterra and Ortiz were advised of their rights under the Vienna Convention by Chief John Douglas of the Overland Park Police Department. (T. Vol. VII at 1496.) Sinisterra was interviewed first and advised of his constitutional rights per *Miranda*. (T. Vol. VII at 1518.) He waived his rights and provided a videotaped statement. In that statement, Sinisterra admitted that he shot Julian Colon. (T. Vol. IX at 2077.)[8]

---

[8]Sinisterra testified at trial. After denying shooting anyone, the Government played his videotaped statement, wherein he stated that Ortiz, Tello, and Hinestroza were all active

Interviews were also conducted with Ortiz and Tello. (T. Vol. IX at 2077.) Each was advised of his constitutional rights per *Miranda*, then waived those rights. (T. Vol. VII at 1529, 2115-16.) Both suspects admitted coming to Kansas City to do a job and each admitted his presence during the beating and taping of Colon and Borja. (T. Vol. IX at 2082-84, 2123, 2134-37.) Moreover, each suspect admitted being present during the shooting of Colon and Borja, but denied being the actual shooter. (T. Vol. IX at 2082, 2084, 2123, 2134-37.) Notably, each of the three suspects believed Borja to be dead at the time their statements were given to police. (T. Vol. IX at 2077, 2084, 2136.) Sinisterra, Ortiz, and Tello each confirmed that Hinestroza had employed them to participate in the beating and shooting, with a promise of paying them $3,000 to split three ways. (T. Vol. IX at 2082, 2097, 2134.)

On November 30, 1998, Borja contacted Detective Kevin Kilkenny with the Kansas City Police Department. (T. Vol. VI at 1240.) Borja related that he had driven around the Swope Park and Prospect areas in an attempt to find the house where he had been beaten and his uncle killed. (T. Vol. VI at 1239-40.) Borja indicated that he found the house, which was 5823 Prospect. A State of Missouri search warrant was obtained for this residence. (T. Vol. V at 1086.) Borja had earlier told Detective Kilkenny that on the night of the murder, he had been wearing a Georgetown baseball hat. (T. Vol. V at 1093.) A subsequent search of 5823 Prospect revealed Borja's Georgetown ball cap and several other items of evidence, to include: carpet with blood; linoleum with blood; duct tape with hair and blood; duct tape

---

participants in the killing of Julian Colon. (T. Vol. XI at 2364; Govt. Exhibit 20.)

wrappers, rubber gloves; and a bullet fragment from the basement where Borja was shot at. (T. Vol. V at 1091-96, 1102.) Subsequent to these findings, Luminol was sprayed throughout the house. (T. Vol. V at 1101.) The Luminol displayed a bright luminescence throughout the house, exhibiting special brightness in the bathroom. (T. Vol. VI at 1151-52.) The Luminol reaction indicated that Colon had been executed in the bathroom, then dragged out of the house. (T. Vol. VI at 1148-49.) It also appeared that an attempt to clean the blood had been made. (T. Vol. IX at 2022.) By examining tax records, 5823 Prospect has been determined to be owned by Percy Smith (a/k/a "Y.C."). (T. Vol. VII at 1598-99.)

An autopsy revealed that Colon died from a single gunshot wound to the head. (T. Vol. IX at 1973.) DNA testing revealed that blood matching the genetic profile of the victim, Julian Colon, was found on the shirt of German Sinisterra and the blue jeans of Arboleda Ortiz. (T. Vol. IX at 2005-08.) Additionally, carpet samples recovered from 5823 Prospect contained blood matching the genetic profile of Julian Colon. (T. Vol. IX at 2007.)

## C.    <u>Sentencing Hearings</u>[9]

On December 18, 2000, the court conducted a sentencing hearing for Sinisterra. The district court took into account the evidence offered at trial and also heard the testimony of Jose Gomez, Consul General from the Office of the Colombian Consulate, located in Chicago, Illinois, on a perceived violation of the Vienna Convention on Consular Relations.

---

[9]"S.T." refers to the transcript of the relevant sentencing hearing and the page of significance.

(S.T. 2-11.)  After hearing argument, this Court ordered sentences of death on Counts Two and Three and a custodial sentence of 324 months' imprisonment on Count One.  (S.T. 8-22.)

On December 19, 2000, the court conducted a sentencing hearing for Ortiz.  The district court took into account the evidence offered at trial and overruled Ortiz's objection to drug quantity calculations attributable to him and also to Ortiz's objection of not getting a reduction for minimal participation.  (S.T. 5-7.)  Additionally, the court took notice of Jose Gomez' testimony from the day earlier to make Ortiz's alleged Vienna Convention violation a matter of record.  (S.T. 17-18.)  After hearing argument, the court ordered sentences of death on Counts Two and Three and a custodial sentence of 235 months' imprisonment on Count One.  (S.T. 21-24.)

On December 20, 2000, the court conducted a sentencing hearing on Tello.  Once again, the court took into account the evidence offered at trial and overruled Tello's objection to drug quantity calculations.  (S.T. at 3-5.)  Tello sought a downward departure for aberrant behavior, which likewise was denied.  (S.T. at 6.)  After argument, the court ordered sentences of life on Counts Two and Three, and a sentence of 235 months' imprisonment on Count One.  (S.T. at 7-8.)

On April 17, 2006, the court conducted a sentencing hearing on Hinestroza, who had a separate jury trial, which occurred in 2005.  The court conducted a sentencing hearing for Edwin Hinestroza and since the jury did not recommend the death penalty for Hinestroza, the district court imposed a life sentence on Counts Two and Three, and a sentence of 400 months' imprisonment on Count One.

**D.     Direct Appeals**

Tello filed a notice of appeal in a timely manner, which was consolidated by order of the Eighth Circuit with co-defendants Sinisterra and Ortiz's appeals.  The various appeals raised a multitude of issues, that when grouped together are summarized as follows: (1) the district court conducted a constitutionally insufficient examination of jurors during jury selection; (2) the district court failed to suppress statement taken in violation of the rule in *Miranda*, and/or in violation of the Vienna Convention on Consular Relations; (3) the district court failed to grant severance; (4) the district court improperly instructed the jury on the applicable law; (5) the district court failed to *sua sponte* order a mistrial based on government arguments made during closing argument; (6) the district court failed to grant a motion for directed verdict; and (7) the district court erred in allowing the Government to use gruesome photographs.

On November 5, 2002, the United States Court of Appeals for the Eighth Circuit issued its opinion, wherein this Court was affirmed in all respects.  *United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002).[10]

### III.  LEGAL ANALYSIS

**A.     Statutory Aggravating Factors**

Sinisterra first claims that his Fifth and Sixth Amendment rights were violated by the Government's failure to charge statutory aggravating circumstances in the indictment based

---

[10]Likewise, defendants Tello and Sinisterra were denied certiorari on December 8, 2003.  *See United States v. Ortiz*, 124 S.Ct. 920 (2003).

on *Ring v. Arizona*, 536 U.S. 584 (2002) – an opinion which was decided two years after Sinisterra's trial. The Supreme Court has held that "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 2526 (2004). The Eighth Circuit has stated that although *Ring* did not "address whether the Fifth Amendment also requires capital aggravating factors to be found by the grand jury and included in the indictment" the court found that "*Ring* necessarily implies such a Fifth Amendment requirement." *United States v. Allen*, 406 F.3d 940, 942 (8th Cir. 2005). However, the Eighth Circuit has held that the failure to charge at least one statutory aggravating factor in the indictment is not, as Sinisterra claims, a structural error. *Allen, id.* at 945. Thus, the inquiry for the appellate court would have been whether the defect in the indictment was harmless beyond a reasonable doubt. *Id.*

Furthermore, although statutory aggravating factors were not specifically alleged in the indictment, the charges in Counts Two and Three of the indictment were part of the aggravating factors used by the petit jury to impose the death penalty. In essence, statutory aggravating factors were in the indictment, but in the form of the charges in Counts Two and Three, and thus were considered by both the grand jury and the petit jury. Consequently, Sinisterra's claim should fail.

In Sinisterra's case, if they had been asked to do so, the grand jury would have found the existence of the requisite mental state and one or more of the statutory aggravating factors as found by the petit jury. Sinisterra's counsel did contest the aggravating factors presented to the petit jury, and the Eighth Circuit found that the aggravating factors were correct and

the jury, as the rational trier of the facts, properly found the aggravating circumstances beyond a reasonable doubt. *See United States v. Ortiz*, 315 F.3d 873, 900-02 (8th Cir. 2002).

If an appellate court reviewed the evidence in Sinisterra's case that was either presented to the grand jury, or reviewed the entire record presented to the petit jury, or viewed the petit jury's verdict which found the aggravating factors beyond a reasonable doubt, either scenario would lead to the conclusion that the fact that no aggravating circumstances were listed in the indictment amounted to harmless error. *See Allen, id.* at 946. The grand jury was presented with the evidence that was presented to the petit jury at the time they returned a true bill.

Further, the record presented to the petit jury and their verdict that the aggravating factors were proven beyond a reasonable doubt demanded a death sentence, points to the conclusion that the grand jury would have found the same (under probable cause) if they had been asked to do so. Consequently, even if his counsel had appealed, they would not have prevailed as seen by the appellate court's review of the aggravating factor issues raised by Sinisterra. Sinisterra's counsel, therefore, were not ineffective in not preserving this issue and raising it on appeal. This claim must also fail.

**B.  FDPA Evidentiary Standard During Death Penalty Phase**

Sinisterra claims the Federal Death Penalty Act (FDPA) is unconstitutional in that the evidentiary standards are relaxed in the death penalty phase. However, Sinisterra's reliance on *United States v. Fell*, 217 F.Supp.2d 469 (D.Vt. 2002), *rev'd by* 360 F.3d 135 (2d Cir. 2004) to support his claim is misplaced. When the *Fell* case was reversed, the Second

Circuit ruled that the FDPA does not impair the reliability of the evidence submitted during the penalty phase. *Fell*, 360 F.3d at 145-146. Thus, *Fell* offers no support to Sinisterra's claim.

Furthermore, the Eighth Circuit Court of Appeals agreed with the Second Circuit that "[r]ather, the admission of more rather than less evidence during the penalty phase increases reliability by providing full and complete information about the defendant and allowing for an individualized inquiry into the appropriate sentence for the offense." *United States v. Lee*, 374 F.3d 637, 645 (8th Cir. 2004) (citing *Fell*, 360 F.3d at 143). As the Eighth Circuit espoused in *Lee*, the evidence, "[w]e agree that the FDPA standard provides a level of protection that ensures that defendants receive a fundamentally fair trial and that it is not unconstitutional." *Lee, id.* (citing *Fell, id.* at 145). Since the relaxed FDPA evidentiary standard is not unconstitutional, this claim should be denied.

**C.    Vienna Convention**

Sinisterra next contends that the Government's failure to comply with the Vienna Convention on Consular Relations violated his right to consular consultation. As Sinisterra acknowledges, the Eighth Circuit has already addressed this issue and found that "this record contains no evidence that violations of the Vienna Convention in this case of defendants prejudiced them in any way." *Ortiz*, 315 F.3d at 887. In fact, the Eighth Circuit disagreed with the contention that a violation of the Vienna Convention renders a defendant's statements inadmissible. *Id.* at 886. The court stated that:

Even if we assume for present purposes that the Convention creates an individually enforceable right, it would not follow, on this record, that the statements should be excluded merely because the Convention has been violated. The reason is that appellants are unable to establish a causal connection between the violation and their statements. The District Court found: "No credible evidence suggests that had defendants been advised of their right to have their Colombian consul notified of their arrest, they would not have made the statement." Opinion of Magistrate Judge at 33. This finding is not clearly erroneous.

*Id.*

The court went on to address the defendants' other contention that a violation of the Convention should prohibit the Government from seeking the death penalty. In denying this aspect of the argument, the court found, again assuming the Convention creates individually enforceable rights, "no causal or logical connection at all between the penalty imposed on defendants and violation of the Vienna Convention. The death penalty is provided by statute." *Id.* at 887. The defendants "own incriminating statements, potent evidence supporting the conviction, would have been made even if consular contact had occurred. The Convention itself says nothing about the appropriateness of penalties, and certainly does not provide that the death penalty is excluded if the Convention is violated." *Id.* While Sinisterra disagrees with the Eighth Circuit's opinion, a § 2255 motion is not the proper vehicle to challenge an appellate court's findings; that is within the province of the United States Supreme Court.

Sinisterra contends he is "entitled to meaningful de novo review and reconsideration of the Vienna Convention violation in his case and appropriate remedy" in light of the decision by the International Court of Justice (ICJ) in *Avena and Other Mexican Nationals*,

2004 I.C.J. 12 (March 31). (Sinisterra Mot. at 8.) Sinisterra correctly states that the Government has an obligation to review and reconsider a conviction and sentence of a defendant whose Vienna Convention rights were violated. *Avena*, I.C.J. at 72. Particularly, Article 36 of the Convention requires notification of consular officials when their nationals are arrested and grants consular officials the right to visit and communicated with their incarcerated nationals. *Ortiz*, 315 F.3d 873-74. Unlike Sinisterra, however, the defendants in *Avena* failed to timely object to an alleged violation of their Convention rights, and thus procedurally defaulted. *Avena*, 2004 I.C.J. at 44. Though the ICJ held that the procedural default rule is not facially invalid under the Convention, the rule as applied in *Avena* prevented meaningful review and reconsideration of the defendants' Convention rights. *Id.* at 56-57.

Here, conversely, the Eighth Circuit considered Sinisterra's claimed violation of the Vienna Convention on direct appeal. *Ortiz*, 315 F.3d at 885-88. The court held that, although a violation of Sinisterra's Vienna Convention rights occurred, Sinisterra was not prejudiced by the violation, and the court, therefore, denied relief. *Id.* Thus, *Avena* does not require the district court to re-visit, yet again, Sinisterra's request for relief.

Moreover, the Eighth Circuit's review of the violation of Sinisterra's Vienna Convention rights satisfied the guidance given by the ICJ for reviews of such claims. Importantly, the ICJ stated, "It is not to be presumed, as [defendants] assert[s], that partial or total annulment of conviction or sentence provides the necessary and sole remedy" for violation of the Convention. *Avena*, 2004 I.C.J. at 60. Instead, *Avena* permits the United

-23-

States to choose its own method for reviewing the defendants' convictions and sentences as long as "such review and reconsideration [is] carried out 'by taking account of the violation of the rights set forth in the Convention,' including, in particular, the question of the legal consequences of the violation upon the criminal proceedings that have followed the violation." *Id.* at 59, 62. Thus, a review must determine if the violation of the Vienna Convention caused actual prejudice to the defendant in the process of administration of criminal justice. The Eighth Circuit's review of Sinisterra's claim complied with this guidance from the ICJ. Indeed, the Eighth Circuit provided an extensive explanation of why the violation of the Vienna Convention did not cause Sinisterra prejudice. *Ortiz*, 315 F.3d 885-88.

Sinisterra is suggesting the Supreme Court in *Medellin v. Dretke*, 125 S.Ct. 686 (2004) hinted that a violation of the Vienna Convention on Consular Relations creates binding and enforceable rights that can be enforced in United States courts. He is correct that the Supreme Court denied certiorari on this particular issue. However, the Eighth Circuit here, rendered its ruling that Sinisterra was not prejudiced in any way by the violation of the Vienna Convention, assuming "the Convention creates an individually enforceable right." *Ortiz, id.* at 886. With the Eighth Circuit making this assumption, its decision would not have been affected by *Medellin*. Consequently, there is no reason for this Court to reconsider or revisit this issue. Sinisterra's claim should therefore be denied.

**D.      Constitutionality and Impact of Federal Death Penalty**

Sinisterra next makes a broad claim that the federal death penalty disproportionately and unconstitutionally applies to race. Other than raw statistics which only capture numbers, Sinisterra offers no evidence that race or ethnicity have ever been factors in the Department of Justice approving death penalty requests.

In *McCleskey v. Kemp*, 481 U.S. 279 (1987), the United States Supreme Court found that in order to prevail on a claim that the death penalty disproportionately impacts race and ethnicity in violation of the Eighth Amendment, a defendant has the burden of proving both discriminatory intent and discriminatory effect. *Id.* at 292-93. In order to prove discriminatory intent, a defendant must demonstrate that the "decision makers in his case acted with discriminatory purpose." *Id.* at 292. Such a showing cannot be met by systemic statistics alone – that is, discriminatory intent in a particular prosecution cannot conclusively be inferred from system-wide findings suggestive of racially disparate impact. *Id.* at 297. "[S]tatistics, when produced 'without regard to the facts of a particular case,' are insufficient proof of discrimination." *United States v. Minerd*, 182 F.Supp.2d 459, 462 (W.D. Pa. 2002) (quoting *McCleskey*, *id.* at 293.)

In this case, Sinisterra only has statistics of the percentages blacks verses whites approved for death penalty prosecution by the Department of Justice from 1995-2000, and the percentages under former Attorney General John Ashcroft. (Sinisterra Mot. at 10-11.) With only these numbers, Sinisterra has woefully fallen short of meeting the first prong of his equal protection claim – providing evidence of discriminatory intent as required under *McCleskey*. Therefore, Sinisterra's claim must fail.

Sinisterra also fails to show the decision to pursue the death penalty in his case had the requisite discriminatory effect to establish a violation of the Eighth Amendment. In order to show prima facie proof of discriminatory effect, a defendant must proffer evidence that shows "that similarly situated individuals of a different race were treated differently." *Edelin*, *id.* at 261 (citing *United States v. Armstrong*, 517 U.S. 456, 466 (1996)). Sinisterra is required to establish that at least one of the decision makers in this case has "systematically declined to capitally prosecute" black Colombian defendants accused of illegal activity comparable to the allegations here. Sinisterra has not established any such information or evidence. Consequently, he has failed to provide evidence to support the second prong, and thus, his claim that the federal death penalty is disproportionately and unconstitutionally applied by race is unsubstantiated and must be denied.

**E.      Prosecutorial Misconduct**

Sinisterra contends the prosecutor's references to Jeffrey Dahmer, Adolf Hitler, and Charles Manson in closing argument during the death penalty phase constituted prosecutorial misconduct in violation of the Fifth and Eighth Amendments. These allegedly improper references were, however, raised on direct appeal and decided by the Eighth Circuit Court of Appeals. The appellate court stated that "the prosecutor made these references when arguing that a family's love for a convicted criminal should not excuse the criminal's behavior . . . [and] the thrust of his argument was that familial love should not outweigh the aggravating circumstances of a crime in deciding on the appropriate punishment." *United States v. Ortiz*, 315 F.3d 873, 903 (8th Cir. 2002). "This type of reference is not 'prejudicial

enough to deprive [the] defendant[s] of [their] constitutional rights to a fair penalty phase hearing.'" *Id.* (quoting *United States v. Allen*, 247 F.3d 741, 776 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002)).

Since this issue has already been resolved by the appellate court, it should not be revisited here. Sinisterra's claim should be denied.

**F.      Sinisterra's Death Sentences Do Not Constitute Cruel and Unusual Punishment**

Next, Sinisterra claims his death sentences under the FDPA are disproportionately harsh and in violation of the Eighth Amendment since co-defendant Hinestroza, who was more culpable, only received a life sentence. Applicable case law supports a finding that Sinisterra's claim be denied.

In 2000, Sinisterra was convicted and sentenced to death for the murder of Julian Colon, which resulted from the actions of a four-person drug conspiracy of which Sinisterra was a member. According to Sinisterra, the murder was actually "planned and organized" by co-defendants who did not receive a death sentence. The co-defendants Sinisterra refers to who were either sentenced subsequent to Sinisterra, or were tried and sentenced by a different jury years after Sinisterra's sentencing.

At the initial trial, co-conspirators Sinisterra and Ortiz received death sentences, while Tello received life imprisonment. Hinestroza was apprehended at a later date, and was tried in 2005 before a different jury. Hinestroza's jury failed to recommend a death sentence because it was deadlocked. Given these varying sentences, Sinisterra alleges his death

sentence was arbitrarily imposed in violation of 18 U.S.C. § 3595 and the Fifth and Eighth Amendments.

### 1. *Review for Proportionality*

As stated above, Sinisterra claims his death sentence was arbitrarily imposed in violation of 18 U.S.C. § 3595 and the Eighth Amendment. Case law and traditional cannons of statutory interpretation militate against such findings. The statutory and constitutional claims will be discussed separately below.

### a. **Statutory Claim**

A reduction in Sinisterra's sentence is not justified by § 3595. In pertinent part, the statute authorizes the reviewing court "to consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor." 18 U.S.C. § 3595. Sinisterra focuses solely on the alleged arbitrariness of his sentence in light of Hinestroza's sentence of life imprisonment. Though § 3595 fails to specifically authorize a proportionality review, Sinisterra attempts to read one into the statute's "arbitrariness" language. For support, Sinisterra cites *United States v. Llera-Plaza*, 179 F.Supp.2d 444 (E.D. Pa. 2001). In that case, the district court noted "that, although the [statute] does expressly require that a court of appeals reviewing a federal death sentence examine its proportionality, nothing in the statutory language precludes such an inquiry." *Id.* at 457. However, the district court quickly conceded that "[d]etermining the proper scope

of appellate review is, of course, a matter to be determined by a court of appeals, not by a district court." *Id.*

Both the Fourth and Fifth Circuits have examined the proper scope of review under the statute. The Fifth Circuit in *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998), viewed § 3595(c)(1) as establishing a two-part test. First, the court reviewed the evidence to determine if it supported the jury's finding under a sufficiency of the evidence standard. *Id.* at 353. Assuming this is satisfied, "[its] next responsibility is to ensure that the sentence was not handed down under the influence of passion, prejudice, or some other arbitrary factor." *Id.* at 354. Though the court declined to articulate the standard of review, it concluded that "[t]he death sentence [was] warranted by the jury's specific findings" in that case. *Id.*

As in *Webster*, the Fifth Circuit took a decidedly jury-centered analysis in *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), abrogated on other grounds by *United States v. Martinez-Salazar*, 528 U.S. 304 (2000). The *Hall* decision was noted in *Webster*, stating that "[w]e have found nothing in the record indicating that the jury's recommendation of a death sentence was motivated in any degree by passion, prejudice, or any other arbitrary factor." *Webster, id.*, 162 F.3d at 354 n. 68 (quoting *Hall*, 152 F.3d at 426).

The Fourth Circuit similarly adopted a jury-centered approach in *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000). The court stated,

> There is no indication that the jury did not weigh the evidence, and it had sufficient evidence to reach its particular findings on the aggravating factors, even if the defense is correct that the above allegations were errors, which we

do not hold. We recognize that while the proceedings must be free from passion, prejudice, and other arbitrary factors, a death penalty case will not be emotionless. The errors alleged by the defense did not rise to a level that overwhelmed the proceedings and created an improper basis for the verdict.

*Barnette, id.* at 821.

Based on these three precedents, therefore, it is clear that when evaluating whether or not a sentence of death is improperly based on "passion, prejudice, or other arbitrary factor" the courts will take a jury-centered approach. In other words, the court will ask itself if *this jury in this case* was filled with passion, prejudice, or otherwise acted arbitrarily. Thus, the case law does not support reading a proportionality review into the statute because it goes outside the confines of this jury's findings given the facts in this case.

Additionally, traditional cannons of statutory interpretation do not support Sinisterra's contention that the statute encourages the court to engage in a proportionality review. For support, Sinisterra cites the Georgia statute at issue in the foundational United States Supreme Court case *Gregg v. Georgia*, 428 U.S. 153 (1976), along with a litany of state court opinions interpreting analogous statutes. Sinisterra fails to realize, however, that the state statute, particularly Georgia, has provisions directing the court to conduct a separate review for arbitrariness and proportionality of the sentence. *See Gregg, id.* at 166-67.

### b. *Eighth Amendment Claim*

In addition to his statutory claim, Sinisterra also asserts that his sentence is unconstitutional under the Eighth Amendment. This argument again rests on the disparity in sentences between Sinisterra, Ortiz, and Hinestroza. The proportionality review is not

required by the Eighth Amendment. *See Pulley v. Harris*, 465 U.S. 37 (1984). However, Sinisterra attempts to distinguish his case from that of *Harris*. *Harris* concerned "inter-crime" proportionality whereas this appeal is one of "intra-crime" proportionality. *Harris* makes a distinction between "an abstract evaluation of the appropriateness of a sentence for a particular crime" and the appropriateness of the punishment given "punishment imposed on others convicted of the same crime." *Id.* at 42-43. It is the latter type of review that concerned the *Harris* Court. *Id.* Unlike Sinisterra's assertion, the Court's language does not appear to be limited to "inter-crime" comparisons. Additionally, different juries sat in judgment of Sinisterra and Hinestroza making the comparison more akin to "inter-crime" rather than a true "intra-crime" in which one jury would sit in judgment of all defendants. Thus, a proportionality review is also not required in the instant case.

Furthermore, the Court in *Harris* emphasized that proportionality review may be "constitutionality superfluous" given the "safeguards of the . . . statute." *Harris, id.* at 49. The Fifth Circuit in *United States v. Jones*, 132 F.3d 232 (5th Cir. 1998), *upheld in* 527 U.S. 373 (1999), spoke directly to this issue. The court held that the statute "is not so lacking in other checks on arbitrariness that it fails to pass constitutional muster for lack of a proportionality review." *Id.* at 240.

Finally, *Harris* recognized that "[a]ny capital sentencing scheme may occasionally produce aberrational outcomes. . . . As we have acknowledged in the past, 'there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" *Id.* at 54 (quoting *Zant v. Stephens*, 462 U.S.862, 844 (1983) (quoting

*Lockett v. Ohio*, 438 U.S. 586 (1977) (plurality opinion)). Even though Sinisterra only challenges his sentence as opposed to the whole scheme, the court's wisdom is just as well placed. Juries are not exact duplicates of one another; the fact that Hinestroza's jury failed to unanimously recommend the death sentence does not alter the fact that the jury in Sinisterra's case acted properly under the statute. Consequently, Sinisterra's request that his sentence be set aside in light of Hinestroza's life sentence should fail.

2.      *Substantive Due Process and Equal Protection*

Sinisterra's substantive due process and equal protection claims are merely guises to advance his earlier proportionality argument. He provides little support to demonstrate a lack of substantive due process and equal protection in their own right.

For his substantive due process argument, Sinisterra recites the standard tests of "shocks the conscience" and "arbitrarily and capriciously." However, Sinisterra fails to apply these standards to this case other than merely asserting the different sentences, given the facts, fail to satisfy these long-held standards. The many protections and safeguards of the statute and the Eighth Amendment alleviate the concern over an arbitrary imposition of the death penalty. *See Jones, id.*, 132 F.3d at 240.

In a similar vein, Sinisterra asserts that the "disparate treatment" of his two co-conspirators deprives him of equal protection of the law. As his subsequent citation to the *Gregg* case indicates, Sinisterra is actually concerned with the differing sentences that resulted from the application of the same law. He makes no allegation that the federal courts

have applied different rules to similar cases. Thus, Sinisterra's equal protection clause is without merit.

**G.** <u>**Ineffective Assistance of Counsel Claims 1-11**</u>

Sinisterra makes 11 claims of ineffective assistance of counsel, alleging that his counsel failed to: (1) object to the introduction of testimony that Sinisterra was a violent person who killed people for a living; (2) present evidence, challenge or object to evidence regarding Sinisterra's presence at the "murraco" a meeting; (3) prepare for and present Sinisterra for his testimony; (4) communicate with Sinisterra through a Spanish-speaking interpreter; (5) retain and utilize a mitigation specialist; (6) conduct a thorough mitigation investigation; (7) investigate and present mental health evidence during the death penalty phase; (8) object to alleged prosecutorial misconduct in closing argument; (9) challenge the indictment; (10) object to alleged inflammatory hearsay in the penalty phase; and (11) object to application of the FDPA.

Sinisterra must satisfy a heavy burden to successfully establish an ineffective assistance of counsel claim:

> A claim of ineffective assistance of counsel under § 2255 must be scrutinized under the two-part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed 2d 674 (1984). Under *Strickland*, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must prove both that his counsel's representation was deficient and that the deficient performance prejudiced the defendant's case. The first part of the test is met when the defendant shows that counsel "failed to exercise the customary skills and diligence that a reasonably competent attorney would [have] exhibit[ed] under similar circumstances. The second part is met when the defendant shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Cheek v. United States*, 858 F.2d 1330, 1336 (8th Cir. 1988) (citations omitted).

Counsel's performance will not be deficient if the performance was one of "reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). For a defendant to show otherwise, he must show that counsel's representation fell below an objective standard of reasonableness, and but for counsel's ineffective assistance, there is a "reasonable probability" that the result would have been different. *Id.* at 694. "Reasonable probability" means a probability sufficient to undermine the confidence in the outcome of the trial. *Id.*

In the inquiry of assistance of counsel, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance which is a barrier that the defendant must overcome. *Id.*; *see also Blankenship v. United States*, 159 F.3d 336 (8th Cir. 1998). The defendant bears the burden to affirmatively prove the prejudice aspect of the claim which requires proof of a reasonable probability that the result would have been different but for counsel's deficient performance. *French v. United States*, 76 F.3d 186, 188 (8th Cir. 1996) (citing *Strickland*, 466 U.S. at 694). In evaluating counsel's conduct, the court should avoid "the distorting effects of hindsight," and concentrate on the circumstances as they appeared to counsel at the time of trial. *Strickland*, 466 U.S. at 689.

The failure to establish "prejudice" is dispositive of a § 2255 claim, and the court does not have to then address the reasonableness of the attorney's performance. *United States v.*

*Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996); *see also United States v. Montanye*, 77 F.3d 226, 230 (8th Cir. 1996); *Sanders v. Trickey*, 875 F.2d 205, 222 n. 8 (8th Cir. 1989).

      1.     <u>*Testimony that Sinisterra was a Violent Person*</u>

Sinisterra's first ineffective assistance counsel contention relates to counsel not moving to exclude testimony from Government witnesses Andres Borja Molina and Edward Ortiz regarding their prior discussions and experiences with Sinisterra, and not objecting to their testimony. Contrary to Sinisterra's claim, the testimony of both witnesses was not Rule 404(b) evidence. Instead, the testimony explained the nature of Borja-Molina and Edward Ortiz's relationship with Sinisterra. Furthermore, Borja-Molina's testimony about Sinisterra was an explanation of why he was concerned about a possible double-cross when he saw Sinisterra's truck at the house where he and Julian Colon were shot. (*See* T. Vol. VI at 1218-20.) Additionally, Borja-Molina was conveying his prior conversations with Sinisterra – words from Sinisterra's own mouth. (T. Vol. VI at 1321.) As pointed out in counsel Fred Duchardt's affidavit, the witnesses' knowledge of Sinisterra's reputation for violence was proper because he had " researched the matter prior to trial, and [] concluded from that research that objections to such testimony would have been fruitless." (Duchardt Aff. 24, ¶ 23.) Since the testimony was not 404(b), counsel's representation was not ineffective.

Even if such evidence were Rule 404(b) evidence, the court still would have been correct in allowing the testimony. Rule 404(b) of the Federal Rules of Evidence provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the

character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

"To be admissible under Rule 404(b), the evidence must be (1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged." *United States v. Vieth*, 397 F.3d 615, 617–18 (8th Cir. 2005) (citations and internal quotations omitted); *see also* Fed. R. Evid. 403. A general denial defense places the defendant's state of mind at issue. *United States v. Jackson*, 278 F.3d 769, 771 (8th Cir. 2002).

### 2. *"Murraco" meeting*

Second, Sinisterra complains that his counsel did not present evidence to challenge the Government's eye-witness testimony that Sinisterra was present at a meeting on Thanksgiving 1998, where there was a discussion that a body ("murraco") must pay for the attack and robbery of $250,00 from Hinestroza's girlfriend. Contrary, to Sinisterra's claim, defense counsel Fred Duchardt fully addresses the defense team's strategy in addressing the "murraco" meeting. First of all Mr. Duchardt states that although Sinisterra claimed he was not at the meeting, upon further probing counsel did not believe Sinisterra's wife and her mother (or others allegedly present at the Thanksgiving dinner) could account for Sinisterra's whereabouts the entire day. Mr. Duchardt explained that "when I probed, in a way I felt

likely would occur in cross-examination, as to their ability to account for all of the time of the day, and precisely when dinner had occurred, neither woman could say that she could account for Mr. Sinisterra's presence so as to preclude the possibility that he left for a time (for example, to go across town, to be present outside during the 'murraco meeting'). Thus, I believed that the testimony of these witnesses would have been easily undercut by what I believed to be a likely line of cross-examination." (Duchardt Aff. 18, ¶ 20.)

Furthermore, the defense strategy was to not put Sinisterra's wife on the stand because there was a danger that she could have been implicated and possibly charged. Additionally, her testimony could have led to questions about her "knowledge about her husband's involvement with drug dealings, most certainly her knowing that Mr. Sinisterra would contribute sums of money to the family, with no means for obtaining those funds other than through drug dealings." (Duchardt Aff. 19, ¶ 20.) Such a strategy was reasonable.

Additionally, part of defense strategy was that the "murraco" meeting was not particularly significant because Sinisterra did not participate in the meeting since the testimony was that he was outside. (Duchardt Aff. 19, ¶ 20.) Furthermore, even if Sinisterra was not part of this "murraco" meeting, there still was ample evidence that he took part in the planning of the killing of Colon and attempt to kill Borja-Molina. Sinisterra traveled from Houston to Kansas City and was present when the shooting took place, and he also confessed to "roughing up" and actually shooting Colon. The decision to not focus on the "murraco" meeting was a decision both counsel made after discussion with Sinisterra. (Duchardt Aff. 19, ¶ 20.) While Sinisterra may not have totally understood the defense

strategy, the fact that other evidence overwhelmingly convinced the jury beyond a reasonable doubt does not amount to his counsel providing ineffective assistance. In light of the reasons stated by Mr. Duchardt, counsel's strategy was objectively reasonable. Consequently, Sinisterra's claim should be denied.

3.     *Preparation for and Presentation of Sinisterra's Testimony*

Sinisterra's third ineffective assistance of counsel claim revolves around counsel's preparation of Sinisterra for testimony on his own behalf. Mr. Duchardt's affidavit emphatically disagrees with the affidavit submitted by co-defense counsel Jennifer Herndon that Sinisterra was only prepped for trial the day before his testimony. Mr. Duchardt states that "work on Mr. Sinisterra's testimony was done in my discussions with him over the months prior to trial. Particularly, because Mr. Sinisterra had testified during pretrial hearings, I had had the chance to observe certain things which he did, and was able to coach him about those things afterward." (Duchardt Aff. 22, ¶ 23.) Clearly, counsel did prepare Sinisterra for his testimony.

Mr. Duchardt further states in his affidavit that there was some difficulty in communicating with Sinisterra in English and Spanish. However, Mr. Duchardt found that the best way to communicate was through the method used by Sinisterra's wife, Michelle, which was to talk slowly in English but be willing to repeat ideas and explain back to assure accurate communication of that idea. (Duchardt Aff. 21-22, ¶ 21.)

The supposed appearance of unpreparedness of Sinisterra's testimony, or his seemingly "not coming off as well as possible," was due to his testimony being translated

through an interpreter. Mr. Duchardt explained that the use of an interpreter made the answers given by Sinisterra to appear impersonal and detached. (Duchardt Aff. 23-24, ¶ 22.) Sinisterra was prepared for trial. As previously discussed, defense counsel deliberately omitted questions about the "murraco" meeting; it was "not an oversight due to inadequate preparation." (Duchardt Aff. 23, ¶ 22.)

Sinisterra's counsel' representation was proper and objectively reasonable. Government witness testimony, as well as Sinisterra's own admission that he shot Colon, provided the jury with sufficient evidence to support the guilty verdicts and the imposition of the death sentences. Sinisterra's ineffective assistance claim should be denied.

### 4. *Communication with Sinisterra Through a Spanish-Speaking Interpreter*

In his fourth ineffective assistance of counsel claim, Sinisterra complains that his counsel failed to use an interpreter which would have resulted in "meaningful communication" with Sinisterra. As Mr. Duchardt explains in his affidavit, counsel communicated with Sinisterra in both English and Spanish throughout his representation. However, while counsel had a particular concern that Sinisterra understood the English in his *Miranda* warnings, counsel utilized what he thought was the best approach, as explained in the Government's response to Sinisterra's third ineffective assistance of counsel claim – the best way to communicate was through the method used by Sinisterra's wife, Michelle, which was to talk slowly in English but be willing to repeat ideas and explain back to assure accurate communication of that idea. (Duchardt Aff. 21-22, ¶ 21.)

Mr. Duchardt explained that he utilized an interpreter, but found that "interpreters often were counterproductive against communication" since most "paraphrase in English and Spanish, thereby putting their own interpretation, even spin, on what each party is saying." (Duchardt Aff. 21, ¶ 21.) Counsel ultimately used "simultaneous interpreters" at trial, but there still was "a gap in communication." (Duchardt Aff. 21, ¶ 21.) Mr. Duchardt facilitated his communication in English with Sinisterra by spending "long periods of time in each session, and spent more sessions." (Duchardt Aff. 21, ¶ 21.)

While counsel may not have been able to totally convey the reason why both counsel agreed to not highlight the "murraco" meeting, the same lack of understanding legal strategy can occur with English-speaking defendants. Sinisterra was a part of every aspect of his defense, including the decision to testify. Neither the mitigation investigation nor Sinisterra's mental health was affected by the communication between Sinisterra and his counsel.[11] Counsel's communication with Sinisterra was sufficient to allow Sinisterra to participate in an effective, although not successful, defense. This claim is without merit and should be denied.

---

[11]Both the mitigation investigation and mental health issues will be addressed in subsequent sections of this response. Suffice it to say, counsel's actions in both regards were reasonable in that a mitigation investigation was conducted and Sinisterra was tested and found to not be mentally retarded.

5.    *Retention and Utilization of a Mitigation Specialist*

In his fifth issue, Sinisterra claims that Dan Grothaus functioned as a mitigation investigator rather than a mitigation specialist, and counsel's representation was ineffective in not hiring a "separate, trained mitigation specialist." Mr. Duchardt clarifies Mr. Grothaus' education and experience which made him qualified as a mitigation specialist in this case. (Duchardt Aff. 2, ¶ 4.) Mr. Grothaus served in the dual role as a mitigation investigator and specialist in both phases of trial. Specifically, Mr. Grothaus had previous experience as a private investigator in Kansas City and Houston, Texas; had been an investigative journalist with the Houston Chronicle and educationally trained in human relations; and had extensive connections with and knowledge about the Houston area. (Duchardt Aff. 2, ¶ 4.) Mr. Duchardt believed Mr. Grothaus's education and experience made Grothaus "qualified, even more than those who often act as 'mitigation specialists' to take on the multifaceted tasks that confronted us as concerned investigation of both phases of the trial of this case." (Duchardt Aff. 3, ¶ 4.) Mr. Grothaus was assigned the investigation work for the first phase of trial, while Mr. Duchardt and Ms. Herndon developed "mitigation themes and evidence." (Duchardt Aff. 4, ¶ 6.) Both counsel drew upon their years of experience with death penalty cases to develop the mitigation themes and evidence. (Duchardt Aff. 4, ¶ 6.) So, contrary to Sinisterra's claim, the defense team possessed the clinical skills contemplated by the ABA Guidelines in death penalty cases.

Sinisterra's claim that the penalty phase was "disjointed, unfocused, and incomplete" cannot be blamed on Mr. Duchardt. The witnesses from Colombia could not obtain visas to

travel to the United States, through no fault of defense counsel. Counsel timely applied for entry visas, but the visas were rejected. (Duchardt Aff. 11, ¶ 13.) The court of appeals did not find sufficient prejudice from the denial of the visas. *United States v. Ortiz*, 315 F.3d 873, 904 (8th Cir. 2002). In any event, Sinisterra's mother could not travel even if the visas had been granted. (Duchardt Aff. 11, ¶ 13.)

Contrary to Sinisterra's claim, Mr. Duchardt developed mitigation evidence from the Houston, Texas, area and with Sinisterra's extended family. (Duchardt Aff. 7, ¶ 8.) The information developed by counsel was presented during the trial process.

Mr. Grothaus was employed as the mitigation specialist by the defense. (Duchardt Aff. 13, ¶ 14.) The type of information Sinisterra suggests in his motion is really that of a forensic social worker who would "synthesizes all of the background information about the client, and then testifies, in hearsay fashion, about the information gathered by him/her and others from other persons and sources. (Duchardt Aff. 13-14, ¶ 15.) Mr. Duchardt, in his experience with capital cases, has found that "such presentations about a client's background are more effectively made if family members can be enlisted to make the presentations directly, themselves, instead of second hand, through a forensic social worker." (Duchardt Aff. 14, ¶ 15.)

Both Mr. Duchardt and Ms. Herndon believed that the forensic presentation could be accomplished through testimony of Sinisterra's wife, mother, and other family members. (Duchardt Aff. 14, ¶ 15.) Even still, counsel attempted, unsuccessfully, to locate a forensic

social worker with a background in the Spanish culture and familiarity with the Colombian culture. (Duchardt Aff. 14, ¶ 15.)

Instead, Ms. Herndon traveled to Colombia and obtained authorization to employ and pay a Colombian interpreter/guide. (Duchardt Aff. 14-15, ¶ 15.) It would seem that if the jury actually saw the videotapes depicting how Sinisterra was raised and the cultural environment in Colombia that would have a greater impact than jury hearing hearsay information from a forensic social worker. So, although in retrospect, given the denial of visas for Sinisterra's family members to travel to the United States, Mr. Duchardt would have sought to hire a forensic social worker, counsel's decisions at the time to pursue presenting the mitigating factors through videotape was not objectively unreasonable.

Just because a defense theory or strategy does not convince a jury of a defendant's innocence does not mean that defense counsel provided ineffective assistance. Generally, defense counsel provides a defense strategy based on perceived weaknesses of the Government's case and the evidence counsel has obtained based on the assistance from the defendant. Sinisterra's counsel, therefore, did their part to provide reasonably objective and competent representation for Ortiz, and consequently, provided effective assistance. Therefore, the representation provided to Sinisterra did not amount to ineffective assistance of counsel.

6.      <u>*Thorough Mitigation Investigation*</u>

As explained above in sub-section 5, counsel did conduct a mitigation investigation in this case. Additionally, contrary to Sinisterra's claim, counsel did attempt to converse with Sinisterra in his "native" language. (*See* Duchardt Aff. 20-22, ¶ 21.)

In an effort to present evidence of Sinisterra's background, socio-economic conditions of his childhood and other mitigating factors Ms. Herndon traveled to Colombia. It was counsel's intention to present Sinisterra's "youthful background information" through live testimony from his family members because "there were no records about Mr. Sinisterra's childhood which were available from Colombian authorities." (Duchardt Aff. 10-11, ¶ 13.) However, family members could not obtain visas to travel to the United States, resulting in Ms. Herndon making trip to Colombia to obtain information. (Duchardt Aff. 11-12, ¶ 13.) Ms. Herndon suggested defense use videotapes of witness testimony, which she pursued. (Duchardt Aff. 12, ¶ 13.) Ms. Herndon did not disclose or provide copies of the Colombia videotapes, nor did she have Mr. Duchardt review those tapes until the sentencing phase. (Duchardt Aff. 12, ¶ 13.)

The videotapes of Sinisterra's upbringing in Colombia sufficiently conveyed to the jury information deemed as mitigating factors. This is demonstrated in the jurors finding as a non-statutory mitigating factor, that Sinisterra's "lack of guidance and support as an adolescent made him an easy target of the violent drug culture." (Sinisterra's Mot. at 43.) It is clear that the videotapes had an impact on the jury's findings during the penalty phase. Counsels' actions and duties to provide such background information were in accordance with the standard set forth in *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), in that both knew

and attempted to exercise their duty to investigate Sinisterra's medical, family, social, and educational history. Consequently, Sinisterra's claim that counsel did not conduct and present a thorough mitigation investigation is without merit and should be denied.

7.    *Investigation and Presentation of Mental Health During Penalty Phase*

Sinisterra claims his counsel was ineffective in not introducing evidence of Sinisterra's mental health during the penalty phase. However, as Mr. Duchardt states in his affidavit, Dr. Wheelock's conclusions were pursued and Dr. Wheelock testified about his finding that Sinisterra had a low IQ during the trial. (Duchardt Aff. 17, ¶ 18.) The jury had an opportunity to hear this testimony and consider it during the trial and penalty phase (although the testimony was not repeated during the penalty phase).

Contrary to Sinisterra's claim that a mental health expert was not utilized, Mr. Duchardt, in his affidavit, states that in light of Dr. Wheeler's report, counsel had Sinisterra evaluated before trial by a mental health expert, Dr. Enrique Dos Santos, M.D., whose oral report indicated that Sinisterra had no mental problems. (Duchardt Aff. 17, ¶ 19.) Dr. Santos is a Spanish-speaking psychiatrist who was the Clinical Director of the Fulton State Hospital. In light of Dr. Santos' evaluation, counsel rightly did not pursue a mental health issue. (Duchardt Aff. 17, ¶ 19.)

Even in light of the evaluation report completed in 2006, years after the trial, by Dr. Antolin M. Llorente, PhD., Mr. Duchardt still would question whether he would have pursued such testimony because of "its lack of strength." (Duchardt Aff. 17, ¶ 19.) Further, Mr. Duchardt states that, "Had we relied on such an expert, it would have permitted

evaluation of Mr. Sinisterra by a mental health expert of the government's choosing. . . . I believe that the evidence from such an expert would likely be quite damaging, so as to counterbalance whatever benefit would be gained by Dr. Llorente's opinions." (Duchardt Aff. 17-18, ¶ 19.)

Based on the knowledge of Dr. Santos' opinion that Sinisterra had no mental problem, and even with a weak, after-the fact mental health evaluation, it was reasonable for counsel to pursue its case in a manner done during the trial and penalty phase. Counsel's strategies were objectively reasonable in that counsel conducted its defense based on information and reports available to counsel at that time. As such counsel's assistance was effective and Sinisterra's claim should be denied.

*8.        Object to Alleged Prosecutorial Misconduct in Closing Argument*

Sinisterra next complains that his counsel did not object to the Government's argument during the penalty phase which "constituted an emotional appeal" to persuade the jury to impose the death penalty. The excerpt Sinisterra points out does not amount to an impermissible emotional appeal. Instead, the Government's closing argument put the facts presented to the jury in context and referred to the actual evidence the jury heard. Further, the penalty phase is not a matter of guilt or innocence, it is a matter of the jury weighing the aggravating and mitigating factors. The cases cited by Sinisterra were guilt-phase closing arguments which the Eighth Circuit found to be reversible error and, therefore, are not apposite here.

Sinisterra also claims that the Government's reference to Adolf Hitler, Charles Manson, and Jeffrey Dahmer during the penalty phase was improper and counsel was ineffective for not objecting. However, the Eighth Circuit has already address ths issue and found that, "The prosecutor was not directly likening appellants' crimes or character to those of Hitler, Manson, or Dahmer. Instead, the thrust of his argument was that familial love should not outweigh the aggravating circumstances of a crime in deciding on the appropriate punishment." *United States v. Ortiz*, 315 F.3d 873, 903 (8th Cir. 2002). Since the appellate court has already determined that the remarks were not improper, Sinisterra's claim that his counsel was ineffective in not objecting is without merit and should be denied.

9.      *Challenge the Indictment*

Sinisterra claims that his trial and appellate counsel were ineffective in not challenging the second superseding indictment, contending that the indictment was "insufficient to charge a capital offense, and failed to argue that Sinisterra's death sentences violated the Fifth Amendment." (Sinisterra Mot. at 50.) Basically, Sinisterra is referring to *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002).

This claim was already addressed under Section A, "Statutory Aggravating Factors" of this response. As pointed out, although specific aggravating factors were not specifically charged in the indictment, the charges in Counts Two and Three were considered as aggravating factors by the grand jury and petit jury. Therefore, the indictment was not defective, but rather set forth and provided Sinisterra with notice of aggravating factors that

would be considered by the jury. Furthermore, as pointed out by Mr. Duchardt in his affidavit, the Eighth Circuit has resolved this issue in *United States v. Allen*, 406 F.3d 940 (8th Cir. 2006), which is still pending certiorari approval before the United States Supreme Court. (*See* Duchardt Aff. 7-8, ¶10.) Therefore, counsel was not ineffective in not challenging the aggravating factors issue at the district court or appellate levels.

10. <u>Object to Alleged Inflammatory Hearsay in Penalty Phase</u>

Sinisterra's next issue relates to counsel not arguing the relaxed evidentiary standards applied in the penalty phase of a trial. Again, this issue has been addressed in Section B, "FDPA Evidentiary Standard During Death Penalty Phase" of the Government's response. The Eighth Circuit has already found in *United States v. Lee*, 347 F.3d 637, 645 (8th Cir. 2004), that the "FDPA standard provides a level of protection that ensures that defendants receives a fundamentally fair trial and that it is not unconstitutional." In light of current case law, it cannot be said that counsel was ineffective in not objecting to hearsay testimony during the penalty phase. Thus, Sinisterra's ineffective assistance of counsel claim must fail.

11. <u>Objection to Application of the FDPA</u>

Sinisterra claims his attorneys were ineffective in not objecting to application of the FDPA. Again, this issue was addressed in Section B, "FDPA Evidentiary Standard During Death Penalty Phase" of the Government's response. The FDPA does not violate the Equal Protection Clause and the Eighth Amendment. Also, Mr. Duchardt rightly concedes in his affidavit that an attack on the FDPA would have been fruitless in light of current case law.

(Duchardt Aff. 8-9, ¶ 11.)  Consequently, counsel's representation on this matter was effective and Sinisterra's claim should be denied.

**G.     Cumulative Effect of All Previously Stated Grounds**

Sinisterra alleges that the cumulative effect of the claims he raised resulted in an unfair trial and sentence.  As the Government has asserted throughout this response in opposition to each of Sinisterra's claims, Sinisterra was provided with competent and effective counsel, received a fair trial, and was sentenced appropriately for his crimes.  Since the Government assert that none of Sinisterra's claims have merit, this last claim, likewise, has no merit and should be denied.

Furthermore, the Government takes issue with the affidavit submitted by attorney Jennifer Herndon, because if counsel's representation she professes occurred in actuality, Ms. Herndon had a duty as an officer of the court to bring such ineffectiveness to the attention of the court.  The Government submits that Ms. Herndon is abundantly mistaken in her impression of Mr. Duchardt's representation because if counsel's assistance was so blatantly obvious the court, magistrate and district, would have addressed the situation. Seeing that neither the court nor counsel raised any concerns over Mr. Duchardt's representation of Sinisterra during the trial and appeal process, Ms. Herndon must, therefore, have come to her conclusions in hindsight and second guess.  Surely, it would defy logic and Ms. Herndon's ethical duty for her to have allowed such alleged atrocities to persist. Consequently, the Government submits that Mr. Duchardt's affidavit accurately reflects both

counsel's posture and representation of Sinisterra, and that counsel's representation met the objectively reasonable representative expected of competent attorneys.

To prove ineffective assistance of counsel, a movant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Anderson v. United States*, 393 F.3d 749, 753 (8th Cir. 2005). To prove prejudice, a movant must establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 753-54 (quoting *Strickland v. Washington*, 446 U.S. 668, 694 (1984)). Sinisterra has not established the above criteria for any of his ineffective assistance of counsel claims, and therefore, the Government respectfully submits that all of Sinisterra's claims should be denied.

## H. No Evidentiary Hearing is Necessary

A movant is entitled to a hearing on a § 2255 motion "unless the motion, files, and record conclusively show" that he is not entitled to relief. *United States v. Regenos*, 405 F.3d 691, 694 (8th Cir. 2005). "A § 2255 motion can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Regenos*, *id.* (internal quotations and citations omitted.)

In this case, Sinisterra's allegations cannot be accepted as true because all are either contradicted by the record or are inherently incredible. Accordingly, this Court should deny Ortiz's claims without an evidentiary hearing. *Id.*

## IV.  <u>CONCLUSION</u>

Based on the above-cited reasons and authorities, the Government respectfully requests this Court to deny Sinisterra's § 2255 motion without an evidentiary hearing.

Respectfully submitted,

BRADLEY J. SCHLOZMAN
  United States Attorney

By      /s/ *Lajuana M. Counts*

LAJUANA M. COUNTS
  Assistant United States Attorney

JEFFREY VALENTI
  Assistant United States Attorney

  Charles Evans Whittaker Courthouse
  400 East Ninth Street, Suite 5510
  Kansas City, Missouri  64106
  Telephone:  (816) 426-3122

  *Attorneys for Respondent*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was delivered on December 8, 2006, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

John Jenab
110 South Cherry, Suite 200
Olathe, Kansas  66061

William E. Shull
104 West Kansas
Liberty, Missouri  64068

Attorneys for Movant Sinisterra

 /s/ *Lajuana M. Counts*
Lajuana M. Counts
Assistant United States Attorney