**DECLARATION OF RUSSELL STETLER**

I, Russell Stetler, declare as follows:

1.     In 2005, I joined the Federal Defender Program to fill a newly created position as National Mitigation Coordinator working with and through the Federal Death Penalty Resource Counsel, Capital Resource Counsel and Habeas Assistance and Training Counsel Projects. This new national position was created in response to the increased demand for high-quality mitigation preparation in death penalty cases following the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003). I have investigated all aspects of death-penalty cases since 1980, first working in a private office and later in institutional offices. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial and on appeal.

2.  From 1990-2005, I worked as the chief investigator and Director of Investigation at non-profit law offices in New York and California. In that capacity, I supervised an in-house staff and consulted with investigators, mitigation specialists, lawyers, and other professionals outside the office who were retained to assist counsel representing death-sentenced prisoners. I am very familiar with the particular needs of capitally charged defendants who are also foreign nationals. A substantial portion of New York's death-eligible defendant population was comprised of foreign nationals, including immigrants from Colombia, Guyana, Honduras, Jamaica, Latvia, Mexico, Trinidad, and Tunisia. California's death-sentenced population

1

currently includes forty-three foreign nationals (thirty Mexicans, two Cambodians, two Estonians, and individuals from Cuba, Egypt, El Salvador, Guatemala, Iran, Laos, Peru, the Philippines, and Vietnam). One Korean was released from California's death row, and a Thai national was executed.

3. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have been invited to lecture on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Missouri, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Virginia. I have also lectured on numerous occasions under the auspices of the Administrative Offices of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. I have lectured at five capital defense seminars in Missouri, at the invitation of the Missouri State Public Defender, the National Legal Aid and Defender Association, and the Habeas Assistance and Training Counsel Project of the Administrative Office of the U.S. Courts.

4. I have lectured on mitigation investigation at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conferences), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times in the past decade and a half, I have served on the planning committees for these national conferences, as well as the Capital Case Defense Seminar sponsored by California

2

Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA).

5.     I have written extensively about the investigation of mitigating evidence in capital cases.  I contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA) since 1993.  This four-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I  helped to shape in the 1990s.   A number of my articles have been cited in the Commentary to the Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (available at www.abanet.org/deathpenalty).  At the request of *Hofstra Law Review*, I wrote a commentary addressing particular sections of the Revised ABA Guidelines (31 Hofstra Law Review 1157 (Summer 2003)).  Much of my material has been incorporated in *Losch's Texas Capital Defender Manual*, 8th edition, published by the Texas Criminal Defense Lawyers Association in 2006.  My latest article, "Mitigation Investigation: A Duty That Demands Expert Help But Can't Be Delegated," appeared in the March 2007 issue of *The Champion.*

6.     I am the coauthor of chapters on psychiatric issues in death penalty cases in two recent books: "Dead Men Talking: Mental Illness and Capital Punishment," in Gerald Landsberg, D.S.W., and Amy Smiley, Ph.D., eds., *Forensic Mental Health: Working with Offenders with Mental Illness* (Kingston, New Jersey: Civic Research Institute, Inc., 2001) and "Punishment," in Richard Rosner, M.D., ed., *Principles and Practice of Forensic Psychiatry*, 2nd edition (London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press).

7.     My investigative experience has included assignments in foreign countries.  In addition, I have experience teaching in the criminal justice systems of other countries.  During the summer of 1995, I taught a course in homicide investigation to judges and prosecutors in

3

Cambodia under the auspices of the Cambodian Court Training Project of the Washington-based International Human Rights Law Group.  In the fall 2003, I trained public defenders in Nanchang, Jianxi Province, under the auspices of the Geneva-based International Bridges to Justice and the Legal Aid Center of Ministry of Justice of the People's Republic of China.  At the invitation of the National Legal Aid and Defender Association, I have written a chapter on investigation for their forthcoming manual for design and implementation of international legal assistance programs for the indigent.  I am familiar with the many difficulties associated with conducting investigations abroad, with or without the cooperation of the host country.

8.      Over the years, I have been directly involved in hundreds of capital cases, including dozens of trials and postconviction hearings.  I have also been consulted on capital cases in numerous jurisdictions around the country, and I have provided evidence on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in numerous jurisdictions, including Arizona, Arkansas, California, Mississippi, Missouri, New York, Oklahoma, Pennsylvania, Tennessee, Texas, and Wyoming.  In 2004, I received the "Life in the Balance Achievement Award" from the National Legal Aid and Defender Association for my work in this field.

***Review of the German Sinisterra Case***

9.      At a seminar in Nashville last month, I met John Jenab, counsel assigned to represent German Sinisterra in connection with a motion for post-conviction relief under 28 U.S.C. § 2255.  At the request of postconviction counsel for Mr. Sinisterra, I have provided this affidavit setting forth the standard of practice in mitigation investigation in death penalty cases,

4

the general contours of the mitigation investigation that would have been appropriate in preparation for Mr. Sinisterra's trial in 2000, and the standard of care in mental health evaluations in death penalty cases.

10. At the request of postconviction counsel for Mr. Sinisterra, I have reviewed various materials relating to the case, including *United States v. Ortiz et al.*, 315 F.3d 873; the transcripts of the penalty phase of Mr. Sinisterra's trial, April 28 through May 2, 2000; DVD copies of the videotaped trial exhibits 63, 64, 65, 66, 67, 68, 69, 71, and 72; the verdict sheets dated May 3, 2000; the Statement of Frederick A. Duchardt, Jr., dated November 24, 2006; the Affidavit of Counsel Jennifer Herndon, dated December 2, 2004; the Report of Neuropsychological Evaluation by Antolin M. Llorente, Ph.D., dated February 6, 2006; the Ex Parte Motion for Hiring of Mitigation Specialist and Ex Parte Renewed Motion for Leave to Hire Mitigation Specialist (both filed under seal); and the Order Denying Movant German C. Sinisterra's Ex Parte Renewed Motion for Leave to Hire Mitigation Specialist, dated January 5, 2005.

11. Based on the information provided by Mr. Sinisterra's postconviction counsel and the materials I have reviewed, it is my understanding that post-conviction counsel for Mr. Sinisterra has asked the court to appoint the Capital Habeas Unit for the District of Arizona as co-counsel for the limited purpose of providing the assistance of bilingual members of its staff to develop mitigation evidence that went unexplored at the time of trial, particularly evidence relating to Mr. Sinisterra's early life and developmental years in Colombia. (I am familiar with the Capital Habeas Unit for the District of Arizona, having lectured at training programs under their auspices in Tucson and Phoenix, Arizona, in 2005. I have discussed with their staff the

5

value of their bilingual attorneys and investigators in cases involving foreign nationals from Mexico, Central and South America, and I am also familiar with their expertise in the investigation and presentation of evidence relating to mental disorders and impairments.)

12. The mitigation presented at Mr. Sinisterra's trial focused on his loving relationships with his wife, children, mother, and mother-in-law; his hard-working efforts to support his loved ones; and the homicide victim's own involvement in the brutal world of drug trafficking. Based on the information provided by post-conviction counsel and the materials I have reviewed, I have seen no evidence that any member of the trial team screened for the presence of mental or psychological disorders or impairments. A thorough and complete life-history investigation would explore numerous areas identified by Mr. Jenab and Dr. Llorente, including inherently mitigating intellectual deficits, brain damage which may be secondary to childhood head injuries with loss of consciousness, and a history of trauma that included extreme domestic violence (father "going after his mother with a machete") and sexual assault in childhood. A thorough and complete mitigation investigation would also include a multigenerational history exploring alcohol and substance abuse, as well as depression and psychiatric disorders. The mitigation investigation should also explore the poverty of Mr. Sinisterra's living environment in early childhood, including malnutrition, access to medical care, exposure to environmental toxins, and basic sanitation in the home. It is important both to understand the culture of Mr. Sinisterra's background in Colombia and the impact of the immigration experience itself. The jury heard none of this at trial.

13. Based on the information provided by counsel and the materials I have reviewed, the only investigation conducted in Colombia was by Ms. Herndon, and the work product is

Case 4:04-cv-08003-GAF     Document 64-1     Filed 09/19/07     Page 6 of 12

reflected in the superficial and vague videotaped interviews that were presented at trial. The interviews did not even attempt to explore critical areas of mitigation investigation, including head trauma and brain injury, sexual abuse, family dysfunction, and the family history of alcoholism and mental disorders. There was no attempt to uncover the concrete effects of rural poverty, such as malnutrition, lack of medical care, lack of sanitation, and exposure to environmental toxins. In addition, recording has a chilling effect on interview subjects unless there has been an opportunity to build trust and rapport in advance. Mitigation interviews are invasive of sensitive and shameful subjects, including in this case sexual abuse, domestic violence, and family histories of alcoholism and mental disorders and impairments. These topics require skilled ethnoculturally competent interviewers – not a video recorder. A fully developed social history is also necessary to permit a reliable and accurate assessment of Mr. Sinisterra's intellectual functioning and the potential causes and effects of his brain damage as disclosed by neuropsychological testing.

***Standard of Care in Capital Cases***

14. Investigation of a capitally charged client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar I have participated in since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases.

15. The Revised ABA Guidelines for the Appointment and Performance of Defense

Counsel in Death Penalty Cases (hereinafter, 2003 Revised ABA Guidelines, available at www.abanet.org/deathpenalty) state unequivocally that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after a case is designated for capital prosecution with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11).   It is my understanding that the investigation which the Arizona CHU proposes to conduct is consistent with these Guidelines.

16.     Without a thorough social history investigation, it is impossible to ascertain the existence of mental or neurological disorders, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments.  Mental health experts, in turn, require social history information to conduct a thorough and reliable evaluation.

17.     The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records.  Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate.  Careful review of records often discloses the existence of collateral

8

documentation which, in turn, needs to be pursued.

18. It takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

19. In addition, mitigation investigation is particularly important when the client does not share the attorney's cultural background. In those cases, attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural differences. In my experience, the process of compiling an accurate social history is delicate when interviewing clients and family members from foreign cultures, due to inevitable cultural misunderstandings about the nature of the legal process and the purpose of the investigation. Every aspect of the investigation is more difficult abroad, from gathering records to gaining the trust and cooperation of witnesses. I am familiar with the difficulties of conducting investigations in foreign countries from my own personal experience. I have personally traveled to Canada, Germany, Honduras, Nigeria, Puerto Rico, and the Virgin Islands on investigative assignments. I have supervised staff investigators and mitigation specialists in capital cases who have had to conduct investigations in Colombia, the Dominican Republic, Jamaica, Mexico, Peru, and Thailand.

9

These assignments are consistently viewed as the most arduous even among the most seasoned and skilled practitioners.

20. The degree of cooperation of the foreign government can have tremendous impact on the success or failure of the investigation. The foreign government can assist in securing the cooperation of local institutions in locating and copying historical records, it can provide access to ethnoculturally competent experts who can facilitate counsel's understanding of the client's world and worldview, and it can promote trust between client and counsel by helping the client understand the legal framework in which counsel is operating.

***Standard of Care in Capital Mental Health Evaluations***

21. Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. (See, for example, Scott Sundby, "The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony," 83 Va. L. Rev. 1109 (1997), finding that two thirds of the witnesses jurors thought "backfired" were defense experts.) Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be learned through life-history investigation. In addition, the proper standard of care for a competent evaluation of mental disorders or impairments in a capital case requires an accurate medical and social history as its foundation. The Arizona CHU's limited involvement in Mr. Sinisterra's case will allow his defense team, for the first time in his capital case, to identify lay witnesses who can

10

illuminate the causes and consequences of the brain damage and intellectual impairment disclosed in Dr. Llorente's neuropsychological assessment.

22. It is my understanding that at no time through the litigation of Mr. Sinisterra's capital proceedings has anyone fluent in Spanish represented him or conducted investigation in his case.

23. It is clear from the materials I have reviewed that no attempt has yet been made to explore the aforementioned sensitive areas of investigation that must be addressed in order to complete a mitigation investigation on Mr. Sinisterra's behalf.

24. It is my professional opinion that if the Capital Habeas Unit of the District of Arizona is appointed as co-counsel for the limited purpose of providing assistance in the development of mitigation evidence, such work would not be duplicative of investigation performed by or on behalf of trial counsel.

25. The Arizona CHU staff have the training, experience, and bilingual skills to explore a range of issues relevant to mitigation, including the resources and the experience to work with foreign governments in conducting such an investigation abroad. Their facility with Mr. Sinisterra's native language will be far more efficient in obtaining necessary information to complete Mr. Sinisterra's mitigation investigation than even well-meaning efforts by prior counsel have been because of the language and cultural barriers to which I have referred, and their language skills will invariably facilitate overcoming many of the difficulties that arise while conducting investigations abroad. Their previous experience in similar cases and fluency in Spanish will allow them to surmount many of the barriers to disclosure of sensitive information much more easily than most other defense teams, and will allow them to complete their limited

11

role in this matter both efficiently and competently.

I declare under penalty of perjury under the laws of the States of Missouri and California, and the United States of America, that the foregoing is true and correct.

/s/Russell Stetler
Russell Stetler

Dated: September 13, 2007

12