# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

GERMAN C. SINISTERRA,

      Movant,

                          Case No. 04-8003-CV-W-GAF

v.

UNITED STATES OF AMERICA,

      Respondent.

## MOVANT'S TRAVERSE

COMES NOW movant, German C. Sinisterra, and for his Traverse in reply to the government's opposition to movant's amended motion pursuant to 28 U.S.C. § 2255 states as follows:

## I. Mr. Sinisterra's Trial Counsel Failed to Investigate or Present Critical Mitigating Evidence Mr. Sinisterra Was Constitutionally Entitled to Have His Jury Consider.

### A. Introduction

With this traverse, Mr. Sinisterra is submitting for the Court's consideration three sworn statements: 1) Second Affidavit of Counsel Jennifer Herndon ("Herndon Second Aff.") (Ex. 1); Declaration of Daniel J. Grothaus ("Grothaus Dec.") (Ex. 2); and 3) Declaration of Russell Stetler ("Stetler Dec.") (Ex. 3). These statements, together with the previously filed Statement of Frederick A. Duchardt, Jr. ("Duchardt Stmt.") (Doc. 50) and the first Affidavit of Counsel Jennifer Herndon ("Herndon Aff.") (Amended 2255 Motion Ex. 2), establish a compelling record, uncontroverted as to virtually every key fact, of a tragic and enormously prejudicial deficiency in the composition and resultant performance of Mr. Sinisterra's trial team: namely, that Mr. Sinisterra's team lacked a mitigation investigator; that no one on the defense team was qualified to perform a mitigation

investigation; that no mitigation investigation was in fact performed; and that as a result a wealth of inherently mitigating evidence went undiscovered by counsel and unpresented to the jury. The result was that what could have been a powerful, compelling penalty phase presentation, one that would have given the jury a social, environmental, and life history context within which to view the evidence presented by the government in its case-in-chief – in short, a context that would help explain how a person could be drawn into the violent world of international drug trafficking, and be involved in a drug-related homicide, and yet should be spared the death penalty – was never presented.

The disastrous result of counsel's failure to investigate and present critical mitigating evidence in this case is well-summarized by Russell Stetler, the National Mitigation Coordinator for the Federal Defender Program and one of the nation's leading mitigation experts. Mr. Stetler has reviewed the mitigation work done in this case, and concludes as follows: "What the jurors learned about Mr. Sinisterra was a fragment of the available mitigating evidence. Ultimately, they were deprived of the full quantum of evidence they needed to make a reasoned moral decision about whether Mr. Sinisterra should live or die." (Stetler Dec. ¶ 43)

**B. Composition and Performance of the Defense Team**

The uncontroverted facts in this 2255 litigation establish that Jennifer Herndon was the attorney in charge of Mr. Sinisterra's penalty phase case. (Herndon Aff. ¶ 11; Duchardt Stmt. ¶¶ 5, 8; Grothaus Dec. ¶ 4; Herndon Second Aff. ¶ 6) There was no qualified mitigation investigator working on Mr. Sinisterra's capital trial. (Herndon Aff. ¶¶ 4-5,9; Duchardt Stmt. ¶¶ 4-6; Grothaus Dec. ¶ 1; Herndon Second Aff. ¶ 8) This was the only case Ms. Herndon had worked on in her decade of doing capital trials in which no mitigation investigator was hired. (Herndon Aff. ¶¶ 4-5)

2

Daniel J. Grothaus was the only investigator on Mr. Sinisterra's defense team. Mr. Grothaus was not experienced or trained in mitigation investigation at the time of Mr. Sinisterra's trial, and his work on that trial was almost exclusively limited to investigation of facts related to the guilt-innocence phase of Mr. Sinisterra's trial. (Herndon Aff. ¶ 5; Duchardt Stmt. ¶¶ 4, 6; Grothaus Dec. ¶¶ 1, 3, 6-7; Herndon Second Aff. ¶ 4). His declaration makes plain that the government's contention that Mr. Grothaus's education and experience made him qualified as a mitigation specialist in Mr. Sinisterra's case is simply untrue. *See* Govt. Resp. at 41; Grothaus Dec. ¶ 1; Herndon Aff. ¶ 5.

Mr. Grothaus did not, as the Government pleads, serve "in the dual role as a mitigation investigator and specialist in both phases of the trial."[1] *Id.* Mr. Grothaus was not directed to pursue a mitigation investigation in Mr. Sinisterra's case. (Grothaus Dec. ¶¶ 4-7; Herndon Aff. ¶ 9; Duchardt Stmt. ¶ 6; Herndon Second Aff. ¶¶ 6-7). "The vast majority" of Mr. Grothaus's time was spent on guilt-innocence investigation. (Grothaus Dec. ¶ 3). The facts he gathered that were relevant to Mr. Sinisterra's penalty phase were incidental to his guilt-innocence phase investigation and were limited to information he learned from Mr. Sinisterra's wife and a few other witnesses he interviewed in Houston. These witnesses provided accounts of Mr. Sinisterra's "life as a husband and father." (Grothaus Dec. ¶ 5). The record is absolutely clear that Mr. Grothaus, who lead trial counsel Fred Duchardt had insisted would double as Mr. Sinisterra's fact and mitigation investigator (Duchardt Stmt. ¶ 4), did not perform any other investigation relevant to the penalty phase of trial.

---

[1] In fact, the Government equivocates about Mr. Grothaus's role in Mr. Sinisterra's case. Just a few sentences after saying that Mr. Grothaus served in the dual role in both phases of the trial, the Government argues that "Mr. Grothaus was assigned the investigation work for the first phase of trial, while Mr. Duchardt and Ms. Herndon developed 'mitigation themes and evidence.'" Gov't's Response at 41. The Government's erroneous contention that Mr. Sinisterra's trial team "possessed the clinical skills contemplated by the ABA Guidelines," *id.* will be discussed further below.

(Herndon Aff. ¶ 9; Grothaus Dec. ¶¶ 4-7; Duchardt Stmt. ¶ 6; Herndon Second Aff. ¶ 7)  Mr. Duchardt hired Mr. Grothaus to be the fact and mitigation investigator, despite the fact that Mr. Grothaus had never worked as a mitigation specialist.  (Duchardt Stmt. ¶ 4).  He was not asked to, nor did he, investigate Mr. Sinisterra's biography or social history, collect records or life history, develop mitigation themes or gather demonstrative evidence for the penalty phase.  (Grothaus Dec. ¶¶ 6-7; Duchardt Stmt. ¶ 6; Herndon Aff. ¶¶ 9-13; Herndon Second Aff. ¶ 7).  He did not travel to Colombia to conduct any investigation.  (Grothaus Dec. ¶ 6; Herndon Aff. 9).

### C.  Basic Life History Information

Mr. Duchardt has stated that he was aware of "all" of the extensive life history evidence that is pled at pages 34-40 of Mr. Sinisterra's amended 2255 motion.  (Duchardt Stmt. ¶ 13) With all due respect, this statement is incredible on its face.  If Mr. Duchardt was aware of this evidence, he shared none of it with Ms. Herndon, lead penalty phase counsel, who was never aware of the vast majority of it until she read the amended 2255 motion.  (Herndon Second Aff. ¶ 10).  Nor did he share any of it with his investigator, Mr. Grothaus, who also learned it for the first time when he read the motion.  (Grothaus Dec. ¶ 8).  Nor did he take any steps, of any kind, to investigate this evidence or present it to the jury.  Mr. Duchardt summarily asserts that it had been his "intention" to present that evidence through Mr. Sinisterra's mother.  (Duchardt Stmt. ¶ 13).  There is no suggestion in Mr. Duchardt's affidavit, however, that he ever even spoke to Mr. Sinisterra's mother, much less that he had any idea whether she would acknowledge the embarrassing facts of Mr. Sinisterra's life history or even was aware of those in which she was not personally involved.  To the contrary, Mr. Duchardt states that it was Ms. Herndon who had responsibility for the Colombian witnesses.  (Duchardt Stmt. ¶ 8)

4

Investigation of a capitally charged client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case. This is obvious. Without obtaining basic information about the client's life, a mitigation investigation cannot even be begun, much less be developed, synthesized, and presented to a jury. (*See* Stetler Dec. ¶¶ 11-24) Yet in this case, the only member of the defense team who even claims to have had any information regarding Mr. Sinisterra's life experiences did nothing with it. Counsel's unprofessional and unreasonable failure to obtain, investigate, synthesize and present available, powerful, inherently mitigating evidence on behalf of their client was inexcusable. (Stetler Dec. ¶¶ 26-43) That failure is only more egregious if one of the attorneys was actually aware of the basic evidence but failed to explore it or even communicate it to the rest of the team. The mitigation evidence that was presented through videotapes of Mr. Sinisterra's family members and neighbors hinted at the family's poverty but did not disclose, or even scratch the surface of, the remaining powerful mitigating evidence that characterized Mr. Sinisterra's life and background. *See* Amended 2255 at 34-40; Stetler Dec. ¶¶ 33-35. No one interviewed on the videotapes discussed the family's violence, including the physical and sexual abuse of Mr. Sinisterra; no one mentioned his head injuries or his father's apparent mental illness or the circumstances of his father's abandonment of the family. No one mentioned that during his childhood and early adolescence Mr. Sinisterra was homeless and lived on the streets away from his family. *See* Trial Exs. 63-69, 71-72. Mr. Sinisterra's trial counsel's performance was grossly deficient and substantially prejudiced the outcome of his capital trial. (Stetler Dec. ¶ 43)

**D. Failure to Pursue Mental Health Investigation Despite Evidence of Low IQ**

Dr. Warren Wheelock evaluated Mr. Sinisterra before trial and concluded that he had a

performance IQ of 75.[2] He also found that Mr. Sinisterra is illiterate in Spanish and English and that

he has a 30% comprehension rate of spoken English at the first-grade level. Amended 2255 at 44

(citing Tr. Supp. H. 706-42 & Ex. DS-2). Despite this glimpse into Mr. Sinisterra's mental health

establishing the need for further investigation, Mr. Sinisterra's counsel failed to investigate mental

health evidence for presentation at his penalty phase. Dr. Wheelock testified during Mr. Sinisterra's

guilt phase about his illiteracy and inability to understand the *Miranda* waiver in English, Tr. 2251-

86, but counsel did not call him to testify during the penalty phase concerning Mr. Sinisterra's low

IQ. Amended 2255 at 45. Mr. Sinisterra's lawyers' failure to investigate and resultant failure to

present evidence of his low IQ, brain damage, and dampened intellectual functioning, to his capital

jury was deficient performance. *See Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005) (counsel

ineffective for failing to present evidence of petitioner's mental health problems); *Williams v. Taylor*,

529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to investigate and present evidence that

petitioner was borderline mentally retarded); *Simmons v. Luebbers*, 299 F.3d 929, 935-38 (8th Cir.

2002), *cert. denied*, 538 U.S. 923 (2003) (counsel was ineffective in "fail[ing] to present any

meaningful mitigating evidence" despite availability of mental health evidence); *Hill v. Lockhart*,

28 F.3d 832, 845-47 (8th Cir. 1994), *cert. denied*, 513 U.S. 1102 (1995) (although receiving

information that petitioner was previously hospitalized, counsel made no effort to obtain medical

records, which would have shown that petitioner had long history of mental problems); *Kenley v.*

*Armontrout*, 937 F.2d 1298, 1308 (8th Cir.), *cert. denied*, 502 U.S. 964 (1991) (counsel failed to

---

[2] Dr. Antolin Llorente noted in his report that the IQ test, the WAIS-III, that Dr. Wheelock administered to Mr. Sinisterra pretrial only measured his "Performance scale (restricted to visual reasoning, and as such, whatever deficits existed in this client in verbal reasoning were not investigated." (Exhibit 6 to Amended 2255, Llorente Report, at 6). Given Mr. Sinisterra's illiteracy, a full-scale IQ test, which would have included a verbal scale, may likely have yielded an even lower score.

investigate available mitigating evidence of petitioner's mental problems because of erroneous belief that evidence was too old and insubstantial); *Pickens v. Lockhart*, 714 F.2d 1455, 1465-68 (8th Cir. 1983) (counsel ineffective for failing to investigate and present available mitigating evidence, including failing to use a mental health expert to examine the petitioner and testify about his rehabilitation prospects).[3] Mr. Sinisterra's counsel failed even to request submission of non-statutory mitigating factors based on his low IQ, of which counsel was aware before trial. They could not have requested jury instructions concerning the non-statutory mental health related mitigators of which they remained ignorant, including his dampened intellectual functioning, history of head injury, and organic brain damage, because of their failure to investigate.

### E.  Legal Standard for Deficient Performance/Applicable Professional Norms

In order to establish ineffective assistance of counsel, a habeas petitioner, or in this case a 2255 movant, must meet both parts of the Supreme Court's familiar two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  A petitioner must first show that counsel's

---

[3]  *See also Jones v. Thigpen*, 788 F.2d 1101 (5th Cir. 1986), *cert. denied*, 479 U.S. 1087 (1987) (counsel conducted no investigation in mitigation and did not realize, or inform jury, of petitioner's low I.Q.);  *Frazier v. Huffman*, 343 F.3d 780, 794 (6th Cir. 2003), *supplemented*, 348 F.3d 174 (6th Cir. 2003), *cert. denied*, 541 U.S. 1095 (2004) (trial counsel was ineffective in failing to "investigate and present evidence of [petitioner's] brain impairment."; "We can conceive of no rational trial strategy that would justify the failure . . . to investigate and present evidence of [petitioner's] brain impairment"); *Coleman v. Mitchell*, 268 F.3d 417, 450-51 (6th Cir. 2001), *cert. denied sub nom. Coleman v. Bagley*, 535 U.S. 1031 (2002) (counsel ineffective for "fail[ing] to [develop and] present . . . any aspects of Petitioner's personal history," which included evidence of head injuries and possible psychological and organic brain disorders); *Brewer v. Aiken*, 935 F.2d 850 (7th Cir. 1991) (counsel failed to investigate and find readily available mitigating evidence of petitioner's low I.Q., susceptibility to influence of companions and disadvantaged background); *Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) (counsel ineffective in failing to present mitigating evidence of petitioner's brain damage, mental retardation and troubled background); *Brownlee v. Haley*, 306 F.3d 1043, 1067 (11th Cir. 2003) (counsel failed to "investigate, obtain, or present" mitigating evidence, despite availability of mitigating evidence of petitioner's borderline mental retardation and mental health problems).

performance was deficient, and then demonstrate that the deficiency prejudiced the defense. *Id.* at 687; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

A habeas petitioner seeking to establish that his trial counsel's performance was deficient under *Strickland* must demonstrate "that counsel's presentation fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688 (internal quotation marks omitted)). In capital cases, an objective standard of reasonableness requires counsel to conduct an adequate investigation for potentially relevant mitigation evidence. Specifically, it is well-settled that trial counsel have a duty to investigate a client's background, including his social history and mental health. *See, e.g., Wiggins*, 539 U.S. at 522-23 (citing *Strickland*, 466 U.S. at 690-91). Moreover, "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. In evaluating the reasonableness of counsel's performance, *Strickland* requires consideration of standards such as those in the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). *See Wiggins*, 539 U.S. at 524 (citing *Strickland*, 466 U.S. at 688 and *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

Moreover, *Wiggins* affirms that, under *Strickland*'s deficient performance prong, counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'" *Id.* at 522 (quoting *Williams*, 529 U.S. at 396); *id.* at 524 (holding that Wiggins's counsel's performance was deficient and fell short of the ABA Standards and analogous state professional guidelines). The Supreme Court recognized that Mr. Wiggins's counsel's failure to investigate their client's

background violated the ABA's provision that investigation into mitigating evidence "'should comprise efforts to discover *all reasonably available mitigating evidence.*'" *Id.* (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93, emphasis in *Wiggins*). The Supreme Court concluded that Wiggins's trial counsel's performance was deficient because counsel failed to pursue avenues of mitigation investigation that were warranted based on leads that became evident to counsel during their initial investigation. *Id.* at 525; *Id.* at 519 ("[T]he scope of [counsel's] investigation was also unreasonable in light of what counsel" had discovered from their limited investigation. Mr. Wiggins's trial lawyers "knew at least some details of Wiggins' childhood."). Specifically, Wiggins's trial counsel were aware of the leads provided in their client's PSI, "which included a one-page account of Wiggins' personal history, noting his misery as a youth and quoting his own background as disgusting, and recording that he spent most of his childhood in foster care." *Id.* (internal quotation marks omitted). Mr. Wiggins's trial counsel also had uncovered social service (DSS) records documenting Mr. Wiggins's various foster care placements. *Id.* In light of initial leads indicating that Mr. Wiggins suffered a difficult childhood, "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background." *Id.* at 525.

In Mr. Sinisterra's case, Mr. Duchardt has stated that he was aware of the mitigating evidence Mr. Sinisterra has pled in his Amended 2255 motion. (Duchardt Stmt. ¶ 13). Yet he failed to retain a mitigation specialist, investigate the evidence himself, or even share it with Ms. Herndon or Mr. Grothaus. He also failed to insure that such evidence was presented during Mr. Sinisterra's penalty phase. By any measure, these failures are deficient performance. *See Wiggins*, 539 U.S. at 519;

*Williams v. Taylor*, 529 U.S. at 395 (2000) (counsel ineffective for failing to investigate and present evidence of petitioner's "nightmarish childhood"); *Simmons v. Luebbers*, 299 F.3d 929, 935-38 (8th Cir. 2002), *cert. denied*, 538 U.S. 923 (2003) (trial counsel ineffective for failing to present evidence that petitioner was raised in abusive home and was himself beaten as a child; that at the age of 12 or 13 he ran away from home and was raped; that he grew up in an impoverished neighborhood with frequent street violence; and that he had an I.Q. of 83; state supreme court's view of "attorneys' penalty phase actions . . . [as] part of a sound trial strategy" was rejected because "there was no justifiable reason to prevent the jury from learning about Simmons's [mitigating] childhood experiences").[4]

Mr. Sinisterra's counsel's failures violated longstanding professional norms. The ABA Guidelines for the *Appointment and Performance of Defense Counsel in Death Penalty* Cases ("Guidelines") in effect at the time of Mr. Sinisterra's trial, which took place in 2000, made it clear

---

[4] *See also Jermyn v. Horn*, 266 F.3d 257, 306 (3d Cir. 2001) (counsel ineffective in failing to investigate and present the circumstances surrounding petitioner's childhood, even though counsel had information prior to trial that petitioner "had been abused as a child, and . . . that the abuse was a critical component to understanding [his] mental illness"); *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) (*per curiam*) (counsel was ineffective in failing to investigate and present mitigating evidence of petitioner's "abusive childhood"; "It is axiomatic – particularly since *Wiggins* – that such a decision [to forego pursuit of mitigating evidence] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose."); *Boyde v. Brown,* 404 F.3d 1159 (9th Cir. 2005) (counsel was ineffective in failing to investigate and present mitigating childhood abuse); *Karis v. Calderon*, 283 F.3d 1117, 1135 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003) (counsel ineffective in failing to investigate and present mitigating evidence; "a substantial mitigating case may be impossible to construct without a life-history investigation"); *Collier v. Turpin*, 177 F.3d 1184, 1201, 1204 (11th Cir. 1999) (although defense attorneys presented ten witnesses at penalty phase, lawyer's ineffective investigation and presentation resulted in "hollow shell" of mitigation, omitting "particularized circumstances of [petitioner's] past and of his actions on the day of the crime that would have allowed [jurors] fairly to balance the seriousness of his transgressions with the conditions of his life"); *Cunningham v. Zant*, 928 F.2d 1006, 1017 (11th Cir. 1991) (counsel failed to present significant mitigating evidence regarding petitioner's mild retardation, limited education, and "poverty-stricken socioeconomic background").

that counsel had a well established duty to investigate a capital client's social history and background in preparation for the penalty phase of trial. The Guidelines, published in 1989, include the following: Guideline 11.4.1 sets forth capital defense counsel's duty to conduct "independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously." In addition, the penalty phase investigation should "comprise efforts to discover all reasonably available mitigating evidence." *Id.* Guideline 11.8.3 instructs counsel to formulate a penalty phase strategy after "considering witnesses familiar with and evidence relating to the client's life and development from birth to the time of sentencing, who would be favorable to the client [or] explicative of the offense(s) for which the client is being sentenced." It further directs trial counsel to consider expert witnesses to provide "medical, psychological, sociological or other explanations for the offense(s) for which the client is being sentenced [or] to give a favorable opinion as to the client's capacity for rehabilitation." Guideline 11.8.6 provides a list of evidence a capital lawyer should consider presenting at the penalty phase, including: medical records, educational records, employment and training history, family and social history evidence, and expert testimony concerning the client's life history and "the resulting impact on the client." The Commentary to this guideline asserts that "[t]he assistance of one or more experts (e.g. social worker, psychologist, psychiatrist, investigator, etc.) may be determinative as to the outcome [of the penalty phase.] . . Counsel may not choose, without investigation and preparation to sit back and do nothing at sentencing."

The Revised Edition of the Guidelines, published in 2003, amplifies these longstanding basic standards for the defense of capital cases. *See* American Bar Association Guidelines for the

Appointment and Performance of Counsel in Death Penalty Cases, Revised Edition (2003) ("Revised Guidelines") at 2 (stating that the Guidelines were designed to express "existing 'practice norms and constitutional requirements'" and "are not aspirational").[5] As such, the Revised Guidelines also apply to an evaluation of Mr. Sinisterra's trial counsel's performance. The Revised Guidelines include Guideline 4.1, "The Defense Team and Supporting Services," which prescribes that the defense team should include two attorneys, an investigator *and* a mitigation specialist. *See also* Revised Guidelines at 5-6 ("Counsel must promptly obtain the investigative resources necessary to prepare for both phases [of trial], including *at a minimum* the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case.") (emphasis added).

In Mr. Sinisterra's case, hiring a single investigator to perform both guilt-phase and penalty-phase work in this complex, multi-co-defendant federal capital trial fell below the standards set forth in the ABA Guidelines for the defense of any capital case, quite apart from the fact that Mr. Grothaus did not actually serve both roles. *See also* Guideline 10.4(C)(2)(a). The Commentary to Revised

---

[5] The United States Supreme Court initially relied upon the ABA Guidelines as appropriate guides for assessing attorney competence in capital cases in *Strickland v. Washington*, 466 U.S. at 688 (approvingly citing ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function")). In *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000), *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), the Supreme Court held that these standards are the appropriate guides for establishing what constitutes reasonably effective assistance under the Sixth Amendment. As the Court recognized in *Rompilla*, the 1989 and 2003 versions of the Guidelines "applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases." 545 U.S. at 387 n.7. *See also Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) ("Although the instant case was tried before the 1989 ABA edition of the standards was published, the standards merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases. The ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland*. They are the same type of longstanding norms referred to in *Strickland* in 1984 as 'guided' by American Bar Association standards and the like.").

Guideline 4.1(A)(1) makes this plain:

> A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing, and often humiliating evidence (*e.g.* family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .
>
> Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.

It is undisputed that no one performed this role in Mr. Sinisterra's case. As Jennifer Herndon's affidavit makes clear, Mr. Sinisterra's penalty phase investigation was rushed, and she undertook its preparation alone. (Herndon Aff. ¶ 7). She was forced to conduct the mitigation interviews with Mr. Sinisterra's family members from behind a videotape a month before he was going to be tried for capital murder. Those same family members had only learned that Mr. Sinisterra was facing a death sentence two days before Ms. Herndon conducted the video-interviews and were still in shock over the news. They limited most of their comments to descriptions of Mr. Sinisterra's kindness to his family and pleas for his life. Because the family was unable to attend Mr. Sinisterra's trial, and Ms. Herndon, as his attorney, could not testify to the information she learned while she performed the penalty phase investigation unaccompanied in Colombia, no one was able to testify to the conditions of stark poverty and ever-present social violence that Ms. Herndon observed and Mr. Sinisterra's family members reported they lived in. (Herndon Aff. ¶ 10)

Ms. Herndon also did not perform the critical task of collecting social history records central to preparing for the penalty phase of any capital case. (Herndon Second Aff. 14; Guideline 10.11(F)(2)(discussing the evidence counsel should consider presenting during the penalty phase, including records providing supporting documentation of the client's medical, psychological, sociological, and cultural background). Thus, even readily apparent mitigating evidence of poverty and the culture of violence in which Mr. Sinisterra's early life was steeped was not presented to his jury. As discussed further below, neither was the wealth of other social and psychological evidence Mr. Sinisterra was constitutionally entitled to put before his capital jury.

Guideline 4.1(A)(2) also provides that "[t]he defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." *See also* Guideline 10.4(C)(2)(b). The Commentary to Guideline 4.1 expands on the reason for this requirement:

> Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses . . . Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions . . . that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subjects as may seem appropriate.

As the declarations of Mr. Grothaus, Ms. Herndon, and Mr. Duchardt make clear, Mr. Sinisterra's defense team lacked any person with such training or experience. That lack resulted in Ms. Herndon, the attorney in charge of preparing Mr. Sinisterra's penalty phase, not knowing to pursue mitigating evidence of mental retardation or other disease or defect in Mr. Sinisterra's trial. (Herndon Aff.¶19).

14

As discussed further below, counsel also failed to present or investigate mitigating evidence related to Mr. Sinisterra's low IQ, history of head injuries, or organic brain damage.

The record is clear and unrebutted that Mr. Sinisterra's trial counsel failed to hire a qualified mitigation specialist to investigate and prepare a cogent penalty phase theory. They also failed to hire other experts who could have testified to his mental deficits and neurological impairments. As a result, Mr. Sinisterra's jury did not hear anything approaching a coherent mitigation case presenting a holistic picture of his background, which he was constitutionally entitled to have his capital jury consider. *See Brown v. Payton*, 544 U.S. 133, 162 (2005)*; Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) (sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration"); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence."). *See also Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (observing, with respect to individual with IQ of 79, that "Wiggins['] . . . diminished mental capacitie[s] further augment his mitigation case"); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (finding prejudice due to failure to present evidence that defendant was "borderline mentally retarded"); *Smith v. Texas*, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores [of 75 and 78] and history of participation in special-education classes as a reason to impose a sentence more lenient than death."); *Brewer v. Quarterman*, __ U.S. __, 127 S. Ct. 1706, 1712-13 (2007) (rejecting Fifth Circuit's contention that only mental health impairments that are "chronic and/or immutable," such as mental retardation, qualify as mitigating, and holding that evidence that the petitioner was involuntarily committed for "major depression, single episode, without psychotic

15

features, polysubstance abuse" was relevant mitigating evidence which the jury should have been permitted to consider); *see also* Commentary to Guideline 10.11.[6]

### F. Trial Counsel's Deficient Performance Prejudiced the Outcome of Mr. Sinisterra's Capital Trial.

As discussed, Mr. Sinisterra's lawyers failed to learn, investigate, or present to the jury a wealth of mitigating evidence that he was constitutionally entitled to have his capital jury consider. As Ms. Herndon acknowledges, Mr. Sinisterra's life history, of which as lead counsel for the penalty phase she was almost completely unaware, is "exactly the type of information that would have been discovered by a mitigation specialist doing a thorough social history." (Herndon Second Aff. ¶ 10) Mr. Sinisterra was prejudiced by counsel's failures. A habeas petitioner meets the second part of the *Strickland* test by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This standard presumes an objective sentencer: "The idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency . . . are irrelevant to the prejudice inquiry." *Id.* at 695.

### 1. Legal Standard for Establishing Prejudice

---

[6]The Commentary reads in part:

Since an understanding of the client's extended, multigenerational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present. Expert witnesses may be useful for this purpose and, in any event, are almost always crucial to explain the significance of the observations. For example, expert testimony may explain the permanent neurological damage caused by fetal alcohol syndrome or childhood abuse, or the hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control. Counsel should choose experts who are tailored specifically to the needs of the case.... Family members and friends can provide vivid first-hand accounts of the poverty and abuse that characterize the lives of many capital defendants.

A reasonable probability requires more than a showing that the attorney's deficient performance had only a "conceivable effect on the outcome of the proceeding," but "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. This is because counsel's deficient performance raises serious questions concerning whether the petitioner received the fundamentally fair trial guaranteed by the Constitution. As the Court explained in *Strickland*:

> An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Id.* at 694. Put simply, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* This inquiry naturally turns on the other evidence before the sentencer, because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

### 2. Available Mitigating Evidence Mr. Sinisterra's Jury Never Heard Because His Counsel Failed to Investigate or Present It

Had Mr. Sinisterra's counsel investigated, they would have learned the following evidence that the jury never heard: Mr. Sinisterra was born to impoverished, illiterate parents in the violence-ravaged city of Buenaventura, Colombia. Amended 2255 at 34. His father exhibited signs of mental illness, was exceedingly violent, unable to hold a job and lacked basic living skills. *Id*. at 34. Mr. Sinisterra witnessed an incident in which his father, during a psychotic episode, chased his mother with a machete. *Id*. at 34. Shortly thereafter, Mr. Sinisterra's father abandoned the family. Mr. Sinisterra's mother subjected him to brutal beatings—some so severe that he would bleed as a

17

result—throughout his time living with her. *Id*. at 35. Mr. Sinisterra dropped out of school when he was seven years old because he was utterly unable to read or learn anything. The highest level of education he has attained is first grade. *Id*. at 35. Also when Mr. Sinisterra was about seven, he was gang-raped by four youths who were in their late teens. *Id*. at 35. This incident changed his personality and exacerbated feelings of fear that he had already experienced. *Id*. at 36. Mr. Sinisterra fled his home shortly after he was gang-raped. *Id*. at 36. He lived on the streets of Cali, Colombia, with other homeless youth who protected each other from adults' repeated attempted sexual assaults on them. *Id*. at 36. Mr. Sinisterra was put in youth detention facilities twice during the six years he was homeless. *Id*. at 36. His inability to learn made itself apparent again when he attended school during his detention; again he failed even to learn to read and write. *Id*. at 36. When he was about twelve years old, Mr. Sinisterra returned to his family; again, he was subjected to violence: his older brother began sexually molesting him and his younger brothers. *Id*. at 37. His family's intractable poverty and dire life circumstances led to Mr. Sinisterra's immigration to the United States. *Id*. at 37.

In addition to this evidence of Mr. Sinisterra's impoverished, violent upbringing, trial counsel also failed to discover evidence of Mr. Sinisterra's history of head injuries, diminished mental capacity, and potential retardation. Mr. Sinisterra sustained a number of head injuries throughout his youth: when he was seven or eight years old, he was knocked unconscious for two days as a result of injuries he sustained during a fight. *Id*. at 39. Also when he was a very young child, Mr. Sinisterra hit his head diving into a pool, which resulted in another extended period of unconsciousness. *Id*. at 40. When he was in his late teens, he suffered a blow to the side of the head with a metal stick. *Id*. None of these injuries was medically treated. *Id*. To this day, Mr. Sinisterra

18

suffers from excruciating headaches and intense pressure in his skull. *Id*. In addition, Mr. Sinisterra's trial expert, Dr. Wheelock, had assessed Mr. Sinisterra's IQ at 75, which is considered within the range of mental retardation by the American Association on Mental Retardation (AAMR). *See* AAMR, *Mental Retardation: Definition, Classification and Systems of Support* 59 (10th Ed. 2002). Although Dr. Wheelock testified during a pretrial suppression hearing and during the guilt-phase about Mr. Sinisterra's ability to understand his *Miranda* rights, trial counsel never presented evidence of Mr. Sinisterra's low IQ during his penalty phase, much less explain what mitigating impact his low IQ should have had on his sentence. (Trial Supp. H. 706-42; Tr. 2251-86) The Supreme Court has recognized that evidence of low IQ is inherently mitigating. *See Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004) (noting that "impaired intellectual functioning is inherently mitigating" and that "evidence of significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death") (internal quotation marks and citation omitted); *See Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (observing, with respect to individual with IQ of 79, that "Wiggins['] . . . diminished mental capacitie[s] further augment his mitigation case"); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (finding prejudice due to failure to present evidence that defendant was "borderline mentally retarded"); *Smith v. Texas*, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's IQ scores [of 75 and 78] and history of participation in special-education classes as a reason to impose a sentence more lenient than death."); *Brewer v. Quarterman*, __ U.S. __, 127 S. Ct. 1706, 1712-13 (2007) (rejecting Fifth Circuit's contention that only mental health impairments that are "chronic and/or immutable," such as mental retardation, qualify as mitigating). In addition to evidence of his low IQ—which the Government has not rebutted—Mr. Sinisterra has produced expert evidence that he

19

suffers from organic brain damage and dampened intellectual functioning. Report of Dr. Antolin

Llorente (Exh. 5 to Amended 2255). Trial counsel failed to discover any of this evidence, despite

knowing from Dr. Wheelock's report, that Mr. Sinisterra had a low IQ. (Herndon Aff. at Para. 19)[7].

As previously discussed, this is exactly the kind of lead that trial counsel was obligated to pursue in

developing mitigation evidence in Mr. Sinisterra's capital case; failure to pursue such leads amounts

to deficient performance under *Strickland*. *See Wiggins*, 539 U.S. at 527.

The clearest evidence that Mr. Sinisterra was prejudiced by his counsel's failure to discover

or present such evidence is that not a single juror found even the statutory "catch-all" mitigator that

would have allowed them to find "Factors in German Sinisterra's background, record, or character,

or any other circumstances of the offenses, that mitigate against imposition of the death sentence."

*See* Verdict forms. No mitigators asking the jury to consider specifically Mr. Sinisterra's upbringing

steeped in violence and poverty were presented. This was despite counsel's awareness that these

conditions characterized Mr. Sinisterra's life. No mitigators asking the jury to consider specifically

Mr. Sinisterra's low IQ, again a circumstance of which counsel was aware, were presented. Of

course none of the unrebutted mitigating evidence that Mr. Sinisterra has pled in his amended 2255

motion that his trial counsel failed to discover or present to the jury were presented for the jury's

consideration. The jury unanimously found that Mr. Sinisterra cared for his wife and children, and

nine jurors found that he loved and helped to support his mother, which strongly suggests that the

---

[7] Ms. Herndon's declaration highlights the extent to which failure to hire a qualified mitigation specialist prejudiced Mr. Sinisterra. Her statement says that she usually relies on a mitigation specialist to bring the possibility that her client might be mentally retarded to her attention in a capital case. (Herndon Aff. at Para. 19). In this case, as Mr. Grothaus's declaration makes plain, the only investigator on the trial team had no training in screening for mental disorders or impairments, nor was he asked to screen for these conditions in this case. (Grothaus Dec. at Para. 1). Mr. Grothaus was unaware, for example, that Mr. Sinisterra had suffered a number of head traumas. (Grothaus Dec. at Para. 8).

jury was willing to give weight to the superficial mitigating evidence that trial counsel did present. *See* Verdict forms.

Additionally strong evidence that Mr. Sinisterra was prejudiced by his counsel's performance is apparent from his co-defendant, Plutarco Tello's, verdict sheet. Seven jurors found that the catch-all mitigator applied to Tello. [Tello Verdict Form.] In addition, the jury independently found that "Tello's mental incapacity/deficiency played a role in his decision making." [Tello Verdict Form.] This was despite the fact that Mr. Tello's family members were also denied visas and their testimony was presented via videotape. *See* Mark Morris, Jurors Review Video; Family Members Plead for Life of Colombian Man, Kansas City Star, May 9, 2000 at B3; Mark Morris, Deadlocked Jurors Spare Defendant's Life, Kansas City Star, May 11, 2000 at B1 (reporting that jurors viewed six hours of video testimony of Tello's relatives). The jury spared Mr. Tello's life despite the prosecution's argument that Tello was the "foreman" of the hit squad that killed the victim. *Id.*

Finally, the Government erroneously argues that Mr. Sinisterra's penalty phase was effective because his jurors found as a non-statutory mitigating factor that his "'lack of guidance and support as an adolescent made him an easy target of the violent drug culture.'" Gov't's Response at 45 (erroneously citing Mr. Sinisterra's Motion at 43). Mr. Sinisterra's jury made no such finding. His 2255 motion pleads that the undisputed ringleader of the enterprise, Edwin Hinestroza's jury made this finding with regard to him. Amended 2255 Motion at 43. Further demonstrating the evidence that Mr. Sinisterra suffered as a result of his counsel's failure, Mr. Hinestroza's jury, which made this finding based on evidence strikingly similar to that which could have been presented on behalf of Mr. Sinisterra, sentenced him to life. *Id.*

The Government's argument that trial counsel's retention of Dr. Enrique Dos Santos, "whose

oral report indicated Sinisterra had no mental problems" is unavailing. *See* Gov't's Response at 46. Consultation with a mental health expert is no substitute for a mental health investigation. *See Rompilla v. Beard*, 545 U.S. 374 (2005). There is no indication in the record that Dr. Dos Santos was aware of any of Mr. Sinisterra's life, family, or social history, nor did he have access to any of Mr. Sinisterra's school, medical, prison or other records. Such information can and often does result in a very different diagnosis. *Id*. at 378-79. Evidence of Mr. Sinisterra's low IQ unquestionably warranted further investigation into the reasons for his dampened intellectual ability. The Government has not pled that Dr. Dos Santos performed neurological or any other diagnostic testing that would rebut Dr. Llorente's conclusion that Mr. Sinisterra suffers from organic brain damage. Moreover, Mr. Duchardt did not state that he retained Dr. Dos Santos to evaluate Mr. Sinisterra in preparation for his penalty phase. There is a critical distinction between a mental evaluation of a capital defendant for competence or other guilt-related issues, and one that his designed to mitigate his crime and establish a case for life. Failure to present available mental health evidence in mitigation amounts to deficient performance. *See*, *e.g.*, *Wiggins*, 39 U.S. at 535 (counsel rendered deficient performance in failing to present evidence of petitioner's low IQ of 79); *Williams* 529 U.S. at 418 (failure to present evidence of defendant's low IQ was prejudicial despite the fact that the jury also heard evidence that defendant had savagely beaten an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw)*; Tennard v. Dretke,* 542 U.S. 274, 287-88 (2004) ("impaired intellectual functioning is inherently mitigating"; "evidence of significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death") (internal quotation marks and citation omitted); *Fraizier v. Hoffman*, 343 F.3d 780, 794-

22

99 (6th Cir. 2003) (finding prejudice where counsel failed to develop and present mitigating evidence of defendant's "functional brain impairment" based on defendant's fall from a ladder); *Harries v. Bell*, 417 F.3d 632, 638-39 (6th Cir. 2005) (counsel ineffective for failing to adequately investigate and present evidence of defendant's mental illness, IQ of 80, and organic brain dysfunction). Finally, Dr. Dos Santos's oral report did nothing to cut against a presentation to the jury of the mitigating effect of Mr. Sinisterra's low IQ. Mr. Sinisterra's lawyers failed even to request inclusion of his low IQ as a mitigating factor for the jury's consideration. No mitigating factor other than the statutory "catch-all" provision would have allowed the jury to consider Mr. Sinisterra's low IQ or any other evidence of mental impairment or illness. *See* Verdict Forms. As noted, no juror found that the catch-all mitigator had been established or applied to Mr. Sinisterra. *Id*.

### G. Conclusion

Counsel's failures deprived the jury that sentenced Mr. Sinisterra to death of the opportunity to consider powerful mitigating evidence; as a result, confidence in the outcome of Mr. Sinisterra's trial is significantly undermined. Had the jury been allowed to hear this evidence, there is a reasonable probability that the outcome of the trial would have been different. *Wiggins*, 539 U.S. at 535; *Williams*, 529 U.S. at 418; Stetler Dec. ¶ 43.

### II. Failure to Object to Prosecutorial Misconduct In Closing

Trial and appellate counsel rendered ineffective assistance of counsel in failing to object to improper remarks made by the government during the closing arguments of the penalty phase of Mr. Sinisterra's trial. The line of improper argument began in the government's initial summation, where it argued:

> You can have the courage to act as the conscience of this community,

to weigh the fact (sic), to apply the law and to determine no matter how much his family may love him [Sinisterra] what he did on November 28, 1998 shall never be repeated and *send a message to all other drug dealers that this community will not tolerate it.*

(Tr. 2892) (emphasis added). This same argument was then repeated in the government's rebuttal closing argument:

Ladies and gentlemen, decent people, decent citizens, fear for their lives because of drug traffickers like German Sinisterra. We cannot forget he was a member of a very efficient but unforgiving cocaine distribution organization and American society is a much different place than it was 50 years ago because of the German Sinisterras of the world.

It is time to turn the tables on drug traffickers like this defendant. *Finish the message that you began with your verdict of guilt in this case. Tell this defendant and those like him that murder will not be tolerated especially murder committed to further drug trafficking schemes. There is no worse crime.* As you sit there you are not just twelve people. You are, like Mr. Valenti told you, the conscience of the community and you have a unique opportunity to make a difference. *You have a unique opportunity to send a message. Don't squander that opportunity. Have the courage to do the right thing.*

...

German Sinisterra believes by his actions that murdering couriers over a drug debt is just a part of doing business. Tell him he's wrong and *tell the other drug traffickers of the world if they come to Kansas City they are going to be dealt with in the most severe way, that are going to receive a sentence of death.*

(Tr. 2910-2911) (emphasis added). As is explained in detail, *infra*, these remarks were improper and violated Mr. Sinisterra's rights under the Fifth, Sixth and Eighth Amendments of the United States Constitution. Moreover, trial counsel's and appellate counsel's failure to object to these remarks constituted ineffective assistance of counsel, and but for their deficient performance, there is a reasonable probability that the outcome of the proceedings would have been different.

24

**A.     The Government's Remarks In Closing Were Improper**

**1.     The Government's Remarks Have Been Repeatedly Held To Be Reversible Error.**

The government claims that its arguments in closing did not constitute an impermissible emotional appeal. Gov't's Resp. at 47. The government's claim that these remarks were proper, however, finds no support in the law. Indeed, such remarks have repeatedly had been held to constitute reversible error. *See*, *e.g.*, *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992); *United States v. Lee,* 743 F.2d 1240 (8th Cir. 1984); *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991); *United States v. Arrieta-Agressot*, 3 F.3d 525 (1st Cir. 1993).

In *Johnson*, the defendant was convicted of various narcotics offenses. During rebuttal closing argument, the prosecutor stated:

> [The defense attorney] says your decision to uphold the law is very important to his client. Your decision to uphold the law is very important to society. You're the people that stand as a bulwark against the continuation of what Mr. Johnson is doing on the street, putting this poison on the street.

*Johnson*, 968 F.2d at 769. Defense counsel objected, but the trial court overruled the objection. The trial court also denied the defense motions for a mistrial, judgment of acquittal and a new trial.

> The Eighth Circuit reversed the conviction, stating:

> [T]he pressing nature of the [drug] problem does not give prosecutors license to encumber certain defendants with responsibility for the larger societal problem in addition to their own misdeeds. We conclude that by urging the jury to act as a 'bulwark against ... putting this poison on the streets,' the prosecutor in this case appealed to the jurors to be the conscience of the community in an improper and inflammatory manner.

25

968 F.2d at 771.  Notably, the misconduct in question in *Johnson* constituted a single remark made in closing.  Citing to *Solivan*, discussed *infra*, the Eighth Circuit noted that "a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated."  968 F.2d at 771 (quoting *Solivan*, 937 F.2d at 1150).  In analyzing the impact that the prosecutor's remarks likely had on the jury, the Eighth Circuit stated: "Given the fear and concern engendered by the national drug epidemic, we conclude it is likely that the prosecutor's comment urging the jury to strike a blow against the problem and the emotion it stirred 'influenced the jury by diverting its attention away from its task to weigh the evidence and submit a reasoned decision.'" 968 F.2d at 772 (quoting *Solivan*, 937 F.2d at 1153).[8]

In *Lee*, the Eighth Circuit reversed a conviction based on the following improper remarks made by the prosecutor in closing:

> Smuggling in 640 pounds of marijuana is definitely wrong.  It is a crime and they should be convicted.  All the drug smugglers around should be told by your actions that bringing in marijuana is wrong.
> ...
>
> What you do as jurors is going to be watched here.  You can better believe that each and every drug smuggler is watching what happens here today.

*Lee*, 743 F.2d at 1252-1253.  In reversing, the Eighth Circuit noted that "this argument was an emotional appeal calculated to persuade the jury to decide the case on other than the facts before it."  743 F.2d at 1253.

In *Solivan*, the defendant was convicted of seven counts related to a conspiracy to distribute

---

[8] The Eighth Circuit also that noted that no curative instruction was given by the trial court, and rejected the argument that the standard jury instructions -- that arguments by counsel are not evidence – were sufficient to cure the error: "Such a broadly sweeping rule would permit *any* closing argument, no matter how egregious."  968 F.2d at 772 (emphasis in original) (quoting *Newlon v. Armontrout*, 885 F.2d 1328, 1337 (8th Cir. 1989), *cert. denied*, 110 S. Ct. 3301 (1990)).

narcotics. During the course of closing arguments, the prosecutor stated:

> What you're listening to is a wholesale distributor of narcotics, cocaine, discuss her business affairs and complain about her busy schedule, the lack of good product and the trouble she's having getting this stuff up here now. And I'd submit to you, folks, that she's been caught now. And I'm asking you to tell her and all of the other drug dealers like her that we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky and...

*Solivan*, 937 F.2d at 1148. Defense counsel interrupted and objected, and the trial court declared a recess and heard argument outside the presence of the jury. The court sustained the objection, but denied the motion for mistrial. When the jury returned, the court issued a strongly worded curative instruction, admonishing the jury to ignore the prosecutor's remarks regarding sending a message to the community and instructing the jury to try the case based solely on the evidence related to the defendant on trial. 937 F.2d at 1149. Despite the fact that the prosecutorial misconduct consisted of only this one instance, and despite the trial court's curative instruction, the Sixth Circuit held that the misconduct was "so destructive to defendant's right to a fair trial that it constitutes reversible error." 937 F.2d at 1150.

The *Solivan* court found that the defendant's right to a fair trial was violated because the prosecutor's remarks were designed to arouse the passion and prejudice of the jury by invoking the fear surrounding the highly publicized and pervasive social problem of the illegal drug trade. 937 F.2d at 1153. Invoking that fear improperly diverted the jury's attention away from its task of a reasoned deliberation of the evidence of guilt against a specific defendant, and instead encouraged the jury to view its verdict as a way to strike back against drug dealers and to protect its community. *Id*. The effect of these comments "was to suggest to the jury that, because of defendant's

participation in the drug trade in northern Kentucky, the drug problem facing the jurors' community would continue if they did not convict her. It is error for a prosecutor to direct the jurors' desires to end a social problem toward convicting a particular defendant." *Id*. As the Court concluded, "the prosecutor's appeal to the jury to convict a defendant as a blow to the drug problem or to send messages to drug dealers cannot be other than highly prejudicial given the specific context of the case in the current social-political environment." *Id*. at 1154. Additionally, the Court was not persuaded that the remarks in question were too limited to have prejudiced the trial. Rather, the Court stated that "a single instance of error may be so destructive of a defendant's right to a fair trial that reversal must follow." *Id*. at 1156. Furthermore, the Court found the prosecutor's remarks "to have been so gross as to probably prejudice defendant." *Id*. at 1157.[9]

In *Arrieta-Agressot*, the First Circuit reversed the defendants' convictions on account of the prosecutor's inflammatory "war on drugs" rhetoric in closing. Although the remarks in question did not explicitly ask the jury to "send a message" by its verdict, it did use inflammatory language

---

[9] The Sixth Circuit noted that in some instances, "an error may be so prejudicial that no cautionary instruction, however swiftly and forcibly given, can safely eradicate its effect." *Id*. at 1156. The *Solivan* Court found that the trial court's admonition to the jury was insufficient to neutralize the harmfulness of the prosecutor's remarks. As the Court noted:

> The admonition in this case was neither swiftly given nor did it sufficiently convey to the jury a sense of judicial disapproval of the remarks to dispel the harmful content and impact of the prosecutor's egregious statements. Even were the district court to have immediately and appropriately admonished the jury to disregard the remarks, we doubt seriously that any cautionary instruction could have safely eradicated the highly prejudicial effect of the prosecutor's statements in this case. The statements were deliberately injected into the proceedings to inflame the jurors' emotions and fears associated with the current drug epidemic that is reported daily in our newspapers and which threatens the very fabric of our society. ... The statements were so inflammatory in the context of the ongoing drug war that no charge could have sufficiently cured the prejudice.

*Id*. at 1157.

regarding the threat that drugs posed to the community. Specifically, the prosecutor repeatedly referred to the defendants as people who were knowingly trying to "poison the people and poison our children," 3 F.3d at 527, and who were "soldiers in the army of evil, in the army which only purpose [sic] is to poison, to disrupt, to corrupt." *Id*. Additionally, the prosecutor invited the jury to view itself as a bulwark against this societal evil: "And we are here today because we want to say no to drugs. We want to say no to what is corrupting and disrupting the society, because marijuana not only disrupts and corrupts our society but it also corrupts and disrupts any society in the world." *Id*.

In reversing, the First Circuit stated that "it is crystal clear that inflammatory language of this ilk falls well outside the bounds of permissible argument." 3 F.3d at 527. As the Court further noted, "such arguments are plainly improper. It is hard enough for a jury to remain dispassionate and objective amidst the tensions and turmoil of a criminal trial, and this is not the occasion for superheated rhetoric from the government urging jurors to enlist in the war on drugs." *Id*. Despite the fact that trial counsel had failed to object to the remarks, the Court reviewed the claim for plain error and held that "the prosecutor's repeated appeals to impermissible considerations might well have altered the verdict," especially given "the potency of the misstatements and the presence of direct exculpatory testimony[.]" 3 F.3d at 529. Therefore, the Court found plain error warranting reversal.[10]

---

[10] The Court rejected the claim that the trial court's standard instruction were sufficient to cure the error:

> [T]he danger was not so much that the jury would consider the prosecutor's statements to be "evidence." Rather, the threat was that the prosecutor's remarks would excite the jury, invite a partisan response, and distract its attention from the *only* issue properly presented by the case: whether the evidence established the crew
>
> (continued...)

**2.** **Prosecutorial Misconduct In The Penalty Phase Arguments Constitutes Reversible Error.**

The government claims that there is a distinction between improper remarks made in the penalty phase as opposed to the guilt phase, and implies that prosecutorial misconduct in the penalty phase closing arguments is not a cognizable legal claim. Gov't's Res. at 47.[11] The government cites no authority for this claim. Indeed, the United States Supreme Court has repeatedly recognized that prosecutorial misconduct claims are equally applicable to closing arguments in the penalty phase. *See Caldwell v. Mississippi*, 472 U.S. 340 n.7 (1985) (death sentence vacated because prosecutor's improper closing argument during penalty phase made it appear to jury that responsibility for the death penalty would be borne by appellate court rather than by jury itself); *Romano v. Oklahoma*, 512 U.S. 1, 3 (1994) (considering petitioner's assertion that closing argument in penalty phase violated petitioner's due process rights, although concluding on the facts that no rights were violated). Indeed, as the Eighth Circuit recognized in *Copeland v. Washington*, 232 F.3d 969, 974

---

[10](...continued)
members' guilt beyond a reasonable doubt.

3 F.3d at 529-530.

[11] The government also asserts that *Johnson* and *Lee* are "not apposite." Gov't's Res. at 47. The government, however, fails to articulate any reasoned legal basis for this assertion. As recognized in *Johnson* and *Lee*, the reason why "send a messsage"-type remarks are prejudicial in the context of drug cases is because they are unduly inflammatory and divert the jury's attention from a reasoned deliberation of the evidence. The government's observation that these cases address improper remarks made in the guilt phase, as opposed to the penalty phase, highlights a distinction without a difference. Given that the government concedes that such remarks have been found to be reversible error when asking the jury to convict a defendant, Gov't's Res. at 47, it fails to explain why, then, it would be proper for it to inflame the passions of the jury and divert its attention when asking it to sentence someone to death. As the Eighth Circuit recognized in *Copeland v. Washington*, 232 F.3d 969, 974 n.2 (8th Cir. 2000), if anything, greater scrutiny must be applied to the penalty phase arguments given the nature of the proceeding and the severity of the consequences resulting from an improper argument.

n. 2 (8th Cir. 2000), "if there is any distinction between guilt and penalty phase arguments, it would seem that there should be a more searching review of the penalty phase as the Eighth Amendment is implicated."  (Citing *California v. Ramos*, 463 U.S. 992, 998-99 (1983): "The Court ... has recognized the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination").

Indeed, as the Eighth Circuit recently held in *Weaver v. Bowersox*, 438 F.3d 832 (8th Cir. 2006), *cert. granted*, 127 S. Ct. 763 (2006), *cert. dismissed*, 2007 U.S. LEXIS 6082 (U.S. May 21, 2007), such "send a message"-type remarks are particularly prejudicial when made in the penalty phase of a capital case because they violate the defendant's Eighth Amendment right to an individualized sentencing determination.  There, the petitioner was convicted of being paid to kill a witness that was set to testify against a drug dealer.[12]  In the penalty phase, the prosecutor urged the jury to sentence the petitioner to death in order to send a message to other drug dealers:

> And I'm going to beg you for the entire community and for society not to spare his life. I'm going to beg you for the right message instead of the wrong message. The right message is life? For an execution? That's the right message? That's the message you want to send to the drug dealers, the dope peddlers and the hit men they hire to do their dirty deeds: Life in prison is what you get when we catch you and convict you. Life in prison? That's the message you want to send to the scum of the world? That when we catch you and we're convinced you're guilty, we're going to give you life in prison? That's not the right message.

---

[12] The *Weaver* case is remarkably similar to Mr. Sinisterra's case.  In both instances: (1) the defendants were convicted of an alleged murder-for-hire scheme initiated at the behest of a drug dealer; (2) the prosecutor urged the jury to sentence the defendant to death in order to send a message to other drug dealers; and (3) trial counsel failed to object to these particular remarks.  In *Weaver*, there were additional remarks to which the defense did object, including: (1) analogizing the role of the juror to that of a soldier with the duty to kill; (2) the prosecutor's personal belief in the death penalty; (3) informing the jury that he had a special position of authority and decided when to seek death; and (4) emotional appeals to the jury to "kill [the petitioner] now."  438 F.3d at 840.

. . .

> The message has to be death for these types of people. That's the only message they are going to understand.
>
> The one thing you've got to get into your head, this is far more important than William Weaver. This case goes far beyond William Weaver. This touches all the dope peddlers and the murderers in the world. That's the message you have to send. It doesn't just pertain to William Weaver. It pertains to all of us, the community. They are our streets, our neighborhoods, our family. The message is death, not life. And you've just got to geer [sic] yourself to that.

438 F.3d at 837.

Citing to a litany of Supreme Court cases, the Eighth Circuit began its analysis by noting that there is longstanding and well-settled precedent that "the Eighth Amendment requires capital sentencing to be an individualized decision-making process." 438 F.3d at 841 (citations omitted). As the Court explained, the "send a message" arguments by the prosecutor violated the petitioner's Eighth Amendment right:

> The argument that a signal must be sent from one case to affect other cases puts a [sic] improper burden on the defendant because it prevents an individual determination of the appropriateness of capital punishment. Further, invoking a jury's general fear of crime to encourage the application of the death penalty in a particular case is unfairly inflammatory. Using the conscience of the community as a guiding principle for punishment puts too significant a burden on a single defendant.

Id. at 841 (internal citations omitted).[13] Notably, it appears that the *Weaver* Court decided

---

[13] The petitioner's case was an AEDPA case. As the Court explained: "There is little doubt that the prosecutor's statements are such that we would certainly grant relief without applying AEDPA." 438 F.3d at 841. However, the Eighth Circuit wasted no time in concluding that "there can be no interpretation of the inflammatory remarks by the prosecutor that is reasonable under the various applicable United States Supreme Court precedents," and found that the Missouri Supreme Court's conclusion to the contrary was "unreasonable under existing United States Supreme Court precedents." *Id*. at 842.

(continued...)

32

that such arguments are *per se* prejudicial because they inherently divert the capital jury's attention away from an individual determination of the appropriateness of a death sentence for a given defendant.

The Eighth Circuit has also had occasion to consider several other cases in which a claim of prosecutorial misconduct in the penalty phase closing arguments was raised. For example, in *Copeland v. Washington*, 232 F.3d 969 (8th Cir. 2000), the Eighth Circuit affirmed the granting of habeas relief based on claims that the prosecutor's penalty phase closing argument was improper, and that counsel was ineffective for failing to object to the improper argument. There, the prosecutor compared the defendant's case to gang shootings in Los Angeles and said the same thing was happening "right here in our backyards." 232 F.3d at 972. The prosecutor also told the jury that this was the worst crime ever committed in their state, and that if this case didn't deserve a death sentence, then no case did. The Eighth Circuit held that this "was the sort of argument that would result in 'mob justice' rather than result in reasoned deliberation," 232 F.3d at 975, and that the "improper argument would have had a significant prejudicial effect on the jurors[.]" *Id. See also*

_____

[13](...continued)

Unlike § 2255 cases, petitioners in § 2254 proceedings must, in addition to demonstrating that the legal claim is meritorious, prove that the state court's ruling against the petitioner involved an unreasonable application of clearly established law as determined by the U.S. Supreme Court. *See* 28 U.S.C. § 2254 (d)(1). That is, a federal court cannot disturb a state court's ruling on the basis that it might have decided the claim differently, but rather, the petitioner must show that the state court's application of applicable federal law was objectively unreasonable. This is a significant limitation on the federal court's review. The fact that the Eighth Circuit held in *Weaver* that the prosecutorial misconduct claim easily satisfied this AEDPA requirement demonstrates both: (1) the strength of the claim, and (2) counsel's incompetence -- i.e., given existing Supreme Court precedent, this claim should have been obvious to counsel from the trial court record.

In the § 2255 context, there is no similar AEDPA threshold that must be met before a petitioner can receive relief on a claim. The *Weaver* Court's statement, therefore, that "[t]here is little doubt that the prosecutor's statements are such that we would certainly grant relief without applying AEPDA," 438 F.3d at 841, is strong evidence that had counsel raised this claim, there is a reasonable probability Mr. Sinisterra would have prevailed on appeal.

*Newlon v. Armantrout*, 885 F.2d 1328, 1340 -42 (8th Cir. 1989) (affirming grant of habeas petition on the ground that prosecutor's arguments in penalty phase – that the petitioner deserved to be sentenced to death not only for what he had done, but in order to send a message to others that if they committed the same crime in their county, they would be executed, too -- violated due process). As this precedent makes plain, the government's attempt to excuse its misconduct on the basis that it made its improper remarks in the penalty phase of Mr. Sinisterra's trial, rather than the guilt phase, is unavailing.

3.      **The Improper Remarks Were Designed To Focus The Jury's Attention On Facts Other Than Those Before It.**

The government also asserts that the improper remarks were merely an attempt to "put the facts presented to the jury in context and referred to the actual evidence the jury heard." Gov't Res. at 47. The record, however, proves that the government's remarks were not restricted to "the actual evidence the jury heard," but rather urged the jury to look beyond the facts of the case before it and make its decision based on the effect that its verdict might have in deterring future drug crimes in Kansas City. The government improperly invoked the threat of "other drug traffickers of the world" bringing drug-related violence to the jury's community to arouse its fear and passion, thereby improperly appealing to the emotions of the jury. This was part and parcel of a larger rhetorical strategy by the government to improperly encourage the jury to make its sentencing decision based on facts other than those before it, rather than on the individual characteristics of Mr. Sinisterra and the facts and circumstances of his case, as required by the Eighth Amendment.

For example, in its rebuttal closing, the government explicitly minimized the importance of any of Mr. Sinisterra's individual characteristics that weighed against death, and instead asked the

jury to look beyond this particular defendant and weigh the impact that a death sentence would have

on deterring other drug dealers from coming into their community:

> The octopus when in danger shoots out a dark ink into the water so
> it can escape.  If it doesn't get out of that, it shoots, it's fatal, the
> octopus dies.  *And that's what mitigation evidence is in this case.*
> *Ladies and gentlemen, it's a smoke screen.*  It's that ink.  He's the
> octopus.  What he wants is to escape in this case, he wants to escape
> justice.
>
> *This case, ladies and gentlemen, is not about this.  Has nothing to do*
> *about that.*  What this case has to do is, *this is what this case is about.*
> *It's taking a thousand dollars to put a gun to somebody's head to*
> *blow their brains out.  They don't want you to think about that but*
> *that's what it is.*

(Tr. 2906-2907) (emphasis added).[14]  Apart from the fact that these remarks improperly

impugned the integrity of defense counsel[15], the government's argument also violated Mr.

---

[14] Trial counsel did not make any contemporaneous objections to this comment, nor does it appear that trial counsel moved for a mistrial based on these comments.  Appellate counsel also failed to challenge these remarks on appeal.

[15] "Attacks on the sincerity and dishonesty of defense counsel are inappropriate."  *United States v. Sblendorio*, 830 F.3d 1382, 1395 (7th Cir. 1987).  Indeed, numerous courts have stated that arguments accusing defense counsel of putting up a "smoke screen" to confuse the jury are improper.  *See, e.g.*, *Sblendorio*, 830 F.3d at 1396 (comments, such as "smoke screen" rhetoric, are "inappropriate and beneath the prosecutor); *United States v. Procopio*, 88 F.3d 21, 32 (1st Cir. 1996) (prosecutor's use of term "smoke screen" in argument was inappropriate); *United State v. Millar*, 79 F.3d 338, 343-344 (2d Cir. 1996) (same); *United States v. Matthews*, 240 F.3d 806, 819 (9th Cir. 2000) (in non-capital case where prosecutor characterized the defense argument as an "octopus squirting ink," and asserting, somewhat ambiguously, that "they're trying to get away, so they gotta hide what they're doing, they gotta hide all the facts, cloud the facts, throw up all kinds of dirt, squirt the ink," the court held that "In this case, the Government walked – and may have overstepped – the line by insinuating that defense counsel was trying to hide the truth. ... The statements made in this case are unworthy of a representative of our government").

The use of the octopus metaphor was not the only instance in which the prosecutor attacked defense counsel.  Moments after making that argument, the prosecutor stated of defense counsel: "*They don't want you to think about that* but that's what it is."  Tr. 2907.  The context of the remark was that what this case was really about was "putting a gun to somebody's head to blow their brains out," not mitigation.  Here, the prosecutor purported to be revealing to the jury the secret intentions

(continued...)

Sinisterra's Eighth Amendment right to an individualized sentencing determination. As the Supreme Court has made clear in *Lockett v. Ohio*, 438 U.S. 586 (1978), "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604 (emphasis in original). The Court noted that "an individualized decision is essential in capital cases" because a death sentence is such an extreme penalty without the corrective mechanisms that are available with other forms of punishment. *Id*. at 605. Moreover, the Court has made it clear in subsequent cases that "the jury must be allowed *to consider and give effect to* mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Penry v. Lynaugh*, 492 U.S. 302, 327-28 (1989) (emphasis added).

Here, the government's argument was improper because it characterized mitigation evidence as irrelevant to the jury's sentencing deliberation and encouraged the jury to simply *ignore* the proffered mitigation evidence. *See Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 1672 n. 21 (2007) (jury may be precluded from giving meaningful consideration to relevant mitigation evidence "not

---

[15](...continued)
and motivations of defense counsel, i.e., that their agenda was to divert the jury's attention away from the facts of the crime. This same kind of argument was repeated later in the rebuttal when the prosecutor addressed the execution impact evidence: "Counsel talked to you about the children of German Sinisterra. *And regardless of what she said she wants sympathy from you.*" Tr. 2908. (Emphasis added). Once again, the prosecutor was claiming to reveal the defense counsel's internal thoughts, i.e., a secret agenda to "manipulate" the jury through improper emotional appeals related to Mr. Sinisterra's children. In fact, such execution impact evidence is relevant and legitimate mitigation evidence. The effect of such improper argument, though, was not merely to only impugn the integrity of defense counsel; it also served to disparage the mitigation evidence itself, as it encouraged the jury to view such mitigation evidence as an emotional ploy, rather than as a legitimate basis for returning a life verdict. Notably, counsel failed to object to any of these remarks at the time of trial or on appeal.

only as a result of the instructions it is given, but also as a result of prosecutorial argument dictating that such consideration is forbidden"). The thrust of these comments was to denigrate not only the proffered mitigation evidence, but the very concept of mitigation itself. Such disparagement of mitigation is improper, as the Supreme Court has repeatedly held that the sentencer must give due consideration to all relevant mitigating evidence in order to insure that a reliable verdict is imposed. *See*, *e.g.*, *Boyde v. California*, 494 U.S. 370, 377-78 (1990) (once the threshold for relevance has been met, the "Eighth Amendment requires that the jury be able *to consider and give effect to*" a capital defendant's mitigating evidence) (emphasis added); *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) (sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration").[16]

---

[16] To the extent that the government was arguing in closing that mitigation evidence must bear some nexus to the offense itself before it may be considered by the sentencer, that claim is legally incorrect. In *McKoy v. North Carolina*, 494 U.S. 433 (1990), the Supreme Court set forth the relevance standard applicable to mitigating evidence in capital trials: the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard– "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"--applies. 494 U.S. at 440 (citation and internal quotation marks omitted). As the *McKoy* Court further noted: "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id*. This "relevance" standard set forth for mitigating evidence is extremely liberal. *Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)). Indeed, the Court has repeatedly emphasized that almost any evidence that might tend to show the defendant should not be put to death is admissible, and has explicitly rejected any requirement that mitigating evidence bear a nexus to the crime before it can be considered by the jury. *See Tennard v. Dretke,* 542 U.S. 274, 284-87 (2004); *Smith v. Texas*, 543 U.S. 37, 43-45 (2004) (noting that nexus requirement was "never countenanced" by any of the Court's precedent pre-dating *Tennard*). This "low threshold for relevance," *Tennard* , 542 U.S. at 285, is consistent with the Supreme Court's jurisprudence since *Lockett* that the Eighth Amendment requires the sentencer to consider any mitigating factor that is

(continued...)

It is clear that the thrust of the prosecutor's argument was not that the proffered mitigation should be given little weight, but rather that it would be "wrong" for the jury to rely on such evidence in determining the appropriate penalty.  Indeed, the prosecutor made that very argument to the jury with respect to the defense execution impact evidence:

> Counsel talked to you about the children of German Sinisterra.  And regardless of what she said she wants sympathy from you.  There is no doubt, there is no doubt those children are deserving of sympathy, they are victims but they are victims of what this defendant has done. *It would be wrong, ladies and gentlemen, it would be wrong to base your verdict on how they feel.*  The defendant chose to live the life he did and he has shamed, he has devastated and he has hurt his family.
>
> *You, as jurors, however are not hurting anybody by following the law and rendering a just verdict as Mr. Valenti told you.  Don't be manipulated in that way.*

(Tr. at 2908).[17]  Here, the government did not contest the existence of the factor itself –it conceded that Mr. Sinisterra's execution would negatively impact his children – but rather, it stated that it would be *wrong* for the jury to consider and give effect to that factor.  What is particularly insidious about this form of argument is that it had the effect of camouflaging its impact on the jury's sentencing deliberations.  That is, here, the jury unanimously found that Mr. Sinisterra's execution would negatively impact his family.  *See* Verdict Forms.  However, in light of the government's argument, the fact that the jury found the existence of that factor is not at all a guarantee that each juror then gave *consideration and effect* to that factor as is required by the Eighth Amendment.  As

---

[16](...continued)
the basis for a sentence less than death.  As the Court explained, "an individualized decision is essential in capital cases" because a death sentence is such an extreme penalty without the corrective mechanisms that are available with other forms of punishment.  *Lockett*, 438 at 605.

[17] Trial counsel did not make any contemporaneous objections to this comment, nor does it appear that trial counsel moved for a mistrial based on these comments.  Appellate counsel also failed to challenge these remarks on appeal.

the Court made clear in *Brown v. Payton*, 544 U.S. 133, 162 (2005):

> The need for caution is plain: the constitutional concern with mitigating evidence is not satisfied by the mere ability of a defendant to present it. The sentencing body must have a genuine opportunity to consider it and give effect to it. *Penry v. Lynaugh*, 492 U.S., at 320, 106 L. Ed. 2d 256, 109 S. Ct. 2934. As the Court said in *Boyde*, "[p]resentation of mitigating evidence alone . . . does not guarantee that a jury will feel entitled to consider that evidence." 494 U.S., at 384, 108 L. Ed. 2d 316, 110 S. Ct. 1190. For this reason, the Court has found Eighth Amendment violations in circumstances precluding the sentencing body from considering the defendant's mitigating evidence, even where the evidence was extensive and where it accordingly might have been thought unnatural for the sentencer to disregard it. See, e.g., *Penry v. Johnson*, 532 U.S. 782, 788, 803-804, 150 L. Ed. 2d 9, 121 S. Ct. 1910 (2001); *Eddings v. Oklahoma*, 455 U.S., at 107, 113-114, 71 L. Ed. 2d 1, 102 S. Ct. 869.

The record demonstrably proves that the government's argument was not designed to "put the facts of the case in context," but rather the opposite: to encourage the jury to *ignore* the facts and evidence it received in the penalty phase regarding Mr. Sinisterra's character and background, and instead re-focus the jury's attention on facts other than those before it – namely, the potential effect that its verdict would have on drug crimes in Kansas City. Such argument was clearly improper and constituted a violation of Mr. Sinisterra's right to due process and a fair trial under the Fifth Amendment, and his right to an individualized sentencing determination under the Eighth Amendment.

**B.** **Counsel's Failure To Object To The Government's Misconduct In Closing At Trial And On Appeal Constitutes Ineffective Assistance.**

**1.** **Trial Counsel's Failure To Make Appropriate Objections And Move For A Mistrial Constituted Ineffective Assistance.**

*Strickland*'s reference to counsel's "thorough investigation of law," 466 U.S. 668, 690 (1984), indicates that reasonably competent defense counsel must be aware of applicable legal

principles.[18]  Here, reasonably competent counsel should have been aware that the above-cited

remarks by the government were improper.  At the time of Mr. Sinisterra's trial, this legal principle

was well-established, as such remarks repeatedly had been held to constitute reversible error.  *See*,

*e.g.*, *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992); *United States v. Lee,* 743 F.2d 1240 (8th

Cir. 1984); *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991); *United States v. Arrieta-*

*Agressot*, 3 F.3d 525 (1st Cir. 1993).  Thus, counsel's failure to make appropriate objections and

move for a mistrial based on the government's improper remarks constitutes deficient performance

under *Strickland*.[19]  *Cf. Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001) (trial counsel's failure

[18] Since *Strickland*, courts have held in a number of cases that failure to be aware of an applicable legal principle constitutes ineffective assistance.  *See*, *e.g.*, *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (trial counsel ineffective for failing to "conduct an investigation that would have uncovered extensive records graphically describing [petitioner's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records"); *Kimmelman v. Morris*, 477 U.S. 365, 385 (1986) (trial counsel's failure to make obvious and meritorious objection to tainted evidence was ineffective and "betray[ed] a startling ignorance of the law"); *Reagan v. Norris*, 365 F.3d 616, 621-22 (8th Cir. 2004) (trial counsel unreasonably failed to object to jury instruction that omitted essential *mens rea* element of charged offense); *Blackburn v. Foltz*, 828 F.2d 1177, 1182-83 (6th Cir. 1987) (dicta stating counsel's lack of knowledge as to the admissibility of defendant's prior convictions was unreasonable), *cert. denied*, 485 U.S. 970 (1988); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989) (finding that defense counsel's failure to object to jury instructions that misstated applicable law was deficient performance under *Strickland*); *Goodwin v. Balkcom*, 684 F.2d 794, 819-20 (11th Cir. 1982) (holding counsel was ineffective for not understanding the "fruit of the poisonous tree" doctrine and, as a result, not challenging the admissibility of defendant's confession), *cert. denied*, 460 U.S. 1098 (1983).  Moreover, even before *Strickland*, it was established that "failure to object properly or to preserve fundamental errors at trial may constitute ineffective assistance of counsel." *Smith v. Black*, 904 F.2d 950, 980 (5th Cir. 1990).  *See*, *e.g.*, *Vela v. Estelle*, 708 F.2d 954 (5th Cir. 1983) (capital case holding counsel's failure to object to prosecutor's character witness on specific grounds so as to preserve the issue for appeal was ineffective assistance of counsel).

[19] To the extent that government relies on Attorney Fred Duchardt's affidavit to claim that the failure to object was a tactical decision, such an argument is foreclosed by Attorney Duchardt's concession that he would not have objected to the aforementioned remarks because he "did not believe them to be improper."  *See* Attorney Duchardt Affidavit 11/24/06 at ¶ 16.  Moreover, Attorney Jennifer Herndon, who was lead counsel on the penalty phase of Mr. Sinisterra's trial, has conceded that her

(continued...)

to object to prosecutor's improper remarks in closing constituted ineffective assistance of counsel).

*See also Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005) ("trial counsel's failure to object to any aspect of the prosecutor's egregiously improper closing argument was objectively unreasonable"); *Washington v. Hofbauer*, 228 F.3d 689, 709 (6th Cir. 2000) (trial counsel's failure to object to prosecutor's improper examination and closing arguments amounted to ineffective assistance of counsel; "One of defense counsel's most important roles is to ensure that the prosecutor does not transgress th[e] bounds [of proper conduct]."); *Martin v. Grosshans*, 424 F.3d 588, 591 (7th Cir. 2005) (defense counsel performed deficiently "for failing to move for a mistrial after the prosecutions's [improper and prejudicial] closing argument"); *Cargle v. Mullins*, 317 F.3d 1196, 1217 (10th Cir. 2003) (trial counsel ineffective for*, inter alia*, failing to object to instances of prosecutorial misconduct in closing argument).

Moreover, *Strickland* prejudice is also manifest. Here, the jury found six mitigating factors unanimously,[20] and seven other mitigating factors were found by at least two or more jurors.[21] In

---

[19](...continued)
failure to object to the improper remarks was not a tactical decision, but rather due to her lack of awareness and knowledge of the relevant caselaw. Herndon Second Aff. ¶¶ 4-5.

[20] (1) That he actively supported, nurtured and loved his children throughout their lives; (2) that he actively loved and nurtured his wife; (3) that he had helped many persons in addition to family members and close friends with his time, support, and when able, his money; (4) that if put to death, his death will have an impact on his children, his wife, his mother, and his other family and friends; (5) that the victim had prepared to rob and murder another person by obtaining duct tape and rubber gloves and by mixing up fake cocaine and taking a gun with him with the willingness to participate in the killing of another person; and (6) the victim intentionally placed his own life in danger because of his occupation, his lifestyle, and his specific actions taken on the day of the murder.

[21] (1) That he actively loved and helped to support his mother (nine jurors); (2) that he has actively supported, nurtured and loved his children while he has been in custody over the last seventeen months that he has been incarcerated awaiting trial (nine jurors); (3) that he has actively loved and nurtured his wife over the last seventeen months that he has been incarcerated awaiting trial (five jurors); (4) if sentenced to life without possibility of release, he will continue to provide his children counseling, guidance, nurturing and love (three jurors); (5) if sentenced to life without possibility

(continued...)

other words, this was not a clear case for death – the jury, in various combinations, found a variety of mitigating factors to balance against the aggravating factors found.[22]  Given the variety of mitigating factors found, and the number of which were found unanimously, the jury could have chosen to impose a life sentence had the prosecutor not fed their fears regarding drug violence in their community and encouraged them to use their verdict as a means to address this larger societal problem.  *See Antwine v. Delo*, 54 F.3d 1357, 1364 (8th Cir. 1995) (ruling that prosecutor's penalty phase comments regarding the "instantaneous" nature of death via gas chamber and the economic costs of life imprisonment violated petitioner's due process rights, and finding such comments prejudicial because "the two aggravating circumstances presented to the jury were balanced by some nonstatutory mitigating circumstances that could have led the jury to choose life imprisonment if the prosecutor had not fed their fears of economic burden while easing their conscience with the idea of a quick, humane death").  Thus, but for trial counsel's deficient performance, there is a reasonable probability that the outcome of the penalty phase proceeding would have been different.

---

[21](...continued)
of release, he will continue to provide nurturing and love to his wife (two jurors); (6) that he provided exceptional care and support to his wife and his mother in law after his father in law passed away (eleven jurors); (7) that he was gainfully employed as often as he was able and, at other times, took responsibility for the primary care of his children and his household (five jurors).

[22] The jury unanimously found the following statutory aggravators: (1) that the crime was committed in expectation of the receipt of anything of pecuniary value; (2) substantial planning and premeditation was involved; and (3) that, in concert with others, he intentionally attempted to kill more than one person in a single criminal episode.

The jury also unanimously found the following non-statutory aggravators: (1) the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society; and (2) the defendant's vile conduct in committing the offense, apart from the other aggravating factors, was substantially greater in degree than that described in the definition of the crime.

The jury rejected the following non-statutory aggravating factor: that Julian Colon's personal characteristics as an individual human being and the impact of the death of Julian Colon upon his family makes this crime more worthy of the death penalty than other murders.

**2. Appellate Counsels' Failure To Challenge The Improper Remarks On Appeal Constitutes Ineffective Assistance.**

"[A]n appellate advocate may deliver deficient performance and prejudice a defendant by omitting a 'dead-bang winner,' even though counsel may have presented strong but unsuccessful claims on appeal. Although courts have not defined the term 'dead-bang winner,' ... it is an issue which was obvious from the trial record ... and would have resulted in reversal on appeal." *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995). As the *Cook* court further explained: "By omitting an issue under these circumstances, counsel's performance is objectively unreasonable because the omitted issue is obvious from the trial record. Additionally, the omission prejudices the defendant because had counsel raised the issue, the defendant would have obtained a reversal on appeal." 45 F.3d at 395.

Here, appellate counsel, Attorney Duchardt, was clearly deficient in failing to raise the prosecutorial misconduct claim on appeal. As Attorney Duchardt stated unequivocally, counsel's failure to raise this claim was not for any strategic or tactical reason, but rather, counsel simply did not believe that the aforementioned remarks were improper. *See* Attorney Duchardt Affidavit 11/24/06 at ¶ 16. In other words, this is not a situation where counsel "winnowed out" a weaker claim in order to focus more effectively on claims more likely to prevail. Rather, counsel was simply *unaware* of the extensive case law in the Eighth Circuit in which similar prosecutorial remarks were held to be reversible error. Here, the prosecutorial misconduct claim was an issue that was obvious from the trial record and, given the pattern of reversals in the Eighth Circuit on this very issue, competent appellate counsel should have known that, if raised, this claim would probably have resulted in a reversal on appeal. Failure to raise a claim under such circumstances is clearly deficient

performance. *See Banks v. Reynolds*, 54 F.3d 1508, 1515 & n.13 (10th Cir. 1995) (failure to raise "dead-bang winner" claim on appeal constitutes ineffective assistance of counsel even though counsel may have raised other strong but ultimately unsuccessful claims, and defining "dead-band winner" as "an issue which is obvious from the trial record and one which probably would have resulted in a reversal on appeal").

Moreover, there is no doubt that Mr. Sinisterra was prejudiced by appellate counsel's failure to raise the prosecutorial misconduct claim. In the context of appellate ineffectiveness, *Strickland* prejudice is demonstrated by showing that but for counsel's failure to raise the claim, there is a reasonable probability that the petitioner "would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *see also Link v. Luebbers*, 469 F.3d 1197, 1205-06 (8th Cir. 2006) (same). What is significant here is that even though appellate counsel would have had to argue the claim as "plain error" given counsel's failure to preserve the issue at trial, it is quite clear that the Eighth Circuit considered this type of prosecutorial misconduct to be egregious and consistently held it to constitute reversible error.[23] Indeed, at the time that Mr. Sinisterra's case was on appeal, the Eighth Circuit had already reversed in a number of cases on a nearly identical claim. *See United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992); *United States v. Lee,* 743 F.2d 1240, 1252-1253 (8th Cir. 1984); *Copeland v. Washington*, 232 F.3d 969, 975 (8th Cir. 2000); *Newlon v. Armantrout*, 885

---

[23] Moreover, to the extent that appellate counsel was at all concerned about having to raise the claim as "plain error," he could have availed himself of the decision in *Arrieta-Agressot*, a First Circuit case in which the Court reversed for similar misconduct under the "plain error" rule. *See United States v. Arrieta-Agressot*, 3 F.3d 525, 529 (1st Cir. 1993). *Cf. Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998) (appellate counsel was ineffective in failing to request "plain error" review of error in first-degree murder instruction that trial counsel failed to preserve for appeal); *Carter v. Bowersox*, 265 F.3d 705 (8th Cir. 2001), *cert. denied*, 535 U.S. 999 (2002) (direct appeal counsel failed to raise plain error resulting from trial court's omission of penalty phase instruction on effect of lack of unanimity on capital sentencing verdict).

F.2d 1328, 1340-42 (8th Cir. 1989). Moreover, considering the result in *Weaver v. Bowersox*, discussed *supra*, it is clear that had appellate counsel raised the prosecutorial misconduct issue on appeal, there is a reasonable probability that the Eighth Circuit would have similarly vacated Mr. Sinisterra's death sentence and remanded for a new penalty phase hearing. Thus, appellate counsel delivered deficient performance which resulted in prejudice to Mr. Sinisterra on his appeal.

**III**.     **Failure to Object to, And Elicitation of, Inadmissible Propensity Evidence**

Trial of this case was marred by live testimony and videotaped statements of key witnesses Andres Borja-Molina and Edward Ortiz to the effect that Sinisterra "kills people for a living" and was one of the "same bad people" that the Office "always send[s] ... to kill" people. *See*, *e.g.*, Tr. 1218-20, 1442-47. Much of this prejudicial testimony was actually elicited by Mr. Sinisterra's own counsel on cross-examination. *See*, *e.g.*, Tr. at 1321, 1474 (on cross: "Edwin said if you needed to go smoke somebody, kill, just call Waja").

No objection was made to any of this evidence. Although defense counsel was aware of it from the case discovery (*see*, *e.g.*, Bates #'s 3071, 3080, 3145), no pretrial motion in limine was filed. No Rule 404(b) notice was filed, no pretrial hearing was held, and no limiting instruction was requested or given.

Trial counsel was ineffective for failing to seek the exclusion of this incredibly prejudicial evidence. This was character evidence of the most devastating kind, labeling Mr. Sinisterra not as the killer of Julian Colon but as a person for whom such a killing constituted a normal day's work. Its admission violated not only Rules 403 and 404(b), but one of the most fundamental and long-standing principles of English, colonial, and American common law. *See, e.g.*, *Harrison's Trial*, 12 How. St. Tr. 834 (Old Bailey 1692) (excluding evidence of a prior bad act in a murder trial, Lord

Chief Justice states "Hold, what are you doing now? Are you going to arraign his whole life? Away, away, that ought not to be; that is nothing to the matter."); *Rex v. Doaks*, Quincy's Mass. Reports 90 (Mass. Super. Ct. 1763) (excluding evidence of prior lascivious acts in trial for keeping a bawdy house); *Boyd v. United States*, 142 U.S. 450 (1892) (admission of prior crimes committed by defendants so prejudicial new trial required).

In its response in opposition to the instant 2255 motion, the government offers no authority to support the admission of this testimony. Instead, it relies on the affidavit of counsel Fred Duchardt, in which he states that he "researched the matter prior to trial, and ... concluded that objections to such testimony would have been fruitless." Again, no authority is provided. *See* Gov't's Res. at 35. Nor is post-conviction counsel aware of any such authority. Further, neither the government nor Mr. Duchardt addresses the fact that much of the evidence came in through cross-examination by defense counsel.

All of the challenged evidence was clearly inadmissible, and trial counsel's failure to object on direct and elicitation of further damaging propensity evidence on cross constituted ineffective assistance of counsel. As the Eighth Circuit stated in *United States v. Villalpando*, 259 F.3d 934 (8th Cir. 2001): "We generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel. Some strategy decisions, however, are so unreasonable that they can support a claim of ineffective assistance of counsel." In that case, the Court held that trial counsel's cross-examination of a government witness fell below an objective standard of reasonable competence, where trial counsel elicited testimony from a government witness "tending to establish Villalpando's character as threatening and murderous." *Id*. Just as in this case, the Court found that "such evidence had absolutely no strategic value for the defendant." *Id.* The *Villalpando* Court

relied on well-established law, such as *Crotts v. Smith*, 73 F.3d 861 (9th Cir. 1996), which found trial counsel to be ineffective for failing to object to testimony on direct examination that the defendant had told a third party he was wanted for "killing a cop." The Court also relied on *Ward v. United States*, 995 F.2d 1317 (6th Cir. 1993), which held trial counsel ineffective where counsel's cross-examination opened the door to defendant's character and propensity to make pipe bombs.

The prejudice caused by this inadmissible evidence was devastating to Mr. Sinisterra's defense. Clearly, trial counsel should have filed a motion in limine to exclude this evidence from the trial. (Herndon Second Aff. ¶ 17) Given that they failed to do that, they should at least have objected to the evidence when it was first offered and moved for a mistrial, or in the alternative for the court to strike the testimony, instruct the jury to disregard it, and order the government to caution its witnesses not to refer to other crimes evidence. (*Id*. at ¶ 18) Had counsel made appropriate contemporaneous objection, this harmful evidence would have been excluded, and the government would not have been able to rely on it in closing arguments. (*Id*.)

Instead, without objection or limitation, the government had a field day in closing arguments, repeatedly relying on this propensity for violence evidence to direct the jury's attention away from the facts of the case and instead focus it on the government's characterization of Mr. Sinisterra as a vicious, cold-blooded, career killer, the Office's regular hitman, the one who regularly "takes care of killing for the drug organization." *See, e.g.*, Tr. at 2458-64 (guilt phase), 2887, 2910-12 (penalty phase). The prejudicial effect at the penalty phase was literally incalculable. With Mr. Sinisterra's life on the line, he was battling not the jury's finding that he killed Julian Colon, but unsubstantiated and inadmissible allegations that he performed such killings all the time. This prejudice saturated the proceedings, undermining the testimony of Mr. Sinisterra's family and friends and providing a

47

dramatic, inflammatory base for the government's allegations of aggravators, such as future dangerousness.

Counsel's failure to object to this testimony, and inexplicable elicitation of further damaging testimony, fell below an objective standard of reasonable competence and prejudiced Sinisterra within the meaning of *Strickland*. Accordingly, Sinisterra suffered ineffective assistance of counsel in violation of the Sixth Amendment. *Villalpando*, *Crotts*, *Ward*, *supra*; Fed. R. Evid. 401, 403, 404(a), 404(b).

### IV.     **Proportionality Argument**

Mr. Sinisterra has alleged that his death sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment, denial of due process in violation of the Fifth Amendment, and an arbitrary sentence in violation of 18 U.S.C. § 3595.

Mr. Sinisterra's argument is well-summarized by the opinions of the six dissenters in the recent Sixth Circuit case of *Getsy v. Mitchell*, __ F.3d ___, 2007.C060000822 <www.versuslaw.com>, No. 03-3200 (6th Cir. July 25, 2007) (en banc), and is supported by the authorities cited in his amended motion. Amended 2255 Motion at 52-55. Unfortunately, the Eighth Amendment argument appears to be foreclosed by the recent panel decision of the Eighth Circuit in *United States v. Johnson*, ___ F.3d ___, 2007.C08.0000879<www.versuslaw.com>, No. 06-1001 (8th Cir. July 30, 2007), in which the Court specifically rejected the argument that "the Eighth Amendment requires not only proportionality between a sentence and a particular category of crime, but also proportionality between co-defendant's sentences." *Id*. In *Johnson*, the arguably less culpable co-defendant received the death sentence, while the more culpable defendant received life imprisonment in a separate trial. *Id*.

Mr. Sinisterra believes that the panel decision in *Johnson* was incorrectly decided and will be overruled either by the Eighth Circuit sitting *en banc* or by the Supreme Court. Accordingly, Sinisterra does not concede or abandon his Eighth Amendment claim. Mr. Sinisterra also urges this Court to grant relief on this claim pursuant to the reasoning of the *Getsy* dissenters on either due process or statutory grounds, neither of which are foreclosed by *Johnson*.

Finally, a principal ground for the Court's ruling in *Johnson* was the possibility that the evidence in Johnson's case and the evidence in her co-defendant's case may have differed: "In particular, Johnson has not apprised us of the mitigation evidence [the co-defendant] presented in his trial." *Id*. This important point is highly relevant to the instant proceedings. No one in this case disputes that Edwin Hinestroza's culpability is greater than that of any other defendant. By the government's own evidence, Hinestroza was the leader, organizer, and planner of Julian Colon's murder. Hinestroza recruited the mules Mr. Sinisterra and Arboleda Ortiz, worked directly with the Office, duped Colon and Borja-Molina into believing they were going to murder someone else, led them to Percy White's house where he performed a double-cross and ordered them to be bound, and presided over the beating of both men and the murder of Colon. Hinestroza ran the operation, and Mr. Sinisterra was a low-level flunky. Yet Mr. Sinisterra received the death sentence while Hinestroza was sentenced to life imprisonment.

There are many reasons for this bizarre disproportionality, but certainly one of the most compelling is the factor identified by the *Johnson* Court. Specifically, Hinestroza presented a penalty phase case that sought to explain <u>why</u> Hinestroza did what he did – that gave the jury information allowing it to understand how a person's life history could develop in such a way that he could be involved in a heinous death-eligible crime and yet should not be executed for it.

Hinestroza's penalty phase presentation centered around the work of a qualified mitigation specialist, Norma Solis, who utilized resources in Colombia, Mexico and the United States to prepare a competent social history of Mr. Hinestroza. Ms. Solis' testimony to the jury allowed it to understand how Hinestroza could have done what he did, to the extent that the jury, on its own, found a mitigator not submitted by either party to the effect that Hinestroza's lack of guidance in his youth made him particularly susceptible to getting caught up in the violent culture of the drug trade.

In contrast, Mr. Sinisterra's penalty phase presentation was a shallow, inept attempt to portray him as a "nice guy." Instead of letting the jury understand the facts of Mr. Sinisterra's youth, the violence and sexual abuse and psychotic family episodes and living on the streets with no guidance whatsoever and drug abuse and organic brain injury, and elucidating the ways in which he was prone to be, and in fact was, sucked into the world of people like Edwin Hinestroza and Jaime Hurtado and the Office, the defense offered that he cleaned house and cooked and served as a pallbearer at funerals of Colombian drug traffickers. Mr. Sinisterra's penalty phase presentation, not being based on any social history, was anchorless and, not being based on any attempt whatsoever to explore any of the social, mental, environmental and other factors that could serve to explain how he came to be involved in a brutal premeditated homicide, was shallow. Indeed, by responding to evidence of a brutal homicide with the mere assertion that he is a nice guy, Mr. Sinisiterra's penalty phase presentation failed to come to grips with the issue before the jury at all, and amounted to nothing more than an insult to the jury's intelligence.

The simple fact is that the two defendants who had competent penalty phase representation – Tello and Hinestroza – received life sentences, while the two defendants who had incompetent representation – Sinisterra and Ortiz – received death. This was true even though Hinestroza and

Tello were both higher up in the criminal organization and more directly involved in the organization and planning of Colon's murder than Mr. Sinisterra and Ortiz were. Mr. Sinisterra prays that, if this Court feels unable to grant relief in these proceedings based on the disproportionate sentences imposed in this case alone, it will at least consider that disproportionality in connection with his other claims, most notably those discussed in Part I, above, pertaining to the constitutionally ineffective investigation, preparation and presentation of his penalty phase case.

## V. The Ring and FDPA Claims

As the government argues, these claims have been foreclosed for the present by the Eighth Circuit decisions in *United States v. Allen*, 406 F.3d 940 (8th Cir. 2005) and *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004). Mr. Sinisterra believes those cases were wrongly decided and will continue to press these claims in the hope that they will be overturned by the Eighth Circuit *en banc* or by the Supreme Court. Mr. Sinisterra's trial counsel has acknowledged that their failure to raise the *Ring* issue was error and that, should *Allen* be overturned, the error was prejudicial. Duchardt Aff. ¶ 10. This error is structural and cannot be deemed harmless beyond a reasonable doubt.

## VI. Vienna Convention Claim

The government does not of course dispute the Vienna Convention violation in this case, but rather argues that the Eighth Circuit decision in Mr. Sinisterra's direct appeal constituted a "reconsideration" of that violation, fulfilling the requirements of *Avena*. Gov't's Res. at 23. Mr. Sinisterra respectfully submits that direct appeal does not constitute the independent review and reconsideration required by *Avena*. Mr. Sinisterra further points out that the United States Supreme Court has recently heard argument in *Medellin v. Texas*, 127 S. Ct. 2129 (2007), a case which likely will clarify the appropriate handling of this claim. The *Medellin* case is expected to be decided by

the end of this year.

## VII.  Other Claims

Mr. Sinisterra continues to assert all of the claims presented in his 2255 motion and his amended motion.  To the extent that issues raised in those filings are not expressly addressed herein, Mr. Sinisterra relies on those filings, with one exception.  The claim of mental retardation put forth in Mr. Sinisterra's motion stands but needs more evidentiary development, including a full social history investigation and additional mental health expert resources.  The findings of Dr. Wheelock and Dr. Llorente are compelling but preliminary.  Dr. Wheelock found an IQ of 75, which is within the range of mental retardation.  Dr. Llorente concluded that Mr. Sinisterra suffers from dampened intellectual functioning and organic brain damage, but was unable without additional information to conclude that Mr. Sinisterra is mentally retarded.  *See* Dr. Llorente Report at 10 (stating that mental retardation "is a difficult issue to address in this individual," and noting that Mr. Sinisterra's "lower-than-average intellectual index and executive functioning scores merit additional attention").  No definitive conclusion can be drawn on this point absent a thorough mitigation investigation.  As Mr. Stetler observes: "A thorough mitigation investigation would have yielded a fully developed social history, which, in turn, would also have provided a basis for a reliable and accurate assessment of Mr. Sinisterra's intellectual functioning and the potential causes and effects of his brain damage as disclosed by neuropsychological testing." (Stetler Dec. ¶ 40) A reliable assessment requires more than examination by an expert; it also requires an independent investigation into the client's history and background – in short, a mitigation investigation – as such information will necessarily play a role in the mental health diagnosis.  *See Rompilla*, 545 U.S. at 378-79.

Mr. Sinisterra moves the Court to grant funds for appointment of experts to conduct a social

history investigation relevant to his claim of mental retardation and for an evidentiary hearing on this claim. Mr. Sinisterra also urges the Court to consider his separate claims not only individually, but also cumulatively. *See Kyles v. Whitley*, 514 U.S. 419 (1995).

### VIII.  <u>Conclusion</u>

WHEREFORE, for all the foregoing reasons, Mr. Sinisterra respectfully requests that (1) respondent be required to appear and answer the allegations contained in this motion; (2) Mr. Sinisterra be afforded reasonable discovery and an evidentiary hearing on his claims of ineffective assistance of counsel, as well as the other claims contained in this motion; (3) after a full and fair hearing, Mr. Sinisterra be discharged from his unlawful and unconstitutional convictions and sentences of death; and (4) Mr. Sinisterra be granted such other and further relief to which he may be entitled under law.

Respectfully submitted,


/s/John Jenab
John Jenab, #47452
JENAB & MCCAULEY LLP
110 S. Cherry Street, Suite 200
Olathe, KS 66061
(913) 390-5023
(913) 764-5539 Fax

/s/William E. Shull
104 W. Kansas
Liberty, MO 64068
(816) 792-4242
(816) 792-0888 Fax

ATTORNEYS FOR MOVANT
GERMAN C. SINISTERRA

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of October, 2007, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


/s/John Jenab