IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

GERMAN C. SINISTERRA,                )
BOP# 11582-045                       )
Terre Haute Federal Penitentiary, USP )
                                     )
                    Petitioner,      )      Case No. 04-cv-8003-GAF
                                     )
v.                                   )      Hon. Gary A. Fenner
                                     )
UNITED STATES OF AMERICA,            )
                                     )
                    Respondent.      )

SECOND AFFIDAVIT OF COUNSEL JENNIFER HERNDON

I, Jennifer Herndon, being duly sworn and of lawful age, state as follows:

1.  I have been asked by German Sinisterra's current counsel, representing him in his proceedings under §2255, to provide additional information as to certain events that occurred during my representation of Mr. Sinisterra at trial on drug trafficking and capital murder charges.

Penalty Phase Closing Argument

2.  I made the penalty phase closing argument in this case, and was therefore responsible for objections to the government's closing argument.  During the penalty phase closing argument, the government called upon the jury to be the conscience of the community and send a message to those involved in drug trafficking that murder committed in connection with drug crimes will be punished by a death sentence.

3.  I did not object to this line of argument by the government.  Although I generally make few objections during closing argument to avoid emphasizing the

argument to the jury, I do object to arguments that are clearly legally improper and must therefore be preserved for appellate review.

4. At the time of Mr. Sinisterra's trial, I was not aware of the case law prohibiting "send a message" arguments such as those made by the government. In the appellate work I have done since Mr. Sinisterra's trial I have discovered several cases, including cases in the Eighth Circuit, that hold such argument to be reversible error.

5. At the time of the prosecutor's comments in Mr. Sinisterra's trial, I did not have any strategic reason for not objecting to the comments; I simply did not know that such argument constituted reversible error. With the benefit of my substantial experience since Mr. Sinisterra's trial, I recognize that I should have objected to the government's argument. There is no strategic reason for failing to object to an argument that under the law the government is precluded from making.

<u>Mitigation Investigation</u>

6. I was in charge of the majority of the mitigation investigation in the case. Lead counsel Fred Duchardt arranged for a mental health evaluation and handled all discussions and contacts with that expert. Mr. Duchardt also hired and presented evidence of a bureau of prisons expert, Joe Brandenburg. With those exceptions, I conducted all of the mitigation investigation and preparation that was done for the penalty phase of the case.

7. I did not ask the guilt/innocence investigator in the case, Dan Grothaus, to do any mitigation investigation in the case. Mr. Grothaus was consumed with work on the guilt phase of the case. I was very aware of the work Mr. Grothaus was doing, having accompanied him on at least one trip to Houston and a trip to North Carolina in an

attempt to locate the government's star witness Andres Borja Molina. My mitigation investigation of Mr. Sinisterra's family in Houston was conducted by myself, including the preparation of the family to testify at trial and the videotaping of Mr. Sinisterra's daughter to be used at trial.

8. No one on Mr. Sinisterra's defense team was qualified to do mental health screenings or to discover and evaluate Mr. Sinisterra's mental health history. It is my practice in capital cases to work with the mitigation specialist to choose a psychologist and neuropsychologist to do an initial evaluation of my client, regardless of my lay assessment of the client's mental health history and current mental state. Prior to these expert evaluations, the mitigation specialist does significant investigation, including record gathering, so that this initial background information can be given to the expert prior to the mental health evaluation. The expert's in person evaluation of the client is only one component of his conclusions. All of the mental health experts I have worked with require as much background information as exists prior to making determinations as to the client's mental history and status. Because there was no mitigation specialist in this case, this procedure was not followed.

9. I am unaware of what information Mr. Duchardt gave the expert he retained to evaluate Mr. Sinisterra. At the time of the evaluation, I had not given to Mr. Duchardt any of the mitigation investigation I had done. In fact, very little investigation had been done at that time. No records had been collected. If Mr. Duchardt had any mitigation materials or records to give the expert, he never shared them with me.

10. I have reviewed the amended petition filed with this Court. As to the section entitled "Brief Background Information on German Sinisterra," contained on pages 34-40

3

of the amended petition, I was never aware of the vast majority of the information contained in that section. I knew that Mr. Sinisterra grew up in a violent culture, that his father disappeared when he was young and never supported the family, and that Mr. Sinisterra dropped out of school at a young age (although I thought it was because he couldn't pay the tuition). I also knew that his mother provided most of the support for him by selling fish and wood, and that Mr. Sinisterra entered the United States illegally. I also knew about his relationships with Tawana and Michelle and his children from those relationships. I knew that he had 3 brothers and 4 sisters, and that at least one of his brothers was murdered. I did not know any of the other information contained in pages 34-40 of the amended petition. This additional information is exactly the type of information that would have been discovered by a mitigation specialist doing a thorough social history in the case.

11. The mitigation work that I did in Mr. Sinisterra's case was far from a thorough social history of Mr. Sinisterra. My work consisted solely of family interviews in Houston, Texas and Buenaventura, Colombia. The interviews that I did in Colombia were nothing more than initial "get acquainted" interviews. Usually, such interviews are done to establish rapport and trust with the family. The next step would be to ask the more difficult questions to discover any discord, abuse, or other "secrets" within the family. My interviews in Colombia were superficial and never reached this next step. The work I did in Colombia did not constitute an adequate social history of Mr. Sinisterra's life there, but rather is better characterized as preliminary work.

12. The videotapes I made while in Colombia were not made with the intent that they be introduced at trial. The questions I asked were to gather information, and did not

mirror what I would have asked the witnesses on direct examination at trial. Neither the questions I asked on tape, nor additional conversations that occurred off tape, explored any of the "darker" areas of Mr. Sinisterra's growing up that have since been uncovered. This is generally the kind of information that I first allow the mitigation specialist to probe into and uncover, due to her expertise in this area.

13. Another fact that made the interviewing in Colombia difficult was that Mr. Sinisterra's mother was not aware that he was facing the death penalty until I explained that to her (through the interpreter and family members) while in Colombia. After breaking that news, I would usually want to allow sufficient time and several interviews to pass before getting into any sensitive subject matters in my questioning. Because my week in Colombia was the only time I talked with Mrs. Sinisterra, there wasn't sufficient time to allow this to sink in and to do the type of in depth interviewing that was needed to develop an adequate social history and/or complete a videotape that was an adequate substitute for live testimony.

14. I do not know whether any records on Mr. Sinisterra are available in Colombia. I never made any attempt to gather any records from Colombia, and never requested that any of Mr. Sinisterra's family members in Colombia gather any records for me. If Mr. Duchardt made any such attempts, he never conveyed that fact to me. I am not aware of Mr. Duchardt doing any work on the mitigation case other than the previously mentioned hiring of a mental health expert and a bureau of prisons expert.

15. While I had originally intended to identify a mitigation specialist familiar with the Colombian culture, I made very little effort in this area due to Mr. Duchardt's insistence that Dan Grothaus be labeled a mitigation specialist to obtain a higher rate of

pay.  I never contacted any potential mitigation specialist with this expertise and Mr. Duchardt never told me that he attempted any such contacts.  It was consistently his position that Mr. Grothaus be labeled the mitigation specialist.  I know that there are several qualified Spanish speaking mitigation specialists and that with the appropriate effort, and assistance of resource counsel if necessary, a mitigation specialist with the necessary expertise could have been retained.

Other Crimes Evidence

16.  I recall at least two witnesses testifying that Mr. Sinisterra was, in effect, a "hitman," and was one of the people that the drug conspiracy would call upon to hurt or kill people.  Some of that testimony was unintentionally elicited by me during the cross-examination of Edward Ortiz.  Immediately after Mr. Ortiz's statement, I realized that I had elicited harmful and inadmissible evidence of other crimes.  I tried to move quickly away from that area.

17.  All of the evidence that came in about Mr. Sinisterra committing other crimes or having a reputation or propensity for hurting or killing people was inadmissible.  As trial counsel, Mr. Duchardt and I should have filed a motion in limine to preclude such evidence.  Although I was aware of this evidence prior to trial, and aware that it was inadmissible, it did not occur to me to file a motion in limine on it because I never imagined that such evidence would be elicited by the prosecutor or volunteered by a witness.

18.  Given that we failed to file a motion in limine prior to trial, we should have made contemporaneous objection to any propensity for violence evidence when it was first offered and moved for a mistrial, or in the alternative for the judge to strike the

testimony, instruct the jury to disregard it, and order the government to caution its witnesses not to refer to any other crimes evidence. Had we made appropriate contemporaneous objection to this testimony and evidence, it would have been excluded, and the prosecutor would not have been able to make use of it in guilt phase and penalty phase closing arguments.

/s/ Jennifer Herndon_____
Jennifer Herndon

Dated this 31st day of October, 2007

I hereby certify that a person known to me as Jennifer Herndon appeared before me on this 31st day of October, 2007, and personally executed the above affidavit.

/S/_____
Notary Public

My Commission Expires _____