# DECLARATION OF RUSSELL STETLER

I, Russell Stetler, declare as follows:

*Background and Qualifications*

1.    In 2005, I joined the Federal Defender Program to fill a newly created position as National Mitigation Coordinator working with and through the Federal Death Penalty Resource Counsel, Capital Resource Counsel and Habeas Assistance and Training Counsel Projects. This new national position was created in response to the increased demand for high-quality mitigation preparation in death penalty cases following the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003).

2.    For the preceding ten years (1995 to 2005), I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases receive effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with investigators, mitigation specialists, lawyers, and other professionals who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases. A substantial portion of New York's death-eligible defendant population was comprised of foreign nationals, including immigrants from Colombia, Guyana, Honduras, Jamaica, Latvia, Mexico, Trinidad, and Tunisia.

1

3.    From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco which coordinated appellate and post-conviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with investigators, mitigation specialists, lawyers, and other professionals outside the office who were retained to assist counsel representing death-sentenced prisoners. California's death-sentenced population currently includes forty-three foreign nationals (thirty Mexicans, two Cambodians, two Estonians, and individuals from Cuba, Egypt, El Salvador, Guatemala, Iran, Laos, Peru, the Philippines, and Vietnam). One Korean was released from California's death row, and a Thai national was executed.

4.    I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial and on appeal. Most of these conferences were organized and attended by attorneys specializing in capital work.

5.    Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have been invited to lecture on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Wyoming. I have also lectured on numerous occasions under the auspices of the Administrative Offices of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense

2

Service. I have lectured at five capital defense seminars in Missouri, at the invitation of the

Missouri State Public Defender, the National Legal Aid and Defender Association, and the

Habeas Assistance and Training Counsel Project of the Administrative Office of the U.S. Courts.

6. I have lectured on mitigation investigation at multiple national training

conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual

Airlie conferences), the National Legal Aid and Defender Association ("Life in the Balance"),

and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At

various times in the past decade and a half, I have served on the planning committees for these

national conferences, as well as the Capital Case Defense Seminar sponsored by California

Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA).

7. I have contributed extensively to the California Death Penalty Defense Manual

published by the California defense bar (CACJ and CPDA) since 1993. This four-volume

reference has a volume devoted to the investigation and presentation of mitigation evidence

which I helped to shape in the 1990s. In 1999, I published articles on "Mitigation Evidence in

Death Penalty Cases" and "Mental Disabilities and Mitigation" in *The Champion*, the monthly

magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled

"Why Capital Cases Require Mitigation Specialists" in *Indigent Defense*, published by the

National Legal Aid and Defender Association. These and other articles of mine have been cited

in the Commentary to the Revised ABA Guidelines for the Appointment and Performance of

Defense Counsel in Death Penalty Cases (available at www.abanet.org/deathpenalty). At the

request of *Hofstra Law Review*, I wrote a commentary addressing particular sections of the

Revised ABA Guidelines (31 Hofstra Law Review 1157 (Summer 2003)). Much of my material

3

has been incorporated in *Losch's Texas Capital Defender Manual*, 8th edition, published by the Texas Criminal Defense Lawyers Association in 2006. My latest article, "Mitigation Investigation: A Duty That Demands Expert Help But Can't Be Delegated," appeared in the March 2007 issue of *The Champion*.

8.      I am the coauthor of chapters on psychiatric issues in death penalty cases in two recent books: "Dead Men Talking: Mental Illness and Capital Punishment," in Gerald Landsberg, D.S.W., and Amy Smiley, Ph.D., eds., *Forensic Mental Health: Working with Offenders with Mental Illness* (Kingston, New Jersey: Civic Research Institute, Inc., 2001) and "Punishment," in Richard Rosner, M.D., ed., *Principles and Practice of Forensic Psychiatry*, 2nd edition (London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press).

9.      My investigative experience has included assignments in foreign countries. In addition, I have experience teaching in the criminal justice systems of other countries. During the summer of 1995, I taught a course in homicide investigation to judges and prosecutors in Cambodia under the auspices of the Cambodian Court Training Project of the Washington-based International Human Rights Law Group. In the fall 2003, I trained public defenders in Nanchang, Jianxi Province, under the auspices of the Geneva-based International Bridges to Justice and the Legal Aid Center of Ministry of Justice of the People's Republic of China. At the invitation of the National Legal Aid and Defender Association, I have written a chapter on investigation for their forthcoming manual for design and implementation of international legal assistance programs for the indigent. I am familiar with the many difficulties associated with conducting investigations abroad, with or without the cooperation of the host country.

4

10. Over the years, I have been directly involved in hundreds of capital cases in California and New York, including dozens of trials and postconviction hearings. I have also been consulted on capital cases in numerous other jurisdictions around the country, and I have provided evidence on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in numerous jurisdictions, including Arizona, Arkansas, California, Mississippi, Missouri, New York, Oklahoma, Pennsylvania, Tennessee, Texas, and Wyoming. In 2004, I received the "Life in the Balance Achievement Award" from the National Legal Aid and Defender Association for my work in this field.

### *Standard of Care in Capital Cases*

11. Investigation of a capitally charged client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar I have participated in since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases.

12. As early as 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." (Gary Goodpaster, "The

5

Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 New York University Law Review 299, 323-324 (1983).)

13. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client had suffered from organic brain injury, psychiatric disorders, mental impairments, or trauma outside the realm of ordinary human experience.

14. In three recent cases, the U.S. Supreme Court has found trial counsel ineffective for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003) and *Rompilla v. Beard*, 545 U.S. 374 (2005). In *Wiggins*, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation. *Wiggins*, 539 U.S. at 537. In *Rompilla*, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting mental health experts. *Rompilla*, 545 U.S. at 377.

15. In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves. Thus, competent capital counsel retain a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted that mitigation specialists "have extensive training and experience in the defense of capital

6

cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." This report also noted that investigators and paralegals cannot substitute for mitigation specialists. (*Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation,* Federal Judicial Conference, May 1998, available at http://www.uscourts/gov/dpenalty/1COVER.htm.)

16.    The Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter, 2003 Revised ABA Guidelines, available at www.abanet.org/deathpenalty) state unequivocally that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after a case is designated for capital prosecution with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The previous Guidelines, adopted in 1989, similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." (1989 Guideline 11.4.1.) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation." (1989 Guideline 11.4.1.(7).) Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." The 1989 ABA Guidelines were recognized by the U.S. Supreme Court in *Wiggins* as

7

"well-defined norms." (*Wigggins*, 539 U.S. at 524.) "The new ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003).

17.    Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a thorough and reliable evaluation.

18.    The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection and analysis of this documentation is a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Great diligence is required to ensure compliance. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

19.    A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish

8

rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

20. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. (One nationally recognized authority in mitigation investigation, Lee Norton, has stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required. See Lee Norton, "Capital Cases: Mitigation Investigation," *The Champion* (May 1992), pp. 43-45.)

21. Mitigation investigation is particularly important when the client does not share the attorney's cultural background. In those cases, attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural differences. In my experience, the process of compiling an accurate social history is even more time-consuming and delicate when interviewing clients and family members from foreign cultures, due to inevitable cultural misunderstandings about the nature of the legal process and the purpose of the investigation. Every aspect of the investigation is more difficult abroad, from gathering records to gaining the

9

trust and cooperation of witnesses. I am familiar with the difficulties of conducting investigations in foreign countries from my own personal experience. I have personally traveled to Canada, Germany, Honduras, Nigeria, Puerto Rico, and the Virgin Islands on investigative assignments. I have supervised staff investigators and mitigation specialists in capital cases who have had to conduct investigations in Colombia, the Dominican Republic, Jamaica, Mexico, Peru, and Thailand. These assignments are consistently viewed as the most arduous even among the most seasoned and skilled practitioners.

22. The degree of cooperation of the foreign government can have tremendous impact on the success or failure of the investigation. The foreign government can assist in securing the cooperation of local institutions in locating and copying historical records, it can provide access to ethnoculturally competent experts who can facilitate counsel's understanding of the client's world and worldview, and it can promote trust between client and counsel by helping the client understand the legal framework in which counsel is operating.

23. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute, mitigation need not involve a mental disease or defect. Nevertheless, in many, many cases, defendants do suffer mental impairments that may not meet the legal definition of insanity or incompetency, but are nevertheless powerfully mitigating disabilities which are given great weight when juries are charged with assessing individualized culpability. *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004) ("impaired intellectual functioning is *inherently* mitigating") (emphasis added). For clients who are psychiatrically disordered or brain damaged,

10

mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions.

24. Over the years, I have been involved in hundreds of capital cases, including dozens of trials and postconviction hearings. Within my personal experience, I have been involved in two recent cases where juries returned life sentences after hearing evidence of extreme poverty in the rural Caribbean and brain damage resulting in impaired intellectual functioning. In one case, the defendant had been convicted of double murder (one murder involving witness elimination) and the nonlethal shooting of an eight-year-old child. The other defendant had been convicted of double murder of children ages two and fourteen and nonlethal shooting of three other family members. My personal experience of the effectiveness of mitigation evidence accords with the research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases. See, for example, Stephen P. Garvey, "Aggravation and Mitigation in Capital Cases: What Do Jurors Think?" 98 Columbia Law Review 1538 (1998) and "The Emotional Economy of Capital Sentencing," 75 New York University Law Review 26 (2000) (concluding that mitigation does matter, especially mental retardation and mental illness).

*Standard of Care in Capital Mental Health Evaluations*

25. Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. (See, for example, Scott Sundby, "The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony," 83 Va. L. Rev. 1109 (1997), finding that two

11

thirds of the witnesses jurors thought "backfired" were defense experts.) Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be learned through life-history investigation. In addition, the proper standard of care for a competent evaluation of mental disorders or impairments in a capital case requires an accurate medical and social history as its foundation.

### *Review of the German Sinisterra Case*

26.     At the request of postconviction counsel for Mr. Sinisterra, I have provided this declaration setting forth the standard of practice in mitigation investigation in death penalty cases, the general contours of the mitigation investigation that would have been appropriate in preparation for Mr. Sinisterra's trial in 2000, and the standard of care in mental health evaluations in death penalty cases. I was also asked to address the performance of Mr. Sinisterra's trial defense team measured against those standards.

27.     At the request of postconviction counsel for Mr. Sinisterra, I have reviewed various materials relating to the case, including *United States v. Ortiz et al.*, 315 F.3d 873; the transcripts of the sentencing phase of Mr. Sinisterra's trial, April 28 through May 2, 2000; DVD copies of the videotaped trial exhibits 63, 64, 65, 66, 67, 68, 69, 71, and 72; the verdict sheets dated May 3, 2000; the Statement of Frederick A. Duchardt, Jr., dated November 24, 2006; the Affidavit of Counsel Jennifer Herndon, dated December 2, 2004; the Report of Neuropsychological Evaluation by Antolin M. Llorente, Ph.D., dated February 6, 2006; and the Declaration of Daniel J. Grothaus, dated October 18, 2007.

28.     Based on the information provided by counsel and the materials I have reviewed, I

12

believe that the pretrial mitigation investigation was seriously compromised by the lack of a qualified and experienced bilingual mitigation specialist on the defense team. Most of the deficiencies I have identified can be traced to the structure of the team. As I noted above in paragraph 15, a mitigation specialist is a crucial member of a capital defense team whose job is "to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes." The ABA Guidelines define the *minimum* core team as follows: "The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist. (Guideline 4.1.A.1) In addition, "The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." (Guideline 4.1.A.2) Mr. Sinisterra's defense team at trial was structurally compromised: there was no mitigation specialist, and no one qualified to screen for mental disorders or impairments.

29.    Mr. Duchardt's statement (at paragraph 4) indicates that a private investigator, Daniel Grothaus, was assigned the "dual role" of investigating evidence relating to guilt and penalty. Mr. Duchardt "knew that Mr. Grothaus had not previously acted specifically in the capacity of a 'mitigation specialist,'" but believed that he could wear both hats. Mr. Duchardt further states (at paragraph 6) that "there was so much first phase case investigation work for Mr. Grothaus to do that I actually assigned him only a very few duties related to the penalty phase of the case, related to matters in the Houston, Texas area." No one else was ever retained to assist with mitigation investigation. Ms. Herndon's affidavit agrees. At paragraph 5, she praises Mr. Grothaus as "the best fact investigator one could ever find," but concedes that no one "could

13

adequately serve double duty as fact and mitigation investigator" because of the sheer amount of work in a capital case. Tellingly, she goes on to say, "Furthermore, Mr. Grothaus has no experience or training in the art of mitigation investigation, and is therefore not qualified to handle the complexities of preparing a mitigation case for a capital trial."

30. Mr. Grothaus confirms (at paragraph 3 of his declaration) that he spent "the vast majority" of his time investigating guilt-innocence issues. At paragraph 4, he states that he was asked to interview some friends and family members in the Houston area who knew Mr. Sinisterra, and some of his conversations were "relevant to Mr. Sinisterra's penalty phase." He states (at paragraph 7) that he was not asked to investigate Mr. Sinisterra's "biography or social history"; "or to "develop mitigation themes"; or to "prepare demonstrative evidence" for the penalty phase; or to "assist in drafting the mitigating factors" on the verdict sheet. The only interviews he conducted relevant to mitigation "focused exclusively on Mr. Sinisterra's relationship with his wife, children, and extended family in Houston."

31. Mr. Grothaus confirms (at paragraph 6 of his declaration) that he interviewed no relatives besides Mr. Sinisterra's wife and some of his in-laws; he gathered *no* life-history records whatsoever; and he interviewed no one with first-hand knowledge of Mr. Sinisterra's childhood, developmental years, life in Colombia, or immigration experiences. Mr. Grothaus did interview four witnesses who testified in the penalty phase of Mr. Sinisterra's trial: Mr. Sinisterra's wife, Michelle; her cousin, Christie Dean Barrs; her friend, Barbara Dillingham; and a local mortician, Vivian Dumas. His reports indicate that all four were interviewed at Michelle's house on a single date in March 1999. There was a follow-up interview – by telephone – with only one, Ms. Dumas. Mr. Grothaus's work product amounts concerning these

14

interviews amounts to a six-page report on Michelle Sinisterra; a four-page report on Vivian Dumas; two paragraphs about Barbara Dillingham; and one page on Christie Barrs. It is widely accepted that competent mitigation investigation requires multiple in-person one-on-one interviews to build trust and rapport in order to explore more sensitive areas of inquiry, as discussed at length above at paragraphs 19 and 20. In addition, Mr. Grothaus's reports reflect no attempt to explore Mr. Sinisterra's intellectual impairments and their effects on his everyday life, or his history of childhood neglect, maltreatment, and trauma.

32. Nothing in Mr. Grothaus's background or professional experience qualified him to conduct the mitigation investigation in this case. As he notes in paragraph 1 of his declaration, he does not speak Spanish. He has no specialized training or expertise in Latin American culture, mental disorders or impairments, or environmental toxins. He has "never claimed to be qualified by training or experience to screen for mental disorders or impairments." He has never conducted a capital defense investigation in a foreign country.

33. Based on the information provided by counsel and the materials I have reviewed, the only investigation conducted in Colombia was by Ms. Herndon, and the work product is reflected in the superficial and vague videotaped interviews that were presented at trial. Recording has a chilling effect on interview subjects unless there has been an opportunity to build trust and rapport in advance. It is apparent from the videos that most of Mr. Sinisterra's family had not even been informed that he was potentially facing the death penalty, and the few who were informed had learned the news from Ms. Herndon when she arrived just a couple of days before the videos were made. There had been little time for Ms. Herndon to build rapport prior to the videotaped interviews, and the information she elicited is typical of what is provided

15

in the initial contacts with family members when they first learn that a loved one faces capital charges, particularly a loved one who lives far away in another country. They are in a state of disbelief about his guilt; they offer conclusory attestations of good character and nonviolence; and they deny any knowledge of Mr. Sinisterra's involvement in the drug world.

34. The videos are of poor technical quality. Interior lighting is often inadequate, and the poor sound quality is exacerbated by ambient noise. (Ms. Herndon points out in paragraph 10 of her affidavit that the trial court recognized the poor quality of the videos and that there was simply no quiet place to conduct interviews. Mr. Duchardt concurs in paragraph 13 of his statement.) More importantly, the interviews themselves simply do not paint vivid pictures of Mr. Sinisterra. The jurors learned very basic facts: he worked in a car wash and a wood shop, but we have no description of what a car wash looks like in Buenaventura, Colombia, or whether the work was hard. The jurors learned vaguely that they made beds and other pieces of furniture, but we know nothing of the skill required or the quality of the finished products. The jurors were told Mr. Sinisterra had "good relationships," "treated people well," and showed "kindness and respect," but there is not a single example of what led the witnesses to these conclusions.

35. But the larger problem is the very limited range of areas explored. There is no discussion of multigenerational family histories of alcoholism, mental disorders and impairments. Mr. Sinisterra's exposure to domestic violence and childhood maltreatment are never mentioned. The jurors learned that two of his brothers died – apparently violently, but there are no details about these traumatic events and their potential impact on Mr. Sinisterra. (When the deaths are mentioned, for example in Exhibits 67 and 72, there are no follow-up questions.) The jurors learned nothing of Mr. Sinisterra's developmental years at all. In Exhibit

16

66, an older brother is simply asked closed-ended questions about whether it was "normal" to leave school after first grade or to go to work at age seven. I am informed that Ms. Herndon has confirmed that she simply did not know the significant information elicited by postconviction counsel's bilingual mental health expert, Dr. Llorente, including evidence of extreme domestic violence (father "going after his mother with a machete") and sexual assault in childhood. Mitigation interviews are invasive of sensitive and shameful subjects, and these topics require a skilled ethnoculturally competent interviewer – a bilingual mitigation specialist, not a lawyer working through an interpreter and conducting the interviews on camera. Mr. Sinisterra's penalty phase reflected the deficits of the trial team's approach to the mitigation case, particularly its failure to overcome the cultural barriers to mitigation investigation or to probe the critical areas of trauma, brain damage, and intellectual impairment.

36. Mr. Duchardt notes (at paragraph 13 of his statement) that he and Ms. Herndon had planned to call family members from Colombia as penalty phase witnesses and assisted them in making timely applications for visas. They learned "at the last minute" that the visas would not be granted and then chose to use the videotapes in lieu of live testimony. He adds (at paragraph 15), "I have no doubt that, had Ms. Herndon or I requested the services of a forensic social worker, I could have obtained Court approval for the expenditure of funds for such an expert. In retrospect, I believe we should have employed such a forensic social worker because, had we such a person on our defense team, that person could have stepped into the void left when the witness visas were disallowed, and could have presented the Colombia witness information in that fashion."

37. Unfortunately, there is no evidence that trial counsel would have explored

17

additional areas of mitigation if the Colombian family members had obtained visas and been available for live testimony. Because of the defense structural deficits – lacking a mitigation specialist or anyone with expertise in mental disorders or impairments – the presentation of live witnesses would have been preferable to the videotapes, but would still have explored only a fraction of the mitigation potentially available. But the mitigation preparation was fatally flawed by the failure to send anyone – a forensic social worker or anyone else – to Colombia who could testify about the most basic socioeconomic data. Missouri's Rules of Professional Conduct follow the ABA Model Rules of Professional Conduct in prohibiting lawyers from combining the roles of advocate and witness (Rule 4-3.7: Lawyer as Witness). The Comment notes (at [2], "The tribunal has proper objection when the trier of fact may be confused or misled by a lawyer serving as both advocate and witness. The opposing party has proper objection where the combination of roles may prejudice that party's rights in the litigation. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof." Indeed, this very problem required redacting some of the videotapes in Mr. Sinisterra's case, as Ms. Herndon noted in her declaration of December 2, 2004, at paragraph 10: "Many of the tapes were edited because the government objected to my narrative on the tape. . . . As Mr. Sinisterra' attorney, I was not available to testify."

38. In paragraph 10 of her December 2, 2004 declaration, Ms. Herndon noted the "poverty and hopelessness in Mr. Sinisterra's hometown" and commented that testimony might have at least conveyed to the jury "the demographics of Buenaventura, the lack of employment

18

opportunities, and the difficulties of daily life Mr. Sinisterra's family endures." Testimony from a forensic social worker could also have provided insight into the neglect and maltreatment Mr. Sinisterra endured in this developmental years. As noted in Dr. Llorente's report, at page 3, when he spoke to Mr. Sinisterra's mother by telephone, she "failed to recognize that [Mr. Sinisterra] was asked to do work that may have been too harsh for such a young child," but a mental health professional would readily have recognized the significance of this child-labor abuse, as well as the exposure to extreme domestic violence.

39. If the investigation in Colombia had been conducted by an experienced bilingual mitigation specialist, not only would it have explored more domains of mitigation, but it would have expanded beyond the few family members and neighbors to credible members of the community who might have been more successful in obtaining visas. In one recent case in which I was directly involved, multiple Honduran family members were denied visas, but a school principal obtained one and became an outstanding mitigation witness in describing the hardships of everyday life in the client's native community.

40. A thorough mitigation investigation would have yielded a fully developed social history, which, in turn, would also have provided a basis for a reliable and accurate assessment of Mr. Sinisterra's intellectual functioning and the potential causes and effects of his brain damage as disclosed by neuropsychological testing. A pretrial expert, Dr. Warren Wheelock, had found evidence of significantly subaverage intellectual functioning, but there was no investigation of the potential biomedical, social, behavioral, and educational factors that are typically considered in the multifactorial construct of etiology in such conditions. Dr. Wheelock's low IQ findings put trial counsel on notice that this inherently mitigating intellectual impairment should be fully

19

explored, both in terms of etiology and in terms of practical impact in Mr. Sinisterra's developmental years. If the defense team at trial had included a mitigation specialist qualified to screen for mental disorders and impairments, they would have appreciated the need for neuropsychological assessment (for potential brain damage) and detailed investigation of adaptive deficits in conceptual, social, and practical domains of functioning. Mr. Sinisterra's stunning adult deficits in academic functioning (with the reading and math skills of a first grader) reflect serious impairment, but the videotapes left jurors with the vague impression that it was just "normal" for poor Colombians to leave school in the first grade to help their families.

41. Mr. Duchardt states (at paragraph 19 of his statement) that a Spanish-speaking psychiatrist found "no mental problems" after examining Mr. Sinisterra pretrial, and he questioned whether he would have used the testimony of an expert like Dr. Llorente at trial because it would have exposed Mr. Sinisterra to evaluation by a government expert. Neither point excuses trial counsel's failure to conduct a thorough mitigation investigation, and that failure once again traces to the absence of a mitigation specialist and the lack of anyone on the defense team qualified to screen for mental disorders or impairments. Dr. Wheelock's findings of intellectual impairment should have triggered a full neuropsychological evaluation, which would have disclosed the static encephalopathy found by Dr. Llorente. (A psychiatrist's clinical interview or mental status examination is no substitute for the rigors of a neuropsychological assessment.) The strategic decision of how best to explain to a jury the causes and consequences of brain damage and intellectual impairment could only have been made after a thorough life-history investigation. Did the brain damage result from in utero exposure to alcohol, or head injuries in childhood, or exposure to neurotoxins in Mr. Sinisterra's developmental years? How

20

did his impairments affect his day-to-day functioning as a child and as an adult in multiple domains – communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety? As I discussed above in paragraph 25, it is unwise to rely on expert testimony without full corroboration from lay and historical witnesses, who could only be identified through thorough investigation.

42. The mitigation presented at Mr. Sinisterra's trial focused on his loving relationships with his wife, children, mother, and mother-in-law; his hard-working efforts to support his loved ones; and the homicide victim's own involvement in the brutal world of drug trafficking. A thorough and complete life-history investigation would have explored numerous areas identified by postconviction counsel and their expert, Dr. Llorente, including inherently mitigating intellectual deficits, brain damage which may be secondary to childhood head injuries with loss of consciousness, and a history of trauma that included extreme domestic violence (father "going after his mother with a machete") and sexual assault in childhood. A thorough and complete mitigation investigation would also have included a multigenerational history exploring alcohol and substance abuse, as well as depression and psychiatric disorders. The mitigation investigation should also have explored the poverty of Mr. Sinisterra's living environment in early childhood, including malnutrition, access to medical care, exposure to environmental toxins, and basic sanitation in the home. It was important both to understand the culture of Mr. Sinisterra's background in Colombia and the impact of the immigration experience itself. The jury heard none of this at trial.

43. Based on all the material I have reviewed, it is my opinion that trial counsel failed

21

to discover all reasonably available mitigation. The team had no one functioning as a mitigation specialist. The team had no one with expertise in mental disorders and impairments. The investigator focused almost exclusively on guilt-innocence issues. The mitigation themes were selected in advance of any investigation. To the extent that the investigator or Ms. Herndon investigated mitigation, they seemed to have employed a template of questions designed to confirm the preselected themes. They abandoned their investigation after acquiring only rudimentary knowledge from a narrow set of sources, without exploring Mr. Sinisterra's medical history, educational history, employment and training history, family and social history, and religious and cultural influences. The scope of their investigation was unreasonable in light of what they had learned from Dr. Wheelock about Mr. Sinisterra's intellectual impairments. It was impossible to make informed choices about possible mitigation without pursuing these leads and conducting the thorough life-history investigation. What the jurors learned about Mr. Sinisterra was a fragment of the available mitigating evidence. Ultimately, they were deprived of the full quantum of evidence they needed to make a reasoned moral decision about whether Mr. Sinisterra should live or die.

I declare under penalty of perjury under the laws of the States of Missouri and California, and the United States of America, that the foregoing is true and correct.

_Russell Stetler_

Dated: _October 30, 2007_

22