IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

GERMAN C. SINISTERRA,          )
                                 )
               Movant,       )
                                 )
   vs.                       )  Case No.
                                 )  04-CV-08003-GAF
UNITED STATES OF AMERICA,     )
                                 )
              Respondent.   )

TRANSCRIPT OF PROCEEDINGS
VOLUME I
PAGES 1-185

On January 22, 2013, through January 25, 2013, the above-entitled cause came on before the Honorable Gary A. Fenner, United States District Judge, sitting in Kansas City.

APPEARANCES

For the Movant:               Mr. Timothy M. Gabrielsen
                            Federal Public Defender's Office
                            District of Arizona
                            407 West Congress, Suite 501
                            Tucson, Arizona 85701

                            Mr. John Jenab
                            Jenab & McCauley LLP
                            110 South Cherry, Suite 103
                            Olathe, Kansas 66061

For the Respondent:          Mr. Jeffrey E. Valenti
                            Ms. Lajuana M. Counts
                            United States Attorney's Office
                            400 East Ninth Street, 5th Floor
                            Kansas City, Missouri 64106

Katherine A. Calvert, RMR
United States District Court Reporter
Charles Evans Whittaker Courthouse
400 East Ninth Street
Kansas City, Missouri 64106
(816) 512-5741

I N D E X                                                    Page

JANUARY 22, 2013

VOLUME I

MOVANT'S EVIDENCE

JENNIFER HERNDON
      Direct examination by Mr. Jenab . . . . . . . . . . .  17
      Cross-examination by Mr. Valenti. . . . . . . . . . .  34
      Redirect examination by Mr. Jenab . . . . . . . . . .  69
      Recross-examination by Mr. Valenti. . . . . . . . . .  73

FRED DUCHARDT
      Direct examination by Mr. Jenab . . . . . . . . . . .  76
      Cross-examination by Mr. Valenti. . . . . . . . . . . 100
      Redirect examination by Mr. Jenab . . . . . . . . . . 133
      Recross-examination by Mr. Valenti. . . . . . . . . . 137

DAN GROTHAUS
      Direct examination by Mr. Gabrielsen. . . . . . . . . 139
      Cross-examination by Mr. Valenti. . . . . . . . . . . 154
      Redirect examination by Mr. Gabrielsen. . . . . . . . 163

JUANITA CHAVEZ
      Direct examination by Mr. Gabrielsen. . . . . . . . . 166
      Cross-examination by Mr. Valenti. . . . . . . . . . . 180
      Redirect examination by Mr. Gabrielsen. . . . . . . . 182

ENRIQUE DOS SANTOS (by videotaped deposition). . . . . . . 183

Case 4:04-cv-08003-GAF   Document 119   Filed 02/19/13   Page 2 of 185

I N D E X                                               Page
(continued)

JANUARY 23, 2013

VOLUME II

RUSSELL STETLER
     Direct examination by Mr. Gabrielsen. . . . . . . . . 197
     Cross-examination by Mr. Valenti. . . . . . . . . . . 235
     Redirect examination by Mr. Gabrielsen. . . . . . . . 243

HECTOR GUEVARA
     Direct examination by Mr. Gabrielsen. . . . . . . . . 246
     Cross-examination by Mr. Valenti. . . . . . . . . . . 281
     Redirect examination by Mr. Gabrielsen. . . . . . . . 288

Case 4:04-cv-08003-GAF    Document 119    Filed 02/19/13    Page 3 of 185

I N D E X                                              Page
(continued)

JANUARY 24, 2013

VOLUME III

ANTOLIN LLORENTE
    Direct examination by Mr. Gabrielsen. . . . . . . . . 302
    Cross-examination by Mr. Valenti. . . . . . . . . . . 358
    Redirect examination by Mr. Gabrielsen. . . . . . . . 388

4

I N D E X                                              Page
(continued)

JANUARY 25, 2013

VOLUME IV

PABLO STEWART
     Direct examination by Mr. Gabrielsen. . . . . . . . . 406
     Cross-examination by Mr. Valenti. . . . . . . . . . . 453
     Redirect examination by Mr. Gabrielsen. . . . . . . . 472

RESPONDENT'S EVIDENCE

MICHAEL OYLER
     Direct examination by Mr. Valenti . . . . . . . . . . 478
     Cross-examination by Mr. Jenab. . . . . . . . . . . . 485

Reporter's certificate . . . . . . . . . . . . . . . . . 503

Case 4:04-cv-08003-GAF    Document 119    Filed 02/19/13    Page 5 of 185

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | First amended 2255 petition 3/1/09 | 15 | 15 |
| 2 | 3/1/09 affidavit of Jennifer Herndon | 15 | 15 |
| 3 | 11/26/06 statement of Frederick Duchardt | 15 | 15 |
| 4 | 10/31/07 affidavit of Jennifer Herndon | 15 | 15 |
| 5 | 10/31/07 declaration of Dan Grothaus | 15 | 15 |
| 6 | 12/2/98 order appointing Fred Duchardt | 15 | 15 |
| 7 | 12/13/98 order appointing Jennifer Herndon | 15 | 15 |
| 8 | 4/11/00 trial transcript | 15 | 15 |
| 9 | 3/23/01 trial transcript | 15 | 15 |
| 10 | 3/23/01 trial transcript | 15 | 15 |
| 11 | 3/23/01 trial transcript | 15 | 15 |
| 12 | 7/1/99 letter from Hector Guevara to Frederick Duchardt | 15 | 15 |
| 13 | 4/10/00 letter from Frederick Duchardt to Enrique Dos Santos | 15 | 15 |
| 14 | 12/22/98 request for funds to hire investigator/ mitigation specialist | 15 | 15 |
| 15 | 2/11/99 order | 15 | 15 |

Case 4:04-cv-08003-GAF   Document 119   Filed 02/19/13   Page 6 of 185

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 16 | 3/4/99 request for funds to hire interpreter | 15 | 15 |
| 17 | 8/13/99 second request for funds to hire interpreter | 15 | 15 |
| 18 | Juanita Chavez' billing records | 15 | 15 |
| 19 | Juanita Chavez' notes | 15 | 15 |
| 20 | 3/13/00 letter from Judge Hays to Jennifer Brewer | 15 | 15 |
| 21 | Death penalty special verdict – Count II | 15 | 15 |
| 22 | Death penalty special verdict – Count III | 15 | 15 |
| 23 | Federal Death Penalty Act mitigating factors | 15 | 15 |
| 24 | Dan Grothaus' notes | 15 | 15 |
| 25 | 5/10/00 letter and invoice from Dr. Dos Santos to Fred Duchardt | 15 | 15 |
| 26(a) | Dr. Llorente's curriculum vitae | 15 | 15 |
| 26(b) | Dr. Llorente's case list | 15 | 15 |
| 27 | 3/1/06 Dr. Llorente report | 15 | 15 |
| 28 | 3/7/11 Dr. Llorente report | 15 | 15 |
| 29(a) | Hector Guevara's 7/17/06 curriculum vitae | 15 | 15 |

7

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 29(b) | Hector Guevara's 2012 curriculum vitae | 15 | 15 |
| 30 | Russell Stetler's curriculum vitae | 15 | 15 |
| 31 | Russell Stetler's declaration | 15 | 15 |
| 32(a) | Rosalia Valencia Candelo video Part 1 | 15 | 15 |
| 32(b) | Rosalia Valencia Candelo transcript Part 1 | 15 | 15 |
| 33(a) | Rosalia Valencia Candelo video Part 2 | 15 | 15 |
| 33(b) | Rosalia Valencia Candelo transcript Part 2 | 15 | 15 |
| 34(a) | Rosalia Valencia Candelo video | 15 | 15 |
| 34(b) | Rosalia Valencia Candelo transcript | 15 | 15 |
| 35 | 2/1/10 Hector Guevara's notes of Beatriz Candelo telephone conversation | 15 | 15 |
| 36 | 7/27/10 Hector Guevara's notes of Beatriz Candelo telephone conversation | 15 | 15 |
| 37(a) | Beatriz Candelo video | 15 | 15 |
| 37(b) | Beatriz Candelo transcript | 15 | 15 |
| 38(a) | Gustavo Viveros video | 15 | 15 |
| 38(b) | Gustavo Viveros transcript | 15 | 15 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 39 | 3/3/11 Gustavo Viveros declaration | 15 | 15 |
| 40(a) | Gustavo Viveros video | 15 | 15 |
| 40(b) | Gustavo Viveros transcript | 15 | 15 |
| 41 | Gustavo Viveros declaration translation | 15 | 15 |
| 42(a) | Segundo Sinisterra video | 15 | 15 |
| 42(b) | Segundo Sinisterra transcript | 15 | 15 |
| 43(a) | Segundo Sinisterra video | 15 | 15 |
| 43(b) | Segundo Sinisterra transcript | 15 | 15 |
| 44 | 3/3/11 Segundo Sinisterra declaration | 15 | 15 |
| 45 | 12/11/12 Segundo Sinisterra declaration translation | 15 | 15 |
| 46 | Pablo Stewart's curriculum vitae | 15 | 15 |
| 47 | Pablo Stewart's report | 15 | 15 |
| 48 | 1989 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases | 15 | 15 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 49 | 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases | 15 | 15 |
| 50 | 1998 Spencer Report | 15 | 15 |
| 51 | 2010 Spencer Report | 15 | 15 |
| 52 | Hector Guevara's billing records | 15 | 15 |
| 53 | German Sinisterra social history | 15 | 15 |
| 54 | Beatriz Candelo transcript | 15 | 15 |
| 55(a) | 12/27/09 Rosalia Valencia Candelo video excerpts | 15 | 15 |
| 55(b) | 12/27/09 Rosalia Valencia Candelo transcript excerpts | 15 | 15 |
| 56(a) | 7/3/10 Rosalia Valencia Candelo video excerpts | 15 | 15 |
| 56(b) | 7/3/10 Rosalia Valencia Candelo transcript excerpts | 15 | 15 |
| 57(a) | 3/8/11 Beatriz Candelo video excerpts | 15 | 15 |
| 57(b) | 3/8/11 Beatriz Candelo transcript excerpts | 15 | 15 |
| 58(a) | 3/4/11 Gustavo Viveros video excerpts | 15 | 15 |
| 58(b) | 3/4/11 Gustavo Viveros transcript excerpts | 15 | 15 |

Case 4:04-cv-08003-GAF   Document 119   Filed 02/19/13   Page 10 of 185

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59(a) | 3/3/11 Segundo Sinisterra video excerpts | 15 | 15 |
| 59(b) | 3/3/11 Segundo Sinisterra transcript excerpts | 15 | 15 |
| 60(a) | 12/5/12 Enrique Dos Santos deposition video | 15 | 15 |
| 60(b) | 12/5/12 Enrique Dos Santos deposition transcript | 15 | 15 |

FOR THE GOVERNMENT:

| | | | |
|---|---|---|---|
| 1 | FBI 302 form with documents | 480 | 480 |
| 2 | Overland Park Police Department continuation report with documents | 481 | 481 |

11

JANUARY 22, 2013

MORNING SESSION

THE COURT: Thank you. You can all be seated. Good morning.

Is everybody ready to proceed this morning?

MR. VALENTI: Yes, sir.

THE COURT: Mr. Jenab, will you be starting on your evidence on behalf of your motion?

MR. JENAB: Judge, would you prefer we approach the podium to address Your Honor?

THE COURT: No. You're fine where you are.

We need to swear the interpreters first.

MR. JENAB: First thing?

THE COURT: Yes.

(The interpreters were sworn by the courtroom deputy.)

THE COURT: Mr. Gabrielsen.

MR. GABRIELSEN: Good morning, Your Honor. It's nice to meet Your Honor.

I've got two sort of housekeeping things. In lieu of an opening statement, we would simply like to submit to Your Honor, either orally or I typed the movant's order of proof in the proceedings this week.

THE COURT: Thank you.

MR. GABRIELSEN: I would like to give it to Tracy or

12

Your Honor.

THE COURT: Bring it up and give it to me would be fine.

MR. GABRIELSEN: The parties have entered a series of stipulations. I've typed those up as well. I don't know if the Court would -- maybe I should just give a brief overview of what the stipulations are and I'll submit that to Your Honor as well.

THE COURT: That sounds like a good plan.

MR. GABRIELSEN: We have a video that we'll present tomorrow that was shot in Columbia, a Spanish-speaking investigator interviewed Spanish-speaking witnesses. So we had a Spanish language tape. We have a certified federal court interpreter in Phoenix by the name of Isabel Fierros. She was certified by the AO in 1991. We gave her those videos. She converted the videos to Spanish question and answer and then across the page she converted that to English question and answer, and we'll be admitting a bunch of those videos and the transcripts later in the proceeding. The government has stipulated pursuant to my representations that she's certified to interpret that report.

THE COURT: All right. Thank you.

MR. GABRIELSEN: Second stipulation, if produced at this hearing, my paralegal in Tucson at the Federal Public Defender's Office by the name of Kim Diulus is also a records

13

custodian, if called as a witnesses, she would testify the following court documents were derived from the trial files of Fred Duchardt. Fred may acknowledge that today too. Some of them he may not remember because of the age of the case, and so forth. But there is a letter from our Columbian investigator, Hector Guevara, of July 1st of 1990 to Fred Duchardt. I won't get into the content of any them. I will just set forth what the documents are and they'll be explained later. Fred's later of April 10th, 2000, to Dr. Enrique Dos Santos, a psychiatrist in Columbia, Missouri. The third document would be Dr. Dos Santos' May 10, 2000, letter to Fred Duchardt and the billing requirements. Then finally the English language notes of trial team interpreter, Juanita Chavez. Those were found in Fred's file. She'll be a witness later this morning and this afternoon. So that's what my paralegal would testify to, and Mr. Valenti has stipulated that that's what she would testify to if she were called.

Finally, Dr. Dos Santos suffered a stroke last spring and he had some recurring problems as a result of that. The parties deposed him in December pursuant to the Court's order. The parties have stipulated to the admissibility of the video that was shot of the deposition. I also have a letter from his doctor that was sent to my office last week. So I got a phone call from Dr. Dos Santos apologizing to the Court and to the parties for not being here. He's not ambulatory right

14

now.  He has a cardiac problem related to the stroke and he also fell and broke his foot.  So he won't be here.  The parties stipulate to the video and transcript, to the video coming in.

Finally, the last stipulation, the fourth stipulation is the parties stipulate to the preadmission of the exhibits, the original exhibits, in support of the hearing this week.  We've got -- and I have a box that has all the original exhibits in it.  They're marked.  I would be happy to leave them at the end of the day or at the end of the hearing.  I'll be happy to take them out at night and leave them at the end of the hearing so they can be entered into the record of this proceeding.

THE COURT:  All right.  I have copies of all of those exhibits.

MR. GABRIELSEN:  Your Honor, you have copies of everything, except we made one mistake in our office in preparing that.  You have a very thick exhibit binder.  It's got 60 exhibits in it.  I would like to approach and hand the Court one exhibit that will replace an exhibit that was inadvertently stuck in one of the exhibit numbers.

With that said, that's all the stipulations that we have.  And I'll approach?

THE COURT:  Certainly.  And while you're doing that, Mr. Valenti, has Mr. Gabrielsen correctly stated your position

15

regarding the stipulations?

MR. GABRIELSEN: He has, Your Honor. We've been able to work fairly adequately in preparation for this trial in hopes to speed things along. The exhibits that have been provided to counsel and myself we have reviewed them and we don't have any real issue with them and they can be used for purposes of this hearing without the need to lay the foundation to get them in given the reduced evidentiary standard of this hearing.

Also, just so the Court is aware, Mr. Jenab and I have spoken. Given the unique posture of this case, Ms. Herndon and Mr. Duchardt, though offered as witnesses at times, may be somewhat adversarial to their position or mine. I've indicated I don't have a particular issue with them leading at times as is necessary to produce the evidence. We've gone through depositions. We're all three familiar with what that information would be and rather than beat around the bush, I'd kind of like to get to the point.

THE COURT: My guess is they're going to say what they want to say regardless.

MR. VALENTI: We've talked about that issue. Rather than object to the leading nature of the questions, I think, quite frankly, it would be more useful to lead at times.

THE COURT: All right. Thank you.

MR. GABRIELSEN: I'll approach, Your Honor.

16

THE COURT:  Thank you.

MR. GABRIELSEN:  This would be the Exhibit 44 that should be in that.

THE COURT:  Thank you.

MR. GABRIELSEN:  And these are the documents that I just referenced.  Thank you.

THE COURT:  Thank you.

Are you ready proceed, Mr. Jenab?

MR. JENAB:  If you wouldn't mind, I'll step out and get Ms. Herndon.

THE COURT:  Very well.

JENNIFER HERNDON, being sworn by the courtroom deputy, testified:

THE COURT:  Mr. Jenab.

MR. JENAB:  Thank you, Judge.

DIRECT EXAMINATION BY MR. JENAB:

Q     Will you state your name, please.

A     Jennifer Herndon.

Q     Ms. Herndon, what is your occupation?

A     I'm an attorney.

Q     How long have you been practicing law?

A     Twenty-two years.

Q     I'd like to take your recollection back, if I could, to 1998 and ask if you were one of the attorneys appointed to represent German Sinisterra?

17

A    I was.

Q    Was that case here in the Western District of Missouri?

A    Yes.

Q    I'm going to represent to you that the record reflects the appointment date of you as cocounsel in the case on December 16th of 1998. Would you have any reason to disagree with that date?

A    No. That sounds correct.

Q    I'm also going to give you another date simply to put the chronology of the case within a reference and that date is April 11th of 2000.

A    Okay.

Q    That was the day that jury selection started in Mr. Sinisterra's capital trial. Would you have any reason to disagree with that date?

A    No. That sounds correct.

Q    How did you come to be involved in Mr. Sinisterra's case?

A    I was contacted by Fred Duchardt who is another attorney who I had worked with previously at the public defender's office, and he told me that there were, I believe -- well, at the time there were several defendants charged in what would be a capital case for some of them, and he indicated there were three defendants who were potentially facing capital charges and wanted to know if I was interested in representing

18

one of them, and I indicated that I was. He asked me then if it would be my preference to be a lead counsel or if I would like to cocounsel with someone else. And I told him -- at the time I think I only handled one or two -- I think it was two federal capital cases. So I told him because I wasn't as familiar with the federal system, it would be my preference to cocounsel with someone.

Q     Did you have more extensive prior experience in state capital cases?

A     Right. I had a lot of experience in state court but just not a lot in federal court.

Q     So when you were appointed on this case, who was your cocounsel?

A     Fred Duchardt ended up being lead counsel and I was his cocounsel.

Q     Early in the representation, did you and Mr. Duchardt divide areas of responsibility between the two of you for the case?

A     Yes.

Q     How did that work?

A     Basically he was handling the guilt phase of the trial and I was responsible for more of the mitigation areas of the trial, although it wasn't like you go do all the mitigation and I'll do all the guilt. I was clearly focused on mitigation.

Q     And was that from the very beginning of the

19

representation that your primary focus was on mitigation?

A    That's my recollection.  And maybe I'm recalling that because that's always what I do.  So I can't be a hundred percent certain about that, but I don't remember doing any work really other than mitigation.

Q    Where, if you know, was Mr. Sinisterra born?

A    In the country of Columbia, Buenaventura.

Q    Do you know how long Mr. Sinisterra lived in that country?

A    My memory is for about 20 years.

Q    He spent -- would it be fair to say he spent his entire childhood there?

A    Oh, definitely, yes.

Q    In a capital case does the mitigation investigation typically involve investigation of the client's childhood years?

A    Always, yes.

Q    So would it be fair to say that in this case an investigation of Mr. Sinisterra and his childhood years would involve investigation in the country of Columbia?

A    Yes.

Q    Who as between you and Mr. Duchardt had responsibility for any Columbian mitigation investigation?

A    I did.

Q    And would that have been main responsibility or would

that have been sole responsibility or what?

A    Sole responsibility.

MR. JENAB:  Now, if we could -- if we could pull up Exhibit 14, please.

Q    (By Mr. Jenab)  You see that motion?

A    Yes.

Q    The Exhibit 14 deals with the appointment of an investigator to assist in the case, correct?

A    Correct.

Q    And the investigator in this case was Mr. Dan Grothaus?

A    That's correct.

Q    You see that the motion there was filed December 22nd, 1998?

A    I see that, yes.

Q    Mr. Grothaus was added to the case on that date or close to it, correct?

A    That's correct.

Q    Did you utilize his services in your work on the case?

A    Not in terms of doing mitigation investigation, no.  He and I did travel to North Carolina to try to interview a guilt phase witness, and I think we may have traveled maybe even initially to Texas to try to interview that same witness.

Q    Did Mr. Grothaus speak Spanish?

A    No.

Q    Did he have any role with respect to mitigation

21

Q investigation in the country of Columbia?

A No.

Q A little bit later do you recall that an interpreter was appointed to assist the defense team?

MR. JENAB: Let's pull up, if we could, Exhibit 16.

A Yes, I remember one being appointed.

Q (By Mr. Jenab) Okay. And that was Juanita Chavez?

A Correct.

Q Did you utilize her services in your work?

A I did not.

Q Now, had you ever performed a mitigation investigation in a foreign country?

A No.

Q And Columbia is a Spanish-speaking country, correct?

A Correct.

Q Are you fluent in Spanish?

A No. I can get by once in a while but I'm way far from fluent.

Q At some point did you consider the possibility that retaining an investigator might assist -- a Spanish-speaking investigator and maybe even a Columbian national might assist any mitigation investigation in the country of Columbia?

A Yes. I mean, when I was first appointed on the case and learned that he was Spanish speaking and that he was a Columbian national, that was one of my first thoughts that we

22

needed somebody who, one, spoke Spanish and, two, would be familiar with the culture of Columbia.

Q    During the course of your representation of Mr. Sinisterra, was such an investigator ever added to the defense team?

A    No.

MR. JENAB:  If I could pull up Exhibit 12, please.

Q    (By Mr. Jenab)  Now, Ms. Herndon, this exhibit is a letter.  It's not addressed to you.  It is addressed to Mr. Duchardt.  And as you can see at the top, it is from Mr. Hector Guevara.  Prior to your deposition in this case, were you familiar at all with Mr. Hector Guevara's name?

A    No.

Q    Did you ever, to your knowledge, see this letter that was addressed to Mr. Duchardt?

A    Oh, I never saw it.  There is no doubt in my mind that I never saw it until my deposition.

Q    And you see the date on the letter as July 1st of 1999?

A    Correct.

Q    Now, since the day of your deposition or during your deposition, did you review that letter as well as the attachments to it consisting of Mr. Guevara's background and curriculum vitae?

A    Yes, I did.

Q    After reviewing the letter and Mr. Guevara's

23

qualifications, is he the kind of person that you would have wanted to speak to about the possibility of assisting the defense team with a mitigation investigation in Columbia?

A     Yes.  I don't know then but based on what I saw in this exhibit, he would have been perfect.

Q     You're aware from reading the letter that he is a Columbian national?

A     That's correct.

Q     Now, you never hired an investigator to assist with the Columbian investigation; is that right?

A     That's correct.

Q     So when you went to Columbia, who did the work on behalf of Mr. Sinisterra?

A     Well, I did the work.  I had with me -- I had hired someone, an interpreter, who was residing there in Columbia to do the interpretation for me, but I was the one who did the work.

Q     Now, I think you mentioned before that when you were going there, your focus was on Mr. Sinisterra's early years?

A     Correct.

Q     In general terms, when you're conducting a mitigation investigation regarding the client's childhood years, what sorts of information are you looking for?

A     Really any and everything.  I mean, you're looking at his family history, who does he have there, anything from

24

siblings way on out to any relation he may have there, any kind of friends that he had, neighbors, anybody who might know anything about the family, any employment he had, his school history, medical history, any kind of records that you might be able to find on any of that that would be related to school or medical records, any evidence of -- any evidence that might be mitigating, such as physical abuse, sexual abuse.

A lot of times in poorer places, especially, I would say, in poorer foreign countries, there are what I want to say environmental things that can provide mitigating circumstances, such as, you know, did he work in a field where he was exposed to pesticides all day every day?  I mean, really there's no limit to what you're looking for.  Anything that may indicate that he could have suffered brain damage, any evidence of mental retardation or cognitive impairment at all, things along those lines.

Q    When you are conducting an investigation like that, what, if anything, is the importance of obtaining as much information as you can directly from the client?

A    Well, that's the obvious starting point because it gives you a good idea of what questions to ask from there and where to go from there, especially when you are going into a foreign country and you don't really know the lay of the land as much.

Q    Some of the things that you mentioned, such as

25

childhood sexual abuse or childhood physical abuse, instances of extreme trauma for a child may be matters that are difficult to discuss; is that correct?

A       Without exception it's difficult to discuss, right.

Q       If you want to get that kind of information from a client, what procedure do you utilize?

A       Well, you have to begin with developing a relationship of trust with the client and having, you know, a lot of repeated meetings where you just get to know him, let him get to know you and doing things he asks you to do, showing that you can keep your word, showing that you are trustworthy, and mainly it just really comes down to kind of common sense in developing a relationship so that someone will reveal things to you that they wouldn't reveal to just anyone.

Q       And as part of that process, in order to get the right information, you have to ask the right questions, don't you?

A       Obviously.  I mean, I never had anybody volunteer to me, by the way, I was sexually abused.  By the way I suffered some trauma.  I never had that volunteered.

Q       In Mr. Sinisterra's case, what, if any, efforts did you make to learn whether Mr. Sinisterra had been the subject of childhood sexual abuse?

A       I don't recall making any efforts to learn that.  I can tell you that common practice would be to ask him, so I probably asked him.  But there was no -- that's all I can say.

26

I know that it wasn't something that I ever went into detail with him, pushed him on. I never had any reason to suspect it happened. So I probably said sort of, you know, this kind of initial few meetings kind of a checklist as you develop the relationship, well, today I'm going to ask him about school, then next time I'm going to ask him about medical history. So I'm thinking I probably said, Did you have any history of sexual abuse and he said no, and that was that.

Q    And assuming that you may have asked that question in an initial meeting as a sort of checklist item, was it something that you ever followed up on with a detailed or probing or focused interview?

A    No. That was -- sexual abuse never entered my mind in this case.

Q    You never saw it as a priority to try to investigate the possibility that he may have suffered sex abuse?

A    Not at all.

Q    Okay. I would ask you the same question with regard to whether Mr. Sinisterra ever suffered serious physical abuse, such as violent beatings as a child?

A    And, again, I didn't have any indication -- it's something I didn't investigate. Nobody ever told me that he was abused physically as a child and I never probed anyone on it.

Q    I want to ask you a little bit about that statement

27

about nobody ever telling you that he had been physically abused; and, as you indicated, you didn't have a forensic social worker doing a mitigation investigation on this case?

A       That's correct.

Q       All right.  So the information that you did obtain from Mr. Sinisterra would have come from one of two places basically, on your team, either you yourself or Mr. Duchardt, right?

A       That's correct.

Q       Did you make any effort to learn whether Mr. Sinisterra had ever witnessed extreme instances of family violence between his parents?

A       No.

Q       Did you make any effort to find out whether Mr. Sinisterra had been the victim of serious head trauma as a young child?

A       No, I don't recall any.  No.

Q       With respect to all of these different categories of traumatic events that could happen to a person in their childhood years, would it be fair to say that none of them was ever a priority for you in the investigation of the case?

A       That's true.

Q       What sort of relationship were you able to establish with Mr. Sinisterra?

A       We had a good relationship.

Q     Did he cooperate with you when you went to speak to him or talk to him on the phone?

A     Always, yes.

Q     How often did you speak to him on the phone or visit him at CCA?

A     You know, I honestly don't remember.  I was living in St. Louis so it wasn't every week, but I saw him several times.  Well enough to say that I felt like I knew him well and he knew me well and we had a good relationship.

Q     If you had focused attention on the possibility of traumatic events in Mr. Sinisterra's life and had obtained information that he had suffered from such events, how might that have affected the way you viewed any possible investigation in Columbia?

A     Well, obviously if I had a clue that any of that was going on, we would have needed to verify that from witnesses in Columbia, which would have required one of two things, either multiple trips to Columbia or being able to bring the witnesses here, and I also would have been more reluctant to go there by myself, you know, without a mitigation investigator, without somebody else doing the investigation.

Q     Now, that response raises a couple of questions, one of which relates to timing.  When you want to do a mitigation investigation regarding a client's childhood years, when do you want to start that investigation with respect to the overall

29

time frame of the representation?

A    Well, really that's the first thing you want to start because that's the thing that takes the longest.  My practice now is to start that investigation before the case is authorized for the death penalty.

Q    And you mentioned also the possibility that if you felt there was serious mitigating evidence regarding childhood trauma, that might necessitate multiple visits?

A    It necessarily would.  I mean, I've never had a family reveal to me -- well, I won't say never.  It is rare, if it ever happens, that a family will reveal those kinds of things to you on the first visit with them.  The first visit is always just this is who I am, this is why you should trust me while I'm helping your family member, let me get to know your family; and unless it's really out in the open, the things about abuse and sort of, you know, the dark secrets I don't even touch on them the first visit or maybe even the first few visits unless they are something that is documented and well known by the family and I feel comfortable in doing that.

Q    How many times did you travel to Columbia in this case?

A    Just one time.

     MR. JENAB:  Could we pull up Exhibit 20, please.

Q    (By Mr. Jenab)  Do you recognize that letter?

A    I do.

Q    And what does that letter relate to?

30

A       That related to my plan to travel to Columbia in that I was advised not to go.  It was too dangerous to go.  I shouldn't go.

Q       Now, that letter is a letter from judge -- Magistrate Judge Hays to you, correct?

A       Correct.

Q       And, of course, at that time your last name was Brewer?

A       That's correct.

Q       The date of that letter -- if we could expand out.  The date of that letter is March 13 of 2000; is that right?

A       Yes.

Q       As of that date, you had not traveled to Columbia, correct?

A       Right.  It was very last minute.  If my memory serves me correctly, we were waiting on the -- we need to go.  Can we go?  Trying to get approval and there was resistance to approval and it was like pushing.  I remember pushing right up against the wire.  We got to go.

Q       Well, we established that your appointment in the case was in December of 1998, right?

A       Correct.

Q       And we established that jury selection began on April 11th of 2000?

A       Correct.

Q       Were you waiting on approval that entire time?

31

A     Oh, no.  No.  I don't remember -- it would probably be in the file -- when we had -- when I requested the travel, but it wasn't -- it was in the year 2000 definitely.

Q     All right.  And you've indicated that the purpose of this trip was not to explore any possible childhood abuse or trauma; is that right?

A     That's correct.

Q     What did you hope to accomplish during your visit to Columbia?

A     Well, one of the big things was Mr. Sinisterra's mom was not aware that he was facing the death penalty and she was in kind of questionable health, and so one of the big things was to convey that to her because she was going to have to know why we were there, and so to find a way to tell that to her without her having a heart attack was one of the big things, and then just like you would with any other family who was here, just to get to know the family and, like I said, do the initial thing of explaining what I was doing for him and getting some background information.

Q     All right.  And when you say background information, what sorts of information do you mean?

A     Oh, just family history.  A big part also there was where he grew up, the poverty, and his mom's wood shop was in a little area right next to the house, so just seeing where and how he grew up and meeting his siblings and having them all

tell me what kind of kid he was and what it was like growing up, and a big part of it was seeing everything because it was so different compared to even the worst poverty you would see here.

Q    Were your interviews videotaped?

A    Yes.

Q    While you were down there, whether you were on camera or whether you were off camera, did you ever have any discussion with anyone that in any way related to any childhood sexual abuse, serious physical abuse, or trauma suffered by Mr. Sinisterra as a child?

A    No.

Q    While you were down there, did you ever ask anyone whether Mr. Sinisterra had ever run away from home as a child?

A    No. In fact, I was surprised to hear that because how they represented his life to me was that he was there growing up the entire time.

Q    The interviews that you videotaped when you were in Columbia ultimately were presented in redacted form to the jury at the penalty phase of Mr. Sinisterra's trial; is that right?

A    That's correct.

Q    Now, considering the penalty phase evidence as a whole, whether from the videotapes or from witness testimony or any other evidence, was any evidence ever presented at Mr. Sinisterra's trial that he had ever suffered from sexual abuse,

33

physical abuse, severe trauma, or head injuries?

A      No.  I wasn't aware that such evidence existed.

MR. JENAB:  Judge, may I have a moment?

THE COURT:  Yes.

MR. JENAB:  No further questions, Your Honor.

THE COURT:  Thank you.

Mr. Valenti.

MR. VALENTI:  Thank you, Your Honor.

CROSS-EXAMINATION BY MR. VALENTI:

Q      Ms. Herndon, during the course of your examination, you indicated that if there were information to be developed about Mr. Sinisterra relative to physical or sexual abuse, that would come from the interviews with either yourself or Mr. Duchardt, is that correct?  If it had happened.  You were the conduit for the information that Mr. Sinisterra would provide about those types of things; is that correct?

A      We were the only two people he was talking to so that would have been the only possibilities.

Q      But Mr. Grothaus was also assigned to your team, correct?

A      Correct.

Q      And Ms. Chavez was hired by Mr. Duchardt to act as an interpreter?

A      Correct.

Q      And the records, at least from the billing perspective,

34

show that both Mr. Grothaus and Ms. Chavez spent time with Mr. Sinisterra at CCA. Were you aware of that?

A    It doesn't surprise me at all.

Q    So you weren't the only two people who did have contact with Mr. Sinisterra. There were others, that being Ms. Chavez and Mr. Grothaus?

A    That's true.

Q    So whether it did or didn't happen, there could have been other sources for him to disclose that type of physical or sexual abuse too, correct?

A    Well, I guess if he had spontaneously volunteered. That certainly wasn't either one of their jobs to go talk to him about mitigation type things.

Q    And you also indicated that as it relates to mitigation investigation, you said, and I noted the word, that your practice now is to commence the mitigation investigation even before the department is certified, which we all know is a very lengthy process, correct?

A    Correct.

Q    And by that it seems to imply that you're looking at these cases the way you investigate them has evolved over time; is that fair?

A    Oh, sure.

Q    And that's natural. You've been practicing I think you said 22 years?

35

A     Correct.

Q     And at the time -- this had gone on some 13 years ago, it would have been -- you would have been an eight- to ten-year practitioner?

A     Correct.

Q     Assuming you were appointed at the end of 1998 and tried the case in the spring of 2000?

A     Correct.

Q     Okay.  When you tried the case at that time and when you investigated the case, you had, I believe you indicated, one prior federal death penalty case in the Eastern District of Missouri?

A     Right.  It actually was two.  I had another one going on at the time so it would have been two.

Q     But beyond those two cases, you also did the state death penalty practice which was probably a larger part of your experience background, correct?

A     That's correct.

Q     And by way of your background, when we talk about the death penalty, we're talking about a fairly nuance or niched area of law?

A     Correct.

Q     In the criminal defense or prosecution, correct?

A     Yes.

Q     You've chosen to get into that area of law voluntarily?

36

A    Yes.

Q    Despite what is at times lengthy hours and coming to different cities to testify and you chose that area. And why did you choose that area?

A    Well, you know, it kind of evolved. I started with the public defender's office straight out of law school and I guess you say promoted up to the capital office as the years went by. That's where the, you know, the pay was higher and the cases were more serious and the people with more experience got up there, so it kind of evolved into that.

Q    Sure. Once you got up there, you continued to practice in that area of law?

A    Yes.

Q    You still do death penalty work?

A    Yes.

Q    And you choose to do that?

A    Yes.

Q    Is it the lion's share of the work you now do as a practitioner in St. Louis?

A    It's all I do. I have a drug case once in a while, but 99.9 percent of my work is death penalty work.

Q    And I think you indicated during your examination just a few moments ago that what you do is mitigation work. That's kind of your bailiwick, so to speak; is that fair?

A    That's correct.

37

Q  And while you indicated that your personal practice has evolved over time, that investigation -- or excuse me -- the defense of death penalty clients has also evolved over time; is that fair?  It's not just you.

Bad question.  Mitigation investigation, mitigation specialists were kind of evolving themselves in the late 1990s; is that fair?

A  When you say they were evolving, what do you mean?

Q  You're familiar with the Spencer Report?

A  Sure.

Q  On how investigations were done.  That was a report authored in May of 1998, correct?

A  If you say.  That sounds about right.

Q  I just looked at it.  I wouldn't have known if I hadn't saw it, but it was in May of 1998 and it talked about the evolving term "mitigation investigator" and it quoted Marr (ph), which means to be defined fairly new or fairly recently in the literature.  Does that seem about right with your recollection?

A  You know, I started -- I mean, when I was in the public defender's office in the capital unit in 1995 we had mitigation investigators on every case, and the two federal cases I had before Mr. Sinisterra's I had a mitigation investigator there. So to me it was standard practice from the time I knew of capital work in 1995.

Q    But not long before this case.  Really we're talking three years versus 13 that's pending since the case had emerged, correct?

A    Correct.

Q    Okay.  In anticipation of the hearings we're having today, you've been asked on two different occasions to provide affidavits to either Mr. Jenab or Mr. Gabrielsen; is that correct?

A    Yes.

Q    I believe the first opportunity they asked was in December of 2004 they asked you to prepare an affidavit about your representation in this matter?

A    If you say that's the date, I believe you.  Yes.

Q    December 2nd, 2004, is when it was signed by you and ultimately appended -- did some litigation in 2006.  Does that sound about right?

A    It does.

Q    And you prepared that affidavit at Mr. Jenab's request; is that accurate?

A    Yes.

Q    Now, were there any issues with you preparing the affidavit or were you happy to do so?

A    Oh, I was happy to do so.

Q    Did Mr. Jenab have to obtain a court order to get you to do that or did you do that voluntarily?

39

A    I did it voluntarily.

Q    And in that affidavit did you go through some of the very same issues that we're discussing now again eight or nine years later?

A    Yes.

Q    However, in October of 2007, according to my notes, October 31st, 2007, you prepared a second affidavit for Mr. Jenab at his request?  Does that sound right?

A    Yes.  I'm sure I just didn't volunteer I'm going to give you another affidavit.  So I assume they asked me, right.

Q    And if we look at that particular affidavit, it starts focusing on issues like should you have objected or not objected to various arguments either made by myself or my cocounsel at the hearing back in 2000.  Do you recall that being the subject of the affidavit?

A    I don't remember at all.  I believe you but I don't remember at all.

Q    Did you likewise with the second affidavit volunteer to produce it without court order?

A    Sure.

Q    And you did so?

A    Yes.

Q    You indicated that in this particular representation you took the lead on the mitigation certainly as it relates to the investigation and almost exclusively that relates as to the

40

Columbian portion of the investigation?

A   Correct.

Q   And ultimately the decision was made that you went down to Columbia to investigate matters that you could and you went with an interpreter that you hired?

A   The interpreter was already in Columbia, but I went there and met him in Columbia, yes.

Q   Was that an interpreter that was paid for by the court system through application and motion?

A   A little bit of his fee.  They wouldn't pay very much so I paid the rest, but some of it was paid by the court.

Q   When you went to Columbia, you didn't go alone, did you?

A   No.

Q   In other words, you went with a man named Pat Berrigan?

A   Correct.

Q   And for the Court's edification, Pat Berrigan was cocounsel, not with you, but was counsel representing Plutarco Tello, a codefendant in the case that went to trial in 2000?

A   Correct.

Q   And Mr. Berrigan like you went down to investigate the facts and circumstances around his client's life and early life in Columbia, South America?

A   That's right.

Q   Did you and Mr. Berrigan utilize the same interpreter?

41

A     No.

Q     You had separate interpreters?

A     Yes.

Q     Did you utilize the same tactics as it relates to the use of videotapes of interviews of family members that may have known your particular clients?

A     I don't know what he did.  We weren't together.

Q     Though you traveled together, you went your separate ways for the investigation?

A     We did for the investigation.  We stayed at the same hotel and we got together at night and everything; but as far as doing the investigation, we weren't together during those times.

Q     To your knowledge, did Mr. Berrigan have a mitigation investigator with him?

A     He did.

Q     Who did he have with him?

A     A man from Texas by the name of Richard.  I think Richard -- I don't remember his last name.  But he was a Spanish-speaking investigator.

Q     Was he an interpreter as well?

A     And interpreter, right.  Well, actually he wasn't an interpreter.  He was the investigator because my interpreter ended up stepping in and doing some interpretation for them because he really wasn't an interpreter.  My understanding is

42

being able to speak Spanish and able to interpreter are two different things.

Q     Understood.  So at some point you did share your interpreter with Mr. Berrigan during his investigation?

A     Right.  They were having some issues with the family interviews so I remember going to, I think, the hotel and some of Mr. Tello's family came and my interpreter went down there to do the interviews to clarify whatever misunderstanding they were having.

Q     You indicated that the interpreter that you took with you or that you hired was paid at least in some part by the court pursuant to motion; is that correct?

A     Correct.

Q     So you're familiar with the process to hire someone, if you need to, with the courts, correct?

A     Yes.

Q     And you did so as it relates to an interpreter?

A     Yes.

Q     So you never did make application for at least hiring your own investigator as you went to Columbia, did you?

A     Oh, Mr. Duchardt would not allow it.

Q     And you didn't do it?

A     No.

Q     All right.  And I know you say that -- you said Mr. Duchardt would not allow it.  He clearly didn't make

43

application to the court for that, did he?

A    Right.

Q    And you didn't either?

A    No.  We already had a mitigation investigator supposedly appointed in the form of Mr. Grothaus, so I don't think that a second one would have been in the wings.

Q    I understand what you think, but my question really is this, though.  You had a mitigation investigator assigned to the team, that being Mr. Grothaus, correct?

A    No, he wasn't a mitigation investigator.  He was appointed in name as that so he could get a higher pay rate, but there was no pretense among the defense team at all he was doing any mitigation work.

Q    Mr. Grothaus was hired upon application made to the court in which he was represented to be both a fact investigator and someone that would assist, as needed, as mitigation investigator, was he not?

A    If that's what's contained in Mr. Duchardt's motion to do so, then yes.  If that's what the motion says.

Q    You had indicated that Mr. Grothaus did not speak Spanish, to your knowledge?

A    Oh, I know he doesn't speak Spanish.

Q    Would you be surprised if he said he grew up in and around Houston -- or not grow up but lived in Houston and communicated in Spanish but was not, in his words, fluent in

44

it?

A   No.  I knew that.

Q   So it's a little bit different than not speaking Spanish.  He communicated.

A   He spoke Spanish about as well as I do which is certainly not anything you can go in and do an interview with.

Q   I understand.  But my point being is Mr. Grothaus was hired on the team, in your words, in name only as mitigation expert, correct?

A   Correct.

Q   And you were making a trip outside the country to Columbia?

A   Yes.

Q   And you did not make application to the court for a mitigation investigator, did you?

A   Correct.

Q   You did not make application to the court to get someone other than an interpreter to help you in your Columbian investigation that you conducted in March of 2000?

A   That's true.

Q   And you indicate and you told this court today that Mr. Duchardt wouldn't allow it?

A   Correct.

Q   You're a big girl.  You could have made application on your own if you thought it was important enough, couldn't you?

45

A    I should have.  You're right.  I'm a big girl and I made a mistake.

Q    And you didn't do it?

A    That's correct.

Q    And you said, and I think it may be a word you used in at least your initial affidavit from '04, that your trip to Columbia, in your words, was a meet-and-greet.  That sound right?

A    That's accurate.

Q    And if you didn't say that in your affidavit, then I apologize.  I certainly know you did in your deposition.  Does that sound like a fair characterization of what you called the trip?

A    Yes.  That's an accurate statement of the trip.

Q    I want to talk about that, though.  You called it a meet-and-greet but you took it less than a month before the hearing, right?

A    Correct.

Q    You know, the Court is telling you in March of 2000, I believe March 13th of 2000, Judge Hays says, Hey, this is kind of dangerous, right?

A    Right.

Q    The State Department is saying that Columbia is not a safe place to go?

A    Correct.

46

Q    That it's probably not in your best interest to go?

A    Right.

Q    And was discouraging you, at least by letter, from putting yourself at risk to go?

A    Correct.

Q    But you did go?

A    Yes.

Q    Because you believed in the work?

A    Right.

Q    And I know it may be -- to say this, but your personal view is being opposed to the death penalty; is that fair?

        THE INTERPRETER:  If Mr. Valenti, could you move to the microphone?  I'm having a hard time hearing.

Q    (By Mr. Valenti)  Your personal view is probably as being opposed to the death penalty, correct?

A    That's my personal view, yes.

Q    One of the reasons, I assume, that you're in this area of law?

A    You know, like I said before, I grew into it.  I didn't go to law school with some, you know, badge of eradicating the death penalty.

Q    But despite being discouraged by the court, at least in writing, you nonetheless went to Columbia in March of 2000?

A    That's correct.  I've traveled quite a bit to South America so I wasn't scared.

47

Q You weren't scared?

A No.

Q You prepared to go down and do what was necessary?

A Right.

Q But in a meet-and-greet that would be an initial interview, correct?

A Correct.

Q You didn't treat it like an initial interview.

A Oh, I did.

Q When you videotaped it?

A Correct.

Q You didn't just take notes, did you?

A No.

Q You instead memorialized what you did on videotape?

A Right.

Q Because you were aware that you were having significant difficulties getting these witnesses into the country?

A Well, not at the time I wasn't, no. At the time I thought that I would be able to get some -- I thought I would be able to get who I wanted into the country at the time. I was uncertain about his mother.

Q You may have hoped but you certainly had got no indication from anyone that they were going to get in this country?

A Well, I guess I was naive because it didn't occur to me

48

they would not get in this country.

Q I understand you look back and say it might have been naivety, but at the time the Department of Justice hadn't told you these witnesses were coming to this country, had they?

A I don't know if we asked them at the time.

Q In March of 2000?

A Well, the reason I say that because I remember after -- I'm almost certain it was after I got back, wiring money to the family to get the proper credentials to come in.

Q And we can look at the record at some point later to figure out what litigation, if any, were filed in an ex parte fashion getting in, but that's late in the game to get someone from the country of Columbia, especially when you consider you've got the court here who appointed you to represent a capital litigant telling you, you might not want to go. To get those people in, you're saying you don't think you knew they weren't coming in that late?

A Oh, I didn't. I thought -- when we were going to trial, I thought they were still coming in.

Q And you may have hoped for an 11th hour victory in that regard, but no one had given you an indication these people were coming in the country. They didn't have visas, did they?

A They never got visas. But what point are you referring to now?

Q Anytime in 2000 starting pretty late in the game.

49

Certainly when you went down there on your supposed meet-and-greet, you had no indication that they were going to be in this country, did you?

A    I had no indication they were not going to be in this country either.  I just didn't have any indication.  I figured we'd get them in because I did not think that anyone would allow a death penalty trial to go on without his family being there.  I didn't think -- I mean, I since learned that -- it's a school of hard knocks here.  I didn't think that would be allowed to happen.

Q    If this was a meet-and-greet, when were you going to go back to Columbia?

A    Well, I don't think that I was going to go back to Columbia.  I was going to bring them here.

Q    But they never did get here?

A    Right.

Q    And ruling upon ruling, whether it be at the magistrate level or district court level or by the Department of State, kept saying, No, these witnesses aren't coming into the country.  What arrangement did you make to send another investigator back to Columbia to follow up on your meet-and-greet?

A    None.

Q    So you made none.  And when I say it does not appear that you treated it like a meet-and-greet is because you

50

videotaped it, didn't you?

A     Correct.

Q     You never went back?

A     Correct.

Q     The witnesses never got in the country?

A     Right.

Q     And you withheld providing the tapes of your interviews of these witnesses to the government until a very late date once the mitigation case had already begun, didn't you?

A     Was it after the case had already begun?

Q     Yes.

A     Okay.  Yeah.  I didn't think that I had to give them to you, nor did I plan to use them so, yes, that would be true.

Q     Well, let's look at some of the transcripts.  The introduction of those tapes during the penalty phase hearing was a critical component and it was contested, was it not?

A     Whether or not the tapes would be introduced?

Q     Whether the tapes would be introduced and, if so, in what form.

A     I remember that you did not want -- you didn't want a lot of what I was saying on the tapes to be introduced.  I recall that.

Q     Because you had your own narration in the tapes?

A     Correct.

Q     Those tapes had been given to us at times, moments

51

before you wanted to play them before the jury and we never even seen them ourselves; do you recall that?

A    You know, I remember you being upset but I don't remember the exact timing.

Q    Do you recall and for the record it's clear that one lawyer, me, was in the courtroom while Mr. Miller was outside the courtroom watching the videotapes 15 minutes or so in advance of them being played and lodging objections to the Court on an ad hoc basis?

A    No, I don't.  But if you say that happened, I'm sure it did.

Q    And you were asked and had many colloquies with the Court on the record about the propriety of these tapes; do you recall that?

A    No.

Q    Well, these tapes really went down a certain theme, as I recall, Ms. Brewer, and they were that your theme, if I may characterize correctly, was that Mr. Sinisterra grew up in conditions of poverty and desperation?

A    Correct.

Q    And I've gotten those words from the transcripts that were yours so I'm not trying to puts words in your mouth.  You believed that the overall mitigation picture you wanted to paint was that he was in a poverty stricken environment and that he was in a desperate situation that led him to the

52

circumstances that he found himself in, in whatever circumstance it may be, with Mr. Hinestroza in Kansas City in 1998, correct?

A    Well, I mean, that was a piece of it.  I mean, the overall theme was that he came out of that poverty and grew into being a good guy which was, you know, what the evidence I had was that he was a good father and what we put on.

Q    And those tapes were effective as it relates to showing a poverty stricken area, weren't they?

A    Oh, I don't think those tapes were effective as it relates to showing anything.

Q    You don't think the tapes showed a poverty stricken area?

A    You know, most of what I taped -- my memory of most of what I taped of the area you kept out.

Q    I'm going to show you trial transcript Volume 13, page 2654, and ask you to refresh your recollection.

MR. VALENTI:  Your Honor, may I approach the witness?

THE COURT:  Yes.

Q    (By Mr. Valenti)  Ms. Herndon, I've highlighted an area.  If you wouldn't mind looking at that for a moment, please.

A    Okay.

Q    Does that refresh your recollection there was a

53

discussion with the Court about whether or not you anticipated -- and feel free if you need to go back if it refreshes your recollection -- in the conversation with the Court about you didn't anticipate the presentation of the videotapes to be a problem?

A    Correct.  If your question is did I anticipate that introducing the videotapes would be a problem, the answer is no, but that's not what your last question was.

Q    Well, I thought that's what my question was.  I apologize for the bad nature of the question.

You indicated back then when talking to the Court you didn't think the presentation of the exhibits would be a problem?

A    Right.  I didn't anticipate you would object to the introduction of them, correct, or the Court would keep them out.  I guess you did object.

Q    Despite the timing and disclosure?

A    Correct.

Q    I show you page 2663 of Volume 14 and ask if you would read the highlighted section, please.

A    Okay.

Q    That section of the trial transcript, again, is a discussion of whether the tapes would be appropriate evidentiary tools to present to the jury.  Does that sound right?  Maybe I'm concluding it in a different way.  I think

54

you're explaining your reasoning for the use of the tapes; is that correct?

A    I don't know.  I don't know from reading that answer.  Hold on.  Let me look for a minute.

Q    Please.

A    Okay.  It looks like we're having a discussion about whether the tapes should come in, and I'm offering to the Court an explanation of why his sister's tape should be introduced, yes.

Q    You're discussing why you essentially thought using the tape was an effective -- maybe effective isn't the right word -- appropriate way to introduce the testimony, correct?

A    The only way we had to introduce the testimony, correct.

Q    Well, the way that you had chosen because you videotaped them when you went down on your trip to Columbia, correct?

A    That's not what I chose.  I tried to get her into the country so she could come testify.  I was left with the tapes.  It's not what I chose.

Q    You may not have chosen that but it was a reality that you faced because the Department of State would not grant the travel visas into this country?

A    That's correct.

Q    Finally on page 2895 of the transcript of Volume 15.

55

You can start where you need to, but I would represent to you that's part of your closing argument in that portion of the case where you are describing your use of the tapes to the jury.

A    Okay.  I've read it.  I agree that it's closing argument when I'm talking about the videotapes, yes.

Q    At that point, in summary, you're telling the jury that there's no quiet place in Buenaventura.  You are using the tapes to illustrate what we talked about earlier that there's poverty in that area that Mr. Sinisterra grew up in, there's desperation that he was born from.  Does that sound consistent with the argument that you made?

A    Well, the purpose of my argument that you just had me read was to, as I said, to tell them that was the best we could do, that I understood that the tapes were at -- oftentimes you couldn't hear them and couldn't understand them but that's the best we could do for everyone and because we didn't have a live witness.

Q    Correct.  But they also illustrate the point that you argued to them to stand for poverty and desperation, didn't they?

A    Do I think that the tapes illustrated that, the portions that were introduced?

Q    Yes.

A    Not very well, no.

Q You argued it certainly to the jury, didn't you?

A I did the best I could under the circumstances.

Q Not only were you upset with the witnesses not being in, you ultimately got upset with your cocounsel, Fred Duchardt, didn't you?

A Oh, it was much sooner than ultimately, yes.

Q You had issues with Mr. Duchardt as it related to the representation because you had another representation, that being the David Martin case, correct?

A Right.

Q And Mr. Martin's case was taking up portions of your time that you thought might distract you from otherwise representing Mr. Sinisterra?

A Correct.

Q And there were discussions between you and Mr. Duchardt whether or not a continuance would be an appropriate vehicle to seek in order to delay Mr. Sinisterra's trial from April of 2000, correct?

A Right. I told him that I needed a continuance, yes.

Q He indicated to you that he was concerned that because of cocounsel and everything in play, that it wouldn't be granted, he didn't want to proceed with it, did he?

A If you say. I don't remember.

Q He did not want to seek a continuance?

A He didn't want a continuance, yeah.

57

Q And there are many reasons for that, one of which the government had exercised closed file discovery in this case, had it not? Do you recall?

A Correct.

Q And Mr. Duchardt felt that by continuing the case, the discovery disclosures the government would make would be delayed and that would hamper his ability to prepare for trial?

A I can't really tell you what he thought. If the trial was delayed, then the discovery would be delayed. It wouldn't be a big deal.

Q He didn't -- he indicated that, if necessary, he could do any extra heavy lifting, I think was his term, while you were doing the Martin case; is that correct?

A Yeah. He basically proposed he could do the trial himself if I could come take notes for him, right.

Q But that didn't actually come to fruition because Mr. Martin's case got resolved in some other manner; is that correct?

A He ultimately pled guilty, yes. It was right before trial.

Q When was his trial scheduled?

A You know, I can't remember. I'm sorry. I can't remember. It had to be before this one because I just remember thinking there's no way I could do both of them, but I can't remember exactly.

Case 4:04-cv-08003-GAF    Document 119    Filed 02/19/13    Page 58 of 185

Q    Well, without knowing the exact date of the continuance for Mr. Martin, it never -- that case had never required a continuance in this case, though you discussed it with Mr. Duchardt, correct?  You wanted a continuance and he didn't want one?

A    I mean, my position is still that it required one because it didn't allow me to do what I needed to do for Mr. Sinisterra.

Q    No continuance was requested by either you or Mr. Duchardt?

A    Correct.

Q    And, again, as we talked about earlier, he didn't request it, nor did you?

A    Correct.

Q    And you felt compelled in representation you could do what you needed to do and you didn't ask for a continuance?

A    Correct.  I probably should have withdrawn, but you're right.  I didn't.

Q    Instead Mr. Martin's case resolved itself and rather than take notes in Mr. Sinisterra's trial, you were more actively engaged in that representation, weren't you?

A    Correct.

Q    So though you discussed the need for a continuance ultimately, A, it was not had; and, B, you didn't have to sit aside and just take notes.  You participated in the trial?

59

A    Correct.

Q    Mr. Duchardt, while conducting much of the, what I'll call guilt phase investigation, also went to Houston on numerous occasions, didn't he, or participated in the Houston portion of the investigation?

A    In mitigation investigation?

Q    Some of the guilt -- I mean, I would tell you it's difficult to say but guilt phase/penalty phase, they overlap because they were all going to be in Houston in some way, weren't they?  Some of the underlying criminal conduct occurred in Houston?

A    Right.  The guilt and penalty phase in this case didn't overlap.  Unless he did it without my knowledge, Mr. Duchardt never did any mitigation investigation in Texas.

Q    Okay.  But did you know he went to Houston and did other investigation?

A    Yes.

Q    If Mr. Duchardt would say that he felt that you were capable of asking the appropriate questions in Columbia, would you be surprised by that?

A    I guess I don't understand the question.  What does capable of asking, what does that mean?

Q    Seasoned practitioner who tried multiple death penalty cases at state and federal level and knew what questions to ask during the investigation.

60

A    Okay.  Yes.

Q    Okay.  And if he described the fact that you were, in his words, a nice person who was able to easily build rapport with other people, I believe in your deposition you said he was stupid for having that view; do you recall that?

A    I don't think he's stupid for having that view.  I think it is, for lack of a better word -- stupid's not the best word.  It is unrealistic to think that anyone could develop a relationship with someone the first time you meet them that would make it okay to say, By the way, were you sexually abused as a kid?

Q    And I know you're asking about physical and sexual abuse now, but you didn't ask it then, did you?

A    Didn't ask who?

Q    Well, you aren't focused on -- you said it was not the focus of your investigation in 2000 when you went to Columbia whether or not he was physically or sexually abused?

A    Right.  I didn't ask any of his family members about that.

Q    And the reason for that is you had participated in interviews with Mr. Sinisterra himself and had had no information disclosed to you by Mr. Sinisterra or to you by Mr. Duchardt that suggested that that was a relevant line of inquiry, correct?

A    That would be correct.

61

Q    And so those questions weren't asked by you then?

A    Well, I would say that's correct, although that wouldn't be okay.

Q    Well, what I'm suggesting to you or what I'm asking is, the amount of investigation, the quality of the investigation that you do, you're somewhat limited by the information provided to you by the reporters you have spoken to; is that fair?

A    No.  I mean, I would say that more often than not I find out about physical or sexual abuse either from a family members or from records that I obtained.  In this case we suffered from the fact we didn't have any records.  So a lot of times it comes from them, then you take it back to the client.

Q    And the records in Buenaventura, Columbia, at the time were almost nonexistent; is that fair?

A    Yeah.  We had some indication of how to get them, and I think his sister either talked about or even went up to Cali maybe to try to get some of them but it was a lost cause, yeah.

Q    Were any of those records, to your knowledge, ever provided to you or Mr. Duchardt?

A    No.

Q    So the information that you would have had in that regard was anecdotal -- maybe not anecdotal but from witness reporters but no documentation to support it?

A    No information about what?  I'm sorry.

62

Q    About anything really candidly.

A    Right.  We didn't really have any documents as to anything, you're right.

Q    My question remains, if you can't get the documentation, if someone hasn't told you, how are you going to find it out?

A    By asking.

Q    Okay.  But you said in your initial interview here before the Court that if you would have had that inventory of questions to ask, you may not have spent a lot of time on it and you certainly don't remember getting anything that was noteworthy, do you?

A    Right.  I'm sorry.  I meant by asking the family.  If I asked Mr. Sinisterra, he just said no and I moved on, right.

Q    You were appointed in this case in December of 1998 and the trial occurred in April of 2000; is that right?

A    Correct.

Q    About a 17-month window?

A    Right.

Q    Give or take of the amount of time you were involved in the case?

A    Right.

Q    In that 17 months you knew a trial was looming because it had been on track for a fairly lengthy period of time?

A    Correct.

63

Q      Ultimately -- or originally, rather, this case was scheduled before a different judge in this courthouse but it was transferred to Judge Fenner sometime in the new year of that year of 2000 for trial, correct?

A      Right.

Q      At no time did you ask for or at least there's no record of a written continuance request saying you needed more time?

A      Correct.

Q      You have no records or indications that you thought that the need of a mitigation specialist needed to be hired or at least if you thought it, you never put it to writing?

A      Oh, you're right.  I never put it into writing, but I certainly thought it and vocalized it to Mr. Duchardt on several occasions.

Q      But you never requested it?

A      Correct.

Q      There's no record of it?

A      Well, I never requested it.

Q      Okay.  You did, however, go to Columbia?

A      Correct.

Q      At a time when at least at that point no witnesses had been granted -- not asylum but were granted entry into the country and you videotaped all the interviews that you conducted to try to memorialize what investigation you were

Case 4:04-cv-08003-GAF    Document 119    Filed 02/19/13    Page 64 of 185

able to accomplish?

A    Right.

Q    And I think it seems pretty obvious, but more time will always lead to more information; is that fair?  You could have been given a year and you surely would have had more information, correct?  I don't think it's -- I'm not trying to trick you.

A    Well, I mean, I would not agree more time will always lead to more information, no, because there's a point where you've gotten everything that's relevant and you're ready.

Q    You think that there's a point where -- the reason I say that is you had 17 months.  You guys worked at it, I assume, as diligently as your professional creed would have you work, but you never asked for more time, and I acknowledge that and I'll concede to you if you had more time, probably more information, but we're in deadline driven business, aren't we?

A    To some extent.  I mean, to the extent that the Court won't grant further continuances.

Q    Like it or not they're not deadlines you control.  You can ask for continuances, can't you?

A    Correct.

Q    But you didn't.  Courts tell you when to be there for trial, don't they?

A    Right.

Q    Courts tell you when to be there for appellate

argument, don't they?

A    Right.

Q    Courts tell you when to be there for motions to suppress hearings?

A    Correct.

Q    You can ask for those hearings to be delayed to let you do more work, but if you don't ask, you don't get it, do you?

A    You're right.

Q    We're here 13 years later from the days of approximately when we tried this case and they've alleged to have had more information they obtained. I'm not surprised by that, are you?

A    Considering the investigation that was done or not done, no, I'm not surprised by that.

Q    Well, I'm not surprised if we come back in 2026, guess what? More information will probably be found, wouldn't it?

A    I don't know. I mean, I think the point you're missing is this is relevant information. I mean, when we find out maybe that his father had an infected hangnail if we have another 20 years, we might find that out. The difference we're talking about here is information that forms the backbone of a good mitigation presentation versus information that added nothing.

Q    And it's easy to see that now in 2013, but what I'm saying is you asked the questions then and you didn't get an

66

answer. You went down there then and you didn't get the answer. And you want this court or the Court to believe that you just didn't do your job, okay? But you knew what your obligation was as a practitioner of the law, didn't you, and you did it?

A     I'm sorry?

Q     You knew your obligations in your representation of Mr. Sinisterra?

A     Correct.

Q     You asked the questions you knew to ask?

A     Well, no. I take issue with that. As I told you before, none of the family members -- I didn't interview the family in a way that resembles the way a family needs to be interviewed.

Q     Ms. Herndon, sorry about called you Brewer, you went down there very late in the game?

A     True.

Q     I submit to you you did it for tactical reasons to prevent the government from obtaining that material until the very last second; would you agree with that?

A     No.

Q     But you did. You waited until the very last second to provide that material.

A     Okay. You can give any sort of horrible defense lawyer motive you want to what I did, but I did what I did

67

because of -- first of all, there were other obligations I had in the Martin case, which was this horrible guy who abducted a little girl from a house and sexually abused and killed her case and that was one of the main reasons my investigation was behind in this case. The other reason my investigation was behind in this case was because I needed a mitigation investigator and Fred would not agree to let me have one and so there was --

Q    But you didn't go to the Court. You didn't go to the Court.

A    We've established that. Yes, we've established that I didn't do it and I should have done it. You're right. I will not argue with you about that, but there was zero, zero tactical let's try to confuse or trick the government in my mind. If I was going to do that, certainly I would have come up with something better than those tapes you couldn't even understand.

Q    You didn't treat that like a meet-and-greet. You went down there with the videotape in hand to memorialize what you did with the translator in pocket and you asked the questions that you thought were appropriate based upon the investigation that you conducted, and now because you don't like the result, you want this court to believe that you should have done more?

A    You can come to that conclusion and you can accuse me of lying under oath if you want to. All I can do is get up

68

here and tell you what I did and what I was thinking and you do what you want with it.

MR. VALENTI: That's all.

THE COURT: We're going to take a break, Mr. Valenti, and I'll be back in 15 minutes.

(A recess was taken.)

THE COURT: Ms. Herndon, I'll remind you that you are still under oath.

And, Mr. Jenab, you may we examine.

JENNIFER HERNDON resumed the stand and testified further:

REDIRECT EXAMINATION BY MR. JENAB:

Q     Ms. Herndon, what were the mitigation themes that were presented to the jury at Mr. Sinisterra's trial?

A     That he had grown up in a poor and disadvantaged environment and had come from that environment to be a good person, a loving father and husband.

Q     The latter that you said is sometimes referred to as the nice guy defense. Have you heard that characterization?

A     Yes.

Q     As a general matter, is a defense that argues basically that the defendant is a nice guy usually very persuasive for a jury that has just found a defendant guilty of a heinous murder?

A     Right. I mean, the answer is no because there is a disconnect between if he's a nice guy, then why did he shoot

69

Case 4:04-cv-08003-GAF   Document 119   Filed 02/19/13   Page 69 of 185

someone in the head. So you need to bridge to show how you can be a nice guy and still shoot someone in the head.

Q What are some of the kinds of evidence that can help provide that bridge?

A Well, the kinds of things we talked about, such as, you know, any evidence of organic brain damage, low intellectual functioning. In this case I think it was pretty clear that even if Mr. Sinisterra was the shooter, he did that upon order of Mr. Hinestroza. So in particular any kind of -- the sexual and physical abuse and trauma from the past would have been relevant to show this is somebody who is used to being pushed down, used to a lot -- usually people in those situations become follower types. So it would have supported how he could have been under Hinestroza's spell and still have been a good husband and good father.

Q Now, the evidence that was presented from Columbia, the videotaped evidence, that pertained to the themes that you initially identified, the fact that Mr. Sinisterra came from a poor and disadvantaged background; is that right?

A Correct.

Q Was there anything in the contents of those videotapes that would have made it strategically advisable or strategically advantageous for you to withhold the evidence from the government?

A No.

70

Q    As an overall characterization of that evidence, would a fair description of it be rather that it was rather innocuous?

A    That's how it played out, yes.  I mean, I actually thought it was going to be a little better than it was; but when it was broadcast up for the jury, it made the sound quality even worse and the sort of intraportions that were taken out were what I thought were some of the best parts too.  So it ended up to be innocuous at best.  If not -- I mean, I think in the courtroom the Court at one time said that I was boring the jury and that this was horrible, I was hurting my case instead of helping it, which may have been the case.

Q    You mentioned on cross-examination that you most often obtain your initial evidence regarding childhood trauma of a client from the client's family members; is that correct?

A    Either family members or records, yes.

Q    Now, in this case you spoke to family members and didn't ask any of them any questions about whether Mr. Sinisterra had suffered serious childhood trauma; is that right?

A    That's true.

Q    And did you have any strategic or tactical reason for not asking those questions?

A    Yes.

Q    What was that?

71

A     Well, it wasn't -- that wasn't the time.  I mean, I wouldn't have expected to get any kind of a positive response at that time, and I think to ask before it's time to ask, then you risk that you're never going to get the information because if they told you once it doesn't exist, it's harder for them to come back and admit it does exist.  So under the circumstances we were in and the culture and me just getting to know them and the frailty of his mom, it just wasn't -- it wasn't on tack for that round of interviews.

Q     The, I guess, final result of how everything played out as far as the pretrial investigation was that at the conclusion of your representation of Mr. Sinisterra you had at no time ever asked any of his family members any questions regarding any prior trauma that Mr. Sinisterra may have suffered as a child; is that correct?

A     That's true.

Q     And it's also true that at no time during your entire representation of Mr. Sinisterra did you ever sit down and ask him a series of focused questions about whether he had ever been the victim of these various categories of childhood trauma that we've discussed; is that true?

A     That's true.

Q     And you testified that you may have asked him a general question in an initial interview like off of a client intake form to which you may have received a negative response?

72

A    Correct.

Q    Do you have any actual recollection of doing that?

A    No.

Q    And in a case, any kind of case, if you had made a general list of client intake type questions and had asked a client facing the death penalty those questions down the list, just kind of checking them off, would you consider that to be anything remotely approaching adequate inquiry regarding the client's background?

A    Oh, no.  It would have been a starting point.

Q    At the initial stage of the representation of the client for a rote question off of a client intake form that would involve revelation of serious personal trauma, would you expect an affirmative answer to that kind of question?

A    No.  I mean, you would almost never get one. Occasionally it warrants asking it but you almost never get it. Yes.  Let me dump it all out to you at that point.

        MR. JENAB:  Nothing further, Judge.  Thank you.

        THE COURT:  Mr. Valenti.

        MR. VALENTI:  Thank you, Your Honor.  I'll try to be brief.

RECROSS-EXAMINATION BY MR. VALENTI:

Q    Ms. Brewer -- Ms. Herndon, I apologize, you indicated during your last series of questioning that as it relates to the nice guy defense, there is a necessary bridge of evidence

73

in order to demonstrate for the jury how the nice guy would have been able to commit an alleged heinous act, correct, some type of bridge evidence?

A     Right.  For that kind of a defense to be successful, because at that point it's not an alleged heinous act.  The jury just convicted him of it.

Q     It's not a new or novel concept that that bridge would be necessary to be effective, is it?

A     No.

Q     You would have known that in 1998 to 2000 in representing Mr. Sinisterra that bridge was something you would have needed to find?

A     That's certainly -- I mean, you put on what you have, but certainly I would have liked to have had more, yes.

Q     I understand that.  You are stuck with what you have.

A     Right.

Q     But you would have known you would be looking for a bridge?

A     Yes.

Q     And you would have wanted to present a bridge to be persuasive in your overall argument for clemency -- not clemency but mitigation?

A     Correct.

Q     During the time that you've been a practitioner for 22 years, have you ever been found constitutionally ineffective by

74

your state or federal court?

A    No.

Q    I'm assuming that having practiced in this area that you've been the subject of allegations of ineffectiveness, such as the kind of hearing we're going through today?

A    Yes.

Q    During that time, have you ever been cited by your bar that you are a member of for being ineffective for any representation of clients?

A    No.

Q    Have you ever been counseled or put on probation?

A    No.

        MR. VALENTI:  That's all I have, Your Honor.

        THE COURT:  Ms. Herndon, there's one matter that I have a little bit of confusion about.  You say that you do not remember whether you asked Mr. Sinisterra about childhood trauma or abuse.  Are you saying that during your entire representation of Mr. Sinisterra, that you don't know whether you asked him about childhood trauma or abuse the entire time you represented him in this case?

        THE WITNESS:  I have to think that I did.  It would have been in the beginning of my representation because, I mean, that's, you know, one of the things that you do.  That's obviously one of the things we look for because it's a common mitigating factor.  I just don't have a specific memory of

75

sitting down and asking him that question. I can tell you that's routine that I would ask Mr. Sinisterra about that, but I don't have specific memory of sitting down and asking him that.

THE COURT: Thank you.

Thank you very much. You're excused.

THE WITNESS: Thank you, Judge.

(Witness excused.)

MR. JENAB: Your Honor, if I may, I will go out and get Mr. Duchardt.

THE COURT: Mr. Duchardt, do you know where the witness chair is?

THE WITNESS: I've been there once, Your Honor.

THE COURT: All right.

FRED DUCHARDT, being sworn by the courtroom deputy, testified:

THE COURT: Mr. Jenab.

MR. JENAB: Thank you, Judge.

DIRECT EXAMINATION BY MR. JENAB:

Q      State your name, please.

A      Fred Duchardt.

Q      Mr. Duchardt, how are you employed?

A      I'm an attorney in private practice.

Q      How long have you been a practicing attorney?

A      Since 1980.

Q      And is a significant portion of your practice

76

representation of defendants in death penalty matters?

A     It has been since about 1985.

Q     I'd like to turn your attention to December of 1998.

A     Yes, sir.

Q     And I'll represent to you that the record in this case reflects that on that date you were appointed to represent German Sinisterra in his capital proceedings in this court.

A     I do recall that time frame.  I don't recall the exact date, but, yes, sir.

Q     Just for purposes of establishing kind of a time frame for the representation, I'll also represent to you that the jury selection in the trial of the case commenced on April 11th of 2000, which Mr. Valenti reminded me was a Tuesday.  Does that date sound appropriate?

A     Yes, sir.

Q     Okay.  So the time frame we're really dealing with is that period from December '98 up to the beginning of trial in April of 2000.

A     Yes, sir.

Q     Okay.

A     I'm with you.

Q     All right.  Now, you were the first attorney appointed to represent Mr. Sinisterra in this case; is that right?

A     That's correct.

Q     And after you were appointed, what did you view as sort

77

of your initial priorities on the case?

A     Well, one of the things that I did pretty quickly was ask that the judge, and that was Judge Gaitan at the time, appoint cocounsel to represent Mr. Sinisterra.  I had worked with then Jennifer Brewer on other capital cases, and I felt that she would be a good addition to the defense team and sought her appointment and that happened.

Q     All right.  And if I could, again, give you a date on that from the court record.  The record indicates she was appointed on December 16th, two weeks after you.  Does that sound about right?

A     Yes, sir.

Q     Did Ms. Herndon bring any kind of special skills or qualities to the table, in your opinion?

A     Well, quite frankly, I believe that a woman brings a lot to the table that obviously a man cannot.  There's certainly that.  She had what I believe to be a goodly amount of experience in criminal case litigation in general and capital case litigation in particular.  She had been cocounsel in a federal capital case in the Eastern District of Missouri that I was aware of.  She also had handled postconviction remedies cases in federal courts and particularly was cocounsel -- actually I was cocounsel with her in a 2254 case that was pending in the Eastern District of Missouri.  So I was personally confident in her capabilities to handle the kind of

78

tasks that would be before us in representing Mr. Sinisterra.

Q    With respect to those tasks, did you and Ms. Herndon have any sort of at least general division of case responsibilities from the outset of the representation?

A    Well, I was lead counsel in the case and I think we both perceived me as such.  My approach to capital case defense in a team approach is to try to allow the process to unfold in what seems to be the most intelligent way as related to the case.  I don't have any kind of format for those kinds of things, so it's kind of a little bit of a long answer to a short question, but essentially we didn't decide, You're going to do the first phase of the case and I'm going to do the second phase of the case, at least not at that point.  It was really we got this mass of work to do.  Here's what I'm going to be doing.  Here's what I would like you to do.  That was essentially the approach that we took as things went along in the early and middle stages of the case preparation.

Q    After Ms. Herndon's appointment, is it fair to say that one of the next things you did or very shortly thereafter one of the things you did was have an investigator appointed to assist you?

A    That's my recollection.  Certainly we did that.  I don't recall the exact time frame, but that was one of the things that I worked on.

Q    I'll represent to you the date of appointment for Mr.

79

Grothaus was December 22nd of '98.

A    Very good, sir.

Q    And why did you select Dan Grothaus to help you?

A    I had the opportunity to meet up with Dan after many years. Dan and I actually went to high school together, and I learned through other sources that Dan had gone to school and had become a reporter in the Houston area and had, out of that experience, developed an interest for and actually employment in investigation, private investigation for cases.

At that time I was looking for someone, quite frankly, to groom to try to do work in capital cases which would cover the gamut of issues that would not only be related to classic, for lack of a better term, first phase investigation but also penalty phase investigation.

Dan's background both in terms of education and experience seemed to me to uniquely qualify him as the kind of person who could take on that kind of dual role and excel.

Q    As you got into the case, how did you end up mainly utilizing Dan?

A    Well, as with many things, what you envision don't necessarily work out the way that you think that they might. Dan did really not have as much interest in the kinds of things that would be necessary for the development of penalty phase type issues, plus we had a tremendous amount of work to keep him busy on with respect to the more first phase related

80

aspects of the case.

So what really ended up happening was rather than -- well, to some extent Dan did investigation in the Houston, Texas, area for which he was also a natural because he was already familiar with the lay of the land there, and to some extent that investigation spilled over a little bit into what we were trying to do with respect to mitigation issues, but really by far what Dan ended up doing for us was classic first phase investigation type of work.

Q    And a few months after you got Dan on board on the defense team, on March 4th of 1999, you filed a motion asking for an appointment of an interpreter.  Do you recall that?

A    Yes, sir.  I don't recall, again, the specific date, but it was fairly early on, though not right at the beginning.

Q    And that was Juanita Chavez?

A    Yes, sir.

Q    How did you utilize Ms. Chavez' services on the case?

A    Just like any interpreter.  She would just accompany us to the jail to speak with Mr. Sinisterra to assist us in understanding.  We had dealt with Mr. Sinisterra, in particularly I had personally, over obviously a few months before we sought the help of an interpreter and really were with a lot of patience by him and a lot of patience by us were able to understand one another and communicate, but I felt that there were some things that we were kind of missing each other

81

on, and that's the reason why at that juncture it seemed to me we needed some help to make sure we were actually understanding each other.

Q    A little bit later in the case there was a second motion related to Ms. Chavez?

MR. JENAB:  If we could pull that one up, Exhibit 17.

Q    (By Mr. Jenab)  Were you at one time thinking of having Ms. Chavez do some investigative work?

A    That was my thought at least.  What we wanted to do was have that open as a possibility because there were obviously family members and friends in Columbia with whom we needed to have discussions, and so at least what I wanted to be prepared for was the possibility of having her working either in conjunction with one of the attorneys or separately in conducting what would essentially have been Spanish language discussion since the folks down in Columbia, unlike Mr. Sinisterra himself, had no capabilities in English.

Q    As matters played out, did Ms. Chavez end up doing any independent investigation?

A    Not that I recall.

Q    And you mentioned Columbia a couple of times.  And is that the country in which Mr. Sinisterra was born?

A    Yes, sir.

Q    And do you know how long he lived in Columbia?

82

A     In terms of giving you the precise dates and amounts of time off the top of my head, I couldn't.  Basically what I knew was that he had grown up in Columbia, had come to the United States, had gone back, and had come back into the United States; but in terms of picking my limited memory for what the exact amounts of time were right now, I couldn't do that for you off the top of my head.

Q     To the best of your recollection, did he spend his childhood years there?

A     Yes.

Q     At some point did you and Ms. Herndon talk about whether it would be necessary for some member of the defense team to travel to Columbia to pursue a mitigation investigation regarding the facts of Mr. Sinisterra's early life?

A     Yes.

Q     Do you recall when that conversation roughly during the course of the representation might have taken place?

A     I don't.  But my best recollection about that is that we had a situation that occurred with Jennifer, that she was involved in representation of another capital case client and that that case conflicted with the trial date that was set in the Sinisterra, Ortiz, and Tello case, and we had a kind of waterloo kind of situation that occurred that Jennifer felt that we should request a continuance in the Sinisterra case to allow her to do what she needed to do in connection with her

83

other capital case.

I did not believe because of the timing of when she came forward with the scheduling conflict, I did not believe that the Court would look favorably on a continuance request because there was still enough time available to do what work that needed to be done to have the case timely prepared because there were codefendants that were also going to trial at the same time and because we had scheduled the trial date well in advance. So we had come to this point where Jennifer was thinking seriously about withdrawing from the case.

The only reason I tell you that story is to tell you this story, which is it was after Jennifer decided that she was still on the case that we then had the discussion as to who would go to Columbia and when. That's my best recollection as to the time, sir.

Q     How was the determination made which one of you would go?

A     At the time I was very busy dealing with many of the legal issues I had taken on, the filing of the pretrial -- most of the pretrial motions and particularly the ones related to challenge on the basis of the Vienna Convention violations, and the like. I was also the one taking the lead in terms of preparation for the jury selection process. So essentially it seemed to me and my recollection both of us she was the logical choice to go to Columbia because I was doing all that other

84

stuff.

Q    Time frame again.  The jury selection started in the case on April 11th of 2000.  Does it sound correct to you that Ms. Herndon went to Columbia sometime after March 13th of 2000?

A    Again, I don't recall the exact date but that -- I mean that timing would not in any way surprise me.

Q    Now, before she left for Columbia, did you and her do any preparation together as far as trying to make sure that she was ready for the trip?

A    I do not specifically recall us doing anything whereby I would tell her what to do or instruct her, make sure you do X, Y, and Z.  My belief was that she was an accomplished practicing capital defense attorney and knew just as well as I did what kinds of issues were important to our case and what kinds of questions needed to be asked and what people needed to be found down there.

Q    When you discussed the important issues and the relevant questions for conducting a childhood mitigation investigation in Columbia, can you give -- can you give me some examples of important issues, important questions and things that should be investigated and looked into?

A    Well, if I'm understanding your question, sir, it kind of assumes an answer which I don't think I gave, which is -- I pretty much left to her what I would anticipate that she would ask.

85

If your question is what would I have thought she would have asked out of her own knowledge and experience and what witnesses she would have tried to locate, I mean literally you would start with family and work out the family fern and friends from there. I would think that there would be lots and lots of folks that you would talk to. And, in fact, that was my understanding as to what Jennifer did was that she started with momma and kind of worked her way through to other family members and friends, saw the workplace where momma ran her business and looked into those people that were made available to her through the family members.

Q When Ms. Herndon went to Columbia, what was your understanding regarding what she was going to try to accomplish there?

A She was going to find all information related to Mr. Sinisterra's background that was available there. Again, start with family members and, through them, friends and other folks and would work her way through talking to all of those people to find out information about Mr. Sinisterra's background.

Now, of course, when I say she would do that, she is not a Spanish speaker. So she had made arrangements to have available an interpreter there familiar with the area and, in fact, she did such a good job in that regard that the team down there to work on Mr. Tello's codefendant's case actually kind of glommed on to her and used the person that she had to help

them with the work they were doing at the same time. That was my understanding.

Q    With respect to the interviews, was it your understanding that Ms. Herndon was intending to have what I guess you could call more superficial kind of introductory interviews with the people that she talked to or did you have more of an expectation that she was going to conduct a thorough and probing investigation into Mr. Sinisterra's childhood?

A    When she returned, in terms of our discussions, it was my understanding that she had had good probing discussions with all of the players that she could find and that she did find and that she had good recordings of those discussions that she had conducted. Now, hindsight, of course, is 20/20. We came to find out as trial unfolded that certainly the tapes were -- how should I put it -- wanting.

Q    And those tapes ultimately, at least in some redacted form, were presented to the jury at the penalty phase of Mr. Sinisterra's case, were they not?

A    Yes.

Q    Now, the information that Ms. Herndon discovered during her travel to Columbia was the information that was contained in those videos; is that fair to say?

A    I'm sorry. Run that by me again. I'm not understanding.

Q    That was a bad question.

87

A     That's okay.  It's probably just me.

Q     With respect to Mr. Sinisterra's childhood, would it be fair to say that the information that was discovered in the Columbia mitigation investigation was the information that was contained in those videotapes?

A     The best way for me to answer your question is that there were two ways that I obtained information about Mr. Sinisterra's upbringing and background.  One of those was my own conversations with his -- with Mr. Sinisterra's mother in which he and I talked to her and he acted essentially as my interpreter to understand what she was saying.

      The other way that we found out information from the folks in Columbia was through Jennifer's trip, and the only memorialization I had of that came through the tapes.

Q     The videotapes that were presented at sentencing, can you characterize the general content of the tapes as they pertained to Mr. Sinisterra's background and upbringing into just general categories.  In other words, were there themes that you and Jennifer wanted to kind of draw from your mitigation presentation at trial?

A     Well, sir, the approach generally for mitigation presentation is to try to, as best as you can, humanize the person who is on trial, explain to the jury who that person is; and, of course, I personally felt very close to Mr. Sinisterra and felt that he was a good man caught in a bad situation and

88

wanted to do our best to portray the goodness in the man.  I think that would probably be the general approach that any capital case litigant -- or litigator would try to do.

Certainly in our just kind of general discussions Ms. Herndon and I would talk -- I mean, frankly, we would talk a lot in shorthand because we both knew what we were talking about.  So, I mean, there was -- there were no grandiose meetings of going through basics of capital case litigation strategy 101.  It's kind of this looks like a good idea, these are the kinds of things we want to do, and that type of stuff.

Now, particularly with the Columbian investigation, that was something that Jennifer left me with the impression was under control, and so I left it to her to assemble that information into a form that she was comfortable with since by that time we had decided she was going to take the lead on the mitigation case and I was going to take the lead on the first phase of the case.  So I left things in her hands to put that together.

Q     Would it be fair to say that it was your understanding that whatever mitigation evidence was available in Columbia that Jennifer had found it and had brought it back?

A     Yes.

Q     The videotapes that Jennifer brought back from Columbia, did any of those videotapes contain any investigation regarding childhood physical abuse or sexual abuse suffered by

89

Mr. Sinisterra?

A     Certainly not that I recall.

Q     Did any of those videotapes include information regarding severe head trauma suffered by Mr. Sinisterra as a child or regarding Mr. Sinisterra running away from home as a child?

A     Not that I recall.

Q     At anytime in the trial of the case, either phase, was any information presented to the jury that Mr. Sinisterra suffered from childhood abuse, trauma, sexual molestation, any of that kind of information?

A     No, sir.

Q     Throughout the term of your representation of Mr. Sinisterra, did you ever have any knowledge that Mr. Sinisterra may have been a victim of childhood physical abuse, trauma from witnessing scenes of extreme domestic violence, or sexual molestation?

A     No, sir.

        MR. JENAB:  Could we pull up Exhibit 3?

Q     (By Mr. Jenab)  Mr. Duchardt, we've got on the screen there the statement that you previously filed in this matter. I guess it's got a file date of November 26th of 2006.

A     Yes, sir, I see that.

Q     I'd like to turn your attention to paragraph 13, which is on page -- and have we previously discussed that this

paragraph may need some clarification or explanation?

A    Well, in the deposition you all took of me I had the opportunity to, I guess, correct any misapprehensions about what I may have been trying to say in that statement.  Of course, basically what you try to do when you're asked to put together something like this is do your best and to try to anticipate what the questions are.  You left me -- or actually cocounsel left me with the impression that what was being gleaned out of this was that I was trying to say something different than the answers to the questions I just gave to you just before.

Q    Just so I can make it simple, would it be fair to say that during your representation of Mr. Sinisterra, the information that you knew about his childhood and background was the information contained in the evidence that was presented at the penalty phase of the trial?

A    Exactly right.

     MR. JENAB:  Just so we're clear, Judge, I don't want to do more than that.  Just to show to the extent there isn't any inconsistency, Mr. Duchardt has clarified that.

     THE COURT:  All right.  Thank you.

Q    (By Mr. Jenab)  Now, I think you indicated that you didn't try to tell Ms. Herndon what to do or how to go about conducting the investigation in Columbia; is that right?

A    That's correct, sir.

91

Q    And is it fair to say that you would have believed that if there was information in Columbia, there was available information that she could have gathered indicating that Mr. Sinisterra did suffer childhood sexual abuse, physical abuse, and other trauma, that Ms. Herndon would have found that information and brought it back?

A    The only reason I'm having trouble is I'm kind of trying to sort through your question a little bit.  Let me try and answer it this way.  It was my belief that Ms. Herndon would be conducting the investigation I would have conducted and that would have been as I described, to talk to all of the people there and exhaust all of the leads concerning Mr. Sinisterra's background and experiences there.  Does that answer the question?

Q    I think it starts to.

A    Okay.  Please go ahead.

Q    I guess the thing I would like clarification on is you -- and correct me on this.  I think you just said it was your belief she would conduct the investigation you would have conducted?

A    Yes, sir.

Q    Would you have made an effort to learn from the family whether there had been significant trauma, such as childhood sexual abuse or physical abuse in Mr. Sinisterra's background?

A    Sure.

Q     If you were approaching those kinds of topics that are by nature somewhat difficult to talk about, would you attempt to conduct a probing, a sense of a patient searching interview with the family members?

A     Sure.

Q     In the videos that Ms. Herndon brought back from Columbia, none of those topics are discussed in any way; is that right?

A     Nothing that I saw.

Q     You mentioned that in the mitigation phase of the case the general goal is to humanize the client for the jury; is that fair?

A     It's not only fair, it's really accurate here since the government's obvious approach was to dehumanize Mr. Sinisterra and try to paint him as Hitler.

Q     Let me ask it this way.  If you had facts that you could have presented to the jury to show that Mr. Sinisterra had suffered from childhood sexual abuse, childhood physical abuse, such as severe beatings, childhood trauma, would that information have been significant to present to the jury?

A     Of course.

Q     How would that information have affected your overall presentation?

A     It would have augmented it.

        THE INTERPRETER:  I'm sorry.  I didn't hear that.

93

A    It would have augmented it.

Q    (By Mr. Jenab)  Is that kind of evidence evidence that you would view as an important augmentation to a presentation that would otherwise be concerned with his poverty, for example, of his illiteracy, the kindness he shows to his family?

A    Sure.

Q    Would that kind of information also have given you the opportunity to request additional non-statutory mitigators?

A    Yes.  Simply put, yes.  Probably both statutory and non-statutory potentially.  The whole idea of drafting mitigating factors is kind of an art in itself, as I'm sure you're aware.

Essentially those kinds of issues, quite frankly, become potential non-statutory mitigating factors, and I guess kind of taking the point you're making, if I may, and taking it the next step, what the government was trying to show or trying to convince the jury about was Mr. Sinisterra's understanding of what he was doing.  Frankly, for some reason they were elevating him to a level far beyond what it seemed the facts justified in terms of his understanding of things and his level of culpability in the matter.

The kinds of things you're talking about would have gone very directly to our notions that he was a much simpler man with many more problems than the government was willing to

94

acknowledge.

Q   If I'm understanding you correctly, then, this kind of information has -- and when I say "this kind," I mean this traumatic -- these traumatic experiences, they have an inherently humanizing element that may rise from sympathy or just the misfortune?

A   Sure.

Q   And then they also have a potential to be directly relevant to specific statutory aggravators as well?

A   You mean mitigators?

Q   And aggravators.

A   Well, certainly it would potentially counter certain of the statutory aggravators as well, yes, sir.

Q   During the course of your representation of Mr. Sinisterra, did you ever ask him yourself whether he had been physically abused or sexually abused as a child?

A   I did not pose that direct question to him, no, sir.

Q   If you had been the one that was going to go to Columbia, before leaving to travel to that country, would you have met with Sinisterra and discussed with him topics like whether he had ever been abused, whether he had suffered serious trauma as a child?

A   Well, I'd like to think I'd have thought of all the right questions to ask before I go.  I can't promise you that's the way I would have handled it, particularly since Mr.

95

Sinisterra and I had prior to that time met on a gob of occasions. I don't know exactly how I would have prepared myself. I have no doubt I would have met with him before I left, if that helps.

MR. JENAB: Could we pull of Exhibit 13, please?

A    I'm with you, sir.

Q    (By Mr. Jenab)  And this letter, Exhibit 13, is from -- a letter from you to Dr. Enrique Dos Santos?

A    Yes, sir.

Q    Dated April 10th, 2000, correct?

A    Yes.

Q    Did you send Mr. Sinisterra to Dr. Dos Santos for an evaluation?

A    No.  I sent Dr. Dos Santos to Mr. Sinisterra.

Q    Right.  And the date of the evaluation was within a couple of weeks after this letter; is that right?

A    It was.

Q    I'll tell you it was April 22nd.

A    Okay, sir.  I see in the first paragraph.

Q    Okay.  The time frame we were talking about before where the jury selection began on April 11th.

A    Yes, sir.

Q    Was there any connection in your mind between the stage of the case and the referral to Dr. Dos Santos?

A    I guess I'm missing you.

Q    I guess the question is, was there any reason why you sent Mr. Sinisterra to Dr. Dos Santos at this time?

A    As opposed to earlier or later?

Q    As opposed to maybe earlier in the case.

A    My notion at the time that I asked Dr. Dos Santos to evaluate Mr. Sinisterra was that I wanted to make sure in my own mind that I wasn't missing something. I did not believe that I was but I wanted to be sure. I did not seek it any sooner because I didn't think I was missing anything, but as time went on, I just wanted to satisfy myself that if there was something I was missing, I had the assistance of a psychiatrist to backstop me.

Q    And, in fact, Dr. Dos Santos didn't find anything, did he?

A    No, sir.

Q    The time of this evaluation was after Ms. Herndon had returned from Columbia; is that right?

A    Sure.

Q    If Ms. Herndon had come back from Columbia with evidence that Mr. Sinisterra had been physically and sexually abused as a child, would it have surprised you if Dr. Dos Santos had diagnosed posttraumatic stress disorder?

A    Well, as long as he knew about it, no. As long as somebody told him, sure. Which we didn't, of course, because we didn't have that information.

97

Q    Absolutely correct.  And I apologize for the long question.

A    No.  That's okay.

Q    I was trying to pause it.  If she had brought that information back?

A    We would have given it to him.  It would not surprise me -- I mean, frankly, it would surprise me in that instance if he did not diagnose a condition of posttraumatic stress disorder.

MR. JENAB:  Can we pull of Exhibit 12, please?

Q    (By Mr. Jenab)  Mr. Duchardt, this letter is one that was also discussed at your deposition.

A    Yes, sir.

Q    Do you recall receiving this letter from Mr. Guevara?

A    To tell you that I recall specifically the content of the letter, no.  To tell you that I'm sure this was in my file because I received it from him, yes, sir.

Q    Okay.  I mention it only because Mr. Guevara is a Columbian national?

A    Yes, sir, which he says in his letter.

Q    Exactly right.  And was offering his services?

A    Yes, sir.

Q    Was the issue of the possible retention of some sort of investigator to assist with the Columbian part of the case, was that a matter of discussion at any point between you and Ms.

Case 4:04-cv-08003-GAF    Document 119    Filed 02/19/13    Page 98 of 185

Herndon?

A    You mean employment of this guy as opposed to anybody in the world?

Q    Anybody.

A    My recollection is that we were looking for someone and we -- probably was more primarily me -- but I think Jennifer and I had discussions about it, looking for someone who I believed would have enough of a familiarity with the lay of the land there and also particular capabilities to assist us with an investigation when we got to that point.  In reviewing this letter, which came unsolicited, I was personally not impressed and that's the reason why I didn't pursue him.

Q    And at the end of the day you didn't end up hiring anyone else either, right?

A    The only person that we hired was the fellow who helped Jennifer when she was in Columbia.

Q    Did that cause you any concern in light of the amount of confidence and trust that you had in Jennifer's abilities that there wasn't an investigator going with her?

A    No, sir.

Q    I think you testified to this but let me just make sure if you didn't.  When Jennifer went to Columbia, you had full trust that she was going to do a thorough job while she was there, right?

A    Yes, sir.

Case 4:04-cv-08003-GAF    Document 119    Filed 02/19/13    Page 99 of 185

Q     It would be fair to say, wouldn't it, that a thorough job would include finding any deep, dark family secrets.  It would include looking for them?

A     Right.

MR. JENAB:  Nothing further.

Thank you, Judge.

THE COURT:  Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

A     Good morning, sir.

Q     Good morning, Mr. Duchardt.  How are you today?

A     Good.  Thanks.

Q     As we get into some preliminary matters, one thing I wanted to ask is when you indicated during your testimony that the source of information you would have relative to Columbia was either from Ms. Brewer -- Ms. Herndon's investigation into Columbia at the time and reflected in the tapes that were brought back to you or in your conversation with Mr. Sinisterra and Mr. Sinisterra's mother; is that accurate?

A     Right.  I think also in fairness I think I also through Mr. Sinisterra talked to a couple of other family members is my recollection.  My time records would probably reflect that best.  But that's my recollection.

Q     In other words, there might have been some phone calls at your office down to members in Columbia to try to ferret out some information?

A       Yes, sir.

Q       And during those conversations because of the language issues, would that have been the role Juanita Chavez served you in?

A       No.  Actually, Mr. Sinisterra helped me with that.  He in my perception did a good job of helping me understand what his folks were saying.

Q       Okay.  I believe you indicated that you did not specifically ask Mr. Sinisterra, that you can recall, whether or not he had been a victim of physical or sexual abuse or significant head trauma; is that fair?

A       No, sir.  I do not recall asking him directly that question -- those questions.

Q       And though you didn't ask that directly, did that source, that subject come up indirectly during any of your conversations with Mr. Sinisterra?

A       I don't recall sexual abuse or abuse of him coming up in any conversations.

Q       Is that true with both Mr. Sinisterra and with any of his family you may have spoke to?

A       Yes.

Q       While using Mr. Sinisterra as a translator?

A       Yes, sir.

Q       Is that also true with any conversation you may have had with Mr. Sinisterra's mother?

A     Yes.

Q     Just so we're clear, the affidavit that we're talking about or the declaration that was previously shown you as Exhibit 3.

A     Yes, sir.

Q     That was provided by you pursuant to Court order at my request in order to respond to the allegations under the 2255 claim, correct?

A     That's my recollection, yes, sir.

Q     And although it was professional, it's one of those things you prefer not to prepare a declaration and you asked the Court to intercede because you didn't want to deal with whether or not there were any attorney-client issues involved?

A     It's my understanding of the law that there is a waiver presumed by the filing of a postconviction remedy case, but I still had difficulties with that unless there is a specific agreement to that and/or a court order and my recollection was that I had both.

Q     And before I get into this a little more deeply, I want to ask you this. I missed it. How long have you been a practicing lawyer, sir?

A     1980.

Q     So 33 years, 32, 33 years?

A     Coming up.

Q     And since 1985, at least, the lion's share of the

102

practice you have is as it relates to the death penalty; is that correct?

A    That's correct.

Q    During the course of the time you've been a practicing lawyer, is the Missouri bar the bar you're a member of?

A    Yes, sir.

Q    Is that your primary bar affiliation?

A    Yes, sir.

Q    Okay.  Have you been ever found ineffective in either state representations you've held or federal representation?

A    I believe once.  That was an instance in which a fellow's conviction was reversed because of a legal error. That was back in the late 1980s, I believe.

Q    Do you recall the nature of the error?

A    It had to do with an instructional error that was committed that, frankly, the Court and the parties missed.  It was something that the attorneys picked up on postconviction relief and fortunately brought that to the attention of the Court and got a new proceeding for the defendant. Unfortunately, the retrial ended up much the same way as the first trial.

Q    Do you recall if it was a state or federal matter?

A    State.

Q    So that was an instructional issue dealing with MAI or Missouri Approved Instructions?

A    Yes.

Q    Which need to be word for word or there can be problems?

A    Yes.

Q    Were you cited by the Missouri bar in any way as a consequence of that finding?

A    No, sir.

Q    Have you been cited by the Missouri bar for any type of inappropriate behavior?

A    No, sir.

Q    No reprimands or anything like that?

A    No, sir.

Q    Okay.  Now, as we get into this, Mr. Duchardt, I'll tease out a few of these issues and some of them may relate, but during the course of either your deposition and in your affidavit, you talk about your view of mitigation investigation and mitigation specialist?

A    Yes.

Q    Can you kind of tell me in your view the role of a mitigation investigator and the role of a mitigation specialist as it pertains to capital defense work?

A    Well, probably the best way to put my opinion is that it's not very heavily influenced by terms like mitigation specialist, mitigation investigator, lawyer.  There's a set of tasks that need to be done by somebody to develop a good

104

working understanding and a paper trail concerning the person who's being represented.  Sometimes that's best done by investigators or so-called mitigation specialists.  Most times, in my opinion, it's best done by the lawyer who's going to be doing the presentation.

Q      Do you consider yourself to be an experienced practitioner in this area?

A      Yeah.

Q      Do you feel comfortable doing that kind of work yourself?

A      I almost exclusively do that work myself.

Q      Do you feel there's anything magical about the title of mitigation specialist or mitigation investigator?

A      It's all made up.

Q      Do you believe that based upon the experience you have and the commitment in this area for the cases you've done that you can do the kind of work necessary to defend a capital case?

A      Better.

Q      Now, capital cases get broken down in to first phase, second phase, guilt phase, penalty phase.  For my purposes do you compartmentalize cases in that way?

A      I don't think it makes much sense in cases to compartmentalize them at all, because, quite frankly, some of the best mitigation evidence comes out hopefully in the first phase and lets the jury be thinking about it early on.

Q Is it fair for me to summarize it by saying that whether it's phase or not, each piece of evidence can build to the next and should have some kind of relatedness?

A As you know, experienced counsel that's the only way it works.

Q When you say "experienced counsel," you were the first person appointed in this matter; is that correct?

A That's correct.

Q And you were appointed to represent Mr. Sinisterra who though not the lead defendant in the case. I believe Mr. Hinestroza was Defendant No. 1 on the indictment?

A But we didn't have him.

Q He was the lead defendant in custody at the time?

A Yes, sir.

Q Under federal law when a defendant is facing a capital case, they are entitled to two counsel, correct?

A Yes.

Q And one of which is referred to as learned or experienced counsel?

A Yes, sir.

Q Were you that in this particular case?

A Actually we both were. I guess I was lead counsel certainly in the -- I believe the estimation of Judge Gaitan he looked for me first and appointed me first and then I brought Jennifer on, though I brought her on because of her level of

106

experience which was pretty close to the level of experience that I had.

Q    When you were appointed to this case, it's fair to say you had about 17 months to get this case ready for trial in April of 2000?  Does that sound about right?

A    I can't count it up for sure but we had well better than a year.

Q    Did you feel that you had enough time?

A    Yes, sir.

Q    Did you ever ask for a continuance so that you could work more and develop more lines of inquiry?

A    The one that we got in the first place, and what I tried to do in cases like this is ask for enough time at the outset because I find that the courts are willing at the beginning to give that kind of time that's necessary so long as you justify it and so long as you stay true to your word and get the case ready.

Q    As the trial date loomed in April of 2000, did you feel it necessary to ask for more time to complete your defense?

A    Well, that kind of comes back to my earlier testimony about the situation that Jennifer brought to me about three months in advance of trial is my recollection, and my belief at that time was that the lion's share of the work had been done and that as long as we were willing to work our tails off between then and time of trial, we'd be ready.  So if that

107

answers your question.

Q    And I believed the case that was causing her some consternation was a Martin case.  I've forgotten his first name.

A    I don't recall at all the name of the case.  I just recall it was another capital case.

Q    In regard to that, did you agree that, if necessary, you could do whatever heavy lifting would be necessary to get the case ready to be tried in April?

A    I think that's the words I put at the time.

Q    You were willing to do that, weren't you?

A    Sure.

Q    Ultimately, though, you discussed the need -- or not really the need -- discussed whether or not seeking a continuance would be appropriate and you chose not to seek a continuance?

A    I didn't see the necessity at the time.  In fairness to Jennifer, I think she thought I had two heads in feeling that way; but, frankly, I felt like there was plenty of time to do what needed to be done to get the case ready.

Q    Ultimately the matter that was occupying a lot of her attention -- I'll represent the Martin case got resolved in some manner, via continuance or plea, that allowed her more time to get ready as trial loomed, correct?

A    Yes.  Basically whatever the problem -- well, the

problem was timing there. It was set for trial at or about the same time that we were set for trial. I believe it was the older case and, therefore, potentially would have taken precedence for her time. I think that's why she had concern. In some fashion she managed to get the timing conflict resolved to be able to devote the kind of time that we both felt would be necessary for her to devote to help the team get ready for trial.

Q      Ultimately she was able to spend some time on it and was the person who made the trip to Columbia to perform that phase of the investigation?

A      That's correct, sir.

Q      It's been stated by Ms. Herndon that she termed that Columbia trip as a meet-and-greet. Is that consistent with how you recall that trip being?

A      I never heard those words out of her mouth.

Q      Would you characterize a trip like that to Columbia, South America, in anticipation of a trial some three to four weeks in the future to be a meet-and-greet?

A      I wouldn't have treated it that way, no, sir.

Q      What would you have considered such a trip to be?

A      Your chance to get all of the work done while you're spending the nickel to be there.

Q      Would you or your team have had the opportunity to go back to Columbia if you thought it appropriate to do so?

109

A    Let me answer it this way to see if it addresses it. It was not my impression from Jennifer that she believed anything more needed to be done there. If she would have told me that more needed to be done there, either she or I would have gone back. I'd have made the arrangements for either her or me to go back.

Q    Okay. So in this hypothetical -- well, in the real world you believed everything had been done?

A    That was my understanding.

Q    Left you with the impression -- let me break it up this way. You thought her capable of doing the work down there?

A    Yes, sir.

Q    You had faith in her ability to do the work down there?

A    Yes, sir.

Q    And then upon her return, you thought she had done what needed to be done while down there?

A    That was the impression I had from her.

Q    And that information she was able to obtain during that information was ultimately memorialized on the various videotapes that you've heard talked about?

A    Sort of. I mean, you've seen them too. I thought going in that it was my impression from Jennifer that the tapes would present what she found out. As the Court made clear during the trial, the tapes were less than perfect in terms of even presenting what was contained on them.

110

Q    I believe in your testimony earlier, you ideally said the tapes were wanting?

A    Yes, sir.

Q    In your affidavit, pages 11 and 12.  I can provide it to you, if it sounds incorrect what I say.  You indicated it was Herndon's idea that the videotapes would be an effective way -- maybe effective is the wrong word -- would be a way to present the evidence to the jury of the information she had obtained in Columbia?

A    Well, let me answer this a little bit more broadly and you stop me if I'm not answering the question.

Q    Sure.

A    I think you'll recall our intention was to present the witnesses themselves.  The tapes were there to memorialize without -- my understanding of the tapes was that they were there to memorialize what had happened so that Jennifer didn't have to take lots and lots of notes.  Nobody intended to use those tapes because we fully intended to present the witnesses themselves to testify.  Because we were unable to persuade the State Department to allow visas to these various witnesses in the end, we were left only with the tapes to use, and that's when Jennifer was going through the process of getting those tapes into the form that they were ultimately presented at time of trial.  Does that answer the question?

Q    It does.  Thank you.

111

And as it relates to the tapes, do you recall there being an issue when Ms. Herndon wanted to disclose those tapes to the government?

A    Sure.

Q    What was that issue?

A    I'm sure you're familiar in your seminars on the prosecution side that there are true believers on both sides of the questions of the death penalty, and those people tend to take an approach to cases that don't necessarily work in the real world.

In the situation of the seminars at that time in conjunction with death penalty defense, it was a common belief that the defense had no duty to disclose information that was going to be presented in the penalty phase. Quite frankly, I had serious difficulties with those notions, but Jennifer believed that it was not something that needed to be presented because we -- needed to be disclosed because we had no obligation to disclose it, based upon what was an approach to evidentiary matters that had not yet really been decided by the courts that I had some real problems with.

Since she was taking the lead on those matters and also because she was having delays in actually preparing the physical tapes to present, I went with her notions, the common orthodoxy on the subject and, of course, that didn't work out very well for us.

112

Q     And to be fair, timing was really a two-way street in this case.  There were a lot of things you were getting from the government late as well?

A     Sure.

Q     The government exercised in this case closed file discovery, I believe?

A     Yes, sir.

Q     Which meant that there was a certain amount of information, good amount of information you weren't going to receive until some 30 days before the trial was set?

A     And that was part of the reason why, quite frankly, when we were talking about a continuance three months prior to trial.  We had gone through everything you all had provided to us to that point.  What we had to do was be in a position to work through all of the remainder of the discovery and whenever that happened, it was going to happen, if that answers your question.

Q     I think the short version is if the case got continued because of the disclosures the government was compelled to make, it would also be continued and you were at a point in your investigation where you needed those disclosures?

A     We were stymied until we got them.

Q     I understand.  As we kind of continue on this idea of the timing as it relates to the Columbia trip, there's no doubt that was fairly late in the period of time which you

113

represented Mr. Sinisterra; is that correct?

 A     Yeah.  I guess.  To me it was -- it makes sense in terms of where we were at at that juncture.  Frankly, it didn't make a whole lot of sense to me to do that without some of the discovery that we were going -- that we were still waiting for from the government just simply because we didn't know what was going to be in there, and to then go on that trip to Columbia without having received that information was a recipe for potentially having to go back there again and ask questions that we didn't have information about, if that makes sense to you.

 Q     It does.  So is it fair to say, then, that you're comfortable doing portions of your mitigation investigation or any part of your investigation, if necessary, late?

 A     Some of the best information I have found in cases has come even during trial, not because of any oversights but just because you find out things as time goes along.

        In terms of this particular timing of the trip to Columbia, sure, it could have been done earlier if the notion was we were going to try to go multiple times and not try to accomplish as much as we could in one fell swoop; but particularly in light of the unrest in Columbia and the problems there, it seemed to me that the more prepared we would be for that trip when we went, the better.

 Q     There were other investigations and trips that were

114

taken, such as some of the trips to Houston that were done that you did with Mr. Grothaus, correct?

A    And that's correct, sir.  Those were ones that there weren't the kinds of preparations for that were necessary and there were lots of things that could be accomplished without having lots of the information that was coming later in the discovery process.

Q    So if I understand you correctly, then, the timing of various trips is dictated to some degree by when you're going to get efficacy out of that trip?

A    Sure.

Q    You made those decisions that are related to whatever trip or whatever part of the investigation was necessary while you were undertaking Mr. Sinisterra's representation?

A    That's correct.

Q    You indicated during your examination with Mr. Jenab that one of the things that you did, kind of my phrase, as a safety net you had Dr. Dos Santos examine Mr. Sinisterra fairly late in the game just to make sure you hadn't missed something?

A    Yes.

Q    When you engaged Dr. Dos Santos, were you aware of his background?

A    Yes, sir.

Q    You were aware that he was formerly with the Fulton Diagnostic Center and looked at inmate patients for years?

115

A     You're probably well aware of Dr. Steve Mandracchia at the Western Missouri Mental Health Center, the director of forensics there for years.  Frankly, I went to Steve and asked him for a recommendation.  He said you really need to talk to Dr. Dos Santos.

Q     And Dr. Steven Mandracchia is someone that you've used numerous times in your representation of various clients, correct?

A     We have had probably hundreds of cases together dating back to my days with the Missouri State Public Defender System.

Q     Is the reason you wouldn't use Dr. Mandracchia here is because the client that you represented was a Spanish-speaking native of Columbia?

A     Yes.

Q     And instead you were looking for someone like Dr. Dos Santos who could speak Spanish natively?

A     Yes.

Q     Did Dr. Mandracchia give you a referral that's who Dr. Dos Santos is?

A     Referral sounds formal.  He didn't send me a letter. He basically said, Fred, call Dr. Dos Santos.

Q     Okay.  And you did?

A     Yes.

Q     And Dr. Dos Santos agreed to meet with Mr. Sinisterra?

A     He did.

116

Q      Did you provide him what information you had you thought relevant to Dr. Dos Santos' evaluation?

A      Yes, sir.

Q      Did Dr. Dos Santos report back to you about his findings regarding Mr. Sinisterra?

A      Yes, sir.

Q      What did he report back to you?

A      He did not find any issues related to Mr. Sinisterra having any mental diseases or problems that would amount to anything that we could use in connection with either the first or the second phase of the trial.

Q      Admittedly that's occurring while the trial is underway?

A      Yes, sir.

Q      It did not bother you to have that going on at a very late hour?

A      If I would have thought that I -- that there was something I was going to find, absolutely I would have done it earlier.  You put it correctly whether you call it safety net or double-checking or whatever you want to do.  However you would term it, I was trying to make sure that I was not missing anything.

Q      Did Dr. Dos Santos ever author a report?

A      I did not ask him to author a report.

Q      Did he ever offer you up any notes he may have taken?

117

A    No, sir.  I didn't ask for them.

Q    Did you ever ask him to destroy his notes?

A    No, sir.

Q    Beyond Dr. Dos Santos, you also had Mr. Sinisterra fairly early on in your representation examined by a Dr. Warren Wheelock?

A    Yes, sir.

Q    For the Court's edification, who is Dr. Wheelock?

A    Warren Wheelock has been at UMKC -- was at that time had been at UMKC for years.  I had used him in connection with educational testing of persons in multiple cases before and since.  He's a dandy.

Q    And Dr. Wheelock did provide some reports to you relative to his examination with Mr. Sinisterra; is that correct?

A    Yes, sir.

Q    Can you tell the Court the kind of summary of what Dr. Wheelock's conclusions were?

A    Well, basically you will recall that we were in the midst of motions to suppress statements, and the thrust of what we were trying to do with Dr. Wheelock is demonstrate Mr. Sinisterra's lack of understanding of the warnings that he was given, both in terms of the classic suppression issues and also the Vienna Convention issues.

         Essentially what Dr. Wheelock found was that Mr.

Sinisterra had serious understanding problems with respect to the kinds of English that's associated with the warnings, but he certainly went further in terms of his conclusions, if that helps.

Q    Did Dr. Wheelock go so far as to conclude whether or not Mr. Sinisterra was mentally retarded?

A    I never received a diagnosis from anyone about mental retardation.

Q    Instead, if I understand it, the summary is Dr. Wheelock testified in numerous occasions before the magistrate court in this courthouse about whether or not your motion to suppress was well taken as it relates to his ability to waive his rights under Miranda?

A    Yes, sir.

Q    Also whether or not he should have some relief under the Vienna Convention on Consular Relations as a consequence of a language issue?

A    Yes, sir.

Q    We'll talk about this shortly, but there were a number of what are now subtle principles of law but at the time you represented Mr. Sinisterra were far from settled; is that fair to say?

A    If you are talking about the issue of mental retardation, that was not, but it was certainly an issue that we would have raised had it reached the level that it needed

119

to; and, of course, you're looking at the need for an expert to -- especially for somebody like Mr. Sinisterra because you don't have records that would show the type of things like onset prior to age 18. You would have to have an expert who would opine that those kinds of criteria likely would have been met in light of the information that they had, and we didn't have anything of that sort.

Q Sure. Those information sources are very difficult when they're anecdotal and not documentary, correct?

A Well, certainly experts can and do jump -- reach those leaps and make those conclusions without the records, but it's certainly better if you have the records; but, of course, in Mr. Sinisterra's case we knew all along, A, it would be very difficult to get whatever records might be there and, B, he didn't go far enough in school there would have been any kind of records that would have been generated and, C, he didn't have the kind of resources to be seen by health and mental health professionals in Columbia, so we didn't believe there would be any kind of paper trail for anything like that that would have ever been even developed.

Q Despite your hopes to the contrary, Dr. Wheelock's testimony ultimately did not support a motion to suppress that you offered to the magistrate court or appealed to the district court?

A Well, I don't know what my hopes were necessarily. Dr.

Case 4:04-cv-08003-GAF   Document 119   Filed 02/19/13   Page 120 of 185

Wheelock's conclusions, I thought, were very supportive of the positions that we were taking on the motions, but as you absolutely describe those positions did not find favor with the judges deciding the issues.

Q     And some of the other legal issues that were controversial at the time it required significant time on your part were the Vienna Convention on Consular Relations that we talked about?

A     Yes, sir.

Q     Not that it's important here but you spent a lot of time on those issues because there was a split in United States versus the world court on whether or not the Vienna Convention would create individually enforceable rights, correct?

A     Actually there wasn't even a split at that point.  The issue had never been decided by the U.S. courts so there was certainly some hope to be had that the fact that the world courts were actually winding their way to what would later be a very favorable decision, and so there was certainly some hope that the U.S. courts would start following that.

Q     You indicated that one of the responsibilities you had during the representation was also motion practice, correct?

A     Yes, sir.

Q     Some of the motion practice that took some time would have been an instructional issue specifically in this case relative to the may versus shall distinction found in Title 18

121

versus Title 21.

A      Which is still going on.

Q      Which is still going on.  But it hadn't really been decided in a meaningful way when you were trying this case?

A      Actually I think Allen came out after -- about the time that the case came to trial, and that was really the first Eighth Circuit determination on the subject, but pretrial we were essentially making new law.

Q      As we look through some of these issues, Mr. Duchardt, you talk about in your affidavit whether or not it would have been appropriate to hire a social -- forensic social worker in this case, which you ultimately chose not to do, correct?

A      Yes, sir.

Q      Why did you choose not to do that?

A      Well, this kind of goes back to the whole thing of whether there's any magic to spending the money to hire a mitigation specialist versus lawyers who are supposed to know what they're doing doing their jobs.  It's my belief that if the forensic social worker is there to do the jobs of the lawyers, the lawyers can do that themselves.

If it's the job of a forensic social worker to identify mitigation themes and things like that, if money grew on trees, that would be maybe a good idea, but then, again, maybe not because, quite frankly, you get too many cooks spoiling the broth.  So where I believe that the forensic

social worker is certainly helpful is, frankly, in a case the way this one turned out. We did not anticipate it was going to be that way, but in hindsight being 20/20 if we would have had a forensic social worker on board, we could have, frankly, used that forensic social worker under the relaxed evidentiary standards of the FDPA in the penalty phase to be able to make the presentation that, quite frankly, the tapes turned out wanting on.

Q    And so the record's clear on that issue, the forensic social worker essentially will gather the information and testify in a summary fashion to a considerable amount of hearsay as a narrative witness, correct?

A    Basically like the government using its case agents to summarize its case, yes, sir.

Q    And you chose not to do that in this case because you hoped and preferred to put the witnesses on that would have had information themselves so there can be a personal connection?

A    Whether I diluted myself or whatever it was, I truly believed that we were going to get the witnesses present. As always, it's my belief that the witnesses themselves do a much better job of presenting their information than somebody summing it up for them.

Q    At the time the decision was made or not made relative to a forensic social worker, it was your hope and belief the witnesses themselves would gain entry in this country to

123

Case 4:04-cv-08003-GAF    Document 119    Filed 02/19/13    Page 123 of 185

testify on their own behalf?

A    That's correct.

Q    That ultimately did not happen.  The Department of State would not grant travel visas?

A    Right.

Q    Had you known that in advance, perhaps that decision would have come out differently?

A    Sure.  And I also suggest that in hindsight the taking of depositions down in Columbia would have been another alternative that we should have --

Q    Nobody ever preserved that information?

A    Not only preserve it but present it.

THE COURT:  Is this a good time to stop for lunch?

MR. VALENTI:  Sure.

THE COURT:  We'll take a recess until 1:30 for lunch and we'll resume again at that time.  Thank you.

(The noon recess was taken.)

AFTERNOON SESSION

THE COURT:  Mr. Duchardt, would you come back up.

THE WITNESS:  Yes, sir.

THE COURT:  And I'll remind you you are still under oath.

THE WITNESS:  Yes, sir.

THE COURT:  Mr. Valenti.

MR. VALENTI:  May it please the Court.

THE COURT: Yes, sir.

FRED DUCHARDT resumed the stand and testified further:

CROSS-EXAMINATION (continued) BY MR. VALENTI:

Q    When we broke, we were going through a number of things. I wanted to talk to you about Hector Guevara. You were shown previously a letter that he wrote to you in July of 1999?

A    Yes, sir.

Q    Which would be the middle of your representation of Mr. Sinisterra, correct?

A    Yes, sir.

Q    I believe you described that as an unsolicited offer of employment regarding social work mitigation investigation by Mr. Guevara?

A    I get a lot of those in the mail, yes, sir.

Q    How do you handle those unsolicited approaches generally?

A    Right next to ignore most of them. Now, the difference between his and most is that he did indicate knowledge of the particular area and that's the reason I held on to it, but the basic inquiries that I made at the time it did not seem to me like he was someone who we really needed or wanted for the purposes.

Q    And you indicated, I believe during your direct examination, that you, I think your words were, personally were

125

not particularly impressed with him or with the letter. Can you explain that further to the Court?

A    Really I can't anymore than just say you can read the letter. I guess personal preferences would dictate whether a person might think that it was impressive or unimpressive. To me it was not particularly impressive. And, again, while certainly that kind of initiative is a good thing, I just did not perceive that to be -- I was looking for someone with more umph to their background to the extent I was going to do it. I was looking for somebody with, not just a basic investigator, but somebody who had more credentials and more potential to bring authority to what they were talking about, because what I would have potentially like to use someone like that for would have been somebody who would be a creditable historian of the area, not just a basic investigator.

Q    Okay. And could you -- kind of to some degree you already had someone you considered a basic investigator, that being Dan Grothaus; is that right?

A    Yes, sir.

Q    Also someone that you described during your direct examination with whom you were familiar and whom you thought could be groomed for future use, not only in this case but other cases as it relates to both fact investigation and mitigation investigation?

A    That's true.

126

Q     Were you aware that Mr. Guevara had previously been interviewed and -- maybe no more than interviewed but was prepared to accept employment on the Plutarco Tello, a codefendant in this case, investigation should those attorneys had they gone to Columbia?

A     Now that you say that, it strikes me that that might have been the case, but I didn't -- I don't recall making any decision about not using him on that basis, because I don't think that they actually did engage him.

Q     During the course of either the declarations or the depositions in this case, you have had an opportunity, I believe, to review Dr. Llorente's report?  I may have mispronounced that.  Let me spell that, L-l-o-r-e-n-t-e.

A     Yes, sir.

Q     You had an occasion to review that doctor's report?

A     Yes, sir.

Q     And you were asked, I believe, during your deposition examination whether that was the kind of thing that you as an attorney representing the capital defendant would be looking for?  Do you recall the kind of inquiry?

A     Yes, sir.

Q     You said you were troubled by his report in that it both giveth and taketh away, I think were your words.  Do you recall that?

A     Yes, sir.

127

Q  Do you recall what it is that you were concerned about in the taketh away department?

A  This kind of comes back to my notion that we didn't need for Dr. Dos Santos to prepare a report for us. My notion was that I did not want to expose Mr. Sinisterra to a possible evaluation by government examiners unless we had a very strong reason to present an expert opinion, because experts can disagree; and to the extent that a report is provided and the intention of reliance upon an expert is expressed, then the opportunity for the government to develop potentially damaging information on the other side is a real possibility.

So the report by the good doctor did not seem to me to augment the already fairly powerful information that had been developed -- that he relied upon, and it seemed to me that if it was my call, I would probably present the information and not present the expert, if that explains it to you.

Q  Sure. As it relates to mental health, when we get into that, of course, that can be of paramount importance in a capital case, can't it?

A  Sure, both sides.

Q  For both sides. And there are distinctions on how that material can be gathered and presented based upon whether you are in the guilt or penalty phase of a death penalty case, correct?

A  Sure.

128

Q    It's true, sir, if you were to proceed on the penalty phase -- excuse me -- the guilt phase of the case with a mental disease or defect, that you would want to present, that, as you mentioned, you would have to produce a report and an expert, then the government would have access to the client to review those materials, potentially in a walled-off situation, but have some type of ability to rebut that evidence, correct?

A    Walled off to the extent it was a penalty phase anticipated presentation, not so much if it's a first phase presentation.

Q    Were you aware, I assume, of the kind of experts the government traditionally hires in this area as it relates to the mental disease or defects, whether it be a psychologist, neuropsychologist, or psychiatrist?

A    Well aware.

Q    Was that the kind of person you wanted to subject Mr. Sinisterra in this case if you didn't have to?

A    No, sir.

Q    Did that concern have any impact on your decision to have Mr. Sinisterra examined by Dr. Dos Santos later rather than sooner?

A    I can't really say that was -- that really played much of a role at all.  It was really more my notion, and I could have been proven wrong, but it was really more my notion that I really did not anticipate that I was going to find anything,

129

and so the timing seemed right at that time.

Q    And based upon the report from Dr. Dos Santos that you ultimately received in April of 2000, your notions were essentially borne out?

A    That's what it seemed to me.

Q    We've talked briefly about Dan Grothaus who was an investigator hired by you in kind of a dual role.  Can you explain that role as you envisioned it to the Court?

A    Sure.  I think I put it forth probably as well as I could now in the motion for the request for Dan's services, but basically what I anticipated then is what I have done in subsequent cases, which is get one person who has enough of a feel and understanding for this general area to be able to understand when an investigation is going on that there are more than one -- there's more than one compartment into which certain information might be able to be fitted, that there are questions that you would likely ask of a witness beyond the normal first phase questions because of the witness' familiarity with aspects of the case that would be involved in the second phase.  To the extent that you have one person capable of doing all of that, you get more bang for your buck timewise and monetarily, too.

Q    And you believe that Mr. Grothaus had more affinity for the fact investigation traditionally associated with the guilt phase than he would with the other investigation relative to

130

the mitigation phase?

A    That's certainly the way it turned out. I had hoped for better and it really did not work out that way. I don't blame that on Dan at all. It's more along the lines of a combination of things. I don't think he had as much of an affinity for what I was talking about as what I thought he might, but also we had more than enough work to keep him busy on other aspects of the case.

Q    But as it relates to the penalty phase investigation or mitigation investigation, I think you've already discussed your views on mitigation investigation in the terms of mitigation specialist, you felt you knew how to develop appropriate themes you wanted to develop at trial?

A    There are -- there's not magic to what any of us do. There are appropriate themes that should be developed. Frankly, the reason that the Court appoints learned counsel for these types of cases is because of the Court's trust that lawyers like me know what those themes ought to be, so I felt that between Jennifer and me, we were capable of developing those themes without somebody coming in and having to tell us how to do them, if that answers your question.

Q    It does, sir. Since 1985 when your practice primarily focused on capital litigation and capital defense, how many such defenses would you estimate you've participated in either as trial counsel, appellate counsel, postconviction counsel?

131

A    Dozens.

Q    Is that both true for both state and federal?

A    Yes, sir.  I'm assuming that's what you wanted was a combination.

Q    What is your most common role when appointed in one of those cases?

A    I've really had all of the roles.  Probably more often on the trial level, but appellate and postconviction I've had certainly my share.

Q    You represented Mr. Sinisterra in this case both as trial counsel and as appellate counsel?

A    Yes, sir.

Q    Do you feel that you had enough time from the date of your appointment to the date trial began to prepare adequately for Mr. Sinisterra's defense?

A    Yes, with the proviso that apparently there are things that we missed.

Q    You say "apparently" because there are not things you found?

A    No, sir.

Q    And you can look back in retrospect and think, well, if the witnesses hadn't been here, I probably could have done this, but you didn't know at the time that you were conducting your investigation that those witnesses would not be allowed into this country, did you?

A    No, sir.

Q    And instead you made your decision at the time on how to proceed with the investigation and the investigator based upon the belief that your witnesses would be available to you?

A    That's correct, yes, sir.

Q    And when they were not, you chose the next best alternative, which was videotapes that had been taken of those encounters in Columbia, South America?

A    That's true.

MR. VALENTI:  That's all I have, Your Honor.

THE COURT:  Mr. Jenab.

REDIRECT EXAMINATION BY MR. JENAB:

Q    Mr. Duchardt, you made a comment when Mr. Valenti was questioning you that with respect to the members of a defense team, there's not a magic in names and that you're not influenced by terms.  The way you put it was there are a set of tasks that need to be done?

A    That's true.

Q    Now, whether you have someone who is called a mitigation specialist or you don't, it doesn't reduce the amount of work that needs to be done?

A    Oh, no, sir.

Q    So --

A    Just who does it.

Q    Exactly.  It's whether it's done by someone that the

133

lawyers hire or whether it's been done by one of the lawyers itself, the work still needs to be done?

A    Correct.

Q    Now, with respect to the investigation in Columbia, the work with respect to finding out any family secrets, any history of trauma, any prior abuse wasn't done, correct?

A    I think on the basis of what you have presented to me, the answer would be yes.

Q    I would agree with that, but I would also suggest to you that it goes beyond just what I've presented to you, and the reason for that is this.  Jennifer videotaped her interviews.  She never even asked those questions.  So in that sense the work was never even begun; isn't that fair?

A    If you're representing to me, and I don't know this from Jennifer directly, but if you're representing to me that she has told you that she never even asked those questions, then, sure, you're right.

Q    I also wanted to ask you a little bit more about a comment you made regarding the timing of the Columbia trip, and I think you said, correct me if I put this down wrong, that in some respects, at least, you thought it made sense to go to Columbia after you had received -- or for Jennifer to go -- after you had received the final discovery disclosures from the government?

A    Yes, for one of us to go after we had gotten the

134

remainder of the discovery because, quite frankly, the lion's share of the discovery was what we received late.

Q     And that discovery was produced about 30 days before trial?

A     Actually, my recollection it was earlier than that, but I mean still 60 days -- in the 60 -- I think we finally decided on 45 days prior to trial, but I just do not recall exactly. I think we asked for 90. They said 30 or less. And we ended up getting the Court to order 45 is my recollection.

Q     So that it would have put it roughly around the end of February of 2000?

A     Yes, sir.

Q     Does that sound right?

A     Yes, sir. Then we had to assimilate the information.

Q     Sure. Would it be accurate to say that that discovery that the government provided would have related to the guilt phase of the proceedings?

A     Actually it was pretty broad but, sure, I would say primarily, but it related to issues that have to do with, quite frankly, the government's main witnesses who, frankly, were also the government's aggravation witnesses.

Q     So to the extent that it may have related to a possible mitigation argument, the relationship would have been indirect to the circumstances of German Sinisterra's life?

A     I would say now that we know that was in there, that's

135

probably right, but we didn't know what was going to be in there.

Q    As a general matter, do you commonly receive discovery from the government that would relate, for example, to the circumstances of the defendant's childhood life?

A    Sure.  I mean, I didn't anticipate that in this case because there was no reason to think that they had anything that was going to be really telling about that.  I mean, we weren't sure but I can't tell you that I really anticipated it here, but in other cases, sure.

Q    The fact that Mr. Sinisterra grew up in Columbia would certainly make that a lot less likely, wouldn't it?

A    Well, yes, but we had people who at least reported to have knowledge about him.  We were looking potentially for information about Jaime Hurtado that might be forthcoming that might give us avenues that we might want to address in Columbia when we were there related to things he was doing, and the like.  So we were at least hoping that there would be some information forthcoming there.  There really wasn't particularly but we were looking for that possibility, or at least I was.

Q    I think your approach with respect to investigators on a case is somewhat similar to your approach with respect to experts sometimes in which it seems that the message you're stating is it's the facts, it's the circumstances themselves

136

that are more important than the label; is that a fair statement?

A   Well, when you're starting to get into experts, especially when you're talking about mental health experts, that would be true, but also the label makes a difference in terms of how much they're going to be able to do for you, if that -- I don't know if that's answering the question.

Q   Let me ask it a different way which hopefully will be a better question on my part.  What you had said about Dr. Llorente is that it might be that you would decide to present the information rather than the expert?

A   Oh, I don't think there's any question in my mind that the information upon which he relied would have dovetailed very nicely into our defense.  My fear of using -- the only quibble I have with the way I've been asked the questions is that it would be my fear that use of the expert as opposed to the information could have led to problems.  The use of the information would -- had we had that information, and I wished that we had, we would have used it, if that makes sense.

Q   Yes.

MR. JENAB:  Nothing further.  Thank you.

RECROSS-EXAMINATION BY MR. VALENTI:

Q   Mr. Duchardt, as it relates to the government's disclosures on the discovery side of the case, couple unique things here.  One, Mr. Sinisterra and his immediately charged

137

codefendants, Mr. Ortiz and Mr. Tello, were all Columbian nationals of African descent, correct?

A    Yes, sir.

Q    And the victims in the case, Mr. Colon, who was actually murdered and Herberth Andres Borja-Molina were also Columbian nationals but were of, I guess, Caucasian descent?

A    Yes, sir.

Q    But all people, victims and defendants in this case, were originally from the country of Columbia?

A    Yes, sir.

Q    And then had nexus or connection with one another in the Houston, Texas, area?

A    And in Kansas City ultimately.

Q    And again in Kansas City where the crime ultimately was found to have occurred.  So some of those disclosures could have been very significant to you in your defense depending on what was or wasn't in it?

A    That's what I was -- I mean, you know as well as I do we were chomping at the bit to get that information and take it whatever directions it might go, and you were quite -- not you but Mr. Miller was quite circumspect in providing that information until the last possible moment.

MR. VALENTI:  That's all I have.

MR. JENAB:  Nothing further, Judge.

THE COURT:  All right.  Thank you, Mr. Duchardt.

138

You're excused.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

MR. GABRIELSEN:  I'll get Mr. Grothaus.

THE COURT:  Come right up over here to the witness stand, please.  Thank you.

DAN GROTHAUS, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. GABRIELSEN:

Q    Good afternoon.  Can you state your name for the record, please.

A    Dan Grothaus.

Q    Dan, where do you presently reside?

A    In Kansas City.

Q    What do you do for a living?

A    I'm a private investigator.

Q    And where do you perform investigations?

A    Well, I would say throughout the country.  I perform investigations in Missouri and other states, wherever I'm called or requested to work within the states.

Q    And are you appointed by courts or retained by counsel?

A    Retained by counsel, appointed by state courts, appointed by federal courts.

Q    Is your practice primarily criminal practice?

A    It's almost all criminal defense work.

Q    Where did you receive your training?

139

A    I was educated at the University of Missouri. Received a journalism degree there and worked in newspapers as an investigative reporter for several years and began working as a private investigator in Houston back in 1988, and so I have to say any training after that was on-the-job training, other than some seminars that I attended over the years.

Q    What kind of seminars have you attended?

A    Habeas seminars, capital murder defense seminars, for lack of a better term, national conference seminars designed to explain to people like myself what needs to be done in capital defense work.

Q    So you attended seminars geared particularly to developing mitigation in capital cases?

A    At least some of those seminars were designed for mitigation, specifically mitigation in capital cases, yes.

Q    Can you tell us what some of the organizations are that put on those mitigation trainings?

A    Oh, jeez. I think the federal courts have put on some of the seminars that I've attended. The National Innocence Conference. To be honest with you, I'm guessing at this point. It's on my resume who gave the seminars, but I just know that at least some of them, if not all of them, were given by some sort of federal court entity.

Q    Would that include the Habeas Assistance and Training Conference every year?

140

A    I know I went to at least one or two of those.

Q    Life in the Balance?

A    Life in the Balance.  I think I attended one or two of those.

Q    In 1988 you moved to Houston?

A    1988 I was living in Houston.

Q    You were living in Houston.  And what were you doing when you were working in Houston?

A    I worked for the Houston Chronicle, then I worked for the Houston Post, then I left the Post and went over to PBS on contract to produce some documentaries.  That contract expired and lost funding; and as a result, about six months later I began working as a private investigator until I could get back into the newspaper business.

Q    And while you were in Houston, did you acquire any Spanish language skills?

A    No.  Just the polite exchanges of -- we call it Tex-Mex down there.  I could not speak fluently in Spanish.  I knew how to say hello, good-bye, and where's the bathroom, things like that.

Q    Could you order a burrito in Spanish?

A    Probably not, No. 3.

Q    What would you -- how would you characterize mitigation in a capital case?

A    Today?

141

Q    Yes.

A    How I would characterize mitigation in capital murder cases?

Q    Yeah.  What is it?

A    It runs the gamut of determining the background of your client from birth, the background of your client's family, mental health issues, family environment, education, mental deficits, you know, just a complete environmental background of both mental and physical and environmental areas of a client's background leading up to whatever act they claim that he committed.  That's a pretty broad question.  But essentially anything and everything that would have contributed to his thought process at that time.

Q    How did you become involved in the Sinisterra case?

A    Fred Duchardt called me, asked me if I was available, and then had me appointed on the case.

Q    Did he tell you what your responsibilities were going to be?

A    I was an investigator.  Whether or not he broke it down into fact investigation or mitigation investigation, I can't be sure other than he just said that I would be the investigator on the case working with him and Jennifer.

Q    Can you give us an approximate time of when you were retained by Fred?

A    Back in 1999.  I couldn't be more specific without

142

referring to any notes or anything. It was early on in the case. I mean, I know that there was -- there may have been a court date set, but I believe it was quite a ways down the road. I think it was early enough, in plenty of time to do what he thought we needed to do.

Q    If I told you that the court record in this case reflects that you were retained in very late 1998, would that sound about right to you?

A    Yeah, that would be about right, because it seemed like the spring of '99 might have been when I got started working on it.

Q    Who else was on the defense team when you got to the Sinisterra case?

A    Just myself, Fred Duchardt, and Jennifer Herndon.

Q    And Jennifer had a different last name at that point?

A    It might have been Weber.

Q    Brewer?

A    Or Brewer.

Q    Thank you.

And how did -- at some point did Juanita Chavez become a member of this defense team?

A    Juanita was used as an interpreter.

Q    Where did you know Juanita from?

A    I actually knew her from church, where I went to church. And I can't remember, I think I just met her casually

143

and found out that she was from, I believe, south -- I'm not sure, but she was a nurse and she spoke fluent English and Spanish, and I think at one point I asked her if she had ever translated and she said that she -- I can't remember if she said she had or had not but she said she certainly can translate. I gathered she did that at her work.

Q   Once this team was assembled, at least on paper, did the team meet physically to talk about the case?

A   Myself, I met with Jennifer and Fred at least a couple of times up in Fred's office, and not to exclude Juanita but I don't believe she ever met in that team atmosphere. I think it was just Jennifer, Fred, and I met a couple of times.

Q   Do you recall Juanita ever going to Fred's office to either travel with him or to arrive there and meet with the rest of the team?

A   I don't recall her ever being in Fred's office when I was there. There might have been a couple of times when he called Juanita while I was there, but I don't remember her being a part of any of those meetings, but I knew that Fred was in contact with her somehow, some way.

Q   Did you ever meet with Juanita with German at the CCA?

A   Yes, I did.

Q   Would you give us an approximation of how many times you might have met with the two of them?

A   My approximation I would say maybe between three and

144

six times. I think anytime that I went up to talk to German, she came along, and most of the time I was just gathering background information on him or the case. I can't remember how many times I went up to see him but I believe she was there each time.

Q    Do you know how the lawyers divided the labor involved in this case?

A    I think I do.

Q    Please explain as best as you can remember.

A    It appeared to me that Fred was first chair handling the first phase of the case, and that Jennifer was essentially the second chair and would be handling the sentencing phase of the case with certain overlaps, but that was the division that appeared to me to be.

Q    Do you recall one discrete meeting where those roles were hashed out?

A    I don't recall those roles ever being hashed out. That seemed to me to be the impression I had from the beginning.

Q    Were you ever present at the team meeting when Fred and Jennifer discussed the development of mitigating evidence?

A    I would say that anytime we met, and I'm thinking there were twice that I met at Fred's office when Jennifer was coming over from St. Louis, I'm sure mitigation was discussed because that would have been part of any discussion, broad discussion of the case. So I would have to say, yes, I was probably there

145

during those discussions when I was present.

Q    And you're aware that at some point a plan was devised to send Jennifer to Columbia?

A    Yes.  I remember they discussed going to Columbia. Someone had to go to Columbia.

Q    Was that discussed in a team meeting as you can recall?

A    It might have been discussed prior, but I remember it also being discussed in Fred's office with the three of us there, and I can't remember if it was decided then or if it had been decided prior to that and it was discussed then, but I can remember that being discussed.

Q    Do you recall any discussion about the specifics of what the team, particularly the lawyers, sought to acquire from Jennifer's trip to Columbia?

A    Nothing beyond general background, talking to family, immediate family, gaining school records, pretty generic discussion about the pretty generic things.

Q    Did you understand your role to include any mitigation investigation besides the penalty phase investigation?

A    My role included some mitigation in terms of going to Houston and interviewing some of German's immediate family and just gathering some family history and maybe gathering some anecdotal information from friends of the family.  Nothing beyond that.

Q    And when you went to Houston to perform that aspect of

146

the investigation, were you alone or were you traveling with one of the other team members?

A    Most of the time I traveled to Houston alone.  The very first trip I think I went down there I think with Fred, although it might have been with Jennifer.  It might have been the three of us went down and met with the family, then I went back later and, again, met with the family.  I made at least a couple of trips with Jennifer where she went out with me interviewing some witnesses.

Q    When you went to the family -- let me strike that.

When you met with family in Houston, where did that meeting take place?

A    I believe that meeting took place at German's wife's house, if I'm recalling this correctly, that she had assembled some of her family members, which was really all we had for family down there was her family, his wife's family.  Again, if I'm recalling this right.  And so she had just gathered some people together just for the sake of convenience to be able to talk to several people about just getting -- starting out getting some general background.

Q    Do you recall his wife's name?

A    No, I don't.

Q    If I told you it was Michelle, would that ring a bell at all?

A    That sounds right.

147

Q      Were there any folks from Columbia at Michelle's house on any occasion when you visited her?

A      I think there might have been but they might have been friends of German's from Columbia.  There might have been.  I don't think they were his family from Columbia.

Q      Do you recall whether any of those Columbians that might have been there might have been men that he stowed away on the banana boats?

A      That's what I'm thinking, people he came up from Columbia with, he was friends with them from Columbia and they might have been there.  I think he kind of stayed friends with some of those people from Columbia.

Q      Do you recall interviewing those persons?

A      No, I don't, and if there was a language barrier, I certainly would not have been able to have interviewed them.

MR. GABRIELSEN:  Could you please pull up Exhibit 5, page 1.

Q      (By Mr. Gabrielsen)  In the second paragraph of your -- what's this document that's up on the screen right now?

A      It's a declaration I signed in 2007.

Q      You did that for Mr. Jenab?

A      Yes, I believe I did.

Q      I'd like to direct your attention to the second paragraph.  You referred to the lawyers providing direction on your investigative priorities?

A    Correct.

Q    Can you explain how that direction came?

A    They would give me a list of witnesses that they wanted me to attempt to locate and contact, and they would give me an idea of what that person might know or what information they would like me to try to gain from that person or what areas of information that person might be familiar with in terms of, you know, my asking him about facts in the case or a trip to Kansas City or am I asking him about his family history.

I would also have read FBI reports on this case, or police reports on this case and in terms of fact investigation, I would come up with witnesses that I would suggest to them we need to talk to and they would say yes or no.

Q    What were the mechanics of your acquiring this list of investigative direction?

A    Well, from Fred it would be just verbal discussion, for the most part.

Q    Phone calls or in-person meetings?

A    Both.  Phone calls.  In between the times when Jennifer would come in town, we would all be up at Fred's.  Most of the phone calls, though, for -- as a practicality.  And, yeah, we would just discuss witnesses, go down a list of witnesses, or discuss witnesses, and then I would make a list as we went if he had anyone for me to talk to, or if I had developed a list of witnesses that I wanted to approach regarding the fact

149

investigation, I would run them by Fred. He would go -- most of these at that time getting started were people from Houston or in Houston or people we thought still lived in Houston.

Q All right. From the discussion that we've just had, the last couple of explanations, there seems to have been greater reliance on direction coming from Fred rather than Jennifer. Is that true of how that direction came?

A In my case, yes, I considered Fred to be the person who gave me the direction and that was -- yeah, he was the boss in this case from my standpoint.

Q Do you recall Jennifer ever meeting with you or calling you and giving you direction independent -- with regard to an investigation independent of what Fred had you doing at the time?

A Not in conflict of anything that Fred had asked me to do. There were times I think Jennifer accompanied me in Houston on some witness searches, and in that case, I mean, she was offering me her own suggestions, but just like any other two people that would go out to try to find somebody. But in terms of the case itself, my direction came from Fred and I did not feel that Jennifer gave me any direction different from that.

Q Did she ever give you a list of witnesses to contact in Columbia?

A No. No.

150

Q    In the trips you made to the CCA, did you have occasion to discuss with German his life in Columbia?

A    You know, that would have been -- have to have been in my reports, and I don't have -- I don't recall discussing Columbia with him other than just, you know, very just scratching the surface knowing he was from Columbia, but I don't recall interviewing him specifically in depth about anything from Columbia.

Q    As you sit here right now, do you even recall what city he was from in Columbia?

A    I would have just no idea.  I mean, I could say Bogota.  That would be a guess.  I think it's a small place.

Q    In your conferences and seminars that discuss the development of mitigation, did speakers talk about social histories?

A    Oh, sure, absolutely.

Q    But apart from the seminars, were you familiar with what a social history was?

A    Yes.  I had helped with social histories together in other cases.

Q    Capital cases?

A    Capital cases.

Q    Pardon me.  I'm sorry.  I spoke over you.  In capital cases?

A    Yes.

151

Q    Did you do any social history work in this case?

A    No.  I mean, other than the witness interviews in Houston that would have been with family and that would, again, just be gathering information, and that would have been turned over to Jennifer who in my mind was putting together whatever mitigation work was being done.

Q    Do you recall approximately what age German was when he was charged in this case?

A    Mid 20s.

Q    Do you recall how long he had been in the United States at that point?

A    I'm thinking he had a ten-year-old daughter.  He could have been 30 with a ten-year-old daughter and my guess extrapolating he had been here ten years.  Boy, I'm guessing. I'm sure I knew at the time, at least, of those facts but I'm guessing right now.

Q    Any social history you would have performed would have been during his adult years in Texas and not from Columbia; is that fair?

A    That would be very fair.  That's the extent of what we were trying to do was to find out who he was from the time he got here.

Q    Did you personally ever ask German whether he was physically abused in Columbia as a child?

A    I don't believe I would have ever asked him that.

152

Q    Would you have asked him if he was ever sexually abused in Columbia as a child?

A    I don't believe I would have ever had a reason to ask him that so I don't believe so.

Q    Do you have any recollection at all of ever speaking with one of his family members in Columbia?

A    I never spoke to any of his family in Columbia.

Q    So you never heard any family member of his address the question of physical or sexual abuse of him?

A    No.

Q    Did you ever ask German, if you can recall now, did you ever ask German if he ever sustained a head injury in Columbia as a child?

A    I don't recall delving into that aspect of it at all. I don't recall asking him any of those questions.

Q    Did you ever ask German whether he had any family members who had sustained violent deaths in Columbia?

A    I don't recall having that conversation with him.

Q    Were you ever present with Fred or Jennifer -- well, let's ask this. Were you ever present with Fred and German when Fred asked whether German was physically or sexually abused as a child?

A    I cannot picture myself being up at CCA with Fred and German. I'm not saying that we didn't but I can't picture that. It seemed like it was always just me and the

153

interpreter.

Q     Same question as to Jennifer.  Were you ever present when she asked German whether he had been physically or sexually abused?

A     I can't remember interviewing him with her, with Jennifer.

Q     Were you ever present alone with German or present with him and either of the attorneys and German described incidents in which he observed his father beating his mother or chasing her with a machete trying to kill her?

A     I don't recall ever hearing a story like that.

     MR. GABRIELSEN:  Judge, that's all for now.

     THE COURT:  Thank you.

     MR. GABRIELSEN:  Thank you, sir.

CROSS-EXAMINATION BY MR. VALENTI:

Q     Good afternoon, Mr. Grothaus.

A     Good afternoon.

Q     When you were initially examined here today, you were asked a question about your view of mitigation investigation work; do you recall that?

A     Yes.

Q     And you qualified the question with the word "today." Do you recall that?

A     Yes.

Q     Is it fair for me to conclude that you have a different

154

view of what mitigation investigation is today, 2013, than you did when you were assigned this case in March of 1999?

A     My understanding of mitigation has developed over the years.

Q     In what way?

A     Well, I learned more in each of these seminars as to what might be considered mitigation.  It's really more of my development of what mitigation is as opposed to what mitigation is.

Q     It may seem silly but the reason for that is professional growth that you've had since that time?

A     Sure.

Q     And you indicate in your declaration that we discussed earlier that you first started working as an investigator in capital cases, I believe the date in your declaration is 1998?

A     Well, actually 1988, but I started as a private investigator and I had capital cases in Texas.

Q     If I misspoke, I apologize.  Is the case that you got assigned to here in March of 1999 one of the first federal death penalty cases you were assigned as an investigator on?

A     I moved to Kansas City in 1995 and started working here and I had a couple of state capital cases.  This might have been my first federal capital case in Western Missouri.

Q     And you indicated in your declaration that the work mitigation investigation that goes into capital cases was kind

155

of an evolving thing as you were getting into that field; is that fair?

A     Yes.

Q     And you got into that field and, of course, subsequently since that time, 13, 14 years have passed and you are a more seasoned investigator as it relates to those matters, right?

A     Correct.

Q     So the Dan Grothaus we talk to today about mitigation is a little bit different than the Dan Grothaus we would have talked to in 1999 or 2000?

A     Correct.

Q     You indicated in your role in this case that you spent, I believe, about 300 hours on Mr. Sinisterra's case in approximately one year.  Does that sound about right?

A     That would have been the time that I billed for work I done on the case.

Q     As you talk about that work, you indicated that some of the things that you did were mostly fact investigation or, you know, here's a list of witnesses that they'd like you to run down and you did?

A     Correct.

Q     And you interview them.  And as it relates to mitigation, you focused primarily on some of the family connections that Mr. Sinisterra would have had in Houston,

156

Texas?

A    Correct.

Q    And that would be through his wife in Houston, Michelle Sinisterra?

A    Correct.

Q    In preparation for those various interviews, I think you indicated that on between three and six occasions you might have met with Mr. Sinisterra while housed at CCA with Juanita Chavez acting as translator?

A    Correct.

Q    And on those occasions I assume you were looking for background information regarding Mr. Sinisterra's upbringing; is that fair?

A    That would be one of the things that I discussed with him.

Q    What kind of other things would you be looking at to discuss with Mr. Sinisterra?

A    Well, there would be fact-based discussions about the factual investigation of the case, what happened, what led up to what happened.  Probably most of my discussions involved the fact side of the investigation.

Q    And specifically we're talking about the defense that was ultimately chosen in this case, and I believe in your deposition you described it as -- let me make sure I get the language right -- the residual doubt slash good guy defense?

157

A     Right.

Q     And I don't mean that in a pejorative way.  I'm not trying to trip you up.  That was the defense that was being used by Mr. Duchardt and Ms. Brewer-Herndon in 1999 into 2000 for the trial, correct?

A     Well, I can't speak for them because I really wasn't even in the courtroom but residual doubt might have been my suggestion of good guy defense.  I know I heard that discussed by Jennifer and Fred.

Q     And as it relates to residual doubt, is it correct when I presume, based upon what I think I know about the case, that you spent a good deal of time in investigating whether or not German was the actual shooter in the case versus having confessed out of fear for his family or himself?

A     That was one area that we looked into, correct.

Q     And you spent time investigating that, I assume, amongst that 300 hours?

A     Sure.

Q     Do you recall at any time during your interviews with Mr. Sinisterra at CCA with Ms. Chavez acting as translator where he discussed having been the victim of sexual abuse or physical abuse in his early formative years in Columbia?

A     I don't recall that ever coming up.

Q     Ms. Chavez never indicated to you that she got that information from Mr. Sinisterra?

158

A    I felt confident she was telling me everything that he discussed.

Q    You didn't learn about that in regards to this case, I assume, until this case was going for postconviction or 2255 relief; is that fair?

A    It was first discussed when we were talking about getting the declaration, and I think it's in the declaration and, yes, that was all news to me.

Q    And if I submit to you that the declaration that we're talking about was one that you provided Mr. Jenab at his request while preparing the postconviction paperwork, would that be fair or an accurate recollection of your memory?

A    The declaration that they showed, yes.

Q    Prior to that declaration, have you ever heard about allegations of physical or sexual abuse?

A    No.

Q    Had you heard anything about witnessing violent acts in his native Columbia?

A    Never heard anything about that.

Q    During the course of your assignment in this case, is it fair to presume that you and Mr. Duchardt and Ms. Brewer-Herndon would exchange updates in some fashion?

A    Yes.

Q    I imagine it's mostly phone calls, things like that, right?

159

A     I think probably back then mostly phone calls, yes.

Q     Of course, e-mail and text would have been vogue. There was not a lot of text back then but there was probably not a lot of e-mail?

A     No text and I don't think e-mail was -- I wasn't using e-mail back then, not to a great extent if I was.

Q     Of course, I would imagine if I asked you that question today, your answer would be a whole lot different as it relates to either text or e-mail?

A     Correct.

Q     Probably use those a lot more as a communication facility?

A     Correct.  Yes, I do.

Q     And in fact, fax machines were used back then too.

A     I was just thinking I had a fax machine and that's how we exchanged documents from Kearney to where I was working. Fax I used a lot.

Q     I'll show you what's been marked and admitted as Exhibit 24 for purposes of this hearing and ask if you can look at that document and tell me if you recognize it, sir?

A     I know what it is from looking at it.  I wouldn't say I recognize it because I can't say for sure that I ever received it.  I can see that it was faxed from Jennifer Brewer and it's German's family history.  I suppose these are notes and things that she had collected.

160

Q    Clearly the top of the document on Exhibit 24 it shows a fax being received from Ms. Brewer's phone number in St. Louis, correct?  314 is a St. Louis number?

A    Correct.  I don't know if that meant that she sent that -- are these mine?

Q    These were recovered from your file.

A    Okay.  All right.  Then I must have received it then.

Q    And as fax machines commonly do has a stamp on incoming faxes from the person who sent it?

A    Okay.

Q    Much like a header would in an e-mail now.

A    I couldn't remember which number ended up there.

Q    You've described that essentially as about six pages from memory of notes involving German Sinisterra's family history; is that correct?

A    Correct.

Q    Does that appear to be information that was prepared by Ms. Brewer that would have been submitted to you to help you in whatever investigation you may undertake so you had that background?

A    Yes.  That's what it would appear to me to be.

Q    It discusses familial relationships Mr. Sinisterra had with members of his family in Columbia, correct?

A    Correct.

Q    And I think it discusses his wife, Michelle Sinisterra,

161

in Houston, Texas?

A     Correct.

Q     I believe it discusses information relative to the criminal history that Mr. Sinisterra reported having to Ms. Herndon -- Ms. Brewer?  Last page.

A     Okay.

Q     It discusses his education, as you've said?

A     Yes.

Q     Discusses his criminal history?

A     Correct.

Q     Then there is a discussion of documents that she's asked Mr. Sinisterra if they would exist, where they would exist and how to get them?

A     Correct.

Q     Anywhere in that document by memory or by your cursory examination now do you recall there being any indication that Mr. Sinisterra was a victim of physical, sexual abuse?

A     Without reading it, I wouldn't know if there's any mention of it in there.

Q     You're welcome to.  I don't want you to say anything you are uncomfortable with.

A     Okay.  I mean, my assumption is there isn't anything here.  And the question is there any mention of sexual abuse in here?

Q     Correct.  There's six pages of data but no mention of

162

physical or sexual abuse?

A      Yeah, I don't believe there is.  I don't remember that being brought to my attention.

MR. VALENTI:  That's all the questions I have, Your Honor.

THE COURT:  Mr. Gabrielsen.

MR. GABRIELSEN:  Thank you, Your Honor.

REDIRECT EXAMINATION BY MR. GABRIELSEN:

Q      Mr. Grothaus, are you familiar with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases?

A      I'm familiar with it, yes.

Q      Are you familiar with -- are you aware that there were guidelines pronounced in 1989 and again in 2003, a revision in 2003?

A      By 2003 I was probably much more familiar with the existence of those guidelines than prior to that.

Q      Have you had occasion to consult the guidelines from time to time?

A      After 2003 I believe I had read them, yes.

Q      Had you ever been in discussions with lawyers who retained you where they were discussing mitigation investigation under the ABA guidelines?

A      Have I had discussions with lawyers?

Q      Yes.

163

A    About those?

Q    Yes.

A    I'm sure I have along the way, yes.

          MR. GABRIELSEN:  Please pull up Exhibit 48.

Q    (By Mr. Gabrielsen)  Mr. Grothaus, what's the exhibit that's on the screen in front of you?

A    This is the 1989 American Bar Association guidelines. These are in death penalty cases.  This version has been -- okay.  This was the 1989 version.

Q    On page 12 of the guidelines I would like you to go to guideline 11.4.1.

A    Okay.

Q    And read paragraph C into the record, please.

A    Paragraph C, "The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."

Q    Thank you.

          I would like you to flip to the next page.  And I would like you to, again, read into the record the line at the top of the page, and after the colon, please go to paragraph C and read that paragraph, please.

164

A    Okay. At the top it reads, "As soon as is appropriate, counsel should cover items A through E below, if this is not possible during the initial interview, these should be accomplished as soon as possible thereafter."

Skipping to paragraph C, it reads, "Collect information relevant to the sentencing phase of trial including, but not limited to: medical history, parenthetical, mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays, closed parenthesis; educational history, including achievement, performance and behavior; special educational needs, including cognitive limitations and learning disabilities; military history, including type and length of service, conduct, special training; employment and training history, including skills and performance, and barriers to employability; family and social history, including physical, sexual or emotional abuse; prior adult and juvenile record; prior correctional experience, including conduct on supervision and in the institution, education or training, and clinical services; and religious and cultural influences."

Q    Thank you, Mr. Grothaus.

In light of these requirements for counsel in terms of the breadth of mitigation to be investigated as early as 1989 and, again, what was the year the trial of Mr. Sinisterra's case?

165

A    2000, 1999 or 2000.

Q    So this is approximately -- these guidelines came down approximately 11 years prior to the trial; is that right?

A    Correct.

Q    Would it be fair to say that the evolution in thinking about mitigation to which Mr. Valenti referred to may be not as great as to what he was suggesting?

A    I would agree with that, that the type of mitigation, the broad look at mitigation certainly existed in the ethnic guidelines in 1989 or '87, whenever that was written, and it's just been expanded upon.

Q    Thank you very much.

MR. GABRIELSEN:  I have no further questions, Judge.

MR. VALENTI:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you.  You're excused.

(Witness excused.)

JUANITA CHAVEZ, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. GABRIELSEN:

Q    Good afternoon.

A    Good afternoon.

Q    Could you state your name for the record, please.

A    My name is Juanita Chavez.

Q    Thank you, Juanita.

What city do you reside in now?

A    Lee's Summit, Missouri.

166

Q     And how long have you resided there?

A     About eight years.

Q     And how long have you resided in the Kansas City area?

A     Fifteen -- since 1995, 15 years.

THE COURT:  Ms. Chavez, could you pull the microphone around and speak into it, please.  Thanks.

THE WITNESS:  Thank you.

Q     (By Mr. Gabrielsen)  And where are you from originally?

A     El Salvador.

Q     When did you leave El Salvador?

A     1991.  I'm sorry.  1981.  My apologies.

Q     When you left El Salvador, did you come directly to the United States?

A     I did.  I came to Los Angeles, then I moved to Canada four years later.

Q     Why did you leave El Salvador?

A     Oh, my brother was killed at that time.

Q     In the civil war?

A     Yes, during the civil war.

Q     And when you got to Canada, what did you do?

A     There I work and I study.  I work first in a daycare and then I was learning English, more English and, then I went to -- the parents of one of the kids that I was taking care of was really nice and he offered me a class to do -- LPN class and then so I went into nursing.  And then I took the

167

prerequisites to take an LPN class. Later on I finished that. I continued studying, go to university, then I took BSN, Bachelor of Science in Nursing at Ryerson Polytechnic University.

Q    I'm sorry. Could you repeat that again?

A    Ryerson Polytechnic University in Toronto, Canada.

Q    Thank you.

Did you then practice as a nurse?

A    I have practiced in Canada as an LPN for about eight years and here in United States for almost 15 years as an RN, as a registered nurse.

Q    Are you a practicing nurse right now?

A    Yes.

Q    Are you employed right now?

A    Yes.

Q    Where do you work?

A    I work at Midwest Home Health Care and I have two jobs. I also work at Shangri-La Rehabilitation.

Q    I'm sorry. I didn't --

A    It's called Shangri-La, S-h-a-n-g-r-i dash L-a Shangri-La Rehab & Living Center.

Q    Where is that located?

A    That would be in Blue Springs, Missouri.

Q    Do you know Dan Grothaus?

A    Who?

Q    Dan Grothaus.

A    Yes.  He was the private detective that I was translating for.

Q    Okay.  Did you just pass Dan on the way out of the courtroom?

A    Yes.

Q    So you recognize him still?

A    Yes.

Q    Where did you first meet Dan?

A    I was going to -- I had just arrived to Kansas City and I was going to a church, Visitation Church at the Plaza and I met him there when I was going to services there, and then I told him -- I don't know.  We just started talking and I spoke English with him.  He asked me if I would interpret for him if he ever needed me and I say yes.

Q    And did -- at some point did he call you and say he did need you on a case?

A    Yes.

Q    And was that German Sinisterra's case?

A    Yes.  That's correct.

Q    Was that the first case you served as an interpreter?

A    I actually interpreted before for medical reasons in the hospital.  Also in Los Angeles I was a volunteer at the clinic, Monsignor Romero for Central America Refugees.  I was interpreting them for the doctors.  This is the first time I

169

got paid.

I was also volunteering -- also I was volunteering in El Salvador -- that's how I met the community of Visitation. They invited me here. I volunteered for them for a week at the clinic that my mother is working right now.

Q    Was that a group of nuns from Visitation Parish?

A    They were not nuns but they were doctors and nurses.

Q    Medical team?

A    Medical team, yes.

Q    When Dan approached you about serving as an interpreter in this case, what did he explain that your responsibilities would be?

A    Basically he told me that I needed to -- that this was a case that they would be investigating. He gave me a lot of details but they were investigating, and I needed to specifically just interpret what was said, nothing to be left or to not make any judgment of what was said, and that's what I did.

Q    And who was the person, the Spanish speaker for whom you were serving as an interpreter?

A    For German Sinisterra. I was interpreting for him on occasions we went to the jail where he was. I forgot the place of the area.

Q    If I told you it was at CCA, does that sound familiar?

A    Yes.

170

Q    Okay.  So you met with -- who did you meet with at CCA when you went to see German there?

A    I met with Dan.  I also met previously before I went there I went with the lawyer.

Q    Do you recall the lawyer's name?

A    Is it -- I can't remember his name.

Q    If I told you lead counsel was Fred Duchardt, would that sound familiar?

A    Yes, that sounds right.  I'm really bad with names.

Q    Who was the second lawyer on the case?  Do you remember a second lawyer on the case?

A    No.  I always met with Fred Duchardt.

Q    You always met with Fred?

A    And Dan.

Q    And Dan?

A    Uh-huh.

Q    If I told you the other lawyer was Jennifer Brewer, does that sound familiar at all?

A    No.

Q    Okay.  So you never met with Ms. Brewer?

A    No.

Q    Did Dan or Fred tell you what country German was from?

A    I think so.  They told me that I would be making some phone calls for his family in Columbia.

Q    In Columbia?

171

A      Yeah.

Q      Do you remember what city his family was in?

A      Buenaventura.

Q      Thank you.

When you served as an interpreter for phone calls, where were those calls made from?

A      Sometimes at the lawyer's office, Fred Duchardt's office, and sometimes I would be with Dan making phone calls and he would actually pay -- they would pay for the phone calls because we couldn't reach the family at that time so I would have to do it different.

Q      And these were calls being made by Dan or Fred to the family?

A      Basically they would ask me because they did not speak any Spanish.  I would actually -- they would talk to me and I would talk to the family and ask the questions that they were asking me to ask the family.

Q      Did you ever independently of Dan or Fred call Columbia to gather information from people there?

A      I think I did once I did independently but I had -- I was talking always with somebody else before I did that.  I never make a phone call on my own, just to call the family.  I would be speaking with somebody on the phone like Dan or Fred Duchardt.  So I would not just out of my own -- I went out of my way to make phone calls.  It was always a business call.  I

172

was always asked what to ask.

Q      Do you remember the names of his family members that you spoke with?

A      Dalila is his mother.

Q      Dalila?

A      Dalila Candelo.

Q      D-a-l-i-l-a?

A      Yes.

Q      Candelo.

A      Uh-huh.  Then Rosa is the sister and I remember speak most of the time to Rosa.  She's the one that would take all the phone calls.  I spoke briefly a few times with mom but not as much.

Q      And the phone calls -- we're talking about Rosa first. In the phone calls that you had with Rosa, did Rosa ever tell you about any physical abuse that German suffered in the family home when he was a child?

A      No.

Q      She ever tell you about any sexual abuse of German in the family home?

A      No.

Q      Did she ever tell you about any sexual abuse of German while on the streets as a child in Buenaventura?

A      No.

Q      Same thing as to Dalila, the mother, did Dalila ever

173

mention that German had been beaten by her or her husband when he was a child?

A       No.

Q       Did she mention any physical abuse of her at the hands of her husband while German was still living in the family home?

A       No.

Q       Did any of the lawyers -- strike that.

        Did Dan ever mention to you that German had been physically or sexually abused as a child?

A       No.

Q       Did Fred Duchardt ever mention that German had been physically or sexually abused as a child?

A       No.  That was never discussed.

Q       Did you ever translate documents for this legal team, Dan and Fred?

A       A letter sent from Rosa and from the mother to Dan. Also I translated phone calls what was said in Spanish I put down in English for them, and that's the extent of what I do.

Q       Juanita, could you describe the document that appears on the screen in front of you right now?

A       Yes.  This was some phone calls that I have made after Dan asked me to call the family, and he asked me specific questions to ask the family and family and friends and so I did that, and I wrote it down so that they would -- I wrote it down

174

right away so that I wouldn't miss any of the information that had been given to me. So, yeah, I recognize that is my own handwriting.

Q     Okay. I would like to go to page 2 of that document, please. Can you identify the person with whom you spoke in this particular document?

A     Yes. That is Rosa. Rosa Valencia is the sister. This is the questions that I would ask to them to see if they knew German and where was German.

Q     Let me -- I'll go ahead and ask you some questions and you can respond to my questions rather than trying to anticipate me. Okay?

A     Uh-huh.

Q     And this isn't the first time I've shown you this document, is it?

A     Right.

Q     I showed this to you at the depositions back in December?

A     Right.

Q     And I later sent you a copy of this exhibit?

A     Yes.

Q     The reason I sent this to you was so it wouldn't take so long for you to be able to answer the questions. Did you refresh your recollection of the document?

A     Yes, I did. I just did. I had enough time to refresh

175

and I just did.

Q   I apologize for that.  I was late with the last witness or I would have had you in already.

A   That's okay.

Q   In this conversation you had with Rosa, and if you need a minute to review it again, is there any mention by Rosa of any physical or sexual abuse of German as a child?

A   No.

Q   What's the date of this document, please?

A   '99.  I can't see the -- 7/19/1999.

Q   At the top of the page there is a continuation of the conversation with Rosa.  In that portion, in the first -- in the top half of the document, is there any mention by Rosa to you of German being an abuse victim as a child?

A   No.

Q   At the bottom of the page who's the person that's identified there?

A   Dalila Candelo, which is the mom.

Q   This is page 3 and 4 of your notes.  Generally what's Dalila talking to you about in this conversation?

A   Basically in the first part she's saying that she never receive a lot of money from German, that she believes in his innocence because he had never sent her a lot of money. Sometimes some used clothes but that was it.

Q   This was an expression of affection by a mother toward

176

her son?

A    I believed she was trying to defend her son. I don't know.

Q    Thank you, Juanita.

MR. GABRIELSEN:  Can we go to page 9, please.

Q    (By Mr. Gabrielsen)  The document at page 9, who's the person you interviewed?

A    Pablo Candelo, which is the brother.

Q    Have you had time to review this translation?

A    Yes.  He was very, very warm toward his brother.  He was -- he believe in his innocence and he was remembering fun times they had together.

Q    In the body of this particular conversation does Pablo ever address any physical or sexual abuse that German suffered as a child?

A    No.

MR. GABRIELSEN:  I would like you to flip to page 12, please.

Q    (By Mr. Gabrielsen)  Juanita, what kind of translation is this, please?

A    I'm sorry?

Q    What kind of translation is this?  Is this another phone call or is this something different?

A    It could have been another phone call.

THE INTERPRETER:  I'm sorry.

177

A    It could be more than one phone call.  I made more than one phone call and I spoke with Rosa very often and she was -- she was very, very much, also very loving and really believing in the innocence of her brother and how loving and kind he was.

Q    (By Mr. Gabrielsen)  Let me stop you right there.  Unfortunately, I think we had the wrong page up there.  At the top of this page what does it indicate the translation is of?

A    Oh, okay.

Q    Are you translating a document or a phone call?

A    It's a letter.

Q    When you were working for Fred and Dan, did you have occasion to translate letters?

A    Yes.

Q    Who were the letters from?

A    From Rosa.  She would send letters, the sister, Rosa Valencia.

Q    Did the lawyers -- I'm sorry.  Did Fred or Dan ever have you translate in English or into Spanish for them to send to Columbia?

A    No.

Q    So most of their communication was phone calls?

A    Phone calls, yes.

Q    This letter that you translated from Rosa, what's the date on that one, please?

A    That was June 21st, 1999.  June 21st, 1999.

178

Q And as you recall, or if you need time to review the letter, is there any mention by Rosa in this letter of any physical or sexual abuse by German as a child?

A I recall that I was never aware of any physical abuse or sexual abuse.

Q In any form of communication?

A In any form because it's something that I believe is very private and it's very cultural in the Hispanic community you don't -- because I'm Hispanic. Usually you don't talk about private issues with anybody. You probably have to go to somebody like a psychologist or something to be able to open up yourself more about those issues.

Q And as a practicing nurse, have you had occasion to work in the mental health field?

A Uh-huh. Yes. I work in the mental health for about 12 years.

Q I'm sorry. Again, how many years?

A I work for about 12 years in mental health.

Q What was the nature of your employment there?

A I work -- I did work with patients who were physically and sexually abused and some of them developed eating disorder or they would cut themself and it was very damaging to their self-image, especially sexually abused.

Q And a sexual abuse victim -- what was the age range of the patients that you worked with?

179

A     I work from 12 years old to 50 or about 50 or 60. Sometimes 30, 20. It varied.

Q     A wide range?

A     A wide range of ages, yeah.

Q     Are sexual abuse victims inclined to share their personal stories with strangers?

A     Not really.

Q     As a practitioner there, after you built some rapport with these patients, did they share their stories with you?

A     Yes. When they get closer to you, they would sometimes would do this. Not all the time.

Q     It depended on the patient?

A     It depended on the patients, yes.

Q     It also depended on some level of trust being established?

A     Correct.

Q     Okay.

        MR. GABRIELSEN: Judge, that's all I've got right now.

        THE COURT: Thank you.

CROSS-EXAMINATION BY MR. VALENTI:

Q     Ma'am, in the letters that you've just gone through, in none of the translations that you provide is there discussions of physical or sexual abuse, is there?

A     I was never aware there was any physical or sexual

180

abuse during the time that I spoke with the families.

Q In fact, far from that. The letters present a fairly idyllic or good upbringing, don't they?

A Yes.

Q If we go to a friend, Heberph Giron, who is a professional baker, he told you that German was very quiet, selfless, a beautiful person that was a very good student. He received a ribbon of excellence when he was a child?

A Correct.

Q He was very good, right?

A Right.

Q That's what was reported to you when you were interviewing them?

A Correct.

Q And they knew who you were?

A Correct. They knew I was working for the family. I was interpreting their words.

Q And when you spoke with Dalila Candelo, she told you that German was not a very sick child and that she does not have a lot of records around or about his childhood; is that correct?

A Correct. Yes.

Q When you spoke to Rosa Valencia, the sister, she indicated to you that we have always lived a tranquil life without problems?

181

A    Correct.

Q    When you spoke to Jose Solis, reported as Mr. Sinisterra's godfather, he told you that he, Mr. Sinisterra, had a normal childhood. He never had any trauma when growing up. Does that sound right?

A    That's correct.

Q    And finally when you spoke to Mr. Sinisterra's cousin, Jose Alcidez Candelo, he told you that German was always afraid to get involved in other people's problems and lived a good life?

A    That's right.

Q    So far from incidents of physical or sexual abuse that's now being reported, at the time that you were serving as a translator paid for by the courts on behalf of his family, they told you about his good and healthy upbringing?

A    Correct.

Q    And that information is what you provided to Mr. Dan Grothaus, to Mr. Fred Duchardt, and to Ms. Brewer, although you didn't know her?

A    Yes.

        MR. VALENTI:  That's all I have, Your Honor.

        THE COURT:  Mr. Gabrielsen.

        MR. GABRIELSEN:  Thank you, Judge.

REDIRECT EXAMINATION BY MR. GABRIELSEN:

Q    Juanita, if Dalila, the mother, were beating her son

182

with whips and sticks and submerging his head in buckets of water as punishment, would you expect her to share that with you, a stranger, over the telephone?

A    I would not expect that, sir.

Q    If his brother, Pablo, had sexually abused him when German was about 12 years old, would you expect Pablo to have said that in a letter to you?

A    I would not.

MR. GABRIELSEN:  That's all, Judge.

MR. VALENTI:  Nothing further, Your Honor.

THE COURT:  Thank you, Ms. Chavez.  You're excused.

(Witness excused.)

THE COURT:  I think we'll take a recess now until 3:30 and I'll be back up.  Thank you.

(A recess was taken.)

THE COURT:  Ready to continue, Mr. Jenab?

MR. JENAB:  We are.

THE COURT:  Mr. Gabrielsen.

MR. GABRIELSEN:  Yes.  Your Honor, the final part of today's proof would be the video deposition of Dr. Enrique Dos Santos in Columbia, Missouri.  He says enough in the video so there's no need to identify him.

THE COURT:  Okay.  Thank you.

(Videotaped deposition of Enrique Dos Santos played to the Court.)

183

THE COURT: All right.

MR. GABRIELSEN: Your Honor, there's an Exhibit 60(b), the tape we FedEx'd I think last week sometime. 60(a) is the video and 60(b) is the transcript of Dr. Dos Santos' testimony in case Your Honor wants to see the transcript of that. You'd have to endure my painful examination of the doctor, but thank you for your patience.

THE COURT: All right. Thank you. Is that all you have for today?

MR. JENAB: Yes, sir, Your Honor.

THE COURT: And how much longer do you think we're going to be here this week?

MR. GABRIELSEN: Unfortunately I think we're going to be here every day. Tomorrow I think we're going to finish probably around two o'clock in the afternoon, and then we've got mental health experts coming in both on Thursday and Friday and I apologize. I think I overestimated how long some of our witnesses would testify, but the mental health experts wanted to sort of lock into a date because of their practices, and such, and one of those dates I think I conferred, Your Honor, with Tracy was Friday. That was Pablo Stewart and Dr. Antolin Llorente teaches at the University of Maryland in the medical school. He was only available on Thursday of this week. So I apologize for that.

THE COURT: That's fine.

184

MR. GABRIELSEN: And as beautiful as Kansas City is, the 11 degrees here last night --

THE COURT: A lot cooler here than in Tucson, I'm sure, so I hope you brought a warm overcoat.

So you think we'll be through by two o'clock tomorrow?

MR. GABRIELSEN: Yes, sir. Maybe Jeff has something else to say.

THE COURT: Do you have anything else you were going to need to take up?

MR. VALENTI: I don't believe so, Your Honor. I don't believe the cross-examination will be as lengthy with any of these individual witnesses who are yet to come.

MR. GABRIELSEN: Your Honor, in brief, it's two witnesses tomorrow and one each on Thursday and Friday morning.

THE COURT: All right. Very good. Are you going to have anything to present?

MR. VALENTI: I don't believe so.

THE COURT: Okay. All right. Thank you all and we'll see you all tomorrow morning at nine o'clock.

(Court adjourned at 4:15 p.m. until 9 a.m. on Wednesday, January 23, 2013.)

185