IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

GERMAN C. SINISTERRA,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Movant,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　　　　　　) Case No.
　　　　　　　　　　　　　　　　　　　　) 04-CV-08003-GAF
UNITED STATES OF AMERICA,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Respondent.　　　　　　　)

TRANSCRIPT OF PROCEEDINGS
VOLUME II
PAGES 186-290

On January 22, 2013, through January 25, 2013, the above-entitled cause came on before the Honorable Gary A. Fenner, United States District Judge, sitting in Kansas City.

APPEARANCES

For the Movant:　　　　　　　　Mr. Timothy M. Gabrielsen
　　　　　　　　　　　　　　　　Federal Public Defender's Office
　　　　　　　　　　　　　　　　District of Arizona
　　　　　　　　　　　　　　　　407 West Congress, Suite 501
　　　　　　　　　　　　　　　　Tucson, Arizona 85701

　　　　　　　　　　　　　　　　Mr. John Jenab
　　　　　　　　　　　　　　　　Jenab & McCauley LLP
　　　　　　　　　　　　　　　　110 South Cherry, Suite 103
　　　　　　　　　　　　　　　　Olathe, Kansas 66061

For the Respondent:　　　　　　Mr. Jeffrey E. Valenti
　　　　　　　　　　　　　　　　Ms. Lajuana M. Counts
　　　　　　　　　　　　　　　　United States Attorney's Office
　　　　　　　　　　　　　　　　400 East Ninth Street, 5th Floor
　　　　　　　　　　　　　　　　Kansas City, Missouri 64106

Katherine A. Calvert, RMR
United States District Court Reporter
Charles Evans Whittaker Courthouse
400 East Ninth Street
Kansas City, Missouri 64106
(816) 512-5741

Case 4:04-cv-08003-GAF　Document 120　Filed 02/19/13　Page 1 of 105

I N D E X                                      Page

JANUARY 22, 2013

VOLUME I

MOVANT'S EVIDENCE

JENNIFER HERNDON
      Direct examination by Mr. Jenab . . . . . . . . . . . .  17
      Cross-examination by Mr. Valenti. . . . . . . . . . . .  34
      Redirect examination by Mr. Jenab . . . . . . . . . .  69
      Recross-examination by Mr. Valenti. . . . . . . . . .  73

FRED DUCHARDT
      Direct examination by Mr. Jenab . . . . . . . . . . .  76
      Cross-examination by Mr. Valenti. . . . . . . . . . . 100
      Redirect examination by Mr. Jenab . . . . . . . . . . 133
      Recross-examination by Mr. Valenti. . . . . . . . . . 137

DAN GROTHAUS
      Direct examination by Mr. Gabrielsen. . . . . . . . . 139
      Cross-examination by Mr. Valenti. . . . . . . . . . . 154
      Redirect examination by Mr. Gabrielsen. . . . . . . . 163

JUANITA CHAVEZ
      Direct examination by Mr. Gabrielsen. . . . . . . . . 166
      Cross-examination by Mr. Valenti. . . . . . . . . . . 180
      Redirect examination by Mr. Gabrielsen. . . . . . . . 182

ENRIQUE DOS SANTOS (by videotaped deposition). . . . . . . 183

187

I N D E X                                          Page
(continued)

JANUARY 23, 2013

VOLUME II

RUSSELL STETLER
     Direct examination by Mr. Gabrielsen. . . . . . . . . 197
     Cross-examination by Mr. Valenti. . . . . . . . . . . 235
     Redirect examination by Mr. Gabrielsen. . . . . . . . 243

HECTOR GUEVARA
     Direct examination by Mr. Gabrielsen. . . . . . . . . 246
     Cross-examination by Mr. Valenti. . . . . . . . . . . 281
     Redirect examination by Mr. Gabrielsen. . . . . . . . 288

188

Case 4:04-cv-08003-GAF   Document 120   Filed 02/19/13   Page 3 of 105

I N D E X                                     Page
(continued)

JANUARY 24, 2013

VOLUME III

ANTOLIN LLORENTE
     Direct examination by Mr. Gabrielsen. . . . . . . . . 302
     Cross-examination by Mr. Valenti. . . . . . . . . . . 358
     Redirect examination by Mr. Gabrielsen. . . . . . . . 388

Case 4:04-cv-08003-GAF   Document 120   Filed 02/19/13   Page 4 of 105

I N D E X                                          Page
(continued)

JANUARY 25, 2013

VOLUME IV

PABLO STEWART
     Direct examination by Mr. Gabrielsen. . . . . . . . . 406
     Cross-examination by Mr. Valenti. . . . . . . . . . 453
     Redirect examination by Mr. Gabrielsen. . . . . . . 472

RESPONDENT'S EVIDENCE

MICHAEL OYLER
     Direct examination by Mr. Valenti . . . . . . . . . 478
     Cross-examination by Mr. Jenab. . . . . . . . . . . 485

Reporter's certificate . . . . . . . . . . . . . . . . . 503

190

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | First amended 2255 petition 3/1/09 | 15 | 15 |
| 2 | 3/1/09 affidavit of Jennifer Herndon | 15 | 15 |
| 3 | 11/26/06 statement of Frederick Duchardt | 15 | 15 |
| 4 | 10/31/07 affidavit of Jennifer Herndon | 15 | 15 |
| 5 | 10/31/07 declaration of Dan Grothaus | 15 | 15 |
| 6 | 12/2/98 order appointing Fred Duchardt | 15 | 15 |
| 7 | 12/13/98 order appointing Jennifer Herndon | 15 | 15 |
| 8 | 4/11/00 trial transcript | 15 | 15 |
| 9 | 3/23/01 trial transcript | 15 | 15 |
| 10 | 3/23/01 trial transcript | 15 | 15 |
| 11 | 3/23/01 trial transcript | 15 | 15 |
| 12 | 7/1/99 letter from Hector Guevara to Frederick Duchardt | 15 | 15 |
| 13 | 4/10/00 letter from Frederick Duchardt to Enrique Dos Santos | 15 | 15 |
| 14 | 12/22/98 request for funds to hire investigator/ mitigation specialist | 15 | 15 |
| 15 | 2/11/99 order | 15 | 15 |

Case 4:04-cv-08003-GAF   Document 120   Filed 02/19/13   Page 6 of 105

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 16 | 3/4/99 request for funds to hire interpreter | 15 | 15 |
| 17 | 8/13/99 second request for funds to hire interpreter | 15 | 15 |
| 18 | Juanita Chavez' billing records | 15 | 15 |
| 19 | Juanita Chavez' notes | 15 | 15 |
| 20 | 3/13/00 letter from Judge Hays to Jennifer Brewer | 15 | 15 |
| 21 | Death penalty special verdict - Count II | 15 | 15 |
| 22 | Death penalty special verdict - Count III | 15 | 15 |
| 23 | Federal Death Penalty Act mitigating factors | 15 | 15 |
| 24 | Dan Grothaus' notes | 15 | 15 |
| 25 | 5/10/00 letter and invoice from Dr. Dos Santos to Fred Duchardt | 15 | 15 |
| 26(a) | Dr. Llorente's curriculum vitae | 15 | 15 |
| 26(b) | Dr. Llorente's case list | 15 | 15 |
| 27 | 3/1/06 Dr. Llorente report | 15 | 15 |
| 28 | 3/7/11 Dr. Llorente report | 15 | 15 |
| 29(a) | Hector Guevara's 7/17/06 curriculum vitae | 15 | 15 |

192

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 29(b) | Hector Guevara's 2012 curriculum vitae | 15 | 15 |
| 30 | Russell Stetler's curriculum vitae | 15 | 15 |
| 31 | Russell Stetler's declaration | 15 | 15 |
| 32(a) | Rosalia Valencia Candelo video Part 1 | 15 | 15 |
| 32(b) | Rosalia Valencia Candelo transcript Part 1 | 15 | 15 |
| 33(a) | Rosalia Valencia Candelo video Part 2 | 15 | 15 |
| 33(b) | Rosalia Valencia Candelo transcript Part 2 | 15 | 15 |
| 34(a) | Rosalia Valencia Candelo video | 15 | 15 |
| 34(b) | Rosalia Valencia Candelo transcript | 15 | 15 |
| 35 | 2/1/10 Hector Guevara's notes of Beatriz Candelo telephone conversation | 15 | 15 |
| 36 | 7/27/10 Hector Guevara's notes of Beatriz Candelo telephone conversation | 15 | 15 |
| 37(a) | Beatriz Candelo video | 15 | 15 |
| 37(b) | Beatriz Candelo transcript | 15 | 15 |
| 38(a) | Gustavo Viveros video | 15 | 15 |
| 38(b) | Gustavo Viveros transcript | 15 | 15 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 39 | 3/3/11 Gustavo Viveros declaration | 15 | 15 |
| 40(a) | Gustavo Viveros video | 15 | 15 |
| 40(b) | Gustavo Viveros transcript | 15 | 15 |
| 41 | Gustavo Viveros declaration translation | 15 | 15 |
| 42(a) | Segundo Sinisterra video | 15 | 15 |
| 42(b) | Segundo Sinisterra transcript | 15 | 15 |
| 43(a) | Segundo Sinisterra video | 15 | 15 |
| 43(b) | Segundo Sinisterra transcript | 15 | 15 |
| 44 | 3/3/11 Segundo Sinisterra declaration | 15 | 15 |
| 45 | 12/11/12 Segundo Sinisterra declaration translation | 15 | 15 |
| 46 | Pablo Stewart's curriculum vitae | 15 | 15 |
| 47 | Pablo Stewart's report | 15 | 15 |
| 48 | 1989 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases | 15 | 15 |

Case 4:04-cv-08003-GAF    Document 120    Filed 02/19/13    Page 9 of 105

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 49 | 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases | 15 | 15 |
| 50 | 1998 Spencer Report | 15 | 15 |
| 51 | 2010 Spencer Report | 15 | 15 |
| 52 | Hector Guevara's billing records | 15 | 15 |
| 53 | German Sinisterra social history | 15 | 15 |
| 54 | Beatriz Candelo transcript | 15 | 15 |
| 55(a) | 12/27/09 Rosalia Valencia Candelo video excerpts | 15 | 15 |
| 55(b) | 12/27/09 Rosalia Valencia Candelo transcript excerpts | 15 | 15 |
| 56(a) | 7/3/10 Rosalia Valencia Candelo video excerpts | 15 | 15 |
| 56(b) | 7/3/10 Rosalia Valencia Candelo transcript excerpts | 15 | 15 |
| 57(a) | 3/8/11 Beatriz Candelo video excerpts | 15 | 15 |
| 57(b) | 3/8/11 Beatriz Candelo transcript excerpts | 15 | 15 |
| 58(a) | 3/4/11 Gustavo Viveros video excerpts | 15 | 15 |
| 58(b) | 3/4/11 Gustavo Viveros transcript excerpts | 15 | 15 |

195

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59(a) | 3/3/11 Segundo Sinisterra video excerpts | 15 | 15 |
| 59(b) | 3/3/11 Segundo Sinisterra transcript excerpts | 15 | 15 |
| 60(a) | 12/5/12 Enrique Dos Santos deposition video | 15 | 15 |
| 60(b) | 12/5/12 Enrique Dos Santos deposition transcript | 15 | 15 |

FOR THE GOVERNMENT:

| | | | |
|---|---|---|---|
| 1 | FBI 302 form with documents | 480 | 480 |
| 2 | Overland Park Police Department continuation report with documents | 481 | 481 |

Case 4:04-cv-08003-GAF   Document 120   Filed 02/19/13   Page 11 of 105

JANUARY 23, 2013

MORNING SESSION

THE COURT:  Good morning.

Mr. Jenab, are you ready to proceed this morning?

MR. JENAB:  We are, Judge.

THE COURT:  Do you have Mr. Stetler here to testify?

MR. JENAB:  We do, Your Honor.

THE COURT:  Sir, would you come up right over here to the witness stand for us, please.

RUSSELL STETLER, being sworn by the courtroom deputy, testified:

(A recess was taken.)

THE COURT:  Are you ready to go now?

MR. GABRIELSEN:  Thank you, Your Honor.

DIRECT EXAMINATION BY MR. GABRIELSEN:

Q      Good morning, Mr. Stetler.  Can you state your full name for the record, please.

A      Yes.  Russell Stetler, R-u-s-s-e-l-l, S-t-e-t-l-e-r.

Q      And, sir, how are you employed?

A      I'm employed as a national mitigation coordinator for the federal death penalty projects.

Q      Is that -- are those projects part of the Office of the Defender Services?

A      They're authorized by the Office of Defender Services, part of the federal defender system.

197

Q    And they are also part of the AO?

A    Yes.

Q    What are your duties and responsibilities in the positions you have?

A    Well, there are multiple death penalty projects.  We provide assistance to federal defenders and private lawyers appointed under the Criminal Justice Act in capital cases in the federal courts, whether in trial or on habeas corpus, and I work with those projects to provide assistance, specifically in the area of investigation and presentation of mitigation evidence.

Q    And how long have you been in those positions?

A    Since 2005.

Q    And I want to continue with your qualifications, but just to give the Court an idea about where we're going with your testimony, I'd like you to state the purpose for having prepared a declaration in 2007 that was attached to Mr. Sinisterra's 2255 motion.

A    I was contacted by Mr. Jenab in 2007 and asked to provide a declaration about the standard of practice in the area of investigation and presentation of mitigation evidence at the time of Mr. Sinisterra's trial, representation in pretrial in 1998 through trial in 2000.

Q    Mr. Stetler, can you -- it should be coming up on your monitor.  Can you identify what the document is that's being

Case 4:04-cv-08003-GAF    Document 120    Filed 02/19/13    Page 13 of 105

pulled up right now?

A     Yes.  This is commonly referred to as the Spencer Report.  It's a report on federal death penalty cases, recommendations concerning cost and quality of defense representation.  This was a subcommittee of defender services headed by Judge Spencer from Virginia.

Q     What was the date of this report?

A     It was issued in May 1998, then approved -- or adopted by the Judicial Conference on September 15th, 1998.

Q     In the recommendations -- did you say they were for the litigation of federal death penalty cases?

A     Yes.  The federal death penalty had been around ten years at that point.  They wanted to take a look at federal death penalty cases and make some recommendations around the cost contained in that quality representation.

Q     And the Spencer Report, I believe it indicates it was published by the Judicial Conference of the United States?

A     Recommendations were adopted by the Judicial Conference.

Q     Adopted by.  Excuse me.

And was that report updated?

A     Yeah.  It was updated in 2010.  And, again, they're commonly referred to as the Spencer Report of 1998 and Spencer update 2010.  I think the recommendations remain the same, but the commentary was revised to include more up-to-date data.

Case 4:04-cv-08003-GAF    Document 120    Filed 02/19/13    Page 14 of 105

Q    Mr. Stetler, your current position was described in the September 2010 update, was it not?

A    Yes.  That's correct.

Q    We're going to attempt to show you pages 111 and 112 where that description of your position is articulated in the report.

Mr. Stetler, I'd like to impose upon you please to read the second half of the paragraph that begins on the middle of page 111 with the words "In 2004."

A    Yeah.  "In 2004 the Defender Services Committee authorized a position for a National Mitigation Coordinator in a federal defender office to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts.  In addition to leveraging his own significant knowledge and skills through case consultations, the National Mitigation Coordinator has enhanced defense representation and contributed to cost containment efforts by recruiting more mitigation specialists to work on federal capital cases, matching mitigation specialists with counsel, and providing expanded training opportunities both for defender staff and for private mitigation specialists who are authorized to work on federal cases.  This training enhances the skills and availability of such professionals."

Q    Mr. Stetler, is this paragraph in fact referring to you, sir?

Case 4:04-cv-08003-GAF   Document 120   Filed 02/19/13   Page 15 of 105

A     Yes.

Q     And are you the only National Mitigation Coordinator the program has had at this point?

A     Yes.

Q     Before you took the position -- before taking your current position, did you hold other positions that related exclusively to death penalty cases?

A     Yes, I did.

Q     Can you describe this, sir?

A     For the ten years before I took this position, I was the Director of Investigation and Mitigation at the New York State Capital Defender Office.  It is an office that was created when the death penalty was reinstated in New York state with the mandates to provide effective representation at the trial and appellate level.

Q     And prior to that, sir, prior to New York, where were you?

A     From 1990 to '95 I was the chief investigator at California Appellate Project in San Francisco, which was a nonprofit created by the state bar to provide assistance to lawyers handling death penalty cases in California on appeal or in state or federal postconviction.

Q     And was your primary concern both in New York and California the development of mitigating evidence in capital cases?

Case 4:04-cv-08003-GAF   Document 120   Filed 02/19/13   Page 16 of 105

A    Yes.

Q    When did you begin working on death penalty cases?

A    Ten years before that.  Again, in 1980 working privately on death penalty cases.  It wasn't exclusively death penalty but a large part.

Q    Were you in a firm or were you in private litigation practice?

A    Private practice.

Q    And just to be clear here, at the time Mr. Sinisterra was being prosecuted in this case between '98 and 2000, where were you working at that point?

A    I was working in New York.

Q    Okay.  And if you could give us a fairly full description of your duties there.

A    Yeah.  Our office, as I said, was created by statute. We had responsibility for providing both direct representation and consultation in all state death penalty cases.  There was a statutory requirement that we be notified whenever anybody was arrested for murder.  Our lawyers had to make a determination whether it was a potential death eligible case.  If it was, our office took as many of the cases as possible for direct representation, and my duties were to supervise the mitigation development whether it was in-house or consulting with private lawyers.  So I worked with lawyers, mitigation specialists, and other ally experts and professionals.

Case 4:04-cv-08003-GAF    Document 120    Filed 02/19/13    Page 17 of 105

Q     Did you also do hands-on work on the individual cases yourself?

A     Oh, yes.

Q     And what would your caseload have looked like back in the day?

A     Well, we tried to limit individual teams to have no more than three to four cases at one time.  But as the supervisor of the unit, I had responsibility to work on a much larger number of cases.  There were 800-some death eligible cases in a ten-year period.  Most of those cases were not authorized.  We had a statutory period where prosecutors had to make an affirmative decision whether to file those.  In the federal system it's called notice of intent, and we actively worked up cases in the early period, made presentations to prosecutor offices, and most cases overwhelming majority were not finally authorized as capital prosecutions.

Q     In your role in that office did your office have -- well, let me put this more directly to you.  Did you in any of those cases engage in any mitigation investigations in foreign countries?

A     Yes.

Q     What are some of the countries that you investigated in?

A     I think the only cases that I was involved in directly visiting a foreign country was Alvarez in Westchester County

203

involving a Honduran national. There was another case in Monroe County, Rochester, New York, where the client was originally from Puerto Rico and I did some hands-on investigation in that case, but our office had involvement in a number of other cases supervising people and those cases included nationals from Mexico.

THE INTERPRETER: I'm sorry. The interpreter is having a hard time hearing.

A     Is that better? Sorry.

So I did not personally travel to these other countries, but we sent people on investigative assignments in Mexico, Columbia, Latvia, Jamaica.

Q     (By Mr. Gabrielsen) And these folks would report back to you on progress of those investigations?

A     Yeah. Sometimes we were in direct phone contact while they were there.

Q     So you had an idea about what was going on on the ground in places like Mexico and Columbia?

A     Yes. And I should say the same is true when I was in California from '90 to '95. I remember one of our cases involved sending one of our staff to Thailand and we had -- again, I had active supervision contact with her by telephone.

Q     Team meetings, and so forth?

A     Oh, yeah.

Q     Can you give us a description of continuing legal

education programs dedicated to the death penalty or the development of mitigation you've attended in your years as a mitigation specialist?

A    I began attending annual programs in California and then took advantage of the national programs. The National Legal Aid and Defender Association has a program called Life in the Balance. The National Association of Criminal Defense Lawyers had one directly focused on mitigation called Making the Case For Life. The NAACP Legal Defense Fund has a national conference every year at the Airlie, A-i-r-l-i-e, in Warrenton, Virginia, that brings people from all over the country, acquaints them with the latest ideas in capital defense litigation. So those are the major national programs historically.

More recently, beginning in 2005 there were also hands-on interactive consultative programs referred to generically as Bring Your Own Case programs where you actually sit down and just have talking heads talk about capital defense topics, but instead you are also brainstorming people about their individual cases, and you get an entire team encouraged to attend programs, sometimes at the death penalty colleges.

Q    Have you served as faculty on some of the legal continuing education programs?

A    Oh, yes, faculty on all the ones I mentioned and more.

Q    Roughly how many times have you been a member of a

Case 4:04-cv-08003-GAF    Document 120    Filed 02/19/13    Page 20 of 105

faculty in a CLE program?

A    It's about 350.

Q    Over the course of what period of time?

A    More than 20 years.

Q    Were any of those in Missouri?

A    Yes.  I've been to eight CLE programs in Missouri.

Q    On which you served as faculty?

A    Yes.

Q    Were any of those in Kansas City?

A    Yeah.  I think half were in Kansas City and a couple were in -- one was in the Ozarks, one was in another town in the middle of the state, and a couple in St. Louis.

Q    And who were the sponsors of these programs in Missouri?

A    They were under various auspices.  A couple, I think the ones that were not in the big cities, were sponsored by the Missouri State Public Defender.  The ones in St. Louis and Kansas City were sponsored by the federal death penalty defense programs, National Institute of Trial Advocacy, had one at UMKC and UMKC itself had a CLE symposium.

Q    Have you appeared as faculty at the CLE death penalty jurisdictions in most of the country?

A    Yes.  I think all but four jurisdictions.

Q    And have you also appeared in training programs in the federal death penalty cases?

206

A     Yes.  That's a big part of my job.

Q     Have you helped plan CLEs on death penalty topics?

A     Yes.

Q     Primarily litigation?

A     Yes.  That's my focus.

Q     So almost exclusively mitigation?

A     Yes.

Q     Have you taught in any of those so-called death penalty colleges or other interactive programs?

A     Yes.  There are death penalty colleges at the DePaul University, College of Law in Chicago and St. Clair University, School of Law in California and I've served as faculty at both those programs.

Q     And how were the so-called death penalty colleges with the interactives, how do they differ from a typical CLE where we lawyers show up and sit in the audience and listen to folks speak?

A     Well, the difference is there is a lot of interactive discussion and brainstorming individual cases.  So you may hear a lecture on mental health issues or on mitigation, and then that's followed by an intense discussion of what are the issues in the individual cases and what are the obstacles to developing mental health evidence, what are the problems that you are having, and there are really hands-on brainstorming sessions.

Case 4:04-cv-08003-GAF    Document 120    Filed 02/19/13    Page 22 of 105

Q      Have you also kept abreast of publications relating to capital defense investigation?

A      Yes, of course.

Q      And what are some of those publications that you read?

A      Well, there is a National Association of Criminal Defense Lawyers has a monthly magazine called The Champion that regularly publishes practice tips on capital defense work.  I serve on the advisory board of that magazine.  There are listservs and they've been around since I think about 1997 that bring to our attention relevant articles in law reviews. Popular Press sometimes has other journals.  Those are a broad range of materials like that.

Q      And you also keep up with death penalty articles in the law reviews?

A      Oh, yeah.  Absolutely.

Q      Do you also keep abreast of decisions of the Supreme Court with respect to the death penalty claims of ineffective assistance of counsel?

A      Those that relate to mitigation.

Q      And just off the top of your head, what are some of the more recent -- over the past decade some of the names of those cases in the Supreme Court that you've kept abreast of?

A      Well, the critical cases about the duty to investigate mitigation thoroughly began with Williams v. Taylor in 2000. Wiggins, W-i-g-g-i-n-s, the Smith case in 2003.  Rompilla v.

Beard, R-o-m-p-i-l-l-a, in 2005, I believe, and then Porter v. McCollum, M-c-C-o-l-l-u-m, and Sears, like Sears Roebuck, v. Upton, U-p-t-o-n. All those cases were ones the United States Supreme Court found counsel ineffective for failing to investigate mitigation evidence thoroughly.

Q     Have you yourself published articles related to the development of mitigation?

A     Oh, yes.

Q     Can you give the Court a couple of examples of specific publications?

A     I've published articles in The Champion magazine that I mentioned. Some of these were back before the time of Mr. Sinisterra's trial. An article just called Mitigation Evidence in Capital Cases. Another one called Mental Disabilities in Mitigation in, I believe, 2007. An article on mitigation, something to the effect of the duty to require as expert assistance but can't be delegated.

I've also written a few law review articles in this area. One for the University of Pennsylvania, Journal of Law and Social Change called the Mystery of Mitigation. It's just kind of a broad overview of mitigation evidence.

Q     When did that article appear?

A     About 2008. And one for UMKC Law Review. Professor Sean O'Brien organized a symposium issue at the UMKC Law Review and asked me to write one on a successful habeas case where the

209

key evidence was developed in the habeas area, and that's
called, I believe, The Unknown Story of a Motherless Child.

Q    And I'm holding that in my hand.  That's the summer of
2009?

A    Yes.

Q    UMKC Law Review.  The Unknown Story of a Motherless
Child?

A    That's correct.

Q    What was the nature of your writing that particular
article?

A    It was an interesting case where at trial this client
had been interviewed by numerous mental health experts and
shared with the experts what information he knew about his
family history but his mother had died in childbirth and he
knew nothing about her side of the family, and in the habeas
investigation all of the -- both sides of the family were
investigated in more detail and disclosed a great deal of
mental illness multigenerationally that the original
psychiatrist knew nothing about.  It was basically about the
importance of developing social history evidence independent of
what you can learn from clients because clients are one source
of information but by no means the only source.

Q    And in this particular issue of the UMKC Law Review it
appears there are similarly themed articles written by other
authors?

A     Yes.

Q     Was this a sort of a symposium issue that focused on the topic?

A     Yes.  It was an event at the law school.

Q     And this was commissioned by Professor O'Brien?

A     That's correct.

Q     During the time period of Mr. Sinisterra's trial here, were you publishing things in that time frame, '98 to 2000?

A     Yes.  I had a number of articles published in The Champion in 1999, 2000.

Q     Were you also helping to edit some death penalty manuals in some different states at that time?

A     Yes, principally the California manual.  The California has a four-volume death penalty defense manual.  In the 1990s I helped shape the volume that's dedicated to mitigation evidence.

Q     In your more recent career, have you provided testimony or supplied affidavits in court that address the standards of practice and prevailing norms in death penalty defense?

A     Yes, I have.

Q     And where have you testified?

A     I've testified in 15 courts.  I think eight of them have been in postconviction cases and they were in Wyoming, Arkansas, Alabama, three cases in California, one in Arizona, one in Iowa.  I think that's the list.

211

Q    And when you testified in these cases, were you permitted to testify as an expert witness in your area?

A    Yes.  And these were cases where I was discussing what was the standard of practice at the time of the particular trials.  I also testified in pretrial proceedings on similar issues, what's the standard now?  I've testified in that area in connection with funding applications, and that sort of thing.

Q    Has any court ever not found you qualified to testify to a mitigation development in a capital case?

A    No.

Q    I want to take you back to your declaration you prepared for Mr. Jenab back in 2007.  That would be the first page of your 2007 declaration.

A    Yes, I've got it.

Q    Okay.  And, again, can you tell the Court again how you got acquainted with Mr. Jenab in this case?

A    Yes.  I met him at a --  it was an annual national habeas corpus seminar and I was on the faculty of that program in August of 2007 and met him at that program in national.

Q    In paragraphs 2 and 3 -- we'll start with paragraph 2 you mention your personal experience in death penalty cases involving foreign nationals.  Could you elaborate again on that experience?  You gave us a little bit of an overview of the countries your offices did investigations in, but what's the

212

work actually like when the mitigation investigator hits the ground in those places?

A     Well, those are viewed as the hardest investigative assignments.  You know, working in a foreign country, different language, sometimes you have to work through interpreters.  You have all the cultural barriers of helping people understand what it is that you're doing.  Mitigation is a foreign enough concept in this country and it's a very, very difficult thing to explain in other cultures.

Some of these places have concerns about physical security as well.  And people's attitudes towards the courts and investigators is sometimes really inhibiting.  There can be issues of corruption which make people reluctant to cooperate.  For that matter, issues of traumatic experience with people in uniform.  So there's all kinds of potential barriers that arise in those settings.

Q     We had some discussion outside your presence yesterday from witnesses and we'll hear more testimony this morning about the propriety of making repeated trips to see witnesses, whether, I suppose, it be domestic or these foreign investigations, but could you comment on the need to make repeated trips to have repeated meetings with mitigation witnesses?

A     Well, yeah.  In the case I was most directly involved in where the client was from Honduras, we had two bilingual

213

mitigation specialists who were involved in the case who made at least three trips to Honduras. I made two trips myself and that was necessary to build the kind of relationships that you needed, the relationships of trust, build rapport so the people were comfortable discussing the most sensitive information in the life of their families.

It is a client whose parents had gone to the United States without him and left him behind initially with relatives. The relatives didn't care for him the entire time that he was there so he was living on the street for a while. So it was very difficult to get people to talk openly about some of the hardships that he had experienced there.

Also we were trying to get visas for witnesses and that's at best a slow process. You needed to build in plenty of time. We actually took family members to the U.S. Embassy and met with embassy staff to try to assist them in getting visas. As a matter of fact, all the family members were denied visas, but the school principal was able to get a visa because the U.S. authorities were sufficiently confident that he had firm roots in his community and loyalty to his students and would not abscond. So a lot of time was spent just determining who was going to be able to come and testify.

And then in the case of the individuals who couldn't come we did a couple of videotaped interviews after we had spent time with them and built up a relationship so that they

214

could really speak candidly about the mitigation issues.

Q     Do you expect these witnesses in these foreign investigation cases to open up with you about, for lack of a better term, I'll call them the deep dark family secrets on the first interview?

A     No.  That doesn't happen whether it's in a foreign country or in your own neighborhood.  The initial response is, you know, not understanding what may be relevant and just wanting to put the family member in the best light.  So you've got a lot of superficial good guy information from family members, but they are pretty reluctant to share the most intimate things about the family the first time you meet them.  So we talk about barriers to disclosure.  As human beings, there's all kinds of thing we don't automatically feel comfortable psychologically discussing with strangers.

In addition to the human psychological barriers that we all have talking about the most intimate things in our lives, there's all the things that identify who we are, the social badges of identity, whether it's religion, politics, or education, race, ethnicity, culture can further complicate that process, things that establish a difference between ourselves and the person that we're talking to.  So all of those considerations factor in.  That's why the development of mitigation evidence is a slow process.

Q     When you talk about intimate issues, what specifically

Case 4:04-cv-08003-GAF     Document 120     Filed 02/19/13     Page 30 of 105

are you referring to?

A    Well, what happened in the development in the household?  Was it a nurturing home environment?  Was it an intact family?  Were the parents faithful to one another?  Were they providing for their children?  Was there adequate not just nutrition but emotional support?  Were there issues of physical brutality and violence in the home or worse issues of incest and sexual abuse?  Those are things that are very difficult for anybody to talk about, and so you never get that the first time you sit down with people.

Q    When Mr. Jenab called you and asked you to become involved in this case, what did he ask you to address, for example, in the declaration that you performed?

A    Well, it was pretty much just to summarize what was the standard practice at the time of Mr. Sinisterra's trial, and that he provided me with information about what had actually been done in the case and asked me to comment on how that performance measured up to the standards.

Q    And shortly after Mr. Sinisterra's trial, were you asked to actually come to testify to mitigation issues at a federal death penalty pretrial proceeding?

A    Yeah.  That was in September of 2001.  I remember because it's the first time I flew on a plane after September 11th and it was a hearing in the Middle District of Tennessee on a funding issue in a pretrial case.

216

Q      And that was funding for mitigation specialists?

A      Exactly.

Q      In your declaration, I think in several different places, and I won't have -- we won't try to pull those different places up right now, but you state the importance of investigating mitigation and that's been stressed at all the seminars you've attended over the course of time going back to around 1980 or so; is that correct?

A      Yes.  Everything I've been to, yes.

Q      In paragraph 12 you mention a law review article from 1983, as early as 1983, expressing the importance of investigating client's childhood and traumatic experiences.  In '83 would that have been an isolated article or thoughts of an author or was that already developing into a standard?

A      This was a significant and widely read law review article.  In fact, it's even quoted in the Strickland, I believe, but there were a whole series of articles in the 1980s in The Champion magazine.

Dennis Bailte, B-a-i-l-t-e, also wrote an article I believe in the Akron Law Review making similar points.  There was a former journalist named Lacey Fosburgh, F-o-s-b-u-r-g-h, who was teaching at the journalism school at Berkeley who was brought into a California case very early and wrote about it in 1982, and what she said was -- she didn't use the term "mitigation specialist."  She just said somebody needed the

217

exclusive job of focusing on the client's life and background and associates, and so forth. So this journalist is somebody who had written in a true crime book about a murder case when she used to work for the New York Times and the California law found her at the journalism school and say somebody spend time with the client and interview family members, friends, associates and develop this evidence for the penalty phase, and so that was a successful penalty phase presentation, and Ms. Fosburgh wrote about that in the California defense journals, I believe as early as 1982.

Q     Mr. Stetler, in that paragraph you cite three Supreme Court cases where the Supreme Court found ineffective assistance of counsel at sentencing. Have you had occasion to read those opinions or research the cases that led to those decisions and determine whether those cases were tried?

A     Yes. They were all tried in the 1980s. Wiggins v. Smith, I believe, was tried in 1989 and Williams and Rompilla cases were, I think, a little earlier, I think '86 and '88. And I mentioned -- in addition to these three cases, I mentioned Porter v. McCollum and Sears v. Upton. Porter v. McCollum was a Florida case that was also tried in the 1980s, and Sears v. Upton was a Georgia case that was tried in the early '90's, '92 or '94. Williams v. Taylor was from Virginia, Wiggins v. Smith was from Maryland, and Rompilla v. Beard was from Pennsylvania. I mentioned those locations because I guess

218

part of the point is the standard is a national one, and this duty to investigate potential mitigating evidence is something which the United States Supreme Court has recognized in cases arising from multiple jurisdictions.

Q     And in those cases in deciding claims of ineffective assistance, I assume that the Court sets out a standard of care for the mitigation function in these death penalty cases?

A     Yes.  And that one sentence is the most important point, the duty to conduct thorough mitigation investigation.

Q     And even though these cases were tried in the 1980s, when the Court decides these cases in the 2000s, did the Court cite to ABA guidelines or some other guidepost for determining what the standard of care was for developing mitigation?

A     Yes.  All three of these cases; Williams, Wiggins, and Rompilla, cited to ABA publications.  I think Williams v. Taylor just cited the ABA standards for Criminal Justice Defense Function published earlier I think in 1982 and it also cited the Strickland opinion.  Wiggins v. Smith and Rompilla v. Beard cited the language of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, which first appeared in 1989, and actually Rompilla has a lengthy footnote that also talks about the later revised edition of the ABA guidelines in 2003.

But the essential point is the same in all of those ABA publications.  When the standards for the defense function

Case 4:04-cv-08003-GAF     Document 120     Filed 02/19/13     Page 34 of 105

were published back in the early '80s, the commentary begins, Facts form the basis of effective representation, so there's always been a kind of recognition that developing evidence through investigation is a critical part of the defense function in all cases and then particularly in death penalty cases.

Q    In the development of mitigation?

A    Yes.  But even in the generic defense function publications they talk about the reports of investigation both to guilt and to sentencing.

Q    I'd like to ask you how close you followed the progress of those cases after they were remanded by the United States Supreme Court for new sentencing.  What were the dispositions in those cases later?

A    As far as I know, the Sears case in Georgia, which was just reversed in 2010, is still pending, but the other four cases were resolved by negotiated dispositions.  So they were resolved by pleas.

Q    So after -- in those cases after the remand, was there a thorough mitigation investigation done?

A    Well, I think those cases were reversed because the thorough mitigation investigation that was done in the habeas proceedings, and when they went back to the trial court, those cases were resolved through pleas.

Q    So the prosecuting authority decided not to try them as

220

death cases after they came back?

A    Yes, accept the resolution of life without parole.

MR. GABRIELSEN:  I'd like to take us to paragraph 15, please.

Q    (By Mr. Gabrielsen)  In paragraph 15 you discuss what we previously referred to as the original Spencer Report.  In that report there's a discussion of what the role is of a mitigation specialist.  Can you just speak to that?  I'm not going to pull up that report.  I don't need to have you read that in the record.  But can you speak to the Court about what the Spencer Report noted about the importance of mitigation specialists in these cases?

A    Again, the Spencer Report was discussing federal death penalty cases from the beginning of the Federal Death Penalty Act through its first decade.  Mitigation specialists have become part of the standard of care.  They are typically less expensive than lawyers so they are a cost-saving measure in that sense, and they are doing the work that otherwise would have to be done by attorneys and couldn't just be delegated to investigators and paralegals, and their job was to develop a full understanding of the social history or life history of the client in the context of the world that he grew up in.

Q    So the standard of care identified in the first Spencer Report, 1998, included a statement that mitigation investigators or mitigation specialists were part of the

221

standard of care?

A    Yeah, that's in the commentary.

Q    I would like to take us to paragraph 16 briefly.  You mentioned them briefly but what are the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, and can you please indicate to the Court how those guidelines were developed?

A    Yeah.  The ABA published standards in criminal cases back as early as 1980, I believe.  They had a separate volume on the prosecution function and one on the defense function kind of laying out what are the basic duties and expectations for counsel in criminal defense representation.

Then they decided that capital defense work was more specialized and needed a separate articulation of standards, so they worked with the largest public defender organization, the National Legal Aid and Defender Association to develop guidelines.

The National Legal Aid and Defender Association known by its initials NLADA began a drafting process and came up with its own standards for capital defense representation, polling experienced death penalty lawyers all over the country, and it's a slow drafting process.

But through the middle 1980s NLADA put together this set of standards, and then that draft went to the ABA, and I don't recall in detail which ABA committees were responsible

222

for reviewing it, but ultimately they put it through their committees. They changed the nomenclature a little bit from standards to guidelines, and they inserted that these were not just for appointment of counsel but standards for appointment and performance of counsel in death penalty cases, and they tried to capture, you know, what are the basic duties in death penalty cases, and it's not simply, you know, a polling of what are individual lawyers doing around the country but what are the common duties that everybody recognizes? And, of course, the ABA is not an organization of defense counsel. It includes defense counsel but it included prosecutors, judges, civil attorneys. So the investigation process there was I think very, very thorough.

Q     With this vetting process, is there a lag time in the promulgation of the guidelines? In other words, I guess what I'm asking is, is the practice ahead of -- timewise is the practice ahead of the promulgation of the guidelines, and I guess what I'm asking more specifically is, for example, when the 2003 guidelines came out, were lawyers who were practicing at the time of Mr. Sinisterra's trial, for example, were they already adhering to a standard of care that was articulated in the 2003 guidelines?

A     Absolutely. I mean, for example, the 2003 revision stated very, very succinctly the defense team should require a minimum of two competent lawyers, a fact or guilt innocence

223

investigator, a mitigation specialist, and somebody, whether it's one of those four or somebody else, should be qualified by a training screen for mental disorders. That was articulated in the ABA revised guidelines in 2003.

But that's exactly what we were doing, for example, in my office in New York from the moment we opened the office in 2005. Every case was staffed with two lawyers, a fact investigator, and a mitigation specialist. That's the way we created the office. We hired as many nonlawyers as lawyers for the trial practice teams.

Q     For the defense of capitally charged clients?

A     Yes. That's all we were doing.

Q     I'd like to pull up paragraph 17, please. My cocounsel has indicated that you may have misspoke. What year did the New York office open again?

A     In 1995.

Q     1995?

A     I'm sorry if I misspoke. It was in operation in 1995 to 2005.

Q     In paragraph 17 you speak to an interrelationship between the mitigation investigation and mental health evaluations, including the discussion of social history. Could you expand on that briefly, please?

A     Well, I think what most experienced capital defense practitioners recognize is that there are -- mental health

224

issues are pervasive in these cases, but social history, reliable, corroborated information about the client's life history and family members is going to be the foundation of careful mental health assessments.

If there are disorders that are running in the family, if there are what they sometimes call family scripts that are reenacted from one generation to the next, the more you can tell your experts about those predispositions, vulnerabilities, and repeated familial patterns of behavior, the better informed their assessment is going to be.

Again, as in the example of the case that I wrote about in the UMKC Law Review, clients may not be reliable historians. They may not know all the information and, in any event, experts are going to be very, very vigorously and effectively cross-examined if their information comes principally from capitally charged clients. So that's another reason why you want to gather your corroborated information from triangulated sources, documentary evidence information from multiple interviews, so what you can give your experts is going to be a very, very sound picture of what were the risk factors for mental disorders? What was this client exposed to? Was there trauma in the home environment? Was there trauma in the community where he grew up? Was there a pattern of behavior in the family that was suggested of the signs or symptoms of mental disorders?

225

And I should say there were a couple of articles written on this subject as well back in that time frame. There were, I believe it's in the Journal of Forensic Psychology is an article on standard of care issues from the mental health perspective in death penalty cases by Liebert, L-i-e-b-e-r-t, and Foster. I think Douglas Liebert and David Foster wrote about this issue back in the late '90s in the Comprehensive Textbook of Psychiatry by Kaplan, K-a-p-l-a-n, and Sadock, S-a-d-o-c-k. Also a nonforensic textbook, a psychiatrist textbook, that talked about how reliable corroborated information from people other than the person being evaluated will be critical to the reliable assessment.

Q    Would it surprise you if I indicated to you that we saw a video from a doctor who examined -- psychiatrist who examined Mr. Sinisterra back in 2000 who said that his diagnosis might have changed if he had been aware of the social history of Mr. Sinisterra? Would that surprise you?

A    That wouldn't surprise me. Experts are always looking for more information. The more you can give them the more reliable their diagnosis is going to be.

Q    And has the Supreme Court in some of the cases you addressed earlier, have they found ineffective assistance of counsel where mental health experts rendered a benign diagnosis in a mitigation investigation but later when armed with appropriate social history changed the diagnosis to a much more

226

mitigating one?

A      Yes.  Probably the best example is the Rompilla case from Allentown, Pennsylvania.  In that case the trial defense counsel had consulted with three mental health experts who had interviewed the client and came back with no information, but the postconviction investigation disclosed a pattern of family violence, mental illness, cognitive impairments.  That completely changed the picture of what that case was about.

I also should say of the five cases; Williams, Wiggins, Rompilla, Porter, and Sears, every one of them had cognitive issues and issues of intellectual impairment and potential brain damage.  So there's one common denominator.  Things that were missed in all five cases was that important mental health evidence.

I guess it seems to be making two points.  One is that the mental health evidence is very important in death penalty cases, and the other, and maybe it's just an implicit point, but it's something that's often missed.

Q      Mr. Stetler, in paragraph 23 of your declaration you indicate that mitigation is not developed to provide a defense to the crime but it provides evidence on another point.  What are those other points mitigation provides proof of?

A      Well, there are conditions that may inspire a juror to extend mercy in the individual case.  Again, the Court just said, as I quote here, Some things are inherently mitigating.

227

The fact that somebody has impaired intellectual functioning. What is distinguishing here is somebody who does not necessarily meet the criteria for exemption under the Atkins decision isn't exempt from capital prosecution but has impaired intellectual functioning. That's something that may be a reason for mercy completely independent whether it has any practical effect on his mental state at the time of the crime.

Q     And you indicated that it might change the mind of even one juror, one lone juror --

A     Sure.

Q     -- with respect to punishment?

A     That's, again, a point that was stressed in the more recent case, Porter v. McCollum. Some of the expert evidence was called into question, were disputed by rebuttal experts, and the Supreme Court said that the lower courts were mistaken in trying to sort out which expert was correct. The issue was really whether the defense evidence might have affected the decision of any juror in that case.

Q     And that would be the --

A     Yes.

Q     I would like to take you very briefly to paragraph 25. You speak I think to the -- well, I'll let you testify -- the relationship between the expert opinion and the development of facts supporting that opinion. Can you address what you were speaking to in paragraph 25?

228

A        Yes.  It's pretty simple.  There are really two points. On the one hand, you need experts to provide an interpretive framework so you're just not kind of throwing out random facts. You need experts to help connect the dots, but you can't rely on experts by themselves.  You need corroboration.  Jurors particularly find that experts backfire if they're not supported by lay testimony, what we sometimes think of historical experts, people who encounter the client long before the capital charges.

So this article by Professor Sundby quantifies that. It says two-thirds of the witnesses that backfire were these isolated experts.  What he's urging is not putting on your experts altogether but put on your experts very carefully in conjunction with solid evidence from lay witnesses.

Q        You spoke to the standard of care that the Supreme Court has enunciated in a number of fairly recent cases.  Have you read the Eighth Circuit's decision in the Sinisterra case from 2010?

A        Yes.

Q        Do you have a copy of that opinion with you?

A        One thing I do have.  Yes.

Q        I'm not going to dwell on this much, but I would like to direct your attention to 600 F.3d 907.  Have you found that page?

A        Which page?

Q 907.

A Yes.

Q Can you read into the record just the first two sentences of that paragraph that begins with "we conclude"?

A Yes. "We conclude that Sinisterra's claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence merits further review. Sinisterra's counsel had an obligation to conduct a thorough background investigation and to exercise reasonable, professional judgment in determining the mitigation evidence to present during the penalty phase of Sinisterra's trial."

Q The next paragraph, again, can you read into the record the first four sentences, please?

A Yes. "The record does not conclusively show that Sinisterra's attorneys acted within the range competence demanded of attorneys in criminal cases. Sinisterra's 2255 motion set forth facts pertaining to his life in Columbia, including rape, physical and sexual abuse, homelessness, privation, and head injuries. No testimony or other evidence about these factual allegations was presented at trial. Herndon and Grothaus stated that they did know this information about Sinisterra's upbringing, but Duchardt stated that he was, quote, aware of all of this information prior to the start of the trial, end quote. The record thus leaves unanswered a number of questions related to his attorneys' performance,

230

including whether Duchardt exercised reasonable professional judgment in refraining from presenting information of which he had knowledge and whether Herndon's mitigation investigation was constitutionally deficient for failing to discover that information."

Q       The first paragraph you read, is it fair to say that would be the Eighth Circuit's statement of the standard of care?

A       Yes.  And that's quoting, again, Williams v. Taylor.

Q       And the second paragraph is the paragraph that indicates in what respects the mitigation investigation in Columbia might have been deficient?

A       Correct.

Q       I'm going to ask you to make an assumption first, then ask you just a few questions about the Sinisterra case.

        I'm going to pause that and say yesterday Mr. Duchardt acknowledged that he didn't know about the mitigation that was contained in Mr. Jenab's 2255 motion and Mr. Grothaus never really had anything to do with the investigation in Columbia.  The government may contest that at some point, but for the purposes of the next couple of questions, I simply would like you to assume that's true.

        Did you have occasion to review the 2255 motion that Mr. Jenab filed?

A       Yes, I did.

231

Q   And in your earlier -- in your declaration you indicated a number of materials that he supplied to you for your review prior to you writing that declaration; is that correct?

A   Yes.

Q   From your review of that, do you know when Ms. Herndon's investigation in Columbia took place?

A   I think the videos were made less than four weeks before jurors were summonsed.

Q   And do you know from the materials you reviewed had she had prior contact with the Sinisterra family in Columbia?

A   I think the prior contact was very limited in my recollection.  I don't know whether it was Ms. Herndon, but the lawyers had spoken to some family members over the telephone with Mr. Sinisterra as the interlocutor.  They had some very limited contact, but my recollection from Ms. Herndon's video is that family members were learning for the first time that he even faced a potential death sentence when she arrived in the next couple of days before the videos were made.

Q   And subsequent to your declaration that you did for Mr. Jenab, Mr. Jenab and I have sent you documents relating to our investigation in Columbia; is that correct?

A   Yes.  That's correct.

Q   Including a social history and reports of mental health experts; is that correct?

232

A     Yes.

Q     And the mental health experts obtained information from Mr. Sinisterra; is that correct?

A     Yes.

Q     And acknowledged that there was corroborating information in the investigation that we did in Columbia?

A     Yes.  That's correct.

Q     Is the kind of information that we related to you more recently about the fruits of our investigation in Columbia -- let me ask you this:  What have we tendered to you to indicate what we have discovered in Columbia?

A     Well, chiefly some videotaped interviews with family members, friend who was also sexually abused, cousin who was sexually abused.

Q     And one of those gentlemen was actually an eyewitness to the sexual abuse of German?

A     Yes.  That's correct.

Q     Generally speaking, is the kind of evidence we've tendered to you more recently, is that the kind of evidence that a thorough mitigation investigation should seek to develop?

A     Yes.  Absolutely.

Q     When shall this investigation have taken place?

A     As soon as counsel are appointed, and one reason for that is sooner the investigation is commenced, the greater the

233

likelihood this might not have ended up as a death penalty case. You know, there's an authorization process and proffer of mitigating evidence is often very, very effective in persuading the government not to go forward with a capital prosecution, and the evidence of mitigation that we just talked about is one factor, but you've also got the reports of Dr. Llorente, the neuropsychologist, indicating the subaverage intellectual functioning, the low IQ score, the kind of very important information to present in the early proffer as a reason why the government might decide not to file a notice of intent.

Q    In anything you testified to this morning were you suggesting that it's, per se, reversible error not to have a mitigation specialist on the case?

A    No.  No.  My point about mitigation specialists is that it's the cost effective way to get the job done, but if the lawyers can do it, more power to them; and then on the other hand, sometimes there are cases where they've got on paper a full team.  The Angela Johnson case, which was where ineffectiveness was found on the 2255 motion, they had a very good mitigation specialist on the team, but, nonetheless, failed to develop all the mitigating evidence that was subsequently presented in the 2255.

Q    Angela Johnson, that was the case in front of Judge Mark Bennett in the Northern District of Iowa?

234

A    That's correct.

Q    That resulted in his granting relief on the claim of ineffective assistance of counsel at sentencing; is that right?

A    That's what I'm saying.  It's neither necessary nor sufficient.  It's a good idea.  It's a cost effective way to get the job done.

Q    If the mitigation specialist or mitigation investigator doesn't go out to do the investigation, the lawyers are certainly duty bound --

A    Yes, sir.  It's the lawyer's responsibility to guide that information.  That's what the Supreme Court said from the beginning.

MR. GABRIELSEN:  Your Honor, that's all I have for now.

THE COURT:  All right.  I think we'll take a break before your cross.  I'll be back at a quarter 'til eleven.

(A recess was taken.)

THE COURT:  Are you ready for your cross-examination?

MR. VALENTI:  I am, Your Honor.

THE COURT:  Mr. Stetler, I'll remind you that you are still under oath, sir.

THE WITNESS:  Yes, sir, Your Honor.  Thank you.

RUSSELL STETLER resumed the stand and testified further:

CROSS-EXAMINATION BY MR. VALENTI:

235

Q    Mr. Stetler, at the end of your examination is where I want to start, and real briefly I believe you indicated that the term "mitigation specialist," "mitigation investigator," whatever that label is is not particularly important. What's important is the work. Is that a fair way for me to say it?

A    Not quite. I think it is important but the critical thing is the work. We're on the same page on that.

Q    Whether someone has someone that's labeled mitigation specialist, mitigation investigator is not what the controlling factor is. It's whether or not they have -- they can perform the mitigation investigation as part of their case, correct?

A    Whether they performed it thoroughly. Again, there is no ineffective assistance of mitigation specialists.

Q    Correct. It always comes back to the lawyers under the Sixth Amendment but whether the work has been done, not necessarily who has particularly done the work?

A    Yes.

Q    You indicated during your testimony that you got into the field primarily of capital litigation investigation, I believe in 1980. Did I get that right?

A    I started in 1980 but it was not exclusive capital until 1990.

Q    How did you get into the field?

A    I began my adult life as a journalist. A friend opened an investigative agency and invited me to work with him, and

236

within a couple of weeks of my employment there the first capital case came in, and from that point on I took an interest in death penalty cases, an interest in investigating mitigation, learned on the job, learned more about it at conferences; and then over a ten-year period, I worked on about a hundred homicide cases, roughly a third of them were death penalty cases. So it's all on-the-job experience.

Q You started out as a victim of circumstance, so to speak, then you developed an affinity for the work over time?

A Yes.

Q You indicated also that the position you now hold was a position that was created by the federal public defender system in 2005?

A Yes. It was authorized by the Office of Defender Services in 2004 and they hired me in 2005.

Q I believe that was in response to some of the recent Supreme Court decisions that had come down, either Rompilla or Wiggins?

A Wiggins.

Q In addition to the restatement of the ABA standards in 2003?

A Yes. I say also in response to the Spencer Report from 1998.

Q And in order to homogenize mitigation work throughout the federal public defender system nationwide?

237

A    Sorry?

Q    In order homogenize or even out the level of defense work being conducted nationwide?

A    They wanted to see if there was high quality throughout the country and always concerned about cost effectiveness.

Q    You also indicated, I believe, sir, in your declaration in paragraph 25, to refresh your recollection, is the paragraph that discusses the jurors' perceptions that often the witnesses that backfire are expert witnesses. By that I believe that you're discussing the principle that it would require a reasoned decision whether to put an expert witness on the stand and balance that decision with lay witnesses that can help support that expert. Is that a fair way to summarize what you're saying there?

A    I say a little bit more. I think you need experts to provide the conceptual framework so that you just don't have isolated facts out there. For example, an isolated fact may be that somebody has trouble reading but the expert can explain exactly what cognitive impairment is. But what you want is both. You want the expert to tell the -- to put the diagnostic label on the official interpretation, but you want the lay witness to talk about, yeah, this guy couldn't make change or couldn't read, had problems learning.

Q    So to the extent possible, it would be reasonable for a criminal practitioner to want to put on the lay witnesses or

238

the fact witnesses to provide those facts for a jury to hear?

A    Yes, along with an expert.

Q    In paragraph 27 of your declaration you lay out -- sorry I have a frog in my throat.

A    Can I offer you some water?

Q    I have some.  You lay out the parts of the file that you reviewed in preparation for the declaration you prepared at Mr. Jenab's request.  Did you review the entirety of Mr. Duchardt's file?

A    No.

Q    Or were you given his declaration?

A    His statement, yes.

Q    So you saw his declaration.  You saw Ms. Herndon's declaration.  But you did not received those files?

A    That's correct.

Q    In preparation for your testimony today, have you gone through Mr. Duchardt's file?

A    No.

Q    Have you gone through Ms. Herndon's file?

A    No, sir.

Q    During the examination, Mr. Gabrielsen asked you about the reluctance people might have in giving up their intimate family details.  In his words he called it deep dark family secrets.

A    Yes, I remember that.

239

Q     Do all families have deep dark secrets?

A     Of one kind or another.  Some are darker than others. Let's put it that way.  Every family has family lore, family stories, things they don't want to mention.  They've got an official sanitized version.  They don't talk about Uncle Eddie is in the mental hospital.  My experience from these cases is that there are secrets in every family; but, again, what kind of secrets there are it's going to vary tremendously.

Q     You mention also in your declaration and, again, your testimony today that foreign investigations are among the most difficult that a mitigation investigator, probably any investigator, could get assigned to; is that fair?

A     Yes.

Q     Columbia, of course, is the country of origin in this case so that investigation would necessarily involve a foreign investigation?

A     Yes.

Q     You had mentioned that some of the difficulty with that would be language issues?

A     Yes, always.

Q     And, of course, so the record would be clear, the Columbian native language would be Spanish, correct?

A     Yes.  There are probably some other languages spoken there as well.

Q     And various dialects?

240

A     For purposes of this case, yes, Spanish is absolutely critical.

Q     When undertaking a foreign investigation, would it be an important thing for somebody to do to be aware of the State Department's view on how safe the region is to travel in?

A     Yes.  Absolutely.

Q     Were you aware the State Department was issuing warnings about travel in Columbia in 19 -- certainly in 2000 when Ms. Herndon went to Columbia?

A     I don't recall the details but I certainly would accept that.

Q     And if I submitted to you that Ms. Herndon had been specifically warned by judges in this courthouse about travel, it would be based on those State Department warnings, that wouldn't surprise you?

A     It wouldn't surprise me.  In fact, there had been other federal cases where motions had been filed seeking to preclude the death penalty because of the inability to conduct investigation.  As you probably know, there are cases now involving Somalian pirates as difficult a place you could possibly have to try to conduct the life history investigation.

Q     You also indicated in reference to a case that you were a part of that one of the problems with foreign investigations is the ability to get people to travel or get visas into this country?

241

Case 4:04-cv-08003-GAF    Document 120    Filed 02/19/13    Page 56 of 105

A     Yes.  I had both experiences.  In one case I recall where witnesses were able to come and another where they were denied, but you certainly need to allow lots of time to work on that issue.

Q     Of course, in this case, as it turned out, the witnesses that the defense team hoped to get into this country from Columbia were all denied entry visas despite whatever efforts were undertaken by that team?

A     Yes.  I know they didn't come.

Q     One other concern, I imagine, and I wonder if I'm right is in foreign investigations is there a concern about the ability to obtain documentation information?

A     Always.

Q     And by documentation, I'm talking about hospital records, education records, birth records, anything that might be useful to you, the investigator?

A     Yes.  Yes.

Q     And in this case I don't believe any documents were ultimately uncovered by Mr. Duchardt or Ms. Herndon.  Are you aware of any such documents?

A     I'm not aware of anything.

Q     And subsequent to their investigation and representation in this case over the last 13 or so years, have any documents been uncovered by the current mitigation investigation that you are aware of?

242

A    I don't believe so.

MR. VALENTI: Your Honor, I believe that's all the questions I have.

REDIRECT EXAMINATION BY MR. GABRIELSEN:

Q    Just one question. The fact that the State Department has warnings for Americans not to travel in certain regions, is that of any consequence with a lawyer who, nonetheless, goes ahead and makes the trip to attempt to obtain the evidence in that country?

A    Oh, yeah. I think you have to take security measures to make a trip as safe as possible, but I don't think it's a prohibition.

MR. GABRIELSEN: Judge, could I have just one moment? I might ask one more question.

THE COURT: Yes.

Q    (By Mr. Gabrielsen) I'm going to ask that Ms. Perez pull up Exhibit 20 for just a second and ask Mr. Stetler to read that. That's a letter from Judge Hays to Jennifer Herndon.

A    (Witness complied.)

Q    Were you able to read that?

A    Yes.

Q    Can you read the second paragraph please aloud for the record?

A    Yes. "Whether you decide to travel to Columbia or

243

alternatively are able to hire someone in the country to obtain evidence and information for use, if necessary, at a mitigation phase, Judge Fenner has asked that I remind you that the more factual and noninflammatory the information that is gathered in Columbia, the more likely it will be admitted at the penalty phase."

Q    Is it a fair reading of that that the Court, whether it is the magistrate judge or Judge Fenner, contemplated that perhaps Ms. Herndon would not want to go herself and obtain services of some other investigator to do that investigation in Columbia?

A    Yes.  As I think about it, I think there were similar warnings about Honduras at the time that we traveled there in the case that I referred to earlier and there were discussions of kidnapping insurance and the precautions that some Americans were taking.  Just part of the facts of life when you do this work.

Q    And we Americans are often counseled by our State Department not to travel to certain parts of the world?

A    I was in Nigeria on a case where I had to go from Lagos to Benin City.  The people at the embassy said it's too dangerous to go there.  If we had to go, we could only convoy with walkie-talkies, etc.  We had an obligation to get the information.

Q    I did human rights work in Central America in the '80s

244

during the wars. The embassy in El Salvador told us we shouldn't come in the country. It's fairly prevalent that at any given point, even today, there's probably warnings about various countries in the world that we shouldn't travel to?

A  And areas within the country that are unsafe.

Q  But we Americans still have business in some places that are dangerous?

A  Of course.

Q  And there were alternatives available to Mr. Sinisterra's defense team to obtain the evidence in very difficult circumstances?

A  I also add that this is really not something that -- mitigation investigation is not something that you can easily delegate to somebody else on the ground in a country because it is sufficiently foreign to American law. It is very, very difficult to explain to people in another country what you're trying to obtain for sentencing purposes in a United States death penalty case.

Q  Thank you.

MR. GABRIELSEN:  Judge, during Mr. Valenti's cross, I was going through my notes. I thought I had made a request to have Mr. Stetler considered an expert witness in the area of mitigation development. I don't have a memory of doing that, having asked the Court to do that. I would ask that now if Mr. Valenti doesn't have an objection to it.

Case 4:04-cv-08003-GAF   Document 120   Filed 02/19/13   Page 60 of 105

MR. VALENTI:  I have none.

THE COURT:  Thank you.  So considered.

Q     (By Mr. Gabrielsen)  One final question.  The danger in the country doesn't change the standard of care that an attorney has to respect -- with respect to the development of his client's mitigation evidence?

A       No, it does not.

MR. GABRIELSEN:  That's all Judge.

MR. VALENTI:  I have nothing further, Your Honor.

THE COURT:  All right.  Thank you very much, Mr. Stetler.  You're excused.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Good morning, Mr. Guevara.  Would you come up right over here to the witness chair, please.

HECTOR A. GUEVARA, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. GABRIELSEN:

Q     Good morning, sir.  Can you please state your name and spell your name for the record, please.

A       My name is Hector A. Guevara, H-e-c-t-o-r, G-u-e-v-a-r-a.

MR. GABRIELSEN:  I'm going to indicate to the Court and not for the purpose to embarrass Mr. Guevara.  He lacks hearing in his right ear, and so there may be times when my

246

questions might not be understood.  I may repeat a question or something due to that disability.

THE COURT:  That's fine.  Thank you.

Q      (By Mr. Gabrielsen)  Mr. Guevara, what's your profession?

A      I'm a private investigator/mitigator on capital cases.

Q      And where were you born?

A      I was born in Bogota, Columbia, South America.

Q      And what year were you born?

A      Excuse me?

Q      What year were you born?  What year?

A      1950.

Q      And you're a native Spanish speaker?

A      I do.

Q      In your role as a mitigation investigator, what do you do?

A      Usually study the social history of the client.  I usually pick up all kind of records in reference to the life of the individual.  I get all the paperwork presented.

Q      Where do you presently reside?

A      I live in Bethlehem, Georgia.

Q      Are you a citizen of the United States?

A      Yes, I am.

Q      And are you also a citizen of Columbia?

A      Yes, I am.

247

Q    When were you naturalized a citizen of the United States?

A    Around 1997.

Q    1997 or 1987?  When did you become a U.S. citizen?

A    1987.  1987.

Q    Do you travel back and forth between the two countries?

A    Yes, sir, a lot.

Q    Does your family have residences both in Columbia and the United States?

A    Yes, sir.

Q    What grade did you finish in school in Columbia?

A    Bachelor's Degree.

Q    And what was the subject matter of your Bachelor's Degree?

A    Political science and diplomacy.

Q    And what university did you achieve that degree?

A    University of Bogota, Bogota, Columbia.

Q    What year did you graduate?

A    1973.

Q    Shortly after that, you left for the United States?

A    Following year, 1974.

Q    Where did you settle in the United States?

A    I went to live with my brother in Nashville, Tennessee.

Q    Did you speak English already when you came to the United States?

248

A    No, sir.

Q    Where did you learn English?

A    In Nashville.  I start going to school.

Q    What school did you attend?

A    Excuse me?

Q    What school did you attend?

A    Initially I went to Peabody College, then I went to Vanderbilt University.

Q    I'm going to -- just so the court reporter can get this, did you say Peabody College?

A    Peabody College.

Q    Then Vanderbilt University?

A    Vanderbilt University.

Q    Did you finish your Master's Degree at Vanderbilt?

A    No, I did not.

Q    Sometime thereafter, did you go to Indiana to start working as an investigator on a death penalty case?

A    Yes, sir, I did.

Q    And what was the name of the attorney who retained you?

A    Linda Wagoner.

Q    Can you spell that for the court reporter?

A    W-a-g-o-n-e-r, Linda.

Q    What was the nature of the work that Ms. Wagoner asked you to perform?  What was the nature of the work that Ms. Wagoner asked you to perform?

249

A    Mitigation investigation.

Q    What was the name of the client?

A    Gregory Scott Johnson.

Q    And in the case of Gregory Scott Johnson, was this a death penalty case?

A    It was, yes.

Q    Did you perform a mitigation investigation in that case?

A    We start with mitigation then went to factual investigation.

Q    You did both mitigation and factual investigation in that case?

A    Yes, I did.

Q    Did Ms. Wagoner then retain you to work on a second death penalty case?

A    I'm sorry?

Q    Did Ms. Wagoner retain you to work on a second death penalty case?

A    Yes, sir, she did.

Q    And in your time in Indiana how many criminal cases did you investigate?

A    Around 15 cases.

Q    And how many of those cases were death penalty cases?

A    They were all death penalty cases.

Q    Besides Ms. Wagoner, did you work for other attorneys

250

in Indiana on those other death penalty cases?

A    Yes, sir, I did.

Q    While you were working on those death penalty cases, did you attend training in the art of mitigation investigation?

A    Yes, sir, I did.

Q    And what were some of the conferences or the organizations that put on the training?

A    Indiana was with NLADA.

Q    Life in the Balance?

A    Life in the Balance seminars, that's right.

Q    What other trainings did you attend as a mitigation investigator?

A    Went to seminars and I work with MCLAP in investigation.

Q    All right.  Let me stop you right there.  What is MCLAP?

A    Mexican Capital Legal Assistance Program.

Q    Can you explain to the Court what MCLAP is?

A    It specialize on supervising the death penalty cases of Mexican nationals.

Q    Mexican nationals who are being tried for death penalty offenses in the United States?

A    That's correct, sir, death penalty.

Q    Did you also attend training by the Georgia Public Defender System?

251

A        Every year, yes, sir.

Q        And at some point did you move to Georgia?

A        Yes, sir, I did.

Q        Did you do death penalty cases while you were residing in Georgia?

A        Yes, sir, I did.

Q        Eventually were you retained by lawyers in different parts of the United States to do death penalty mitigation investigations?

A        Yes, sir, I did.

Q        Did any of those investigations take you outside the United States to do a mitigation investigation?

A        Fourteen times, yes, sir.

Q        And what country did you go to to do those investigations primarily?

A        Most of the time were to Mexico, three times to Puerto Rico, and this case.

Q        Did you ever testify?

A        Five times.

Q        In death penalty cases?

A        Death penalty cases.

Q        As a mitigation witness?

A        As a mitigation witness.

Q        Based on your evidence you developed in your investigation?

Case 4:04-cv-08003-GAF    Document 120    Filed 02/19/13    Page 67 of 105

A    Yes, sir.

Q    Mr. Guevara, how did you come to be involved in the case of German Sinisterra?

A    In the beginning of 1999 I was approached by public defender, Larry Pace. He wanted to meet with me to talk about this particular case.

Q    And why did he want to talk with you about this case?

A    He informed me that there was a death penalty case out of Kansas, and we have a meeting at the Life in the Balance in Georgia. He want to meet there and discuss the case.

Q    Did he know you were a Columbian national?

A    Yes. Yes, sir. We discussed that, yes.

Q    So you met with him at the NLADA conference that year?

A    Yes, sir.

Q    1999?

A    1999.

Q    Who did Mr. Pace represent, do you remember?

A    Mr. Ortiz.

Q    Did Mr. Pace have any later contact with you about the case?

A    No, sir. We met once one day at the hotel. That was the end of the meeting with him.

Q    From that meeting with Mr. Pace in Atlanta, did you learn the identity of the lawyer who had been represented to represent -- the lawyer who had been appointed to represent Mr.

253

Sinisterra?

A   Yes, sir, I did.

Q   And who was that?

A   I don't remember the name at this time.

Q   Is it the lawyer you sent the letter to?

A   Yes, sir, I sent a letter to him.

Q   Do you remember that lawyer's name?

A   (Witness shook head.)

      MR. GABRIELSEN:   Okay.  Can we pull up Exhibit 12, please.

Q   (By Mr. Gabrielsen)  Does your letter refresh your memory as to who the lawyer was?

A   Yes, sir.  Mr. Fred Duchardt.

Q   What did you indicate to Mr. Duchardt in the letter?

A   That I was a mitigation investigator.  I was from Columbia.  That I could be of help if he needed any.

Q   What kind of help did you tell him you could provide?

A   I could try to get in contact with the family.  I knew the area.  I knew about Columbia.

Q   Did you ever travel to the city of Buenaventura?

A   Yes, sir, I did.

Q   Did you ever hear any kind of response from Mr. Duchardt?  Did you hear any kind of response from Mr. Duchardt from your letter?

A   No, I did not, no response.

Q    Did you write a letter to Jennifer Brewer?

A    Yes, sir, I did.  To who?

Q    To Jennifer Brewer.

A    I don't think so.

Q    Mr. Duchardt was the only lawyer you approached?

A    I think that was the first chair and that is the person I contacted, yes.

Q    In 2006 did you get a phone call from Mr. Jenab?

A    Yes, sir, I did.

Q    What did Mr. Jenab indicate to you?

A    He wanted to know if I was available to work this case in particular.

Q    Did Mr. Jenab retain you to do any work on the case?

A    Excuse me?

Q    Did Mr. Jenab retain you to do work on the case?

A    No, sir, he did not.

Q    Was the next contact you had with the case when I called you in 2009?

A    Yes, you did.

Q    What did I ask you to do?

A    After signing the contract, you wanted me to meet with the client and talk about Columbia and start my mitigation investigation in Columbia.

Q    Did I indicate to you at that time that your investigation might be relevant to the case that was pending in

the Eighth Circuit but also to clemency later on if Mr. Sinisterra's case was not successful?

A    Yes, sir.

Q    Did you go to Terre Haute, to the federal prison in Terre Haute to meet Mr. Sinisterra?

A    In December 2006 I went with Mr. Castro.

Q    John Castro?

A    That's correct.

Q    From the Federal Public Defender's Office in Tucson?

A    Yes, sir.

Q    How many times have you visited Mr. Sinisterra?

A    Twice.

Q    So December of 2009 and what was the other time?

A    July 2012.

Q    Last July?

A    That's correct.

Q    With me?

A    That's correct.

Q    What was the purpose of your first trip that you made to Terre Haute to see Mr. Sinisterra?

A    To establish rapport with the client, but I wanted to investigate the sex and physical abuse that he was indicating to me.  I needed to follow up.

Q    How did you know that physical or sexual abuse might be part of your investigation?

256

A     Your office sent me notes from Mr. John Jenab and they were making reference of sexual abuse and physical abuse and I took that --

Q     When you visited Mr. Sinisterra the first time, did you also obtain the identity of one of his family members who could help you in Columbia?

A     Yes, sir.

Q     And who was that?

A     Rosa Valencia Candelo.

Q     Rosa Valencia Candelo?

A     She's half sister.

Q     Besides the references that Mr. Jenab's notes made to possible physical and sexual abuse of German when he was a child, what other indications were there in Mr. Jenab's notes that there might have been violence within the family?

A     In the conversation with Mr. Sinisterra he mentioned different forms of physical abuse that he suffered.

Q     Let me stop you right there.  I want to know what you got from Mr. Jenab first before I ask you what Mr. Sinisterra told you.  What else did Mr. Jenab tell you besides the possibility of sexual abuse of German when he was a child?

A     Yes.  They say information about him being assaulted, sexual abuse with a knife and ordered to perform oral sex on these individuals.

Q     On some adult males?

257

A     That's correct.

Q     Did he also speak of violence perpetrated by German's mother, for example?

A     Yes, sir.  He mentioned mother pushing him off --

Q     I'm sorry.  He first said the mother pushed him off of what?

A     Out of the -- they live over -- there is like two floors down into the water and she push him.  He complains about she followed him with a machete and trying to discipline him.  She and his father there's an indication of physical abuse.

Q     And when you spoke to German at Terre Haute, did he confirm some of these details from what Mr. Jenab told you?

A     Yes, sir, he did.  And he responded to me more about situations of sexual abuse.

Q     Did German also tell you about an incident in Buenaventura in which a cab driver sexually abused him as a child?

A     Yeah.  During the conversation with Mr. Sinisterra, he mentioned that one time he came out of the house.  He had been downtown Buenaventura and that night a taxi driver offered to take him home and that particular night he was made to perform oral sex on him.  There was an earlier incident where he mentioned where his brother Pablo introduced him to somebody else who had a clothes store, then he was taken to his house.

Case 4:04-cv-08003-GAF     Document 120     Filed 02/19/13     Page 73 of 105

He can remember seeing a couple of men having sex that night.

Q     I'm going to ask you to repeat that.  He told you that his brother Pablo did what?

A     Introduced him to a man who owns a clothes store in Buenaventura.

Q     Who owns a clothing store?

A     Excuse me?

Q     You said he owns a clothing store?

A     Yes, sir.  And in that particular house that he was taken he saw two males having sex.

Q     And did German eventually come to learn the identity of one of those two males who was having sex in that building?

A     Oh, no.  No.  He had mentioned the first time when he was forced to have oral sex with an individual.  He mentioned no names whatsoever.

Q     Okay.  But the two men that were having sex in the building that he and his brother Pablo saw, did German eventually learn the identity of one of those two men?  Was one of those men a man by the name of Chucho Ramirez?

A     That was the name but he did not mention to me yet.

Q     He did not mention the name Chucho Ramirez to you?

A     No.

Q     Later that month did you go to Columbia?

A     By December that year I did go to Columbia, yes, sir.

Q     And who was your primary contact in Columbia?

259

A    Ms. Rosa Valencia Candelo.

Q    And where did you first meet Rosa, what city?

A    I first met her in the city of Cali.

Q    And then you proceeded to travel with her to Buenaventura?

A    Following day, yes, sir, travel to Buenaventura.

Q    And on that first trip to Buenaventura how many witnesses did you interview?

A    I interviewed 30 people.

Q    You interviewed 30 people?

A    Yes, sir.

Q    How long were you in Buenaventura on that trip?

A    About a week.

Q    What did you know about Buenaventura before you went there on that trip?

A    I went there before and I keep myself up to date with newspapers, up to date.

Q    You read the Columbian newspapers?

A    Oh, yes, all the time.

Q    And they have stories about Buenaventura?

A    Every day.

Q    And what kind of city is it?  What happens in Buenaventura?  What happens in Buenaventura?

A    Can you explain the question?

Q    What kind of events happen in Buenaventura?  Is it a

260

nice place to go or not so nice place to go?

A    I'm sorry.  I cannot understand.

Q    What kind of place is Buenaventura?

A    Port Pacific (ph) is the main entrance to Columbia through the south.  It is the -- it's an area that is being in constant warfare for the last 20, 30 years.  There is actual factions that are taking control over the area, trying to take over the area, infested area.  The military, the government is trying to control it.  It's not being possible.  The guerillas and the paramilitary are trying to take over that area.

Q    Who are the paramilitaries?

A    Paramilitaries are created by people who want to try to protect themself and their businesses.

Q    An army formed by the wealthy class?

A    Army, yes, mainly for the wealthy class.

Q    Who are the guerillas?  The guerillas?

A    The guerillas are a socialist group that are trying to take over for the last 40, 50 years.

Q    And there's also the narcotraffickers in that area?

A    Yes, sir.  The drug trafficking over there is very rampant on all kind of levels.  Some of the guerillas have now become narcotraffickers and the same with the paramilitaries.  Right now everybody is trying to do business in that particular area.

Q    Would this violence have taken place during Mr.

261

Sinisterra's childhood?

A   Very much.  It's a violent place, constant violence, constant trouble, constant death.  There are many people who disappear and nobody knows where they are.

Q   Can you explain to the Court what a sicario is?  And I'll spell that for the court reporter, s-i-c-a-r-i-o.

A   Sicario is a hitman, somebody who's been paid to kill.

Q   Is it possible to practice the profession of being a hitman in Buenaventura?

A   Oh, yes.

Q   Very common?

A   Very possible.

Q   Getting back to the interviews you did with German's family, what did you learn about German from those interviews?

A   The life of German, the family is very unstable.  Two of the brothers died growing up.

Q   How did they die?

A   They were shot.

Q   They were shot to death?

A   They were shot to death.

Q   How many brothers did he have?

A   He had -- he has Luis Eduardo, Pablo, Ricouter, and German.

Q   So there were four boys in the family?

A   Four boys.

262

Q    And it was Pablo?

A    Pablo, Luis Eduardo.

Q    Luis Eduardo, who had a nickname; is that correct?

A    El Flaco.

Q    El Flaco, F-l-a-c-o?

A    That's correct.

Q    What does that stand for in English?

A    The skinny one.

Q    The skinny one?

A    The skinny one.  Then there were three girls.

Q    Wait a minute.  Then you said German was next?

A    Excuse me?

Q    Pablo, Luis Eduardo, German, and then who was the fourth brother?

A    Ricouter.

Q    Ricouter.

A    Then there was Beatriz, Rosa, Yolima, and Durlyn.

Q    Were these witnesses open with you on your first visit to Buenaventura?

A    Oh, no, they were not.

Q    What makes you say that they were not open with you?

A    They don't know me.  I was coming from the outside. They knew that I was coming from the States.  The area, they were so unstable.  They don't trust anybody.  It takes time to get through them.

263

Q    And how did they behave toward you?  When you say they were not open, how did that manifest itself?  How did they demonstrate their lack of openness to you?

A    They were very guarded to the questions, overprotected to what they have to say.  They tried to mislead in some kind of ways some of the questions.

Q    Did you conduct a video interview of Rosa on your first visit to Buenaventura?

A    Yes, sir, I did.

Q    Do you recall the date of that interview?

A    December 27, 2009.

Q    And where was that interview conducted?

A    That was at the Hotel Estacion.

Q    The Hotel Estacion?  Can you spell Estacion for the court reporter?

A    E-s-t-a-c-i-o-n.

Q    What subjects did you cover in that interview with Rosa in that first video interview?

A    The family and the physical abuse, and I believe that there was some kind of mental abuse discussed at the time.

Q    What kind of physical abuse in the family did she describe for you?

A    She described being hit with a machete by the mother. She described being dumped into a bucket of water and then being whipped.

264

Q     Who did that happen to when she talked about heads being held in a bucket of water?

A     She talks about the boys, German, herself, the boys by the mother and father.

Q     The mother and the father?

A     Yes, sir.

Q     Both held the children's heads under water?

A     When they struggle, the father was there.

Q     What other kinds of physical abuse was there on the part of the mother toward the children?

A     She talks about kneeling on bricks and kernels of corn and then put bricks or rocks on their hands for a bit of time. She complained about bleeding and getting blisters.

Q     She would make them kneel on rocks and kernels of corn? She said she was made to kneel down on rocks and kernels of corn?

A     That's correct.  They put the rocks on their hands for a period of time.

Q     What instruments did Rosa describe the mother using to beat the children?  What instruments did Rosa describe that the mother used to beat the children?

A     I'm sorry.  I cannot understand the question.

Q     What did the mother use to beat the children?  What did she have in her hand?

A     Anything she can put her hands on, usually was a whip.

265

It was machete, a stick, whatever is available to her.

MR. GABRIELSEN: Your Honor, at this point we would like to play the video that is numbered Exhibit 55(a).

THE COURT: All right.

MR. GABRIELSEN: She's ready to play it, Your Honor.

THE COURT: All right. Thank you.

(Defendant's Exhibit No. 55(a) was played to the Court.)

MR. GABRIELSEN: May I resume, Your Honor?

THE COURT: Yes.

Q       (By Mr. Gabrielsen)  Mr. Guevara, you said most of the witnesses did not open up to you in the first interviews you did in Buenaventura.  Was Rosa the only one that opened up to you on that first visit?

A       The one and only, yes, sir.

Q       And did she withhold information from you during your interviews with her?

A       Yes, sir, she did.

Q       Was the information she withheld, did it have to do with Chucho Ramirez?  Did she withhold information about Chucho Ramirez?

A       Yes, sir, she did.

MR. GABRIELSEN: Your Honor, I'm prepared to play the next video.  I think it's about four minutes long.

THE COURT: All right. Thank you.

266

MR. GABRIELSEN: I'm sorry. This will be Exhibit 56(a), and I should have announced it but obviously we have English subtitles in the videos where the text that's in white is Mr. Guevara speaking to the witnesses and the yellow is the answer of the witnesses to his questions.

(Defendant's Exhibit No. 56(a) was played to the Court.)

Q    (By Mr. Gabrielsen)  Mr. Guevara, at the end of the interview Rosa identifies her sister, Beatriz, as being the other person who saw German come home that night?

A    Yes, sir.

Q    And you interviewed Beatriz about that incident?

A    Yes, sir.

Q    Did she confirm the details -- excuse me -- did she confirm the details of what Rosa had said?

A    Yes, sir, she did.

MR. GABRIELSEN: Your Honor, we now would like to play the videotape of German's sister, Beatriz.

THE COURT: All right.

MR. GABRIELSEN: That would be Exhibit 57(a).

(Defendant's Exhibit No. 57(a) was played to the Court.)

Q    (By Mr. Gabrielsen)  Mr. Guevara, when was that interview of Beatriz made?

A    March 8, 2011.

267

Q    March 8th of 2011?

A    Yes, sir.

Q    And was that after you already had several other phone calls or visits with her?

A    No.  I have a telephone conversation with her previously.

Q    And where did this -- where was the video made?

A    This video was made in the land of Curacao, the Caribbean, another country.

Q    Is that where Beatriz lived at the time?

A    Yes, sir, she lived there.

MR. GABRIELSEN:  Can we please pull up Exhibit 35.

Q    (By Mr. Gabrielsen)  Do you recognize this document?

A    Yes, sir, I do.

Q    What is it?

A    The telephone conversation, my interview with Beatriz.

Q    I notice it does not have a date on it.  Do you recall the date?  Was it before or after the previous video?

A    This was before the video.

Q    I would like you, sir, to simply read this paragraph to yourself, not out loud.  Just read it to yourself.

A    Okay.  Yes, sir.

Q    Did you write these notes yourself?  Did you write these notes?

A    Yes, sir, I did.

268

Q    You wrote these in English?

A    Yes, sir, in English.

Q    But the interview of Beatriz, was it in Spanish?  The interview with Beatriz, was it in Spanish?

A    Yes, it was in Spanish.

Q    And without reading the graphic sexual language to the Court, what was Beatriz conveying to you in this interview?

A    Chucho liked to be at the receiving end of the relationship, then he changed and he wanted to perform sex in this case with German and that's when German refused it.

Q    He wanted to sodomize German?

A    That's correct.

Q    Was there another witness in the family, in German's family, to an incident in which German came home from another encounter with Chucho?

A    Yes, sir, there was another.

Q    Who was that other person?

A    Segundo.

Q    I'm sorry.

A    Segundo.

Q    Segundo.  Was it Segundo Sinisterra or Gustavo Viveros? Who was the witness?  You said Gustavo Sinisterra.  There is no witness named Gustavo Sinisterra.

A    Gustavo Viveros.

Q    Another witness to the incident.  I want to be very

269

clear. You look like you're not understanding me. There was another witness to German coming home after an encounter with Chucho.

A    That's right.

Q    Who was that witness?

A    Mr. Sinisterra's cousin.

Q    What was the cousin's name?

A    Segundo Sinisterra.

Q    Segundo Sinisterra.

MR. GABRIELSEN:  Your Honor, at this point we're going to play Exhibit 59(a).  It is a videotaped interview with the cousin, Segundo Sinisterra.

THE COURT:  All right.

(Defendant's Exhibit No. 59(a) was played to the Court.)

Q    (By Mr. Gabrielsen)  Mr. Guevara, do you remember the date of this video interview with Segundo?

A    Second interview?

Q    Yes.

A    March 2011.

Q    And in this interview Segundo explains why he earlier did not tell you the truth about the abuse by Chucho; is that correct?

A    Yes, sir.

Q    When did you first interview Segundo about matters in

270

the Sinisterra family?

A    It was 2010, I believe.

Q    What month?  Do you remember what month it was?

A    July.  It was July 2010.

Q    So approximately six months later you went back and interviewed him again and he told you the truth about what happened?

A    That's correct.

    THE COURT:  Mr. Gabrielsen.

    MR. GABRIELSEN:  Yes, sir.

    THE COURT:  When you are finished with the Segundo Sinisterra matter, then we'll take a break for lunch.

    MR. GABRIELSEN:  Very good, Judge.  That won't be more than about two minutes.

    THE COURT:  All right.

    MR. GABRIELSEN:  Thank you, sir.

Q    (By Mr. Gabrielsen)  Mr. Guevara?

A    Yes, sir.

Q    Can you identify the document that's on the screen in front of you?

A    I do, sir.

Q    What is it, please?  What is it?

A    It's a declaration where he swears what he's going to say is true.

Q    Did he sign this document in front of a notary public?

271

A    He did and he have it fingerprint on it too.

MR. GABRIELSEN: We're going to Exhibit 45.

The previous exhibit was Exhibit 44, the Spanish language notarized declaration of Segundo. Now, we're at 45.

Q    (By Mr. Gabrielsen) Mr. Guevara, can you identify this document?

A    Yes, sir. That is the translation to the previous document.

Q    Did you obtain the Spanish language document -- the Spanish language affidavit from Segundo Sinisterra?

A    Yes, sir.

Q    You took him to a place where there was a notary?

A    Yes, sir.

Q    And both he and the notary signed the document?

A    Yes, sir.

Q    And, sir, in English can you read this first sentence of paragraph 5 of the document?

A    Yes, sir.

Q    Can you read it out loud to the Court, please.

A    "I used to know Chucho Ramirez, a man who sexually abused me six times. Chucho owned Almacen Monaco, a children's clothing store. He was a friend of Dalila's and he had her trust. He used to come over for dinner. He also was a dangerous man, a hitman who always carried a gun. He was also a friend of the police."

272

Q     Thank you.

If we could go to page 2 of that document.  If you would pull up paragraph 9, please.

Q     (By Mr. Gabrielsen)  Could you please read that paragraph to the Court.

A     Yes, sir.  "I remember one time, maybe in 1980, when German walked home after a visit with Chucho.  That was unusual, because Chucho typically returned the boys back home on his motorcycle.  German was walking funny.  His backside hurt as if he were a victim of sodomy.  I knew what'd occurred from my own experiences."

MR. GABRIELSEN:  Thank you, sir.

Your Honor, I'm finished with this part of the interview.

THE COURT:  All right.  Thank you.  We'll take a recess now until 1:30 for lunch.

(The noon recess was taken at 12:20 p.m.)

AFTERNOON SESSION

THE COURT:  Thank you.  You can all be seated.

Mr. Guevara, I'm going to remind you that you are still under oath.

THE WITNESS:  Yes.

HECTOR A. GUEVARA resumed the stand and testified further:

THE COURT:  Mr. Gabrielsen.

MR. GABRIELSEN:  Good afternoon, Your Honor.

273

Your Honor, Mr. Guevara brought to my attention the louder I spoke to him the more he got echo in his ears from the disability he has. I'm going to -- he made an indication that he couldn't hear so, of course, I spoke up louder. He said it made it worse. I'm going to modulate downwards to see if we can get the rest of this. I apologize for -- he asked me to apologize to the Court. He didn't want to appear to be evasive to the Court. He was just having trouble understanding me.

THE COURT: We did notice you were speaking up.

MR. GABRIELSEN: I apologize for that.

DIRECT EXAMINATION (continued) BY MR. GABRIELSEN:

Q     Mr. Guevara?

A     Yes, sir.

Q     Did you interview a friend of German Sinisterra's named Gustavo Viveros?

A     Yes, sir.

Q     How many times did you interview him?

A     Twice.

Q     The first time you interviewed him was when?

A     July 1980.

Q     I'm sorry?

A     It was around July 1980 the first time.

Q     I'm having trouble hearing the date. You are saying July of what year?

A     2010.

274

Q    2010. And during that interview with Gustavo, did he acknowledge that he knew that German had been sexually abused as a child?

A    Yes, sir, he did.

Q    Did Gustavo admit that he, Gustavo, had been sexually abused as a child?

A    No, sir.

Q    When was the second time you interviewed Mr. Viveros?

A    March of 2011.

Q    March of 2011?

A    That's correct.

Q    And in that interview did Mr. Gustavo -- I'm sorry -- did Gustavo Viveros change his statement with respect to whether he was an abuse victim earlier?

A    Yes, he did.

Q    In that second interview how did he describe the sexual abuse of him as a child? What did he tell you?

A    He said he and Mr. Sinisterra were playing in an abandoned home.

Q    How old were they at the time?

A    Eight, nine years old. And a couple of individuals came to the place. They put a knife to their necks and ordered them to perform sex on them. When they finished, they switched. Mr. Sinisterra went to the other guy and Mr. Gustavo to the other guy.

275

MR. GABRIELSEN: Your Honor, at this time we're going to play Exhibit 58(a), which is an interview that Mr. Guevara did with Mr. Gustavo.

(Defendant's Exhibit No. 58(a) was played to the Court.)

MR. GABRIELSEN: Your Honor, so the Court's aware, the videos we played were 55(a), 56(a), 57(a), 58(a), and 59(a). The transcripts are the numbers with the letters B after that follow the videos in the binders that we sent along, which I'll be leaving the box of original exhibits when we leave here on Friday. So there are transcripts of these edited videos earlier in the binder. There are the transcripts of the longer videos from which these edited forms were taken in Your Honor's binder, and the government's binders has the long versions of the videos as well as the edited ones that we edited and supplied subtitles for today's proceeding.

THE COURT: Thank you.

Q    (By Mr. Gabrielsen)  We've pulled up Exhibit 39.

A    Yes, sir.

Q    Mr. Guevara, are you familiar with that exhibit?

A    Yes, I am.

Q    What is that exhibit, please?

A    That's the statement of witness, Gustavo Viveros.

Q    Were you present when he wrote the statement?

A    Yes, sir, I was.

276

Q    And was that statement written in front of a notary public in Columbia?

A    Yes, sir, we did.

MR. GABRIELSEN:  And then if we could pull up Exhibit 41.

Q    (By Mr. Gabrielsen)  What is this exhibit, please?

A    That is the translation of the previous document.

MR. GABRIELSEN:  Can we focus on paragraphs 3 and 4, please.

Q    (By Mr. Gabrielsen)  Mr. Guevara, can you read paragraphs 3 and 4 into the record, please.

A    "When I was around seven or eight years old, I and German Sinisterra were sexually abused by two unknown men. This occurred nearby, at a house where we were playing."

Q    Paragraph 4 also.

A    "I never discussed with anyone what happened to us.  I didn't discuss it with German either."

MR. GABRIELSEN:  Can we pull up paragraphs 5 through 7, please.

Q    (By Mr. Gabrielsen)  Could you also please read those into the record.

A    "I have suffered very much shame, and this has been a negative thing in my life.

"I am a married man and I have three children, two daughters and a son.

277

"In the first questioning, I didn't want to give my name to Mr. Guevara regarding what occurred to German Sinisterra and me at seven years of age."

Q     Do you remember what last name Mr. Viveros used in that first interview with you?  I'm going to refresh your recollection in a second.

MR. GABRIELSEN:  Can we pull up the first page of Exhibit 38(b), please.

Q     (By Mr. Gabrielsen)  Can you see a name that's identified in the middle of that transcript, sir?

A     Name was Gustavo Rivera.

Q     Gustavo Rivera.

Mr. Guevara, did you have an occasion to visit with German Sinisterra and me last July at Terre Haute?

A     Yes, sir.

Q     And did you recount for Mr. Sinisterra the history of abuse of him that you learned from the other witnesses in Columbia?

A     Yes, sir.

Q     How did he react to that recitation of that abuse?

A     As before, very emotional.  He started crying.

Q     For how long did he cry?

A     Fifteen, 20 minutes.

Q     And at some point did he tell you -- did he tell us how he felt he and his brothers were treated when they were

278

children?

A    Yes, sir.

Q    What did he say?  What did he say?

A    Can you repeat the previous question?

Q    Yes, I can.  How did he describe the way his brothers and he were treated when they were children?

A    Just like dogs.  That was his impression.

Q    Just like dogs?

A    Just like dogs.

Q    Mr. Guevara, how many trips have you made to Columbia for our defense team?

A    Three times.

Q    And if you would, sir, please tell the Court how much you've been paid by our office, the Federal Public Defender's Office for your three trips to Columbia.

A    Up to today $20,980.

Q    Finally, Mr. Guevara, at the beginning of your testimony today I asked you how many death penalty cases you worked on in Indiana when you first became a mitigation investigator.  Do you remember that testimony earlier today?

A    Yes, sir.

Q    You said about 20 cases?

A    Twenty cases.

MR. GABRIELSEN:  Can you pull up Exhibit 12, please, and go to page 5.

Q      (By Mr. Gabrielsen)  This is Exhibit 12, page 5.  Mr. Guevara, is this exhibit the first page of the case list that you sent to Mr. Duchardt in 1999?

A      Yes, sir, it is.

        MR. GABRIELSEN:  Go to the next page, please.

Q      (By Mr. Gabrielsen)  Is this page 2 of your case list? Is this page 2 of your case list?

A      Yes, it is.

        MR. GABRIELSEN:  Go to the next page, please.

Q      (By Mr. Gabrielsen)  Is that page 3 of your case list?

A      Yes, it is.

        MR. GABRIELSEN:  Page 4.

Q      (By Mr. Gabrielsen)  And this is the last page of your case list?

A      Yes, sir, it is.

Q      And when you said there were approximately 20 cases, these are the 20 cases you were referring to?

A      These are the 20 cases.

Q      This is what you sent Mr. Duchardt along with your cover letter?

A      Yes, sir.

Q      The attorneys whose names you list on these cases --

A      Yes, sir.

Q      -- would all of these attorneys recommend you for employment doing mitigation investigation on the death penalty

case?

A    I would say so, yes, sir.

Q    Can you think of anybody on this list who would give you a negative reference?

A    No, not that I'm aware of.

MR. GABRIELSEN:  That's all I have, Your Honor.

MR. VALENTI:  May it please the Court.

THE COURT:  Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q    Mr. Guevara, your knowledge of the case we're here for began when you were first approached by Mr. Pace with the Federal Public Defender System; is that correct?

A    Yes, sir.

Q    And though you and Mr. Pace met, I believe you said in Georgia at the Life in the Balance conference, he ultimately never hired you or retained your services, did he?

A    That's right.

Q    Instead when that was over, based upon your knowledge of the case you learned from Mr. Pace, you sent a letter soliciting Mr. Duchardt or the trial team, potentially Mr. Bradshaw and his trial team advising them of your services, correct?

A    Yes, sir.

Q    In time Mr. Jenab contacted you and discussed the case a little further, correct?

A    Yes, sir.

Q    And then again down in 2009 later Mr. Gabrielsen contacted you and you ultimately began the work that we're talking about here today?

A    Yes, sir.

Q    When you spoke to Mr. Sinisterra for the first time, my understanding is that was in December of 2009.  Does that sound right?  When you spoke to the defendant, Mr. Sinisterra, for the first time, that was in December of 2009?

A    Yes, sir.

Q    At the time you spoke to Mr. Sinisterra, did you tell him who you were?  Did you introduce yourself?

A    To who?

Q    To Mr. Sinisterra.

A    Yes, sir.

Q    Did he know what your job was?

A    I think so.

Q    Did you explain who you were and what you did for a living?

A    That's correct, sir.

Q    Did you go to meet Mr. Sinisterra by yourself or did you go with his legal representatives?

A    Both times I was with Mr. Castro.

Q    You were with who?  I'm sorry.

A    The investigator.

Case 4:04-cv-08003-GAF    Document 120    Filed 02/19/13    Page 97 of 105

Q    Mr. Castro?

A    Castro, yes.

Q    And Mr. Castro, though not here, is he someone employed by the Federal Public Defender System in Tucson, Arizona?

A    Yes, sir.

Q    So Mr. Castro was someone who would perform investigations on behalf of Mr. Sinisterra's representatives?

A    That's my understanding.

Q    Was Mr. Castro then the person that introduced you to the defendant?

A    Yes, sir.

Q    So at that time that you first met him in December of '09 he knew why you were there?

A    Yes, sir.

Q    And, in other words, he knew that you were a mitigation investigator looking for information in his past that might give him relief from the sentence of death he was currently under?

A    Yes, sir.

Q    At the time that he disclosed to you the physical and sexual abuse that we've discussed today, he knew all those things?

A    Yes, sir.

Q    He'd been sentenced some nine years previously to death by a jury in this courtroom?

283

A    Yes, sir.

Q    His appeals had run, to your knowledge?

A    His what?

Q    Did you know whether or not Mr. Sinisterra had already lost his direct appeal?

A    (Witness shook head.)

Q    You don't know?

A    I don't know.

Q    Fair enough.

But he knew what your role was?

A    Yes, sir.

Q    And I would say that your role is you're on the postconviction representation team; is that fair?

A    Yes, that's fair.

Q    After meeting with Mr. Sinisterra and based upon the disclosures he made to you, you then went to Columbia, South America?

A    Yes, sir.

Q    You met with, I believe you said, somewhere in the neighborhood of 30 witnesses in about a week's period of time?

A    That's correct, first trip.

Q    In the first trip.  Amongst those people you indicated that the majority were not open to you except for Rosa who was mostly open with you; is that fair?

A    Very fair.

284

Q    Okay.  When you met with Rosa on your first trip to Columbia, did you introduce yourself to her and why you were there?

A    Yes, sir.

Q    She knew your purpose?

A    Yes, sir.

Q    She knew that you worked for her brother's postconviction representative team?

A    That's correct, sir.

Q    And she knew that her brother was currently facing a sentence of death in the United States?

A    That's correct, sir.

Q    She knew that your role as a mitigation investigator was to look into his past to see if there was information that might help him?

A    That's correct.

Q    And at the time that you spoke to her on the first trip, she was kind of open with you but not fully open in your words?

A    That's correct.

Q    In your subsequent meetings with her, then later she was more open on a second or third trip?

A    Yes, sir.

Q    On those second or third trips, did she then act as a point of contact for you to the other witnesses you would

interview?

A Yes, sir.

Q And ultimately, if I understand correctly, she led you to her sister and defendant's sister, Beatriz?

A Yes, sir.

Q Some of the witnesses that you interviewed we spoke of just a few moments ago, one being Segundo Sinisterra and Gustavo Viveros?

A Correct.

Q When you spoke to Segundo Sinisterra, he eventually prepared a declaration we went through today; do you recall that?

A Yes, sir.

Q Did you take Mr. Segundo Sinisterra to the notary to have that declaration prepared?

A That's correct, sir.

Q What role did you personally play in the preparation of that declaration?

A Who?

Q What role did you play in the preparation of the declaration?

A I asked him to write down, write in words what happened to him and what his comments were.

Q Similarly with Mr. Gustavo Viveros, what role did you play in the preparation of his declaration?

286

A    Same thing.

Q    The first declaration of Gustavo Viveros that was in Spanish, I believe, was Exhibit I want to say 39 was handwritten.  Whose handwriting was that?

A    He did.

Q    It was his handwriting?

A    Yes, sir.

Q    And did you ask him questions or just ask him to write down what had happened?

A    He did it himself.  I did not ask any questions at that particular time.

Q    You indicated, I believe, sir, during your testimony that you are a dual citizen of the United States and of Columbia, correct?

A    That's correct, sir.

Q    Being a dual citizen in a native born Columbian, are you familiar with where to get records of hospitals or schools or how to go about getting records?

A    Yes, sir.

Q    I assume you tried to do that in this case?

A    Yes, sir.

Q    Have you been able to locate any hospital records that detail the defendant's youth?

A    Can you repeat the question?

Q    Have you found any records, hospital records or any

287

medical records for the defendant?

A    There were none.

Q    Have you been able locate any school records of the defendant?

A    He only did few months in elementary school.

Q    So there were no records to find?

A    No records, sir.

Q    Were there any records that you were able to find at all that were useful to you as a mitigation investigator in this case?

A    No, sir.

         MR. VALENTI:  Thank you, Your Honor.

         That's all the questions I have, sir.

         THE WITNESS:  Thank you.

         THE COURT:  Mr. Gabrielsen, anything further?

         MR. GABRIELSEN:  Just very briefly, Your Honor.

REDIRECT EXAMINATION BY MR. GABRIELSEN:

Q    Mr. Guevara, I think we need to clear something up from Mr. Valenti.

A    Yes, sir.

Q    He asked you whether you wrote the declaration for Segundo Sinisterra.

A    If I what?

Q    He asked if you wrote the declaration for Segundo Sinisterra.

A    That's right.

Q    And that in fact is not correct, is it?  My office e-mailed you that declaration for you to take to Columbia with you on that trip; isn't that correct?

A    It is possible.  I could be confused with any other paper.

Q    Okay.  Well, I mean, of course, the difference in the declarations is that the one for Segundo is typewritten, the one for Gustavo is handwritten.  So I think, according to Mr. Valenti's question, if you prepared Segundo's declaration in Columbia, you had to sit down and type it someplace?

A    No.

Q    Right.  And I'm offering that John Castro and I at some point e-mailed that to you.  I can't remember if I did or John did but I think one of us e-mailed that to you after I think John talked to Segundo?

A    Yes, sir.

Q    Does that refresh your memory as to how that declaration was produced?

A    Yes, sir.

Q    So it wasn't written by you.  It was prepared in our office from other people's interviews with Segundo?

A    That's correct.

Q    But you were a witness to the signature and you took him to the notary office to have his signature notarized?

289

A     I went with him, yes.

Q     Okay.  Mr. Valenti also asked whether on the first visit with German whether German admitted to all the sexual abuse and you said, yes, he did.  Isn't the truth that he didn't mention the name of Chucho Ramirez on that first interview?

A     No, he did not.  He made a few comments about sex and I took that was it.

MR. GABRIELSEN:  Judge, that's all I have.

MR. VALENTI:  I have nothing further, Your Honor.

THE COURT:  Thank you, sir.  You're excused.

(Witness excused.)

THE COURT:  Is that all for today, Mr. Gabrielsen?

MR. GABRIELSEN:  That's all we have for today, Your Honor.

THE COURT:  Nine o'clock tomorrow morning, is that when your expert will be available?

MR. GABRIELSEN:  Yes, sir.

THE COURT:  Okay.  All right.  We'll be adjourned until nine o'clock tomorrow morning.  Thank you.

(Court adjourned at 2:07 on Wednesday, January 23, 2013, until 9 a.m. Thursday, January 24, 2013.)

Case 4:04-cv-08003-GAF    Document 120    Filed 02/19/13    Page 105 of 105