IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

GERMAN C. SINISTERRA,                )
                                     )
              Movant,                )
                                     )
        vs.                          )   Case No.
                                     )   04-CV-08003-GAF
UNITED STATES OF AMERICA,            )
                                     )
              Respondent.            )

TRANSCRIPT OF PROCEEDINGS
VOLUME III
PAGES 291-393

        On January 22, 2013, through January 25, 2013, the

above-entitled cause came on before the Honorable Gary A.

Fenner, United States District Judge, sitting in Kansas City.

APPEARANCES

For the Movant:                 Mr. Timothy M. Gabrielsen
                                Federal Public Defender's Office
                                District of Arizona
                                407 West Congress, Suite 501
                                Tucson, Arizona 85701

                                Mr. John Jenab
                                Jenab & McCauley LLP
                                110 South Cherry, Suite 103
                                Olathe, Kansas 66061

For the Respondent:             Mr. Jeffrey E. Valenti
                                Ms. Lajuana M. Counts
                                United States Attorney's Office
                                400 East Ninth Street, 5th Floor
                                Kansas City, Missouri 64106

Katherine A. Calvert, RMR
United States District Court Reporter
Charles Evans Whittaker Courthouse
400 East Ninth Street
Kansas City, Missouri 64106
(816) 512-5741

291

I N D E X                               Page

JANUARY 22, 2013

VOLUME I

MOVANT'S EVIDENCE

JENNIFER HERNDON
    Direct examination by Mr. Jenab . . . . . . . . . . . .  17
    Cross-examination by Mr. Valenti. . . . . . . . . . . .  34
    Redirect examination by Mr. Jenab . . . . . . . . . .  69
    Recross-examination by Mr. Valenti. . . . . . . . . .  73

FRED DUCHARDT
    Direct examination by Mr. Jenab . . . . . . . . . . . .  76
    Cross-examination by Mr. Valenti. . . . . . . . . . . 100
    Redirect examination by Mr. Jenab . . . . . . . . . . 133
    Recross-examination by Mr. Valenti. . . . . . . . . . 137

DAN GROTHAUS
    Direct examination by Mr. Gabrielsen. . . . . . . . . 139
    Cross-examination by Mr. Valenti. . . . . . . . . . . 154
    Redirect examination by Mr. Gabrielsen. . . . . . . . 163

JUANITA CHAVEZ
    Direct examination by Mr. Gabrielsen. . . . . . . . . 166
    Cross-examination by Mr. Valenti. . . . . . . . . . . 180
    Redirect examination by Mr. Gabrielsen. . . . . . . . 182

ENRIQUE DOS SANTOS (by videotaped deposition). . . . . . . 183

292

I N D E X                                                    Page
(continued)

JANUARY 23, 2013

VOLUME II

RUSSELL STETLER
      Direct examination by Mr. Gabrielsen. . . . . . . . . 197
      Cross-examination by Mr. Valenti. . . . . . . . . . . 235
      Redirect examination by Mr. Gabrielsen. . . . . . . . 243

HECTOR GUEVARA
      Direct examination by Mr. Gabrielsen. . . . . . . . . 246
      Cross-examination by Mr. Valenti. . . . . . . . . . . 281
      Redirect examination by Mr. Gabrielsen. . . . . . . . 288

Case 4:04-cv-08003-GAF   Document 121   Filed 02/19/13   Page 3 of 103

I N D E X                                        Page
(continued)

JANUARY 24, 2013

VOLUME III

ANTOLIN LLORENTE
     Direct examination by Mr. Gabrielsen. . . . . . . . . 302
     Cross-examination by Mr. Valenti. . . . . . . . . . . 358
     Redirect examination by Mr. Gabrielsen. . . . . . . . 388

294

I N D E X                                          Page
(continued)

JANUARY 25, 2013

VOLUME IV

PABLO STEWART
     Direct examination by Mr. Gabrielsen. . . . . . . . . 406
     Cross-examination by Mr. Valenti. . . . . . . . . . . 453
     Redirect examination by Mr. Gabrielsen. . . . . . . . 472

RESPONDENT'S EVIDENCE

MICHAEL OYLER
     Direct examination by Mr. Valenti . . . . . . . . . . 478
     Cross-examination by Mr. Jenab. . . . . . . . . . . . 485

Reporter's certificate . . . . . . . . . . . . . . . . . 503

Case 4:04-cv-08003-GAF   Document 121   Filed 02/19/13   Page 5 of 103

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | First amended 2255 petition 3/1/09 | 15 | 15 |
| 2 | 3/1/09 affidavit of Jennifer Herndon | 15 | 15 |
| 3 | 11/26/06 statement of Frederick Duchardt | 15 | 15 |
| 4 | 10/31/07 affidavit of Jennifer Herndon | 15 | 15 |
| 5 | 10/31/07 declaration of Dan Grothaus | 15 | 15 |
| 6 | 12/2/98 order appointing Fred Duchardt | 15 | 15 |
| 7 | 12/13/98 order appointing Jennifer Herndon | 15 | 15 |
| 8 | 4/11/00 trial transcript | 15 | 15 |
| 9 | 3/23/01 trial transcript | 15 | 15 |
| 10 | 3/23/01 trial transcript | 15 | 15 |
| 11 | 3/23/01 trial transcript | 15 | 15 |
| 12 | 7/1/99 letter from Hector Guevara to Frederick Duchardt | 15 | 15 |
| 13 | 4/10/00 letter from Frederick Duchardt to Enrique Dos Santos | 15 | 15 |
| 14 | 12/22/98 request for funds to hire investigator/ mitigation specialist | 15 | 15 |
| 15 | 2/11/99 order | 15 | 15 |

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 6 of 103

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 16 | 3/4/99 request for funds to hire interpreter | 15 | 15 |
| 17 | 8/13/99 second request for funds to hire interpreter | 15 | 15 |
| 18 | Juanita Chavez' billing records | 15 | 15 |
| 19 | Juanita Chavez' notes | 15 | 15 |
| 20 | 3/13/00 letter from Judge Hays to Jennifer Brewer | 15 | 15 |
| 21 | Death penalty special verdict - Count II | 15 | 15 |
| 22 | Death penalty special verdict - Count III | 15 | 15 |
| 23 | Federal Death Penalty Act mitigating factors | 15 | 15 |
| 24 | Dan Grothaus' notes | 15 | 15 |
| 25 | 5/10/00 letter and invoice from Dr. Dos Santos to Fred Duchardt | 15 | 15 |
| 26(a) | Dr. Llorente's curriculum vitae | 15 | 15 |
| 26(b) | Dr. Llorente's case list | 15 | 15 |
| 27 | 3/1/06 Dr. Llorente report | 15 | 15 |
| 28 | 3/7/11 Dr. Llorente report | 15 | 15 |
| 29(a) | Hector Guevara's 7/17/06 curriculum vitae | 15 | 15 |

297

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 29(b) | Hector Guevara's 2012 curriculum vitae | 15 | 15 |
| 30 | Russell Stetler's curriculum vitae | 15 | 15 |
| 31 | Russell Stetler's declaration | 15 | 15 |
| 32(a) | Rosalia Valencia Candelo video Part 1 | 15 | 15 |
| 32(b) | Rosalia Valencia Candelo transcript Part 1 | 15 | 15 |
| 33(a) | Rosalia Valencia Candelo video Part 2 | 15 | 15 |
| 33(b) | Rosalia Valencia Candelo transcript Part 2 | 15 | 15 |
| 34(a) | Rosalia Valencia Candelo video | 15 | 15 |
| 34(b) | Rosalia Valencia Candelo transcript | 15 | 15 |
| 35 | 2/1/10 Hector Guevara's notes of Beatriz Candelo telephone conversation | 15 | 15 |
| 36 | 7/27/10 Hector Guevara's notes of Beatriz Candelo telephone conversation | 15 | 15 |
| 37(a) | Beatriz Candelo video | 15 | 15 |
| 37(b) | Beatriz Candelo transcript | 15 | 15 |
| 38(a) | Gustavo Viveros video | 15 | 15 |
| 38(b) | Gustavo Viveros transcript | 15 | 15 |

298

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 39 | 3/3/11 Gustavo Viveros declaration | 15 | 15 |
| 40(a) | Gustavo Viveros video | 15 | 15 |
| 40(b) | Gustavo Viveros transcript | 15 | 15 |
| 41 | Gustavo Viveros declaration translation | 15 | 15 |
| 42(a) | Segundo Sinisterra video | 15 | 15 |
| 42(b) | Segundo Sinisterra transcript | 15 | 15 |
| 43(a) | Segundo Sinisterra video | 15 | 15 |
| 43(b) | Segundo Sinisterra transcript | 15 | 15 |
| 44 | 3/3/11 Segundo Sinisterra declaration | 15 | 15 |
| 45 | 12/11/12 Segundo Sinisterra declaration translation | 15 | 15 |
| 46 | Pablo Stewart's curriculum vitae | 15 | 15 |
| 47 | Pablo Stewart's report | 15 | 15 |
| 48 | 1989 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases | 15 | 15 |

299

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 49 | 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases | 15 | 15 |
| 50 | 1998 Spencer Report | 15 | 15 |
| 51 | 2010 Spencer Report | 15 | 15 |
| 52 | Hector Guevara's billing records | 15 | 15 |
| 53 | German Sinisterra social history | 15 | 15 |
| 54 | Beatriz Candelo transcript | 15 | 15 |
| 55(a) | 12/27/09 Rosalia Valencia Candelo video excerpts | 15 | 15 |
| 55(b) | 12/27/09 Rosalia Valencia Candelo transcript excerpts | 15 | 15 |
| 56(a) | 7/3/10 Rosalia Valencia Candelo video excerpts | 15 | 15 |
| 56(b) | 7/3/10 Rosalia Valencia Candelo transcript excerpts | 15 | 15 |
| 57(a) | 3/8/11 Beatriz Candelo video excerpts | 15 | 15 |
| 57(b) | 3/8/11 Beatriz Candelo transcript excerpts | 15 | 15 |
| 58(a) | 3/4/11 Gustavo Viveros video excerpts | 15 | 15 |
| 58(b) | 3/4/11 Gustavo Viveros transcript excerpts | 15 | 15 |

Case 4:04-cv-08003-GAF   Document 121   Filed 02/19/13   Page 10 of 103

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59(a) | 3/3/11 Segundo Sinisterra video excerpts | 15 | 15 |
| 59(b) | 3/3/11 Segundo Sinisterra transcript excerpts | 15 | 15 |
| 60(a) | 12/5/12 Enrique Dos Santos deposition video | 15 | 15 |
| 60(b) | 12/5/12 Enrique Dos Santos deposition transcript | 15 | 15 |

FOR THE GOVERNMENT:

| 1 | FBI 302 form with documents | 480 | 480 |
|---|---|---|---|
| 2 | Overland Park Police Department continuation report with documents | 481 | 481 |

301

JANUARY 24, 2013

MORNING SESSION

THE COURT: Good morning.

Are you ready to proceed this morning, Mr. Gabrielsen?

MR. GABRIELSEN: Yes, sir.

THE COURT: Very well.

MR. GABRIELSEN: Your Honor, we would call at this time Dr. Antolin Llorente.

ANTOLIN LLORENTE, being sworn by the law clerk, testified:

MR. GABRIELSEN: Your Honor, if it's all right with you and if it's all right with the government, Dr. Llorente is going to be speaking to some reports and things he's done in this case, and we're going to put those things up on the screen. I think he would feel more comfortable having his reports in front of him so he can flip through and find things if the government has no objection.

MR. VALENTI: No, Your Honor.

THE COURT: That would be fine. Thank you.

DIRECT EXAMINATION BY MR. GABRIELSEN:

Q    Good morning, Dr. Llorente. Could you state your name, first and last name for the court reporter, please.

A    Yes. My name is Antolin, A-n-t-o-l-i-n, Llorente, L-l-o-r-e-n-t, as in Texas, E.

Q    Sir, what's your profession, please?

302

A      I am an associate professor in the Department of Pediatrics, University of Maryland, School of Medicine, and the chief of neuropsychology at Mt. Washington Pediatric Hospital, a hospital that is owned by the University of Maryland, School of Medicine, and Johns Hopkins University as a joint venture.

Q      And what's the nature of the work that's done at Mt. Washington Pediatric Hospital?

A      Well, that is a tertiary, very specialized hospital for children and young adults all 21 years of age.  They have specific developmental disabilities as well as other trauma, including other kinds of central nervous system dysfunctions, including brain tumors, epilepsy, any other types of disorders that affect the central nervous system, including child abuse and child neglect in some specific cases.

Q      Would that include children who suffered from sexual abuse as well?

A      That would include children who have been sexually abused if it affects their central nervous system, yes.

Q      Your appointment at the University of Maryland, School of Medicine, can you describe what your duties are there?

A      Yes, sir.  First of all, I have several duties there as a faculty.  I'm responsible to conduct research, peer review research that would be published in the literature, to receive funding for me to be able to conduct my research, to teach medical students, as well as psychology and other individuals

303

who come to the division of developmental pediatrics, one, to learn about child development and other factors related to the central nervous system dysfunctions in children. As well as some committee work sometimes in the hospital where I work, and also I'm responsible for the educational components of Mt. Washington Pediatric Hospital related to neuropsychology.

Q     And so the students that you're teaching are going to be medical doctors some day?

A     Some of them will be medical doctors, some psychologists, and some of them will be social workers. We don't differentiate sometimes in the courses or in the didactics that are given to them. Sometimes they are together or in part because some day they will be practicing within an immediate group of all these professionals and they have to learn to dispatch their responsibilities within that realm.

Q     Dr. Llorente, can you tell us where you are from originally?

A     Yes. All my family is Cuban, from Venezuela trying to escape communism, and then we came to the United States in 1972.

Q     Where did you study psychology, sir?

A     I received my Ph.D. in clinical psychology and specialized in adults and children from Oklahoma State University and also specialized in neuropsychology, and then I subsequently did my internship or some people may call that

residency at the Johns Hopkins School of Medicine/Kennedy Krieger Institute in Baltimore, Maryland.

Then I subsequently conducted my fellowship at the University of California, Los Angeles in the Neuropsychiatric Institute and Hospital as well as volunteering my time at the VA Hospital. I wanted to learn about the diseases of aging as well as diseases about adults that do not take place in children. So I was a visiting scientist and clinician at the West Los Angeles VA Hospital where I saw adults continuously.

Q    Are you board certified?

A    Yes.

Q    What are you board certified in?

A    In December of last year I became board certified by the American Board of Pediatric Neuropsychology. So I received board certification in December of last year.

Q    And to become board certified what does a doctor have to do?

A    Well, first of all, you need a lot of time because institutions do not see the value of that either from an economic or from other standpoints. They do see it as a value, inherent value in a clinician who wants to continue to grow and that's, of course, true for most other professions. So I would say to you that at the abstract level you do require an inherent curiosity to continue to grow as a professional. If you look at my CV, my board certification came, I think, 15

years after I left my fellowship.  So that's No. 1.

Then No. 2, you have to go to a written exam.  You have to then send work samples so that you can be criticized about your work samples, which are essentially you have conducted a patient you have seen and you have to defend that work sample.

Then finally you have to pass an oral exam, which is the component I passed in December.  If the committee feels that all these levels -- you have successfully reached a level of competency enough to become board certified, then you receive your board certification.

Q     What past faculty appointments have you held?  Where else have you taught?

A     Well, before receiving my appointment, my tenure appointment as an associate professor, I was an assistant professor at the University of Maryland as well, and before that I was on the tenure track in the Department of Pediatrics at the Baylor College of Medicine in Houston, Texas.  I also was an adjunct in the Department of Psychiatry at Baylor as well.  So I saw adults there as well.  And I also taught at two universities in Houston in the departments of psychology as an adjunct, one at the University of Houston itself proper, as well as at the University of Houston, Clear Lake, and so those are some of the appointments.

I also have, you could say, somewhat of an honorary

306

appointment that I have had for sometime at the University of Hong Kong in China.

Q     And, again, your present teaching position is at the University of Maryland?

A     That is correct.

Q     Your clinical work in your research is at Mt. Washington?

A     Well, some of my research is also at the University of Maryland.  My research examining core relates of drug abuse in mothers examining their products, in other words, their children as adolescents.  That work was being done or continues to be done at the University of Maryland School of Medicine, so the extent of my research is conducted at the University of Maryland and some of it is conducted at the hospital.

Q     Doctor, we've pulled up on our screens the page of your CV that has the bibliography of your work and it's -- frankly, the government and the Court have the documents in front of them as Exhibit 26, but can you give us just a sense of the publications that you've written?  What have you published?

A     Well, I publish in different areas, including a specific area within your psychological assessment, particularly related to Hispanics in the United States and abroad.  I've also studied a great deal of individuals who have been exposed to infectious diseases, including HIV, cytomegalovirus, other diseases, all usually related to the

307

impact of these conditions on the central nervous system of individuals. I also would like to point out if you look at the bibliography, that the majority of my publications are in peer review journals and that's important.

Q     And what does it mean to have something peer reviewed?

A     Well, I think people can publish in many books and many other areas but when you -- and I'm also the editor in three journals myself; and so when you publish in the peer review literature, that means that your work has been examined by your peers internationally to determine whether your work is worthy of publishing and appearing in scientific literature that essentially moves the scientific field forward.

Q     Doctor, I'm going to ask you briefly about some cases. I'm referring to our Exhibit 26(b), please. Attached to your CV you sent us a list of your past criminal cases you've worked on.

A     Yes.

Q     And in those -- in that list of cases it looks to be a mix of cases that are in both state and federal court?

A     Yes.

Q     In these cases were you qualified as an expert to testify in those courts?

A     Yes. I have always been qualified as an expert in neuropsychology.

Q     And is neuropsychology a subset of psychology or are

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 18 of 103

they distinct things?

A You can say that is a branch of psychology in general that attempts to examine brain behavior relationships; in other words, how is it that the human brain with different functions is able to control human behavior and to direct human behavior. You could say it is subbranch of the field of psychology.

Q Do psychologists and neuropsychologists diagnose based on the DSM system?

A Absolutely. And, in fact, psychology uses also the ICD-9, International Classification of Disorders. ICD-9 and ICD-10 contains within it DSM-IV. So DSM-IV is a special case of the International Classification of Disorders that is used internationally.

Q We are going to get to your diagnosis of Mr. Sinisterra in a minute, but was part of your diagnosis of him based on the DSM classifications?

A Yes.

MR. GABRIELSEN: Your Honor, I move that Dr. Llorente be qualified as an expert witness in psychology and neuropsychology.

MR. VALENTI: No objection.

THE COURT: Granted.

MR. GABRIELSEN: Thank you, sir.

Q (By Mr. Gabrielsen) Doctor, what are the red flags in a criminal case that would cause a criminal defense attorney to

Case 4:04-cv-08003-GAF Document 121 Filed 02/19/13 Page 19 of 103

refer a client to you for a neuropsychological evaluation?

A     Well, I think there can be many, many factors, including, for example, if an attorney feels that one of his clients -- or the client or a petitioner is an individual who suffered from deficits or intellectual delays.  That would be a reason.  And particularly if there is potential causative factors that could account for that.

For example, if the attorney during his inquiry of his or her client begins to realize there may be cases of malnutrition because it affects the central nervous system dysfunction, particularly does the individual have any kind of brain injuries or head injuries, particularly if the individual in the case that there has been loss of consciousness and this, of course, you can see has come into the forefront.  These forced concussions even in the news media.  But those are issues that are important.

Also if there's any kind of abuse reported by the individual, particularly during the course of childhood because now we know that child abuse, it not only -- we don't have to adopt concepts that are historically related to the psychology, but we know, for example, from the work of Bruce Perry that child abuse can cause changes in the human brain, and the Court can go look at the work of Bruce Perry who used to be at Baylor but is now in Toronto where he actually shows scans of people who have been abused and neglected of children and individuals

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 20 of 103

who have not been abused and neglected and you can see the changes, the blatant differences even in the size of the brain because their neuronal structures are not growing the same way as say somebody who has not been abused, and so on.

So the concepts of malnutrition, abuse, consideration that the person may not be okay intellectually, all these were red flags even in a not very astute attorney to seek the counsel of a neuropsychologist or neurologist or psychiatrist, somebody in the profession who can from then on guide him or her in terms of what other referrals you want to make for an individual with such histories.

Q     Did Mr. Sinisterra have some of these indicators in his record as the case came to you?

A     Yes.

Q     Which ones can you identify?  Which ones do you recall as you sit there now?

A     Well, there were many and these are all contained, for example, starting in my report from 2006 when I first saw him and then repeated in 2011.

Really he had been abused by his mother in very severe ways.  He was also homeless as a child in Cali, Columbia.  He most likely left his home because of the abuse, but there are other important factors that to me are just as important.

Q     Can I interrupt you for just a second.  Can you address

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 21 of 103

what homelessness -- why that would be a potential indicator of a neuropsychological problem?

Q    A    Well, again, because we do know that is associated particularly at a critical period of development, of human brain development as a child in which there may be malnutrition, in which there be lack of stimulation to that brain, lack of schooling in most cases.  We do know what the risk factors are of not going to school, not from a psychosocial standpoint but from a brain standpoint, how it changes the structure of the human brain not to have an education.  So that's just to address a couple of points.  In addition to that -- if I may continue, counsel.

Q    Yes.

A    In addition to that, this individual has sustained some traumatic brain injuries.  For example, it's been reported in this case that he may have hit a pole and lost consciousness, and so you can begin to get an idea if you speak to him in his native language, he has some kind of a lisp when he speaks.  Lisps are considered to be perhaps changes in the structure of the human brain.  People who have articulation problems, and dysarthria is the technical term, have been considered to have changes in their central nervous system, and I talked about that in the report as well as variables that I pointed out to be discussed why I feel this individual suffered from an organic brain dysfunction.  So he had different potential risk

312

factors.

And then to complicate the matters further this is an individual who actually was placed in some kind of a school or reformatory when he was a child. This is an individual who came to this country by himself. For example, I have read myself in the literature, and you can read the immigration literature, what it does to a person to immigrate to a foreign country without having any kind of systems or structures in place. That can lead to psychological depression, posttraumatic stress, as well as other factors.

Then finally this individual was exposed to a great deal of violence, not only in his home but he saw, for example, his father go after his mother with a weapon, I think a machete. But also other type of violence. For example, his brother was killed. So he saw his brother shot as well as other people in the community in which he lived, because as I indicated in my report, the town where he comes from is a poor town in Columbia of 350,000 inhabitants but is one of the most used in the native country for narcotrafficking and other kinds of issues related to criminality.

Q How many times have you interviewed Mr. Sinisterra?

A I have assessed Mr. Sinisterra twice, once in 2005 and the second time in 2011 when I saw him for the second time.

Q And the first time your clinical interview -- your clinical evaluation was based upon communication between you

313

and Mr. Jenab?

A    That is correct.  That's how I got involved in the case.

Q    Second time was pursuant to my calling you and asking you to reevaluate Mr. Sinisterra?

A    That is correct, counsel.

Q    Is there any benefit to a mental health expert seeing a patient more than once or -- well, I'll just leave that question at that.  Is there a benefit seeing a patient more than one time?

A    Yes.  There are many benefits, particularly in a legal case like this, in a forensic case like this because you can even compare the test results from the first time against the test results of the second time to see if there is consistence, to see if there's consistency among them.

There's also the issue of continuity that the patient may or the client or the defendant or the petitioner may feel more comfortable in opening up to discuss other important issues because rapport now has become greater because he or she knows the clinician better.  As well as for the clinician to get a better picture of an individual who he's seen more than once from a clinical standpoint.

Q    With respect to the red flags, the indicators we addressed a few moments ago, you had outlined a number of them that included head injury, malnutrition, physical abuse.  Would

sexual abuse also fit within that set of indicators that you indicated why an attorney might refer a patient?

A    Absolutely.

Q    Because your second report does a fine job of sort of relating what had been added from the first report, I think what I would like to do is just ask you generally what you learned from Mr. Sinisterra in the two clinical interviews that you performed with him. And actually before we get to that question, can I ask you how much time you spent with him in 2005 and again in 2011?

A    Yes. I think under both conditions I think I spent a total of about 16 hours with him of live actual evaluation face to face. I think approximately eight hours of each one of those evaluations. So a total of about 16 hours of face-to-face contact.

Q    What materials were in your possession when you went to visit him, again, both in 2005 and 2011?

A    Well, in 2005 Mr. Jenab had sent me a disk that had all the records relevant in this case up to that time, as well as, of course, I took all the tests that I reported in both of these reports to be administered to the petitioner; and then during the second time, then I took all the tests, plus the information that I had from the first evaluation again so that I could be comparing as I was administering other procedures to him while I was looking at -- as I was assessing him through

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 25 of 103

the evaluation. So I had the data from the previous evaluation in addition to all the test materials that were being given to me, in which many cases were many of the same procedures so that I could compare apples with apples without even having to compare him to samples, compare him against other individuals. I can compare his own performance against his own performance.

Q   And as you sit here today, we've tendered additional documents, transcripts of interviews with Columbian witnesses that our investigator found videos of those things and also a video of the interview with Dr. Dos Santos; isn't that right?

A   Yes. That information was provided by you and some of it was available to me prior to seeing him the second time, and some information was provided afterwards, after I saw him.

Q   So we're at page 8 of Exhibit 28, page 8 of your report, sir. Now, what I'd like to do is just have you take us through the evaluative process with respect to German Sinisterra. What is assessment validity?

A   Yes. Assessment validity, which by the way, is something that no one had ever done until I did it during the 2006 evaluation and the 2011 evaluation as well.

Q   With respect to Mr. Sinisterra?

A   That's correct, with respect to Mr. Sinisterra.

Q   Thank you.

      Can you explain what that is?

A   Yeah. Sure. Essentially there are procedures that are

given to an individual who's undergoing assessment to determine to what extent they are being forthcoming, to what extent they are not being biased in their responses to test items, to what extent the individual is providing good effort and similar factors like that; and this is very important because it enhances the interpretive process of the clinician. In other words, the validity comes from the course of a neuropsychological assessment, then that really impacts the interpretation that the clinician will provide about that data. So it is very important.

Q     And there are tests that are designed to elicit validity?

A     That's correct. And also even some of the specific test findings that are designed that you can examine to see to what extent the individual is performing at their optimal level of performance.

Q     How did you find German to be performing when you evaluated him?

A     Both times, in 2006 and 2011, he passed all the procedures. He came across as an individual who was trying to do his very best. He was administered procedures such as the Rey Memory 15-Item, the Test of Memory Malingering, which is the last one, the TOMM, the Test of Memory Malingering, which is a probabilistic test, much more difficult for anybody to be able to even try to fake it because it's probabilistic in

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 27 of 103

nature.

In addition to other clinical measures that were used that appear in the scientific literature, for example, there are some tests if a person performs at a minimum level of performance, you can suspect a performance is of optimum, but in his case none of those issues were raised because he always presented himself in a true light. He was cooperative and forthcoming.

Q    All right. Can we move on to the next page, Doctor, page 9 of your report. Can you explain to us what you did with him in terms of the test for academic function and language dominance?

A    This is also a very critical issue in this case, which I, in my personal opinion, has not been given due attention, and I have a footnote in my report related to the work by a great researcher and clinician by the name of Cummins. That's Footnote No. 1 in my report from 2011.

Simply because an individual can speak a language or somewhat have a rudimentary understanding of language, does that mean -- does not mean that that individual assesses the necessary and within the capabilities to be considered a bilingual individual.

There are -- in this particular case I wanted to take a formal approach to assessing his linguistics abilities, and so I administered measures that assess, for example, his

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 28 of 103

reading skills, his ability to, for example, to read both in English and Spanish, which by the way, he's not able to do so. He's able to decode some simple words, but he doesn't have a gauge, a formal gauge of his abilities in the linguistics skills as well as his academic skills in English and Spanish. So we can make a decision as to how to properly test this individual, and what we discovered, of course, is that this individual is predominantly a Spanish dominant individual and his capabilities in English are very poor.

By the way, this is something that I'm not the only one who has found that to be the case. For example, the educational psychologist, Dr. Wheelock, also found the same thing.

Q     Can I interrupt you for just a second. We're just lawyers here and maybe it would be helpful for you to tell us what decoding words mean. I'm not sure what that means.

A     Your ability to look at a word and sound out the word.

Q     Okay.

A     That's very different than reading a paragraph. Like when you are reading a text for a book in which you now have multiple sentences with different types of grammatical components to it, and so on, as well as you have to comprehend. To this date that individual, Mr. Sinisterra, is unable to read either in English or Spanish to this day.

Q     And the tests that you administered to test him for

Case 4:04-cv-08003-GAF     Document 121     Filed 02/19/13     Page 29 of 103

reading and reading comprehension, those are the tests at the top of page 10 in your report?

A    Yes.  As far as -- I'm on page 9 under academic functioning, reading levels, and language dominance and then it goes to the top of page 10.

Q    What levels did he read at when you tested him?

A    Well, for example, his performance in Spanish fell in the 1.2 grade level in letter recognition and decoding, as I said, and, of course, we do not test his comprehension because he's really unable to read.  And then in English is far worse.  So his decoding in English is at a K.9 level or similar to an individual who has attended nine months of kindergarten.

Q    These reading levels that you obtained from him, were they consistent with what you knew about his background?

A    Absolutely consistent because one of the things -- and this is important too because it goes to his own verbal reports.  So he's asked during the clinical interview, How far did you go in school?  And he says, I went to about a first grade level.  And then he doesn't know that I'm actually formally assessing his academic achievement for the purposes of comparing what he has said in terms of his verbal report, and essentially he's functioning at a similar level consistent with his level of education.  So it's not too far from his level.  So it's very consistent and it's very consistent with the history that he is an individual who left school early, who had

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 30 of 103

malnutrition, who did not have significant stimulation as a child, leaving for the city of Cali as a child by himself for a long period of time, and so on, and so on.

Q     Can we move on, please, sir, to intellectual functioning evaluation?

A     Yes.

Q     How did you test him for intellectual functioning?

A     On two occasions I chose to administer to this individual the Bateria III, which is the Woodcock-Munoz battery of intelligence.  That came after a great deal of talk and examination because that's the only test that we have available in the United States to this day where the normative sample in his calibration sample includes individuals from Columbia, who were born in Columbia, as well as individuals living in the U.S. who come from a Columbian background, and I gave my report -- and the Court can look into this.  There's an Overview and Technical Supplement, Assessment Service Bulletin Number 1 on page 14.  That is in the report.  It says Footnote No. 19.  And that's very critical because it allows us to be able to compare that individual's ethnicity and cultural background with a relative stable and best normative sample that we can find in the United States for an individual who finds himself in an American society who is acclimating slowly to American society.  So this was the best measure of intellect that could have been administered to this individual as far as

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 31 of 103

I'm concerned.

Q    What did you -- what results did you obtain from that testing, intellectual testing?

A    First of all, let me point out.  It's very important that the results in 2006 were very close and almost identical to the ones I obtained in 2011.

Q    And what did that tell you?

A    Well, that tells me, No. 1, that there is a stability in his intellectual abilities, which are very low, and we'll talk about that in a minute; but, No. 2, that the data that is coming in seems to be consistent with each other.

It is also important because even though I criticized Dr. Wheelock for the approach he took to assessing his intellectual ability, what he did and I still do and criticize the approach that he took, the test findings of Dr. Wheelock, notwithstanding how obtained, are very similar to these test findings in that his level of functioning is in the borderline range, and so that's very important.  So we are getting consistency even from two different clinicians which to this day have never met, who assessed this individual in different locations, using different tests of intelligence showing that he's receiving the same low score.  So that's very important.

What I did find, as I report in my report both in 2006 and in 2011, is that this is an individual who is

functioning at a very low level. Did I say in any of these reports that he was functioning at a level consistent with mental retardation? No, I did not. I took a very conservative approach and it took a lot of thought because there is a tremendous amount of data suggesting that he could have been diagnosed with mental retardation but I took a conservative approach and I said that this individual is not mentally retarded, not only because of his IQ score because he meets the criteria easily for mental retardation.

Q      What is his IQ score, by the way?

A      Well, the overall IQ obtained in 2011 was 71, and we can even gauge, of course, as high as 75 to be considered mental retardation in the United States according to DSM and according to the American Association of Mental Deficiency -- Intellectual and Developmental Disabilities. So his score meets the criteria.

Then the rationale, why I chose not to adopt that is because he has adoptive skills that in my mind will be inconsistent with mental retardation, notwithstanding my opinion was obtained in 2006 and it is today and continues to be that this individual is not too far functioning from a level that is consistent with mental deficiency, even though I'm saying that he's not mentally deficient, borderline of intellectual abilities which is the range just above mental retardation.

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 33 of 103

Q    Dr. Llorente, I would like to move ahead to page 13 of your report and have you speak to us about executive skills functioning, please.

A    Well, executive skills, first of all, are an umbrella or a term that we study very much in detail today at the turn of this new century as clinicians for skills that humans possess that are usually subserved by circuitry that is afferent and efferent, going in and going out, from the frontal lobes of humans.  These skills are responsible for higher organic function, such as long-term planning.  For example, when I teach pediatricians, it always impresses me that I will have one in the didactic that I'm teaching and I ask, What made you decide to become a pediatrician?  And he'll tell me, When I was nine years old, I had a brother who was very ill and he died and from that moment on I knew I wanted to spend the rest of my life helping children and curing children from diseases, and here you find a young lady or a young man sitting in my classroom 20-some-odd years afterwards or say 15 years or 17 years afterwards becoming a pediatrician.  That to me shows executive skills, long-term planning, tremendous amount of organic -- cognitive organizational skills, judgment, those kinds of skills.  Inhibition, very important, is subserved by the inferior portions of the frontal lobe.  So, in other words, inhibition leads to withhold certain responses even though we want to perform them but we don't.

324

That's executive skills.  And what I found in this individual is that he had several areas in which his skills were impaired; and, furthermore, not only were they impaired but they were very impaired in the first percentile, which would be consistent with other data that was coming in during the course of the evaluation.  He was consistent with both times when I assessed him, so in 2006 as well as in 2011.

And, furthermore, that it involved both in some cases verbal areas or domains of functioning in the executive domain as well as nonverbal.  In other words, that there are some skills that this individual possessed that are impaired in terms of executive planning, organization, judgment, and so on, that involve verbal skills.  So, for example, in verbal skills you will be talking about the ability of an individual to, for example, sit down here and hypothesize what would happen if that door catches on fire and you can't leave through that door.  So that person would begin to use verbal skills to begin to devise a hypotheses on what avenues or recourses that individual has to perform a certain behavior that would be positive to the organism, such as thinking about other doors, perhaps an escape.  Are there any windows?  Can I jump on top of a fixture or something until help arrives, and so on, and so on.

In addition to that, he also had difficulties in a number of those skills that were related to executive

325

functioning, and that's important because when the nonverbal domain is addressed, it's reducing reliance on linguistic factors. That's important for this individual because he comes from a diverse cultural background and linguistic background.

Q    And that consisted of both Spanish and English language --

A    That's correct.

Q    -- use. Doctor, on page 14 at the end of the last paragraph on executive skills functioning, you again address the impact of his low academic achievement on your scoring of the exam. Can you address that again, please?

A    Yes, sir. If you read my report, there is even a footnote that I wrote, "Low levels of education can impact neuropsychological performance in a human being." And so I took, again, a very conservative approach as I have in every one of these cases I've ever been involved where there's low levels of education, and so I tried to correct always the data from all the tests that were administered to him for his low level of education whenever there's that normative sample so that I can compare it when it exists. In some cases it did not exist. If it didn't, I told you that in the report or I explicitly indicated in my report that could not be done. So I was using certain norms that did not contain even Hispanics in this case. This is a national problem we have in our field.

Q    So if a clinician doesn't account for low academic

achievement, he might artificially deflate the numbers that are produced?

A    That is exactly correct, counsel.

Q    And that would be true in IQ testing as well?

A    Well, that could be on IQ testing as well.  For example, in the development of the Color Trails Test, which is my test, which will be published worldwide and is used worldwide, one of the things that we discovered is, you know, that as an individual becomes more educated, even children, that their test performance in time decrease.  So it's as if the educational offense level in a human being has a positive or mediating factor that allows a person, particularly when you give him a test that are cognitive in nature, and so on, to be able to drive, better avenue of solving problems in a better way, in a more efficient way, and so on.

So absolutely.  If you don't correct some of these scores for low levels of education, then you will get scores that are impaired when they're really not impaired.  They are artificially deflated because of his low level of education, and I try to correct for that, and I have an entire process and I discussed that and presented to the Court.

Q    Perhaps I should be remiss in having you point this out because the government is sitting here and taking notes about how they can attack the next mental retardation case that comes through here.

327

A    I'm sorry, counselor.

Q    The government can take this information to attack the findings of a clinician in the next mental retardation case that comes through here.

A    I think that's in the literature.  I hope -- I always thought of my role in a great courtroom like this to be educational in nature, as it is in this case, but that has been found in the literature for many years.  The work of Heaton, H-e-a-t-o-n, at the University of San Diego wrote a very instrumental paper talking about the impact of age, education, and other factors on neuropsychological performance and so that has been around for awhile in the literature.

Q    Could we move to page 14 of your report, sir?

A    Yes.

Q    Can you speak to the behavioral/emotional/personality functioning assessment?

A    Well, when I assessed this individual this particular time, he did obtain scores that were suggestive that he had levels, high levels of -- mild to moderate levels of depressive symptoms and also of mood alterations.

Let me say something that the measures that were given to him are not diagnostic in nature.  In other words, the Beck Depression and Beck Anxiety tries to measure symptomatology but it is not diagnostic, and for that we would need a far more detailed assessment, but where I did go to

328

examine diagnostic information using DSM-IV was that of PTSD, and I made a note here in my report, in my book Neuropsychological Assessment of Hispanics, there's two pages where I redact an entire set of research that we did with immigrants.  This is research that has come to Australia, Turkey, the United States, and other places showing that the immigration process itself is capable of exposing an individual, particularly individuals who already have potential risk factors for the development of PTSD and mood alterations to be present; and, again, you can look at the scientific literature for multiple countries including at the turn of the last century of Irish immigrants coming into the United States during the great potato famines.  There is data coming from back then showing that many individuals from a foreign country and had no social support system, and so on, developed symptomatology that were very different from PTSD and depression, and so on.

So because of those factors, that was examined very closely and, lo and behold, even though this is conducted retrospective in so many ways, I felt that his profile, given the history of abuse, physical abuse in a very apparent way by his mother.  I think she would stick his head in a bucket of water and not let him breathe under water, as well as the sexual abuse that was reported, and so on, was very consistent with an individual whose profile would meet the criteria for

329

Case 4:04-cv-08003-GAF   Document 121   Filed 02/19/13   Page 39 of 103

posttraumatic stress disorder.

Q     And, to your knowledge, or based on the reporting of either Mr. Sinisterra or the other documents, did he ever receive treatment for mental health issues?

A     I also wrote in my report, and this is a very important issue I think in this case as well, because we tend to forget when people are children, we only look at their behaviors once we find ourselves in a situation like this.  When this individual was a child and even as an adult, he never received any kind of treatment psychologically that we know of or psychological in nature, particularly for an individual that sustained even physical abuse that he received at home.  By today's standards that individual would be in some kind of a therapy or some kind of assistance for a while, not to mention in some instances for years.

Q     Doctor, have you ever heard the term "posttraumatic growth"?

A     Posttraumatic --

Q     Posttraumatic growth?

A     Yes.  But I don't consider myself an expert on those issues.

Q     We'll move on.

        I would like to go to, then, your clinical impressions, the bottom of page 14, at the bottom of 14.  I'd like to ask -- I think you set out the other data I think

330

contained with regard to German's education.  Can you speak to -- at least give us your thoughts about his vocational and occupational histories.

A       Well, again, they're very poor.  He always performed unskilled work when he did the work.  At one point in time there's even information coming in showing that he actually stayed in his household caring for his children because he couldn't find work because of linguistic and other variables, also because of his low level of intelligence and his cognitive difficulties.  I think that also played a major role even though he may not be aware of that.  But my point is that his vocational history is also very poor, conducting essentially tasks that were very menial in nature.

Q       And then if we could move to the bottom of page 15, please, the paragraph that begins with, "The present results revealed overall intellect."

A       Yes.  Well, so that's one of the first and one of the most important I think in this entire case findings which is that this individual meets criteria for what we call borderline intellectual functioning.  Again, as I indicated early on, even though I have not stated that this individual at any point in time is an individual with mental retardation, I continue to claim that he possesses intellectual abilities which are not within the average range and they are at the level just above mental retardation.  So this individual has significant

331

cognitive difficulties that, in my opinion, he has experienced not since 2006 when I saw him first, not in 2011 but they were present since childhood.

Q    Doctor, in the middle of that paragraph you indicate that education alone is not able to account for borderline intellectual profile.  What did you conclude?

A    Yes.  This is very important because it tries to speak about the chicken-versus-the-egg issue.  What I'm trying to say is that low levels of education alone does not explain a person to have this low level of intellect.  In fact, many foreigners come to this country with very low levels of education but they're intelligent people or at least have average intellect and are able to start businesses, to profit from the greater opportunities that our great nation offers people, both in personal as well as economic and intellectual, yet he was never able to profit from those abilities, not even as a child.

So I think what I was trying to say when I was trying to address that is that it is not that he had a low level of education and that's why his intellect is low.  I think he was born with low levels of intellect which precluded him from benefiting from education.

In fact, one of the issues that when we see patterns of American immigration, and you can see that in my peer review literature I have looked at some of these factors over the years.  When you see individuals come from this country, it

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 42 of 103

doesn't matter where they come from and what large scale migration they came from in Irish, Italians, Koreans, Vietnamese, Cubans, and so on, to the United States. You see how these individuals as a group are able to rise up the company ladder of this nation because most individuals, thank goodness, possess intelligence which would be normal limits. It is those individuals who are not able to profit from the opportunities that our great nation offers that sometimes are the individuals who we realize that one of the reasons why they haven't profited is because they have difficulties identical to, in my opinion, to what this individual suffers from.

Q    Is -- I guess I'll ask it in the simplest way I can. I'm trying to wrap my mind around it. Is there -- are low intellectual functioning and cognitive problems, are they the same thing?

A    I'm trying to use them -- they don't have to be identical, the same thing. In that sentence, in that context that I used them, yes, I think I was trying to -- I was using them as synonyms. When you refer to cognitive, you're referring to the whole gamut. For example, in this case his refrains from cognitive is just not he has problems intellectually but, for example, he also has problems in executive skills in addition to having problems intellectually.

Q    And is there some kind of synergy between those things?

A    Absolutely. And I wrote about that in my report as

333

well. We cannot hang our, you know, our fruits in one area here and say, well, the difficulties and why we're here today is because he has low intellect or, no, it is because he has low executive skills. No. I think it is the synergistic or the compounding affect of all these factors. We have an individual who has a history most likely of posttraumatic stress disorder. That is considered a mental illness.

So you have an individual who has low levels of intellect, you have an individual who has an executive dysfunction, as I have noted now on a couple of occasions, so it is the integrating or these factors inextricably related that are capable to provide the profile that we see in this individual today and the difficulties that we may have experienced in his compartment as a result of the brain functions or the brain dysfunctions really that he has as a result of the organic disorder that he possesses.

Q    And what did you find with respect to organicity in this particular case in German?

A    On page 18 of my report I talked about it very clearly, I hope, where I say that the impairments that we saw in higher order cognitive skills, executive skills, the difficulties that we see from average intellect in this individual and reasoning skills has significant applied consequences, and one of them is that he favors a hypothesis indicating that this individual has brain damage or static encephalopathy,

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 44 of 103

e-n-c-e-p-h-a-l-o-p-a-t-h-y. That's the technical term for organic brain damage. And then I continued to talk about it in the middle paragraph on that same page 18.

If I, as a clinician, begin to hypothesize that an individual has organic brain damage, I should try to find a rationale, why is it that I'm reaching that conclusion that should not only be based on the test findings that I'm obtaining. The test findings are like the paintings in a great canvas, okay, but before I start putting those paintings on that canvas, there is a backdrop that is coming into this assessment of this individual and that is his history.

So I have an individual who has a history of abuse, malnutrition, an individual who has low levels of education, and we know what risk factor that does for human being. We also know what abuse does for the human being, an individual living in the streets alone with all the risk factors I mentioned early, and so on. So then I have to adopt as a clinician a hypothesis saying indeed these test scores mean something. He's functioning in the first percentile in executive skills, even the second and third percentile, depending on what you test him intellectually, and so on. So the conclusion that I reach as a clinician, yes, this is most consistent with an individual who suffers from organic brain damage or static encephalopathy.

Q     In neuropsychology can you come to that diagnosis even

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 45 of 103

in the absence of any particular scans?

A   Absolutely.  I see children and young adults all the time who have normal scans who are incredibly impaired and vice versa, and you can look at the textbook by Yudofsky, Professor Yudofsky, who has done studies about that, and we have known about that for a long time.

It was a study conducted in England where scans, particularly MRIs, were becoming very much used, and they were trying to study what normal brains look like.  Well, here comes an individual into the school of medicine who has never been referred for any problems at all whatsoever, not in childhood, not in adulthood, yet had abnormal scans.  So we know there's people who have abnormal scans who have normal behavior and have never been referred to any clinician and are functioning quite well.  We do know that the reverse is also true, that we have people who can have very apparent behavior, including blatant mental retardation, blatant epilepsy, so on, that we sometimes take scans and those scans are normal.

So the fact that an individual does not have imaging that shows abnormality does not rule out or is not exclusionary of that individual having difficulties behaviorally and in compartment and in cognition and functions subserved by that human being.

Q   And what specifically did you diagnose with respect to organic brain damage in German Sinisterra?

336

A    Well, as I said, I used that term of static encephalopathy, which means that I have a brain that's abnormal and it's not something that would progress; in other words, that every week or every month or something like getting worse over time.  It's something -- and that's another clue that I have here that most likely this is something that this is how he was born, and one of the ways that you could look at that is when you look at the intellectual score when I assessed him from 2006 to 2011.

So here I have a five-year period where those intellectual scores are very similar and same thing for Dr. Wheelock.  If it was something that is progressive in nature, even if it's insidious and slow, you would expect greater changes over that period of time, particularly as we age, as an individual is an adult that is maturing, but I did not see that.  Instead what we see is most likely what we call a static process.  In other words, a brain that's abnormal because that's how he was born.

Also I want to finally add something here which is very important.  It is my fault that I have not brought it up.  And that is that there is a history in his family, for example, his father, his biological father was reported to have had -- himself may have been considered an individual who himself had mental retardation, who used not to take baths, told to watch his hygiene, and so on, and so on.  And so we may be

337

tampering -- I'll strike the word tampering. I apologize. We may be even dealing here with a genetic component to why this individual was born with these difficulties, in other words, because there's a biological component. Unfortunately, we don't have records to show that is the case.

Q     But organic problems can be genetic?

A     Absolutely. By organic problems we mean the impact of some of those factors on cognition. Yes. Of course. We do know that, for example, mental retardation or low levels of intellect not even consistent with mental retardation run in families just like genius and high intellect also run in families. Francis Galton was Charles Darwin's first cousin.

Q     I'm sorry. Who was that?

A     Francis Galton, Sir Francis Galton, one of the fathers of modern psychology was the first cousin of Charles Darwin. Just like an athletic family who produces multiple children whose father was a great athlete, so on, so on. The same goes for cognitive impacts and conditions. They are genetically transmitted, similar to mental illness and psychopathology, same thing.

Q     Let me ask you this: Could the organic brain damage that you found in German, can that come from one discrete head injury or some kind of physical impact to the head or can it also come from, as you spoke earlier about, malnutrition affecting the brain on the central nervous system?

338

A     Well, first of all, it can come from a single factor. For example, if you read my peer review literature, we study children with Smith-Magenis Syndrome.  So if you have a genetic deletion, for example, chromosome 18 in the distal part of that chromosome, you can end up with mental retardation and abnormalities in your brain.  So it can come from a specific.

You can also sustain a very severe traumatic brain injury where you can have a brain tumor that can lead you to have sustaining effects, but in a lot of these cases what you see is that you do have an individual who is born with these difficulties and then you have all these other risk factors and, of course, that leads to even more impairments, and so on; but, yes, the answer it could be one factor or a multiplicity or synergistic effects on multiple factors.

Q     Doctor, when you wrote this report in 2011, and I believe you indicate this in the report, you were already aware that Dr. Pablo Stewart, a psychiatrist diagnosed German with posttraumatic stress disorder?

A     Yes, and a report of his work I think had already been submitted to me at that time.

Q     I don't need to ask you anything about what Dr. Stewart found.  He'll be here tomorrow with us.  But was there anything in your findings with respect to low intellectual functioning, poor executive functioning, organic brain damage that is at all inconsistent or undercuts the diagnosis of posttraumatic stress

339

disorder?

A   Not at all.  In fact, as I note in my report, it is consistent with an additional diagnosis of PTSD.  His entire history starting with the physical abuse as well as other factors.  As I said, the fact that he left his home very early on in life, that's a very traumatic event for a child to leave by himself, homelessness.

Q   And that was after the sexual abuse of him at the age of seven in the abandoned building?  You are talking about him leaving home at that point?

A   Yes.

Q   You are saying that's significant as opposed to what?  What would have been --

A   Not leaving his home, remaining at home under the care of a loving family who gave him good nutrition, who cared for him as a human being, and so on.  When I interviewed his mother, because I called in 2006, she didn't even realize that even by his own country's laws he had been exposed to statutory child abuse because he had been sent to work selling wood and carrying heavy loads as a young child.  She didn't realize that was abusive, and she got into an argument with me saying that was not -- that that was not wrong, if I recollect, and so, yeah, exactly to have the opposite of that kind of environment.  That's what I meant.

Q   Yesterday we saw a video and we got transcripts of an

340

incident when German was sexually abused by a pedophile named Chucho Ramirez and his sisters saw him come home naked and beaten. Rather than wanting to tell mom about it, one of the things that he was quoted by the sisters as saying is he didn't want his mother to know. They were not to tell mom about that. Is that indicative of the same thing, of the lack of support at home for a child who has been traumatized?

A    Also it's indicative of how children may respond to an event like that in the sense that children may even be afraid of telling their parents thinking that they had to do something, why they had to be abused by somebody because children do not have the executive capacity to realize how a parent would respond, particularly if the parent has abused you in the past for misbehaving or for something that the parent considers inappropriate.

Q    Doctor, your report relies, at least to some extent, on self-reporting by German to you?

A    Yes.

Q    Is that correct?

A    Yes.

Q    And within the mental health field do clinicians, such as yourself, rely on self-reporting of your patients?

A    Yes, we do.

Q    And to what extent do you rely on that?

A    Well, first of all, you have to be very careful, not

341

just with any individual, but particularly with individuals that you suspect to have low levels of intellect because of multiple factors, such as masking, for example.

I have worked for many years with people who have developmental disorders, including mental retardation. One that always comes to my mind is a case I was involved in where an individual worked for the forestry service and when I called to check what he had said, I discovered actually he was a janitor. He was not a forester. So he was working for the forest service as a janitor. He was not cutting trees or doing any significant job that would require certain skills and issues related to safety, and so on.

So there's many factors. So we examine and we accept verbal reports on the individual that we're assessing to the extent that the information that's coming from that individual is consistent with information that's coming from the test results, information that is coming from the ecological environment of the individual.

So, for example, when he says to me -- I say, How far did you go in school? Let's pretend I ask that. And he says, The first grade. And then, for example, on a test of academic achievement he scores a 16.8 grade level, that would suggest that he's functioning like someone who has received 16 years of education or a bachelor's degree. Well, then, I'm going to look very closely at the statement that he made that

342

he only attended to the first grade because it is very inconsistent. However, if he says to me that he attended the first grade and I give him later on, in some cases maybe an hour or later or the next day, a test of academic achievement and he functions at a 1.2 grade level, then I'm beginning to put more weight on the answer that he went to the first grade, because that is consistent with the test data that is coming in.

However, a clinician should not rely on those two pieces of information. That's why I took it upon myself in 2006 to talk to his family and ask his mother what grade level, for example, he went. Following the same train of thought that I'm using here as an example. So she says, Yeah, he only went until the first grade. So now I have the verbal report from the client, consistent with the verbal report of the client with his actual test data from a formal test consistent with a maternal report.

And, furthermore, let me also add to that that we, of course, tried to find records, school records, for example, to make sure that the data coming in from an independent entity such as the school would also be consistent saying that the individual received only a first grade education. Clearly in this case we couldn't come up with those records, but I hope that answers your question.

So a verbal report of a client is important both for

343

positive and for diagnostic purposes, and a clinician will use it and he or she are trained for many years and we train our clinicians to be able to use verbal reports and to examine the veracity of that verbal report. As I said, using the canvas as a background of ecological information that's coming in, not simply depending on the paintings that are being dropped as Pollock used to do on a canvas.

Q In German's case could you use, as you call it, the canvas of his life these different sources to make a credibility judgment as to his report of physical and sexual abuse was credible?

A That is correct.

Q And how would you do that in the same analysis you just did for --

A Well, for example, we do know that severe physical abuse, as I said, changes the human brain, so it is consistent with the fact that he obtained scores in the first percentile in several areas, that his intellect was close to the first percentile. That is the first level there. She told me about it. His sister also shares some information related to that. And then counsel provided other information, some of which we were not even aware to the extent to which it had occurred. That would also be consistent with that data.

Q So until you saw the videos we gave you recently, you weren't aware of the full extent of the sexual abuse of him?

344

A    Actually the videos and information that had been sent were from previous work that had been done.  If you recollect, there was a document that was sent from a mitigation specialist that was discovering some of this information.

Q    Talking about the social history --

A    That's correct.

Q    -- that was submitted.  I confess.  I'm the one that wrote the social history based on sources and references.  Is there anything wrong with the clinician relying on a social history written by the lawyers for the person you're evaluating?

A    If it's the only source of information that he or she uses, yes; but if it's only one single piece of information that the clinician uses, again, looking at other information that is coming in from other sources, then it's just another piece data coming in which the clinician is trained to do, to look at many pieces of data to -- in fact, the ethical principles of psychologists talks about trying to gather as much information as possible from different, quote, collateral sources of information.  So it would be just another piece of data that is coming in.

Q    So if what I wrote was the only thing that was submitted to you, you would be suspicious that I might be trying to skew your results in the long term?

A    Absolutely.

345

Q    But in this case you had so much other data, that wasn't a concern to you?

A    That's correct.

Q    At this point I would like you to simply confirm something before I ask the next question.  In your report I see at least four diagnoses that you made; the low intellectual functioning, the poor executive functioning, organic brain damage, and you agree with Dr. Stewart that there appears to be posttraumatic stress disorder here.  Could I ask you to take those things in the aggregate and comment on whether German Sinisterra would have been able to, for example, engage in long-term planning in his life?

A    Well, when you examine, for example, and I think I wrote about that in my report towards the end, I think, if I remember correctly, really his intellectual ability combined with his executive dysfunction and his psychopathology would have impacted for him to receive any kind of significant long-term planning or to benefit from his ability to contemplate multiple avenues that he had, that he may have had at his disposal to comport himself to other years, not just -- not just in the late 1998, and so on, but long before that.  So we can see how his ability to consider long-term planning would be impaired by all these dysfunctions that he unfortunately possesses.

Q    Directing this a bit more closely to the offense for

346

which he was convicted, at some point in his life he attached himself to a drug cartel called La Oficina; do you recall that?

A     Yes.

Q     How would any deficits from which he suffers -- I guess I would ask you to relate what you just said about impacts on long-term planning to that decision to associate himself with the drug cartel?

A     Well, we do know that people who have low intellectual abilities, particularly combined with executive dysfunctions have poor judgment.  So that's how we see that.  I would see it as difficulties in contemplating the dangers, issues related to his own safety by involving himself with such an entity or such a group of individuals.

And, incidentally, this is not something -- again, it speaks about his difficulties in poor judgment, and so on. We don't have to depend solely on this event, although it is very critical for this case from a legal standpoint.  But I want to point out that the stress for him living such a poor judgment, and so on, it didn't start then.  For example, it starts -- and I can go back and give you examples.  I just want to respect the time of this court.

I will give you another example.  What kind of individual, unless he has very poor judgment and very poor planning abilities and very poor concept of the too dangerous issues related to safety, gets in a boat and come illegally to

347

the United States when they know that if they are caught, they are thrown overboard and they actually die in the ocean.  Not only did he do that once, he did it more than once.  So we can begin to gauge even long before this happened his poor judgment that would impact the reason why, for example, he would join something like La Oficina.

Q    Let me ask you this:  Given his limited educational achievement, given his limited intellectual functioning, poor executive skills, if La Oficina offered him an opportunity to make better money or make money where he's otherwise not employable, does that show he actually has some acumen, some ability to make a good judgment?

A    I would not actually see that as positive or adoptive of good judgment.  I would always see it as something negative. In part of the issues related to that is individuals who have executive dysfunction combined with low levels of intellect, it's very difficult for them to realize the temporal nature of the decisions that they make.  So, yeah, in the short time he may have seen that as being positive.  Hey, I'm going to make so much money by X, Y, or Z, yet he's not able or capable of seeing not only the dangers and issues of safety I noticed but he made a temporal decision that, you know, wait a minute, in the long run this is not a good idea because eventually you are going to get caught, and so on, and so on.

In other words, you can begin to see the poor

judgment, you know, the lack of good planning skills that he possesses as an individual which, again, I'm going to make a point of it. It's not something that starts in 1998 or when he joined La Oficina. It's something that's been around in him for a long time because of his dysfunctions.

Q    And can we take the same discussion to the events that occurred in the building in Kansas City where the life was taken on that night in November of 1998? Can you please just give the Court your thoughts on how sort of the confluence of his physical presence with these other persons from La Oficina how his mental functioning interacted with that scenario?

A    Well, I wrote about it on page 21 in my report. For example, in the first paragraph of that page where I talked about how his executive deficits, subaverage intellect, and emotional problems. Yeah, that paragraph there. Thank you, sir.

Q    Yes.

A    And all these other risk factors, his emotional development, his PTSD, so on, affected his capacity to realize, No. 1, the criminality of his conduct and, for example, to meet the requirements of the law but also to, even at that moment, to be able to contemplate multiple options that he may have had and not to follow through on the orders that he was being given.

Q    And in that regard can you please comment on how the

posttraumatic stress disorder might have impacted his ability to look at that range of options as well?

 A     Well, for one thing we do know that this individual's events in their past where there may have been fear associated with it, as well as other emotional and psychological factors, power, he may have felt threatened.  So if he didn't follow through, you know, something could have happened, and I think there's some reports that his family or he made those reports that his family may have been threatened if he didn't follow through with what La Oficina was asking him to do, and so on, and so on.  That's how that particular factor affected his decision making process.

 Q     From what you just said, for a person like German with the PTSD, could he give Hinestroza, could he give the kingpin who gave the order, would he view him perhaps similarly to the other authority figures that imposed physical abuse on him or even the sexual abuse on him younger in his life?

 A     Absolutely.  PTSD is capable of doing that to a human being and much more.  In fact, this is very interesting and very telling because he does have a lot of behaviors that, again, not only show his difficulties intellectually and cognitively, but I think even the government reports in the case that Mr. Sinisterra comes to Kansas City without a gun, so he's been given a gun.  How poor judgment if you have the long-term planning, and so on, capability to do something which

350

he never would have been able to have done; but if he has this mastermind of killing people, and so on, the first thing that he should have done is to arm himself, yet he gets in a car and comes to Kansas City without a gun and he has to be given a gun and asked to shoot somebody else. Again, that speaks to a tremendous amount of difficulties in judgment, poor planning, poor organizational skills, and so on, and so on, low intellectual skills, and so on. And it is compounded by these emotional factors associated with the PTSD.

THE COURT: Mr. Gabrielsen, when you're at a good point to stop, we'll take a break.

MR. GABRIELSEN: This will be fine, Your Honor. Thank you.

THE COURT: We'll take a break until ten minutes until eleven.

(Recess taken at 10:30 a.m.)

THE COURT: Doctor, would you take the witness stand again, and I'll remind you you are still under oath.

THE WITNESS: Thank you, Your Honor.

ANTOLIN LLORENTE resumed the stand and testified further:

THE COURT: Mr. Gabrielsen.

MR. GABRIELSEN: Thank you, Your Honor.

Pull up Exhibit 21, please and let's go to page 4.

DIRECT EXAMINATION (continued) BY MR. GABRIELSEN:

Q       Dr. Llorente, in the course of your work on our behalf,

351

on behalf of Mr. Sinisterra for these proceedings, I sent you a copy of the verdict form that was returned by the jury in this case. Do you remember seeing that?

A    Yes.

Q    I would like you, sir, to please read into the record, if you wouldn't mind, the statutory aggravating factor No. 2 that begins on the bottom of page 3 of that verdict form and goes on to page 4. Just read that to yourself. I'm sorry. Read that into the record.

A    "Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant committed the offense of murder of Julian Colon after substantial planning and premeditation to cause the death of a person as set out in Instruction No. 7?"

Q    Thank you.

You have indicated to us that you diagnosed German with low intellectual functioning, poor executive functioning, organic brain damage, and PTSD. I would like you to indicate to the Court your opinion as to whether German had the ability to engage in this kind of mental thought.

A    As I indicated early on, the difficulty of this individual has, even throughout his lifetime, we don't just have to take the test results but actually his history is one where it shows that they have deficits in planning, particularly long-term planning, and so on; and so, no, he did

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 62 of 103

not engage, nor create some mastermind; and, in fact, even the records state that he came to Kansas City, as I said, early on without a weapon and that his idea was that he was coming to collect money that had been stolen from Hinestroza and his girlfriend from their apartment in Kansas City, not that there was some master plan to go and unfortunately take the life of another human being.

Q    Do you remember reading a transcript of an interview with the sister Rosa where Mr. Guevara asked the question whether German could even engage in the planning of a party and Rosa said no; do you recall that?

A    I recall that and he would not be.  I would not be surprised.

MR. GABRIELSEN:  Can we pull up Exhibit 23, please.

Q    (By Mr. Gabrielsen)  Dr. Llorente, these are the statutory and mitigating factors in the federal death penalty statute.  Does this look familiar to you?

A    Yes, counselor.

Q    In fact, you do reference it on page 21 of your report, correct?

A    Yes.

Q    In your report what do you state with regard to the statutory mitigating factors in this case?

A    Well, as I wrote in page 21 -- I don't want to insult the intelligence of people.  It can be read here on page 21, as

353

you noted. I indicated that in this regard, really his subaverage intellect, his executive deficits, emotional problems, such as PTSD that he was under, the influence of extreme mental or emotional disturbance and he did not appreciate, you know, the criminality of his conduct and was unable to conduct himself to the requirements of the law. So really this will be consistent with some of the mitigating factors, as I noted, in 1, 2, and 8 as well.

Q So you would find that he -- and with respect to the (a)(2), duress, again, with his emotional problems and the other incapacities, is it likely that he was acting under unusual and substantial duress in the course of the events that happened in the house in Kansas City?

A Absolutely. And it's also how he interprets that duress regardless of what is also happening in his environment. So, yes, absolutely.

Q So you are saying regardless of how one might objectively look at it, his objective state of mind he could have great fear at that time?

A Absolutely. And when you study PTSD, for example, I know in studying the literature there's a test we use very common. For example, two individual who have gone to Vietnam may come back and one of them is devastated and the other one will become a Congressman or senator for the United States Senate. Why? Because how they interpret the event or the

354

experience even if they were identical.  The host of the experience, whatever traumatic experience they have experienced throughout their lifetime impacts very much how the expression of behaviors later on as a result of posttraumatic stress disorder and we know that.

So it depends on how he interprets that information, particularly since it started when he was very young as a child at which time he didn't have the coping resources, the thought processes and other mechanisms that we as adults may have to interpret those events and continue until his adolescence.  In fact, it continued, as I said, later on, including his immigration by himself to this country risking his life three times where he actually if found could have been thrown overboard.

So, yeah, it is his impression of this event, but no question that he was under duress, not to mention he didn't have a gun.  He was given a gun.  So he actually could have been told if you don't do this, we're going to terminate you too.  So absolutely.

Q     Finally with respect to these factors, there's sort of a catchall at No. 8 at the bottom that factors in the defendant's background, record, or character might mitigate the offense.  Would it surprise you if you knew that the jury in this particular case -- strike that.

Would the factors you just identified support a

355

finding that there are things in his background or record or character that might have mitigated the offense?

A     Yes.

Q     Exhibits 21 and 22 are basically the same.  There are two different crimes for which the jury returned verdicts, but they returned exactly the same numbers where you have to say how many jurors find each factor.  I would like you --

        MR. GABRIELSEN:  Could we go to page 6 at the bottom of the statutory mitigating factors.

Q     (By Mr. Gabrielsen)  Dr. Llorente, this is the verdict form that was returned with respect to the two murder counts.  Does this statutory mitigating factor appear to track part of the statute that you referenced just before this?

A     Yes.

Q     And how many jurors voted that there was mitigation deriving from German's background, character, or record?

A     According to this, zero.

Q     Sir, you had spoken -- you speak in your report and you've testified earlier about the reluctance of abuse victims to come forward and talk to people.  At one point in your report -- we're not going to pull it up right now.  We don't need to go back to it.  But you indicate, I'm thinking in both reports, that when you talked about the abuse with German, his affect went flat.  Does that demonstrate a reluctance to talk to the interviewer about these incidents?

A    Yeah. Sometimes it may be that or also be factors such as shame or other factors that are affecting for which he doesn't want to talk.

In my report, on the 2011 report, Footnote No. 7, I talk about another factor that I felt was critical and that has to do with culture and it should not be diminished but given due weight. It would be very unusual for a Hispanic male, No. 1, to want to admit he was sodomized on multiple times, that he was gang raped, so on, then to have to tell that in the face of another male Hispanic, that is something that I've never encountered to take place unless tremendous rapport has been established with the individual.

Q    And do you know that from your personal experience in being a Latin male or is this from research you've done?

A    Well, this is from my clinical experience in working with people who have been abused, including young adults, adolescents, and children.

Q    Could we extend the same principle -- you saw the videos of Segundo and Gustavo and in those they acknowledge that they gave a prior statement regarding their knowledge that German had been abused in childhood but they had not been sexual abuse victims; do you recall that?

A    Yes.

Q    With the same principle you just discussed, the reluctance, could you please address how that would also affect

357

the other witnesses in the case?

MR. VALENTI: Your Honor, I object to him commenting on what other witnesses may or may not have done or reluctance they may have had to disclose.

THE COURT: Sustained.

Q     (By Mr. Gabrielsen)  You saw the videos of Segundo and Gustavo?

A     Yes.

Q     How would you describe their affect to the extent you can from the video?

MR. VALENTI: Your Honor, I'll object. The videos speak for themselves. It's not appropriate --

MR. GABRIELSEN: I'll withdraw that, Your Honor.

THE COURT: I think you made your point on that. Thank you.

Q     (By Mr. Gabrielsen)  Finally, one last question, Dr. Llorente.  The low intellectual functioning, poor executive functioning, organicity, and PTSD, did you find these -- did you diagnose these conditions beyond a medical certainty?

A     Yes.

MR. GABRIELSEN: I have nothing else, Judge. Thank you.

THE COURT: Thank you.

CROSS-EXAMINATION BY MR. VALENTI:

Q     Dr. Llorente, I think I'll start where we finished and

Case 4:04-cv-08003-GAF   Document 121   Filed 02/19/13   Page 68 of 103

talk about the verdict forms that were shown to you.  You recognize that as a doctor who's been certified -- or not certified but offered up as an expert witness in this case, that you're entitled to offer an opinion, correct?

A    That's correct.

Q    That even if you were a witness in this case that had testified in 2000, regardless of the opinion you held and regardless of how strongly you particularly held it, the jury was in no way obligated to agree with you; do you understand that?

A    Yes.

Q    The jury was their own independent finders of fact in that capacity and they had to make those decisions in regards to mitigating circumstances individually based on a preponderance of the evidence?

A    Yes.

Q    Okay.  Now, as we start, sir, I first note that you've worked on approximately 42 criminal cases as I look at the list of cases that was provided, I did I quick count, does that sound about right?

A    It sound right, counselor.

Q    Of those 42 criminal cases, it looks about 30 of them are cases that involve the death penalty, either at the federal or state level.  Does that also sound about correct?

A    Yes.

359

Q On those 42 cases or more particularly on the 30 that involved the death penalty in what capacity were you hired?

A Always as a neuropsychologist, as an expert witness.

Q By whom?

A By the defense.

Q Have you been hired by government counsel to conduct neuropsychological exams in death penalty cases?

A No.

Q In the times that you recall, have you been called both in what I would call penalty phase mitigation investigations as well as 2255 investigations?

A Yes.

Q I notice from your recitation of credentials that you're board certification in neuropsychology is relatively recent, about a month ago or thereabouts?

A Yes.

Q Congratulations, sir.

A Thank you, counsel.

Q Currently, as I understand your practice, you work primarily with children?

A I work with children? No.

Q Okay. I'm sorry. You work in a children's hospital in pediatrics and in educating others to work with children?

A Yes.

Q When we get going, before I talk about your reports in

360

general, I want to make sure I've covered some background information about mental retardation so that the record is clear.

Mental retardation to the extent that it is a diagnosis either by the AAMR, American Association of Mental Retardation, which is now, I think, the American Association on Intellectual and Developmental Disabilities?

A    That's correct.

Q    I'm going to say AAMR if that's all right.

A    All right.

Q    Because it's easier for me.  I'm going to be referring to that institution or a diagnosis in the DSM.  We're essentially looking at three things as I understand it.  First we're looking at whether an individual has a general intellectual ability, commonly referred to as an IQ, at or around two standard deviations below the norm which the statistical analysis is approximately 70; is that fair?

A    Plus or minus the five points for standard of measurement.  So, yes, you are correct.  Seventy, plus or minus five.

Q    And because of that standard measurement, you correctly said in your direct examination that it is possible for someone with an IQ as high as 75 to be considered mentally retarded if you look at the other factors we'll discuss?

A    Yes, counselor.

361

Q    And, correspondingly, it's also possible for someone with an IQ as low as 65 to be considered not mentally retarded if you look at the other factors that we'll have to talk about?

A    It is probable, yes.

Q    So beyond the simple IQ test that we do -- I say simple. I guess that's an unfair statement. These tests are anything but simple. They're complicated. But beyond simply assessing IQ to determine mental retardation, we look at two other factors. One other factor is what's commonly referred to as adaptive functioning or adaptive deficits; is that correct?

A    That's correct.

Q    And the other thing we look at is whether or not these conditions have manifested themselves prior to an individual reaching the age of 18?

A    Correct.

Q    Okay. Of course, you've conducted that examination in this case; is that fair?

A    Yes.

Q    And we'll get to the conclusion in its entirety, but a short version of that is you do not find the defendant to suffer from mental retardation. You find him to be in a very low intellectual range close but not at mental retardation?

A    That's correct.

Q    And you did that assessment on two occasions, once at the end of 2005 with the report in 2006, correct?

A     Yes.

Q     And again in 2011, which is the subject of the report that you went through at length with Mr. Gabrielsen?

A     Yes.

Q     Okay.  You are aware, I assume, since you've been hired in the capacity that we discussed on some 30 occasions in death penalty litigation, of the United States v. Atkins case?

A     Yes.

Q     And what is in shorthand referred to as an Atkins claim would be someone who believes that they would be barred from having a sentence of death imposed upon them because they are a person who suffers from mental retardation?

A     Yes.

Q     Because you have determined that in your professional opinion that Mr. Sinisterra does not suffer from mental retardation, he is not barred, based on my understanding and I would assume yours, under Atkins from having a sentence of death imposed should he lose all of his appeals or postconviction claims; is that fair?

A     Yes.

Q     So we're not really talking about an Atkins claim here. We're really talking about a quantum of mitigation evidence that the defense now alleges should have been produced at his trial; is that fair?

A     Yes.

363

Q    Okay.  Having said that, now I want to go through your reports, and I would like to start with your 2006 report, if I may.  Only because I think I want to go through this chronologically.

When you look at that report -- you have it before you.  Feel free to refer to it.  If I misstate anything, please tell me.  On page 1 of your report you have a subtitle referred to as relevant background information?

A    Yes.

Q    And in that paragraph you indicate that during the clinical interview he, being Mr. Sinisterra, admitted that he had been involved with the drug cartel but vehemently denied that he had committed the crime he is being charged with, noting that he had confessed under duress after he was told that confessing to the crime would help his outcome at sentencing.  So that's what he told you in 2006?

A    Yes.

Q    And, in essence, a very important factor related to the crime he denied actually having done the shooting to you, correct?

A    Yes.

Q    However, in 2011 when you interview him, he has changed that story and he does tell you that, well, in fact he did do the shooting but that he was told to do it by his boss, a man named Edwin Hinestroza; is that correct?

364

A    Yes.

Q    So a very critical fact that was relayed to you by the defendant himself in 2006 turns out, at least by his own admission in 2011, to not be true?

A    Yes.

Q    He also during that background interview denied with you having any previous involvement with the law, particularly in Columbia as he was growing up, and that was information that you verified through your interviews with his mother and his sister?

A    And I spoke about it in my report too that that was inconsistent between 2006 and 2011.

Q    That's right.  But in 2006 he denied any involvement with the law, but then in 2011 when you re-interviewed him, he has admitted that there was some involvement in the law?

A    Yes.

Q    Okay.  And there is an Exhibit 24 that you probably -- maybe you have or haven't seen it.  I'll show it to you in paper form.  This was, I'll submit to you, a social history report prepared by Mr. Sinisterra's former counsel at the trial, and on the back page -- you don't have to read every bit of it -- there is a discussion of criminal history that she has said to have obtained from Mr. Sinisterra.  Would you please look at that?

A    Yes.

365

Q    In that typewritten social history report it is recounted by former counsel that there is a suspicion that Mr. Sinisterra was involved in a homicide in '95 or '96 where, I believe, he was shot and hospitalized, a gun in a car incident, a marijuana -- and two different marijuana possession type events.  Did he report those to you?

A    I don't think he reported that to me.  We were -- in fact, in my report when I was talking about it, I was more concerned during his childhood; and now if you remember, I wrote in my report about the discrepancy, and then he indicated that that discrepancy had occurred maybe because he didn't understand what I was asking, but I don't remember him telling me about that event in Houston.

Q    Correct.  And I think in 2011 when you interviewed him, he indicated that he didn't understand that you meant by significant that meant anything that put him in a home but he was put in a juvenile detention facility and whether you want to call that significant or not, regardless of the fact, it was not reported to you in 2006 by the defendant?

A    That's correct.

Q    In the next paragraph you indicate, sir, that Mr. Sinisterra was able to correctly recall portions of his history but portions of such information had to be obtained from records and interview with his mother and sister.  I understand the interview with mother and sister was a phone call you made

during this assessment period, correct?

A    Yes.

Q    What records did you look at to verify his history, do you recall?  Because your report says you were given records. To my knowledge, there are no real records other than court records associated with this proceeding that exist.  Can you tell me what you looked at?

A    Well, in fact, I looked at the social history that have been gathered until that time and factors like that and, of course, all the records that were provided by Mr. Jenab to me related to the proceedings that had taken place, so on, as well as testing and things like that, and so on.

Q    So it would be records associated with the criminal proceedings that you had been retained to represent him in rather than educational records in Columbia or hospital records or something like that?

A    In fact, you notice in my report I wrote that those records had never been produced in my report in 2011.

Q    I just want to make sure from that phrase I wasn't missing a record that you might have been given.

You had mentioned in your testimony and it's recounted in your 2006 report about him going to work at a very tender age, and you make note that even in Columbia that could be considered statutory child abuse based upon the age he's going to work?

367

A      Yes.

Q      That's not particularly uncommon that males in impoverished nations go to work at a very young age, is it?

A      No.  But it does not make it right.  It is statutory child abuse and it has repercussions for him, for his brain, and for him as a person.  It also not only happens in impoverished nations, it also happens in our nation unfortunately.

Q      That's correct.  What I mean by that, and I'm not trying to suggest that doesn't have an impact on him, but it's not a unique factor to Mr. Sinisterra?

A      Oh, absolutely not.

Q      In fact, in some of the cases you've been -- that you represented in courts before like the Manuel Velez case, he was very similarly put to work at a very young age during your assessment?

A      Yes.

Q      Is that correct?

A      Yes.

Q      And because of the lack of records that we've discussed, oftentimes, because you've been brought in what I would call the back end, and I don't mean that in a derogatory fashion, but you've been brought in later, there's not a lot of records to rely upon so you have to rely on self-reporting, correct?

368

A    Partially, yes.

Q    And you indicated as a clinician, self-reporting is very important and you looked to try to corroborate that information to the best of your ability?

A    Yes.

Q    Sometimes that's through interviews of other people, family members, neighbors, whatever.  There's always a danger, I think -- well, let me ask it this way:  Mr. Sinisterra when you went to him in 2006, knew who you were, correct?

A    Can you --

Q    You introduced yourself?

A    Oh, yes, I introduced myself, and he had been told by Mr. Jenab that I was going to evaluate him.

Q    And he knew you were employed on his behalf?

A    Yes.  To his level of understanding, I'm sure that he knew that I was working on his behalf, yes.  I would suspect so, yes.

Q    And that you were there in 2006 which was some six years after he had been convicted and sentenced to death, correct?

A    Yes, counsel.

Q    Of course, you knew his appeals had run at that point and the pending 2255 litigation was the last legal recourse he had to set aside his verdicts?

A    Yes.

369

Q    Other than clemency which, I guess, exists too so that wouldn't be fair to say, but he knew that you were there on his behalf for the legal proceedings pending in court?

A    Yes.

Q    So you are interviewing him not just as a clinician but also as a forensic neuropsychologist, correct?

A    Yes.

Q    Because there may be application of what you learn in court which is the forensic portion.  Is it fair for me to state that relying on self-reporting in a clinical state is inherently risky as you've described but maybe even more so in a forensic setting when a defendant knows why you're there?

A    I would agree with you.

Q    You would not?

A    I would agree with you.

Q    You would agree that it's even more risky?

A    Sure.  That's, for example, one of the reasons why you have to give tests to examine the validity of the data that is coming in in a formal fashion because you are concerned about the validity of the information that is coming in, yes.

Q    When you conducted the interview with Mr. Sinisterra's mother and sister in 2006, they were able to satisfy you, at least to the point that you wrote in your report, that he had been able to achieve some satisfactory adaptive milestones while living in Columbia, correct?

370

A    Some, yes, sir, and incidentally that is the case.

Q    And we're talking about things like walking by eight months, using single words by six to nine months?

A    Yes.

Q    Riding a bicycle without training wheels.  The kind of things you would expect a child who develops normally to hit those milestones?

A    Yes.

Q    And according to the report, Mr. Sinisterra was able to achieve those milestones?

A    Yes.

Q    And I noted in my reading of your reports that you were critical in 2006 of Dr. Wheelock and the manner in which he assessed Mr. Sinisterra's intellectual range, and right or wrong, I'm not here to criticize Dr. Wheelock, but whether you agreed with the way in which he did it, you and he came up with remarkably similar results; is that fair to say?

A    That is fair to say.  However, that does not make his evaluation valid simply because he got the same results.  Two people can be sent from Philadelphia to New York and arrive both in New York by two very different routes.  One could be by serendipity where the other one has the validity of knowing that he's going up and down the 95.  So I still criticize him. And, in fact, one of the main reasons why I got involved in this case when Mr. Jenab called me and asked me a question

371

whether it was correct for a person who is not a mental health professional to assess somebody psychologically.

Q And you obviously hold the opinion and still do that Dr. Wheelock should not have done that?

A Oh, absolutely. And, in fact, it's not me. I'm sure the state of Missouri or Kansas or wherever he was practicing finds that egregious because he's not a mental health professional. He's not licensed to administer those tests or has the training or experience to administer that test.

Q To be fair, grading those exams, scoring them is a little bit tricky, isn't it? Can be?

A Yes, it can be tricky.

Q Now, as we get into the testing that was done on your part, there's one thing that I wanted to get into that I thought you did a very good job of explaining is that scores have to be adjusted to account for circumstances like educational level or lack of education?

A If possible, yes.

Q If possible. You need to account for literacy versus illiteracy?

A Yes.

Q And you need to account for what I would call acculturation issues, whether a person has been acculturated in the community or not?

A Yes.

372

Q    And as I look at those, I consider those opportunities. Those are -- a person if they're literate or illiterate, they don't read, that's an opportunity lost, correct?

A    For some people, yes.  For others even though the opportunities are there, they are not able to benefit from it because they don't have the capacity; but, yes, I would agree with you they can be seen as opportunities.

Q    If a person had the ability to function at a sufficient level, they should be able to take advantage of those opportunities?

A    Yes.

Q    And in Mr. Sinisterra's case we know that from at least all the reports we have, whether there are documents to support it or not, but all the other reports he was out of school by the first grade and that he does not read, I think you said, to this day in either English or Spanish?

A    Yes.

Q    So in addition to those two factors, he was a man born and raised in Columbia who came to this country who had acculturation issues as well to deal with?

A    Yes.

Q    Okay.  And you've accounted for those in your results, which is one of the reasons, I believe, that -- well, one of many reasons by which even though he has a low general intelligence ability or IQ in the range that could possibly be

373

mentally retarded, you have opined that he is not suffering from mental retardation; is that correct?

A     No.  I opined about the issue of mental retardation not because of the IQ scores because I think -- and I was sharing this when the finding came up with counsel, I opined because of his adaptive skills, not because of his IQ.  If he had had more impaired adaptive skills that would be exhibited at some point in time in his lifetime, the IQ score of 71 and Wheelock, 75, my previous one, I forget, they are very close, would meet the criteria in my mind for mental retardation because you can even see the flavor of his impairments even in the data that is coming in his responses in abstract reasoning, and so on.  It is predominant because of the adaptive achievements, even though they are very little, very limited that he was able to achieve that, I have not adopted or triggered a diagnosis of mental retardation.

Q     And as we did in your report of 2006, I believe it's at the bottom of page 9, you began to discuss those adaptive functions, and you talk about several things that he was able to do that you thought were noteworthy, such as his ability to come to the U.S. through a border crossing, I believe you described at one point as a banana boat without assistance?

A     Yes.

Q     You described his ability to make friendships, and I guess chief among them would be that he found an American

374

citizen, non-Spanish speaking woman that he married and had children with?

A   Yes.  And also he had other relationships as well in the past, and he also sent funds to his family in Columbia trying to help them over there.  So these are altruistic adaptive variables that are usually not seen in someone with mental retardation, even though I believe that he's not too far from it, but I opined that he was not.

Q   Okay.  And some of the other ones I think are important for the record to reflect is that you were aware and reported that he had been able to obtain a driver's license and purchase transportation that was a truck essentially in this country?

A   I'm not sure if I spoke about that.  One of the things that I discovered about that is that he may not have passed his own driver's license test, that someone else may have taken it for him.  I'm not sure.  Counselor, it's not one single variable or the other.  It's a multiplicity of factors that led me to believe that adaptation was higher than what you would expect in a person with mental retardation.

Q   And so based upon the multiplicity of factors, that's the driving force behind the conclusion that you ultimately reached?

A   Yes, counsel.

Q   Okay.  As we progress in here, you do, however, opine about his inability to plan, and I want to talk about that

375

because it was one of the issues shown to you in the exhibits, I believe 21 and 22, that were the special verdict forms from the trial in 2000. When you were talking about planning, Doctor, I heard you use the phrase "master plan" like a strategist who was planning an invasion of Normandy, so to speak. Okay. I will submit to you that the substantial planning that is submitted in the instructions talks about substantial planning and premeditation; in other words, something happening not at the spur of the moment but at a preceding time and then that plan was carried out. I don't believe there's a correlation between master and substantial in that way. Is that fair for me to say that to you or I give you that information?

A     That's like to me like an opinion more than a question, I guess. I'm not sure. But I used the term "master planning" to say that he has the ability to premeditate long term to create a plan, and so on. In fact, throughout the entire documents he doesn't come as a person who is in charge of this operation. Hinestroza actually who comes in charge of the operation, not him.

Q     I will not disagree with you. I was the one who tried this case. I'll never dispute that Mr. Hinestroza was in charge. But other people were members of this and I would like to know if you were aware of the facts that were adduced at trial and ultimately accepted by the jury that Mr. Sinisterra

376

had participated in a meeting in Columbia -- or excuse me -- in Houston, Texas, on Thanksgiving 1998 wherein the plan to discuss coming to Kansas City murdering someone was first broached. Were you aware of that fact?

A     I may have read that but --

MR. GABRIELSEN:  Judge, I'd like to enter an objection.  I believe that is a misstatement of the record. Mr. Sinisterra was outside the presence of the folks that were in the house during the so-called Morocco meeting that day.

MR. VALENTI:  I'll reclarify.

Q     (By Mr. Valenti)  There was a meeting in Houston, Texas, on Thanksgiving Day in 1998 where the discussion to come to Kansas City and someone was going to pay for the money that was lost and that Mr. Sinisterra was outside the meeting in the parking lot?

A     Yes.

Q     Were you aware of that fact?

A     I think I remember reading that, yes.

Q     Were you aware that the surviving victim in this case, Herberth Andres Borja-Molina, had reported that previously Mr. Sinisterra offered to kill someone else for him?

A     I don't recall that one, but I may have read it also, but I don't recall that.

Q     Were you aware that Mr. Sinisterra picked up codefendant, Plutarco Tello, and drove him to Kansas City in

377

Mr. Sinisterra's Mazda pickup truck; do you recall that?

A    Yes.

Q    Were you aware that they checked in to the Drury Inn hotel in Overland Park, Kansas, and ultimately had to change hotel rooms, I think, because of some problem?

A    Yes.

Q    Were you aware that Mr. Tello, Mr. Sinisterra, and another defendant, Mr. Ortiz, had flown to Kansas City separately, then called Mr. Hinestroza and agreed and met up with him to go carry out their ruse on two people they intended to kill?

A    I don't recall that one, but, again, I may have read it, but I'm aware of some of these factors and they do not change my opinion because one of the factors -- you see, counselor, when it comes to these sets of skills, we can't have our cake and eat it too.  We can say that how much does it take to get in a car when somebody had told you to go someplace and go and do something when we forget about the great planning abilities in the history of human kind.  Okay.  You see what I'm saying?

Q    Yes, I do, sir.

A    So we have to take these skills within the context of not just -- you know, if you say to me how much planning does it take for me to plan to step outside and go kill somebody?  Well, that doesn't take a lot of planning.  It takes a heck of

Case 4:04-cv-08003-GAF    Document 121    Filed 02/19/13    Page 88 of 103

lot of planning to put a man on the moon.

Q    I agree with that.  But it does take a lot of planning to get three killers from Houston, Texas, to Kansas City, starting in Kansas then over to Missouri, to execute two men, doesn't it?

A    I would disagree with that.

Q    Okay.  Well, Mr. Sinisterra was part of the drug cartel.  Would you agree with that?

A    Yes.

Q    And you put a lot of stock in the fact that he came to Kansas City without a weapon.  Do you recall having provided that information?

A    Yes.

Q    Of course, the cartel that Mr. Sinisterra was a member of had cells, one of which was in Kansas City run by Edwin Hinestroza, correct?

A    Yes.

Q    And that cell had plenty of drugs and plenty of money and plenty of weapons here.  And, in fact, they supplied the weapons once Mr. Sinisterra got here, didn't they?

A    Yes.

Q    Doesn't it seem inherently dangerous to drive from Houston, Texas, to Kansas City, Missouri, carrying a firearm if you intend to commit a murder versus showing up and having one given to you?

379

A     That would require an opinion on my part that I don't even know how to opine, but I will see that as a poor adaptive skill not to have one during that business.

Q     You don't think it would be dangerous to travel -- I don't know how far Houston is to here.  I would say a thousand miles.

A     Probably so, 900.

Q     Dangerous to drive a thousand miles with a weapon in your hands if you had ill in your heart?  It seems a lot better to drive with nothing on you, doesn't it?

A     Again, not when you're in his kind of business.  If we're saying that he is an individual whose job is to kill people, and so on, then why would you want to travel 980 miles and not carry a weapon yourself?  But, again, it's just one of the factors that I'm using.  You know, not the only factor to claim that he has poor planning skills.

Q     Rather than go through all the other factors associated with it, I would submit to you there were many other factors about where they went, when they went, they got there on time, and the efforts to dispose of Mr. Colon's body that I would argue showed planning but you don't believe so?

A     That's correct, counselor.  I guess, you know, in general sometimes we have to agree to disagree.

Q     I understand.  And that's fair.  I just want to make sure you had been apprised of those facts and you determined

Case 4:04-cv-08003-GAF     Document 121     Filed 02/19/13     Page 90 of 103

whether they changed your opinion.

Now, as we go to your 2011 report, we've already talked about the two instances where in 2006 he denied vehemently being involved in the shooing but now admitted he had done it at Hinestroza's orders and his criminal history, so I'll skip that.

Instead I'll ask you, as I'm reading through the report your opinion has I don't believe changed although you've incorporated more of the physical and sexual abuse that has been brought to your attention into the report; is that fair?

A     That's correct.  As a scientist, clinician, practitioner, and a forensic practitioner, in fact, I still remain open to changing my opinions on the basis of new data that comes in.  That is the role of an open-minded expert; and so, yes, when that data began to come in, I also included it in my opinion and in the interpretations of the data, sir.

Q     And, in fact, you had that at page 21 of your report you indicate that should it be necessary to change your opinion, you would do so based upon new data?

A     Yes, sir.

Q     Which is one of the reasons I've been asking you about all these issues related to the murder to see if that changed your opinion.

A     Thank you, counsel.

Q     On page 16 of your report when you get into the

381

discussion of cognitive difficulties, you talk specifically about when the timing of when those cognitive difficulties may have come in, and you opined that, I believe, the cognitive difficulties in all likelihood preceded his academic difficulties and precluded him from profiting from formal instruction in school in Columbia, not to mention as an adult?

A    Yes.

Q    How do you come to the conclusion of the cognitive difficulties preceding that because there's such a dearth of records or supporting documentation for that.  I'd like to know how you fleshed that out if you could.

A    Sure.  I mention in my testimony when defense counsel was asking me, for example, let me start with the very good one and that is there's data coming in now that suggests that his own father, his biological father may have been impaired himself, definitely had a lot of problems as reported by multiple people now.  So to start with, we have a hereditary or a genetic component to start with.

Second, he did have opportunities.  In fact, definitely as an adult when he comes to the United States or when he came to the United States, for example, he never pursued his GED, and so on, so having the opportunity and not taking advantage of such opportunities bespeaks that there's something more so than simple learning disorder capable of accounting for his problems.

382

In addition to that, the fact that the individual is abused and what we know about abuse on the human brain based on the work of Bruce Perry and other modern researchers, I would suspect that whatever happened to him was partially congenital and partially something that took effect very early on in his life. Clearly he living in Cali and having left his house to live by himself, homeless did not help his lot. Factors such as I indicated here, malnutrition, lack of stimulation, and so on, would have led to his brain changing and causing some of the difficulties. So that's what I mean these factors began very early on, not later on in life.

Q    When you discuss his inability or not exercising or taking advantage of opportunities, like getting his GED or reading, that also is a function of desire, isn't it? A person has to choose to go after that goal.

A    Actually, I disagree with that, counselor. We are learning that we today from studies even at the NIH, counselor, the frontal lobes -- in fact, if we look at the studies in schizophrenia the lobotomies, where they took place in our great country many years ago, the persons no longer are schizophrenic because now they didn't have volition. I think we make the mistake --

Q    Did you say --

A    Volition.

Q    Okay.

383

A    They didn't have the will to do anything.  They didn't have schizophrenia anymore because they just sat there, and this is what they did.  You have destroyed the center of the circuitry in their brain that is responsible for even wanting to get up to do something.  Okay.

One of the things that I think we make a mistake is we attribute more holistic factors when we find those kinds of data in these people when they find themselves in these situations, and what we are discovering is that it is not a lack of will or desire or motivation, it's that their brains are abnormal and that's what causes them not to even have motivation or desire.

Incidentally, I want to let you know something, counselor, and that is that it is even true in healthy people. We could come and say that I chose to work at the University of Maryland that I not have enough desire that I want to work -- say I should have wanted to work at Yale University, more prestigious.  You see what I'm saying?

Q    My special agent went to Maryland so I wouldn't suggest to denigrate Maryland.

A    I appreciate that.  So, in any event, we have to be very careful in attributing -- now had his intellect been normal, had he had excellent adaptation, had he not had the history that he had, then I would have agreed with you a hundred percent that it is lack of will, lack of desire to

384

better himself as a human being, but not with this course, not with his history.

Even if you take away some of the historical factors, other people will argue that this is central nervous system, particularly his frontal lobe not wanting to give him this, quote, desire or motivation to do better with himself.

Q    I know of no empirical way to describe the frontal lobe or any other part of the brain essentially not providing him a desire.  I know that someone can say I want to read today or I want to get my education or I want to try, and that didn't happen.  I mean, a lot of cases it doesn't happen if someone doesn't take care of their opportunity; is that true?

A    That's true.

Q    I lost my train of thought.  What I was going to say leads me to think, though, that people who involve themselves in criminal acts have exercised choice or desire or will, correct?

A    In some instances, yes; in others, no.  If you are six years of age and the pulp is being beaten out of you in your house and you have to leave your house and move from Baltimore, Maryland, to Oregon, to Portland, Oregon, because it's a city that provides great resources for homeless in this country, regardless of why they are there, in some cases you even -- in fact, the DSM or the American Association, as you put it, of Mental Retardation, AAMR, talks about how adaptive behaviors in

385

some individuals may be positively adapted even though they include criminality or stealing or something like that, because it has to go to the survival of the individual.

So, for example, when he left his home in Buenaventura and goes to Cali to live by himself, one of the reasons why he ends up in one of those orphanages or whatever we want to call them, those homes, because he was caught stealing. Well, that may not be perceived as criminality by most clinicians, including this one here. It is perceived as an adaptive function because he has to eat so he is going to steal something to be able to eat that night.

Q    Understood. An Oliver Twist situation. I certainly understand where we're coming from. But I'm talking about, however, a man who lives and stays in the home, cooks for the family who has joined a drug cartel and comes to Kansas City knowing, at least in the best case scenario for him, that he's here to collect money on a drug debt?

A    Yes.

Q    Those are volitional acts?

A    I would agree with you, yes. They are poor judgment and poor acts but they are volitional.

Q    Correct. And when you talk further about adaptive functioning, one of the functionings that is necessary to examine as a clinician or forensic neuropsychologist is safety issues, and you specifically mentioned that he came into

386

illicit activity which led to his arrest and put him amongst a bad crowd essentially and how that is in demonstration of bad adaptive functioning relative to his safety, correct?

A Uh-huh.

Q That would also be true pretty much for anybody in the criminal justice system that you looked at. They would have made, from a safety standpoint, bad decisions based upon their association?

A Yes.

Q When we get to the summary of your report, essentially the conclusions of the report, when you are assimilating the new data into it, you have talked about many of the new things, but some of the strengths, what I would call, that you describe in your 2006 report, such as the friendships, the traveling, and all that are not really discussed any further or brought forward in the 2011 report. Those strengths still exist, correct?

A Yes. I still believe they exist, counsel.

Q And though not discussed in any real detail in the 2011 report, you would still maintain that those strengths are sufficient in your mind to lead you to the conclusion that while low functioning, not a man that suffers from mental retardation?

A You are correct, counselor.

MR. VALENTI: May I have one moment, Your Honor?

387

That's all I have, Your Honor. Thank you.

THE COURT: Thank you.

Mr. Gabrielsen.

MR. GABRIELSEN: Thank you, Your Honor.

REDIRECT EXAMINATION BY MR. GABRIELSEN:

Q Dr. Llorente, in Mr. Valenti's cross-examination he had you discuss the list of cases that you supplied to us with your CV and your report. Do you recall his discussion with you?

A Yes.

Q Okay. I think the implication, the inference he would have us draw that you always find an opinion for the defendant that you evaluated. Is that true in all these cases?

A Absolutely not.

Q And is it particularly not true with respect to some of the evaluations you did in mental retardation in some of the Texas death penalty cases?

A That is correct. In fact, if you look at that list, there's two that come to my mind, one is the Rocha case and the other one -- I'm blocking on his name. If you could show it to me, I would point it out to you.

Q Is it the Salazar case?

A Salazar. Thank you, sir.

In those two cases, for example, I opined that those individuals were not mentally retarded, and I think Mr. Salazar is no longer alive. The state of Texas exercised the death

388

penalty, and the other individual is I think as well. And then in that entire list there's many other of those cases that are death penalty cases where I opined that those individuals were not mentally retarded even though I was working for the defense.

Q     Mr. Valenti pointed out that German was not candid with respect to the shooting with you in the 2006 and the 2011 report. Do you recall that discussion?

A     Yes.

Q     As we discussed on direct examination, by that change it also showed there was more trust in the interviewer at that point?

A     Yeah, that's a possibility as well. It's hard to say why that is not in there. I think the important thing to realize is that he did share that information the second time and also that I got it in my report. I was not trying to hide discrepancies between 2006 and 2011 and I just share in my report what that is.

You know, it can be fear. It can be shame. It can be many other factors why he would not share. Lack of rapport established with me as a clinician and forensic evaluator, as Mr. Valenti very well pointed out. You know, sometimes this issue of rapport is very important when you are meeting a client. So even though they know you are working in their case for the defense counselor, and so on, it doesn't necessarily

Case 4:04-cv-08003-GAF     Document 121     Filed 02/19/13     Page 99 of 103

mean that they are willing to share all of the information, that they are very forthcoming.

And it also, I will say, in particular for an individual -- and I recommend that the Court in that regard may want to read the scientific work of a gentleman who made great strides to try to understand these factors, and I jotted it down in my report, which is the work of Gudjonsson, Footnote No. 23. And I'm going to read this title for you because it's important and I'm going to touch on it. "The relationship between confabulation and intellectual ability, memory, interrogative suggestibility and acquiescence, published in the great journal of Personality and Individual Differences." Gudjonsson spent a large portion of his lifetime trying to study how people who did not enjoy normal intellectual skills would function during the course of interrogations which they may perceive as being more duress, but he also studied how people with lower levels of intellect would essentially confabulate sometimes, not because they recognize that they were confabulating but because it is masking, and we know that now that people -- it doesn't always have to be people with mental retardation. In fact, as far as we are concerned in the field, there is not a lot of difference between somebody who has an IQ of 75 and an IQ of 81.

In fact, in the legal literature, for example, if you look at the work of Shur, S-h-u-r, when he talks about the

condition of mental retardation, and so on, if you look at that study, you see that the IQs of those individuals, they were not all mentally retarded, yet they did not understand some of the legal concepts. The same things applies here. So it doesn't necessarily mean that he was trying to show himself in the light he was not being or that he was not being forthcoming. Could it also be that? Yes. It could also be that. But it's difficult to tell.

Q    Mr. Valenti brought to your attention that German may have been involved in some illegal act in Texas in 1995 or 1996 with regard to a shooting and marijuana, things of that regard. Do you recall discussing that with Mr. Valenti?

A    Yes, sir.

Q    Has the government deposed you in this case?

A    No.

Q    So the government forwent the opportunity to provide you any documentation as to that incident; isn't that correct?

A    Yes.

Q    Can you offer an opinion as to whether that kind of conduct and any other criminal conduct in German's lifetime has any effect on your opinion when you haven't been provided any documentation of the facts?

A    No, it doesn't have an effect and my opinions continue to be the same.

Q    If the information were provided to you, it might

affect your opinion?

A    Absolutely.  If you can provide school records tomorrow showing that this individual went to school to the fifth grade or the tenth grade or the twelfth grade, I would change my opinion.  If you are also able to provide data suggesting that somehow he was able to be tested in Columbia, let's pretend for a moment, by a school district or somebody like that and some prior clinician before the age of 18 assigned the diagnosis of mental retardation to him, then I will also change my opinion in that regard and in that direction.

Q    And then finally one last area in which Mr. Valenti inquired.  The discussion of the travel from Houston to Kansas City to perform acts on behalf of the cartel.  Have any -- are you aware of any facts disclosed in this case who did the driving?  Who decided when to stop for lunch?  Where they gassed up?  Any of those facts?

A    No, counsel.

Q    So, in short, we don't really know who planned most of those activities?

A    That's correct.  Yes.

        MR. GABRIELSEN:  Judge, that's all I have.

        MR. VALENTI:  Nothing further, Your Honor.

        THE COURT:  All right.  Thank you, Dr. Llorente. You're excused.

        THE WITNESS:  Thank you, Your Honor.

392

(Witness excused.)

THE COURT: Is that all you have today, Mr. Gabrielsen?

MR. GABRIELSEN: That's all we have.

THE COURT: And will Dr. Stewart be here at nine o'clock?

MR. GABRIELSEN: We expect so.

THE COURT: Okay. That doesn't sound terribly reassuring. Are there travel difficulties?

MR. GABRIELSEN: No, there aren't at this point. He's on schedule. But he and I went to Terra Haute in October and Hurricane Sandy caused his plane not to leave Cleveland for Indianapolis and he drove all night. We can't account for that. I spoke to him last night and he's got a flight this afternoon and he's supposed to be here.

THE COURT: All right. We'll be adjourned until nine o'clock tomorrow morning.

(Court adjourned at 11:57 a.m. until 9 a.m. on Friday, January 25, 2013.)