IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

GERMAN C. SINISTERRA,          )
                                     )
             Movant,       )
                                     )
     vs.                  )  Case No.
                                   )  04-CV-08003-GAF
UNITED STATES OF AMERICA,     )
                                   )
             Respondent.   )

TRANSCRIPT OF PROCEEDINGS
VOLUME IV
PAGES 394-503

On January 22, 2013, through January 25, 2013, the above-entitled cause came on before the Honorable Gary A. Fenner, United States District Judge, sitting in Kansas City.

APPEARANCES

For the Movant:             Mr. Timothy M. Gabrielsen
                              Federal Public Defender's Office
                              District of Arizona
                              407 West Congress, Suite 501
                              Tucson, Arizona 85701

                              Mr. John Jenab
                              Jenab & McCauley LLP
                              110 South Cherry, Suite 103
                              Olathe, Kansas 66061

For the Respondent:        Mr. Jeffrey E. Valenti
                              Ms. Lajuana M. Counts
                              United States Attorney's Office
                              400 East Ninth Street, 5th Floor
                              Kansas City, Missouri 64106

Katherine A. Calvert, RMR
United States District Court Reporter
Charles Evans Whittaker Courthouse
400 East Ninth Street
Kansas City, Missouri 64106
(816) 512-5741

394

I N D E X                                    Page

JANUARY 22, 2013

VOLUME I

MOVANT'S EVIDENCE

JENNIFER HERNDON
     Direct examination by Mr. Jenab . . . . . . . . . . . .  17
     Cross-examination by Mr. Valenti. . . . . . . . . . . .  34
     Redirect examination by Mr. Jenab . . . . . . . . . .  69
     Recross-examination by Mr. Valenti. . . . . . . . . .  73

FRED DUCHARDT
     Direct examination by Mr. Jenab . . . . . . . . . . . .  76
     Cross-examination by Mr. Valenti. . . . . . . . . . . . 100
     Redirect examination by Mr. Jenab . . . . . . . . . . 133
     Recross-examination by Mr. Valenti. . . . . . . . . . 137

DAN GROTHAUS
     Direct examination by Mr. Gabrielsen. . . . . . . . . 139
     Cross-examination by Mr. Valenti. . . . . . . . . . . 154
     Redirect examination by Mr. Gabrielsen. . . . . . . . 163

JUANITA CHAVEZ
     Direct examination by Mr. Gabrielsen. . . . . . . . . 166
     Cross-examination by Mr. Valenti. . . . . . . . . . . 180
     Redirect examination by Mr. Gabrielsen. . . . . . . . 182

ENRIQUE DOS SANTOS (by videotaped deposition). . . . . . . 183

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 2 of 110

I N D E X                                            Page
(continued)

JANUARY 23, 2013

VOLUME II

RUSSELL STETLER
     Direct examination by Mr. Gabrielsen. . . . . . . . . 197
     Cross-examination by Mr. Valenti. . . . . . . . . . . 235
     Redirect examination by Mr. Gabrielsen. . . . . . . . 243

HECTOR GUEVARA
     Direct examination by Mr. Gabrielsen. . . . . . . . . 246
     Cross-examination by Mr. Valenti. . . . . . . . . . . 281
     Redirect examination by Mr. Gabrielsen. . . . . . . . 288

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 3 of 110

I N D E X                                                    Page
(continued)

JANUARY 24, 2013

VOLUME III

ANTOLIN LLORENTE
     Direct examination by Mr. Gabrielsen. . . . . . . . . 302
     Cross-examination by Mr. Valenti. . . . . . . . . . . 358
     Redirect examination by Mr. Gabrielsen. . . . . . . . 388

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 4 of 110

I N D E X                                    Page
(continued)

JANUARY 25, 2013

VOLUME IV

PABLO STEWART
      Direct examination by Mr. Gabrielsen. . . . . . . . . 406
      Cross-examination by Mr. Valenti. . . . . . . . . . . 453
      Redirect examination by Mr. Gabrielsen. . . . . . . . 472

RESPONDENT'S EVIDENCE

MICHAEL OYLER
      Direct examination by Mr. Valenti . . . . . . . . . . 478
      Cross-examination by Mr. Jenab. . . . . . . . . . . . 485

Reporter's certificate . . . . . . . . . . . . . . . . . 503

398

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | First amended 2255 petition 3/1/09 | 15 | 15 |
| 2 | 3/1/09 affidavit of Jennifer Herndon | 15 | 15 |
| 3 | 11/26/06 statement of Frederick Duchardt | 15 | 15 |
| 4 | 10/31/07 affidavit of Jennifer Herndon | 15 | 15 |
| 5 | 10/31/07 declaration of Dan Grothaus | 15 | 15 |
| 6 | 12/2/98 order appointing Fred Duchardt | 15 | 15 |
| 7 | 12/13/98 order appointing Jennifer Herndon | 15 | 15 |
| 8 | 4/11/00 trial transcript | 15 | 15 |
| 9 | 3/23/01 trial transcript | 15 | 15 |
| 10 | 3/23/01 trial transcript | 15 | 15 |
| 11 | 3/23/01 trial transcript | 15 | 15 |
| 12 | 7/1/99 letter from Hector Guevara to Frederick Duchardt | 15 | 15 |
| 13 | 4/10/00 letter from Frederick Duchardt to Enrique Dos Santos | 15 | 15 |
| 14 | 12/22/98 request for funds to hire investigator/ mitigation specialist | 15 | 15 |
| 15 | 2/11/99 order | 15 | 15 |

399

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 16 | 3/4/99 request for funds to hire interpreter | 15 | 15 |
| 17 | 8/13/99 second request for funds to hire interpreter | 15 | 15 |
| 18 | Juanita Chavez' billing records | 15 | 15 |
| 19 | Juanita Chavez' notes | 15 | 15 |
| 20 | 3/13/00 letter from Judge Hays to Jennifer Brewer | 15 | 15 |
| 21 | Death penalty special verdict – Count II | 15 | 15 |
| 22 | Death penalty special verdict – Count III | 15 | 15 |
| 23 | Federal Death Penalty Act mitigating factors | 15 | 15 |
| 24 | Dan Grothaus' notes | 15 | 15 |
| 25 | 5/10/00 letter and invoice from Dr. Dos Santos to Fred Duchardt | 15 | 15 |
| 26(a) | Dr. Llorente's curriculum vitae | 15 | 15 |
| 26(b) | Dr. Llorente's case list | 15 | 15 |
| 27 | 3/1/06 Dr. Llorente report | 15 | 15 |
| 28 | 3/7/11 Dr. Llorente report | 15 | 15 |
| 29(a) | Hector Guevara's 7/17/06 curriculum vitae | 15 | 15 |

400

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 29(b) | Hector Guevara's 2012 curriculum vitae | 15 | 15 |
| 30 | Russell Stetler's curriculum vitae | 15 | 15 |
| 31 | Russell Stetler's declaration | 15 | 15 |
| 32(a) | Rosalia Valencia Candelo video Part 1 | 15 | 15 |
| 32(b) | Rosalia Valencia Candelo transcript Part 1 | 15 | 15 |
| 33(a) | Rosalia Valencia Candelo video Part 2 | 15 | 15 |
| 33(b) | Rosalia Valencia Candelo transcript Part 2 | 15 | 15 |
| 34(a) | Rosalia Valencia Candelo video | 15 | 15 |
| 34(b) | Rosalia Valencia Candelo transcript | 15 | 15 |
| 35 | 2/1/10 Hector Guevara's notes of Beatriz Candelo telephone conversation | 15 | 15 |
| 36 | 7/27/10 Hector Guevara's notes of Beatriz Candelo telephone conversation | 15 | 15 |
| 37(a) | Beatriz Candelo video | 15 | 15 |
| 37(b) | Beatriz Candelo transcript | 15 | 15 |
| 38(a) | Gustavo Viveros video | 15 | 15 |
| 38(b) | Gustavo Viveros transcript | 15 | 15 |

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 8 of 110

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 39 | 3/3/11 Gustavo Viveros declaration | 15 | 15 |
| 40(a) | Gustavo Viveros video | 15 | 15 |
| 40(b) | Gustavo Viveros transcript | 15 | 15 |
| 41 | Gustavo Viveros declaration translation | 15 | 15 |
| 42(a) | Segundo Sinisterra video | 15 | 15 |
| 42(b) | Segundo Sinisterra transcript | 15 | 15 |
| 43(a) | Segundo Sinisterra video | 15 | 15 |
| 43(b) | Segundo Sinisterra transcript | 15 | 15 |
| 44 | 3/3/11 Segundo Sinisterra declaration | 15 | 15 |
| 45 | 12/11/12 Segundo Sinisterra declaration translation | 15 | 15 |
| 46 | Pablo Stewart's curriculum vitae | 15 | 15 |
| 47 | Pablo Stewart's report | 15 | 15 |
| 48 | 1989 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases | 15 | 15 |

Case 4:04-cv-08003-GAF    Document 122    Filed 02/19/13    Page 9 of 110

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 49 | 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases | 15 | 15 |
| 50 | 1998 Spencer Report | 15 | 15 |
| 51 | 2010 Spencer Report | 15 | 15 |
| 52 | Hector Guevara's billing records | 15 | 15 |
| 53 | German Sinisterra social history | 15 | 15 |
| 54 | Beatriz Candelo transcript | 15 | 15 |
| 55(a) | 12/27/09 Rosalia Valencia Candelo video excerpts | 15 | 15 |
| 55(b) | 12/27/09 Rosalia Valencia Candelo transcript excerpts | 15 | 15 |
| 56(a) | 7/3/10 Rosalia Valencia Candelo video excerpts | 15 | 15 |
| 56(b) | 7/3/10 Rosalia Valencia Candelo transcript excerpts | 15 | 15 |
| 57(a) | 3/8/11 Beatriz Candelo video excerpts | 15 | 15 |
| 57(b) | 3/8/11 Beatriz Candelo transcript excerpts | 15 | 15 |
| 58(a) | 3/4/11 Gustavo Viveros video excerpts | 15 | 15 |
| 58(b) | 3/4/11 Gustavo Viveros transcript excerpts | 15 | 15 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59(a) | 3/3/11 Segundo Sinisterra video excerpts | 15 | 15 |
| 59(b) | 3/3/11 Segundo Sinisterra transcript excerpts | 15 | 15 |
| 60(a) | 12/5/12 Enrique Dos Santos deposition video | 15 | 15 |
| 60(b) | 12/5/12 Enrique Dos Santos deposition transcript | 15 | 15 |

FOR THE GOVERNMENT:

| | | | |
|---|---|---|---|
| 1 | FBI 302 form with documents | 480 | 480 |
| 2 | Overland Park Police Department continuation report with documents | 481 | 481 |

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 11 of 110

JANUARY 25, 2012

MORNING SESSION

THE COURT: Good morning again.

Mr. Gabrielsen, ready to go this morning?

MR. GABRIELSEN: Yes, sir, we are, Your Honor.

THE COURT: All right.

MR. GABRIELSEN: Judge, this morning we're calling Dr. Pablo Stewart as a witness.

THE COURT: Doctor, would you come up.

MR. GABRIELSEN: If the government doesn't object, may the doctor have the report and notes with the interview of the client with him?

MR. VALENTI: No, sir.

THE COURT: That's fine.

Have a seat up here and before you are seated have my clerk swear you in.

PABLO STEWART, being sworn by the courtroom deputy, testified:

MR. GABRIELSEN: Judge, before I begin, this might be a little unusual. I would like Dr. Stewart to remain in the courtroom. The government has a witness that they noticed this morning, and it might be necessary for us to obtain Dr. Stewart's reaction to whatever evidence that might be. And to tell the Court the truth, I don't know what that evidence exactly is going to encompass but we tendered 302 forms and other materials and it may be necessary Dr. Stewart be recalled

405

after their witness testifies.

MR. VALENTI: I don't care.

THE COURT: That would be fine.

MR. GABRIELSEN: Thank you, Your Honor.

DIRECT EXAMINATION BY MR. GABRIELSEN:

Q    Could you please state your name for the record.

A    Pablo Stewart. Excuse me. I apologize. I've been fighting off this flu for about a week. I think it's sort of getting me right now.

THE COURT: That's all right. You have some water I see.

Q    (By Mr. Gabrielsen) What do you do for a living, sir?

A    I'm a psychiatrist.

Q    Where are you a psychiatrist?

A    I'm a psychiatrist at the University of California, San Francisco, and I also have a private consulting practice.

Q    And what do you do at the University of California, San Francisco?

A    Clinical professor of psychiatry in the school of medicine.

Q    And let's start with your academic qualifications. Where did you go to college, sir?

A    I went to college at the United States Naval Academy.

Q    What years were you at the Naval Academy?

A    I was at the Naval Academy 1969 to 1973.

Case 4:04-cv-08003-GAF    Document 122    Filed 02/19/13    Page 13 of 110

Q    And upon your graduation, what did you do from 1973 to 1978?

A    Upon graduation in Annapolis, I elected to take a position in the Marine Corps so I served as an infantry officer for five years.

Q    Where were you stationed during that time?

A    A variety of places.  In Charleston for a while, in Okinawa, in Guam.  During the time that I was in Annapolis, I had a brief tour in Vietnam.

Q    And that was during your time as a midshipman at the Naval Academy?

A    Yes.

Q    You went to Vietnam?

A    Yes.

Q    Upon leaving the Marine Corps, you enrolled in medical school?

A    Yes.  I was sworn out of the Marines on June 30th and started medical school June 30th of 1978.

Q    Very good.  And where did you go to medical school?

A    At the University of California, San Francisco.

Q    When did you graduate from there?

A    I graduated in May of 1982.

Q    When you left there, did you do any residencies or fellowships?

A    I did.  When I graduated from medical school, I stayed

407

on at the university to complete my psychiatric residency program.

Q    Where are you licensed to practice medicine?

A    I'm licensed to practice medicine in the states of California and Hawaii.

Q    Are you board certified?

A    Yes, I am.

Q    What are you board certified in?

A    I'm board certified in general psychiatry.

Q    And can you indicate to the Court what that board certification means?

A    Well, the board certification means that you graduated from an accredited medical school, you graduated from an accredited residence program.  When I did it, this is many years ago, you had to apply to take the written test, and if you passed the written test, then you were invited to do your oral examination.  If you passed all that, then you were considered board certified.

Q    And who is it that administers these boards?

A    I believe it's called the board -- American Board of Psychiatry and Neurology.

Q    And if you recall, what year were you board certified?

A    In 1990.

Q    Thank you.

    And so you presently have an academic appointment at

Case 4:04-cv-08003-GAF    Document 122    Filed 02/19/13    Page 15 of 110

UCSF?

A     Yes.

Q     And you also have a -- you engage in private psychiatric consulting?

A     Yes.

Q     Have you consulted with government agencies during your career?

A     Yes.  I've worked for the Department of Justice as a prison -- a prison monitor and prison inspector.  I do a lot of prison condition work, and I've worked for the U.S. Justice. I've worked for the city and county of San Francisco.  I've consulted with the state of California, state of New Mexico.

Q     For a period of time you worked for the Veterans Administration?

A     Yes.  My first job out of residency was running the jail psychiatric unit at the San Francisco General Hospital. After I did that for about five years, I took a lateral transfer to the Veterans Administration Hospital, both of which were administered by the university, and I ran a drug and alcohol psychiatric inpatient unit.

Q     We're going to develop this more fully later, but in your work with the Veterans Administration, did you evaluate and treat persons with posttraumatic stress disorder?

A     Yes.  When I worked for the VA, I worked for them at a couple different times, during the early '80s and then during

Case 4:04-cv-08003-GAF     Document 122     Filed 02/19/13     Page 16 of 110

the early '90s; and during those time frames, the majority of patients were Vietnam veterans. The most common psychiatric diagnosis we encountered, even in a drug and alcohol clinic, was posttraumatic stress disorder.

Q     And were your duties purely administrative or did you have hands-on contact with the patients?

A     There were administrative, then I was in charge of certain units. Also I was a practitioner.

Q     And I didn't prep you for this but is there any way you could quantify how many patients you diagnosed with posttraumatic stress disorder back in the day?

A     I remember the VA has very tight statistics they keep, and so we had -- almost 50 percent of the patients had a diagnosis of posttraumatic stress disorder and something else in addition, and on average for the five years that I worked in the aid patient unit, we averaged one new patient a day we admitted, then you had more patients you took care of. We had a new patient a day. So if you look at that, maybe that's, you know, 1500; and then half of that, at least, had PTSD, so something in that range.

Q     So you saw a lot of patients there with posttraumatic stress disorder?

A     Yes.

Q     And prior to that time when you were at the -- in the department of psychiatry as chief resident, did you treat other

410

victims of posttraumatic stress disorder?

A    During my last year of the residency program, I was the chief resident and I elected to serve that chief position at the San Francisco General Hospital, and I was assigned to the Spanish-speaking treatment ward.  We had different language based units there, psychiatric units, and it was -- that was in the early '80s when a large number of our patients were refugees from Central America, either El Salvador or Nicaragua, and the majority of those patients were suffering from posttraumatic stress disorder, as well as other psychiatric conditions.

Q    Is there a particular medical nomenclature when you treat somebody who's got PTSD and another mental illness?

A    Well, when a person has a primary psychiatric disorder like posttraumatic stress disorder and a substance-related disorder, like say alcoholism, that's referred to as dual diagnosis; but if you have two psychiatric diagnoses, like posttraumatic stress disorder and major depression, there's no special term that I'm aware of.

Q    Okay.  Thank you.

In that time, in that period when you were seeing these Central American refugees as a chief resident, can you estimate the number of these patients that you saw and the number that had posttraumatic stress disorder?

A    I was on that unit a year and, again, we averaged about

411

one new patient a day. Not all of those were Central American refugees. I would say 200 of them in a year and at least half were suffering from PTSD so that's another 100 patients.

Q     Okay. And if I ask with respect to your work with the VA, you obviously had administrative duties. Were you also hands on?

A     Yes. I was the doctor for that unit.

Q     And you indicated this was a -- many of these were Spanish-speaking patients?

A     Yes.

Q     Are you a Spanish speaker, sir?

A     Yes.

Q     How do you come about that?

A     My household growing up where both my parents were Mexican, even though my last name is Stewart -- that's a whole other story and I won't bore the Court with it. So we grew up at home speaking both languages, Spanish and English, and when I went to school, I started studying Spanish so that's how I became a Spanish speaker.

Q     And where did you grow up?

A     I grew up in east Los Angeles.

Q     During your career, have you also -- and in the decade of the 2000s did you provide psychiatric consultation to the San Francisco Police Officers Association and sheriff's department?

412

A     Yes.  After 9/11, it became very clear to the administration that many of our police officers were suffering from posttraumatic stress disorder, so we began a comprehensive training program to train police officers in how to identify fellow officers that were suffering from posttraumatic stress disorder.

Q     Same thing with the sheriff's department or was that a different program?

A     It was basically the same.  The sheriff's department program only lasted a couple of years.  The police program lasted, I think, eight years, something like that.

MR. GABRIELSEN:  Your Honor, at this time I'd ask the Court to recognize Dr. Stewart as an expert in the field of psychiatry.

MR. VALENTI:  No objection.

THE COURT:  Granted.

MR. GABRIELSEN:  Thank you, Your Honor.

Q     (By Mr. Gabrielsen)  Dr. Stewart, did I contact you in the fall of 2010 to retain you to evaluate German Sinisterra?

A     Yes.  I believe it was maybe in October I first started receiving phone calls about the possibility of my work in this case.

Q     I indicated to you at that time the time was of the essence?

A     Yes, because my understanding at that time that the

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 20 of 110

original hearing was going to be in the early part of 2011.

Q    How many visits did you ultimately make with Mr. Sinisterra?

A    Well, I had on one trip to Terra Haute -- I spent two separate days with him for about a total of seven hours, then I made an additional trip to Terra Haute in October of last year and I wasn't able to see Mr. Sinisterra at that time.

Q    And why were you unable to see him at that time?

A    Mr. Sinisterra actually refused to come out of his cell to meet with me.

Q    And we don't need to get into the details now, but does that have significance to the diagnosis you are going to provide to us later in the testimony?

A    I think it has a lot of significance to the diagnosis.

Q    Okay.

MR. GABRIELSEN:  Could you pull up Exhibit 47.

Q    (By Mr. Gabrielsen)  We're going to pull up Exhibit 47, which is Dr. Stewart's report of evaluation.  He also has his loose paper copy of the report which you may find easier to flip through for our purposes.

Doctor, you testified a minute ago that you saw Mr. Sinisterra on January 4th and 5th of 2011.  I'd like to ask you, first of all -- if we could pull up the box that says, "to reach my conclusions."  In this box you indicated that you reviewed some materials relative to German's case.  You don't

414

need to read the whole box to us.  Generally what were the materials that we supplied to you before your first evaluation?

A      There was a lot of materials related to his trial, when he was convicted and sentenced to death.  There was a social history that was prepared by your office, and all of the source documents that went into preparing that social history were also included.

Q      That included transcripts of interviews we'd already done in Columbia with his family and friends?

A      Yes.  And there was a report by a Dr. Wheelock, and there was also a report that was done by Dr. Llorente.

Q      And since that time -- and, again, your evaluation or your report is dated January of 2011, we're roughly two years out from that, have you been provided with additional materials?

A      Yes.

Q      What's the nature of the additional materials you've seen or read?

A      The additional materials were interviews and video interviews that were transcribed.

Q      And those were interviews we represented to you were edited forms of the longer, more tedious interviews we sent you much earlier?

A      That was my understanding.  And I had an updated report from Dr. Llorente that I looked at.  I saw an interview --

415

video interview of Dr. Dos Santos.

Q    I believe we sent you some new video that we had just gotten -- I'm sorry.  Strike that.  We'll get to that when we get into the diagnosis.

So your first interview, first clinical interview with German was in January of 2011.  How would you assess his candor in that first interview with you?

A    Well, if I remember, that interview took place when the both of us were together and we went in to see him together, so it started off with your introducing me to Mr. Sinisterra, and then you left after a period of say 15, 20 minutes, something in that range, and he was -- I would describe his overall attitude, presentation that day as being very guarded.  He did -- he was forthcoming with me but it took a lot of encouragement on my part, and I was armed with the social history information so that when I asked him about certain periods of his life and he says, Oh, things were fine, I say, Well, what about the time you did this, and then he was reluctant but still able to give me some more detailed information.  So that's pretty much how that first day went.

Q    I want to -- I think I want to ask you your diagnosis, then we'll work back from that and we'll see how you got to the diagnosis.  So ultimately what did you diagnose Mr. Sinisterra as suffering from?

A    I diagnosed Mr. Sinisterra as suffering from

416

posttraumatic stress disorder.

Q     And you were aware at that time that Dr. Llorente had some other diagnoses as well?

A     I was aware Dr. Llorente did a neuropsychological evaluation that indicated Mr. Sinisterra was suffering from what he called static encephalopathy or brain damage, as well as some profound problems with his executive functioning.

Q     I would like to pull up page 2 of the diagnosis and go to criterion A from the diagnostic and statistics manual.  Dr. Llorente -- excuse me.  Dr. Stewart, can you tell us what the DSM system is?

A     The DSM is the Diagnostic and Statistical Manual and it's put out by the American Psychiatric Association.  Basically -- it's hard to describe it.  I would refer to it colloquially as a rule book.  It gives criteria for certain diagnoses and very specifically about what you need to have for what period of time, et cetera, et cetera, in order to qualify for a particular diagnosis.  It is not the width and breadth of the field by any means, but it is an attempt to codify diagnoses so people in Kansas City are talking about the same type of diagnoses as people in Florida or California are so we're all together on the same thing.

Q     Which version of the DSM was in effect at the time that you evaluated German?

A     When I first evaluated Mr. Sinisterra in January of

417

2011, the one that you have there at your hand which is called the DSM-IV-TR is the version that was in effect and it remains in effect now.

Q    And there were prior versions of this?

A    Yes.

Q    Roughly how many prior versions?

A    Well, that's the fourth one.  So the first major revision occurred in 1980 was DSM-III because there were two prior versions but they were almost pamphlet like.  The DSM-III in 1980 was the first version of any substantial version.  That was the first time that posttraumatic stress disorder appeared in the DSM.  And then there's been a DSM-III Revised that came out in 1987, and then there was a DSM-IV that came out in '94 and the DSM-IV-TR came out in 2000.

Q    And you consulted the DSM-IV-TR as you determined what your diagnosis of German was?

A    Yes.  That's the version that's in effect at the time of my evaluation.

Q    How many diagnostic criteria are there for a practitioner such as yourself to make a diagnosis of posttraumatic stress disorder?

A    Well, there's four major diagnostic criteria, but there's an additional two other ones for a total of six.

Q    Okay.  I think what I'd like to have you do is I think I'd like to take it sequentially through the four major

418

diagnostic criteria, and I'm going to ask you to look on page 2 of your report, criterion A?

A     Yes.  Basically criterion A refers to that a person needs to have been exposed to a traumatic event, and a traumatic event for the purposes of PTSD has a very specific definition.  It is an event basically where there's actual loss of life or serious bodily injury or the threat of loss of life or serious bodily injury and that it must be accompanied by fear, helplessness, and horror.

Q     Within the criteria that you indicate, again, there's three different ways of obtaining PTSD, if I'm using the right term?

A     The manual uses a word "exposed," and that term has been in effect since the DSM-IV, and what that means is that the individual that we're making the diagnosis on didn't necessarily have to be the victim of a traumatic episode.  They could have observed it.  They could have heard about it.  It became very clear after 9/11 that people watching TV developed PTSD, so the word "exposure" is the correct term.  So it doesn't mean it actually has happened to you but even if it was happening in your vicinity.  That's one area, one way, and even if you heard about it happening to someone else is yet another way.

Q     And that implies there was a time DSM didn't recognize exposure in that sense of being told about something that it

didn't recognize -- the DSM didn't recognize PTSD from those events?

A     Right.  It basically said you had to be the victim. You had to be in the plane crash or car wreck, or sexual assault or something like that.

Q     Did the diagnosis originally grow out of something that they used to call combat fatigue?

A     Well, there is a long history of how the PTSD got to be what it was, but that was one of the earlier references to what we now know as PTSD, and at that time it was felt mainly to be related to people in a time, mainly men, who were exposed to combat.

Q     And now we know it encompasses a much greater breadth of our population?

A     Yes.  In fact, PTSD is more common in women than it is in men.

Q     Doctor, just after your statement of the diagnostic criterion, there's a further note that you quote from the DSM. You don't need to read that into the record, but give us the gist of what that additional note in the report means.

A     The DSM makes a distinction about trauma that is interpersonal in nature, meaning of human design.  So the science behind PTSD has been real clear that a mugging victim has a much greater chance of developing PTSD as opposed to someone in a natural disaster, for example.  What is done by a

420

person and especially if it's done by an intimate, someone dependent upon, trusting of is even more likely that you develop PTSD.

Q    And in your 25 or so years of practice in this area treating all kinds of trauma victims, do you find that to be true in your own experience as a treating physician?

A    Yes.  You know, some of the highest rates of PTSD are sexual assault victims.

Q    And also from your experience and whatever literature you are aware, although it might not be in the DSM, is the PTSD -- I guess you started to allude to -- is worse in people if they were abused -- or victims abused by someone he trusts or some level of intimacy?

A    Yes.  The literature is clear on that.  That aspect is not listed in the criteria in the DSM-IV-TR, but the literature is very clear that intimate sexual abuse, for example, is more severe than say a random act.

Q    I guess that background -- can we then turn to your discussion above your bullet points with respect to the traumas that were inflicted on German as a child?  Can you simply -- can we go through the -- and we don't need to dwell on this in as much detail but can we go through the list and identify the traumas you were aware of, either from your clinical interview or from the materials you reviewed, that you got from us?

A    There were many traumatic episodes that he experienced

or was exposed to.  It started off by being physically abused by his mother and father, being beaten.  His mother was described as dunking his head in a bucket of water for punishment and holding him down there for a time being.  There was at a very early age, I believe it was six or seven, he and another boy were playing in an abandoned house and then they were sexually assaulted by two older men -- or two older boys, young adults; and in large part because of those traumas that had occurred, he at a very young age, seven to eight or nine years old, a couple different age ranges, but still he was very young, he decided on his own to live in this violent city of Cali, Columbia, for a number of years.

Q        Where was he from?  What city?

A        He was from the city called Buenaventura.

Q        And he left for Cali?

A        And he lived on the street there for many years where there was at least one episode of his being sexually assaulted in Cali; but, you know, he banded up with some other children who were living on the streets and they had to steal to eat and they were subject to, you know, the perils of living on the street in this very violent city.

When he returned home from Cali, he had an older brother who had recently been released from prison who was reported to have sexually assaulted him, an attempt to sexually assault his sister also.

422

Around the same time he observed at least one occasion when his father was chasing his mother with a machete. And then we're back in Buenaventura. There was an associate of his mother's who was a known pedophile, a known violent guy in the community.

Q    This is Chucho Ramirez?

A    This is Chucho Ramirez, yes. Who was reported and Mr. Sinisterra confirmed that he sexually assaulted him over a period of years, many times over a several year period.

Q    Sodomized him?

A    Yes. There was a description by his sisters that saw him coming back from an encounter with Mr. Chucho Ramirez and he was naked and bleeding, and I think they described him as caminar gracioso, which is walking funny implying that he had been sodomized. Then he reported to me, and I don't have any independent verification of this, that his brother, Luis Eduardo, was found dead in the street and that he had to go retrieve the body and they built a casket and buried him and then he found out some later time that another brother of his was murdered.

Q    And the second brother was murdered after he was already in the United States?

A    Yes.

Q    But what happened to Luis Eduardo was while German was in Columbia?

423

A       And then, again, all of this sort of builds on each other, if you will.  He then took three very, I would call, very dangerous boat trips where he stowed aboard these boats leaving Buenaventura that were coming to the United States with the knowledge that it was common practice that stowaways if found, they were thrown overboard, and he did that in large part because of the violence in Buenaventura, and he felt he needed to leave and he was willing to take a risk on these boats as opposed to staying there.

Q       And did he tell you or was it contained in other interview transcripts and such we sent you that he did learn that several of the persons he met on those boats also died violent deaths in the United States?

A       I believe he told me.  I don't remember the exact detail on that one.

Q       Is it significant that he came from a background of generalized violence in Buenaventura?

A       How do you mean significant?

Q       In terms of your applying the diagnostic criteria.

A       Yes.  Yes, because I think there tends to be a misconception when people are thinking about PTSD that somehow you get used to it, and so if you are exposed to violence because there's a lot of violence in your community, that after the first three murders you witness or the first three dead bodies you see laying on the street, then you're sort of numb

424

and it doesn't bother you anymore, but that's not what scientific literature suggests about PTSD. That each individual episode is traumatic and it builds on each other and the fact that repetitive exposure to trauma is one of the risk factors for a more serious form of PTSD.

Q Is there any way -- and, again, I'm just a layperson asking. Is there any way to sort of characterize the level of trauma that German sustained in his young life compared to other patients you've had in your practice?

A I'm sure there are people in the courtroom who's involved with these sorts of cases and other cases like it have heard, you know, very horrendous stories about childhood abuse, sexual abuse, traumatic experiences, viewing dead bodies, murders, violence, et cetera, and in my work I come across these stories frequently and I always think that the last story that I have is the worst one that I'll ever have. There can't be anything worse than a person being sexually abused by a grandfather when he's three years old, but then the next case.

This case in particular, it was -- I don't even have right the right descriptor for it. It was disturbing the extent of the traumatic exposure, and not only the severity of the trauma that he had, but the chronicity of it and the repetitive nature of it and the fact that it occurred, you know, by people who supposedly -- he was supposed to be able to trust. This is -- I don't -- now, I don't want to say you

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 32 of 110

can't have a worst case than this because probably the next case will be equally bad trauma, but this is up there as far as the most serious trauma that I've dealt with in my years of doing this PTSD work.

Q    In our conversations you noted a couple of things to me with regard to the kinds of stressors that increase the severity of the PTSD in German.  Can you speak to some of those stressors?

A    Well, I've already mentioned that one of the stressors is trauma that occurs on an interpersonal basis.  So as an individual doing something bad to an individual as opposed to a natural disaster or like an accident, a plane crash or car accident.  The chronicity of it, the repetitive nature is a risk factor.  The violence associated with it is a risk factor. The fact that it occurred with Mr. Sinisterra and started at a very early age that he's left to deal with this using six- or seven-year-old people's coping skills.  You know, trauma's never good but when it happens to an adult, they have a better chance of being able to address it because if a person had normal development, then we're hoping that they have normal adult coping mechanisms.  When it happens to a child, that's not possible.  So the child uses the primitive coping skills to try to deal with it which is an aggravator for a more serious condition.

When it occurs in an individual who's got documented

Case 4:04-cv-08003-GAF    Document 122    Filed 02/19/13    Page 33 of 110

intellectual difficulties, cognitive impairments because, again, it goes to a person being able to utilize their cognition as a way to deal with an event afterwards. I'm trying to think if there's any other examples. Oh, and the one that I think of recently has gotten a lot of news in the psychiatric field is PTSD is made much worse by a lack of proper psychosocial supports after the event.

Q        I'm sorry. Say that again, please.

A        PTSD has been shown to be worse in individuals that lack proper psychosocial supports after a traumatic event.

Q        What would psychosocial supports be?

A        Would be a loving family to help you deal with it, would be referrals to therapists or some sort of talk therapy or some sort of therapy about it, but basically you talk about a loving supportive environment to help you through the difficult time after the event.

I mean, there's actually even a phrase that's come up recently in the literature called posttraumatic growth. It's been demonstrated that even in children who have been exposed to trauma they can come away more psychologically stronger, psychologically stronger if they receive proper psychosocial supports after a traumatic episode.

Q        Where was that study done? What was the population that was studied?

A        That was a study that was done in New York City of the

New York City public school students and it was created post 9/11 and those students who had psychosocial supports after 9/11, they came out stronger because they were able to incorporate more strength in their whole psychological makeup.

Q     I would like to go to page 4 of your report and the second criterion. And can you give us your shorthand statement of it? The Court and the government, we can read the entire criterion but can you summarize it for us, please?

A     After people are exposed to a traumatic event, it's very common that people re-experience a traumatic event. That's through unwanted, intrusive thoughts, nightmares, dissociative flashbacks, psychological distress when confronted with cues of trauma and physiological reactivity. So it is a re-experience of the trauma.

And it's important to note that when people with PTSD re-experience a trauma, it isn't as if you are sort of thinking about it in a more detached intellectual way. When you re-experience it, you're actually re-experiencing the trauma. So for a combat soldier who is in an ambush and it started off by one rifle going off, when they hear a rifle going off or backfire of a motorcycle, for that moment they are back in that ambush and everything that they were experiencing at that time is going on with them at the time.

Q     And did -- with respect to the five criteria, the five parts of this particular criteria, can you speak -- and, again,

it doesn't have to be specific as to each of the five pieces, but could you tell us the things that you in your clinical interview with German that you thought supported the re-experiencing?

A    He reported to me that he has unwanted, intrusive thoughts of various traumatic episodes in his life, and obviously, you know, a person -- you can't read somebody's mind so I just go on a self-report there. He reported that he has nightmares over some of the sexual assaults he's experienced. And during the course of my interviews with him when I was, how can I say this, literally forcing him to re-experience a trauma through the course of my interview saying, Okay, what happened then? And now take me to this next stage. What occurred to you at that point? He dissociated -- he was dissociating there with me in the interview room, and then when questioned about that, he came up and was talking he was having thoughts of the event.

Q    When you say dissociated, let me stop you there and indicate to the Court what that means.

A    An association is when you're going along with a particular line of thought, then your thoughts sort of derailed and you go off on another sort of tangent, if you will. The theory behind that is that your brain is trying to protect you by taking this out of your main thinking, but in people with PTSD they get -- it looks like the person is lost in thought.

429

I mean, you see some of these movies that came out after the Vietnam War. It shows veterans acting like zombies and crawling around, digging foxholes and these sorts of things. That's pretty rare. Dissociative episode is when you're sitting there and you lose the person and they get lost in thought, and he did that several times during my interview with him.

Q    And maybe it's implicit in what we're doing here, but did you conduct your interview with him in English or Spanish?

A    It was done primarily in Spanish but he had some knowledge of English. We tried some English words but for clarity, we reverted back to Spanish.

Q    Did he also indicate to you that he had dreams about the various events?

A    Yes, he reported that he had dreams.

Q    What particular dreams did he report to you?

A    Sexual assaults. The sexual assault occurred when he was like seven years old in an abandoned house, he and a friend of his when they were assaulted by two older men.

Q    And then sort of, I guess, to get toward the end of the criteria, the intense psychological distress and physiological reactivity, could you address those two parts of the criteria?

A    Well, again, those are something that can be observed just like a dissociative episode can be observed. So you are interviewing someone and in this case -- you know, it's not

something I do in my clinical practice. We go about dealing with trauma very differently, but in a case for a forensic evaluation where I have a limited amount of time and I need to get information, I'm sort of really just diving into it with, in this case, Mr. Sinisterra, and he displayed psychological distress. He became anxious. He was telling me it was making him really sad and he tear up and also physiological reactivity. He got really agitated when I was having him deal with some of these issues.

Q     You seem to be distinguishing between what you observed and self-reporting?

A     Yes.

Q     With respect to some of these factors?

A     Yes.

Q     To what extent do you rely on self-reporting?

A     Well, when you're in the room with a person, I just take in what they're saying. You know, I'm not at that point trying to judge it or put a validity scale on it. I just listen to what they say. And then, as in this case, and in most cases of posttraumatic stress disorder, you need to rely on collateral sources of information to confirm what really happened, because quite often with the individual who has been traumatized you won't get a straight story.

Q     With respect to Mr. Sinisterra and the materials that we submitted to you, did you find that there was corroboration

431

in the collateral materials for what he told you?

A    Yes.  There was absolute corroboration and what also these collateral materials showed is how much he minimized these traumas when he was talking to me.

Q    So it was actually worse than what he told you?

A    Yes.

Q    I'm wondering if we could then go to criterion C.

A    Criterion C is generally just people don't want to deal with this stuff.  It's too uncomfortable.  You know, imagine the most scared you've ever been in your life and then having somebody come in and having you recount things and having you re-experience that.  So people don't like to do that.  So they do all these other different maneuvers to avoid it and, you know, you can read those yourself.

     But I think a very telling point was when I came back and wanted to see him in October where, you know, we're sitting in the waiting room there at Terra Haute and the guard was right there with a walkie-talkie and I could hear Mr. Sinisterra saying, No mas, no mas.  It came across on the intercom.

Q    What does that mean?

A    That means no more and how I understood that was that he -- you know, he knew by my presence that it was very likely that I was going to want to go over these traumatic episodes with him, which I was.  He correctly surmised that.  He didn't

432

Case 4:04-cv-08003-GAF    Document 122    Filed 02/19/13    Page 39 of 110

want to do it so he just said no mas.  I don't want to do it anymore.

Q     Even though his best interest might be to cooperate with his legal team?

A     Even though, yes, given the severity of his legal situation, he -- I would describe that of his being unable to cooperate at that time.

Q     I want for a second just to go back to the previous criterion because I'm afraid I missed one line of questions.  I wanted to ask you whether the additional materials that you -- strike that.

Did you have reason to call his wife, Michelle Sinisterra, to speak with her about him?

A     Yes.

Q     And what did you learn from -- that was subsequent to your evaluation of German?

A     Correct.

Q     And what did you learn from Michelle that was significant to your diagnosis?

A     When I asked her just generally to describe his behavior, she would talk about his being detached, sitting by himself in the corner of the room crying for no apparent reason, lost in thought, you know, which is consistent with his being in a dissociative episode.

She also reported that he had real severe sleeping

433

problems, that he would wake up in the middle of the night having experienced nightmares, and that in her estimation he was drinking more alcohol at certain times, and she linked his increased drinking to when these behaviors that she described to me were more strong.  So I'm thinking that he was using alcohol, which is very common, to self-medicate the anxiety that he was experiencing from these traumatic episodes.

Q      Did he tell his wife what he was thinking during those periods when he was crying?

A      She asked him and he said, No one will understand.  No one can understand what I went through.  And so she never had a clue, at least that's what she told me when I talked to her.

Q      I would like to go to the top of page 5 of your report. You continue to speak to this avoidance criterion.  Can you address the rest of those factors that you found with respect to avoidance?

A      Well, I think I mentioned earlier -- I mean, here's a young boy, when you think about it, an eight-year-old American kid living on the streets in a violent city.  I mean, that's something that we don't allow or try not to allow, but he did that because the alternative was worse in his mind, which really --

Q      And the alternative was what?

A      Was staying in a home being potentially sexually abused, had his head dunked in a bucket of water by his mother,

434

being beaten by her. And so he chose to avoid all of that by living on the streets of Cali.

Q You also speak to his inability to recall certain facts of the traumas. Can you explain to us what that paragraph means with respect to how he remembered his abuse versus the abuse his brother Pablo suffered?

A For me how I approached this -- I had this social history going into this interview, so I had documentation about some degree of where these traumatic experiences were. So when I asked him about a particular period, I say, Oh, tell me about how it was at home, and he goes, Oh, you know, it was not that bad. You know, my mom had hit me a few times because I was sort of a handful and my older brother got it a lot worse. And, I mean, you can look at that a number of ways. He's avoiding just dealing with it or he's forgotten it or it goes into this avoidance criteria.

Q It's not consistent with the other factors?

A It's not consistent with the supporting documents, yes.

Q Can you speak also to the feelings of detachment or estrangement? You mention relationships with the women that he's been in relationships with and what happened with those?

A Well, you know, the one that is most striking in speaking to his wife Michelle --

MR. GABRIELSEN: Your Honor, may I approach to give him some more water?

435

THE COURT: Sure.

THE WITNESS: Thank you, Your Honor.

A She recounted just a general estrangement and detachment, worse at times, and she associated that with his being more -- this posttraumatic stress syndrome being prominent at certain times.

Q (By Mr. Gabrielsen) You indicated a restrictive range of affect during the interviews?

A Yes.

Q And for a layperson what does that mean exactly?

A Your affect is your sort of presentation to the world and his was guarded and limited. I mean, normally in a course of a normal conversation you might go from crying to laughter and all ways, everything in between. But his remained over -- in a very guarded way and very restricted. He didn't show normal range of affect.

Q And then finally can you speak to his sense of foreshortened future?

A Oh, yeah. This is a very interesting, from a psychiatric standpoint, symptom of PTSD where you ask people that have PTSD what their life holds for them or what are their future plans. They look at you with this incredible stare and say, What are you talking about? And I originally thought that it was a language issue that he and I were having because I was having a very hard time to get him, to my satisfaction, to

436

understand my question about prior to -- you know, prior to you being incarcerated, what did you see for your life in the future? What were you looking forward to? And he wasn't getting that. Maybe I wasn't saying it correctly. But after a long time of explaining it, you know, he didn't think that he was going to live, based on his experience of life up to that point. He didn't think he was going to live very long. He had no sense of his future.

Q    And that was based not only on his own experience but what happened to other families members too?

A    Yes.

Q    And, again, how many family members did he lose to violence in his childhood?

A    At least two, I believe, two brothers.

Q    Could we then go on to page 5 to criterion D, persistent symptoms of increased arousal. What are we talking about there?

A    Well, the example I use on this one is, you know, how are you feeling when you're riding the roller coaster? Your heart's beating fast. You don't know what's going to happen. Are you going to crash? Are you going to do this stuff? And you're really revved up and that's how people with PTSD are most of the time. And so the DSM-IV-TR calls for being able to document sleeping difficulties, irritability or anger, concentration problems, being in a state of hypervigilance and

437

also talking about exaggerated startle response.

Q     And what is exaggerated startle response and what did you observe in German with respect to that?

A     It's a response that's out of line with what the stimuli is.  You know a person would have an exaggerated startle response if somebody dropped a big book on a table and it would make a sound.  All of us might jump a little bit when we heard the sound, but a person who is in the throes of PTSD at that time would maybe have a much more greater reaction to something like that.  That's exaggerated startle response.

In talking to him about that, he used the phrase with me in Spanish escomopanico, e-s-c-o-m-o-p-a-n-i-c-o, and to me that means as if I'm in a panic.  When talking about if he's startled, when people kind of creep up on him, these sorts of things.

Q     Was he describing things that would happen at the prison in Terra Haute that would startle him?

A     That was the discussion we were having, yes.  But, again, in speaking with his wife Michelle, she confirmed that he had sleep difficulties.

Q     And sometimes that can be related to increased arousal that interferes with sleep?

A     Yes.  And also I think his difficulty that he has with concentration is described by some of the social history documents that he would have to observe a simple task in his

438

wood shop type of work that his mother did.  In order to be able to learn how to do a very simple task, he would have to observe it many, many times until he finally understood it where other people would get it more quickly.

He was described at school, he told me and it was also confirmed by his sister, that he really had difficulty in school, and this is in the first grade, but his trauma -- he had been exposed to trauma prior to first grade, and so it was clear to me during the course of my interview that he was having problems with concentration.

Q    Do you remember reading parts of the transcript of testimony which Michelle said that he couldn't finish English language classes?

A    Yes.

Q    And is that indicative of this fact we're talking about right now?

A    Well, yes.  Mr. Sinisterra, as Dr. Llorente showed, is that he has, again, the term "static encephalopathy," which is brain damage, and so this is very interesting, sort of the chicken-and-egg thing with PTSD, because PTSD affects your ability to concentrate and can appear like brain damage, but with Mr. Sinisterra the thinking is that he had preexisting brain damage and the PTSD is thrown on top of it which further impairs his cognitive functioning.

MR. GABRIELSEN:  If we could go to page 6, please.

439

Q      (By Mr. Gabrielsen)  You've taken us through the four diagnostic criteria.  Criterion E and F, what do those speak to in the DSM?

A      The DSM is real clear that these symptoms that we've been describing so far have to be present for more than 30 days because these sort of symptoms we're describing are common when people are exposed to any sort of traumatic event.  You have sleep problems, you're thinking about it, you have intrusive thoughts, you have avoidance, all these things; but if they persist after 30 days, then and only then do you meet their criterion E, and I interviewed him on January 2011 and it was clear to me that he was suffering these symptoms; and if the trauma occurred some point before that, then he had it at least for 30 days but in his case much longer.

Q      And, in fact, you indicate that symptoms were documented at least from the time he was six years old, and which symptom would that have been?

A      I was thinking about his school difficulties he was having at that time.

Q      And his dropping out after first grade?

A      Yes.

Q      Would his flight to Cali would that also --

A      And his flight to Cali also.  Excuse me.

Q      And then finally criterion F on that page, can you speak at least generally to the significant distress or

impairment of these different aspects of life?

A    Yes.  Criterion F is sort of the so-what criteria.  So a person has all these symptoms, they're -- first, they're exposed to trauma and they have all these symptoms we've been talking about.  If they're able to live, work, go to school, have intimate relationships, you know, be able to take advantage of community resources, et cetera, et cetera, then it doesn't make any difference he's got these symptom because it's obviously not affecting your functioning; but when you look at Mr. Sinisterra's life, you know, he has one year of formal education, he went to flee and live in another city on the streets when he was such a young age, he took these perilous boat rides to the United States on several occasions.  He hasn't been able, to my understanding, to complete a GED since he's been in the United States or really have any sort of capacity of English.  So all of these things speak to his impairment as caused by the PTSD.

Q    To your knowledge, has he received any kind of therapy -- I'm sorry.  What was the term -- you applied a term earlier.

A    Psychosocial supports, yes.

Q    Yes.  Has he ever acquired psychosocial support for his illness?

A    Not that I'm aware of.  In fact, quite the opposite.  After his, I believe, it was his sexual assault in the house

Case 4:04-cv-08003-GAF    Document 122    Filed 02/19/13    Page 48 of 110

with the two men that his baby sister was going to tell his mother because he knew he would get in trouble with his mother that happened to him.

Q    And mom should have been the one that most of us would have run to have after a circumstance like that?

A    One would think, yeah.

Q    I'd like you to comment just briefly.  At the bottom of page 6 you talk about additional support for the diagnosis and you speak about a heritable component.  Can you address again what that means or expand on what you've written?

A    The work in PTSD has shown that if you come from a family where there's mental illness, you have a greater chance of developing PTSD when exposed to trauma, because not everybody exposed to trauma results in PTSD.  A significant number do but not everyone, and it's felt that a family history of mental illness puts you at a greater risk of developing PTSD, which is the case of Mr. Sinisterra's family.

Q    What did you know about his family?

A    They described his father and I think his father's side of the family being mentally ill.

Q    Then at the top of page 7 of your report you indicate that Dr. Llorente in his report, he confirmed posttraumatic stress disorder as well.  Is it significant that another mental health practitioner reaches the same diagnosis of a patient that you do, and can you please explain the dynamic between

442

multiple practitioners in the diagnosis?

A    Well, mental health is often criticized by -- say, you get five psychiatrists in a room and you get five different diagnoses.  But in this case with Mr. Sinisterra it's not that I consulted with Dr. Llorente before he arrived at his diagnosis but I looked at his report when it was finished and saw his findings were consistent with mine, and that's, I think, standard of care.  You get more than one professional looking at it you want to see whether you guys are together or not together, and we both were similar in our assessments.

Q    And it didn't come into existence at the time that you wrote your report but you have reason to know what Dr. Dos Santos' thoughts are about German as well, right?

A    Well, it actually did come into play when I first saw Mr. Sinisterra and compared his report because I was aware of Dr. Dos Santos in the original court proceedings didn't feel he was suffering from anything, and I was not shocked by that but I needed to explain to myself how that could be given the fact that this is not a subtle case, given that this is way out there as far as PTSD goes, and so I viewed a recently done video interview of Dr. Dos Santos where he said that he did not have the benefit of the social history that I did when I did my evaluation, and I think that explains it to my satisfaction.

Q    And what did Dr. Dos Santos indicate in that video that you saw?

A    That given the information that he has recently come to be aware of that he likely would have diagnosed Mr. Sinisterra with PTSD.

Q    And even if we didn't have the benefit of Dr. Dos Santos' views about that, if we just knew that he had -- I think Mr. Duchardt said in his affidavit that he supplied to this Court back in 2006 or '7 he didn't find anything wrong with him, Dr. Dos Santos didn't find anything wrong with German.  Would it be understandable to you how a practitioner without the social history could come to that conclusion?

A    Yes, because it's very easy because I think if I wouldn't have had the benefit of the social history, I would have gone in the room and asked him about his life, he would have said things like he did tell me.  Well, you know, my mom hit me a little bit but I was sort of a problem kid.  My older brother really got it.  And, you know, I chose to live in this other city because it was exciting to me to go, and these sorts of things, and I could see given his sort of avoidance and restricted affect, I could see how a practitioner could come away saying there's nothing wrong with him without the benefit of this collateral information.

Q    Is there any way that in that interview with Dr. Dos Santos -- I'll ask you to put yourself in that position -- given German's background and your present diagnosis of PTSD that German would somehow intuit that the information about his

background was important and volunteer that up to the doctor?

MR. VALENTI: I object to the speculative basis.

THE INTERPRETER: I'm sorry. The interpreter did not hear.

MR. VALENTI: I'm going to object, calling for speculation.

THE COURT: I can't contemplate what that question was.

MR. GABRIELSEN: How about if I rephrase, Judge, and I'll take it to Dr. Stewart instead of asking him to think about what Dr. Dos Santos might have thought.

Q    (By Mr. Gabrielsen) You had already indicated to us that German minimized the abuse of him. Given your present diagnosis of him with posttraumatic stress disorder, avoidance, some of the other things you talked about, does it surprise you that when you did your clinical interview of him, that he didn't intuit the importance of that and be more expansive in describing the abuse that he suffered as a child?

A    No, not at all. I mean, this is something that's very clearly understood in the field of dealing with patients with PTSD is that you rarely get the straight story from them because of the nature of the illness. You know, avoidance, they don't want to have these intrusive thoughts. They don't want to talk about this stuff. And so it's very understandable that a person -- a person who suffers from PTSD I think would

445

be asking a whole heck of a lot of them to be able to intuit the importance of something that happened to them during the course of a mental health evaluation.

MR. GABRIELSEN:  Judge, pardon me.  I need to return to the table to get another notebook, please.

THE COURT:  All right.  I'm getting close to taking a break if this would be a good time.

MR. GABRIELSEN:  That would be perfect, Your Honor.

THE COURT:  Okay.  We'll take a recess until 11:15.

THE WITNESS:  Thank you, Your Honor.

(Recess taken at 10:55 a.m.)

THE COURT:  Doctor, I'm going to remind you that you are still under oath, sir.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Mr. Gabrielsen, you can continue.

MR. GABRIELSEN:  Thank you, Your Honor.

PABLO STEWART resumed the stand and testified further:

DIRECT EXAMINATION (continued) BY MR. GABRIELSEN:

Q     Dr. Stewart, you had mentioned that German was not completely open with you at the outset of the interview, but over the course of the January 4th, 2011, and during the day on January 5th, did he open up more to you and give you more details about his past?

A     Yes.  Over the course of the entire interview he started to loosen up a little bit, but he still remained fairly

446

guarded, but he did give me a lot of information.

Q     And at some point he did at least corroborate evidence you had about his past that we had provided to you in the social history?

A     Yes.

Q     And he also shared with you, I believe, at least one abusive sexual assault that we were not even aware of, yet you were able to obtain that from him.  Which one was that?

A     I believe he said he was sexually assaulted in Cali.

Q     Who was the victimizer, for lack of a better term?

A     No.  Excuse me.  He said he was raped by a cab driver.

Q     Was that in Buenaventura?

A     In Buenaventura, yes.

Q     You're aware from materials we sent you that two of the other sexual abuse victims with whom he was friendly related, Segundo Sinisterra and Gustavo Viveros, at first told investigator, Hector Guevara, that they knew of the assault, the sexual assaults of German but they denied being victims themselves.

A     Yes, I'm aware of that.

Q     And subsequent to your clinical interview with German in January of 2011 we've had testimony and we have exhibits that indicate that Gustavo and Segundo gave interviews in March 2011 that indicated to Hector that in fact they were sexual assault victims.  Are you aware of those transcripts and

447

videos?

A Yes.

Q And in those videos Segundo admitted he had been sexually abused by Chucho Ramirez; do you remember that?

A Yes.

Q And that Gustavo was the other kid in the building with German?

A When he was seven years old, yes.

Q Why would -- and maybe we can all intuit this. I'm not sure. Why would those witnesses have given a prior inconsistent version of whether they were abuse victims?

A Well, see, I wouldn't call that an inconsistent version. You wouldn't expect these two men to on a first visit be able to share their deepest, darkest, most shameful secret. For a lot of reasons we talked about for PTSD. Male sexual assault carries with it one of the highest rates of developing PTSD, I believe mid to high 60s percent-wise. So you wouldn't expect these guys to be so forthcoming about their own experiences. It's something you would not see.

Q And is it because of the shamefulness of the sexual assault or is it the attack on the masculinity? Can we be more specific or is it there's just a lot of things going on?

A I mean, it's all those things you mentioned, but also if you think about it, you know, a relative stranger just shows up and asks you to share your deepest, darkest, most shameful

448

secret. I think we can all understand it's not something we would look forward to do. We probably wouldn't do.

Q And, in fact, I'm going to just quote Gustavo Viveros in the second interview transcript when asked by Hector Guevara whether he was -- what he remembered about Chucho Ramirez, he said, "I wouldn't want to recall that moment. It hurts me to remember it." And then he shared no details about it. Is that consistent with what you're saying?

A Yes, absolutely.

Q I think the final areas, I would like to relate your diagnosis to the events in this case. Do you recall at least in some basic form what the offense itself was?

A In its most general form, yes.

Q What do you sort of recall of that?

A That there was a large amount of money stolen from this drug distribution organization, La Oficina, and that they needed to get this money back or show up with somebody responsible and that the local leader of this drug organization took Mr. Sinisterra with him to a house where there were two men being held and he gave him a gun and said he had to kill this guy.

Q Was it possible for German to resist the -- I think in your report you call it the coercive nature of the relationship with Tello and Hinestroza, the guys from La Oficina, or their commands?

Case 4:04-cv-08003-GAF    Document 122    Filed 02/19/13    Page 56 of 110

A    Knowing what I know about narcotrafficking and drug distribution networks that these are pretty serious guys when it comes to violence, and so I think it would be very difficult, if not impossible, for someone without PTSD to resist the coercive nature of this -- of what occurred during these murders.  Then you take someone with PTSD who's been subjected to coercive situations; namely, you know, I'm thinking about all the sexual abuse, and when he's put into a similar situation that all of the memories are flooding back from these other events that are sort of general -- they're similar in nature where he succumbed.  I mean, he submitted.  So I think it would be almost impossible for someone suffering from PTSD to then come up with an alternative plan of action given his history and given how this event, where the murders occurred is very similar to where a lot of the sexual assaults occurred.

Q    From what you know about the crime, from what we've sent you from the trial record, and so forth, and your diagnosis of him and what you know from Dr. Llorente's findings of low intellectual functioning, poor executive functioning, and organic brain damage, is it likely that German engaged in substantial planning and premeditation to cause the death of the victim in this case, Julian Colon?

A    This is where I rely on Dr. Llorente's findings, where he did subjective testing and found he has static

450

encephalopathy and poor judgment.

Q   Did you say subjective testing?

A   Objective testing.

Q   I'm sorry.  I misheard.

A   And so that's his baseline that he's operating from.

Q   He's already impaired?

A   He has impaired cognitive functioning.  Okay.  Then in addition to that, he has posttraumatic stress disorder which further erodes his cognitive functioning, which further erodes his executive functioning, which is basically your ability to plan, anticipate consequences, take situations into consideration and factor them into how you are going to proceed.  So he's very impaired in those areas.  So based on what I understand from the objective findings of the neuropsychological testing coupled with the diagnosis that I made of posttraumatic stress disorder, it's my opinion it would be highly unlikely that he would be able to participate in any sort of planning about anything complicated, you know, a murder.

Q   I would like to pull up, if we can, Exhibit 23.

Dr. Stewart, this is the section of the federal statute that has to do with death penalty proceedings, and there's a list of what we call statutory mitigating factors.  I would like to have you read just to yourself factor small (a)(1) and then I'll inquire, please.

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 58 of 110

A     Okay.

Q     Is there any impairment in German -- is there any significant impairment in German with respect to his ability to understand and appreciate the wrongfulness of the conduct or conform the conduct to the requirements of law?

A     I think, as we're talking about, he has cognitive impairments.  Now with the superimposed PTSD on it, that significantly impairs his capacity.  Now, I wouldn't necessarily say that appreciate the -- excuse me.  Yeah, to appreciate the wrongfulness and to conduct -- to conform conduct to requirements of law.  I think he was impaired based on those two things.

Q     With respect to (a)(2), and if you would take just a second to review that for yourself.

A     Okay.

Q     What can you tell us with respect to whether he was under unusual and substantial duress?

A     Again, from my reading of the events of the crime, it certainly appeared to me that he was under significant duress.

Q     Then finally (a)(6), if you would read that to yourself, please.

A     Yes.

Q     Is PTSD an emotional disturbance?

A     Well, the whole thing is a severe mental disturbance. PTSD isn't really described in this manner but it certainly is

452

a severe mental disturbance that has with it associated emotional problems. So I think it would clearly meet this criteria.

Q So it would constitute severe mental emotional disturbance?

A Yes, based on my understanding of that.

Q Is there anything -- is there anything in German's background, as you know it, that would have made him think he could have stood up to the orders to go with the cartel to Kansas City from Houston or to have participated in the building that night? Is there anything in his past that leads you to think he could stand up to that?

A No, especially -- I mean, in addition to his impaired cognitions and his posttraumatic stress disorder, it's my understanding that this group of drug traffickers were working in Buenaventura in Columbia and were aware where his family was, and Mr. Sinisterra reported to me that he felt if he went against them, they would not only kill him but they would kill his family in Columbia.

Q The diagnosis you presented us with this morning, the PTSD, do you hold the belief of that diagnosis to a reasonable degree of medical certainty?

A I do.

MR. GABRIELSEN: That's all I have, Judge.

CROSS-EXAMINATION BY MR. VALENTI:

453

Q     Good morning, Dr. Stewart.

A     Good morning.

Q     What I took out of the examination this morning when they were talking about -- when you were talking about PTSD is that, quite frankly, it's not all that uncommon; is that fair? Not all that uncommon an experience for people to have or a diagnosis to be made?

A     Well, no.  The first part is correct that a lot of people are exposed to traumatic events and depending on the type of traumatic event or events, then there is a greater or lesser likelihood of going on to develop the condition.

Q     Correct.  And, in fact, as we understand PTSD today, there has been an evolution of the understanding of that malady over time; is that fair?

A     Yes.

Q     I think it started out as shell shock, at least in the public perception, and then battle fatigue and various nomenclatures but it did show up in DSM-IV until, I believe you said, 1980; is that correct?

A     It was DSM-III, yes, in 1980.  That was the first time that it officially appeared in DSM.

Q     Subsequent to it officially appearing in 1980, it has gone through minor modifications from time to time in the various revisions that occurred in the DSM and now includes a broader category of rather than personal experience can be the

454

term "exposure" to these events, correct?

A     Yes.  And that occurs because of advances in the field and understanding of how the illness -- what the illness really is.

Q     And it's fair to say, as I understand it, that some of the advancements made in this field were in direct correlation to the events of 9/11 or the terrorist bombings in New York where people who did not themselves experience that tragedy then developed symptoms of PTSD having been exposed to the media coverage?

A     That was, I think, the most recent sort of high profile example of that, but the DSM-IV-TR gives the example that if a parent hears that their child has a serious medical illness, then that would qualify for traumatic stress.

Q     When was TR first -- the DSM-IV-TR first published?

A     The one you have there in front of you is 2000.

Q     So about the time that this case went to trial there was some more scholarly thought that went in to the idea of what PTSD was and always has?

A     Yes.

Q     It's an evolution?

A     It is.  But for the word "exposure" first appeared in the definition of PTSD in DSM-IV and that was 1994.  Prior to that it was the DSM-III-R in 1987.  It didn't have the word "exposure."  So the word "exposure" has actually been around

455

since '94.

Q	And what I'm getting at is I think most people would know based upon recent events at Sandy Hook there's been a lot of scholarly debates amongst the scientific community on how much PTSD may be exposed to the American population in general given the nature of the tragedy that befell the children; would that be fair?

A	Okay.  I'm sorry.  I lost your question.

Q	What I'm getting at, in the evolutionary basis of this when you're talking about PTSD, what I was saying it's not -- it's uncommon as maybe once had been thought there are -- it's not -- it's been postulated that a number of American citizens not related to Connecticut may come down with symptoms of PTSD simply having been exposed to the media coverage of the tragedy at Sandy Hook Elementary School; is that accurate?

A	Yes.  I think that's a fair statement.

Q	Okay.  And I wasn't trying to break new ground.  I was trying to -- my point being is that the understanding of PTSD has evolved over time and is much more pervasive than maybe once been thought or maybe the general public even to this day thinks.

A	Well, I don't know if pervasive is the right word. There's certain and greater understanding and what I think if we look at the history or the development of posttraumatic stress disorder, it was grossly underdiagnosed in World War II

456

veterans, for example, Korean War veterans.  It was only during Vietnam that this whole concept came to fruition.

Q     As we get into the diagnosis that you made and going through various diagnostic criteria, I want to start with diagnostic criterion A and under that criterion, rather, you recount a number of traumatic events that Mr. Sinisterra had been exposed to?

A     Correct.

Q     When you were talking about that, you say that you had gone and gotten documentary corroboration.  The documentary corroboration you're talking about for the most part are documents that have been created recently in preparation for the postconviction representation of Mr. Sinisterra; is that accurate?

A     Well, for example, the first one about how his mother mistreated him, that came from an interview of his sister Rosa. I believe that first interview was 2009.  I think you're correct.

Q     And the short version of that is we're talking about support that's been provided to you that is from about 2005 and later once postconviction counsel represented Mr. Sinisterra but not hospital records or school records or police records that would have come from Columbia that predate his conviction?

A     No.  You're right.  But thinking about the context in Buenaventura, there isn't really records as we know them here

457

in the United States.

Q I understand. I want the record to be clear, the trial record here, to be clear the type of documentation we're talking about in the frame of that is essentially post 2005 or so?

A Yes.

Q Okay.

A That's my understanding.

Q You said, as many psychiatrists, psychologists, neuropsychologists do, you have to rely upon what the person you're interviewing tells you, in other words, self-reporting and you've done that in this case?

A You certainly take into consideration self-reporting, but -- and like I tried to explain earlier, maybe I didn't do a really good job of it, was when you're with the patient or the person that we're evaluating, I don't necessarily challenge them or say, okay, let me hear what you have to say and later on see if the guy's telling me a line or not or omitting things. So it isn't just self-reporting but it's self-reporting and then hopefully that will be corroborated by collateral evaluation.

Q You prefer to have as much information provided to you as you can?

A Yes, absolutely.

Q As we go further into the diagnostic criterion, I want

458

to move on to the criterion C, which for shorthand purposes I'll refer to as avoidance.

A    Yes.

Q    As we talk about avoidance, in the sixth aspect of that you are referring to the foreshortened vision of one's future. So that I'm clear, are you talking about his future as he sees it on the day you interview him or are you asking him to go back 13-odd years to the days when he was at liberty and ask him about what he thought of his future then?

A    No.  That's a good distinction to make because a person on death row has a different view of their future than the rest of us do, I suspect.  And I was really -- I don't want to say diligent but careful to make sure that we understood that I wasn't talking about his current situation because it's sort of ridiculous basing his lack of future planning when a guy's on death row.

Q    Correct.  And my point being there's generally not a lot?

A    Yes.

Q    Even in the best case scenario he's looking at a sentence of life in prison without parole.  Instead, then, you were asking Mr. Sinisterra to kind of go back in time and recreate what thoughts he may have had about his future as it existed say in 1998?

A    And sometime prior to his incarceration, yes.

459

Q    And that's because your interview was in January of 2011, that's a little bit abstract type of thinking you're asking him to engage in during that interview, isn't it?

A    Yeah.  Given his situation, I mean, obviously it's not the best but it was the best I could do.

Q    I understand.  I mean, you were not brought into the case until later and you deal with the situation you're in, but whatever you may or may not have thought of his future in 1998 or previous to the homicide that got him in custody, he's had 13 years to know, of dealing with what his life is in the federal penitentiary that could very well quash whatever views in the future he may have had?

A    Yes.  But I think it's important to just remind all of us is that, you know, on criterion C we're talking about three or more.  So if, in fact, you know, we even throw out given the foreshortened future, he still meets this criteria because he meets at least three of the other ones.

Q    Doctor, don't misunderstand me.  I'm not trying to suggest that I disagree with your diagnosis based on information before you.  I just want to clarify what we're talk about in the foreshortened future.  I think it makes a big difference in what we're talking about, because I think if we're talking about his future sitting on death row, it's a little hollow.  If we're talking about looking backwards, its more meaningful perhaps but it's a little tortured because it's

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 67 of 110

abstract thinking, correct?

A    Right.  In response to that, I'll just say real briefly is that, you know, I'm not relying on that one particular symptom.

Q    As we go to diagnostic criterion D, which I would call the increased arousal or hypervigilant, I notice the parenthetical talks about not present before the trauma.

A    Yes.

Q    I assume the way that's written within the DSM, the goal is to try to find these hyperavoidance type -- not avoidance.  I apologize.  Arousal information, try to determine that they occurred posttrauma rather than pretrauma; is that fair?

A    In an ideal situation it absolutely is, because this has to reflect the change from previous level of functioning.

Q    And because we're talking about the initial trauma that you report going back to him being six or seven years of age in Buenaventura, we really are left with the kind of dearth of data about what he may have been like in those adolescent or very young tender years, correct?

A    Yes.  And, quite frankly, that was a concern of mine during the course of this evaluation, and since that is -- I don't want to call it fairly common, but it's a situation that you run into a lot as a practicing clinician where it's hard to get the pre -- we call it premorbid which means predisease

461

onset functioning because it happens so early in life or there's compounding factors, and so the clinical experience, the psychiatric literature suggests that you try to make your best attempt to qualify, quantify what the premorbid functioning was, but then you rely on the current presentation of symptoms, because I mean that's basically all you have.

Q As we get into the effects of the symptomatology, which is essentially the conclusion paragraph, I want to ask you some questions, because in the conclusions you make you say that German did not possess the capacity to determine an alternative action at the time in the incident involving Julian Colon, and I want to ask you about some of these facts because he joined the cartel that put him in the situation he was in, to your knowledge. He wasn't drafted into this organization, was he?

A You know, I have to admit that I don't know the exact mechanism from which he joined.

Q Okay. He had an alternative action of fleeing. He didn't have to come from Houston to Kansas City, did he?

A Well --

Q You know he drove himself here? Were you aware of that fact?

A I'm not sure I was aware of that fact.

Q I would submit to you that there was a meeting in Houston, Texas, on Thanksgiving Day 1998, I want to say 25th or 26th right off the top of my head. I can't guarantee that

Case 4:04-cv-08003-GAF    Document 122    Filed 02/19/13    Page 69 of 110

date. That he was outside of the meeting in the parking lot and there was a decision to come to Kansas City to hold people accountable for the monetary loss you earlier described, that he drove himself and another coconspirator, not Hurtado or not Hinestroza to Kansas City?

A    Yes.

Q    So he got here on his own by all evidence that was admitted and ultimately accepted by the jury. Okay. He didn't have to come here. He drove himself. Did he?

A    You know, that's where I think I have to come -- I don't know if that's the best characterization of it because at all times during this, in my opinion, he's suffering from PTSD and at all times during the situation he has the cognitive deficits as outlined by Dr. Llorente. So it isn't as if they only came on when he's in the room or basement of this house in Kansas City. They were existing prior. So, in my opinion, I took the entire -- how do we call it -- the entire episode into consideration.

Q    Okay. But part of the episode if he is under that chronic diagnosis is he's fled in the past, hasn't he?

A    Yes, he has.

Q    He fled his home in Buenaventura for Cali, correct?

A    Uh-huh.

Q    He fled the country of Columbia on apparently three separate occasions to seek better environments?

463

A    Right.

Q    He's fled multiple relationships with women?

A    Yes.

Q    He's fled children from each of those relationships with women, correct?  So he's had a coping mechanism of -- flight is a coping mechanism he's employed on numerous occasions?

A    He has, yes.

Q    And I might submit to you he could have fled this situation since he drove himself to it?

A    Okay.  But then the question in my mind is, why didn't he flee?  What was the special circumstances about this situation as opposed to as a young child going to Cali or escaping from Buenaventura or leaving these women and children behind?  So that's a very interesting question to consider why he would not flee in this situation; and, in my opinion, I think it goes to the fact that he was under duress and that the duress further impaired his ability to even call upon previously, and I will call them dysfunctional coping skills of just taking off, but he was unable to even utilize those at this time.

Q    Or chose not to because he could have just as easily been a willing, happy participant in this conspiracy who was a hitman or Columbian -- I don't know, and he wanted to get paid. By coming to Kansas City to commit this murder, he was going to

464

get paid?

A    All of that is possible, I imagine, but then we still have to take into consideration what Dr. Llorente's findings and my findings are in trying to understand the situation.  So in the absence of cognitive impairments, in the absence of severe posttraumatic stress disorder, in the absence of impaired executive functioning, then maybe the scenario you just painted would be, you know, sort of the leading thought on this thing, but given the realities of what his mental health status was, at least in my opinion, was at the time, then I don't know if you can necessarily say that.

Q    Well, he was a member of this cartel clearly and he did travel to Kansas City --

A    Yes.

Q    -- however he did it.  And this cartel was expansive enough to have cells in Cali, Columbia, correct?

A    Yes.

Q    Houston, Texas?

A    Yes.

Q    And in at least Kansas City, Missouri.  So there was certainly a plan in place in this case, whether you want to say he participated in the planning of it, there was a meeting days earlier in Houston, Texas, about having to come to Kansas City. Did you know that from the facts that were given to you?

A    I understand that obviously there was some planning

465

that was involved in accomplishing this event, but it's my opinion, again, based on -- I keep sounding repetitious -- but the neuropsych findings, then my own findings that I would really challenge the notion that Mr. Sinisterra was capable of participating in any real way in planning.

Q    One of the victims, the surviving victim in this case, a man by the name of Herberth Andres Borja-Molina who was a very young man at the time of this crime, teenage years, he knew Mr. Sinisterra from Houston.  Did you know that?

A    I believe, yeah, he was one of them.

Q    And that Mr. Sinisterra had previously held himself out to Mr. Borja-Molina has someone who would kill someone for him for a price.  Were you made aware of that?

A    I'm not familiar with that.

Q    Were you aware that when Mr. Colon and Mr. Borja-Molina were taken into custody, it was -- the defendant was one of the primary actors that took him into custody?  Because of the friendship, they went, the victims in this case, thinking they were going to hold someone up until they themselves became victims.  Did you know that?

A    I was aware there was some sort of bait-and-switch situation going on.

Q    So you were aware that was all going on?

A    Yes.

Q    And despite what is apparently some significant

Case 4:04-cv-08003-GAF    Document 122    Filed 02/19/13    Page 73 of 110

planning in advance, you suggest that because of his mental situation he was experiencing at that time, that he could not participate; is that what you are saying today?

A    In any real significant way.  Again, the neuropsych testing is an objective measure, and I would like to think that my diagnosis was based on objective measures also.  It wasn't just a self-report or it wasn't just on that sort of thing.  It was a collaboration -- I mean corroborating information.  So, again, based on his mental conditions, as I understand them, I would really question his ability to be able to be involved in any sort of significant planning.

Q    Do you have any way to account for why he couldn't choose flight in 1998 when he had chosen flight on approximately a half dozen occasions, all of which would have been periods of time that he would have been experiencing PTSD?

A    I think the duress that he was under.  You don't start functioning better under duress as a whole.  So his condition that he has would get worse under duress.

Q    Which duress specifically are you speaking of?

A    The duress of the entire situation where he reported to me that he felt that if he didn't go along with these people, that they could kill his family back in Buenaventura.

Q    And, of course, you read both Dr. Llorente's reports, the one he authored in 2006 and, I believe, the other one in 2011, correct?

467

A   Correct.

Q   And the reporting that was done to Dr. Llorente in 2006 by the defendant had at least two material falsehoods the defendant provided Dr. Llorente.  Do you recall what those were?

A   No, I don't.

Q   In the first 2006 interview Mr. Sinisterra reported to Dr. Llorente that he did not do any shooting, that he only confessed to the shooting out of fear for his family back in Columbia; however, in 2011 he admitted that he did in fact do the shooting when confronted with the fact that he had said he was confessing because he had gotten threatened which was not possible since he was arrested and confessed within hours of the event actually occurring.  Were you aware of the distinction Dr. Llorente made?

A   Yes.

Q   Dr. Llorente annotates the change in the nature of the defendant's admission to the crime in his 2011 report.  So you saw that?

A   Yes.

Q   The second, what I would call, material falsehood is that when interviewed in 2006, the defendant, Mr. Sinisterra, denied any involvement with law enforcement, particularly authorities in Columbia; whereas, in 2011 he has admitted that, yes, he did have prior law enforcement contact.  So much so

that while in Cali he had gotten in a boy's home. I'm not sure what they were called. Orphanage, some type of disciplinary facility for youth for stealing?

A     Yes.

Q     That there were other contacts in Houston involving drugs and, I believe, a homicide where he might have gotten shot?

A     Yes, I'm aware of that.

Q     All right. So it seems to me that you're putting some significant stock in his latter reports that he felt that he had to go along for his family's safety when he had previously offered that up falsely to Dr. Llorente?

A     Okay. I'm not sure what the question is.

Q     Well, does it change your opinion -- it seems to me, Doctor, you've put a lot of stock in the defendant's statements to you that he felt he had to go along with the homicide or his family would be in danger in Columbia. You call that the duress situation, correct?

A     Yes.

Q     Does it change your opinion in any way that he previously used that very similar excuse with Dr. Llorente for even being involved in this case when he said he falsely confessed to the crime for the same reason, fear for his family?

A     Yes. I'm aware of that.

469

Q     Does it change your opinion to know that the thing that you rely upon very strongly is a similar falsehood he previously provided another medical professional, that being Dr. Llorente?

A     Well, it doesn't really change anything from the purpose of my understanding it.  You know, it developed over a period of time.  So the first one was in 2005 when he said this, and I really can't explain to you, as I'm sitting here today, why he would say that to Dr. Llorente in 2005, then change his story later and tell me something a little different.  I can't explain that.  But it doesn't take away from the -- from what I feel the validity of what he told me I saw in 2011.

Q     But if he was to tell you another falsehood and you're describing that to the duress of the situation, if that duress doesn't truly exist, that kind of changes the inventory of coping mechanisms he could have employed such as flight, doesn't it?

A     To a slight degree, yes.  When you're under duress, PTSD is worse, cognitive functioning is worse, but it doesn't -- the absence of duress hypothetically doesn't remove the condition.  It doesn't give better executive functioning.  And so, yes, it is something that may be taken into consideration, but I don't see it as being a major factor.

Q     Well, but you just moments ago said it was a major

470

factor when I asked you why he didn't employ the coping mechanism of flight in 1998 which he previously had employed a half a dozen times or more and you said duress. So I'm suggesting duress doesn't exist. Past behavior being an indication of future behavior seems to me that flight was a perfectly valid option for him.

A    I think I said the duress was part of it, but that -- he still was suffering from cognitive impairments and PTSD at the time. So it wasn't just that he was under duress and then was unable to formulate a flight plan.

Q    I'm with you. But didn't you say that the PTSD and the static encephalopathy were chronic situations that endured during the same periods of time he previously employed the coping mechanism of flight?

A    Yes.

Q    I thought the only difference in 1998 was the added element of duress and fear for his family.

A    And that was an added element, yes.

Q    That's why I was asking. My concern still comes back that if that duress that he's indicated to you is false, we should be able to reasonably conclude or assume that he would be able to act in the manner he previously acted before?

A    Not necessarily. I understand your line of questioning but, again, the duress doesn't make it or break it. I mean, it's certainly a factor that I took into consideration in

471

trying to understand the fact that he didn't flee.

MR. VALENTI: Your Honor, that's all I have. Thank you.

THE COURT: Thank you.

Mr. Gabrielsen.

REDIRECT EXAMINATION BY MR. GABRIELSEN:

Q     With respect to the point Mr. Valenti was making about, I guess, onset of concern for the family and what you might say to keep them out of harm's way, isn't it also true that the concerns for his family certainly could have been formulated well before this trip to Kansas City?

A     How do you mean?

Q     I mean in this sense: The facts that came out at trial indicated that one of the leaders of La Oficina was from Buenaventura. Sinisterra was from Buenaventura. German knew that these people were from his hometown. He knew they had people in proximity to his family. Is it possible or even likely that he always had some fear that in dealing with these people that his family may have been in harm's way just by virtue of his daily contact or however often his contact was with members of La Oficina?

A     Yes. You're right. And there's another factor that I -- that didn't come up in cross, that one of the victims, the one that wasn't killed, I believe was the brother of a girlfriend of Mr. Hinestroza.

472

Q     That's correct.  Your recall is exactly right on that.

A     And so here is Mr. Sinisterra going with the situation that these guys are willing to kill the brother of his girlfriend.  This is some pretty serious stuff.

Q     Excuse me for a second.  Okay.  Mr. Valenti has indicated to me that his recall is that it's the nephew of the girlfriend, but it's still a relative for our purposes.

A     Okay.  Relative.  A relative.

Q     So I'm sorry.  I distracted you from the point you were making.  You were saying that Sinisterra thought that if Hinestroza would kill the nephew of his girlfriend and then what did that imply?

A     I mean, even as Mr. Valenti was saying, taking away the other duress, and I don't know if you necessarily take it away, but I mean you showed this guy is ready to kill a relative of his girlfriend.  I mean, to me that's a very, very powerful message that he got down there in the basement at that moment.  This is some pretty serious stuff.

Q     That Hinestroza might think German's life is at least as dispensable or disposable, rather, as Borja-Molina's life?

A     Yes.

Q     Mr. Valenti asked you about the lack of evidence as to whether there was abuse of German very early in his life because as the testimony in the record and these proceedings show the onset of abuse started at a fairly early age.  And you

473

talked about premorbidity and -- well, let me ask you this: Even in the absence of proof that there was no abuse premorbidity or prior to the first act, do practitioners in mental health such as yourself, are you able to diagnose children or even adults, I suppose for that matter, with posttraumatic stress disorder even if you don't have the premorbidity baseline?

A      Yes, you do, and you look at the current level of symptoms in the hyperarousal.  That's basically that one category.  I think it's category D.  The literature suggests that is what you have to do if you are unable to establish a pretrauma baseline.  But otherwise you would be excluding huge numbers of people from being properly diagnosed if you couldn't take that into consideration.

Q      You would be unfairly excluding them?

A      I believe so.

Q      Because there may be reasons of therapy or other things they need that you might deprive them of if you make the incorrect diagnosis because of that one factor?

A      Yes.

Q      Mr. Valenti asked if you were aware that Mr. -- that German offered to commit a homicide for the 16-year-old kid, Borja-Molina.  Do you remember him asking you questions about that?

A      Yes.

474

Q     Would it surprise you if I said there's nothing in the record that corroborates that that offer was ever made?  It was simply made by Borja-Molina to law enforcement in this case?

A     I'm not sure of the question.

Q     The question is, would it -- does it make any difference to you with respect to that fact -- it seems to me you were -- you testified to sort of diminished significance of that fact if the threat were made, but that's not really -- the fact is only established to the extent that the government's primary witness in this case made that allegation, but there's no other evidence to support it and so either way does that make a difference in your consideration?

A     Well, I think, you know, the government's going to play by the same rules I have to, which you certainly take into consideration what the guy said, but there's no corroborating information, then that doesn't carry as much power or weight as something that the person reports and then can be shown -- can be validated by outside sources.

Q     And if we're looking at collateral information that would either support or undermine the assertion Molina made as to this offer in the regard you're just discussing having as much information as possible, would it be useful for you to know also that he was in this country illegally and after he testified against German was allowed to remain in this country after that?

A    Well, you know, I don't have enough information to really say what all that is about.

Q    I guess this would be more argument, I guess, for counsel based on what the record does or does not show only to the extent that -- I'll stop right there.  I think we're getting maybe far afield of what we're here to talk about.

MR. GABRIELSEN:  I apologize, Your Honor.

Q    (By Mr. Gabrielsen)  Mr. Valenti was asking you whether the absence of flight when he was either ordered to or somehow agreed to go to Kansas City that because he fled in prior circumstances when there was stress whether he necessarily -- I think the implication he made some conscious, considered, deliberate, high mental level of functioning choice to go to Kansas City to participate with the cartel.  My question is, isn't a decision whether to flee in certain circumstances, isn't that a different question than whether you actually participated in the planning of a murder?

A    Yes.  I think the case of fleeing shows that he had what I will call a dysfunctional coping mechanism to deal with PTSD, just taking off; and then, on the other hand, it's a different situation whether or not he can participate in planning.  I think one is an example of a coping mechanism and the other is an example of the documented brain damage that he has.

Q    And with respect to the lack of flight in 1998, isn't

476

it also true that he knew who Hurtado and Hinestroza were?  He knew of the prevalence of weapons and such that he used in carrying out their business and might that element also have been coercive and caused him to not flee in that circumstance?

A    I think I testified earlier about my general understanding of how these organizations work is coercive by nature.

Q    And it's possible he thought they had tentacles that could reach out and get him and that flight maybe was not even available?

A    I couldn't answer that.  I don't know what he was thinking.

MR. GABRIELSEN:  Judge, one moment to consult with counsel.

THE COURT:  All right.

MR. GABRIELSEN:  That's all we have, Judge.

MR. VALENTI:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you, Doctor.  You're excused.  Mr. Gabrielsen does want you to remain available, though.

(Witness excused.)

THE COURT:  Is that all you have, Mr. Gabrielsen?

MR. GABRIELSEN:  That's all we have, Your Honor.

THE COURT:  All right.  And you want to call Special Agent Oyler?

477

MR. VALENTI: I do, Your Honor. I don't anticipate it being more than just a few minutes.

THE COURT: More than 15 minutes?

MR. VALENTI: I don't believe it will be that long.

THE COURT: Do you mind if we go ahead and take a break for lunch and come back and finish with that and then discuss where we go from here?

MR. VALENTI: Yes, sir.

THE COURT: All right. We'll be in recess until 1:15.

(The noon recess was taken at 12:10 p.m.)

AFTERNOON SESSION

THE COURT: Thank you. You can be seated.

Ready, Mr. Valenti?

MR. VALENTI: I am, Your Honor.

GOVERNMENT'S EVIDENCE

MR. VALENTI: At this time the government would like to call Special Agent Mike Oyler.

MICHAEL OYLER, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. VALENTI:

Q     Sir, could you briefly introduce yourself to the Court and remind the Court your role in this case.

A     Yes, sir. My name is Michael Oyler, O-y-l-e-r, Special Agent with the FBI assigned to the Kansas City division, and I was one of the original case agents of this investigation from

478

1996.

Q       I want to talk to you about this particular hearing. At my request did you go through and pull some documentary records as it relates to items that were seized off Mr. Sinisterra when he was taken into custody in Overland Park in 1988, as well as items taken from his truck as it was searched after he was taken into custody?

A       Yes, sir.  That's correct.

Q       I want to show you two packets of paperwork, first what's been marked as Government's Exhibit 1 for purposes of this hearing.  I'll show it to you on the Elmo in front of you assuming it will appear out.  Do you recognize that, sir?

A       Yes, sir.  That is a FBI 302 document, which is kind of a cover sheet for what's attached to it, which were items that were taken from Mr. Sinisterra when he was arrested by the Overland Park Police Department and those are the items that the FBI took seizure of when we picked up Mr. Sinisterra December 1st and transported him to this building.

Q       Now, Government's Exhibit 1, is that a packet of dockets -- or documents rather?

A       Yes, sir.

Q       Have you gone through that packet of documents?

A       Yes, sir.

Q       Does it appear to be an accurate representation of the items taken from Mr. Sinisterra as he was taken into custody in

1998?

A     Yes, sir.

MR. VALENTI:  For purposes of this hearing, Your Honor, I move to admit Government's Exhibit 1.

MR. JENAB:  No.

THE COURT:  Received.

Q     (By Mr. Valenti)  I don't want to go through every page in that, but in general what are we talking about in that packet of information taken from Mr. Sinisterra?

A     Yes, sir.  What we recovered from Mr. Sinisterra's person were documents.  For example, he had several receipts from the Easy Pawn Shop in Houston, Texas, with his name printed at the signature block.  We have several business cards with phone numbers handwritten on the front and the back.  We have things like Allstate membership card for insurance with his name.  We have an HMO insurance card with his name on it, other business cards, slips of paper with numerous phone numbers on them.

Q     In short, the kind of thing somebody would have in their wallet?

A     Yes, sir.

Q     I'm going to show you now what's been marked as Government's Exhibit No. 2, again, on the Elmo and ask if you recognize that document?

A     Yes, sir.  Exhibit 2 is an Overland Park Police

Department continuation report, and what this report is were documents that were seized through a State search warrant of a 1994 Mazda truck registered to Mr. Sinisterra that was seized on November 28th.

Q    Similarly, have you looked through that packet of documents to determine whether it appears to be a fair and accurate representation of the items seized when that warrant was executed?

A    Yes, sir.

MR. VALENTI:  For purposes of this hearing, Your Honor, I move to admit Government's Exhibit 2.

MR. JENAB:  Judge, with the exception of one page that I think Mr. Valenti is in fact going to inquire about, I have no objection.

THE COURT:  Thank you.

Received pursuant to later objection.

Q    (By Mr. Valenti)  Special Agent Oyler, I'm going to go to a page that Mr. Jenab mentions and show that page to you within the documents.  Do you recognize that page, sir?

A    Yes, sir.  That was a sketch provided by Detective Hobson of the Overland Park Police Department of an intersection of Nall where Menorah Medical Center was located.

Q    In context to this case, specifically it was a sketch showing a location where Herberth Andres Borja-Molina had a shotgun when he took his uncle, Julian Colon, to the hospital?

A    That's correct.

Q    That clearly was not in Mr. Sinisterra's truck when the warrant was executed?

A    That's correct.

Q    So this is a document that's been maintained but misfiled at some point by the Overland Park Police Department?

A    Yes, sir, that's fair.

Q    And we left it in there because in the original chronology of discovery provided it's numerically next in line so we haven't taken it out even though it probably doesn't belong there?

A    That's correct.

Q    Now, the rest of the documents in this packet, however, were either reports of or copies of things taken from Mr. Sinisterra's truck?

A    Yes, sir.

Q    Let's talk about various things.  First let's go to what's marked at the bottom as 412 that was located in the truck.  Do you see that document before you, sir?

A    Yes, sir.

Q    What is that?

A    That appears to be a North Harris Community College registration form in the name of German Sinisterra.  Basically to me it looks like Mr. Sinisterra's signing up for a basic class at the college which begins on August 29th of 1998.

482

Q    The registration fee for that class was how much?

A    It was zero.

Q    The address of the individual signing up for the class was what?

A    3615 Pine Ridge Lane in Houston, Texas.

Q    Do you recognize that address?

A    Yes, sir.  That was Mr. Sinisterra's home address.

Q    And other than what this document purports to be, you have no idea or information you can provide the Court whether he actually attended that class or not, can you?

A    That's correct.

Q    There are several -- in general what are the rest of the documents?

A    Yes, sir.  In general there is insurance applications in the name of Michelle Sinisterra, German Sinisterra.  There is a receipt for a pager number in the name of a John Caicedo, C-a-i-c-e-d-o, 3615 Pine Ridge Lane.  There's more insurance forms filled out for three vehicles in the name of Michelle and German Sinisterra.  There is a Walgreens pharmacy receipt in the name of German Sinisterra for some medicine with a receipt attached.  This is page 417 which shows paid cash.

Q    Let me stop you there, if I may, Special Agent.

A    Yes, sir.

Q    During the course of searching the Mazda pickup truck, was it ever able to be determined who the vehicle was

483

registered to?

A Yes, sir.

Q To whom was the vehicle registered?

A To German Sinisterra.

Q I'm going to show you what's marked as page 424 of that packet and ask if you recognize that particular series of documents?

A Yes, sir.

Q Page 424.

A Page 424 is a buyer's order and invoice from a car dealership in Houston, Texas. The purchaser is German Sinisterra. To me it looks like on March 19th of 1998 a '94 Mazda pickup truck was purchased.

Q Does that look consistent with the vehicle ultimately seized and searched by police in conjunction with this offense?

A Yes, sir.

Q And ultimately I believe the Mazda pickup truck was forfeited at the conclusion of the trial?

A Yes, sir.

Q I show you page 425. Is that some of the registration paperwork we were talking about?

A Yes, sir, from the Texas Department of Transportation just showing the registration of the vehicle, the '94 Mazda, in the name of German C. Sinisterra.

Q And corresponding then later insurance for that same

484

vehicle?

A    Yes, sir.  On page 431 you have the Texas insurance card.

MR. VALENTI:  I believe that's all the questions I have, Your Honor.

THE COURT:  Thank you.

Mr. Jenab.

MR. JENAB:  Thank you, Judge.

CROSS-EXAMINATION BY MR. JENAB:

Q    Agent Oyler, I will take the same order that Mr. Valenti did, so we'll start, if you don't mind, with Government's Exhibit 1.

A    Yes, sir.

Q    I want to ask you a few questions about some of the documents in Government's 1.  If we look first to the -- these pages aren't numbered but this is the fourth page?

A    Yes, sir.

Q    Which is a handwritten -- it looks like a note sheet. Do you have any idea who wrote this?

A    No, sir.

Q    Okay.  Do you see in this that there are -- even on the first line there's a reference to Dios or God?

A    Yes, sir.

Q    Then a couple lines down do you see a reference to the Virgin, a couple more lines down to the Virgin Mary, a couple

485

more lines down to St. Pablo, and then to St. Pedro?  If you look at the fifth or sixth line down do you see a reference there to Jesus?

A       Yes, sir.

Q       Then a little further down you also see a reference to Jesus Christ?

A       Yes, sir, I see that.

Q       Would it be fair to say this is probably some form of a prayer?

A       If my memory -- because I believe we did have this translated or looked at back in '98, '99, I believe it's like a prayer, like a Spanish prayer or South American prayer to God and the Virgin Mary and Jesus.

Q       It's not uncommon in Hispanic cultures for people to carry prayers like that sort of as good luck charms?

A       That is correct.

Q       That would be independent of whether they can actually even read the language, right, as far as you know?

A       Yes, sir.  I agree with that.

Q       All right.  If we go to these pawn shop receipts that you mention, the only thing that is handwritten on these is just a handwritten, not in cursive but in block letters, the name German Sinisterra; is that correct?

A       Yes, sir.

Q       And we begin about eight pages in with these notes that

486

you talked about with phone numbers and various items?

A     Yes, sir.

Q     So if we were to look at these various business cards and the various writing on these cards, including names and phone numbers, would it be fair to say that we see a lot of different handwriting in these different cards?  In other words, even as not being a handwriting expert, and I know you're not, but it's pretty clear that there are different people's handwritings on these different cards; would that be a fair statement?

A     Yes, sir, I would agree with that.

Q     Now, as we sit here, is it possible for you to say which, if any, of these would have been Mr. Sinisterra's own handwriting?

A     No, I cannot say that.

Q     Okay.  There is a -- if we go to the second to the last page of this exhibit, do you see here a Texas driver's license?

A     Yes, sir.

Q     That's in the name of German Sinisterra?

A     That's correct.

Q     You heard testimony earlier in this proceeding that Mr. Sinisterra, in fact, failed the driver's license examination and that another person took it for him and passed it; do you recall that?

A     I heard the testimony.

487

Q    Do you have any basis to comment either one way or the other on that testimony?

A    Other than the fact that I being the case agent for so long and talking to so many other people in this case that Mr. Sinisterra drove constantly in Houston, the long -- I guess it is a 12-hour drive up here, he drove around Kansas City.

Q    So no question that then, if I'm understanding you correctly, that Mr. Sinisterra could drive a car?

A    Yes.

Q    My question, though, was a little more specific and that is, do you have any reason to disagree with the testimony that he didn't in fact pass the written driver's examination?

A    I can't answer that.  I don't know if he passed it or failed it.

Q    That's all I wanted to find out.

A    Okay.

Q    If we look on this same page, there is a card that says employment authorization?

A    That's correct.

Q    Do you see that one?

A    Yes, sir.

Q    And that, again, is in Mr. Sinisterra's name, right?

A    Yes, sir.

Q    However, whoever filled that out actually misspelled his name, didn't they?

488

A      It looks like it's missing maybe a T or an I.

Q      So if Mr. Sinisterra himself wrote his name there, then he misspelled his own name; would that be correct?

A      Yes.  The last name Sinisterra is either missing an I or a T.  I don't know if he wrote that or not.

Q      All right.  If we could turn to Government's Exhibit 2, these are the items that were found in Mr. Sinisterra's truck. I want to first look at the registration form on page 412.  A couple of things I would want to ask you about this.  First, if you look down to the client's name area, that appears to me that writing is consistent with -- we can't quite see everything from this copy but it looks to be consistent with E-S-L basic one.  Does that look right to you?

A      It's either E-S-L or L-S-L which it might either be English or language.

Q      Yes.  Are you familiar that the term E-S-L is a short form of the phrase English as a second language?

A      I'm not familiar with that term.

Q      Okay.  Assuming then that this is a language class, that it is an English class, you'd agree that it is indicated as a basic one class?

A      Yes, sir.

Q      That would be an introductory course?

A      Yes.

Q      The date on this document is for a course to begin in

489

the fall of 1998; is that correct?

A    '98 but the starting date was August 29th.

Q    Sure.  Fall semester, right?

A    Correct.

Q    So in your knowledge of the case by August of 1998 how long had Mr. Sinisterra been in the United States?

A    Maybe six or seven years.

Q    All right.  So if he was taking an English class that was at the most basic level in 1998, that would have been after he'd had six or seven years of being in this country where English is the first language; is that correct?

A    Well, six or seven years he was here for the last time. He had come two other times.

Q    So, in fact, he had been here even more than the continuous period of time of the last six or seven years?

A    Yes.  Yes.

Q    And that, then, would be consistent with the testimony that we've heard at this hearing that Mr. Sinisterra has been unable to acquire proficiency in the English language?

A    Well, I would disagree with that.  I've seen the video of his interview with Kansas City, Missouri police.  He had no problem with that interview.  So I can't really answer to his proficiency.  He lived in Houston for six or seven years.  He had an American wife, had his children.  The things we found in his car and on his person shows someone that is living his life

490

in America.  I mean he has the same things in his wallet that I have in my wallet.  He has insurance cards, driver's license, phone number of friends, phone numbers of associates.  So that means he was proficient in English.  I can't give a technical answer but I'm comfortable to know that he was comfortable in this country living in Houston with an American wife, picking up prescriptions, getting a driver's license, driving around, going to classes, picking up fees.  I know that's a long answer.  It should have been a short answer.  But I can't -- in my opinion, I'm comfortable that he was proficient enough in English to live in this country and to live in Houston, Texas, and to raise children, and things like that.

Q     Let's talk about some of those things.

A     Checking out of hotels, things like that.

Q     First off, with respect to this registration form, is there any indication that Mr. Sinisterra ever attended this class?

A     I have no information about that.

Q     And obviously there's no indication on this form that this would be any sort of college credit class?

A     I don't have an answer to that.

Q     I mean it's no tuition?

A     That's correct.

Q     I mean it's a free class.

      All right.  Is there -- let me go to the next one.

491

All right.  Now, let's go to the next page which deals with insurance items, and there's an indication of a payment made on this auto insurance, correct?

A       Yes, sir.

Q       And that -- the indication is that payment was in fact made by Michelle Sinisterra?

A       That's correct.

Q       Now, do you have any information or evidence that Mr. Sinisterra had anything to do with the procurement of insurance for the automobile that he was stopped in?

A       That's a tough question to answer.  I don't have any evidence that he walked into this insurance -- now, this document shows that Michelle made a payment.  So, again, going back to my wife.  She's made payments.  I've made payments.  Do I have evidence that he actually obtained this evidence himself?  No, I don't.

Q       This page 415, do you have any reason to be able to identify who wrote any of this information on this page?

A       No, sir, I don't.

Q       And I'd ask the same question about page 416.

A       No, sir, other than his name and address with his wife's name but I don't have no idea who filled that out.

Q       And the first name written there is actually his wife's, not his, right?

A       Yes, sir.

Q    The page 417, this is a receipt from Walgreens, correct?

A    Yes.

Q    And all that this indicates is that he picked up medication, correct?

A    Well, somebody on October 26th paid cash for that prescription. I don't know who picked it up.

Q    That could have been either him or his wife or someone else?

A    That's correct.

Q    And, again, with respect to procurement of health insurance coverage, do you have any indication that was something that Mr. Sinisterra personally did or whether that was something that Michelle Sinisterra did?

A    No, I have no information on that.

Q    The page 419, this appears to be an automobile insurance policy. Does that sound correct?

A    Yes, sir.

Q    And, again, on this form, this is that Amko Company that we saw before, right, that Michelle made a payment on?

A    Yes, sir.

Q    And in this document it indicates that the named insured is actually Michelle Sinisterra, correct?

A    Named insured, mailing address, and then further down it shows the name of the two drivers.

493

Q    Correct. But the named insured is Michelle?

A    That's correct.

Q    Mr. German Sinisterra is listed as an authorized driver?

A    Yes, sir.

Q    The next few pages, again, are just auto insurance policy documents, correct?

A    Yes, sir.

Q    And then, again, where there is a payment made on page 421 it indicates that that payment was from Michelle?

A    $15 payment, yes, sir.

Q    And we are agreed, of course, that page 423 was simply inadvertently added?

A    Correct.

Q    Now, page 424, this buyer's order and invoice, any idea who inserted the handwriting on this document?

A    No, sir.

Q    Actually if you go down and look at the buyer's signature on that document, it's actually not signed?

A    It's blank, yes, sir.

Q    Now, the page 425 is a title and registration document. Would it be correct or fair to say that you don't have any idea who actually paid that and sent the payment in?

A    No, sir.

Q    That is correct to say, right?

494

A       Yes.

Q       Page 427, we have another payment on that Amko policy and, again, that one is made by Michelle; is that correct?

A       That's correct, for $65.

Q       428, same thing?

A       For $65, yes, sir.

Q       Those two pages appear to be duplicate copies of the same payment, don't they?

A       I think you're right, yes, sir.

Q       Then we do have another payment, though, on page 429?

A       Yes, sir.

Q       And that one, again, was made by Michelle?

A       That's correct.

Q       The final page, 431, Texas liability insurance, Allstate property and casualty, that lists Michelle Sinisterra first and then German Sinisterra and that does cover three vehicles, including the '94 Mazda; is that right?

A       Yes, sir.

Q       And, again, we don't have any information as to who actually took out that policy?

A       That's correct.

Q       You have -- you, of course, were the case agent at the trial and heard the testimony?

A       Yes.

Q       Do you recall when Michelle Sinisterra testified that

495

German was never able to complete any courses in English?

A   She testified to that?  I don't remember that.

MR. JENAB:  Judge, I'm sorry.  I thought we had found that portion of the transcript but it was a lengthy one and we weren't able to find that portion.  We just ask the Court to take judicial notice of the evidence that was presented at the prior proceeding.

THE COURT:  Request granted.

Q   (By Mr. Jenab)  We're going to pull up one piece of, just very briefly, the transcript from Michelle Sinisterra's testimony.  To refresh your recollection Mr. Oyler, Ms. Sinisterra testified that German was never able to fill out an application because he could not read or write English, nor can he read or write Spanish.  So she would do that work.  Do you have any basis to contest the accuracy of that testimony?

A   I mean I would contest, again, being the case agent for so long to fill out an application.  There are some things he has filled out.  When we talked about the pawn shop with his printed signature, that's his signature because he's used that same signature when he signed his Miranda form, things like that.

Q   Let's pull that up.  I'll pull that up again and we can talk about it briefly.  Are these the forms you were talking about?

A   Yes, sir.  I mean, I'm familiar with that signature.

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 103 of 110

I've seen that signature before on other documents by Mr. Sinisterra.

Q     Sure.  Right.  I guess my point was that it's only his signature?

A     That's correct.

Q     I mean, in other words, he didn't fill out a lengthy application, provide information, biographical data, things like that.  This document has his signature but that's all?

A     That's correct.

Q     That's all he added to it?

A     Yes.

MR. JENAB:  Judge, just for the record, that excerpt that I read was from page 2623 of the trial transcript.

THE COURT:  Thank you.

MR. JENAB:  Thank you, Your Honor.

MR. VALENTI:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you, Special Agent Oyler.

THE WITNESS:  Thank you, Judge.

(Witness excused.)

MR. VALENTI:  We don't have anything further, Your Honor.

THE COURT:  I don't know that in this proceeding it's really necessary to do so.  I suppose that the only claim that Mr. Sinisterra might have of postconviction counsel would

497

be one of abandonment.  I think a person would be hard pressed to make that.

I would like to make a record of whether or not Mr. Sinisterra would like to testify at this proceeding.  Would you like to take a moment to advise him of what the procedure's going to be, and then I'll ask a few questions along those lines to make sure he understands that right and what his decision is about that?

MR. JENAB:  Yes.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. JENAB:  Your Honor, would you like me to bring Mr. Sinisterra to the podium?

THE COURT:  No.  That's fine.  He can stay where he is and he can remain seated.

I would like to place Mr. Sinisterra under oath, though, if you would please, Tracy.

GERMAN C. SINISTERRA, being sworn by the courtroom deputy, testified:

THE COURT:  Thank you.

Mr. Sinisterra, do you understand that you have a right to decide whether you wish to testify in this proceeding or not?

THE DEFENDANT:  Yes.

THE COURT:  And have you had an opportunity to discuss the matter of whether you wish to testify or not with

Case 4:04-cv-08003-GAF   Document 122   Filed 02/19/13   Page 105 of 110

your attorneys, Mr. Jenab and Mr. Gabrielsen?

THE DEFENDANT: Yes.

THE COURT: And have you made the decision, sir, as to whether you wish to testify or not in this proceeding?

THE DEFENDANT: No.

THE COURT: Have you decided that you do not wish to testify? Is that what you are telling me?

THE DEFENDANT: Yes. I don't. No.

THE COURT: Just to make sure we're clear. You've discussed this with your attorneys and it's your decision that you do not wish to testify; is that correct?

THE DEFENDANT: Correct.

THE COURT: And do you understand that that decision is for you to make, not for your attorneys to make for you; do you understand that?

THE DEFENDANT: Yes.

THE COURT: And have you made this decision of your own free will?

THE DEFENDANT: Yes.

THE COURT: Do you feel that anyone has attempted in any way to force you to decide not to testify?

THE DEFENDANT: No.

THE COURT: All right. Thank you.

Just for the record, Mr. Jenab, have you discussed this with Mr. Sinisterra?

499

MR. JENAB: Yes, Your Honor.

THE COURT: And you are confident that Mr. Sinisterra understands his right to decide whether to testify or not?

MR. JENAB: I do.

THE COURT: And do you agree with Mr. Sinisterra's decision to exercise his right not to testify?

MR. JENAB: Yes, Your Honor.

THE COURT: All right. Thank you.

Well, I'd like for you each to submit proposed findings of fact and conclusions of law for me, and I would like to suggest that counsel do that on or before February 22nd. Is that sufficient amount of time for you? If you need more time, that's fine.

MR. GABRIELSEN: Your Honor, I think it would be our preference to have maybe transcripts at hand to be able to cite Your Honor to testimony, and such. So we'll place the order immediately to have that produced. We could try to live within the Court's ruling; but if we find the transcripts are a little late in coming and we need more time, could we approach Your Honor?

THE COURT: Yes. Well, there is no point in crowding you all in having to do that. So why don't we say 30 days. That's close to February the 22nd, but let's say -- well, let's say March 15th. Is that agreeable with everyone?

MR. JENAB: That would be plenty of time.

THE COURT: All right. On or before March 15th please submit your proposed findings and conclusions, and I'll take the matter under advisement pending my review of the evidence and consideration of your suggestions.

I would like to say, and Mr. Gabrielsen, I've worked with all of these attorneys before and they're all fine attorneys. I've appreciated having you here in the courtroom. I've appreciated the professionalism with which you've approached matters and the courtesy that you've extended to everyone. It seems obvious to me that all counsel have endeavored to work together and cooperate with each other in a professional manner and I appreciate your professionalism in that regard. So thank you very much.

MR. GABRIELSEN: I would like to speak for a second. I would like to thank Your Honor for all the courtesies that you've extended to us. Also thank Tracy and the rest of your staff for making this much easier for us to come before Your Honor and present our case with very few glitches. Also thank Jeff and Lajuana. As Your Honor knows, we never had a status conference or anything, yet we were able to come this morning or all week this week and present a case to Your Honor without really have any major glitches. We were able to work out most of our problems on our own. And I just want to thank everybody that was involved on this and for all those considerations.

501

THE COURT: Well, all right. Thank you very much. And I hope that it's warmer for you when you get back home.

MR. GABRIELSEN: Thank you, sir.

(Adjournment)

502

REPORTER'S CERTIFICATE

I, Katherine A. Calvert, Registered Merit Reporter, hereby certify that I am a duly appointed, qualified, and acting official court reporter for the Western District of Missouri; that on January 22, 2013, through January 25, 2013, I was present and reported all of the proceedings in GERMAN C. SINISTERRA, Movant, vs. UNITED STATES OF AMERICA, Respondent, No. 04-CV-08003-GAF.

_____, RMR
Registered Merit Reporter

Dated this 19th day of February, 2013.

503